## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GENESEE COUNTY EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>                     Plaintiff,<br><br>          v.<br><br>KORNIT DIGITAL LTD., RONEN SAMUEL, and ALON ROZNER,<br><br>                     Defendants. | Case No. <br><br>__CLASS ACTION__ <br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br>__JURY TRIAL DEMANDED__ |

Plaintiff Genesee County Employees' Retirement System ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, *inter alia*, the investigation of its counsel, which included review and analysis of: (i) regulatory filings made by Kornit Digital Ltd. ("Kornit" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, presentations, and media reports issued by and disseminated by the Company; (iii) analyst and media reports concerning Kornit; and (iv) other public information regarding the Company.

## INTRODUCTION

1.      This securities class action is brought on behalf of all persons or entities that purchased or otherwise acquired Kornit ordinary shares between February 17, 2021 and July 5, 2022, inclusive (the "Class Period").  The claims asserted herein are alleged against Kornit and certain of the Company's current and former senior executives (collectively, "Defendants"), and

arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2.     Kornit designs and manufactures industrial digital printing technologies for the garment, apparel, and textile industries.  The Company's digital inkjet printers enable end-users to print both direct-to-garment ("DTG") and direct-to-fabric ("DTF").  In DTG printing, designs and images are printed directly onto finished textiles such as clothing and apparel.  In DTF printing, large rolls of fabric pass through wide inkjet printers that print images and designs directly onto swaths of fabric that are then cut and sewn into a product, and can be used in the fashion and home décor industries.  Kornit also produces and sells textile inks and other consumables for use in its digital printers.  Through customer support contracts, Kornit also provides customer assistance and equipment services for its printers, including technical support, maintenance, and repair.

3.     During the Class Period, the Company also began offering software services to its customers, including a suite of end-to-end fulfillment and production solutions, called KornitX, through which the Company provides, among other things, automated production systems and workflow and inventory management.

4.     The Company's largest customer is multinational e-commerce company, Amazon.com, Inc. ("Amazon").  Among the largest of Kornit's other customers during the Class Period were Delta Apparel, Inc. ("Delta Apparel"), a leading provider of activewear and lifestyle apparel products, and Fanatics, Inc. ("Fanatics"), a global digital sports platform and leading provider of licensed sports merchandise.  Kornit generates more than 60% of its revenues from its ten largest customers.  Accordingly, it was critically important for Kornit to maintain those major customers as well as continue to grow its customer base in order to achieve the Company's ambitious goal of "becoming a $1 billion revenue company in 2026."

5.     Throughout the Class Period, Kornit repeatedly touted the purported competitive advantages provided by its technology and assured investors that it faced virtually no meaningful competition in the "direct-to-garment" printing market.  The Company also represented that there was strong demand for its digital printing systems, consumable products, such as textile inks, as well as the services Kornit provided customers to maintain and manage its digital printers, and to manage customer workflow.  Kornit further assured investors that the purportedly strong demand for the Company's products and services would enable it to maintain its existing customer base and attract new customers that would limit the risks associated with a substantial portion of its revenues being concentrated among a small number of large customers.

6.     These and similar statements made throughout the Class Period were false.  In truth, Kornit and its senior executives knew, or at a minimum, recklessly disregarded, that the Company's digital printing business was plagued by severe quality control problems and customer service deficiencies.  Those problems and deficiencies caused Kornit to cede market share to competitors, which, in turn, led to a decrease in the Company's revenue as customers went elsewhere for their digital printing needs.  As a result of these misrepresentations, Kornit ordinary shares traded at artificially inflated prices throughout the Class Period.

7.     Investors began to learn the truth on March 28, 2022, when Delta Apparel and Fanatics—two of Kornit's major customers—announced that for months they had collaborated with one of Kornit's principal competitors to develop a new digital printing technology that directly competed with products and services Kornit offered.  Delta Apparel revealed that it had already installed this new technology in four of its existing digital print facilities and had plans to expand further.  The utilization of this new, competing technology by Delta Apparel and Fanatics reflected the widespread dissatisfaction of Kornit's major customers with the Company's product

quality and customer service, and meant that Kornit would likely lose revenue from two of its most important customers.

8.      On May 11, 2022, despite reporting revenues that exceeded expectations, Kornit reported a net loss of $5.2 million for the first quarter of 2022, compared to a profit of $5.1 million in the prior year period.  The Company also issued revenue guidance for the second quarter of 2022 that was significantly below analysts' expectations.  Kornit attributed its disappointing guidance to a slowdown in orders from the Company's customers in the e-commerce segment.  In addition, the Company admitted that, for at least the previous two quarters, Kornit knew that one of its largest customers, Delta Apparel, had acquired digital printing systems from a Kornit competitor.  As a result of these disclosures, the price of Kornit ordinary shares declined by $18.78 per share, or 33.3%.

9.      Then, on July 5, 2022, after the market closed, Kornit disclosed that it would report a sizeable shortfall in revenue for the second quarter of 2022.  Specifically, Kornit expected revenue for the second quarter to be in the range of $56.4 million to $59.4 million, far short of the previous revenue guidance of between $85 million and $95 million that the Company provided less than two months earlier, in May 2022.  Kornit attributed the substantial revenue miss to "a significantly slower pace of direct-to-garment (DTG) systems orders in the second quarter as compared to our prior expectations."  As a result of these disclosures, the price of Kornit ordinary shares declined by an additional $8.10 per share, or 25.7%.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's shares, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 (17 C.F.R. § 240.10b-5), promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.     Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b).  Kornit maintains its U.S. headquarters and conducts operations in this District.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13.     Plaintiff Genesee County Employees' Retirement System is a multi-employer defined benefit plan that provides retirement and survivor benefits for employees of Genesee County, Michigan.  As indicated in the certification submitted herewith, Plaintiff purchased Kornit ordinary shares at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

14.     Defendant Kornit is based in Israel and is incorporated under the laws of Israel. Kornit maintains its U.S. headquarters at 480 South Dean Street, Englewood, New Jersey.  The Company's ordinary shares trade on NASDAQ under the ticker symbol "KRNT."  As of November 14, 2022, Kornit had over 49 million ordinary shares outstanding, owned by hundreds or thousands of investors.

15.     Defendant Ronen Samuel ("Samuel") is, and was at all relevant times, Kornit's Chief Executive Officer.

16.     Defendant Alon Rozner ("Rozner") was, at all relevant times, Kornit's Chief Financial Officer, having served in that role from December 2020 until November 2022.

17.     Defendants Samuel and Rozner are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with Kornit, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## BACKGROUND

18.     Kornit designs and manufactures digital printing solutions for the fashion, apparel, and home goods segments of the printed textile industry.  The Company's digital printers utilize a unique technology which enables them to print both directly on finished garments and directly on large rolls of fabric that is then cut and sewn together.  Unlike other textile printers, Kornit's digital inkjet printers can print on any material without the use of chemicals.  This significantly limits the consumption of water during the production process and yields less waste, thereby having a less harmful impact on the environment.

19.     The Company generates revenue from sales of its printing systems as well as textile inks and other consumables for use in its digital printers.  Kornit also provides equipment services to end-users of its printers through customer support contracts, including technical support, maintenance, and repair.  In addition, during the Class Period, Kornit expanded its business and began offering software services to its customers, including KornitX, a suite of end-to-end fulfillment and production solutions.  Through KornitX, the Company provides customers with, among other things, automated production systems as well as workflow and inventory management.

20.     Kornit's largest customer is e-commerce company, Amazon.  Kornit's other large customers during the Class Period included apparel and activewear brand, Delta Apparel, as well as Fanatics, a provider of licensed sports merchandise.  The Company's ten largest customers account for more than 60% of Kornit's revenues.  Because such a sizable portion of Kornit's revenues is concentrated among its largest customers, it was crucial that the Company maintain business with its largest customers and continue to expand its customer base in order to achieve Kornit's lofty goal of generating $1 billion in revenue by 2026.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

21.     The Class Period begins on February 17, 2021, the trading day after Kornit announced its financial results for the fourth quarter and full year ended December 31, 2020.  In the press release issued by Kornit on February 16, 2021, after the market closed, which the Company also filed with the SEC on Form 6-K, Defendant Samuel stated that "[t]he massive leap in e-commerce and the exposed inefficiency of the traditional textile supply chain is accelerating the digital transformation that Kornit is leading."  Defendant Samuel further represented that "[w]e

see new and existing customers significantly expanding production capacity globally, and our recurring consumables business is growing strongly."

22.     That same day, Kornit held a conference call with analysts and investors to discuss the Company's financial results for the fourth quarter and full year of 2020.  During the call, Defendant Samuel touted the Company's "phenomenal execution" in 2020, "demonstrating the accelerating demand for our products and the continued execution of our team."  Defendant Samuel also emphasized that the Company's "[s]ervices [business] continue[d] to outperform our expectation on growth and profitability," and led investors to believe that this was the result of "the execution of our customer success teams."

23.     During the call, Defendant Samuel stated that its new business line, a "unique" cloud-based software workflow service platform called KornitX, was, even in its early stages, "experiencing huge interest from brands and fulfillers looking to adopt on-demand business models at a global scale, as well as automate and optimize the production flows."  Defendant Samuel stated that this provided the Company with "a huge opportunity for Kornit to build an incremental recurring business model, and we have an exciting roadmap of new software application and value-added services."

24.     During the call, Defendant Samuel also claimed that the Company was strongly positioned to sustain its revenue growth in 2021 and beyond because of "accelerating industry tailwinds and [an] impressive backlog of global expansion project[s] with strategic accounts that we are in [the] process of fulfilling and an extremely robust pipeline."  Specifically, Defendant Samuel touted the Company's "significant strategic initiatives," stating that, among other things: "We will scale our new software workflow business line.  We will execute on massive global expansion with our strategic accounts, and we will expand our footprint in key segments to grow

our activities with mega brands as well as penetrate new market verticals while continuing to drive customer success."

25.     Throughout the Class Period, Kornit and its senior executives continued to tout its purportedly superior technology as a competitive advantage and claimed that it faced virtually no competition in its core direct-to-garment printing business.  Kornit also assured investors that it had strong visibility of the needs of its customers and that its products and services met the expectations of those customers, including by having a purportedly strong pipeline for recurring revenues through its KornitX business line.  For example, during an investor meeting Kornit hosted on May 18, 2021, at which Defendants Samuel and Rozner participated, Defendant Samuel stated that KornitX is "about to become the standard for on-demand production."

26.     Also, during the investor meeting, Defendant Rozner touted the strength of Kornit's business model, stating "Kornit today has [a] very strong financial model with robust and growing recurring revenues."  Defendant Rozner also stated that "our system revenue grow[s] very fast which is fantastic and as we grow our installed base over the years, we expect consumable and software solutions to grow faster."  Specifically, in discussing the Company's services revenues, which includes the KornitX business line, Defendant Rozner represented that "we already see the huge value [KornitX] brings to our customers and the potential for us" and "expect KornitX to generate approximately $100 million of revenues in 2026 at a very high profitability."

27.     The next day, on May 19, 2021, Defendants Samuel and Rozner participated in the Barclays Americas Select Franchise Conference on behalf of Kornit.  During the conference, Defendant Samuel boasted that the Company had "about 1,000 customers all around the world using our technology.  Within them, very big companies like Amazon, like Fanatics and . . . Adidas . . . and many other big companies, many of them using hundreds of our systems."  Defendant

Samuel further represented that "if we're talking about the [direct-to-garment market] and we're talking about the industrial space, the space that we are focusing on, we don't see today any [competitor] that we can say that it's any threat on us" and "this is . . . mainly due to the moat that we manage[d] to build around our technology."

28.     Also, during the conference, Defendant Samuel stated that "[w]e really have unique technologies that no one has" and this "provides . . . a huge differentiator."  Defendant Samuel also represented that, just two years after launching its direct-to-fabric printing technology, called Presto, Kornit was "already a market leader" in the direct-to-fabric printing market, stating "the market leadership is because, again, [of] the technology."

29.     On June 1, 2021, Defendants Samuel and Rozner participated in the William Blair Growth Stock Conference on behalf of Kornit.  During the conference, in response to an analyst's question about the competition Kornit faced, Defendant Samuel stated that "this is not something that we are worried about" and "we know what is coming in the future is that bringing the next level of technology."  Defendant Samuel explained that some of the digital ink jet printers produced by competitors require different processes than what Kornit uses and stated that "[t]he level of the quality is not the same."  Defendant Samuel further represented that "it's not only the technology" that differentiates the Company from its competitors, but it is Kornit's ability "to service and support our customers, having an install base of more than 1,200 customers within them."

30.     Also, during the conference, Defendant Samuel sought to further assuage investor concerns about competition, stating that "[t]he biggest customers of the world, if it's [ ] Amazon or [ ] Adidas, that already tested . . . our technology, approved it and [are] going with us" and so "[i]t will be very difficult to enter there."  Defendant Samuel also represented that the Company's

software and workflow solutions would allow Kornit to realize "very strong stickiness" with customer retention, stating that "[o]nce customer[s] [for which] we are managing their production flow and brands are using this workflow to connect to our customers, this is the strongest stickiness that you have . . . to the company and our technology."

31.     On June 10, 2021, Defendants Samuel and Rozner participated in the Citi Silicon Valley Tech Virtual Tech Bus Tour on behalf of Kornit.  During the call, in response to an analyst's question about Kornit's customers, including Amazon, Adidas, and Fanatics, that have used Kornit's products, Defendant Samuel stated that "Kornit is actually the perfect fit for all of them providing the on-demand sustainable production with no limitations."  Defendant Samuel continued his response, stating:

> And we see huge growth [ ] from net new and from our top 10 customer[s]. Our top ten customer[s] today represent about 60% of our business. The nice thing is that they continue to grow, continue to grow very fast with a very aggressive plan, while we are having many newcomers with potential to become really large customers for Kornit moving forward.

32.     Also, during the conference, Defendant Samuel touted KornitX as "a breakthrough . . . that [ ] will change the market" and told investors that "[w]e see great adoption on the KornitX" by customers.  Accordingly, Defendant Samuel represented that KornitX was already poised "to be [a] $100 million software [as a service] business . . . by 2026."

33.     During the conference, in describing Kornit and the purported opportunities ahead, Defendant Samuel stated:

> I don't think there are many companies with such an opportunity of disrupting end markets with such an amazing technology, with a total market leadership both on the technology, installed base with the leading brands and marketplaces of the world, with [a] track record of execution, with a clear vision moving forward with all the market trends fulfilling our growth that we have discussed, with limited competition and also on the horizon.

34.     On August 10, 2021, Kornit announced its financial results for the second quarter ended June 30, 2021.  In the press release issued by Kornit, which the Company also filed with the SEC on Form 6-K, Defendant Samuel stated that "[o]ur pipeline and visibility have never been stronger as the industry accelerates its digital transformation with Kornit leading the way." Defendant Samuel also stated that "[w]e are more confident than ever in our outlook for the remainder of this year and into next year," leading investors to believe that Kornit was "well on [its] way to becoming the operating system for on demand sustainable fashion and a $1 billion revenue company in 2026."   In the press release, Defendant Rozner touted the Company's "exceptionally strong second quarter results" which were "due in part to continued momentum with our global strategic accounts" and that this strong performance "further validates our strategy."

35.     That same day, Kornit held a conference call with analysts and investors to discuss the Company's financial results for the second quarter of 2021.  During the call, Defendant Samuel touted "very strong growth not only in our systems and consumables businesses but also in our service organization" and "very strong growth with key customer[s] as well as with net new customers."  Defendant Samuel then assured investors that "our pipeline has never been stronger," including with the KornitX business line where the Company "continue[s] to see great momentum."  In response to an analyst's questions about KornitX, Defendant Samuel stated that "we have a big long list of orders for more than 80 projects right now to implement the KornitX both with fulfillers that would like to join the network both with marketplaces, with brands" and "[t]here's huge interest also from the retail environment."  Defendant Samuel further represented that "we are very, very pleased with the adoption of KornitX and the vision that we are driving and the change we are driving in the marketplace."

36.     On November 10, 2021, Kornit announced its financial results for the third quarter ended September 31, 2021.  In the press release issued by Kornit, which the Company also filed with the SEC on Form 6-K, Defendant Samuel touted the Company's "phenomenal third quarter performance" and stated that "Kornit is leading the digital transformation the fashion industry must make with innovative solutions that break the barriers between imagination and physical applications."  Defendant Samuel also stated that "[w]e enter 2022 with very strong business fundamentals supported by broad-based demand for our industry leading solutions" and "[t]his growing demand and market acceptance puts us firmly on the path [to] becoming a $1 billion revenue company in 2026."  Similarly, Defendant Rozner stated that "[w]e are focused on ending the year strong and supporting our customers to ensure they are ready for their peak season" and "enter 2022 in a phenomenal position with outstanding business fundamentals, a robust backlog and strong pipeline."

37.     That same day, Kornit held a conference call with analysts and investors from its Customer Experience Center in New Jersey to discuss the Company's financial results for the third quarter of 2021.  During the call, Defendant Rozner touted Kornit's "great progress with new customers, while continuing our very strong momentum with large strategic customers, which we expect to continue for the balance of 2021 and throughout 2022."  During the call, in response to an analyst's question about KornitX, Defendant Samuel stated that "we have great, great feedback from many, many brands, retailers, marketplaces" and "[w]e believe KornitX will be a major driver of growth and change for this industry" and "[w]e see [ ] very strong adoption."  Defendant Rozner also touted the success and profitability of the Company's service business and represented that it "will continue to be as such," emphasizing that "[w]e are investing a lot in customer support" and "building a very strong management team for KornitX."

38.     Also, during the call, Defendant Samuel represented that "customer success and customer support are super important for Kornit, not only for the success of our customers, but in terms of the growth engine for the future."  As a result, Defendant Samuel told investors that Kornit was positioned for "massive growth both in revenue and in terms of profitability on the customer success line of business."

39.     On January 10, 2022, Defendants Samuel and Rozner participated in the Needham Growth Conference on behalf of Kornit.  During the conference, Defendant Samuel represented that the Company was "entering very, very strong into 2022" and had "massive momentum coming from both existing customers and many new customers both in the [direct-to-garment] and in the [direct-to-fabric markets]."  During the conference, Defendant Samuel also described the Company's KornitX service as "the secret sauce of Kornit" that would "drive Kornit to a multi-billion-dollar revenue company in the next coming years, so beyond 2026."  Defendant Samuel further stated that "KornitX is already generating multi-million-dollar revenue on transaction[s] to Kornit, and the aim is to scale it very quickly."

40.     On January 12, 2022, Defendant Samuel participated in the CJS Securities New Ideas for the New Year Conference on behalf of Kornit.  During the conference, Defendant Samuel touted the Company's network of more than 1,300 customers, including "some of . . . the biggest companies of the world.  Amazon is our biggest customer using many, many, many systems of Kornit all around the world, but many other customers like [A]didas and Fanatics and then Stakes and DSG . . . and many, many other[s], both from leading brands and fulfillers and marketplaces that are using our technology."  Defendant Samuel also represented that "we have the best technology by far versus any other technology in the [direct-to-garment printing space], and we feel the same thing also on the [direct-to-fabric printing] on the pigment side."  Defendant Samuel

stated further that "the biggest companies of the world that checked all the other solution[s] that[] [are] available chose us not only because of the technology and the quality, but also because of the full value proposition."

41.     Also, during the conference, Defendant Samuel touted the Company's ability to maintain its existing customers while securing new strategic customers.  Specifically, Defendant Samuel stated that "[w]e are very much focusing on bringing also net-new customers, not only the biggest companies of the world.  And you will see a lot of new names coming both in [direct-to-garment] and [direct-to-fabric printing markets] and definitely leveraging KornitX as well."

42.     On February 15, 2022, Kornit announced its financial results for the fourth quarter and full year ended December 31, 2021.  In the press release issued by Kornit, which the Company also filed with the SEC on Form 6-K, Defendant Samuel touted the Company's "outstanding execution on the huge market opportunity we are pursuing and the strength of our unique business model."  Defendant Samuel also stated that for Kornit 2022 would be "a year with strong growth and a remarkable pipeline of ground-breaking new product introductions, starting already in the first quarter."  Defendant Samuel further claimed that Kornit has "never been in a better position as a company and we are extremely confident in our ability to meet our $1B revenue goal by 2026, if not before."  In the press release, Defendant Rozner also represented that "[o]ur good visibility into the business, combined with our experienced team, gives us the confidence that we can deliver on our commitments for the balance of 2022 and into 2023."

43.     That same day, Kornit held a conference call with analysts and investors to discuss the Company's financial results for the fourth quarter and full year of 2021.  During the call, Defendant Samuel represented that Kornit "started 2022 with outstanding momentum" and "[t]he mega-trends that have been fueling our business are intensifying in magnitude and transformation

to digital on-demand sustainable production continue[s] to accelerate."  Defendant Samuel also represented that Kornit was poised to further capitalize on these trends because "Kornit is the only company that offer[s] high-quality, on-demand mass production digital solutions that can deliver to this massive need and is also the only company that seamlessly connects the virtual and physical walls of the textile industry."  Accordingly, Defendant Samuel told investors that for 2022, Kornit was "gear[ing] up for very strong growth and a remarkable amount of groundbreaking new product introductions starting already in the first quarter" with a "backlog of orders" for its technology that was "very strong."

44.     Also, during the call, Defendant Samuel represented that "our fundamentals are excellent, the market opportunity we are after is endless and our competitive position is unmatched," and "Kornit has never been in a stronger position."  Further, Defendant Rozner touted the Company's "great traction with new accounts, which accounted for half of the systems' order[s] and excellent progress and strength with existing strategic accounts."

45.     The statements set forth above in ¶¶ 21-44 were materially false and misleading and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading.  In truth, Kornit and its senior executives knew or, at a minimum, recklessly disregarded, that the Company's digital printing business was beset by significant quality control problems and deficient customer service.  As a result, Kornit was more vulnerable to pressure from competitors than it had represented and lacked the competitive advantages it touted to investors.  Those problems and deficiencies caused Kornit to lose market share to competitors, which led to a decline in the Company's revenues, as Kornit's dissatisfied customers sought out alternative options for their digital printing needs.  In addition, to the extent that the Company purported to warn of risks regarding quality and customer service

issues as well as increased competition, Kornit failed to disclose that such risks had already materialized.

## THE TRUTH EMERGES

46.     The truth began to emerge on March 28, 2022, when two of Kornit's major customers—Delta Apparel and Fanatics—announced that they had collaborated with Kornit competitor M&R Printing Equipment, Inc. for months to develop and launch a unique digital print technology that would be "the new north star of high volume direct-to-garment printing."   Delta Apparel described this unique digital production process as "revolutionizing the made-to-order business model with garment quality, print aesthetics and repeatability standards."  According to Delta, this new print technology "meets the high quality and repeatability standards that Fanatics' passionate customer base demands" and "will allow custom orders to be produced, packaged and shipped to the end consumer within twenty-four hours from receipt of order."   Delta Apparel further revealed that it had already installed this new technology in four of its existing digital print facilities and planned to install additional equipment.

47.     On May 11, 2022, Kornit reported its financial results for the first quarter of 2022 and held a conference call with analysts and investors to discuss those results.  Despite reporting revenues for the first quarter of 2022 that exceeded the Company's prior guidance as well as analysts' estimates, Kornit reported a net loss of $5.2 million, compared to a profit of $5.1 million for the first quarter of 2021.  The Company also told investors to expect Kornit to generate between $85 million and $95 million of revenues in the second quarter of 2022, which, at the midpoint, was $13 million below analysts' expectations.  Kornit also disclosed that it expected its profitability in the second quarter of 2022 to be lower than the first quarter.   The Company attributed its disappointing guidance to a slowdown in orders in the e-commerce segment, including from

Kornit's large global customers as well as other customers.  Moreover, Defendant Samuel admitted that, for at least the previous two quarters, Kornit knew that Delta Apparel, one of Kornit's largest customers, had decided to acquire digital printing systems from one of Kornit's competitors. These disclosures caused the price of Kornit ordinary shares to decline by $18.78 per share, or 33.3%, from a closing price of $56.41 per share on May 10, 2022, to a closing price of $37.63 per share on May 11, 2022.

48.     Then, on July 5, 2022, after the market closed, Kornit announced its preliminary financial results for the second quarter of 2022.  The Company disclosed that it would report a significant revenue shortfall in the quarter.  Specifically, Kornit expected revenue for the second quarter to be in the range of $56.4 million to $59.4 million.  That represented a reduction of more than 35% at the midpoint of Kornit's previous revenue guidance of between $85 million and $95 million that the Company provided less than two months earlier, in May 2022.  Kornit attributed these poor results to "a significantly slower pace of direct-to-garment (DTG) systems orders in the second quarter as compared to our prior expectations."  As a result of these disclosures, the price of Kornit ordinary shares declined by an additional $8.10 per share, or 25.7%, from a closing price of $31.56 per share on July 5, 2022, to a closing price of $23.46 per share on July 6, 2022.

## **LOSS CAUSATION**

49.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

50.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Kornit ordinary shares and operated as a fraud or deceit on the Class (defined below).  Later, when Defendants' prior misrepresentations and fraudulent conduct

were disclosed to the market, the price of Kornit ordinary shares fell precipitously as the prior artificial inflation came out of the price over time.  As a result of their acquisition of Kornit ordinary shares during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired Kornit ordinary shares during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Kornit and their families and affiliates.

52.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of November 14, 2022, there were approximately 49.8 million Kornit ordinary shares outstanding, owned by hundreds or thousands of investors.

53.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)     Whether Defendants' conduct impacted the price of Kornit ordinary shares;

(g)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)     The extent of damage sustained by Class members and the appropriate measure of damages.

54.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

55.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

56.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

57.     To the extent that any of the alleged false statements described in this Complaint were forward-looking, Kornit's "Safe Harbor" warnings accompanying any purportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

58.     To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false or misleading forward-looking statements because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of

Kornit who knew that the statement was false or misleading.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## **PRESUMPTION OF RELIANCE**

59.     At all relevant times, the market for Kornit ordinary shares was an efficient market for the following reasons, among others:

(a)     Kornit ordinary shares met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Kornit filed periodic public reports with the SEC and NASDAQ;

(c)     Kornit regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Kornit was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

60.     As a result of the foregoing, the market for Kornit ordinary shares promptly digested current information regarding Kornit from all publicly available sources and reflected

such information in the price of Kornit ordinary shares.  Under these circumstances, all purchasers of Kornit ordinary shares during the Class Period suffered similar injury through their purchase of Kornit ordinary shares at artificially inflated prices and the presumption of reliance applies.

61.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on material omissions.  Because this action involves a failure to disclose material adverse information regarding Kornit's business and operations— information that was required to be disclosed—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the significance of Kornit's ability to provide high quality products and customer service that adequately met the needs and expectations of its customer base in the digital printing market, that requirement is satisfied here.

## CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

62.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

63.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Kornit ordinary shares at artificially inflated prices.

64.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ordinary shares in an effort to maintain artificially high market prices for Kornit ordinary shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

65.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce, and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

66.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

67.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Kornit's true condition from the investing public and to support the artificially inflated prices of Kornit ordinary shares.

68.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Kornit ordinary shares.  Plaintiff and the Class would not have purchased Kornit ordinary shares at the prices they paid, or at all, had they been aware that the market prices for Kornit ordinary shares had been artificially inflated by Defendants' fraudulent course of conduct.

69.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's ordinary shares during the Class Period.

70.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants**

71.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

72.     The Individual Defendants acted as controlling persons of Kornit within the meaning of Section 20(a) of the Exchange Act.   By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Kornit, the Individual Defendants had the power and ability to control the actions of Kornit and its employees.   By reason of this conduct, the Individual Defendants are liable under Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: February 15, 2023

Respectfully submitted

*/s/ James E. Cecchi*
James E. Cecchi
**CARELLA, BYRNE, CECCHI, OLSTEIN,
    BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com

*Liaison Counsel for Plaintiff Genesee County
Employees' Retirement System*


Hannah Ross
Avi Josefson
Scott R. Foglietta
**BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
avi@blbglaw.com
scott.foglietta@blbglaw.com

*Counsel for Plaintiff Genesee County Employees'
Retirement System*

Thomas C. Michaud
Francis E. Judd
**VANOVERBEKE MICHAUD
    & TIMMONY P.C.**
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
tmichaud@vmtlaw.com
fjudd@vmtlaw.com

*Additional Counsel for Plaintiff Genesee County
Employees' Retirement System*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Jeff Carpenter, on behalf of Genesee County Employees' Retirement System ("Genesee County Employees"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am the Chairperson of Genesee County Employees and I am authorized to sign this certification on its behalf.  I have reviewed the complaint and authorize its filing by counsel.

2.  Genesee County Employees did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.  Genesee County Employees is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  Genesee County Employees' transactions in the Kornit Digital Ltd. securities that are the subject of this action are set forth in the chart attached hereto.

5.  Genesee County Employees has sought to serve as a representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

    *Genesee County Employees' Retirement System v. FirstCash Holdings, Inc.*,
    No. 22-cv-33 (N.D. Tex.)

6.  Genesee County Employees will not accept any payment for serving as a representative party on behalf of the Class beyond Genesee County Employees' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 13 day of February, 2023.

Jeff Carpenter
Chairperson
*Genesee County Employees' Retirement
System*

**Genesee County Employees' Retirement System
Transactions in Kornit Digital Ltd.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 12/6/2021 | 1,950 | 151.0081 |
| Sale | 6/13/2022 | (1,950) | 35.2620 |