# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re Kornit Digital Ltd. Securities Litigation | Civil Action No. 2:23-cv-00888-MCA-AME |
| | Hon. Madeline Cox Arleo |
| | <u>CLASS ACTION</u> |
| | <u>JURY TRIAL DEMANDED</u> |

## CONSOLIDATED COMPLAINT FOR VIOLATION OF
## THE FEDERAL SECURITIES LAWS

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

THE EXCHANGE ACT CLAIMS ............................................................................ 1

I.     INTRODUCTION ..................................................................................... 1

II.    JURISDICTION AND VENUE ................................................................ 7

III.   THE EXCHANGE ACT PARTIES .......................................................... 8

     A.    Plaintiffs ........................................................................................ 8

     B.    Corporate Defendant .................................................................... 8

     C.    Officer Defendants ....................................................................... 9

IV.   SUMMARY OF THE FRAUD ................................................................ 9

     A.    Background and Kornit's Business ................................................ 9

     B.    Defendants Misrepresent Various Aspects of Kornit's Business and Products, and Paint a Misleading Picture of Demand and Growth Prospects ...................................................................................... 15

          1.    Defendants Touted Kornit's Purportedly Profitable Service Department and Contracts While Misrepresenting the Nature of the Contracts and Failing to Disclose Significant Problems With Service .............................................................................. 16

          2.    Defendants Misrepresented The Total Cost of Ownership of Kornit's Products ..................................................................... 22

          3.    Defendants Touted Kornit's Purported Technological Advantage and Competitive "Moat" While Their Largest Customers Turned to Kornit's Main Competitor ........................................................ 24

          4.    Defendants Touted the Purported Value of KornitX, Even As the Program Failed to Get Off the Ground and then Stagnated ...... 29

          5.    Defendants Ignored Concerning Known Trends In Kornit's Business, Touted Their Strong "Backlog" of Orders, and Then Accelerated Revenue to Deceive Investors ............................... 31

V.    THE TRUTH EMERGES ........................................................................ 38

A.     May 11, 2022 – In a Partial Disclosure, Defendants Issue Disappointing Results for the First Quarter of 2022 and Lackluster Financial Guidance for the Second Quarter of 2022 ................................................................................ 38

B.     July 5, 2022 – Kornit Reports Shockingly Bad Results for the Second Quarter of 2022 ............................................................................................................. 43

VI.     POST-CLASS PERIOD ADMISSIONS BY DEFENDANTS ................................. 44

VII.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS .................................................................................................... 45

A.     False and Misleading Statements and Omissions Concerning the Fourth Quarter and Fiscal Year 2020 .......................................................................... 46

B.     False and Misleading Statements and Omissions in Kornit's Annual Report on Form 20-F ........................................................................................ 48

C.     False and Misleading Statements and Omissions During Kornit's May 18, 2021 Investor Meeting ...................................................................................... 51

D.     False and Misleading Statements and Omissions During the May 19, 2021 Barclays Conference ......................................................................................... 52

E.     False and Misleading Statements and Omissions During the June 1, 2021 William Blair Conference ................................................................................. 54

F.     False and Misleading Statements and Omissions During the June 10, 2021 Citi and Stifel Conferences ............................................................................. 56

G.     False and Misleading Statements and Omissions During the July 13, 2021 CJS Securities Conference ................................................................................ 59

H.     False and Misleading Statements and Omissions Concerning the Second Quarter of 2021 ............................................................................................... 61

I.     False and Misleading Statements and Omissions Concerning the Third Quarter of 2021 ............................................................................................... 64

J.     False and Misleading Statements and Omissions During the December 7, 2021 Barclays Conference ................................................................................. 67

K.     False and Misleading Statements and Omissions During the January 10, 2022 Needham Conference ............................................................................... 70

L.     False and Misleading Statements and Omissions During the January 12, 2022 CJS Securities Conference ....................................................................... 72

M.    False and Misleading Statements and Omissions Concerning the Fourth Quarter and Fiscal Year 2021 ................................................................. 74

N.    False and Misleading Statements and Omissions in Kornit's Form 20-F for the Fiscal Year 2021 ................................................................. 77

O.    False and Misleading Statements and Omissions Concerning the First Quarter of 2022 ................................................................. 80

P.    False and Misleading Statements and Omissions During the June 2022 William Blair and Stifel Conferences ................................................................. 83

VIII.    LOSS CAUSATION ................................................................. 86

IX.    ADDITIONAL ALLEGATIONS OF SCIENTER ................................................................. 86

X.    INAPPLICABILITY OF STATUTORY SAFE HARBOR ................................................................. 93

XI.    PRESUMPTION OF RELIANCE ................................................................. 94

XII.    EXCHANGE ACT COUNTS ................................................................. 95

COUNT I ................................................................. 95

COUNT II ................................................................. 98

SECURITIES ACT CLAIMS ................................................................. 99

XIII.    PLAINTIFFS' SECURITIES ACT CLAIMS ................................................................. 99

A.    Jurisdiction and Venue ................................................................. 99

B.    The Securities Act Parties ................................................................. 100

1.    Plaintiffs ................................................................. 100

2.    The Securities Act Defendants ................................................................. 100

a.    Offering Defendants ................................................................. 101

b.    Underwriter Defendants ................................................................. 102

C.    Kornit and the 2021 Offering ................................................................. 103

D.    The Offering Materials Contain Untrue Statements of Material Fact and Omitted Other Facts Necessary to Make the Statement Made Not Misleading ................................................................. 104

XIV.    SECURITIES ACT COUNTS ................................................................. 106

COUNT III ............................................................................................................... 106

COUNT IV ............................................................................................................... 108

COUNT V ................................................................................................................. 109

XV.    CLASS ACTION ALLEGATIONS ........................................................... 110

XVI.    PRAYER FOR RELIEF ............................................................................ 112

XVII.    JURY DEMAND ...................................................................................... 113

Court-appointed Lead Plaintiffs Genesee County Employees' Retirement System, Kranot Hishtalmut Le Morim Tichoniim Havera Menahelet LTD, Kranot Hishtalmut Le Morim Ve Gananot Havera Menahelet LTD, and Hachshara Insurance Company Ltd. (together, "Lead Plaintiffs"), along with Additional Named Plaintiff Indiana State Police Pension Trust (together with Lead Plaintiffs, "Plaintiffs"), by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, inter alia, counsel's investigation, which included review and analysis of: (i) regulatory filings made by Kornit Digital Ltd. ("Kornit" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, presentations, and media reports issued by and disseminated by the Company and its subsidiaries and affiliates; (iii) analyst and media reports concerning Kornit; (iv) information from former Kornit employees, industry professionals, and other knowledgeable persons; and (v) other public information regarding the Company.

## THE EXCHANGE ACT CLAIMS

## I.    INTRODUCTION[1]

1.    By the beginning of the Class Period in February 2021, Kornit had experienced a pandemic growth spurt, reporting 2020 revenue of $193 million, but was facing customer service problems, increasing competition, and a difficult roll-out of its "KornitX" software. In the face of these difficulties, rather than being honest with investors, Ronen Samuel, Kornit's CEO, boldly proclaimed that Kornit's meteoric growth would actually accelerate. Samuel repeatedly, unequivocally suggested that Kornit would have revenue running at a rate $500 million per year before the end of 2023 and would achieve $1 billion in revenue soon after. These targets relied on

---

[1] Unless otherwise indicated, all emphasis in quotations contained in this Complaint is added.

unprecedented growth in product sales and service revenue, and immediate acceptance of the Company's new, untested KornitX software product.

2.      Defendant Samuel and Defendant Rozner (Kornit's CFO), both of whom knew the truth about Kornit's problems, were unequivocal in their misleading statements to investors about: the impact of customer service and reliability problems, combined with competition, which led to losses in sales to two of their top ten customers; the length of service contracts, which were mostly for one year—not two, as Defendant Samuel told investors; the "pull-forward" of revenue in Q1 2022 to mask declining demand; and, the lack of KornitX sales. While concealing these (and other) known problems, Defendants' unbridled positivity about growth drove Kornit's share price to a high of $176 in November 2021. But that optimism was unfounded and the truth was revealed in May and July 2022, wiping out over $1.3 billion in Kornit's market capitalization as its stock price cratered to just $23.46 per share. Critically, while the stock was at or near these highs, Defendant Samuel filed to sell nearly $10 million worth of his personal Kornit stock, and the Company sold approximately $340 million of stock (net of fees) in a November 2021 public offering. By the end of the Class Period those proceeds would have been worth less than 20% of those amounts.

3.      The Class Period runs from February 17, 2021 until July 5, 2022 (the "Class Period").[2] Those investors who purchased beginning in February 2021 understood that Kornit is fundamentally a manufacturer of commercial textile printers and the ink needed to use them. Kornit sells machines that print designs directly onto garments and rolls of fabric, as well as the supplies and services necessary to run those machines. In the second half of 2020 and into 2021,

---

[2] The first statement made by Defendants that Plaintiffs allege as false and misleading was made after the market closed on February 16, 2021. Therefore, the Class Period begins the following day, February 17, 2021.

2

Kornit was a beneficiary of the notable shift towards e-commerce, as traditional retail channels constricted under public health mandates.

4.      The Company's pitch to its clients highlights and depends on the low "total cost of ownership" or "return on investment" of its printers.  These representations are highly material to customers because Kornit's machines are very expensive compared to competing technologies. And so, to make up for the large capital investment required to purchase a printer from Kornit, the machine needs to reliably delivery a high volume of impressions (prints).

5.      To "optimize" its customers' machine uptime and impressions, and to deliver on the Company's promise of an "attractive" total cost of ownership throughout the Class Period, Kornit offered (and purportedly required its customers to purchase) service contracts with each machine sold.  Indeed, as a cornerstone of Defendants' strategy to make Kornit's customer service business profitable, Defendant Samuel stated at the beginning of the Class Period that customers could not purchase a Kornit printer without a two-year service contract.

6.      Defendants also repeatedly misrepresented the lack of any "threat" from competitors due to Kornit's technological superiority, which provided a "moat."  However, Defendants Samuel and Rozner knew by early 2021 that M&R Equipment, among others, was a serious competitor that had at least partially displaced Kornit's products at Delta and Fanatics, two of Kornit's largest customers.  But Defendants concealed these facts from investors.

7.      In addition, just prior to the Class Period, Kornit expanded its business and began offering software services to its customers. KornitX, which Defendants dubbed the "Uber" of printing, was marketed to investors throughout the Class Period as a revolutionary system that was allowing brands to order items at any of Kornit's participating customers, for delivery within 24 hours to the end consumer. Thus, Kornit claimed it would not only collect a fee for its software

and for each "impression" (printed garment) sold through the KornitX network, but would also make money from sales of ink and other consumables required to fulfill the order. Defendants repeatedly claimed throughout the Class Period that KornitX was experiencing great adoption and growing rapidly.

8.    On the strength of these and similar representations, Defendants told investors that they not only anticipated achieving their $500 million revenue run rate target earlier than anticipated in 2023, but proclaimed that Kornit would be a $1 billion company by 2026, if not earlier, the latter target comprising a staggering $100 million contribution from KornitX.

9.    Defendants' statements were false and created a misleading and fundamentally flawed impression of Kornit's business and growth prospects. During the Class Period and unbeknownst to investors, Kornit's machines were plagued by downtime that Kornit's vaunted service department was systematically unable to fix in a timely manner. This systemic failure, corroborated by multiple former Kornit employees ("FEs"), dramatically impacted Kornit's customers' return on their investment. As a result, sales of equipment to both new and existing customers suffered, and, ultimately, two of Kornit's "top 10" customers—Delta and Fanatics— defected to the competition. Thus, Defendants' efforts to transform Kornit's service department into a recurring profit center had the opposite effect, negatively impacting Kornit's revenues and growth during the Class Period. Moreover, Defendants' statements about KornitX's purported success starkly differed from the reality, corroborated by former Kornit employees, that KornitX simply was not ready and was difficult to sell, particularly in the Americas where clients already had customized software. According to these former employees, it would take Kornit much longer than disclosed to get the $100 million in KornitX sales they needed by 2026. Indeed, a former Kornit employee described Kornit's public statements about achieving $100 million in revenue by

2026 as "kind of crazy" based on internal sales targets and the Company's failure to sell KornitX to any client during his tenure.

10.    Then, starting in November of 2021, Kornit began to experience a deceleration in growth as its customers' end consumers returned to more traditional buying patterns.  Samuel later admitted that Defendants knew by the end of 2021 that there was a deceleration in demand.  But Defendants continued to tout Kornit's growth and obscured the serious business issues they were facing through July 2022.  While knowing of this deceleration in sales and customer losses to competitors (caused by Defendants' inability to adequately service those clients), Defendants rushed to market with a secondary offering, unloading approximately $340 million of stock (net of fees) at inflated prices.  Defendant Samuel himself profited handsomely during the Class Period, filing to sell more than $10 million worth of his own personal holdings of Kornit stock at inflated prices, nearly 8 times his sales in comparable periods.

11.    Instead of disclosing the material trend negatively impacting Kornit's customers in 2021 or even in early 2022, Defendants boldly embarked in a final effort to conceal the severity of the decline in their business by "pulling forward" revenue from the second quarter of 2022 into the first quarter of 2022, enabling them to just "barely" exceed the high end of their public guidance.  When confronted by analysts about Kornit's ballooning receivables and late quarter transactions, Defendant Rozner, Kornit's Chief Financial Officer, flatly denied that there was a revenue pull forward during the quarter.  But, as confirmed by former Kornit employees, Kornit not only had the ability to pull forward revenues, but did pull forward revenues in the first quarter of 2022, with full knowledge of the Company's executives.

12.    The truth concerning Defendants' misrepresentations and omissions was partially revealed on May 11, 2022, when Kornit reported a net loss of $5.2 million compared to a similar

gain in the prior year and abysmal guidance for the second quarter of 2022 that was well below consensus expectations, which was attributed to competitive pressures Defendants had denied the existence of.  Analysts were surprised by Defendants' belated disclosures about competition, noting emphatically that the "competition was worth watching."  On this news, the price of Kornit ordinary shares cratered by $18.78 per share, or 33.3%, from a closing price of $56.41 per share on May 10, 2022, to a closing price of $37.63 per share on May 11, 2022.

13.    Kornit's disclosure that day, however, did not reveal the full truth.  To the contrary, Defendants continued to make additional false statements to soothe the market and conceal the lack of adoption of KornitX, deteriorating customer relationships and competitive losses, and the undisclosed pull forward of revenue.  Defendants' false assurances worked.  Based on these representations, investors—even the analysts who revised downward their short-term outlooks— understood (incorrectly) that Kornit's disappointing results were a "one-off," and that the Company maintained strong fundamentals that would drive growth.

14.    However, beset by problems with service, competition, and failure to sell KornitX, and unable to fill the declining demand gap left by their undisclosed revenue pull forward, on July 5, 2022, the last day of the Class Period, Kornit stunned investors by announcing preliminary financial results for the second quarter of 2022, including a 35% reduction of recently issued guidance—attributed to declining demand "as compared to our prior expectations."  Analysts were astonished, downgrading Kornit en masse and calling management's candor into question given their "generally bullish tone in early to mid-June at several conferences."  Another analyst noted that "management regaining the trust of the investment community will prove to be a long and winding road."  Defendant Samuel himself would later admit that the bullish statements about

growth and the overall health of the business were directly contradicted by information he had by the "[b]eginning of 2022" as Kornit "saw major decline[s] within[] the business of our customers."

15.    As a result of these disclosures, the price of Kornit ordinary shares declined by an additional $8.10 per share, or 25.7%, from a closing price of $31.56 per share on July 5, 2022, to a closing price of $23.46 per share on July 6, 2022, injuring investors.

16.    Kornit's poor performance in the first half of 2022 was not a short-term interruption in its growth—it reflects the reality of the Company's business.  For example, Kornit's 2023 first-half revenue totaled just $104 million, which is less than half of the $500 million "run-rate" that Defendants' repeatedly touted during the Class Period.  Nor has Kornit's share price rebounded. As of October 26, 2023, it closed at just $13.87, a tiny fraction of the Class Period high price.

## II.    JURISDICTION AND VENUE

17.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18.    Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Kornit maintains its United States headquarters in Englewood, New Jersey, which is situated in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.    THE EXCHANGE ACT PARTIES

#### A.    Plaintiffs

19.    Lead Plaintiff Genesee County Employees' Retirement System ("GCERS") is a multi-employer defined benefit plan that provides retirement and survivor benefits for employees of Genesee County, Michigan.  As previously represented to the Court in the certifications filed with the motion for appointment as Lead Plaintiff, GCERS purchased Kornit ordinary shares at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein (ECF No. 12-4).

20.    Lead Plaintiffs Kranot Hishtalmut Le Morim Tichoniim Havera Menahelet LTD and Kranot Hishtalmut Le Morim Ve Gananot Havera Menahelet LTD (together, the "Teachers Funds") are investment funds based in Israel.  As previously represented to the Court in the certifications filed with the motion for appointment as Lead Plaintiff, the Teachers Funds purchased Kornit ordinary shares at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein (ECF No. 12-4).

21.    Lead Plaintiff Hachshara Insurance Company Ltd. ("Hachshara") is an insurance company based in Israel.  As previously represented to the Court in the certifications filed with the motion for appointment as Lead Plaintiff, Hachshara purchased Kornit ordinary shares at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein (ECF No. 12-4).

#### B.    Corporate Defendant

22.    Defendant Kornit is based in Israel and is incorporated under the laws of Israel. Kornit maintains its United States headquarters at 480 South Dean Street, Englewood, New Jersey. The Company's ordinary shares are listed and trade on NASDAQ under the ticker symbol

"KRNT." As of November 14, 2022, Kornit had over 49 million ordinary shares outstanding, owned by hundreds or thousands of investors.

        **C.**    **Officer Defendants**

23.    Defendant Ronen Samuel ("Samuel") is, and was at all relevant times, Kornit's Chief Executive Officer.

24.    Defendant Alon Rozner ("Rozner") was, at all relevant times, Kornit's Chief Financial Officer, having worked in that role from December 2020 until November 2022.

25.    Defendants Samuel and Rozner are collectively referred to herein as the "Officer Defendants." The Officer Defendants, because of their positions within Kornit, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Officer Defendants was provided with copies of the Company's reports, presentations, and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

**IV.**    **SUMMARY OF THE FRAUD**

        **A.**    **Background and Kornit's Business**

26.    Kornit was founded in 2002 in Israel, and since 2005 has developed, designed, and marketed digital printing technology for the textile industry. Kornit's business is centered on the textile printing industry as applied to the fashion, apparel, and home décor sectors. As Kornit told

investors both before and during the Class Period, its "mission is to revolutionize the fast-changing [textile printing] industry" away from "analog processes that have not evolved for decades."

27.    Kornit's pitch to customers—and investors—is simple.  The Company claimed to create technologies that allow its customers to print designs directly onto their fabrics or finished garments, in a way that is faster, cheaper, and more environmentally friendly than traditional "screen" printing.  The aim of Kornit's business was to allow textile manufacturers to transition away from traditional brick-and-mortar, where those manufacturers must often carry and stock more inventory than they need.  Instead, by using Kornit's technology, textile manufacturers would be able to print on-demand or made-to-order models where the fabric is only printed on, and the products are only finished, once a customer actually places an order.  Thus, Kornit's services were designed to allow textile manufacturers to control their inventory without needing to perfectly predict demand.  Kornit also touted its production lead times and the low total cost of ownership of its products.

28.    Kornit's business is largely focused on two types of printing: direct-to-garment ("DTG") and direct-to-fabric ("DTF").  In DTG printing, an inkjet printer prints directly onto the textile.  DTG printing allows for printing images and designs onto finished textiles, such as t-shirts that have already been sewn and dyed.  In DTF printing, by contrast, rolls of fabric pass in-line through wide-format inkjet printers that are utilized to directly print images and designs onto rolling fabric.  The rolling fabric is then subsequently converted into finished textiles.  Kornit sells "proprietary digital printing systems" for both its DTG and DTF processes.  During the Class Period, 90% of Kornit's revenues came from its DTG business, which featured printers such as the Kornit Vulcan Plus Printer depicted below.  Kornit's printer product line also included the

Kornit Atlas, Avalanche, and Presto machines, each of which was designed to print directly onto rolled fabric or garments such as the shirt further below.





29.     Kornit supports its printing business by selling ink and other consumable parts that are intended to be used with Kornit's proprietary printers, as well as the accompanying software that runs the printers.  In addition, Kornit offers maintenance and support contracts that are designed to "optimize" the number of prints that a customer can create in a set period of time, purportedly allowing the customer to maximize its return on investment.  These service contracts included the option for Kornit's customers to (purportedly) have a devoted team of Kornit's employees on-site for maintenance and repairs of that customer's Kornit machines.  Ink sales and related consumables account for approximately one third of Kornit's revenues.

30.     Kornit went public through an initial public offering in 2015.  For the first several years after its IPO, Kornit experienced steady growth.  Then, in 2018, the last of Kornit's original founders left the Company and new management, including Defendant Samuel, was installed.  Kornit immediately posted back-to-back years with tremendous 25% revenue growth and promised even further growth.

31.     Kornit's largest customer is the e-commerce company, Amazon. Kornit's other large customers during the Class Period included apparel and activewear brand, Delta Apparel and its subsidiary DTG2Go, as well as Fanatics, a provider of licensed sports merchandise. The Company's ten largest customers, which included Delta Apparel and Fanatics, accounted for approximately 60% of Kornit's revenues.  Because such a sizable portion of Kornit's revenue is concentrated among its largest "Top 10" customers, referred to as the "strategic accounts" or "global strategic accounts," it was crucial that the Company maintain business with these customers and continue to expand its customer base to achieve Kornit's ambitious goal of a $500 million revenue run rate by 2023 and $1 billion in revenue by 2026.

32.     Just prior to the Class Period, Kornit expanded its business and began offering software services to its customers, including KornitX, a suite of end-to-end fulfillment and production solutions. Through KornitX, the Company provides customers with, among other things, automated production systems as well as workflow and inventory management.  KornitX, which Kornit dubbed the "Uber" of printing, was marketed to investors throughout the Class Period as a revolutionary system that would allow brands to order items at any of Kornit's participating customers, for delivery within 24 hours to the end consumer.  Thus, Kornit claimed that it would not only collect a fee for its software *and* for each "impression" (printed garment) sold through the KornitX network, but would also make money from sales of ink and other consumables required to fulfill the order.

33.     By the start of the Class Period in early 2021, Kornit had experienced a boom in its business during the first year of the coronavirus pandemic.  The pandemic negatively impacted brick-and-mortar shopping, but accelerated e-commerce and online ordering, which was favorable to Kornit's business model.  Thus, by the start of the Class Period, Kornit's business appeared to

13

be stronger than ever.  Defendants made numerous material misrepresentations concerning the strength of the Company's products, service, competitive position, and growth rate.  Building upon those misrepresentations were the highly aggressive statements that due to Kornit's competitive position it would achieve a revenue run rate of $500 million by 2023 (i.e., quarterly revenue of $125 million) and reach $1 billion in full-year revenue by 2026.  This astounding growth would only be achievable if Kornit were to grow its quarterly revenues between the start of the Class Period and before the end of 2023 by a staggering 78%,[3] and then double its yearly revenues between 2023 and 2026.  But this growth was simply not attainable, and Defendants knew it.  As discussed below, Kornit was uniquely situated to understand and assess the demand for its products, leading investors to believe that Kornit would be able to head off any issues that may arise from competition and fluctuating customer demand.  And based on Kornit's incredible visibility into its sales pipeline, when Defendants continued to assure investors that the Company was on track to meet its financial projections, investors believed those statements.

---

[3] On February 16, 2021, Kornit announced that it had achieved $72.3 million in revenues in the fourth quarter of 2020, which is typically the best quarter of the year.  Kornit would need to grow its quarterly revenue by 78% to achieve its much touted $500 million run rate before the end of 2023.



**B.    Defendants Misrepresent Various Aspects of Kornit's Business and Products, and Paint a Misleading Picture of Demand and Growth Prospects**

34.    Throughout the Class Period, Defendants made material misrepresentations concerning several aspects of Kornit's business and growth.  Defendants misrepresented basic facts about the Company's service department all the while touting its newfound "profitability" to investors.  But Defendants failed to disclose, as reported by numerous former employees, that the service department was systematically unable to provide timely service to customers, leading to outright refusals to purchase additional equipment and customer departures that materially impacted revenues during the Class Period.  Frequent failures in Kornit's equipment only exacerbated the problem, which materially and further impacted the purportedly favorable "total cost of ownership" of Kornit's printers that Defendants had already exaggerated to prospective clients.  These concealed facts, along with Defendants' repeated exaggerations about the growth prospects and adoption of KornitX, contributed to a shortfall in revenue in the first quarter of 2022

that Defendants knew about but concealed, contrary to their public statements, by pulling forward revenue from the subsequent quarter.

1.    **Defendants Touted Kornit's Purportedly Profitable Service Department and Contracts While Misrepresenting the Nature of the Contracts and Failing to Disclose Significant Problems With Service**

35.    A key part of Kornit's offering to customers involved its services department; Kornit offered contracts to its customers, providing that whenever its machines broke down, Kornit would arrange to have the machines fixed.  This was designed to be a source of recurring revenue for Kornit, but prior to the Class Period, this segment of Kornit's business had not achieved profitability.  Kornit told investors that its services business would become profitable in the fourth quarter of 2020, just before the Class Period, and that the service department would be a significant and profitable recurring revenue center for the Company going forward.

36.    At the beginning of the Class Period, Defendant Samuel touted Kornit's strategy to make Kornit's service center, which services Kornit machines for customers, profitable.  On February 16, 2021, Kornit released its quarterly results for the fourth quarter of 2020, filed with the SEC on Form 6-K.  Kornit disclosed that it had achieved a year-over-year increase in service revenue of 70%, totaling $10.9 million in the fourth quarter of 2020.  As part of this initiative, Defendant Samuel disclosed for the first time during Kornit's earnings call that day that Kornit customers were obligated to purchase a ***two-year*** service contract with each printer, and that there was ***no other way*** to purchase a Kornit printer, indicating that Kornit's service contract revenues were locked in for at least two years and would provide a stable source of profits for the Company. Analysts paid attention to this material update.  For example, analysts from Needham noted the impressive growth in service revenue, which they understood "benefit[ed] from strong service-contract attach rates."  These and other similar statements were buttressed by additional statements made directly to investors as Defendants assured the market during Kornit's May 2021 earnings

call for example, that its "consumable business continued to scale and we continued to outperform our profitability goals on services."

37.    However, Defendant Samuel's representations about the length of Kornit's service contracts, their value to customers, and thus the recurring nature of the Company's service revenues and profits, were false.

38.    Specifically, FE1,[4] who was a customer success contract administrator and customer success manager at Kornit from July 2016 to February 2023 and dealt with customer's service contracts in that role, reported that initial service contracts were almost always *one year in length*, elaborating that only occasionally would Kornit do a two-year contract *and give the customer a discount*.  Similarly, FE2, who worked as a Roll-to-Roll Sales Manager for Kornit Europe, Middle East, and Africa ("EMEA") from October 2012 until December 2022, corroborated FE1's statement concerning the length of service contracts, recounting that Kornit systems automatically came with *a one-year* service agreement.

39.    Defendant Samuel's statements misrepresenting the length and attach rate of service contracts, and those statements throughout the Class Period touting the Company's service organization also concealed troubling deficiencies within the service organization itself that compounded the defects and high cost of Kornit's machines.  These concealed deficiencies not only impacted Kornit's customers' return on their investment but also forced those customers into the arms of Kornit's competitors.  *See infra* Section IV.B.2-3.

40.    FE3 worked as Kornit's Director of Professional Services Sales from July 2021 until August 2022.  In that role, FE3 oversaw the service department at Kornit.  He then worked

---

[4] The terms "Former Employees" and "FE" refer to the former Kornit employees whose reports are discussed in this Complaint. In order to preserve the Former Employees' anonymity while maintaining readability, the Complaint uses the pronouns "he" and "his" in connection with all of the Former Employees, regardless of their actual gender.

as Kornit's Director of Americas Category Management and Chief of Staff to the President of Kornit Americas from August 2022 until December 2022. In connection with his responsibilities in the service department, FE3 reported that during the Class Period, customers were screaming that they couldn't get technicians. FE3 elaborated that Kornit did not invest in training customers on their machines, which was poor and not sufficient for people who were new to Kornit's machines, which are fairly technical. According to FE3, this created situations where technicians would have to go back to repair the machine again and again. However, FE3 explained that Kornit also wasn't funding customer success properly, so they didn't have the number of technicians necessary to meet the additional business generated by the lack of training, elaborating that customers couldn't get a technician if the machine broke, and that it would take Kornit a week or longer to get someone in to fix it.

41.     Describing the impact that unreliable printers and poor customer service had during the Class Period, FE3 was directly in conversations where potential customers canceled possible orders because they ended up buying used machines from Sticker Mule. FE3 confirmed that Sticker Mule was a Kornit customer that Kornit canceled orders for because they couldn't work the machines correctly and because of the Company's inadequate training programs. FE4, who worked as a General Manager for Kornit Latin America from February 2019 until December 2021, corroborated FE3's account, explaining that Sticker Mule decided to start printing t-shirts and had purchased three or four of Kornit's largest machines (the Atlas) at the end of 2021, but Kornit was unable to get them to run properly, pushing Sticker Mule to get rid of its Kornit machines in the beginning of 2022 and purchase a competitor's product instead. Despite the issues with Kornit's installation that were present at the end of 2021, Defendant Samuel announced the sale during Kornit's November third quarter 2021 investor call, falsely representing that Sticker Mule had

18

successfully "*integrated* a fleet of our Atlas systems into their business and are *utilizing* the growing customer base to support a *strong DTG revenue channel*."

42.     FE5 worked as an Implementation Manager and Service Team Lead at Kornit from March 2017 until June 2023.  FE5 confirmed that Kornit's service organization was overstretched. FE5 estimated Kornit would need a total of thirty technicians for the entire United States.  FE5 confirmed that at all times he was at Kornit, the Company had only twenty technicians in the US, six of whom reported to him.  FE5 said he got written up for repeating to his manager what a customer said to him. The customer said that Kornit was making them wait a week or two to get a technician, and that when this first technician got there, they didn't actually know the machine that well, so Kornit was basically wasting the customer's time.  According to FE5, this was a pretty common complaint from customers who were paying a lot of money for service. Indeed, FE5 relayed that every time he went to a new customer site, customers were complaining about the last technician that Kornit had sent.

43.     FE6 was a Strategic Accounts Manager at Kornit from January 2021 to July 2022, with responsibility for managing sales to the bigger US customer accounts.  FE6 recounted how pervasive these service issues were across Kornit's major clients and strategic accounts.  FE6's accounts included Printful, Monster Digital, Spoonflower, and Vistaprint.  FE6's account volume was around $16m annually.  According to FE6, all of the accounts were having issues with service, with the biggest issue being that even though they were Kornit's largest customers, they weren't getting serviced immediately.  FE6 elaborated that there was a whole protocol customers had to go through, and then wait for a response.  FE6 reported that Kornit's technicians weren't available the next day.  According to FE6, one of Kornit's biggest competitors is M&R Printing Equipment ("M&R"), and one of FE6's customers told him that when they called M&R, a technician would

be there the next day.  Executive management definitely knew that service was an issue, according to FE6.  The response that FE6 heard that directly from Chuck Meyo and Udi Har-Nof, the head of customer service, was that customers needed to follow the protocol and that they didn't have the budget to hire more technicians.  Jeff Lumis, who was Kornit's VP of sales at the end of FE6's tenure, told FE6 that he was very concerned about the issues with service, but the customer success team was not very responsive to those concerns.

44.    FE7 was a Senior Program Manager for Kornit from June 2020 until September 2022, located in Texas.  His team was repurposed to support strategic accounts in the first quarter of 2022 since some of those customers were having issues.  According to FE7, strategic accounts included Printful, DTG2go, and Fanatics.  FE7 elaborated that there ended up being nine strategic accounts in total, and Kornit was "kind of fretting" because they didn't have enough people on the team for that many accounts.  FE7 understood that several strategic customers said they were not going to buy any more machines from Kornit unless the Company improved its service, including Printful and DTG2go.

45.    FE8 worked as a Sales Manager for Kornit South America from April 2019 until February 2022.  FE8 confirmed that Kornit has very bad service and that the service contract is also very expensive.  FE8 said that he attended meetings that included Samuel and other executives where people brought up the issues with the machines and service.

46.    FE1, in his role as a Customer Success Manager at Kornit, tried to secure service contracts on the equipment, which were for service, parts, and labor, from customers.  Most of the accounts FE1 worked with were existing customers.  FE1 recounted that customers were paying for service contracts but could not get technicians out to their site as quickly as they should have been able to.  FE1 stated that when employees raised the need for more technicians with

20

management, they were told there were enough.  FE1 indicated that this issue persisted over his entire tenure at Kornit.

47.    FE1 said that most of the time the requirement was to sell a new system with a service contract, and most of the time Kornit did.  However, a lot of customers would cancel the contract *as soon as the six-month warranty was up*.  That happened quite a bit.  FE1 said getting customers to renew service contracts was a "very tough sell," estimating that only about *twenty percent renewed contracts*.

48.    FE1 elaborated that he knew of several customers who were sold systems and told that there were three technicians in their area when there were not.  FE1 said the service issues "absolutely" impacted sales, adding that there were also problems with the quality of the machines.  According to FE1, nine times out of ten there were issues with new models.  Kornit would do some beta testing with a few customers, but every single time they rolled out a new system there were issues.  FE1 stated that this was true during his entire tenure, and that the technicians got so burnt out that they would just quit, and then a new technician would have to learn the machines.

49.    FE1 was aware of Delta and Fanatics moving their business elsewhere because he had to cancel the service contracts.  According to FE1, executives at Kornit were well-aware of the issues customers experienced.

50.    FE2, who was a Roll-to-Roll Sales Manager for EMEA in the Netherlands from October 2012 to December 2022, corroborated that service was an issue, adding that some customers did leave because of service and even tried to bring legal action.  FE2 elaborated that if you look at the amount of systems and the amount of problems Kornit had, and the number of engineers, it was clear they could not keep up.  According to FE2, the more systems they installed, the more engineers would be needed, and the gap was always getting bigger.  FE2 added that as

the systems got more and more complex, so the time to repair a system got longer over time.  That timing gap was also always growing.

51.    Customers complained about service and pricing.  FE2 added that the service department is also a profit center and has very strict budgets and that they therefore try to annoy customers as much as possible to try different things in order to prevent a technician going to the site, because that costs money.  FE2 added that this was not only to annoy customers, but to make it so that multiple service visits in the same area can happen at the same time to avoid costs.  FE2 elaborated that there was a database that tracked when a message was sent and how long it took for a technician to go out for that repair, noting that on average, it took seven to twelve days to get a technician on-site.

52.    FE9 was the VP of Marketing and President for North America at Kornit from August 2015 to September 2017 and currently works at a competitor to Kornit.  He confirmed that from a quality perspective, if you ask any of their existing customers, Kornit's products "are garbage."  Typically, by the time a Kornit customer calls FE9, they are really upset.  According to FE9, the way the Kornit machines perform versus the way they are sold is completely different, and that the machines also break down all the time.  FE9 confirmed that he frequently speaks to current Kornit customers who are unhappy.  The biggest complaint FE9 hears is about the service contract.

       **2.      Defendants Misrepresented The Total Cost of Ownership of Kornit's Products**

53.    During the Class Period, Kornit offered numerous products to its customers and rolled out several additional new products.  One important factor to customers in deciding which company to buy printing equipment from was the cost associated with those products—meaning, not just the purchase price of the printer itself, but the total cost of ownership associated with the

device; consumables such as ink; operating the device; and necessary maintenance and repair costs. Investors were similarly focused on this issue. Kornit thus made multiple statements throughout the Class Period touting its products' total cost of ownership as a strong benefit to the Company. For example, in Kornit's Annual Reports filed on Form 20-F, the Company stated that "the differentiation across our new line of HD systems is mainly based on system productivity and total cost of ownership, with a clear benefit to our higher productivity systems." The Company also described its products as having "attractive total costs of ownership" or the "best total cost of ownership" in their class.

54.    But contrary to Defendants' statements, the total cost of ownership of Kornit's products was drastically misrepresented, and in truth, Kornit's products cost the Company's customers much more than Kornit had told them.

55.    For example, as explained by FE8, a sales manager for South America at Kornit from April 2019 to February 2022, Kornit claims the stability of their machines is very good, but it is 100% not. For example, FE8 explained that Kornit's Presto printer has a lot of problems in terms of stability, and the business output Kornit claims is not real. According to FE8, Kornit says the new Atlas machine will cost five cents per garment to produce, but the real cost is more like fifteen cents per garment. FE8 is good friends with a Kornit customer in Brazil that has one plant in Miami. The customer told FE8 that Kornit told them the cost per t-shirt would be ten cents, but it was actually twenty. Similarly, according to FE8, when a customer in Colombia realized it was going to cost twice as much to produce as Kornit had told them, they turned off the machine; another customer in Brazil returned the machine after four months for the same reason. FE8 explained that Kornit tells customers they can have fashion brand quality with the new Atlas Max machine, but they don't mention that in order to get it, you have to use double of a lot of elements,

such as white ink and primer.  According to FE8, the machine also has to do more passes to make more layers of the ink, but no one explains that when they do customer demonstrations.

56.    FE2 provided a similar account.  According to FE2, the total cost of ownership turned out to be much higher than what Kornit claimed to customers during the sales process.  FE2 explained that Kornit would help any potential customer make a calculation on how quickly they could get their investment to break even or make money.  Kornit came up with those numbers using an ROI (return on investment) tool where a customer could put in specific figures and then it calculated the cost and put out an ROI.  FE2 reported that the biggest thing you have to calculate is the ink consumption, because that is the most expensive part of the calculation.  According to FE2, with the calculator, Kornit would calculate the milliliters of ink needed for a specific design or garment, but then it would turn out that if customers wanted to print at the quality they saw during the Kornit demonstrations, they would need to use much more ink than calculated during the sales process.  FE2 stated that where a customer might have seen a $1.00 estimate in the calculator, the reality is that it would actually cost them up to 60% more to print the design.  Kornit used this tool for DTG as well.

57.    As noted above, FE9 was a VP of Marketing and President for North America at Kornit from August 2015 to September 2017.  FE9 currently works at a competitor of Kornit.  FE9 similarly confirmed that for most of their machines, "Kornit has grossly, grossly over-marketed the outputs of their machines."  The actual output is half of what Kornit markets according to FE9, because the machines use more ink and take longer to print than Kornit markets.

### 3.    Defendants Touted Kornit's Purported Technological Advantage and Competitive "Moat" While Their Largest Customers Turned to Kornit's Main Competitor

58.    Kornit's business is largely dependent on its ability to create printers, software platforms, and consumable products (such as ink) that are better than its competitors' products.

Investors were thus keenly focused on the quality of Kornit's products relative to its competitors' versions.  To reassure investors, Defendants made various statements concerning the Company's purported technological advantages over its competitors and the oft-touted "moat," or gap, that the Company had created between itself and those competitors.

59.    For example, on May 19, 2021, Defendants Samuel and Rozner participated in the Barclays Americas Select Franchise Conference.  During that conference, Defendant Samuel assured investors that Kornit did not "see today any [competitor] that we can say that it's any threat on us," "mainly due to the moat that we manage[d] to build around our technology."  This moat, or gap, between Kornit and its competitors, was supported by the purported superiority of Kornit's products, which Kornit claimed to have "brought it to the level of quality that's much better than any conventional technology."  In response to a direct question about protecting Kornit's technology from competition during another analyst conference on June 1, 2021, Defendant Samuel rejected the notion that Kornit faced any real competition, stating that the reality was "Actually, the opposite.  What we see in the market today that's we are opening much bigger moat versus our competitors."  As detailed further below, these representations continued throughout the Class Period, as Defendants routinely assured investors that the threat of competition was "not something that we are worried about" and that those perceived competitors' "level of the quality is not the same" as Kornit.

60.    Analysts credited these statements concerning the unmatched quality of Kornit's products and competitive moat.  For example, immediately following the Americas Select Franchise Conference, analysts from Barclays lauded Kornit's "new technologies which have digitized specialized processes which could only be done using analog ways of productions until now" and proclaimed these technologies as "unique" to Kornit.  Later that year, in October 2021,

analysts from Berenberg Capital Markets issued a highly favorable valuation for Kornit and explained: "We believe the valuation is justified considering the long-term growth prospects of the business and competitive moat."  Analysts continued to believe Kornit's representations as the Class Period continued.  For example, in February 2022, Barclays analysts stated that they saw Kornit as "the company best positioned to capitalize on the industry's digital transformation thanks to its best-in-class products and cutting-edge technology."

61.    But, as reported by several former Kornit employees, Kornit experienced significant competition, including from M&R Printing Equipment, during the Class Period.  This intense competition eventually resulted in the complete or partial loss of two of Kornit's top 10 clients, Delta Apparel and Fanatics, who accounted for more than 10% of Kornit's recurring revenues during 2021.

62.    Public information corroborates the existence of competition, especially from M&R.  On March 28, 2022, Delta Apparel and Fanatics announced that they were expanding their "digital print business through the installation and utilization of newly developed digital print technology."  Delta's press release announcing this expansion informed the public for the first time that Delta and Fanatics had worked closely with M&R, one of Kornit's main competitors, to design and supply this new technology.  Delta explained that this "unique digital production process will allow custom orders to be produced, packaged and shipped to the end consumer within twenty-four hours from receipt of order"—essentially replacing Kornit. Delta Apparel further revealed that it had already installed this new M&R technology in four of its existing digital print facilities and planned to install additional equipment in the near future.

63.    FE3 reported that internally at Kornit, M&R was considered serious competition.  This fact was corroborated by other former Kornit employees.  For example, FE1 worked at as a

Customer Success Manager from July 2016 until February 2022, and as a Customer Success Contract Administrator from February 2022 until February 2023. FE1 similarly said that it was not true that Kornit did not have competition in the market. According to FE1, Kornit's biggest competitor is M&R and it was generally known in the sales organization that M&R was a big competitor. Despite this knowledge, Defendants repeatedly affirmed that they were insulated from competition by their purported ever-widening moat.

64.     Similarly, throughout the Class Period, Defendants repeatedly touted that the composition of Kornit's top 10 clients would change as Kornit *added* larger customers. But Defendants' statements about the composition of Kornit's top 10 clients was misleading in failing to disclose that their top 10 clients *had* changed because Kornit had *lost* business from Fanatics and Delta Apparel. According to FE4, Fanatics and Delta had over 100 Kornit installations, which were lost to the competition. Fanatics and Delta were two of Kornit's top 10 clients.

65.     According to FE4, Kornit knew there was a problem in the relationship with Delta Apparel, but never disclosed it. Indeed, FE4 recounted that it was never formally communicated, but the whole Company knew internally. FE4 indicated that Delta started placing orders with the competition in the beginning of 2021, and by the end of that year they had fifteen units installed and had placed an order with the competition for fifty more. According to FE4, Kornit knew about this by the time that Kornit conducted a secondary offering of its ordinary shares in November 2021 (the "2021 Offering") but did not disclose it. FE4 knew this because it was discussed in meetings prior to the 2021 Offering. FE4 believes customers left Kornit, including Delta, due to terrible customer service. FE4 explained that Kornit had a customer service team in-house at Delta. FE4 knew about the problems with customer service because it was discussed in meetings that included the CEO, Ronen Samuel, the president of North America, Chuck Meyo, and the VP

27

of sales, Don Whaley.  According to FE4, these issues started being discussed at the end of 2020 or the beginning of 2021.

66.    FE4 remembers DGT2go switching to the competition and believes that Delta was already *using* the competitor's equipment by the fourth quarter of 2021. FE4 explained that this means the units were probably installed six months before that, and bought nine months before the fourth quarter, so they would have purchased the competitor's equipment in the first quarter of 2021.  Further, as FE4 explained, the drop-off in Kornit ink consumption would have started in the fourth quarter of 2021 as DTG2go was replacing their Kornit machines.  According to FE4, and as detailed below in the discussion of Kornit's ability to monitor ink consumption and impressions, Kornit knew it was happening and just pretended it wasn't.

67.    Further, according to FE4, the CEO and CFO of Kornit had a very strong relationship with the CFO of Delta and DTG2Go.  Kornit's CEO and/or CFO spoke with Delta's CFO every month, if not every week.  But the relationship broke down.  FE4 stated that this was discussed in meetings that included the management team in the United States, the head of strategic accounts in the United States, and the service director.  FE4 confirmed that Delta did not buy any new Kornit units and that there was conflict with Kornit management.  He doesn't know exactly what the conflict was about, but he knows there was a big discussion about service.  This was in the second quarter of 2021.  According to FE4, the problems with customer service were discussed in meetings that included the CEO, Ronen Samuel, the president of North America, Chuck Meyo, and the VP of sales, Don Whaley.  These meetings took place frequently.  FE4 was not personally part of those meetings, but he had weekly meetings with Chuck Meyo, and Meyo mentioned every time that he had reported the customer service issues to Defendant Samuel, as did Whaley, who FE4 reported to.

68.    FE7 corroborated FE4's account.  According to FE7, several strategic customers said they were not going to buy any more machines from Kornit unless they improved their service, including Printful and DTG2go.

### 4.    Defendants Touted the Purported Value of KornitX, Even As the Program Failed to Get Off the Ground and then Stagnated

69.    As described above, KornitX was a suite of end-to-end fulfillment and production offerings.  KornitX was designed to automate workflow and inventory by allowing brands to order items at any of Kornit's participating customers, with delivery to the end consumer within 24 hours.  KornitX was intended to accelerate Kornit's overall growth.

70.    Even before the Class Period, Defendants touted the benefits that KornitX would bring to the Company.  For example, Kornit held a conference call for investors in connection with its acquisition of KornitX (then known as Custom Gateway) in August 2020.  During that call, Defendant Samuel described KornitX as a product that would "enable brands, retails to move into on-demand manufacturing" and "enable[e] the brands to produce [garments] after they got their orders and not to produce to forecast and being stuck with huge waste."

71.    These statements continued throughout the Class Period, as Defendants touted KornitX as "a breakthrough . . . that [ ] will change the market" and told investors that "[w]e see a great adoption on the KornitX" by customers.  In addition, Defendants repeatedly claimed that $100 million of Kornit's 2026 $1 billion revenue target "directly will come from transaction out of this KornitX."

72.    Defendants' statements about the success of KornitX and their expectations for future growth were false.  As Defendants admitted after the Class Period, KornitX only ever generated a "couple million" in revenue.  This is because, as reported by former Kornit employees, KornitX simply wasn't ready to market and was difficult to sell in the Americas to clients who

already had customized software.  According to these former employees, it would take Kornit much longer than they disclosed to get the $100 million in sales they needed by 2026.  Indeed, a former Kornit employee described Kornit's public statements about achieving $100 million in revenue by 2026 as "kind of crazy" based on internal sales targets and the Company's failure to sell KornitX to *any* client during his tenure.  And, on the final day of the Class Period, Defendants pre-announced disastrous financial results for the second quarter that were materially impacted by KornitX's failure to generate meaningful revenue or growth, with Defendant Samuel admitting the following quarter that the Company was still working on "stabilizing the platform".

73.    FE10 was a Platform Sales Manager for KornitX from March to July 2022.  He was hired as part of a sales team that was tasked with selling KornitX to both customers that had Kornit printers, and other potential customers that were demand generators who might want customization.  When told that Kornit had said that they expected to get to $100 million revenue per year for KornitX by 2026, FE10 said that number was "kind of crazy" because, according to an internal document he had, the targets per salesperson were $51k for the second quarter, $97k for the third quarter, and $176k for the fourth quarter, totaling about $325k per sales manager.  FE10 explained that there were four sales managers total for KornitX and one boss, who was also responsible for sales.

74.    Similarly, FE3 explained that KornitX was one of the reasons he joined Kornit. FE3 stated that originally, marketing KornitX was supposed to be part of his role.  However, FE3 explained, it became a separate organization with its own president, and then the product never came to market.  According to FE3, by the time he left it had been three years since Kornit acquired Custom Gateway (from which the KornitX technology had been acquired), and it had not turned any kind of profit or generated any sales in the Americas.

75.     FE11 worked as a Software Architect at KornitX from July 2021 until November 2021.  According to FE11, KornitX was not ready and they were constantly working on it and figuring out the integration.

###### 5.    Defendants Ignored Concerning Known Trends In Kornit's Business, Touted Their Strong "Backlog" of Orders, and Then Accelerated Revenue to Deceive Investors

76.     Throughout the Class Period, investors were focused on whether Kornit could maintain its strong momentum and meet its financial projections, including the Company's medium- and long-term guidance.  Kornit had announced plans to hit $500 million in revenue per year before the end of 2023, and to follow that up by hitting $1 billion in revenue by 2026.  To reassure investors that it was on track to meet their expectations, Defendants made various statements in Kornit's SEC filings concerning the demand for the Company's products and touted their high visibility into that demand.

77.     For example, on February 16, 2021, Kornit reported its results for the fourth quarter of 2020, as well as its full-year results.  In its earnings release, Defendant Rozner touted the Company's "significant order backlog" and its "solid pipeline position," which he claimed positioned Kornit to "drive sizable growth and profitability in 2021 and beyond."  Defendant Samuel echoed these statements, similarly touting the Company's "impressive backlog" of orders and Kornit's "extremely robust pipeline."  Defendant Rozner further assured investors that Kornit had "strong visibility" into its pipeline and the orders that the Company would get in 2021.

78.     Defendants buttressed these statements with similar assurances during Kornit's regular conference calls with investors.  For example, on the earnings call held that day, Defendant Samuel claimed that Kornit's "very strong" outlook for 2021 was supported by "the highest level of visibility" into its order flow in the Company's history.  Similarly, Defendant Rozner repeatedly

touted the purportedly "strong demand" for Kornit's products, including its printers and consumable products such as ink.

79.    These statements continued throughout the Class Period.  In various quarterly earnings releases and calls, as well as investor conferences, Defendants reassured investors that they had a "strong backlog" in orders that would continue to drive revenue for Kornit and clear "visibility" into future business in "2022 and beyond."  These representations concerning Defendants' visibility permeated their discussions with investors.  For example, in August 2021, an analyst asked Defendants to speak about any potential supply chain issues that might impact Kornit's business.  In response, Defendant Samuel dismissed concerns that supply chain problems would have any negative effect, because Kornit had "very, very good visibility for this year and we have excellent visibility for next year."  Defendant Rozner immediately followed up, explaining that "because of the great visibility, we were able to secure production floor as well as the main lead times for quarters ahead."

80.    Analysts credited these statements.  For example, a Barclays analyst report released the day after the February 16, 2021 earnings release and call echoed management's assertions concerning their "robust pipeline and backlog" in orders, as well as the "strong demand for all its product lines and consumables."  Analysts from Needham immediately increased their first quarter 2021 revenue estimates for Kornit by nearly 25% and issued a report referencing management's statements that Kornit "entered 2021 with the highest level of visibility in its history."  Similarly, William Blair confirmed its "outperform" rating on Kornit's stock, crediting management's claims of "visibility at the highest level in the company's history" as well as a "strong backlog" of orders and a "robust project pipeline."

81.    Analysts continued to believe these assurances and factor them into their valuations of Kornit throughout the Class Period.  For example, analysts from Berenberg Capital Markets noted Kornit's "strong visibility into FY21 & FY22" in August 2021 while "increas[ing] our estimates" for Kornit's performance.  Then, in November 2021, Barclays noted with approval management's pointing "to good visibility heading into 2022."  Later in February 2022, William Blair credited the assertion that "Kornit's backlog provides excellent visibility into 2022."

82.    Defendants' visibility into system revenues was also supported by the fact that, as Defendants told investors in January 2022, many of Kornit's customers operated on two-year purchasing plans, providing unique visibility into future ordering patterns.  Moreover, according to Defendant Samuel, Kornit's largest customer and "global strategic account," Amazon, operated on a three-year plan, providing Kornit with even more information.  Based in part on these long-term customer plans, Defendant Samuel represented on January 10, 2022, that "*we have the visibility so we can place order[s] already for 2023 with* our suppliers to secure the needed supplies that we need."

83.    Defendants' visibility into sales, by their own admission, was also buttressed by live data received from each of its installed printers that uses Kornit Konnect which, among other things, reports detailed usage metrics to Kornit – effectively in real time.  As Defendant Samuel explained, Kornit is continuously "measuring everything. So we have a Konnect system that connecting to all our installed base for all new system that we are selling, and we know everything that our customer is doing.  We know what are the garment that they're using, how much ink laydown they're doing, what type of jobs that they're printing.  So we have a very good visibility for the trends."  In other words, Kornit was able to both measure current demand levels for its products and use that data to assess future trends and anticipate customer needs.

84.     Moreover, as revealed by internal Company documents provided by a former Kornit employee, ink usage was closely monitored each week by Kornit during the Class Period for purposes of financial planning in an "Ink Summary". The Ink Summary reported, among other things, contemporaneous ink bookings for every client with more than $65,000 in ink bookings, which represented more than 80 percent of revenues generated from ink sales.  The Ink Summary also compared quarter-to-date revenues against both management's revenue forecast for the quarter and Kornit's "AOP" or annual operating plan.  For example, the Ink Summary from the second quarter of 2021, lists both DTG2GO and Fanatics as top clients, with each representing five percent of more of Kornit's total ink sales.

85.     As Defendants have also admitted, this live, granular visibility into system and ink usage corelates closely with system sales, utilization rates, and ink sales. Usage rates were determined by impressions.  Indeed, after the Class Period, Defendant Samuel acknowledged that "the best indicator, leading indicator for our business is the health of our customers.  And the health of our customer is what we call impression.  What is the trend on the impression?  How many impressions they are printing?  Is it going up or going down?"  Defendant Rozner made a similar admission on November 9, 2022, stating that "if the peak season will be strong as it started – and I can tell you that the initial indication are very, very nice from ordering of ink, then we believe that it will open the market a bit more for investment in new equipment next year."  Thus, as impressions and ink usage increase, Kornit's customers are more likely to order additional systems to meet demand.  Conversely, as impressions and ink usage decline, Kornit customers are unlikely to order additional systems, ink, or supplies given existing unused capacity.  As a result of their various lines of sight into their customers' use of Kornit's products, Defendants were able to plan accordingly.

86.    But despite this crystal-clear visibility into business trends, Defendants continued to make material misrepresentations to customers that demand for Kornit's products was strong, and that Kornit had a significant "backlog" of orders that would keep the Company on track toward its stated financial targets.  And when asked directly about whether Kornit was pulling forward revenue to meet its projections, Defendants unequivocally denied that this had happened.

87.    In truth, however, demand for Kornit's business was rapidly cratering, particularly beginning in late 2021 and into 2022.  Despite this, Kornit continued to set unrealistic targets, and when those proved to be unattainable, pulled forward revenue in order to meet its guidance.

88.    *First*, Kornit relied on a top-down system to set "unrealistic" revenue targets that were disconnected from market demand.  According to FE2, goals were set by headquarters in Israel and it was Defendant Samuel in particular who always came up with the revenue numbers the Company should deliver.  FE2 explained that sales projections were based on the revenue number that Defendant Samuel wanted to hit. According to FE2, the regional presidents then had to come up with plans to achieve those targets.  FE2 did not attend these meetings, but explained that after the meetings, his director would come to him and disclose the target numbers for the next year.  As FE2 stated, the targets were not based on previous sales or what the market could bear. FE2 stated that there was no input related to market situations or market challenges.

89.    FE2 confirmed that the targets were "unrealistic, by far," and believed that Kornit doubled the numbers that were actually reachable.  When discussing the disconnect between targets and demand, FE2 stated that the response from management was: "Stop complaining. There is always someone else who will do it."  FE2 stated that management weren't willing to listen, but added that toward the end of a quarter, everything was possible.  Specifically, towards the end of the quarter, Kornit's CEO would contact the salespeople and say, "We need revenue. Do what you

need to make the deal." The end of quarter deals, which could be discounted by up to 30%, were not always a discount on pricing and could include extended payment terms or free service contracts. According to FE2, all these discounts had to be approved by Defendant Samuel. Even the 5% and 7% discounts eventually would also be approved by Defendant Samuel, but anything above 7% could *only* be approved by Defendant Samuel alone. There was no deal where Defendant Samuel did not give the final go-ahead.

90.    *Second*, Kornit had the ability to accelerate revenue with its most important client, Amazon. Specifically, according to FE7, there was always a discussion of when to upgrade more machines based on when they wanted to declare the revenue from Amazon. As FE7 explained, in 2021 Kornit installed more than 100 machines for Amazon. According to FE7, Amazon told Kornit that the machines had to be safety rated, so Kornit undertook an extensive safety upgrade program for all of Amazon's machines, which included installing updated electronics and pneumatics. The safety upgrades would culminate with the application of a sticker indicating that the machine had completed such safety upgrades. FE7 explained that his team would be told to upgrade more or fewer machines depending on what Kornit wanted to recognize for the quarter. FE7 understood that when he gave Amazon the test results and sticker for the machine, that would constitute the official acceptance from Amazon, which is when Kornit would recognize the revenue for that machine.

91.    Indeed, as admitted by Kornit only recently, the equipment sold to Amazon, and on which Kornit recognized revenue in 2022, were only in the process of being installed in 2023. Similarly, according to FE9, the Amazon plant that was "delayed" (and purportedly contributed to the 2022 second quarter earnings miss) was in Philadelphia. FE9 explained that Amazon took the machines because they had an agreement with Kornit. According to FE9, however, even though

Amazon took the machines, Kornit knew that Amazon was not going to be buying ink for the machines right away because of the delay, and therefore revenue should have dropped.

92.    *Last*, contrary to Defendants Rozner's express representation, Kornit in fact pulled revenue into the first quarter of 2022 which was slated for the second quarter of that year. FE3 stated that there were "recognizable trend issues that were recognized by some at the Company and ignored by others until it was too late to stop the tailspin." FE3 added that in November and December 2021 when he was still in his role at Customer Success, Kornit saw a slowdown in their sales. As FE3 explained, November and December are typically a very busy season for Kornit's customers, when they produce a tremendous amount of product. According to FE3, that period in 2021 wasn't as busy as the last couple years, and not as busy as Kornit had projected. Indeed, FE3 reported that as soon as the pandemic mandates ended, everybody got back outside, and Kornit saw the negative effects on their sales in the fourth quarter of 2021. FE3 was in weekly, and sometimes twice weekly, calls concerning sale projections and revenue. FE3 had discussions with the President and Vice President of the Americas division about what was going on with the 2021 slowdown.

93.    This trend continued into the first quarter of 2022 as Kornit's customers, including its largest account, experienced additional slowdowns in business and purchased substantially less product from Kornit than they had in the past. To cover the anticipated miss in first quarter 2022 forecasts, according to FE3, projected revenue for the second quarter of 2022, or booked to bill revenue, was ***brought in to the first quarter*** to "stave off the inevitable reality that Kornit was in a tailspin" and to create the appearance that Kornit was on or just short of its target for Q1 2022. FE3 explained that he was made aware of the sales being pulled forward by Chuck Meyo. FE3 added that executives were definitely aware of the problems in the first quarter of 2022, because

that was *why they chose* to bring in the revenue from the next quarter. FE3 stated that he also knew executives were aware of the sales and service problems because he was in meetings where presentations covered these issues, and he knows from speaking with Meyo that Meyo told executives about the issues. FE3 explained that Meyo told FE3 that Meyo was sharing all of these issues about sales and service with executive management, and they weren't listening. According to FE3, the decision to bring revenue forward was a direct result of the reports of the slowdown being given to management.

94.    Later, in May 2022, Kornit would announce disappointing results for the first quarter of the year, and Defendant Rozner would admit that a substantial amount of Kornit's sales that quarter, which allowed the Company to meet its target, came late in the quarter.

## V.    THE TRUTH EMERGES

95.    The truth concerning Kornit's misleading statements and omissions was not fully revealed until the end of the Class Period on July 5, 2022 and was disclosed to investors through a series of partial corrective disclosures and/or the risks concealed by Defendants' misrepresentations and omissions materialized, as explained below.

### A.    May 11, 2022 – In a Partial Disclosure, Defendants Issue Disappointing Results for the First Quarter of 2022 and Lackluster Financial Guidance for the Second Quarter of 2022

96.    On May 11, 2022, Kornit reported its financial results for the first quarter of 2022. Kornit reported a net loss of $5.2 million, compared to a profit of $5.1 million for the first quarter of 2021, representing more than a $10 million negative swing in profit year over year. Kornit also reported a GAAP operating loss of $6.9 million for that quarter. The Company reported $83.3 million in revenue for the first quarter of 2022, which was nearly $5 million below Kornit's guidance range of $87-91 million, but when combined with $8 million in non-cash warrants from one of Kornit's largest customers, Kornit reported total revenue of $91.3 million, just over the

Company's guidance range.  The Company also issued weaker-than-expected revenue guidance for the second quarter of 2022, telling investors to expect Kornit to generate between $85 million and $95 million of revenues in the second quarter of 2022, well below the street consensus expectations of approximately $103 million.  Furthermore, Kornit issued operating margin guidance between a range of -2% to 2%, significantly below the nearly 12% consensus estimate of analysts covering the Company.

97.     Analysts were surprised by these disclosures, indicating that the disappointing results were attributable to competitive pressures that Defendants had denied the existence of, specifically noting that "competition was worth watching."  For example, Barclays commented that a "Tough 1H raises some questions" and noting that Kornit's "1Q results and the 2Q22 revenue guidance missed [its] estimates." Analysts from Needham noted that the "weak Q1 revenue guidance has left investors understandably skeptical that this is a temporary issue, as evidenced by the sharp drop in KRNT's share price today."  Needham also noted that "All eyes will be on how KRNT exits the June quarter" and lowered its revenue estimate for the second quarter of 2022 from $104 million down to $86 million, a more than 17% decrease.

98.     Kornit also held a conference call with analysts and investors to discuss those results, during which the Company attributed its disappointing guidance to a slowdown in orders in the e-commerce segment, including from Kornit's large global customers.  The Company's conference call that day also revealed additional information concerning Kornit's relationship with certain of its largest customers.

99.     During the call, an analyst asked Defendants to "update us on any specifics around the strength of your relationship with Fanatics and Delta Apparel," referring to the March 2022 announcement discussed above at paragraph 62.  In response, Defendant Samuel *admitted* that, for

*at least the previous two quarters*, Kornit knew that Delta Apparel, one of Kornit's largest customers, had decided to acquire digital printing systems from one of Kornit's competitors. Defendant Samuel also admitted that he "kn[e]w a bit more on that" but told analysts that he would "not get into it."  Thus, Samuel acknowledged Kornit had been aware since the quarter beginning in July 2021 that it faced significant competitive risk from M&R and loss of sales at Delta and Fanatics, two of its largest and most important customers.

100.    On this news, the price of Kornit ordinary shares declined by $18.78 per share, or 33.3%, from a closing price of $56.41 per share on May 10, 2022, to a closing price of $37.63 per share on May 11, 2022.  This decline wiped out approximately $932 million in Kornit's market capitalization.

101.    Kornit's disclosure, however, did not reveal the full truth.  To the contrary, Defendants continued to make additional false statements to soothe the market and conceal the full truth concerning Kornit's financial health and its customer relationships.  For example, in the earnings release, Defendant Samuel continued to tout Kornit's plan to "deliver, ahead of plan, on the $125 million run-rate [in quarterly revenue] business we originally targeted for the fourth quarter 2023," and reiterated that the Company remained "confident in our journey to become a billion-dollar business in 2026."  Likewise, Defendant Rozner tried to reassure investors that Kornit's "pipeline of opportunities" remained strong.

102.    Defendants continued their campaign to reassure investors during the earnings call that day.  For example, Defendant Samuel characterized these results as simply a "very short-term bump on the road."  Then, in response to the question about Fanatics and Delta Apparel, Defendant Samuel falsely attempted to minimize the impact of the customer loss and material impact on Kornit's revenues, noting that the "few" competing machines that Delta was purportedly trying

out were "more of a replacement for screen, not for short run, not for one-off, not for direct to consumer." Defendant Samuel's assurances were false. Not only did it contradict the press release issued by Delta Apparel announcing its new partnership with Fanatics and M&R, which provided that "this business process is the first of its kind as it will allow custom orders to be produced, packaged, and shipped to the end consumer within 24 hours from receipt of order" but Defendant Samuel's reference to the "few" machines was also false. Indeed, in its March 28, 2022, press release, Delta Apparel noted that in addition to four currently installed *sites*, that additional machines would be installed in the *first* quarter of 2022. And, that same day, on Delta Apparel's earnings call, Delta's CEO further indicated that the technology to be supplied by M&R to be used in its business with Fanatics, would represent a huge part of Delta's business: "we expect [Fanatics] to be our biggest customer in DTG2Go. It might be our biggest customer in any business given a few quarters and the power behind the Fanatics brand and what they're doing in the marketplace."

103. In addition, one analyst specifically asked Defendant Rozner whether Kornit had pulled forward revenue from the second quarter of 2022 into the first quarter. Defendant Rozner flatly denied that Kornit had pulled forward revenue, claiming instead that Kornit's late-quarter sales in Q1 2022 "was a timing issue of making decisions and getting the paperwork."

104. Defendants' false assurances worked. Based on these representations, investors— even the analysts who revised downward their short-term outlooks—understood (mistakenly) that Kornit's disappointing results were a one-off, and that the Company maintained strong fundamentals that would drive a positive valuation. Comforted by Defendants' statements, analysts at Berenberg stated that they "remain[ed] bullish in our thesis." Likewise, analysts at Needham concluded that the "selloff" in response to the disappointing earnings release was "overdone, particularly given what appears to be a solid line of sight into 2H demand." Finally,

analysts at William Blair continued to credit Defendants' assurances that "Kornit continues to have a robust pipeline of opportunities and invest in the business to support the company's growth initiatives."

105.    Defendants continued to make similar false statements to soothe the market in the weeks that followed.  For example, on June 7, 2022, Defendants Samuel and Rozner attended the William Blair Growth Stock Conference.  During that conference, an analyst from William Blair noted that "the second quarter guidance surprised some people in being below the consensus estimate in terms of revenue and operating margin."  In response, while acknowledging that Kornit's customers had seen a slowdown "[b]y the end of 2021," Defendant Samuel assured investors that "the fundamental of Kornit business is unbelievable in the best place that we could dream of."  Defendant Samuel further noted that market "trends are really pushing into digital," which would benefit Kornit, and that the "fundamental of our business [is] very, very strong moving forward."  He went on to again describe the first quarter results as merely a "bump on the road" and reaffirmed that Kornit would achieve a $500 million revenue run rate in 2023, and specifically projected $125 million in revenue for the fourth quarter of 2022.  Defendant Samuel also stated that Kornit was selling more product than it had been earlier in the year, and that the Company was seeing "real time supplies coming back, back into growth."

106.    The next day, Defendants Samuel and Rozner attended the Stifel Cross Sector Insight Conference and continued to make false assurances to the market.  For example, Defendant Samuel opened the conference by stating that "the fundamentals of what Kornit is driving in our business is better than ever" and again describing the first quarter as just a "bump on the road" that had already passed as Kornit saw "a new normalization" and "continued growth."  Defendant

Samuel also continued to tout KornitX's value, representing that demand for the product "is growing very fast."

**B.    July 5, 2022 – Kornit Reports Shockingly Bad Results for the Second Quarter of 2022**

107.    On July 5, 2022, after the market closed, Kornit stunned investors by announcing disappointing preliminary financial results for the second quarter of 2022.  In its earnings release, the Company disclosed that it expected revenue for the second quarter to be in the range of $56.4 million to $59.4 million.  That represented a dramatic reduction of more than 35% at the midpoint of the $85-95 million guidance that the Company issued less than two months prior.  Furthermore, Kornit cryptically told investors that it expected results for the third quarter of 2022 to be "at or above" second quarter levels, which implied a substantial decrease to consensus expectations based on Kornit's prior representations.  Kornit attributed these poor results to "a significantly slower pace of direct-to-garment (DTG) systems orders in the second quarter as compared to our prior expectations."

108.    Analysts were astonished, given Defendants' previous statements. For example, analysts at Craig-Hallum downgraded Kornit to "hold," remarked on the "surprisingly weak results," and expressed that "visibility has become increasingly challenged" given the "sizeable revenue and profitability miss."  Analysts at Berenberg Capital Markets stated that the "other shoe drops" as the July 5 disclosure "shows sobering results."  Berenberg went on to say that these results showed "significant weakness in demand which far exceeded both consensus and market expectations."

109.    Moreover, analysts immediately called management's candor into question. For example, analysts at Berenberg Capital Markets stated: "we believe management regaining the trust of the investment community will prove to be a long and winding road." Indeed, analysts at

Craig-Hallum were particularly puzzled by "the delta between [second quarter] results and expectations given management's generally bullish tone in early to mid-June at several conferences," such as those discussed above.  Analysts at Barclays even noted that "our conversations with investors point to some concerns about management coming across as overly confident about the pace of growth / level of interest, both pre-1Q (with 2Q guide missing consensus on revenues) and post-1Q (with management pointing to recovery in 2H)."

110.    As a result of these disclosures, the price of Kornit ordinary shares declined by an additional $8.10 per share, or 25.7%, from a closing price of $31.56 per share on July 5, 2022, to a closing price of $23.46 per share on July 6, 2022.  This decline wiped out approximately an additional $402 million in Kornit's market capitalization.

## VI.    POST-CLASS PERIOD ADMISSIONS BY DEFENDANTS

111.    On August 10, 2022, Kornit held a conference call to discuss its second quarter 2022 earnings results. During the earnings call, Defendant Samuel admitted that, now in the third quarter, Kornit had finally seen "some customers . . . going back into the growth phase.  But *in H1, they were declining year-over-year*."  Defendant Samuel also admitted that some customers had been complaining of overcapacity in the *first half* of the year and had therefore declined to upgrade to the Atlas Max.

112.    Given the poor results, Defendant Samuel also withdrew the Company's 2023 and 2026 growth targets, noting that "As for the $500 million in 2023, at this moment, we do not want to commit to bringing it in 2023" despite vigorously reaffirming that target at two conferences less than three weeks before the close of the second quarter.

113.    Defendant Samuel made similar representations nearly a year later in May 2023, stating that in 2022 "we saw the impression[s] in many customers going down, and we started to talk about in H2 that we're *starting* to see a new trend that it's starting to move up."  Defendant

Samuel elaborated, that "[a]fter the huge growth that we were experiencing during 2020 and 2021, mainly through our customers, the e-commerce was booming. ***Beginning*** of 2022, we saw major decline within the business of our customers. They found themselves with overcapacity. They acquired many, many systems, inks and systems during the year of 2021 and the first and the second half of 2020. And they had overcapacity and they didn't buy additional systems during 2022."

114. On November 9, 2022, during Kornit's earnings call for the third quarter of 2022, Defendant Samuel also admitted, with respect to KornitX, that Defendants were *still* working on "stabilizing the platform itself" and that "KornitX generates [a] few millions of dollars" of revenue, which was "still not meaningful enough." These admissions flatly contradicted *six* quarters of repeated representations by Defendants concerning KornitX's adoption, growth, and prospects.

## VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

115. Defendants made materially false and misleading statements and omitted to disclose material facts that they were required to disclose during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Throughout the Class Period, Defendants' SEC filings, press releases, and analyst and investor presentations included material misstatements and omissions concerning the Company's financial condition which included, among other misrepresentations, statements concerning Kornit's vulnerability to competition and demand for the Company's products and services.

116. As discussed above, Defendants' representations were false and misleading and omitted material facts either required to be disclosed or necessary to make the statements not misleading. These material misstatements and omissions had the effect of creating an unrealistically positive assessment of Kornit's business and future growth prospects, including as

related to the Company's stated goal of achieving a $500 million run rate before the end of 2023 and $1 billion in annual revenue by 2026. In truth, Defendants were falsely presenting a materially misleading depiction of Kornit's business.

### A.    False and Misleading Statements and Omissions Concerning the Fourth Quarter and Fiscal Year 2020

117.    The Class Period begins on February 17, 2021, the trading day after Kornit announced its financial results for the fourth quarter and full year ended December 31, 2020.

118.    On February 16, 2021, after the market closed, Kornit held a conference call with analysts and investors to discuss the Company's financial results for the fourth quarter and full year of 2020. During the call, Defendant Samuel touted the Company's "phenomenal execution" in 2020, "demonstrating *the accelerating demand* for our products." Defendant Samuel also emphasized that the Company's "*[s]ervices [business] continue[d] to outperform our expectation on growth and profitability*," and led investors to believe that this was the result of "*the execution of our customer success teams*." Eager to portray the service business as a stable, high margin profit center, Defendant Samuel, in direct response to an analyst question about whether the Company's service contracts were "singular year" contracts with the potential for renewal or "multi year" contracts, represented that "*every machine that we are selling, we are selling it with a contract. There's no other way to buy from us a machine and it's not for one year*. *It's for multiple year contracts and we see a very nice recurring revenue coming from the service business*." Defendant Rozner elaborated, stating that "*[w]e continue to improve our service contract attach rate, which is growing our recurring revenue stream*," and that the Company's strong gross margins for the fourth quarter were the result, in part, of profitable service revenue.[5]

---

[5] In this section of the complaint, the language that is emphasized in ***bold italic*** type is quoted from Defendants' public statements and disclosures and is the language that Plaintiffs specifically allege to be materially false and misleading as set forth in this paragraph and the paragraphs that follow.

119.    During the call, Defendant Samuel stated that its new business line, a "unique" cloud-based software workflow service platform called KornitX, was, even in its early stages, "***experiencing huge interest from brands and fulfillers*** looking to adopt on-demand business models at a global scale, as well as automate and optimize the production flows."  Defendant Samuel stated that this provided the Company with "***a huge opportunity for Kornit to build an incremental recurring business model***, and we have an exciting roadmap of new software application and value-added services."

120.    On the strength of these representations, Defendant Rozner touted the Company's 2023 revenue guidance of $500 million, noting that "***we are more confident than ever in our ability to achieve our $500 million run rate goal ahead of plan*** while expanding gross margin and profitability."

121.    The statements in ¶¶118-20 above were materially false and misleading when made, and omitted material facts.  Specifically, the above statements concerning the "execution" of Kornit's customer success team, the mandatory nature, attach rate, and length of service contracts were false and misleading when made.  According to former Kornit employees, both initial and renewal service contracts were *one year* in length and approximately 80% of customers would *decline* to renew service contracts because of poor service or the unjustified cost of the service contract.  Thus, Defendants' statements related to the "very nice recurring revenue" generated by the service department were false.  *See supra,* Section IV.B.1.

122.    Defendant Samuel's statement concerning the purported strength of the service department which supported "very nice recurring revenue" for Kornit was also false and misleading because poor service performed by Kornit exacerbated issues with the Company's frequently broken equipment and caused significant customers, including DTG2go and Sticker

Mule, to complain and ultimately defect to the competition. These problems also negatively impacted Kornit's revenues and made it impossible for the Company to achieve the lauded $500 million annual revenue run rate. *See supra,* Section IV.B.1.

123.    It was also false and misleading for Defendant Samuel to state, for example, that KornitX was "experiencing huge interest from brands and fulfillers" when, in truth, the system was not ready, the Company was "constantly working on it and figuring out the integration," and the product effectively never came to market. Indeed, as reported by FE3, there was *no* revenue in the Americas coming from KornitX during his tenure. *See supra,* Section IV.B.4. It was similarly false and misleading for Defendants to represent that they were "more confident than ever" in their ability to achieve the $500 million revenue run rate before the end of 2023 considering the known but undisclosed impact of poor service, increasing competition, customer defections, and lack of adoption of KornitX. *See supra,* Section IV.B.

**B.    False and Misleading Statements and Omissions in Kornit's Annual Report on Form 20-F**

124.    On March 25, 2021, Kornit filed its annual report with the SEC on Form 20-F, which was signed by Defendants Samuel and Rozner. First, Kornit's 20-F included a risk factor concerning potential "undetected errors or defects." That risk factor stated that Kornit's "***systems, ink and other consumables, and associated software may contain undetected errors or defects when first introduced or as new versions are released***," and that those "***problems may cause us to incur significant warranty and repair costs***, divert the attention of our engineers from our product development and customer service efforts ***and harm our reputation***."

125.    The statements in ¶124 above were materially false and misleading when made, and omitted material facts. Specifically, it was false and misleading for Defendants to claim that its products "may" contain defects or errors, or that those defects "may" result in significant costs

or reputational harm because the risk that the Company's products would contain defects or that those defects might result in significant repair costs had already materialized. Poor service performed by Kornit exacerbated issues with the Company's frequently broken equipment and caused significant customers, including DTG2go (Delta) and Sticker Mule, to complain and ultimately defect to the competition. These problems also negatively impacted Kornit's revenues and made it impossible for the Company to achieve the lauded $500 million annual revenue run rate. *See supra,* Section IV.B.1.

126.    In addition, Kornit's 20-F included several statements concerning the total cost of ownership of its products. For example, Kornit touted the benefits of its Atlas product line, claiming that the Atlas boasted "retail-grade print quality, ***high productivity and attractive total cost of ownership***." Kornit similarly claimed that its Vulcan system benefited from the "the ***best total cost of ownership*** for large production facilities with high volumes of mass customization print jobs." On the whole, Kornit claimed that the unique "***differentiation across our new line of HD systems is mainly based on system productivity and total cost of ownership***."

127.    The statements in ¶126 above were materially false and misleading when made, and omitted material facts. Specifically, it was false and misleading to state, for example, that Kornit's products maintained "high productivity." In truth, Kornit's products suffered from significant defects and were significantly less productive than advertised. It was also false and misleading to represent that Kornit's products, including its Atlas and Vulcan systems, boasted an "attractive total cost of ownership." As a result of the significant defects and repair costs, as well as the lack of productivity of Kornit's products, the total cost of ownership of those products was significantly higher than Kornit's customers had been led to believe. *See supra,* Section IV.B.1-2.

128. Kornit's 20-F also represented that "Strategic accounts are an important and valued part of our business and future growth, and *we continue to make the appropriate investments in ensuring we serve their needs as it comes to sales, application consulting and services support*. We expect to continue developing our strategic accounts practice in a combination of dedicated regional and corporate resources as we strive to help these important customers improve their business performances by delivering *best-in-class customer experience*."

129. The statements in ¶128 above were materially false and misleading when made, and omitted material facts. Specifically, it was false and misleading for Defendants to tout Kornit's investment in service support and the Company's provision of "best-in-class customer experience" when, instead, Kornit's attempt to turn its service business into a profit center materially impaired its ability to adequately service its customers, leading to customers refusing to order additional product or altogether defecting to one or more of Kornit's competitors. *See supra,* Section IV.B.1.

130. In addition, Kornit's 20-F also stated that KornitX, "Kornit's cloud workflow software solution, based on the acquisition of Custom Gateway, *is a robust platform with a wide range of services to digitally transform our customers' operations* . . . ."

131. The statements in ¶130 above were materially false and misleading when made, and omitted material facts. Specifically, it was false and misleading for Defendants to state that KornitX was a "robust platform" when, in truth, the system was not ready, the Company was "constantly working on it and figuring out the integration," and the product effectively never came to market. Indeed, as reported by FE3, there was *no* revenue in the Americas coming from KornitX during his tenure. *See supra,* Section IV.B.4.

50

C.     **False and Misleading Statements and Omissions During Kornit's May 18, 2021 Investor Meeting**

132.     On May 18, 2021, Kornit held a Company investor meeting. During that meeting, Defendant Rozner touted the strength of Kornit's business model, representing that "***we already see the huge value [KornitX] brings to our customers and the potential for us***" and that Kornit "expect[ed] KornitX to generate approximately ***$100 million of revenues in 2026*** at a very high profitability."

133.     Based on their purported strong "visibility," recurring service revenues, and new product introductions which would "generate much higher revenues in five years" and also "include[d] higher ASP [average selling price], ***higher quantity of consumables*** and higher ASP of the special consumables," Defendant Samuel also announced new, long-term guidance, revealing for the first time "our new management goal to be a ***$1 billion revenue business in 2026***."

134.     The statements in ¶¶132-33 above were materially false and misleading when made, and omitted material facts. Specifically, Defendants' statements concerning the "higher quantity of consumables" used by Kornit's new product introductions were false and misleading when made. Contrary to Defendant Samuel's statements, Kornit's revenues were *negatively* impacted in 2021 because, as discussed in a sentence buried in Kornit's 2021 annual report filed on Form 20-F, the newer machines incorporated "HD technology which consumes a *lower amount of ink* and other consumables . . . ."

135.     In addition, it was false and misleading for Defendants to claim that they were "***already see[ing]*** the huge value" that KornitX was providing to customers. Defendants' statements misleadingly portrayed KornitX's development status, revenues, and growth prospects. In truth, and as confirmed by former Kornit employees, KornitX was "not ready" during the Class

Period and was difficult to sell to customers in the United States (Kornit's largest market). Indeed, as reported by FE3, there was *no* revenue in the Americas coming from KornitX during his tenure. Furthermore, Defendants' much-discussed $1 billion revenue target, which incorporated a purported $100 million in revenue attributable exclusively to KornitX, was also false or misleading for the same reasons. As FE10 explained, the $100 million revenue forecast for the platform was "kind of crazy" given internal sales targets shared with former employees responsible for selling the software during the Class Period. *See supra,* Section IV.B.4. It was similarly false and misleading for Defendants to tout their $1 billion revenue target considering the then known but undisclosed impact of poor service, increasing competition, customer defections, and lack of adoption of KornitX. *See supra,* Section IV.B.

### D. False and Misleading Statements and Omissions During the May 19, 2021 Barclays Conference

136. On May 19, 2021, Defendants Samuel and Rozner participated in the Barclays Americas Select Franchise Conference on behalf of Kornit. During the conference, Defendant Samuel boasted that "if we're talking about the [DTG market] and we're talking about the industrial space, the space that we are focusing on, ***we don't see today any [competitor] that we can say that it's any threat on us***" and "this is . . . mainly due to the ***moat that we manage[d] to build around our technology***." Buttressing this moat was the purported advantage of Kornit's DTG process, which the Company assured investors that it had "***brought it to the level of quality that's much better than any conventional technology***."

137. Defendant Samuel similarly elaborated that Kornit's technology is enmeshed with its customers' infrastructure: "***We are well integrated into their system. So, it will be very difficult to bring new technology in***." Defendant Samuel also claimed that the Company was "looking very

carefully" at what the "competition is doing," and that "*we don't see today any competitive that we can say that it's any threat on us*."

138.    Also, during the conference, Defendant Samuel stated that "*[w]e really have unique technologies that no one has*" and that this "*provides . . . a huge differentiator*." Defendant Samuel, in direct response to an analyst question on the topic of Atlas Max revenue, similarly touted the profitability of the printer, stating that "[t]he machine is 20% faster. Another reason is because the assumption is that the [sic] all ATLAS MAX, most ATLAS MAX will be sold with automation. So, another 20%, it's 40% faster. So only by that, it's 40% more supplies that you are going to generate."

139.    In light of these purported competitive advantages, Defendant Samuel falsely represented that the Company's guidance was "*conservative*," noting: "Now yesterday, it was nice to hear one of our analysts that thought that maybe *we are conservative about our goal* with – *he knows us really very well… we can even bring even more than that earlier than what we were forecasting*."    Defendant Samuel also reiterated the Company's long-term guidance, noting that the $500 million run rate would be hit "*earlier than expected*." "*And we put a target to become $1 billion company, revenue, in 2026*."

140.    The statements in ¶¶136-39 above were materially false and misleading when made, and omitted material facts.    Specifically, it was false and misleading for Defendants to represent that there was no competition in their market.    It was also false and misleading for Defendants to tout Kornit's "unique" technologies and the purported "moat" that they had built around Kornit's technology, and to state that this gap would make it "very difficult" for competitors "to bring in new technology."    Contrary to Defendants' statements, the Company's machines did not function as advertised and were plagued by various reliability issues.    As a result,

Kornit's customers were losing market share and significant customers. Poor service performed by Kornit exacerbated issues with the Company's frequently broken equipment and caused significant customers, including DTG2go and Sticker Mule, to complain and ultimately defect to the competition. These problems also negatively impacted Kornit's revenues and made it impossible for the Company to achieve the lauded $500 million annual revenue run rate. *See supra,* Section IV.B.1. Furthermore, and as reported by numerous former Kornit employees, Kornit experienced significant competition from M&R in the beginning of 2021, resulting in the complete or partial loss of two top 10 clients, Delta Apparel and Fanatics, who accounted for more than 10% of Kornit's recurring revenues. *See supra,* Section IV.B.3.

141. It was similarly false and misleading for Defendants to tout their revenue targets as "conservative" considering the then known but undisclosed impact of poor service, increasing competition, customer defections, and lack of adoption of KornitX. *See supra,* Section IV.B.

### E. False and Misleading Statements and Omissions During the June 1, 2021 William Blair Conference

142. On June 1, 2021, Defendants Samuel and Rozner participated in the William Blair Growth Stock Conference on behalf of Kornit. During the conference, in response to an analyst's question about the competition Kornit faced, Defendant Samuel stated that "***this is not something that we are worried about***" and that "***we know what is coming in the future is that bringing the next level of technology.***" Defendant Samuel explained that some of the digital ink jet printers produced by competitors require different processes than what Kornit uses and stated that "***[t]he level of the quality is not the same.***" Defendant Samuel further represented that "it's not only the technology" that differentiates the Company from its competitors, but also Kornit's ability "***to service and support our customers***, having an install base of more than 1,200 customers within them."

143.    During the conference, Defendant Samuel sought to further assuage investor concerns about competition, stating that "[t]he biggest customers of the world, if it's [ ] Amazon or [ ] Adidas, that already tested . . . our technology, approved it and [are] going with us" and so ***"[i]t will be very difficult to enter there.*** " Defendant Samuel also represented that the Company's software and workflow solution, KornitX, would allow Kornit to realize "***very strong stickiness***" with customer retention, stating that "***[o]nce customer[s] [for which] we are managing their production flow and brands are using this workflow to connect to our customers, this is the strongest stickiness that you have . . . to the company and our technology***." And, in response to a question about competition, Defendant Samuel specifically rejected the notion that "There will be competitors that will bring a technology that can disrupt our technology or can do similar thing that we can do today," stating: "***Actually, the opposite. What we see in the market today that's we are opening much bigger moat versus our competitors***."

144.    The statements in ¶¶142-43 above were materially false and misleading when made, and omitted material facts.  It was false and misleading for Defendants to tout the purported "level of quality" of Kornit's machines, which made it "very difficult" for the competition to enter the space, as well as the "moat" that they purportedly had built around Kornit's technology. Contrary to Defendants' statements, the Company's machines did not function as advertised and were plagued by various reliability issues.  As a result, Kornit's customers were losing market share and significant customers, including DTG2go and Sticker Mule, complained and ultimately defected to the competition, negatively impacting Kornit's revenues during the Class Period. Furthermore, and as reported by numerous former Kornit employees, Kornit experienced significant competition from M&R by the beginning of 2021, resulting in the complete or partial

loss of two top 10 clients, Delta Apparel and Fanatics, who accounted for more than 10% of Kornit's recurring revenues. *See supra,* Section IV.B.3.

145.    In addition, it was false and misleading for Defendants to state that Kornit had the infrastructure in place to sufficiently "service and support our customers."   Contrary to Defendants' statements, the repeated failures of Kornit's service organization to timely repair customers' printers, corroborated by numerous former employees, establish that Kornit did not have the number of technicians necessary to service its clients in a timely manner, leading to frequent customer complaints, refusals to purchase additional equipment, and even order cancellations.  *See supra,* Section IV.B.1.  Poor service performed by Kornit exacerbated issues with the Company's frequently broken equipment caused significant customers, including DTG2go and Sticker Mule, to complain and ultimately defect to the competition.  These problems also negatively impacted Kornit's revenues and made it impossible for the Company to achieve the lauded $500 million annual revenue run rate.  *See supra,* Section IV.B.1

### F.    False and Misleading Statements and Omissions During the June 10, 2021 Citi and Stifel Conferences

146.    On June 10, 2021, Defendants Samuel and Rozner participated in the Citi Silicon Valley Tech Virtual Tech Bus Tour on behalf of Kornit.  During the conference, in response to an analyst's question about Kornit's customers, including Amazon, Adidas, and Fanatics, Defendant Samuel stated that "Kornit is actually the perfect fit for all of them providing the on-demand sustainable production with no limitations."  Defendant Samuel continued his response, stating:

> ***And we see huge growth [ ] from net new and from our top 10 customer[s]****. Our top ten customer[s] today represent about 60% of our business. The nice thing is that they continue to grow, continue to grow very fast with a very aggressive plan, while we are having many newcomers with potential to become really large customers for Kornit moving forward.

147.    Defendant Samuel also touted the profitability of the service department, stating: "*Services used to be a lost P&L, now is profitable and is becoming more and more profitable*."

148.    During the conference, Defendant Samuel also proclaimed KornitX to be "*a breakthrough . . . that [ ] will change the market*" and told investors that "*[w]e see great adoption on the KornitX*" by customers. Accordingly, Defendant Samuel represented that KornitX was already poised "to be [a] *$100 million software [as a service] business . . . by 2026*." During the conference, Defendant Rozner reiterated both the Company's medium- and long-term guidance, stating "Currently, we feel very confident in our ability to meet this target and actually, *we are confident that we'll be able to meet this target ahead of plan*. Again, it's the annual rate, $500 million, which means $125 million a quarter. And so this is kind of a mid-term target for us."

149.    On these purported strengths in the Company's business model, Defendant Rozner also touted the "really realistic" nature of the Company's long-term guidance, noting "We believe that our long-term model is *really realistic*. There is some way to go there. But it seems realistic. And there is also *an upside opportunity from our point of view* . . . . So, all in all, . . . *we feel very comfortable with the target that we set of $1 billion*."

150.    That same day, Defendant Rozner participated in the Stifel Cross Sector Insight Conference on behalf of Kornit. During the conference, Defendant Samuel represented that "We have the best solution both on the DTG and DTF. We released the Atlas about two and a half years ago with huge success. This is the main product that we are selling, the Atlas we are selling, the average selling price is at around $550,000. And we are selling really hundreds of those system per year. *The consumption of ink is very high.*" Defendant Samuel also reiterated his statements from that day about how "realistic" Kornit's $1 billion long-term growth target was, noting "We

believe that our long-term model is ***really realistic***. . . . ***And there is also an upside opportunity from our point of view***."

151.    The statements in ¶¶146-50 above were materially false and misleading when made, and omitted material facts.  Specifically, it was false and misleading for Defendants to represent that they saw "great adoption" of KornitX and to describe it as a "breakthrough." Defendants' statements misleadingly portrayed KornitX's development status, revenues, and growth prospects.  In truth, and as confirmed by former Kornit employees, KornitX was "not ready" during the Class Period and was difficult to sell to customers in the United States (Kornit's largest market).  Indeed, as reported by FE3, there was no revenue in the Americas coming from KornitX during his tenure.  Furthermore, Defendant Samuel's statement that KornitX was already poised "to be [a] $100 million software [as a service] business . . . by 2026," was also false or misleading for the same reasons.  As FE10 explained, the $100 million revenue forecast for the platform was "kind of crazy" given internal sales targets shared with former employees responsible for selling the software during the Class Period.  *See supra,* Section IV.B.4.

152.    The above statements concerning profitability of Kornit's service department, which was purportedly "becoming more and more profitable" were also false and misleading when made.  Specifically, according to a former Kornit employee, approximately 80% of customers would decline to renew service contracts because of poor service or the unjustified cost of the service contract.  Moreover, and contrary to Defendants' statements, the repeated failures of Kornit's service organization to timely repair customers' printers establish that Kornit did not have the number of technicians necessary to service its clients in a timely manner, leading to frequent customer complaints, refusals to purchase additional equipment, and even order cancellations which negatively impacted Kornit's revenues and profits during the Class Period. Poor service

performed by Kornit exacerbated issues with the Company's frequently broken equipment and caused significant customers, including DTG2go and Sticker Mule, to complain and ultimately defect to the competition. These problems also negatively impacted Kornit's revenues and made it impossible for the Company to achieve the lauded $500 million annual revenue run rate. *See supra,* Section IV.B.1.

153.    The above statements concerning the Atlas, representing that its "consumption of ink is very high" was false and misleading when made. Contrary to Defendant Samuel's statements, Kornit's revenues were *negatively* impacted in 2021 because, as discussed in a sentence buried in Kornit's 2021 annual report filed on Form 20-F, the newer machines such as the Atlas incorporated "HD technology which consumes a *lower amount of ink* and other consumables . . . ."

154.    It was similarly false and misleading for Defendants to tout their $500 million and $1 billion revenue targets as having "upside" and being "really realistic" considering the known but undisclosed impact of poor service, increasing competition, customer defections, and lack of adoption of KornitX. *See supra,* Section IV.B.

## G.    False and Misleading Statements and Omissions During the July 13, 2021 CJS Securities Conference

155.    On July 13, 2021, Defendant Samuel and Rozner attended the CJS Securities New Ideas Summer Conference on behalf of Kornit. During the conference, Defendant Samuel touted the Company's gross margins, noting "One of the reason is that we are selling more high-end product that ***consume more ink*** and the gross margin on the high-end products are higher. We move from a lost business on the service to ***a profitable business to service*** and we expect that service organization ***will be even more profitable in the coming quarters***."

156.    In addition, in direct response to an analyst question asking "where are you on the development curve of KornitX," Defendant Samuel answered, "*we see a great adoption*. Actually, *we see a very, very big adoption from – both from the fulfillers* that would like to connect to this network and get connected to brands and retails and marketplaces.  And now, *we are really dealing and scaling up our operation team to support this growth* of their fulfiller.  On the other hand, we are engaging many multiple project across the world with mega brands of taking part of their business and really transforming them to on-demand manufacturing.  If it's on the local level, like in the UK *or specifically in the US* or in the global or a brand that would likely to spread all over the world to use this system. So, *great adoption*, we see a lot – *very good growth on the impressions and in the transaction*. . . ."

157.    The statements in ¶¶155-56 above were materially false and misleading when made, and omitted material facts.  Specifically, it was false and misleading for Defendant Samuel to assert that Kornit's high-end products "consume[d] more ink" and thus generated higher gross margins for the Company.  Contrary to Defendant Samuel's statements, Kornit's revenues were *negatively* impacted in 2021 because, as discussed in a sentence buried in Kornit's 2021 annual report filed on Form 20-F, the newer machines incorporated "HD technology which consumes a *lower amount of ink* and other consumables . . . ."

158.    In addition, the above statements concerning the "profitab[ility]" of the service department, which was purportedly becoming "even more profitable in the coming quarters" were false and misleading when made.  Specifically, according to a former Kornit employee, approximately 80% of customers would decline to renew service contracts because of poor service or the unjustified cost of the service contract.  Moreover, and contrary to Defendants' statements, the repeated failures of Kornit's service organization to timely repair customers' printers,

corroborated by former employees, establish that Kornit did not have the number of technicians necessary to service its clients in a timely manner, leading to frequent customer complaints, refusals to purchase additional equipment, and even order cancellations, which negatively impacted Kornit's revenues and profits during the Class Period instead of generating recurring profits. Poor service performed by Kornit exacerbated issues with the Company's frequently broken equipment and caused significant customers, including DTG2go and Sticker Mule, to complain and ultimately defect to the competition. These problems also negatively impacted Kornit's revenues and made it impossible for the Company to achieve the lauded $500 million annual revenue run rate. *See supra,* Section IV.

159.    It was also false and misleading for Defendants to represent that Kornit was "see[ing] great adoption" of KornitX, which was purportedly leading to "very good growth on the impressions and in the transactions" and "specifically in the US." Defendants' statements misleadingly portrayed KornitX's development status, revenues, and growth prospects. Specifically, according to former employees, KornitX was "not ready" during the Class Period, was difficult to sell to customers in the United States, Kornit's largest market, and the $100 million revenue forecast for the platform was "kind of crazy" given internal sales targets shared with former employees responsible for selling the software during the Class Period. Indeed, as reported by FE3, there was *no* revenue in the Americas coming from KornitX during his tenure. *See supra,* Section IV.B.4.

## H.    False and Misleading Statements and Omissions Concerning the Second Quarter of 2021

160.    On August 10, 2021, Kornit announced its financial results for the second quarter ended June 30, 2021. In the press release issued by Kornit, which the Company also filed with the SEC on Form 6-K, Defendant Samuel stated that "[o]ur pipeline and visibility have never been

stronger as the industry accelerates its digital transformation with Kornit leading the way." Defendant Samuel also stated that "[w]e are more confident than ever in our outlook for the remainder of this year and into next year," leading investors to believe that Kornit was "***well on [its] way to becoming*** the operating system for on demand sustainable fashion and a ***$1 billion revenue company in 2026***." In the press release, Defendant Rozner touted the Company's "exceptionally strong second quarter results" which were "due in part to continued momentum with our global strategic accounts" and that this strong performance "further validates our strategy."

161.    That same day, Kornit held a conference call with analysts and investors to discuss the Company's financial results for the second quarter of 2021. During the call, Defendant Samuel touted Kornit's purportedly "***very strong growth not only in our systems and consumables businesses but also in our service organization***."

162.    Defendant Samuel then assured investors that "our pipeline has never been stronger," including with the KornitX business line where the Company "***continue[s] to see great momentum***." In response to an analyst's questions about KornitX, Defendant Samuel stated that "***we have a big long list of orders for more than 80 projects right now to implement the KornitX*** both with fulfillers that would like to join the network both with marketplaces, with brands" and "[t]here's huge interest also from the retail environment." Defendant Samuel further represented that "***we are very, very pleased with the adoption of KornitX*** and the vision that we are driving and the change we are driving in the marketplace."

163.    The statements in ¶¶160-62 above were materially false and misleading when made, and omitted material facts. Specifically, it was false and misleading for Defendants to state that Kornit was experiencing "***very strong growth . . . in our service organization***" as, according

to a former Kornit employee, approximately 80% of customers would decline to renew service contracts because of poor service or the unjustified cost of the service contract. Moreover, and contrary to Defendants' statements, the repeated failures of Kornit's service organization to timely repair customers' printers, corroborated by former employees, establish that Kornit did not have the number of technicians necessary to service its clients in a timely manner, leading to frequent customer complaints, refusals to purchase additional equipment, and even order cancellations which negatively impacted Kornit's revenues and profits during the Class Period instead of generating recurring profits and growth within the service department. Poor service performed by Kornit exacerbated issues with the Company's frequently broken equipment and caused significant customers, including DTG2go and Sticker Mule, to complain and ultimately defect to the competition. These problems also negatively impacted Kornit's revenues and made it impossible for the Company to achieve the lauded $500 million annual revenue run rate. *See supra,* Section IV.B.1.

164.    In addition, it was materially false and misleading for Defendants to represent that they were "continuing to see great momentum" in KornitX, which purportedly had "a big long list of orders for more than 80 projects right now to implement." Defendants' statements misleadingly portrayed KornitX's development status, revenues, and growth prospects. In truth, and as confirmed by former Kornit employees, KornitX was "not ready" during the Class Period and was difficult to sell to customers in the United States (Kornit's largest market). Indeed, as reported by FE3, there was *no* revenue in the Americas coming from KornitX during his tenure. As FE10 explained, the $100 million revenue forecast for the platform was "kind of crazy" given internal sales targets shared with former employees responsible for selling the software during the Class Period. *See supra,* Section IV.B.4.

165.    It was similarly false and misleading for Defendants to reaffirm that they were "well on [their] way" to Kornit's $1 billion revenue target considering the known but undisclosed impact of poor service, increasing competition, customer defections, and lack of adoption of KornitX. *See supra,* Section IV.B.

### I.    False and Misleading Statements and Omissions Concerning the Third Quarter of 2021

166.    On November 10, 2021, Kornit announced its financial results for the third quarter ended September 30, 2021. In the press release issued by Kornit, which the Company also filed with the SEC on Form 6-K, Defendant Samuel touted the Company's "phenomenal third quarter performance."  Defendant Samuel also stated that "*[w]e enter 2022 with very strong business fundamentals supported by broad-based demand for our industry leading solutions*" and "[t]his growing demand and market acceptance puts us *firmly on the path [to] becoming a $1 billion revenue company in 2026*."  Similarly, Defendant Rozner stated that "[w]e are focused on ending the year strong and supporting our customers to ensure they are ready for their peak season" and that Kornit would "*enter 2022 in a phenomenal position with outstanding business fundamentals, a robust backlog and strong pipeline*."

167.    That same day, Kornit held a conference call with analysts and investors from its Customer Experience Center in New Jersey to discuss the Company's financial results for the third quarter of 2021. During the call, Defendant Rozner touted Kornit's "great progress with new customers, *while continuing our very strong momentum with large strategic customers*, *which we expect to continue for the balance of 2021 and throughout 2022*."  Defendant Samuel, as proof of Kornit's purported "great progress with customers" touted the onboarding of Sticker Mule, noting: "Recently, Sticker Mule, a global leader of fully customized B2C products, *integrated a fleet of our Atlas systems into their business and are utilizing the growing customer*

64

*base to support a strong DTG revenue channel*."  Defendant Samuel also announced that the Company's new "Max upgrade for the Atlas installed base will be available in the first quarter of next year, and we *expect significant revenue contribution from those upgrades next year*."

168.    During the call, in response to an analyst's question about KornitX, Defendant Samuel stated that "*we have great, great feedback from many, many brands, retailers, marketplaces*" and "[w]e *believe KornitX will be a major driver of growth and change for this industry*" and "*[w]e see [ ] very strong adoption*."  Defendant Rozner also touted the success and profitability of the Company's service business and represented that it "*will continue to be as such*," emphasizing that "*[w]e are investing a lot in customer support*" and "building a very strong management team for KornitX."

169.    Defendant Samuel again touted the anticipated boost in revenues from upgrades to existing Atlas machines in the Company's installed base to Max technology, noting: "We see massive order taking from new customer and existing customer for additional Atlas Max's.  We already delivered some of them in Q3, we are delivering in Q4 *and a lot of them are, of course, in Q1 next year and beyond that. . . . So we are not expecting everything in Q1 [2022]. We're expecting massive orders already in Q1 and some implementation in Q1, but most of the implementation will happen along the year*."

170.    The statements in ¶¶166-69 above were materially false and misleading when made, and omitted material facts.  For example, it was false and misleading for Defendants to represent that Kornit was "firmly on the path" to achieving its 2026 guidance considering the known but undisclosed impact of poor service, increasing competition, customer defections, and lack of adoption of KornitX.  *See supra,* Section IV.B.  Moreover, it was misleading to state that the Company was, for instance, "enter[ing] 2022 in a phenomenal position with outstanding

business fundamentals, a robust backlog and strong pipeline," and "expecting massive orders already in Q1," based on the "very strong momentum with large strategic customers," and the purported expectation for significant revenue contribution for upgrades in 2022. Contrary to Defendants' statements, Kornit's business was experiencing significant negative demand trends. FE3 confirmed that there were "recognizable trend issues" related to a slowdown in sales in November and December 2021, which were not as busy as Kornit had projected and negatively impacted sales in the fourth quarter of 2021. Corroborating FE3's statement, Defendant Samuel similarly admitted during the William Blair Growth Stock Conference in June 2022 that "by the end of 2021" major customers had started to experience a slowdown in growth. *See supra,* Section IV.B.5.

171.    In addition, Defendants' factual statements representing that Sticker Mule (one of Kornit's important customers) had "integrated a fleet of Atlas systems into their business" and was "utilizing" those systems to support a growing customer base were false and misleading when made. In truth, Sticker Mule had not *integrated* Kornit's systems and was not utilizing them. Specifically, in describing the impact that unreliable printers and poor customer service had during the Class Period, FE3 was directly in conversations where potential customers canceled orders because they ended up buying used machines from Sticker Mule. Sticker Mule was a Kornit customer that Kornit *couldn't onboard* because of Kornit's inadequate training programs. FE4 corroborated FE3's account, explaining that Sticker Mule decided to start printing t-shirts and had purchased three or four of Kornit's largest machines, the Atlas. The machines were installed, but Sticker Mule was *unable to get them to run properly*. *See supra,* Section IV.B.1.

172.    Defendants' statements concerning Kornit's service department were also false and misleading when made. Specifically, according to a former Kornit employee, approximately 80%

66

of customers would decline to renew service contracts because of poor service or the unjustified cost of the service contract.  Moreover, and contrary to Defendants' statements, the repeated failures of Kornit's service organization to timely repair customers' printers, corroborated by former employees, establish that Kornit did not have the number of technicians necessary to service its clients in a timely manner, leading to frequent customer complaints, refusals to purchase additional equipment, and even order cancellations which negatively impacted Kornit's revenues and profits during the Class Period instead of generating recurring profits and growth within the service department.  Poor service performed by Kornit exacerbated issues with the Company's frequently broken equipment and caused significant customers, including DTG2go and Sticker Mule, to complain and ultimately defect to the competition.  These problems also negatively impacted Kornit's revenues and made it impossible for the Company to achieve the lauded $500 million annual revenue run rate.  *See supra,* Section IV.B.1.

173.    It was also false and misleading for Defendants to describe KornitX as "the growth engine for the future."  Defendants' statements misleadingly portrayed KornitX's development status, revenues, and growth prospects.  Specifically, according to former employees, KornitX was "not ready" during the Class Period, was difficult to sell to customers in the United States, Kornit's largest market, and the $100 million revenue forecast for the platform was "kind of crazy" given internal sales targets shared with former employees re-sponsible for selling the software during the Class Period. Indeed, as reported by FE3, there was *no* revenue in the Americas coming from KornitX during his tenure.  *See supra,* Section IV.B.4.

### J.    False and Misleading Statements and Omissions During the December 7, 2021 Barclays Conference

174.    On December 7, 2021, Defendant Samuel participated in the Barclays Global Technology, Media, and Telecommunications Conference on behalf of Kornit.  During the

conference, in direct response to an analyst's question about the Company's relationship with Amazon, Defendant Samuel touted Kornit's unique visibility into Amazon's roadmap, noting that "the relationship with Amazon is better than ever.  Actually, it's so strategically that they're sharing with us their three years plan.  Of course, I cannot share with you their three years plan. That is growing very fast and very successful. . . .  We expect that the growth will continue not only in Q4, but for next year we know what's going to happen in next year because we have the plans . . . ."

175.    Based in part on this unique visibility into Amazon's roadmap and Kornit's purported competitive strengths, Defendant Samuel also reiterated the Company's long-term guidance, noting "***So, in terms of the $500 million, we already mentioned this, we'll bring it much earlier***.  So, expect to get news when are we going to bring it, but ***it will be much earlier than Q4 2023*** in terms of the target of $125 million.  ***In terms of the $1 billion, we believe that we will be $1 billion in 2026, it's not the run rate, it's the full year $1 billion***.  This $1 billion will be a bid out of $400 million of systems, $400 million of ink, $100 million of services, ***and $100 million of KornitX***."

176.    During the conference, an analyst asked: "what are your biggest concerns, the challenges? What keeps you up at night, if anything?"  Defendant Samuel reaffirmed Kornit's competitive moat, stating "***Yeah, we are not worried about competition***.  We are a market leader. ***We are, by far, the best technology. We are, by far, faster and innovative versus any other companies out there***."

177.    The statements in ¶¶174-76 above were materially false and misleading when made, and omitted material facts.  Specifically, it was false and misleading for Defendants to represent that Kornit would achieve its much-anticipated $500 million 2023 guidance "much

earlier," and would become a $1 billion revenue company in 2026 considering the known but undisclosed impact of poor service, increasing competition, customer defections, and lack of adoption of KornitX.  *See supra,* Section IV.B.  Contrary to Defendants' statements, Kornit's business was experiencing significant negative demand trends.  Indeed, FE3 confirmed that there were "recognizable trend issues" related to a slowdown in sales in November and December 2021, which were not as busy as Kornit had projected and negatively impacted sales in the fourth quarter of 2021.  Corroborating FE3's statement, Defendant Samuel similarly admitted during the William Blair Growth Stock Conference in June 2022 that "by the end of 2021" major customers had started to experience a slowdown in growth.  *See supra,* Section IV.B.5.

178.    In addition, Defendants' statements representing that KornitX would achieve $100 million in revenue by 2026 were also false and misleading.  Defendants' statements misleadingly portrayed KornitX's development status, revenues, and growth prospects.   In truth, and as confirmed by former Kornit employees, KornitX was "not ready" during the Class Period and was difficult to sell to customers in the United States (Kornit's largest market).  Indeed, as reported by FE3, there was *no* revenue in the Americas coming from KornitX during his tenure.  As FE10 explained, the $100 million revenue forecast for the platform was "kind of crazy" given internal sales targets shared with former employees responsible for selling the software during the Class Period.  *See supra,* Section IV.B.5.

179.    The above statements concerning a lack of competition were also false and misleading when made.  Instead, Kornit's customers were losing market share because the Company's machines would not print and did not work as advertised.   And, as reported by numerous former Kornit employees, Kornit experienced significant competition from M&R in the beginning of 2021, resulting in the complete or partial loss of two top 10 clients, Delta Apparel

and Fanatics, who accounted for more than 10% of Kornit's recurring revenues.  *See supra,* Section IV.B.1-3.

### K.    False and Misleading Statements and Omissions During the January 10, 2022 Needham Conference

180.    On January 10, 2022, Defendants Samuel and Rozner participated in the Needham Growth Conference on behalf of Kornit. During the conference, Defendant Samuel represented that the Company was "*entering very, very strong into 2022*" and had "*massive momentum coming from both existing customers and many new customers* both in the [direct-to-garment] and in the [direct-to-fabric markets]."  During the conference, Defendant Samuel also described the Company's KornitX service as "*the secret sauce of Kornit*" that would "*drive Kornit to a multi-billion-dollar revenue company in the next coming years, so beyond 2026*."  Defendant Samuel further stated that "*KornitX is already generating multi-million-dollar revenue on transaction[s] to Kornit, and the aim is to scale it very quickly*."

181.    Defendant Samuel also touted Kornit's incredible visibility into customer orders, noting "The predictabilities that we have to the business is very strong.  We are entering 2022 with a very strong backlog of orders for the year.  With some of our customers, we actually know what are they going to order even for the year after, into 2023. . . .  So, with many of our customers, we are sitting on two years' plan.  With Amazon, for example, we're sitting with three years' plans because their plans are very aggressive into expanding around the world and opening many more sites.  So, we have the visibility so we can place order already for 2023 with our suppliers to secure the needed supplies that we need."

182.    Similarly, in commenting on the composition of the Company's revenue, Defendant Samuel stated "So, while we're having many, many new customers joining us on a quarterly basis, *our top customers, our top 10 customer* representing something like 65% of our

70

revenue and *are growing very, very fast*. So, when we're looking into the $1 billion revenue in 2026, we still see 65% of the revenue will come with the top 10 customer. **There will be different top 10 customers**, so Amazon will stay probably in number one also in 2026, but number two, three, and four will change because we see some **new marketplaces entering, some new major brands entering, some new big, big player** and they are going to take the number two and three in the top 10."

183.    The statements in ¶¶180-82 above were materially false and misleading when made, and omitted material facts.  It was materially false and misleading for Defendants to represent that Kornit was "entering very, very strong into 2022," that it benefitted from "massive momentum coming from both existing customers and many new customers," and that the business derived from Kornit's top 10 customers was growing "very, very fast."  Contrary to Defendants' statements, Kornit's business was experiencing significant negative demand trends.  Indeed, FE3 confirmed that there were "recognizable trend issues" related to a slowdown in sales in November and December 2021, which were not as busy as Kornit had projected and which negatively impacted sales in the fourth quarter of 2021.  Corroborating FE3's statement, Defendant Samuel similarly admitted during the William Blair Growth Stock Conference in June 2022 that "by the end of 2021" major customers had started to experience a slowdown in growth.  Moreover, by their own admission, Defendants knew about the existence of this negative trend by at least by the "beginning of 2022," but failed to disclose it and instead continued to make material misstatements to investors, thus creating a misleading impression of Kornit's future growth.  *See supra,* Section IV.B.5.

184.    In addition, it was materially false and misleading for Defendants to represent that KornitX was, the "secret sauce of Kornit" that would "drive Kornit to a multi-billion-dollar

revenue company in the next coming years, so beyond 2026" and that KornitX was "already generating multi-million-dollar revenue on transaction[s] to Kornit."  Defendants' statements misleadingly portrayed KornitX's development status, revenues, and growth prospects. In truth, and as confirmed by former Kornit employees, KornitX was "not ready" during the Class Period and was difficult to sell to customers in the United States (Kornit's largest market).  Indeed, as reported by FE3, there was *no* revenue in the Americas coming from KornitX during his tenure. As FE10 explained, the $100 million revenue forecast for the platform was "kind of crazy" given internal sales targets shared with former employees responsible for selling the software during the Class Period.  *See supra,* Section IV.B.4.  It was also false and misleading for Defendant Samuel to specifically represent that KornitX was already generating "multi-million-dollar revenue" when, as admitted by Defendant Samuel shortly after the Class Period, KornitX only generated a "couple million" in revenues and that Kornit was still working on "stabilizing" the platform.

185.   Finally, the above statements representing that changes in Company's top 10 customers were caused by new and larger customer displacing existing top 10 customers were false and misleading given Defendant Samuel's admission that Kornit knew that Delta Apparel and Fanatics, two of Kornit's largest customers, had decided to cease business with Kornit or acquire digital printing systems from one of Kornit's competitors, M&R.  *See supra,* Section VI.

**L.   False and Misleading Statements and Omissions During the January 12, 2022 CJS Securities Conference**

186.   On January 12, 2022, Defendant Samuel participated in the CJS Securities New Ideas for the New Year Conference on behalf of Kornit.  During the conference, Defendant Samuel touted the Company's network of more than 1,300 customers, including "some of . . . the biggest companies of the world. Amazon is our biggest customer using many, many, many systems of Kornit all around the world, but many other customers like [A]didas and ***Fanatics*** and then Stakes

and DSG . . . and many, many other[s], both from leading brands and fulfillers and marketplaces that are using our technology."

187.    Defendant Samuel also touted KornitX as a major revenue driver, noting "***KornitX is a platform that enable*** connectivity ***between any marketplace, any brands, any e-commerce to a network of fulfillers using our technology and is really driving major growth*** . . . ."

188.    The statements in ¶¶186-87 above were materially false and misleading when made, and omitted material facts.  Specifically, it was materially false and misleading for Defendants to tout Fanatics as one of Kornit's largest customers. As Defendant Samuel later admitted, by this time, Kornit knew that Delta Apparel and Fanatics, two of Kornit's largest customers, had decided to cease business with Kornit or acquire digital printing systems from one of Kornit's competitors, M&R.  *See supra,* Section IV.B.3.

189.    Furthermore, it was materially false and misleading for Defendants to represent that KornitX was, at that time, already enabling connectivity between marketplaces and driving major growth.  Defendants' statements misleadingly portrayed KornitX's development status, revenues, and growth prospects. In truth, and as confirmed by former Kornit employees, KornitX was "not ready" during the Class Period and was difficult to sell to customers in the United States (Kornit's largest market).   As Defendant Samuel would admit after the Class Period, Kornit was still working on "stabilizing" the platform.  Indeed, as reported by FE3, there was no revenue in the Americas coming from KornitX during his tenure.  As FE10 explained, the $100 million revenue forecast for the platform was "kind of crazy" given internal sales targets shared with former employees responsible for selling the software during the Class Period. *See supra,* Section IV.B.4.

**M.    False and Misleading Statements and Omissions Concerning the Fourth Quarter and Fiscal Year 2021**

190.    On February 15, 2022, Kornit announced its financial results for the fourth quarter and full year ended December 31, 2021. In the press release issued by Kornit, which the Company also filed with the SEC on Form 6-K, Defendant Samuel touted the Company's "***outstanding execution on the huge market opportunity we are pursuing*** and the strength of our unique business model." Defendant Samuel also stated that for Kornit 2022 would be "***a year with strong growth*** and a remarkable pipeline of ground-breaking new product introductions, starting already in the first quarter." Defendant Samuel further claimed that Kornit has "***never been in a better position as a company and we are extremely confident in our ability to meet our $1B revenue goal by 2026, if not before***." In the press release, Defendant Rozner also represented that "***[o]ur good visibility into the business, combined with our experienced team, gives us the confidence that we can deliver on our commitments for the balance of 2022 and into 2023***."

191.    That same day, Kornit held a conference call with analysts and investors to discuss the Company's financial results for the fourth quarter and full year of 2021. During the call, Defendant Samuel represented that Kornit "***started 2022 with outstanding momentum***" and "[t]he ***mega-trends that have been fueling our business are intensifying in magnitude and transformation to digital on-demand sustainable production continue[s] to accelerate***." Defendant Samuel also represented that Kornit was poised to further capitalize on these trends because "***Kornit is the only company*** that offer[s] high-quality, on-demand mass production digital solutions that can deliver to this massive need and is also the only company that seamlessly connects the virtual and physical walls of the textile industry." Accordingly, Defendant Samuel told investors that for 2022, Kornit was "gear[ing] up for ***very strong growth*** and a remarkable amount of groundbreaking new product introductions starting already in the first quarter" with a

"backlog of orders" for its technology that was "***very strong***" and was providing a "***tremendous tailwind into 2022***." Defendant Samuel also touted growing revenues from KornitX, claiming that "***we will start to see a meaningful revenue coming from KornitX [in the second half of 2022]***, and we expect KornitX really to accelerate growth in 2023." Based on the purported strength of KornitX and the Company's "***very, very, strong new moat***" around its Max line of products, Defendant Samuel also reiterated that he was "***more confident than ever in our technology and ability to reach the \$1 billion in 2026***."

192.    Also, during the call, Defendant Samuel represented that "***our fundamentals are excellent, the market opportunity we are after is endless and our competitive position is unmatched***," and that "Kornit has ***never been in a stronger position***." Further, Defendant Rozner touted the Company's "great traction with new accounts, which accounted for half of the systems' order[s] and excellent progress and strength with existing strategic accounts."

193.    Defendant Rozner also provided first quarter guidance, stating: "We expect ***a strong start to the year with first quarter revenues to be in the range of \$87 million to \$91 million***, representing approximately 35% year-over-year growth at the midpoint."

194.    The statements in ¶¶190-93 above were materially false and misleading when made, and omitted material facts. Specifically, it was materially false and misleading for Defendants to represent, for instance, that 2022 would be a "year with strong growth" for Kornit and that the Company was starting with "outstanding momentum" from the previous year and the Company had "never been in a better position" considering the known but undisclosed impact of poor service, increasing competition, customer defections, and lack of adoption of KornitX. *See supra,* Section IV.B. Contrary to Defendants' statements, Kornit's business was experiencing significant negative demand trends. Indeed, FE3 confirmed that there were "recognizable trend

issues" related to a slowdown in sales in November and December 2021, which were not as busy as Kornit had projected and negatively impacted sales in the fourth quarter of 2021. Corroborating FE3's statement, Defendant Samuel similarly admitted during the William Blair Growth Stock Conference in June 2022 that "by the end of 2021" major customers had started to experience a slowdown in growth. These trends continued into the next year. Moreover, by their own admission, Defendants knew about the existence of this negative trend by at least the "beginning of 2022," but failed to disclose it and instead continued to make material misstatements to investors, thus creating a misleading impression of future growth and rendering misleading their statements above about their first quarter 2022, 2023, and 2026 guidance. *See supra,* Section IV.B.5.

195.    The above statements concerning the "very, very, strong new moat" around Kornit's technology and its "unmatched" competitive position were false and misleading when made. Instead, Kornit's customers were losing market share because the Company's machines would not print and did not work as advertised. And, as reported by former Kornit employees, Kornit experienced significant competition from M&R in the beginning of 2021, resulting in the complete or partial loss of two top 10 clients, Delta Apparel and Fanatics, who accounted for more than 10% of Kornit's recurring revenues. *See supra,* Section IV.B.3.

196.    Finally, it was materially false and misleading for Defendants to tout KornitX's purported growth. Defendants' statements misleadingly portrayed KornitX's development status, revenues, and growth prospects. In truth, and as confirmed by former Kornit employees, KornitX was "not ready" during the Class Period and was difficult to sell to customers in the United States (Kornit's largest market). As Defendant Samuel would admit after the Class Period, Kornit was still working on "stabilizing" the platform. Indeed, as reported by FE3, there was *no* revenue in

the Americas coming from KornitX during his tenure.  As FE10 explained, the $100 million revenue forecast for the platform was "kind of crazy" given internal sales targets shared with former employees responsible for selling the software during the Class Period.  *See supra,* Section IV.B.4.

### N.    False and Misleading Statements and Omissions in Kornit's Form 20-F for the Fiscal Year 2021

197.    On March 25, 2022, Kornit filed its annual report with the SEC on Form 20-F, which was signed by Defendants Samuel and Rozner.  The Form 20-F included several purported "risk factors" with respect to Kornit's business.

198.    First, Kornit's 20-F included a risk factor concerning the Company's largest customers.  That risk factor stated that "***the loss of either Amazon or another one of our significant customers, or variability in their order flows, could materially adversely affect our revenues or results of operations***."

199.    Second, Kornit's 20-F included a risk factor concerning potential "undetected errors or defects."  That risk factor stated that Kornit's "***systems, ink and other consumables, and associated software may contain undetected errors or defects when first introduced or as new versions are released***," and that those "***problems may cause us to incur significant warranty and repair costs, divert the attention of our engineers from our product development and customer service efforts and harm our reputation***."

200.    The risk factors in ¶¶198-99 above were materially false and misleading when made, and omitted material facts.  First, the purported "risk" that Kornit could lose one of its significant customers, or that there could be significant variability in their order flows, had already materialized.  By the time that Kornit filed this Form 20-F, as Defendants later admitted, Kornit already knew that two of its major customers were working directly with one of Kornit's main

77

competitors to design printing technology that would replace, in whole or in part, their need for Kornit's products. It was therefore false and misleading to describe that risk as merely a hypothetical risk, when, in fact, that risk was already then-existing.

201. Second, the "risk" that the Company's products would contain defects or that those defects might result in significant repair costs and reputational harm had also already materialized. By the time that Kornit filed this Form 20-F, a number of Kornit's customers had already complained to the Company that Kornit's printers did in fact contain errors and defects that significantly hampered their ability to use Kornit's printers. It was therefore false and misleading to describe that risk as merely a hypothetical risk, when, in fact, that risk was already then-existing.

202. In addition, Kornit's 20-F included several statements concerning the total cost of ownership of its products. For example, Kornit touted the benefits of its Atlas product line, claiming that the Atlas boasted "***retail-grade print quality, high productivity and attractive total cost of ownership***." Kornit similarly claimed that its Vulcan system benefited from the "***the best total cost of ownership*** for large production facilities with high volumes of mass customization print jobs." On the whole, Kornit claimed that the unique "***differentiation across our new line of HD systems is mainly based on system productivity and total cost of ownership***."

203. Kornit's statements in ¶202 were false, misleading, and omitted material facts. It was false and misleading to state, for example, that Kornit's products maintained "high productivity." In truth, Kornit's products suffered from significant defects and were significantly less productive than its competitors' products. It was also false and misleading to state that Kornit's products, including its Atlas and Vulcan systems, boasted "attractive total cost of ownership." As a result of the significant defects and repair costs, as well as the lack of

productivity of Kornit's products, the total cost of ownership of those products was significantly higher than Kornit's customers had been led to believe. *See supra,* Section IV.B.2.

204.    Further, Kornit's Form 20-F failed to disclose material information required to be disclosed by Item 5(D) of Form 20-F. Item 5(D) requires for foreign private issuers such as Kornit essentially the same disclosures that Item 303 requires for most other companies registered with the SEC. Item 5(D) requires the disclosure of "management's assessment of factors and trends which are anticipated to have a material effect on the company's financial condition and results of operations in future periods." Specifically, Item 5(D) states:

> The company ***must identify material recent trends in production, sales and inventory***, the state of the order book and costs and selling prices since the latest financial year. The company ***also must discuss***, for at least the current financial year, ***any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues***, income from continuing operations, profitability, liquidity or capital resources, ***or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition***.

205.    Item 5(D) required Kornit to disclose that its net sales, revenues, income, and profitability were at risk: (i) due to the decrease in demand for Kornit's products that Defendants had been aware of since November 2021, as reflected by the rapid drop off in ink consumption and customer orders; and (ii) because two of Kornit's biggest customers were in the process of developing their own alternative to Kornit's products with one of Kornit's biggest competitors. Indeed, as Defendants would later admit, they knew well before Kornit filed its Form 20-F that demand for the Company's products was rapidly decreasing, such that the financial results reported in the Form 20-F were not indicative of Kornit's future operating results or financial condition. Furthermore, Defendants also knew for multiple quarters throughout 2022 that two of Kornit's biggest customers planned to shift their business away from Kornit's products and toward one of

Kornit's largest competitors. Despite this knowledge, Defendants failed to comply with their Item 5(D) disclosure obligations. *See supra,* Section IV.B.5.

### O.     False and Misleading Statements and Omissions Concerning the First Quarter of 2022

206.    On May 11, 2022, Kornit announced its financial results for the first quarter ended March 31, 2021 and held a conference call to discuss those results. During the earnings call, Defendant Samuel stated that Kornit "***delivered a good start to the year, with revenues coming just about the high end of our guidance and operating margins in line with our expectations***. For the first quarter, ***total revenues grew by 26% year-over-year to $83.3 million***, net of $8 million in warrants related to our global strategic account. ***System revenue growth was very strong*** and overall system contribution to the revenue mix was very high." Discussing the current macroeconomic climate, Defendant Samuel represented "our customers and us are not fully immune to the overall macro headwinds and certain post-pandemic dynamics. We started this year with a strong backlog and robust pipeline. But as we move deeper into the first quarter, we ***begin to see the macroeconomic volatility*** weighed on the pace of consumer purchases and on capital allocation decision of certain customers." Despite these "headwinds," Defendant Samuel nevertheless represented that "***we continue to expect to deliver ahead of plan the $125 million run rate business*** we originally targeted for the fourth quarter of 2023 and ***remain confident in our journey to become a $1 billion business in 2026***."

207.    During the earnings call, Defendant Rozner represented that Kornit "***came off a strong peak season in the fourth quarter and ramped order during the second half of the first quarter***. The ***timing of sales*** later in the first quarter to our largest strategic account ***grew receivables materially quarter-over-quarter***." Defendant Rozner also provided guidance for the second quarter of 2022, stating "given the macroeconomic impact on consumables and capital

allocation decisions of certain customers and overall near-term volatility, *we currently expect second quarter revenues to be between $85 million to $95 million*." Elaborating on second quarter guidance in response to an analyst question on the topic, Defendant Samuel stated "we see Q2 kind of *a bump on the road*. We believe in the $500 million run rate *earlier than expected* than Q4 2023. We believe in the long-term vision of the *$1 billion in 2026 or before*. *All the fundamentals of the business are growing and accelerating*." Defendant Samuel elaborated on his view of the "bump on the road," stating that "we have a line of sight to major orders. Some of them is from our global strategic accounts. So, *you will continue seeing from the global strategic account revenue coming not only in Q2, but in Q3 and Q4, and definitely also in 2023*." Speaking about an uptick in ink supplies, Defendant Samuel added, "*Actually, in the last week, we start to see a different trend on supply*."

208.    During the earnings call, in direct response to an analyst question about competition, Defendant Samuel stated: "I'm not concerned. Actually, I believe that we built a very, very strong new *moat around our technology, around our products*. In the last two years, actually, *we've developed our products and we created much bigger gap versus any of our competitors*." Defendant Rozner also commented on the service department, stating "Overall, we are keep investing and building our service organization, and it very much depends on specific projects. Overall, *we continue to see continuous growth and improvement in service profitability*. And this is the way we plan it going forward."

209.    Defendant Rozner also addressed whether the late quarter sales were a "pull forward" of revenue:

**Question** – Gregory William Palm: And then, on the receivables comment for my follow-up, I think you blamed that on late quarter sales. I think you said specifically to that global strategic. Was that a pull forward of activity into Q1 from Q2 or was

it, I don't know, maybe a push out of shipments from maybe mid quarter to late quarter? It wasn't exactly clear what happened there.

**Answer** – Alon Rozner: *No.* It was a timing issue of making decisions and getting the paperwork. So, the start of the year and the quarter was relatively weak after a very busy peak season. So, people took some time off to relax. And then, we saw the quarter building up at the second half of the quarter when we got the POs of the planned business for the quarter. And then, we shipped relatively close to the end of the quarter. And just in a matter of timing, most of the AR adjusts, they're not due, and will be collected mostly in the second quarter.

210.    The statements in ¶¶206-09 above were materially false and misleading when made, and omitted material facts.  Specifically, it was materially false and misleading for Defendants to represent: (i) that Kornit had experienced a "good start to the year," (ii) that had Kornit a "very strong system growth," (iii) that "all fundamentals of the business . . . [were] growing and accelerating," and (iv) that the second quarter of 2022, for which Kornit revised downward its guidance, was merely a "bump on the road" considering the known but undisclosed impact of poor service, increasing competition, customer defections, and lack of adoption of KornitX.  *See supra,* Section IV.B.  Contrary to Defendants' statements, Kornit's business was experiencing significant negative demand trends.  Indeed, FE3 confirmed that there were "recognizable trend issues" related to a slowdown in sales in November and December 2021, which were not as busy as Kornit had projected and negatively impacted sales in the fourth quarter of 2021.  Corroborating FE3's statement, Defendant Samuel similarly admitted during the William Blair Growth Stock Conference in June 2022 that "by the end of 2021" major customers had started to experience a slowdown in growth.  These trends continued into 2022.  Moreover, by their own admission, Defendants knew about the existence of this negative trend by at least the "beginning of 2022," but failed to disclose it and instead continued to make material misstatements to investors, thus creating a misleading impression of future growth and rendering misleading their statements above about first quarter of 2022, 2023, and 2026 guidance.  Defendants had an

obligation to provide investors with an accurate representation of Kornit's current quarter sales and earnings and related growth projections but failed to do so. *See supra,* Section IV.B.5.

211.    Defendant Rozner's outright denial that first quarter sales were a pull forward from the second quarter was likewise false and misleading. In truth, in order to cover the revenue gap caused by the aforementioned negative trends and allow Defendants' to just barely exceed the top end of first quarter guidance, Kornit had pulled forward sales. According to FE3, Defendants pulled forward sales from the second quarter into the first quarter. *See supra,* Section IV.B.5.

**P.    False and Misleading Statements and Omissions During the June 2022 William Blair and Stifel Conferences**

212.    On June 7, 2022, Defendant Samuel participated in the William Blair Growth Stock Conference on behalf of Kornit. During the conference, Defendant Samuel touted the fundamental trends purportedly affecting the Company, stating: "I must say that the fundamental of Kornit business is ***unbelievable in the best place that we could dream of***. ***All the market trends that we were talking about years ago just accelerated***." Defendant Samuel also downplayed the first quarter results, noting: "What happened in Q1 is a unique case, and I call it ***a bump, bump on the road to grow***. First of all, we mentioned, ***next year, we are going to be $500 million run rate business before Q4 2023***. We promised five years ago, we will be $500 million run rate, which means $125 million in Q4. ***We are going to bring it earlier***. We also – on the run rate for $1 billion in 2026, with operating profit above 20%. We believe in that. We are building all the plans to meet it, and we are confident to deliver on that."

213.    In direct response to an analyst question asking Defendants "about what you're seeing now in the second quarter – real time what you're seeing is that – when you mentioned it's coming back," Defendant Samuel Responded "***Yes. Yeah. Yeah*** . . . ***So in terms of supplies, we see real time supplies coming back, back into growth***."

214.    On June 8, 2022, Defendant Samuel participated in the Stifel Cross Sector Insight Conference on behalf of Kornit.  During the conference, Defendant Samuel was asked: "Is there any update you can provide at least on the near-term outlook with the full understanding that you have kind of reset at least the near-term outlook?,"  In response, he stated that "*all the fundamentals are very strong*."  Defendant Samuel also falsely reassured conference participants that the glut in capital equipment and ink sales was nothing but a "*bump on the road*" and that the "Amazon [business] is booming.  They didn't see any slowdown.  They continue to grow very fast."  Defendant Samuel also added that "of course, *KornitX is growing very fast*" and that "*we see a massive growth coming into it*."

215.    Based on these purported strengths, Defendant Samuel also reiterated Kornit's short- and long-term growth plans, stating "I must say, people are probably sitting here and saying $1 billion in 2026 sounds too long and too ambitious or not too ambitious.  Guys, four years ago, we said we are going to be a $500 million run rate business by 2023, in Q4 2023. *We are going to bring it earlier than Q4 2023*."  Defendant Samuel also touted the "*great adoption and great growth*" of the Atlas Max and the automation upgrade available for that system, which would contribute "mainly in Q2."

216.    The statements in ¶¶212-15 above were materially false and misleading when made, and omitted material facts.  Defendants' statements above about (i) the "fundamentals" and "market trends" supporting Kornit's business being "unbelievable" and "just accelerating," business, (ii) Kornit seeing "real time supplies coming back . . . into growth" and (iii) their reiteration of Kornit's 2023 and 2026 guidance were false and misleading when made. Contrary to Defendants' statements, Kornit's business was experiencing significant negative demand trends. Indeed, FE3 confirmed that there were "recognizable trend issues" related to a slowdown in sales

in November and December 2021, which were not as busy as Kornit had projected and negatively impacted sales in the fourth quarter of 2021. Corroborating FE3's statement, Defendant Samuel similarly admitted during the William Blair Growth Stock Conference in June 2022 that "by the end of 2021" major customers had started to experience a slowdown in growth. These trends continued into 2022. Moreover, Defendants knew, by their own admission, about the existence of this negative trend by at least the "beginning of 2022," but failed to disclose it and instead continued to make material misstatements to investors, thus creating a misleading impression of future growth and rendering misleading their statements touching on second quarter, 2023, and 2026 guidance. Further, in order to cover the resulting revenue gap and allow Defendants' to just barely exceed the top end of first quarter guidance, according to FE3, Defendants pulled forward sales from the second quarter into the first quarter, thus leaving a material gap in the second quarter that Defendants knew they could not fill. Defendants had an obligation to provide investors with an accurate representation of Kornit's current quarter sales and earnings and related growth projections but failed to do so. *See supra,* Section IV.B.5.

217. The above statement concerning Defendants seeing supplies coming back into growth were also false and misleading given Defendants' repeated admissions that the negative trend persisted through the first half of 2022. *See supra,* Section VI.

218. In addition, it was materially false and misleading for Defendants to state that KornitX was "growing very fast" and that "we see a massive growth coming into it." Defendants' statements misleadingly portrayed KornitX's development status, revenues, and growth prospects. In truth, and as confirmed by former Kornit employees, KornitX was "not ready" during the Class Period and was difficult to sell to customers in the United States (Kornit's largest market). As Defendant Samuel would admit after the Class Period, Kornit was still working on "stabilizing"

85

the platform.  Indeed, as reported by FE3, there was *no* revenue in the Americas coming from KornitX during his tenure.  As FE10 explained, the $100 million revenue forecast for the platform was "kind of crazy" given internal sales targets shared with former employees responsible for selling the software during the Class Period.  *See supra*, Section IV.B.4.

## VIII.  LOSS CAUSATION

219.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

220.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Kornit ordinary shares and operated as a fraud or deceit on the Class (defined below).  Later, including on May 11, 2022 and July 5, 2022, when Defendants' prior misrepresentations and fraudulent conduct were partially and fully disclosed to the market and/or the concealed risks materialized, the price of Kornit ordinary shares fell precipitously as the prior artificial inflation came out of the share price.  As a result of their acquisition of Kornit ordinary shares during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## IX.    ADDITIONAL ALLEGATIONS OF SCIENTER

221.    Numerous allegations set forth above and summarized below give rise to the strong inference that Kornit and the Officer Defendants knew that they were making the above-detailed materially false and misleading statements and omissions of material fact, or, at minimum, acted recklessly in making those statements and omissions.

222.    ***First***, the Defendants repeatedly made emphatic public statements touting both their sales pipeline and their purportedly excellent visibility into that pipeline.  As Defendants explained throughout the Class Period, they had near-perfect information in real-time concerning

their customers' use of Kornit's products, including through the Kornit Konnect system. Indeed, Defendant Samuel told investors, "we know everything that our customer is doing. We know what are the garment that they're using, how much ink laydown they're doing, what type of jobs that they're printing." This system formed the foundation for the "excellent visibility" that Kornit repeatedly emphasized to investors. Internal Kornit documents confirm that Kornit closely monitored its customers' ink usage during the Class Period, allowing Kornit to understand when its customers would need to buy more of Kornit's products. And as a result, Kornit was able to analyze and predict trends in the demand for its products and prepare months in advance. As Defendant Rozner told investors, "because of the great visibility, we were able to secure production floor as well as the main lead times for quarters ahead."

223.     Kornit's excellent visibility into its sales pipeline was further buttressed by the fact that the Company's bigger customers provided it with multi-year plans that gave Kornit unparalleled access into those customers' ordering patterns. As Defendant Samuel told investors most of the Company's customers operated on two-year purchase plans with Kornit, while the Company's largest customer provided Kornit with a three-year purchase plan. Defendant Samuel explained in early 2022 that, based on the information Kornit learned through these multi-year plans, the Company had sufficiently clear "visibility so we can place order[s] already for 2023 with our suppliers to secure the needed supplies that we need."

224.     The Officer Defendants understood that these statements were of vital importance to investors and analysts throughout the Class Period. As a result, during nearly ever earnings call, Defendants went out of their way to emphasize the significant "backlog" of business, their "strong visibility" into Kornit's sales pipeline, and specifically reassured investors that they were able to

preview business more than a year into the future.  Defendants repeated these and similar statements during industry conferences attended by analysts and market participants.

225.    Importantly, investors both credited and relied on Defendants' repeated public assurances concerning these issues.  For example, early in the Class Period, analysts from Needham lauded the fact that Kornit "entered 2021 with the highest level of visibility in its history."  Then in August 2021, analysts from Berenberg Capital Markets noted Kornit's "strong visibility into FY21 & FY22."  In February 2022, William Blair credited the assertion that "Kornit's backlog provides excellent visibility into 2022."

226.    That Defendants (i) had such robust information concerning its sales pipeline and the demand for Kornit's products, and (ii) repeatedly made very detailed statements concerning these issues, including in response to direct analyst questions, supports a strong inference of scienter.

227.    ***Second***, Defendants admitted after the Class Period that they had seen significant decline in their business during the Class Period, contrary to their public statements.  For example, in August 2022, during Kornit's earnings call for the second quarter of that year, Defendant Samuel admitted that throughout the entire ***first half of 2022***, its customers were already "declining year-over-year."  Even a year later, in June 2023, Defendant Samuel acknowledged once again that in the "***[b]eginning of 2022***, we saw major decline within the business of our customers.  They found themselves with overcapacity. They acquired many, many systems, inks and systems during the year of 2021 and the first and the second half of 2020. And they had overcapacity and they didn't buy additional systems during 2022."

228.    Defendants' admissions that they "saw [a] major decline" in their customers' business through the first half of 2022 directly contradict their repeated public statements to

investors that, for example, Kornit had "never been in a better position as a company" at the start of 2022.  Defendants' acknowledgement of real-time awareness that their statements were false further strengthens the inference of scienter.

229.    **Third**, various former Kornit employees confirm that Defendants had access to, and were aware of, the significant negative trends in Kornit's business, and that demand for Kornit's products was rapidly decreasing.  For example, FE4 explained that Kornit's ink usage reports were regularly generated and were available to every single person at Kornit, including management.  These reports gave Kornit real-time information on the amount of ink that its customers were using, and as a result, Kornit had almost perfect insight into the demand for its consumable products.

230.    In addition, FE4 explained that Defendant Samuel and Rozner were in nearly constant communication with the CFO of Delta and DTG2Go, speaking at least once a month, if not every week.  Based on Kornit's access to nearly real-time information concerning its customers' business, FE4 also confirmed that by no later than November 2021, Defendants knew that demand for the Company's products was in decline and saw deeply concerning trends.  This decline continued into 2022, and according to FE3, Defendants intentionally pulled forward revenue from the second quarter of 2022 in order to just barely hit their first quarter guidance.

231.    To address declining demand, Defendants also offered significant discounts, particularly at the end of quarters, to customers in order to meet the Company's revenue projections.  These discounts would sometimes reach 30%, and Defendant Samuel, in particular, was intimately involved with this process.  According to FE2, even discounts of 5% and 7% eventually would be approved by Samuel, but anything above 7% could *only* be approved by Samuel.  In other words, Samuel gave the final go-ahead on every significant discount.  That

Defendants knew of these significant negative trends and actively took measures to mask the decline in demand and its impact on Kornit's reported financial results further strengthens the inference of scienter.

232.    ***Fourth,*** Former Employees confirmed that Defendants Samuel and Rozner were aware of the pervasive issues with Kornit's customer service and the existence of strong competition that was in direct conflict with Defendants' public statements.  For example, FE8 reported that he attended meetings with Defendant Samuel where service and reliability problems were discussed.  Similarly, FE4 reported that customer service issues at Delta were discussed at frequent meetings beginning no later than early 2021 attended by Defendant Samuel, Chuck Meyo, (President of the Americas), and Don Whaley, Kornit's VP of Sales.

233.    In addition, both FE3 and FE6 reported that Chuck Meyo, who was President of the American at all times during the Class Period and reported directly to CEO Samuel was well aware of the service issues plaguing Kornit, which eventually led to key customer losses and were explicitly misrepresented by Defendants during the Class Period.  FE3 reported that Meyo spoke to senior Kornit executives, including Defendant Samuel, frequently about sales and service issues. FE6 similarly reported that Kornit's executive management definitely knew about the service issues.

234.    ***Fifth***, the alleged fraud concerned the most important aspects of Kornit's business. For example, Kornit's systems, comprised of its printers and platforms, generally accounted for more than half of the Company's revenue during the Class Period, and Kornit's consumables brought in approximately one third of its revenue.  In light of their importance, the Company's printers, the accompanying consumables, and Kornit's ability to service its machines were the subject of intense market scrutiny and concern.  In other words, either the Officer Defendants were

intimately familiar with the defects plaguing Kornit's machines and the Company's woefully inadequate service department, or they were reckless in making those statements. That Defendants' misrepresentations concerned the most important aspects of Kornit's business further strengthens the inference of scienter.

235. **_Sixth_**, Defendants made several false statements close in time to the dates on which the truth was revealed to investors. For example, on June 7, 2022 Defendant Samuel told investors at a William Blair conference that "the fundamental of Kornit **_business is unbelievable in the best place that we could dream of_**. All the market trends that we were talking about years ago just accelerated." Defendants made similar statements the following day at a Stifel investor conference, touting the Company's business and demand for Kornit's products. Then, just weeks later, in July 2022, Kornit announced staggeringly low results for the second quarter of 2022 which revealed that Defendants' prior statements were false. The temporal proximity between the alleged false statements and the revelation of the true facts supports a strong inference of scienter.

236. **_Seventh_**, Defendant Samuel was highly motivated to conceal the Company's problems. As indicated by Forms 144 which Defendant Samuel filed with the SEC throughout the Class Period, Defendant Samuel initiated the process to execute the sale of more than 80,000 shares of Kornit stock during the Class Periods for proceeds of nearly $10 million. This stands in stark contrast to Defendant Samuel's trading history during the equivalent prior period of time. During that time, Defendant Samuel sold approximately 26,500 shares for only $1.2 million in proceeds. Most of his trades were made pursuant to a Rule 10b-5 plan initiated after the start of the Class Period and Defendants' first false statements. Defendant Samuel was motivated to make the misleading statements he made during the Class Period to ensure that he would reap significant proceeds from those sales at artificially inflated prices. Defendants made those statements to

assure investors about the quality of Kornit's products, that Kornit had the ability to accurately assess its sales pipeline, that its customer relationships were strong, and that there was no competition for Kornit's products. The fact that Defendant Samuel personally benefitted from the impact that these false statements had on Kornit's stock price supports a strong inference of scienter.

237.    Defendants were also influenced and motivated to misrepresent the existence and extent of Kornit's problems to increase the value of the November 2021 Secondary Offering. Kornit sold over 2,335,000of its ordinary shares at a net price of $145.72, for proceeds totaling more than $340 million in the 2021 Offering. Had those shares been sold immediately following the end of the Class Period, when Kornit shares traded at just $23.46 each, the proceeds from the 2021 Offering would have been reduced by over $285 million. By making the material misrepresentations and misleading statements detailed above Defendants were able to increase the proceeds from the 2021 Offering by a factor of *six*.

238.    **Eighth,** Defendants repeatedly made detailed statements based on their personal knowledge about: (i) the profitability of the Company's service department; (ii) the purportedly low total cost of ownership of Kornit's products; (iii) Kornit's purported technological advantage relative to its competition; (iv) the value of KornitX; and (v) trends that impacted Kornit's business. These statements made clear to investors that Defendants were intimately knowledgeable of those issues. For example, Defendants Samuel and Rozner frequently rejected the notion that they faced any serious competition in the market, claiming that it was "Actually, the opposite. What we see in the market today that's we are opening much bigger moat versus our competitors." In addition, Defendants repeatedly touted the value that KornitX brought to the Company, claiming that Kornit "already s[aw] the huge value [KornitX] brings to our customers

and the potential for us" and that Kornit "expect[ed] KornitX to generate approximately $100 million of revenues in 2026 at a very high profitability." Even as the market for Kornit's business deteriorated in 2022, Defendants continued to assure investors that Kornit was "in the best place that we could dream of," and that "[a]ll the market trends that we were talking about years ago just accelerated." Defendants' false public statements repeatedly emphasizing these topics further strengthens the inference of scienter as those statements reflect that: (a) these Defendants investigated and had actual knowledge of the underlying facts (as alleged above), which made clear that the statements were materially false and misleading; or (b) Samuel and Rozner failed to investigate the underlying facts, making their misrepresentations highly reckless. Under either scenario Defendants Samuel and Rozner acted with scienter.

## X.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

239.    Kornit's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. Many of the specific statements described herein were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

240.    Kornit and the Officer Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Kornit who knew that the statement was false.

241.    None of the historic or present tense statements made by Kornit and the Officer Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to

any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Kornit and the Officer Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XI.    PRESUMPTION OF RELIANCE

242.    At all relevant times, the market for Kornit ordinary shares was an efficient market for the following reasons, among others:

a.    Kornit's ordinary shares met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market, with an average daily trading volume of over 409,000 shares;

b.    Kornit filed periodic public reports with the SEC and NASDAQ;

c.    Kornit regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.    Kornit was followed by several securities analysts employed by major brokerage firm(s), including but not limited to Barclays, Craig Hallum, Needham & Co., and William Blair & Co., who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

243.    As a result of the foregoing, the market for Kornit ordinary shares promptly digested current information regarding Kornit from all publicly available sources and reflected such information in the price of Kornit ordinary shares. Under these circumstances, all purchasers of Kornit ordinary shares during the Class Period suffered similar injury through their purchase of Kornit ordinary shares at artificially inflated prices and the presumption of reliance applies.

244.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on material omissions. Because this action involves a failure to disclose material adverse information regarding Kornit's business and operations—

information that was required to be disclosed—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the significance of Kornit's purported technology advantages, revenue streams, and relationships with customers, that requirement is satisfied here.

## XII.    EXCHANGE ACT COUNTS

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against Defendants Kornit, Samuel, and Rozner**

245.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

246.    This Count is asserted on behalf of all members of the class against Defendants Kornit, Samuel, and Rozner for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, in connection with the statements each such Defendant made, as identified above.

247.    During the Class Period, Defendants Kornit, Samuel, and Rozner carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Kornit ordinary shares at artificially inflated prices.

248.    Defendants Kornit, Samuel, and Rozner: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's

ordinary shares in an effort to maintain artificially high market prices for Kornit ordinary shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

249.    Defendants Kornit, Samuel, and Rozner, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce, and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

250.    During the Class Period, Defendants Kornit, Samuel, and Rozner made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

251.    Defendants Kornit, Samuel, and Rozner had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants Kornit, Samuel, and Rozner engaged in this misconduct to conceal Kornit's true condition from the investing public and to support the artificially inflated prices of Kornit ordinary shares. As demonstrated by these Defendants' omissions and misstatements, these Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discovery whether those statements were false or misleading.

252.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Kornit ordinary shares was artificially inflated. In ignorance of the fact that the market price of Kornit ordinary shares

was artificially inflated, and relying directly or indirectly on the false and misleading statements made by these Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or recklessly disregarded, by these Defendants, but not disclosed in public statements by Defendants, Lead Plaintiffs and other members of the Class acquired Kornit ordinary shares at artificially high prices.

253.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Kornit ordinary shares. Lead Plaintiffs and the Class would not have purchased Kornit ordinary shares at the prices they paid, or at all, had they been aware that the market prices for Kornit ordinary shares had been artificially inflated by these defendants' fraudulent course of conduct. It was also foreseeable to these Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Kornit's securities and that the ultimate disclosure of this information, or the materialization of the risks concealed by their material misstatements and omissions would cause the price of Kornit securities to decline.

254.    By virtue of the foregoing, Defendants Kornit, Samuel, and Rozner violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

255.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's ordinary shares during the Class Period.

256.    This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchase of securities giving rise to the cause of action.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against Defendants Samuel and Rozner

257.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

258.    The Officer Defendants acted as controlling persons of Kornit within the meaning of § 20(a) of the Exchange Act, 15 U.S.C. §78t(a), as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading. The Officer Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to have been misleading prior to, and/or shortly after, these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

259.    As set forth above, the Exchange Act Defendants violated §10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions, as alleged in this Complaint.

260.    By virtue of their positions as controlling persons, the Officer Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and other members of the class suffered damages in connection with their purchases of the Company's securities.

## SECURITIES ACT CLAIMS

### XIII.  PLAINTIFFS' SECURITIES ACT CLAIMS

261.  Plaintiffs specifically disavow any allegations or averments of fraud in connection with the claims pleaded below under the Securities Act.

262.  As set forth in the Certifications previously filed with the Court (*see* ECF 12-4) and attached hereto as Exhibit 1, Plaintiffs purchased Kornit shares in and/or traceable to the 2021 Offering and were damaged as a result of those purchases.

### A.    Jurisdiction and Venue

263.  The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o). This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 22 of the Securities Act, 15 U.S.C. § 77v because this is a civil action arising under the laws of the United States and Section 22 of the Securities Act grants jurisdiction to claims under the Securities Act to Courts of the United States.

264.  Venue is proper in this District under Section 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1391(b). Kornit maintains its United States headquarters in Englewood, New Jersey, which is situated in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information in the Offering Materials, occurred in and/or were issued from this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## B.    The Securities Act Parties

### 1.    Plaintiffs

265.    Lead Plaintiff Genesee County Employees' Retirement System ("GCERS") is a multi-employer defined benefit plan that provides retirement and survivor benefits for employees of Genesee County, Michigan.  GCERS purchased Kornit ordinary shares in and/or traceable to the 2021 Offering and was damaged thereby (ECF No. 12-4).

266.    Lead Plaintiffs Kranot Hishtalmut Le Morim Tichoniim Havera Menahelet LTD and Kranot Hishtalmut Le Morim Ve Gananot Havera Menahelet LTD (together, the "Teachers Funds") are investment funds based in Israel.  The Teachers Funds purchased Kornit ordinary shares in and/or traceable to the 2021 Offering and were damaged thereby (ECF No. 12-4).

267.    Lead Plaintiff Hachshara Insurance Company Ltd. ("Hachshara") is an insurance company based in Israel.  Hachshara purchased Kornit ordinary shares in and/or traceable to the 2021 Offering and was damaged thereby (ECF No. 12-4).

268.    Additional Named Plaintiff Indiana State Police Pension Trust ("Indiana Police") (together with Lead Plaintiffs, "Plaintiffs") is a defined benefit plan that provides retirement benefits for police officers in the state of Indiana.  As reflected in the certification attached hereto as Exhibit 1, Indiana Police purchased Kornit ordinary shares in and/or traceable to the 2021 Offering from Defendant Barclays (defined below) and was damaged thereby.

### 2.    The Securities Act Defendants

269.    In addition to Defendants Kornit, Samuel, and Rozner, the following Defendants are liable to Plaintiffs and the Class under the Securities Act for the material misstatements and omissions in the Offering Materials for the 2021 Offering.

### a.    Offering Defendants

270.    Defendant Guy Avidan ("Avidan") was Kornit's Chief Financial Officer from November 2014 until November 2020.  Defendant Avidan signed the Registration Statement for the 2021 Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

271.    Defendant Yuval Cohen ("Cohen") is, and was at all relevant times, a Director of Kornit, serving as the Chairman of the Board of Directors since August 2011. Defendant Cohen signed the Registration Statement for the 2021 Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

272.    Defendant Gabi Seligsohn ("Seligsohn") is, and was at all relevant times, a Director of Kornit, serving as a Director since March 2015. Defendant Seligsohn signed the Registration Statement for the 2021 Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

273.    Defendant Ofer Ben-Zur ("Ben-Zur") is a co-founder of Kornit, and at all relevant times was a Director of Kornit, serving as a Director since 2002.  Defendant Ben-Zur signed the Registration Statement for the 2021 Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

274.    Defendant Stephen Nigro ("Nigro") is, and was at all relevant times, a Director of Kornit, serving as a Director since August 2019.  Defendant Nigro signed the Registration Statement for the 2021 Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

275.    Defendant Lauri Hanover ("Hanover") is currently Kornit's Chief Financial Officer and served as a Director of Kornit from March 2015 until November 2022.  Defendant Hanover

signed the Registration Statement for the 2021 Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

276.    Defendant Alon Lumbroso ("Lumbroso") was at all a Director of Kornit, serving as a Director since March 2015.  Defendant Lumbroso signed the Registration Statement for the 2021 Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

277.    Defendant Yehosua Nir ("Nir") is, and was at all relevant times, a Director of Kornit, serving as a Director since July 2018.  Defendant Nir signed the Registration Statement for the 2021 Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

278.    Defendant Dov Ofer ("Ofer") is, and was at all relevant times, a Director of Kornit, serving as a Director since March 2015.  Defendant Ofer signed the Registration Statement for the 2021 Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

279.    Defendants Cohen, Seligsohn, Ben-Zur, Nigro, Hanover, Lumbroso, Nir, and Ofer are collectively referred to in this Complaint as the "Director Defendants," and together with Defendants Samuel and Avidan, the "Offering Defendants."

### b.    Underwriter Defendants

280.    Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter and underwriter representative for the 2021 Offering.  As an underwriter of the 2021 Offering, Defendant Citigroup was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2021 Offering Materials.

281.    Defendant Barclays Capital Inc. ("Barclays") served as an underwriter and underwriter representative for the 2021 Offering. As an underwriter of the 2021 Offering,

Defendant Barclays was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2021 Offering Materials.

282.    Defendant Goldman Sachs & Co. LLC ("Goldman") served as an underwriter and underwriter representative for the 2021 Offering. As an underwriter of the 2021 Offering, Defendant Goldman was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2021 Offering Materials.

283.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter and underwriter representative for the 2021 Offering. As an underwriter of the 2021 Offering, Defendant Morgan Stanley was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2021 Offering Materials.

284.    Defendants Citigroup, Barclays, Goldman, and Morgan Stanley are collectively referred to in this Complaint as the "Underwriter Defendants."

### C.    Kornit and the 2021 Offering

285.    Kornit is a company incorporated in Israel with its United States headquarters in Englewood, New Jersey.  Kornit's business is centered on the textile printing industry as applied to the fashion, apparel, and home décor sectors.  The Company offers various printing services, including direct-to-garment printing and direct-to-fabric printing with its proprietary printing equipment.  Kornit complements its printing offerings by selling various consumable accessories, such as ink for its printers.  Kornit also offers service contracts for when its equipment breaks down.  The Company was established in 2002 and completed its initial public offering in 2015.

286.    On or around November 23, 2021, Kornit conducted the 2021 Offering pursuant to a registration statement that the Company initially filed on September 14, 2020 and was declared effective by the SEC on September 17, 2020 (the "Registration Statement").  On November 19,

2021, Kornit filed a Prospectus Supplement on Form 424B5 (the "Prospectus Supplement"), which formed part of the Registration Statement (together, the "Offering Materials"). The Registration Statement was signed by the Director Defendants. By means of the Offering Materials, Kornit and a selling shareholder, an affiliate of Amazon.com, Inc., offered and sold 3,042,845 Kornit ordinary shares at $151.00 per share. The 2021 Offering resulted in over $339 million in net proceeds to Kornit.

### D. The Offering Materials Contain Untrue Statements of Material Fact and Omitted Other Facts Necessary to Make the Statement Made Not Misleading

287.    The Offering Materials incorporated by reference Kornit's annual report filed with the SEC on Form 20-F on March 25, 2021, which was signed by Defendants Samuel and Rozner. The Form 20-F included several purported "risk factors" with respect to Kornit's business.

288.    *First*, Kornit's 20-F included a risk factor concerning potential "undetected errors or defects." That risk factor stated that Kornit's "systems, ink and other consumables, and associated software may contain undetected errors or defects when first introduced or as new versions are released," and that those "problems may cause us to incur significant warranty and repair costs, divert the attention of our engineers from our product development and customer service efforts and harm our reputation."

289.    The above purported "risk factor" contains untrue statements of material fact and omitted other facts necessary to make it not misleading because the "risk" that the Company's products would contain defects or that those defects might result in significant repair costs had already materialized.

290.    In addition, Kornit's 20-F included several statements concerning the total cost of ownership of its products. For example, Kornit touted the benefits of its Atlas product line, claiming that the Atlas boasted "retail-grade print quality, high productivity and attractive total

cost of ownership." Kornit similarly claimed that its Vulcan system benefited from the "the best total cost of ownership for large production facilities with high volumes of mass customization print jobs." On the whole, Kornit claimed that the unique "differentiation across our new line of HD systems is mainly based on system productivity and total cost of ownership."

291.   Kornit's statements in ¶¶288-90 above were untrue statements of material fact when made or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, in violation of the Securities Act. It was untrue and misleading to state, for example, that Kornit's products maintained "high productivity." In truth, Kornit's products suffered from significant defects and were significantly less productive than its competitors' products.

292.   It was also untrue and misleading to state that Kornit's products, including its Atlas and Vulcan systems, boasted "attractive total cost of ownership." As a result of the significant defects and repair costs, as well as the lack of productivity of Kornit's products, the total cost of ownership of those products was significantly higher than Kornit's customers had been led to believe.

293.   Kornit's 20-F also represented that "Strategic accounts are an important and valued part of our business and future growth, and we continue to make the appropriate investments in ensuring we serve their needs as it comes to sales, application consulting and services support. We expect to continue developing our strategic accounts practice in a combination of dedicated regional and corporate resources as we strive to help these important customers improve their business performances by delivering best-in-class customer experience."

294.   Kornit's statement about "mak[ing] the appropriate investment in . . . services support" and "delivering best-in-class customer experience" were untrue statements of material

fact when made or omitted to state material facts required to be stated or necessary to make the statements not misleading, in violation of the Securities Act.  It was untrue and misleading to tout Kornit's investment in service support and the Company's provision of "best-in-class" customer experience" when, instead, Kornit's attempt to turn its service business into a profit center materially impaired its ability to adequately service its customers, leading to customers refusing to order additional product or altogether defecting to Kornit's competitors.

295.    In addition, Kornit's 20-F also touted that KornitX, "Kornit's cloud workflow software solution, based on the acquisition of Custom Gateway, is a robust platform with a wide range of services to digitally transform our customers' operations . . . ."

296.    Kornit's statement about KornitX was an untrue statement of material fact when made or omitted to state material facts required to be stated or necessary to make the statement not misleading, in violation of the Securities Act.  It was untrue and misleading to state that KornitX was a "robust platform" when, in truth, the system was not ready, the Company was "constantly working on it and figuring out the integration," and, as subsequently admitted by Defendant Samuel after the Class Period, the Company was still working on stabilizing the platform.

## XIV.  SECURITIES ACT COUNTS

### COUNT III

**For Violations of Section 11 of the Securities Act Against Kornit, the Offering Defendants, and the Underwriter Defendants**

297.    Plaintiffs repeat, incorporate, and reallege the allegations set forth above under Section XIII only, as if fully stated in this Count. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and negligence under the Securities Act. For purposes

of asserting this Count, Plaintiffs do not allege that the Securities Act Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

298.    This Count is brought under Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired Kornit ordinary shares sold pursuant or traceable to the 2021 Offering, and who were damaged thereby.

299.    Kornit is the registrant for the 2021 Offering. The Defendants named in this Count were responsible for the contents and dissemination of the Offering Materials.

300.    As the issuer of the shares, Kornit is strictly liable to Plaintiffs and the Class for the misstatements and omissions contained in the Offering Materials.

301.    Liability on this Count is predicated on the Offering Defendants' signing of the Registration Statement for the 2021 Offering, and the Underwriter Defendants' participation in underwriting the 2021 Offering, which was conducted pursuant to the Offering Materials. The Offering Materials were false and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated in the Offering Materials.

302.    Plaintiffs purchased shares in and/or traceable to the 2021 Offering.

303.    The value of Kornit ordinary shares has declined substantially as a result of Defendants' violations, causing damage to those members of the Class that purchased or otherwise acquired Kornit ordinary shares in and/or traceable to the 2021 Offering.

304.    Less than one year has elapsed since the time that Plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based. Less than three years have elapsed since the time that the securities at issue in this Complaint were *bona fide* offered to the public.

305.    By reason of the foregoing, the Defendants named in this Count are each jointly and severally liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class under Section 11(e).

## COUNT IV

**For Violations of Section 12(a)(2) of the Securities Act**
**Against Kornit, Officer and Director Defendants, and the Underwriter Defendants**

306.    Plaintiffs repeat, incorporate, and reallege the allegations set forth above under Section XIII only, as if fully stated in this Count. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

307.    This Count is brought under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Kornit ordinary shares in and/or traceable to the 2021 Offering, and who were damaged thereby.

308.    The Securities Act Officer and Director Defendants signed the Registration Statement, which formed the Offering Documents.

309.    The Defendants named in this count were statutory sellers and offerors and/or soliticors of purchases of the Kornit ordinary shares that were registered in the 2021 Offering pursuant to the Registration Statement and sold by means of the Offering Materials. By means of the Offering Materials, the Underwriter Defendants sold millions of Kornit ordinary shares through the 2021 Offering to Plaintiffs and members of the Class. Kornit, the Securities Act Officer and Director Defendants, and the Underwriter Defendants were at all relevant times motivated by their own financial interests. In sum, the Defendants named in this count were sellers, offerors, and/or

solicitors of sales of the stock that was sold in the 2021 Offering by means of the materially false and misleading Offering Materials.

310.    The Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, and failed to disclose material facts, as alleged above.

311.    Less than one year has elapsed since the time that Plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based. Less than three years have elapsed since the time that the securities at issue in this Complaint were *bona fide* offered to the public.

312.    By reason of the foregoing, the Defendants named in this Count are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired Kornit ordinary shares in and/or traceable to the 2021 Offering, and who were damaged thereby.

## COUNT V

### For Violations of Section 15 of the Securities Act
### Against the Offering Defendants

313.    Plaintiffs repeat, incorporate, and reallege the allegations set forth above under Section XIII only, as if fully stated in this Count. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

314.    This Count is brought under Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who purchased or otherwise acquired Kornit ordinary shares in and/or traceable to the 2021 Offering, and who were damaged thereby.

315.    As alleged in Count Three (III) above, Kornit is strictly liable under Section 11 of the Securities Act for untrue statements and omissions of material fact in the Offering Materials

316.    The Offering Defendants, by virtue of their positions, voting power, ownership, rights as against Kornit, and/or specific acts were, at the time of the wrongs alleged in this Complaint and as alleged in this Count, controlling persons of Kornit within the meaning of Section 15 of the Securities Act. These Defendants also had the power and influence, and exercised the same, to cause Kornit to engage in the acts described in this Complaint, including by causing Kornit to conduct the 2021 Offering pursuant to the Offering Materials.

317.    By reason of the foregoing, the Defendants named in this Count each were culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act as alleged in Counts Three and Four above, based on their having signed or authorized the signing of the Registration Statement and/or having otherwise participated in the process that allowed the 2021 Offering to be successfully completed. The Defendants named in this Count are liable for the aforesaid wrongful conduct and are liable, to the same extent Kornit is liable under Section 11 of the Securities Act, to Plaintiffs and members of the Class who purchased or otherwise acquired Kornit ordinary shares sold pursuant or traceable to the 2021 Offering, and who were damaged thereby.

## XV.    CLASS ACTION ALLEGATIONS

318.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired Kornit ordinary shares: (i) pursuant and/or traceable to the Company's 2021 Offering; and/or (ii) during the Class Period (the "Class"), and were damaged thereby.  Excluded from the Class are

Defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

319.    The members of the Class are so numerous that joinder of all members is impracticable. Following the 2021 Offering, Kornit ordinary shares were actively traded on the NASDAQ. As of November 14, 2022, Kornit had over 49 million ordinary shares outstanding. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Kornit, its transfer agent or securities' brokers, and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

320.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.    Whether Defendants violated the Securities Act;

b.    Whether Defendants violated the Exchange Act;

c.    Whether the Offering Materials were negligently prepared and contained inaccurate statements of material fact, omitted other facts necessary to make the statements made therein not misleading, and omitted material information required to be stated therein;

d.    Whether Kornit and the Officer Defendants omitted and/or misrepresented material facts;

e.    Whether statements made by Kornit and the Officer Defendants omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

f.      Whether the Offering Materials' signatory Defendants are personally liable for the alleged untrue statements of material fact and omissions of material fact described herein;

g.      Whether the Director Defendants and the Officer Defendants are personally liable for the alleged misrepresentations and omissions described herein;

h.      Whether Kornit and the Officer Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

i.      Whether Defendants' conduct impacted the price of Kornit ordinary shares;

j.      Whether Defendants' conduct caused the members of the Class to sustain damages; and

k.      The extent of damage sustained by Class members and the appropriate measure of damages.

321.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct in violation of federal law complained of herein.

322.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

323.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XVI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

a.      Determining that this action is a proper class action under Rule 23 of the Federal

Rules of Civil Procedure;

b.    Awarding compensatory, rescissory or statutory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XVII.  JURY DEMAND

Plaintiffs demand a trial by jury in this action of all issues so triable.

Dated: October 27, 2023

Respectfully submitted,

By: /s/ *James E. Cecchi*
James E. Cecchi
**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**
Kevin G. Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs Genesee County Employees' Retirement System, Kranot Hishtalmut Le Morim Tichoniim Havera Menahelet LTD, Kranot Hishtalmut Le Morim Ve Gananot Havera Menahelet LTD, and Hachshara Insurance Company Ltd.*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Hannah Ross (*pro hac vice forthcoming*)
Avi Josefon (*pro hac vice forthcoming*)
James A. Harrod (*pro hac vice forthcoming*)
Alec T. Coquin (*pro hac vice forthcoming*)
Mathews R. de Carvalho (*pro hac vice forthcoming*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
avi@blbglaw.com
jim.harrod@blbglaw.com
alec.coquin@blbglaw.com
mathews.decarvalho@blbglaw.com

*Lead Counsel for Lead Plaintiffs*

Thomas C. Michaud
Francis E. Judd
**VANOVERBEKE MICHAUD & TIMMONY P.C.**
79 Alfred Street
Detroit, Michigan 48201

Telephone: (313) 578-1200
Facsimile: (313) 578-1201
tmichaud@vmtlaw.com
fjudd@vmtlaw.com

*Additional Counsel for Lead Plaintiff Genesee
County Employees' Retirement System*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll
Julie Goldsmith Reiser
1100 New York Ave NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
stoll@cohenmilstein.com
jreiser@cohenmilstein.com

*Counsel for Named Plaintiff Indiana State Police
Pension Trust*