# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re Kornit Digital Ltd. Securities Litigation | Civil Action No. 2:23-cv-00888-MCA-AME <br><br> Hon. Madeline Cox Arleo <br><br> <u>CLASS ACTION</u> <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> **ORAL ARGUMENT REQUESTED** |

# PLAINTIFFS' MEMORANDUM OF LAW
# IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...............................................................................................1

II. STATEMENT OF FACTS .................................................................................5

    A.  Kornit Experiences Significant Growth Prior to the Class Period.........................................................................................................5

    B.  Defendants Misrepresent the Company's Business and Prospects Throughout the Class Period....................................................6

    C.  Unfortunately for Investors, Defendants Knew but Misrepresented That Kornit's Business Was Plagued with Quality Issues and Demand Was Declining Rapidly ...........................9

    D.  Investors Suffer Significant Losses as the Truth Is Revealed and Post-Class Period Events Confirm Defendants' Fraud .......................11

III. ARGUMENT...................................................................................................13

    A.  The Complaint Sufficiently Alleges Violations of the Exchange Act .......................................................................................................13

        1.  The Complaint Sufficiently Pleads Defendants' False and Misleading Statements ..............................................................14

            a.  Defendants' Challenged Statements Were False and Misleading.................................................................14

                (1)  Statements Concerning Service and Service Contracts...............................................................14

                (2)  Statements Concerning Sticker Mule's "Integration" of Kornit Printers and Customer Growth ..................................................17

                (3)  Statements Concerning Demand ..........................19

                (4)  Statements Concerning the 1Q22 Revenue Pull Forward ....................................................23

i

(5)    Statements Concerning KornitX ..........................26

(6)    Statements Concerning Delta and Fanatics and the Company's Technology "Moat"..............28

b.    Defendants' Disclosures Omitted Material Facts...........31

c.    The Safe Harbor Does Not Insulate Defendants from Liability...................................................................33

d.    Defendants' Misstatements Are Not Puffery .................36

e.    Defendants' Purported Opinion Statements Are Actionable......................................................................39

2.    The Complaint Sufficiently Pleads a Strong Inference of Scienter...................................................................................40

a.    Defendants Had Actual Knowledge of the True Facts and Access to Information Contradicting Their Statements ............................................................41

(1)    Credible Former Employee Allegations Establish Defendants' Knowledge ......................44

b.    Defendants' Repeated Statements Support an Inference of Scienter......................................................46

c.    Defendants' Post-Class Period Admissions Confirm Scienter..............................................................47

d.    The Temporal Proximity of Defendants' Statements to the Corrective Disclosures Strengthens the Inference of Scienter............................49

e.    The Fraud Concerned Kornit's Core Operations ...........50

f.    Defendants Were Motivated to Commit Fraud ..............52

(1)    Defendant Samuel's Insider Trading Supports Scienter..................................................52

(2)    Defendants Were Motivated to Maintain the Fraud in Connection with Kornit's Secondary Offering ...............................................56

g.    The Complaint Alleges Corporate Scienter Against Kornit...................................................................................57

3.    The Complaint Sufficiently Pleads Control Person Liability Claims Under Section 20(a) of the Exchange Act Against the Officer Defendants.......................................57

B.    The Complaint Sufficiently Alleges Violations of the Securities Act ...............................................................................................58

1.    The Complaint Adequately Pleads Standing ...........................58

2.    The Offering Materials Contained Misstatements and Omissions.................................................................................60

IV.    CONCLUSION..........................................................................................62

iii

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004) ..................................................................36

*In re Advanta Corp. Sec. Litig.*,
180 F.3d 525 (3d Cir. 1999) ..................................................44, 51, 52

*In re Allaire Corp. Sec. Litig.*,
224 F. Supp. 2d 319 (D. Mass. 2002) ..................................................38

*In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*,
2007 WL 81937 (E.D. Pa. Jan. 9, 2007) ..............................................60

*In re Amarin Corp. PLC Sec. Litig.*,
2012 WL 1171669 (D.N.J. Mar. 29, 2012) ..........................................33

*In re Anadigics, Inc., Sec. Litig.*,
2011 WL 4594845 (D.N.J. Sept. 30, 2011) ..........................................30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................58, 62

*Asher v. Baxter Int'l Inc.*,
377 F.3d 727 (7th Cir. 2004) ..........................................................25, 33

*Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................58, 62

*In re Audible Inc. Sec. Litig.*,
2007 WL 1062986 (D.N.J. Apr. 3, 2007) ............................................55

*Baker v. Croda Inc.*,
2022 WL 19010312 (3d Cir. Oct. 21, 2022), certified question
answered, 304 A.3d 191 (Del. 2023) ....................................................61

*In re Braskem S.A. Sec. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017) ..................................................30

*Brosious v. Children's Place Retail Stores*,
189 F.R.D. 138 (D.N.J. 1999)..................................................................................60

*In re Cambrex Corp. Sec. Litig.*,
2005 WL 2840336 (D.N.J. Oct. 27, 2005) .........................................................41

*In re Campbell Soup Co. Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001).....................................................................25

*Carmack v. Amaya Inc.*,
258 F. Supp. 3d 454 (D.N.J. 2017).....................................................................57

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
2019 WL 3451523 (D.N.J. July 31, 2019) .................................30, 32, 35, 36, 51

*In re Century Aluminum Co. Sec. Litig.*,
729 F. 3d 1104 (9th Cir. 2013) ...........................................................................59

*City of Brockton Ret. Sys. v. CVS Caremark Corp.*,
2013 WL 6841927 (D.R.I. Dec. 30, 2013) ..........................................................38

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023) .................................................................................24

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020) .................................................................18

*In re Compuware Sec. Litig.*,
301 F. Supp. 2d 672 (E.D. Mich. 2004) .............................................................29

*Curran v. Freshpet, Inc.*,
2018 WL 394878 (D.N.J. Jan. 12, 2018)........................................31, 34, 40, 44

*In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*,
7 F.3d 357 (3d Cir. 1993) ...................................................................................30

*Emps. Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent Inc.*,
2020 WL 3026536 (D.N.J. June 5, 2020)................................................16, 25, 33

*In re Enzymotec Sec. Litig.*,
2015 WL 8784065 (D.N.J. Dec. 15, 2015)......................................36, 51, 52, 58

*In re EQT Corp. Sec. Litig.*,
    504 F. Supp. 3d 474 (W.D. Pa. 2020)...............................................................28

*Fan v. StoneMor Partners LP*,
    927 F.3d 710 (3d Cir. 2019) .................................................................16, 33

*Feiner v. SS&C Techs., Inc.*,
    47 F. Supp. 2d 250 (D. Conn. 1999)...............................................................60

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) .........................................................................61

*Frater v. Hemispherx Biopharma, Inc.*,
    996 F. Supp. 2d 335 (E.D. Pa. 2014)..............................................................52

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ......................................................18, 48

*George v. China Auto. Sys., Inc.*,
    2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012).....................................................55

*Gerneth v. Chiasma, Inc.*,
    2018 WL 935418 (D. Mass. Feb. 15, 2018).....................................................38

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
    643 F. Supp. 2d 562 (S.D.N.Y. 2009) .............................................................60

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995)....................................................................................59

*Guzman v. Mana*,
    2018 WL 10150989 (D.N.J. Dec. 6, 2018).................................................24, 45

*In re Hertz Global Hldgs.*,
    905 F.3d 106 (3d Cir. 2018) .........................................................................56

*Industriens Pensionsfrosikring A/S v. Becton, Dickinson & Co.*,
    620 F. Supp. 3d 167 (D.N.J. 2022)................................................................37

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ................. 13, 34, 40, 41, 44, 45, 47, 49, 50, 52, 57

*In re Intelligroup Sec. Litig.*,
    527 F. Supp. 2d 262 (D.N.J. 2007).................................................................50

*Laborers' Int'l Union v. Foster Wheeler Corp.*,
    26 F.3d 375 (3d Cir. 1994) .........................................................................57

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*,
    2011 WL 2444675 (D. Del. June 14, 2011) ...........................................36

*In re Majesco Sec. Litig.*,
    2006 WL 2846281 (D.N.J. Sept. 29, 2006).............................................35

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
    437 F.3d 588 (7th Cir. 2006) .....................................................................16

*Mariana v. Fisher*,
    338 F.3d 189 (3d Cir. 2003) .......................................................................58

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)......................................................................................14

*In re Merck & Co. Sec. Deriv. & "ERISA" Litig.*,
    2011 WL 3444199 (D.N.J. Aug. 8, 2011) ...........................................14, 37

*In re NAHC, Inc. Sec. Litig.*,
    306 F.3d 1314 (3d Cir. 2002) .....................................................................21

*Odeh v. Immunomedics, Inc.*,
    2020 WL 4381924 (D.N.J. July 31, 2020) ...........................................24, 31

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000) .......................................................................54

*In re Party City Sec. Litig.*,
    147 F. Supp. 2d 282 (D.N.J. 2001)..............................................................44

*Paxton v. Provention Bio, Inc.*,
    2022 WL 3098236  (D.N.J. Aug. 4, 2022) ...........................................21, 22

*In re PDI Sec. Litig.*,
    2005 WL 2009892 (D.N.J. Aug. 17, 2005) ................................................35

*In re Penn Treaty Am. Corp. Sec. Litig.*,
   202 F. Supp. 2d 383 (E.D. Pa. 2002)....................................................38

*Pharmanet Dev. Grp. Inc.*,
   720 F. Supp. 2d 517 (D.N.J. 2010)....................................................51

*Phillips v. Cnty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008) ...........................................................13

*In re Plantronics, Inc. Sec. Litig.*,
   2022 WL 17974627 (N.D. Cal. Aug. 17, 2022)...........................................24, 45

*In re PTC Therapeutics, Inc. Sec. Litig.*,
   2017 WL 3705801 (D.N.J. Aug. 28. 2017)............................................47, 52, 53

*In re Questcor Sec. Litig.*,
   2013 WL 5486762 (C.D. Cal. Oct. 1, 2013)....................................................56

*Rahman v. Kid Brands, Inc.*,
   736 F.3d 237 (3d Cir. 2013) ...........................................................44, 46

*In re Res. Am. Sec. Litig.*,
   2000 WL 1053861 (E.D. Pa. July 26, 2000) ....................................................57

*Rescue Mission of El Paso, Inc. v. K-Sea Transp. Partners L.P.*,
   2013 WL 3087078 (D.N.J. June 14, 2013)....................................................22

*Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3rd Cir. 2004) ...........................................................23, 46

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ...........................................................50

*Roofer's Pens. Fund v. Papa*,
   2018 WL 3601229 (D.N.J. July 27, 2018) ...........................................47, 54, 57

*In re Salix Pharm, Ltd.*,
   2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ...........................................40, 47

*Schottenfeld Qualified Assocs., L.P. v. Workstream, Inc.*,
   2006 WL 4472318 (S.D.N.Y. May 4, 2006) ....................................................28

*SEB Inv. Mgmt AB v. Endo Int'l, PLC,*
   351 F. Supp. 3d 874 (E.D. Pa. 2018)....................................................................46

*Shah v. Zimmer Biomet Holdings, Inc.,*
   348 F. Supp. 3d 821 (N.D. Ind. 2018)..................................................................45

*Shapiro v. UJB Fin. Corp.,*
   964 F. 2d 272 (3d Cir. 1992) ...............................................................................36

*Shih v. Petal Card, Inc.,*
   2020 WL 5659429 (S.D.N.Y. Sept. 23, 2020) .....................................................26

*In re Smith & Wesson Holding Corp. Sec. Litig.,*
   604 F. Supp. 2d 332 (D. Mass. 2009).............................................................38, 39

*Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.,*
   243 F. Supp. 3d 1109 (E.D. Cal. 2017) ...............................................................59

*Steamfitters Loc. 449 Pension Fund v. Alter,*
   2011 WL 4528385 (E.D. Pa. Sep. 30, 2011) .......................................................44

*Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n*
   *Pension Fund v. Olo Inc.,*
   2023 WL 8287681 (S.D.N.Y. Nov. 30, 2023)..................................................24, 45

*In re Suprema Specialties, Inc. Sec. Litig.,*
   438 F.3d 256 (3d Cir. 2006) .......................................................53, 55, 58, 60

*In re Synchronoss Sec. Litig.,*
   705 F. Supp. 2d 367 (D.N.J. 2010).......................................................................44

*In re Synchronoss Techs. Sec. Litig.,*
   2019 WL 2849933 (D.N.J. July 2, 2019) .............................................................55

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
   551 U.S. 308 (2007)......................................................................................13, 40

*In re Tseng Labs, Inc. Sec. Litig.,*
   954 F. Supp. 1024 (E.D. Pa. 1996).........................................................23, 25, 30

*In re U.S. Interactive, Inc. Class Action Sec. Litig.,*
   2002 WL 1971252 (E.D. Pa. Aug. 23, 2002) .......................................................36

*Universal Am. Corp. v. Partners Healthcare Sols. Hldgs., L.P.*,
    176 F. Supp. 3d 387 (D. Del. 2016)........................................................................49

*In re Urban Outfitters Sec. Litig.*,
    103 F. Supp. 3d 635 (E.D. Pa. 2015).....................................................................51

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
    2017 WL 1658822 (D.N.J. Apr. 28, 2017)..............................................39, 59, 60

*In re Vantive Corp., Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ...............................................................................56

*In re Viropharma Inc. Sec. Litig.*,
    21 F. Supp. 3d 458 (E.D. Pa. 2014)................................................................54, 55

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) ...................................................................37

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
    495 F. Supp. 3d 622 (N.D. Ill. 2020).....................................................................59

*Weston v. DocuSign, Inc.*,
    2023 WL 3000583 (N.D. Cal. Apr. 18, 2023).............................2, 21, 24, 32, 40

*Wood v. Bristol Virginia Util. Auth.*,
    661 F. Supp. 3d 538 (W.D. Va. 2023).....................................................................62

STATUTES AND RULES

Securities Act of 1933:

    15 U.S.C. § 78u-5 ..................................................................................................33

    15 U.S.C. § 78u-5(c)(1)(A)(i)................................................................................35

    15 U.S.C. § 78u-5(c)(2)(A).....................................................................................35

Securities Exchange Act of 1934:

    § 10(b), 15 U.S.C. §78j(b) .....................................................................13, 25, 57

    20(a), 15 U.S.C. §78t(a)..........................................................................................57

x

Fed. R. Civ. P.:

Rule 8 ...................................................................................................58, 60, 62

Rule 9(b) .......................................................................................................14

Rule 12(b)(6)..................................................................................................13

Rule 15 ..........................................................................................................62

Securities and Exchange Commission Rule 10b-5,
17 C.F.R. § 240.14a-9(b) ....................................................................55

**OTHER AUTHORITIES**

Meriam Webster Dictionary (2022).......................................................................18

Private Securities Litigation Reform Act of 1995 ................................................4, 14

\*\*\*

**Note on Citation Format**: Unless otherwise noted: (i) all capitalized terms have the same meanings ascribed to them in Complaint; (ii) all references to "¶__" are to paragraphs in the Complaint; (iii) all references to "PX __" are to exhibits to the accompanying Declaration of James A. Harrod; (iv) all references to "DX __" are to exhibits to the Declaration of Edmund Polubinski filed with the MTD; and (v) all emphasis is added, and internal quotations and citations are omitted.

Lead Plaintiffs Genesee County Employees' Retirement System, Kranot Hishtalmut Le Morim Tichoniim Havera Menahelet LTD, Kranot Hishtalmut Le Morim Ve Gananot Havera Menahelet LTD, and Hachshara Insurance Company Ltd. (together, "Lead Plaintiffs"), along with Additional Named Plaintiff Indiana State Police Pension Trust (together with Lead Plaintiffs, "Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' motions to dismiss the Consolidated Complaint (ECF No. 23, the "Complaint").[1]

## I.    INTRODUCTION

This case concerns Defendants' deliberate efforts to conceal the severe weaknesses in product quality and service, and a decline in demand that impacted Kornit Digital Ltd.'s ("Kornit" or the "Company") business. By the start of the Class Period, Kornit had experienced an unprecedented boom thanks to pandemic restrictions that pushed customers toward e-commerce. But this growth was out of line with Kornit's historical rates and not sustainable, and the Kornit Defendants knew that.

Notwithstanding the massive increase in pandemic-related growth, which Defendants sought to portray as the "new normal" even as Covid restrictions eased,

---

[1] Plaintiffs submit this memorandum of law in response to the two briefs submitted by the Defendants in this Action: (i) the Kornit Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint (ECF No. 34-1, "MTD"); and (ii) the Underwriter Defendants' Brief in Support of the Underwriter Defendants' Motion to Dismiss (ECF No. 36, "UW MTD").

Defendants, Kornit's CEO Ronen Samuel in particular, touted the Company's ability to hit $1 billion in annual revenue. But that target would require the Covid-era growth Kornit experienced to be repeated for several years (*see* ¶¶32-34), which was impossible in light of the significant and undisclosed problems facing the Company. Defendants' briefs use pejorative language to characterize Plaintiffs' Complaint ("threadbare," but also "bloated") but their overall narrative—that Plaintiffs are seeking to capitalize on the effects of Covid—is backwards. In other pandemic-related cases, plaintiffs asserted that Covid caused a drop-off or adversely affected business, and certain of those complaints were rightly dismissed. But here, the opposite occurred. Kornit's business experienced growth—but this growth was unsustainable and Defendants knew it. Despite this knowledge, they still assured investors the Covid-bump was the present and the future. It was not, and other courts have sustained cases with a similar fact pattern. *See, e.g., Weston v. DocuSign, Inc.*, 2023 WL 3000583, at *1 (N.D. Cal. Apr. 18, 2023).

More specifically, throughout the Class Period—which runs from February 17, 2021 until July 5, 2022—Kornit was impacted by increased competition and an understaffed and ineffective service organization that alienated the Company's key customers. The KornitX platform (which was supposed to be Kornit's product of the future) was still in its infancy and not generating any meaningful revenue. Worse still, as pandemic restrictions eased and Kornit's top clients defected to the

competition because of poor service, Kornit observed declining demand.

Given the significant 2021 growth and investor concern about the sustainability of that growth, Kornit and its senior executives accelerated revenue from the second quarter of 2022 into the first quarter of 2022, while repeatedly assuring the Company's investors that 2022 was off to a "strong" start and that Kornit had never been in a stronger position. These misrepresentations created a misleading impression of Kornit's business and its growth prospects.

Investors first began to learn the truth in May 2022, when Kornit announced disappointing results for that year's first quarter. While the Kornit Defendants subsequently assured the market that these results were "just a bump on the road" and that "the fundamentals of what Kornit is driving in our business [were] better than ever," just weeks later, Kornit would once again announce another set of disappointing financial results in July 2022, missing their guidance by more than 35%. Analysts immediately questioned management's credibility, noting that "regaining the trust of the investment community will prove to be a long and winding road." Predictably, Kornit's share price declined by more than 50% as the market learned that Defendants had misrepresented the strength of Kornit's business and the sustainability of its pandemic-fueled growth.

After the Class Period, Defendants made several damning admissions indicating that their previous statements were not just overly optimistic—they were

3

knowingly false. Defendant Samuel admitted, for instance that "by the end of 2021" major customers had cancelled orders due to slowing growth and that at the "[b]eginning of 2022, we saw major decline within the business of our customers." And despite Kornit's previous statements touting the adoption and profitability of KornitX, Defendant Samuel admitted months after the Class Period that the Company was still attempting to "stabiliz[e] the platform itself," contradicting his repeated Class Period statements about the platform's growth and functionality.

In response, Defendants claim that both Plaintiffs' Exchange Act and Securities Act claims must fail as a matter of law. Defendants first argue that Plaintiffs failed to allege a single actionable misstatement or omission, principally because their statements were too vague and optimistic, or otherwise simply forward-looking projections. Defendants also claim that Kornit sufficiently warned of all the relevant risks facing the Company. None of these arguments withstands scrutiny, as Defendants mischaracterize and ignore their own specific misrepresentations. These were not simply general expressions of corporate optimism; they were highly specific statements about Kornit's business and growth prospects, often made in direct response to questions from analysts. Defendants' attempts to characterize the Complaint as mere "fraud by hindsight" fail.

Next, Defendants argue that the Complaint does not plead scienter; in effect, they claim that each of the Exchange Act Defendants was completely ignorant of all

4

the facts contradicting their statements. But the Complaint alleges a litany of facts that, considered collectively, give rise to a strong inference of scienter, including but not limited to Defendants' knowledge of and access to that information, their own statements touting their knowledge of the relevant facts, and Defendant Samuel's highly suspicious insider trading.

As the Complaint states a claim under both the Securities Exchange Act of 1934 and the Securities Act of 1933, Defendants' motions should be denied.

## II.    STATEMENT OF FACTS

### A.    Kornit Experiences Significant Growth Prior to the Class Period

Kornit develops and sells printers and associated technology designed to let the Company's customers print directly onto fabrics and finished garments, for delivery to the end customer within 24 hours. ¶¶27, 32. Kornit told its customers—and investors—that its systems were faster and cheaper than traditional screen-printing. ¶27. Kornit supplemented its printer business by selling consumable products such as ink, as well as software systems designed to optimize Kornit's machines. ¶29. Kornit also sold maintenance and support contracts purportedly designed to ensure that its customers' machines were fixed quickly to avoid down-time (*id.*), and thus realize the low "total cost of ownership" touted by Defendants.

In the years before the Class Period, Defendants Ronen Samuel and Alon Rozner (the "Officer Defendants," and with Kornit, the "Exchange Act Defendants")

5

were installed as CEO (2018) and CFO (2020), respectively. ¶¶23-24, 30. Under their management, Kornit experienced significant growth and expanded its product lines. ¶¶30, 32. For example, Kornit touted its new KornitX platform as the "Uber" of printing—technology that would allow brands to order items at any of Kornit's participating customers, for delivery within 24 hours to the end consumer. *Id.*

While many companies were negatively impacted by the coronavirus pandemic in 2020 (in particular, brick-and-mortar retail), Kornit, which focused on e-commerce and online orders, experienced a dramatic increase in business. ¶33. Therefore, by the time the Class Period began in February 2021, Kornit had announced a pair of highly ambitious revenue targets: (i) a revenue run rate of $500 million by 2023 (i.e., quarterly revenue of $125 million); and (ii) $1 billion in full-year revenue by 2026. *Id.*

**B.    Defendants Misrepresent the Company's Business and Prospects Throughout the Class Period**

During the Class Period, Defendants knew that Kornit simply could not achieve the growth necessary to hit these projections, and that demand was falling due to undisclosed product quality and customer service issues. Instead of adjusting their forecasts and disclosing the truth to investors, Defendants made numerous material misrepresentations, concealing: (i) significant quality and reliability defects with Kornit's printers; (ii) increased competition during the Class Period; (iii) the Company's inability to adequately service its customers; (iv) Kornit's failure to

6

achieve any material sales of KornitX; and (v) declining demand for Kornit's products and services, which eventually led Defendants to pull forward revenue in 2022. Ultimately, two of Kornit's top ten customers, Fanatics and Delta, moved business to one of Kornit's biggest competitors, M&R Printing, due to Kornit's quality and reliability issues and increased competition. *See* ¶¶61-67.

Defendants' false and misleading statements misrepresented and concealed these true facts and the negative trends in Kornit's business while touting Kornit's purported technological advantage over its competitors, the profitability of its service department and contracts, and the purported rapid growth of KornitX.

Kornit knew that to attract customers, the Company had to manufacture printers, software, ink, and other products that were superior to its competitors. Throughout the Class Period, Defendants repeatedly told the market that Kornit did not see "any threat" from competition, "mainly due to the moat that we manage[d] to build around our technology." ¶59. As Kornit assured investors, competition was "not something that we are worried about" because the Company had "by far, the best technology." *See, e.g.*, ¶¶136, 142, 176.

When customers bought Kornit's printers, the Company also offered them service contracts, whereby Kornit was supposed to fix their printers when they broke down. ¶35. Prior to the Class Period, Kornit's service center had not yet become profitable, but Defendants assured the market that the service department would be

7

a profit source for the Company. ¶¶35-36. To this end, on the first day of the Class Period, Defendants told the market that "every machine that we are selling, we are selling it with a contract," and further assured investors that these were "not for one year"—in other words, that they were "for multiple year contracts" that would create "recurring revenue" for the service department. ¶118. Defendants repeatedly represented that the service center "now is profitable and is becoming more and more profitable." ¶147. In addition, Defendants assured investors that Kornit's customers had "integrated" their business with Kornit's products, creating the misleading impression that these customers were successfully using Kornit's printers. ¶167.

One of Kornit's most important products was its KornitX platform, software that Defendants described as the "Uber" of printing: a platform that would connect brands to printers and deliver finished garments within 24 hours. ¶69. Defendants repeatedly assured the market that KornitX was being sold and used by numerous Kornit customers and growing rapidly. ¶¶70-71, 132.

Throughout the Class Period, Kornit's printers provided the Company with real-time data through Kornit Konnect, software that reported back to Kornit what its customers were doing with Kornit's printers. ¶83. Defendants repeatedly touted their knowledge of customers' use habits, telling investors that "we know everything that our customer is doing . . . . So we have a very good visibility for the trends." *Id.* This visibility allowed Kornit to measure demand for its products and predict how

8

much product it would sell. Even as pandemic restrictions eased and demand began to decline in 2021, however, Defendants assured the market that Kornit had "never been in a better position as a company" and emphasized the "mega-trends that have been fueling our business," which were purportedly "intensifying in magnitude and transformation." ¶¶190-91. When Defendants were specifically asked if they had pulled forward revenue to meet their projections for the first quarter of 2022, Defendant Rozner responded unambiguously: "No." ¶¶209, 211; *see ¶¶*14, 34, 92 (reflecting that pull-forward in 1Q22 exacerbated underperformance in 2Q22).

### C.  Unfortunately for Investors, Defendants Knew but Misrepresented That Kornit's Business Was Plagued with Quality Issues and Demand Was Declining Rapidly

Contrary to Defendants' statements, Kornit's products were plagued with quality issues and Kornit's service department was woefully ineffective, which combined with increased competition (that Defendants denied the existence of) caused significant customer losses. In addition, KornitX was not ready for customer use and did not generate the revenue that Defendants led the market to believe it would. And by late 2021, demand for Kornit's products began to decline quickly.

Despite these significant problems, Defendants continued to make false and misleading statements to investors. Even as demand for Kornit's business cratered in late 2021 and into 2022, and two of its Top 10 customers began to move business to Kornit's biggest competitor, Defendants reassured investors that the Company

9

had clear visibility into its sales pipeline and that Kornit would be able to "deliver" on its commitments as it rode a "very strong" backlog of orders that provided a "tremendous tailwind into 2022." ¶¶191-93. But eventually, Defendants were forced to pull forward revenue into the first quarter of 2022 to meet projections, a fact they hid from investors. ¶¶87, 92-94. Former Kornit employees corroborated these facts and the Officer Defendants' knowledge of them. For instance:

- FE8 "reported that he attended meetings with Defendant Samuel where service and reliability problems were discussed." ¶¶45, 232. FE4 corroborated this account, explaining that "problems with customer service were discussed in meetings that included the CEO, Ronen Samuel, the president of North America, Chuck Meyo, and the VP of sales, Don Whaley" (¶67) and were the cause of customers, including Delta, migrating to Kornit competitors. ¶64. FE3 similarly reported that former Kornit customer Sticker Mule got rid of the Company's machines because they were unable to get them to run properly. ¶41.

- FE3 attended regular calls concerning sales projections and revenue. He discussed the declining demand trend that began in November 2021 with both the President and Vice President of Kornit's Americas division. ¶92. FE3 elaborated that there were "recognizable trend issues that were recognized by some at the Company and ignored by others until it was too late to stop the tailspin." ¶¶92, 170.

- Defendants knew of the fall-off in demand and personally took steps to try and address it. For example, FE2 explained how Defendants masked the impact of declining demand. Defendants "offered significant discounts" "in order to meet the Company's revenue projections." ¶231. These were frequently approved by Defendant Samuel, the only person at Kornit who could approve discounts over a certain threshold. *Id.* Then, according to FE3, projected revenue for the second quarter of 2022 was pulled forward so that Kornit could meet its projections for the first quarter. ¶93. FE3 learned this from the President of Kornit's largest division, who reported directly to Defendant Samuel. *Id.*

10

- FE3 further reported that KornitX "had not turned any kind of profit or generated any sales in the Americas" from July of 2021 through the end of the Class Period. ¶¶40, 74. FE10 reported that Kornit did not sell the KornitX platform to any customer during his tenure. ¶¶72-73.

While Defendants misrepresented the true facts to the market, Kornit conducted a secondary offering in November 2021, generating more than $340 million in proceeds. In addition, Defendant Samuel sold his personally-held Kornit shares for nearly $10 million during the Class Period in a series of highly-suspicious trades that drastically departed from his prior trading. ¶¶236-37.

### D.    Investors Suffer Significant Losses as the Truth Is Revealed and Post-Class Period Events Confirm Defendants' Fraud

The truth began to emerge on May 11, 2022, when Kornit reported financial results for the first quarter of 2022. ¶96. That day, the Company disclosed a multi-million-dollar loss, disappointing revenues, and issued surprisingly low guidance for the second quarter of 2022. *Id.* During the earnings call that day, Defendant Samuel admitted for the first time that Kornit had known for at least the two previous quarters that it was losing business, as Fanatics and Delta Apparel had decided to move business to one of Kornit's biggest competitors. ¶99.

Analysts were surprised by these disclosures. They noted that "weak Q1 revenue guidance has left investors understandably skeptical that this is a temporary issue," and that a "Tough 1H raise[d] some questions" after Kornit's "1Q results and the 2Q22 revenue guidance missed [its] estimates." ¶97. In response to these

11

disclosures, Kornit's share price declined by $18.78 per share, or 33.3%. ¶100. But Defendants continued to make false statements to calm the market, telling investors that Kornit's business was still "in the best place that we could dream of" and that the first quarter results were just a "bump on the road," that did not pose real concern because "the fundamentals of what Kornit is driving in our business [were] better than ever." ¶¶105-06, 212-14.

But less than two months later, Kornit again stunned investors by announcing another set of disappointing quarterly results on July 5, 2022. ¶107. Kornit disclosed that it expected to miss the quarterly guidance it had announced just weeks prior, by more than 35%. *Id.* On this news, Kornit's share price once again declined significantly, by $8.10 per share, or 25.7%. ¶110. Analysts immediately questioned management's credibility, stating that "management regaining the trust of the investment community will prove to be a long and winding road," given "the delta between [second quarter] results and expectations given management's generally bullish tone in early to mid-June at several conferences." ¶109.

After the Class Period, the Officer Defendants made several statements confirming the falsity of their prior representations to investors. For instance, during Kornit's August 10, 2022 earnings call, Defendant Samuel admitted that "in H1" demand from Kornit's customers was "declining year-over-year," and that only going into the third quarter of 2022 was Kornit seeing "some customers . . . going

12

back into the growth phase." ¶111. Almost a year later in May 2023, Defendant Samuel once again acknowledged that in the "[b]eginning of 2022, we saw major decline within the business of our customers," and that Kornit "saw the impression[s] in many customers going down" during the Class Period. ¶113.

## III.   ARGUMENT

On a Rule 12(b)(6) motion, a court must treat the pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321-22, 324 (2007). Dismissal is inappropriate even if "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). Defendants' motions to dismiss must be denied as to both Exchange Act and Securities Act claims.

### A.   The Complaint Sufficiently Alleges Violations of the Exchange Act

To state a claim under Section 10(b) of the Exchange Act, plaintiffs must "allege defendants made a misstatement or an omission of material fact with scienter in connection with the purchase or the sale of a security upon which plaintiffs reasonably relied and plaintiff's reliance was the proximate cause of their injury." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 251 (3d Cir. 2009). As to Plaintiffs' Section 10(b) claim, Defendants only challenge the sufficiency of the Complaint as to: (i) false misrepresentations or omissions; and (ii) scienter. As

13

discussed below, the Complaint readily states claims under the Exchange Act against Kornit, Defendant Samuel, and Defendant Rozner.

### 1. The Complaint Sufficiently Pleads Defendants' False and Misleading Statements

The Complaint sets forth each of the alleged misrepresentations and omissions, which Defendant made each statement, when, and the reasons each was false or misleading. *See* ¶¶118-218, 287-96. Nothing more is required under the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b).

In determining whether the Complaint adequately pleads a misstatement or omission, the Court must draw all inferences in Plaintiffs' favor and evaluate the false and misleading statements in the context they would have been understood by a reasonable investor. See *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46-47 (2011). "Some statements, although literally accurate, can become through their context and manner of presentation, devices which mislead investors." *In re Merck & Co. Sec. Deriv. & "ERISA" Litig.*, 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011). Moreover, under the Exchange Act, once a party chooses to speak, it has a duty to "speak truthfully about that subject." *Id.*

#### a. Defendants' Challenged Statements Were False and Misleading

##### (1) Statements Concerning Service and Service Contracts

Investors were highly interested in and inquired about Kornit's ability to turn

service into a profit source. In touting Kornit's ability to make service profitable, Defendant Samuel falsely stated that: "Every machine that we are selling, we are selling it with a contract. There's no other way to buy from us a machine and it's not for one year. It's for multiple year contracts and we see a very nice recurring revenue coming from the service business." ¶118. *See also id.* ("We continue to improve our service contract attach rate"). To be sure, Defendant Samuel falsely represented that initial sales of equipment came with a mandatory multi-year contract. ¶121. That was not true. ¶¶35, 38. Defendants try to artfully parse what Defendant Samuel actually said and ask this Court to make a factual conclusion in their favor, based on prepared remarks by Rozner, that Samuel was not talking about initial service contracts but rather, multi-year renewal contracts. MTD at 20-21.

Indeed, Defendants cite the Company's Annual Reports as purportedly supporting the existence of "multi-year" initial contracts. *See* MTD at 9 ("they 'can renew their support contract by purchasing a' multi-year 'support package'").[2] But those disclosures do not cure the obviously untrue and misleading statement that Samuel made to create the impression there was more service revenue owing to the expansion of the mandatory period for service contracts on sales.  The suggestion

---

[2] The Kornit Annual Reports Defendants cite say nothing about "multi-year" contracts. The Annual Report explicitly states that one year service contracts are mandatory only for "each industrial system" sale—not "every machine that we are selling," as represented by Defendant Samuel. *Compare* DX 1 at 46 *with* DX 1 at 37 (differentiating between entry level, industrial, and mass production solutions).

15

that Defendant Samuel's statement is "fully consistent" with the disclosures in the Annual Reports, as Defendants' implicitly admit, is thus factually wrong and illogical at best. *See* MTD at 21-22 (Kornit "provided a six-month warranty with every printing system, and customers <u>could</u> buy an additional one-year service contract."). Whether investors understood Kornit's Annual Report as corrective of Defendants' Samuel's false statement—which was itself made in direct response to an analyst and reported favorably—is an "intensely fact-specific" truth-on-the-market defenses that is "rarely an appropriate basis for" dismissal. *See Emps. Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent Inc.*, 2020 WL 3026536, at *6 n.8 (D.N.J. June 5, 2020). Defendants' citation to *Fan v. StoneMor Partners LP*, in which defendants disclosed a "mathematical reality" that rendered their statements accurate, is thus inapposite. 927 F.3d 710, 717 (3d Cir. 2019).

Further, Defendant Samuel's statement concerning the length and mandatory nature of service contracts was made in the context of Kornit's newly-disclosed strategy to make Kornit's service center profitable—and in direct response to an analyst question on the topic. ¶36. This critical context, and analysts' explicit positive reception of the new strategy, buttresses the materiality of those statements and confirms that they were not immaterial or simply puffery. *See Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006) (statement that product

would "maintain its growth rate" in response to analyst question was material).[3] ¶36.

Thus, Defendants' statements concerning service contracts, the "execution" of the customer success team, and other statements implicated by the persistent failure of Kornit's service department are actionable. *See, e.g.,* PX 1 (referencing ¶¶118, 120, 124, 127-28, 133, 136-139, 142-143, 146-49, 150, 155, 160-61, 166-69, 175-76, 180, 182, 186, 190-93, 198-99, 206-08, 212).[4]

### (2) Statements Concerning Sticker Mule's "Integration" of Kornit Printers and Customer Growth

On November 10, 2021, during Kornit's 3Q21 earnings call, Defendant Rozner touted the Company's "<u>great progress with new customers</u>." ¶167. Shortly thereafter, Defendant Samuel highlighted the onboarding of a new customer, Sticker Mule, as a purported example of this great progress, noting: "Recently, Sticker Mule . . . <u>integrated</u> a fleet of our Atlas systems into their business and <u>are utilizing</u> the

---

[3] Defendants claim that the Complaint pleads no facts supporting the allegation that the service contracts did not provide recurring service revenues. MTD at 23 n.14. This misses the point. Plaintiffs do not dispute that service contracts were a source of revenue for the Company. Rather, the Complaint alleges that the market was misled about the <u>length and attach rate</u> of service contracts, and the underperformance of the service department, facts which would impact investor understanding and forecasting of Kornit's service revenue growth. FE1, who was responsible for securing renewal service contracts, reported that many customers would cancel the service contract as soon as the six-month warranty ended. ¶47. FE1 "said that getting customers to renew service contracts was a 'very tough sell,' estimating that only about twenty percent renewed contracts." *Id.*

[4] PX 1 responds to Defendants' DX 30 (Alleged Misstatements Summary Table).

17

growing customer base to support a strong DTG revenue channel." ¶¶41, 167.

Defendants' factual and present tense statements about the "integrated" fleet of Atlas printers and "utilization" of those machines by Sticker Mule are plainly contradicted by FE3 and FE4, who confirmed that Sticker Mule "couldn't work the machines correctly" and that "Kornit was unable to get them to run properly." ¶41. These averments plainly contradict Defendant Samuel's insistence that the printers were successfully "integrated." *See* Meriam Webster Dictionary (2022) (Integrate: to form, coordinate, or blend into a <u>functioning</u> or unified whole) (available at https://www.merriam-webster.com/dictionary/integrate); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 130 (S.D.N.Y. 2020) (words carry their "ordinary meaning").[5]

Defendants quibble with the fact that Sticker Mule sold its Kornit printers at the beginning of 2022, claiming that the FEs do not provide a motive for Sticker Mule's sale. MTD at 18-19. But Sticker Mule's motive for selling its Kornit printers <u>in 2022</u> is irrelevant to whether Defendants' statement concerning Sticker Mule's supposed <u>integration</u> of Kornit printers was false when made <u>in November of 2021</u>, during which time <u>both</u> FEs were employed by Kornit. *See, e.g., Freudenberg v.*

---

[5] Defendants' characterization of Defendant Samuel's statement as forward-looking is plainly contradicted by his use of the past tense to describe the purported "integration." PX 1 (referencing ¶167). Statements of present or historical fact are not protected by the safe harbor. *See* Section III.A.1.c., *infra*.

*E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 179 (S.D.N.Y. 2010) ("corporate officers . . . are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the[ir] statements misleading.").

Moreover, Defendants' false statements concerning Sticker Mule rendered misleading other statements they made touting the Company's service department and purported low "total cost of ownership" of Kornit printers, as unreliable printers that Defendants were unable to adequately service do not have a low total cost of ownership. *See* ¶¶35-52, 53-57, 168, 199, 202, 208.

### (3)    Statements Concerning Demand

Defendants made repeated statements touting the broad demand for Kornit's products. *See, e.g.,* ¶166 (Samuel: "[w]e enter 2022 with very strong business fundamentals supported by broad-based demand for our industry leading solutions"). But, by November 2021, Defendants knew of and concealed the severity of declining demand for the Company's consumables and printers, rendering false and misleading a host of their statements. *See, e.g.,* PX 1 (referencing ¶¶166, 167, 169, 175, 180, 182, 190–93, 206–07, 212–15). Defendants principally argue that Plaintiffs have not done enough to establish a "trend" by November 2021. MTD at 16. Defendants are incorrect.

First, Kornit Konnect provided Defendants with detailed, real time usage metrics such that Kornit knew "everything that our customer is doing . . . . So we

19

have a very good visibility for the trends." ¶83. Based on live data from its clients, Kornit was able to both measure current demand levels for its products (such as impressions and ink usage) and use that data to assess trends and anticipate customer needs. ¶83. Indeed, as Defendants have admitted, this live, granular visibility into system and ink usage correlates closely with future system and ink sales. ¶85.

Second, FE3 attended recurring calls concerning sales projections and revenue and specifically discussed the 4Q21 sales slowdown with his President and Vice President. ¶¶92, 170 (corroborating existence of negative trend in 4Q21). This trend continued into the first quarter of 2022, as Kornit's customers purchased substantially less product from Kornit than they had in the past. ¶93. That the Company's "peak season" in late 2021 was comparatively weaker than previous years is critical, because unutilized supplies from this period are used to fulfill orders in subsequent quarters. ¶¶83-85 (discussing available data). Instead of disclosing the severity of declining demand, Defendants pulled revenue from 2Q22 into 1Q22, to cover the 1Q22 shortfall. *See* ¶93; *infra* at Section III.A.1.a.(4).

Third, Defendant Samuel admitted that major customers started to experience a slowdown in growth and cancelled orders "at the end of 2021." ¶216. He also admitted that at the "[b]eginning of 2022, we saw major decline within the business of our customers." ¶113. Defendant Samuel later admitted that these customers experienced a slowdown "by the end of 2021". ¶170. These admissions establish

20

that a negative demand trend existed in 4Q21. *See* MTD at 16.

Defendants creatively reinterpret Defendant Samuel's admission about the negative demand trend starting in late 2021 as applying <u>only</u> to a <u>single</u> client, Printful. MTD at 17. This is nonsense and again contradicts what Defendant Samuel actually said: Printful was "<u>an example</u>" that Kornit "saw" as representative of "<u>other customers without getting to names</u>." DX 17 at 11–12. Similarly, Defendants argue that somehow, the fact that customers who had experienced a slowdown "by the end of 2021" informed Kornit "at the end of 2021" that they would not order planned equipment, suggests that Defendants did not know of the negative trend before "Q1 2022". MTD at 17. This is illogical, particularly given that Defendants knew of the <u>impact</u> of the trend (no new orders) by the "end of 2021."[6]

Defendants next claim that Kornit disclosed indicators of negative demand (which began in November of 2021) in its earnings call for the first quarter of 2022 on May 11, 2022, a full *six months* after the beginning of the trend. *See* MTD at 16.[7]

---

[6] Defendants' citation to *In re NAHC, Inc. Sec. Litig.*, which held that Defendants "are not obligated to predict future events <u>unless there is reason to believe that they will occur</u>," is thus unavailing. 306 F.3d 1314, 1330 (3d Cir. 2002); MTD at 16. *See also DocuSign*, 2023 WL 3000583, at *17 ("At this stage of the litigation, the plaintiffs have sufficiently alleged enough to plausibly show that DocuSign's disclosures about the pandemic's impact did not alert investors that some of those risks may have already come to fruition.").

[7] Defendants cite *Paxton v. Provention Bio, Inc.*, to suggest they are allowed a "reasonable amount of time" to evaluate negative information before disclosure. 2022 WL 3098236, at *13 (D.N.J. Aug. 4, 2022), MTD at 17. But *Paxton* found four

21

But Defendants' statements prior to the May 2022 earnings call, including on February 15, 2022, plainly denied the existence and severity of the negative demand trend. *See, e.g.*, ¶190 (Kornit has "<u>never been in a better position as a company</u>"); ¶191 ("<u>started 2022 with outstanding momentum</u>"); ¶191 ("<u>[t]he mega-trends that have been fueling our business are intensifying in magnitude and transformation</u>"); ¶192 (similar). Defendants' citation to *Rescue Mission of El Paso, Inc. v. K-Sea Transp. Partners L.P.*, is thus readily distinguishable. 2013 WL 3087078, at \*2 (D.N.J. June 14, 2013) (disclosing number of contracts expiring, excess client capacity, and specific timeline of decline in market demand).

Statements made during the May 11, 2022 earnings call had the same effect. *See, e.g.*, ¶207 ("we see Q2 kind of <u>a bump on the road</u>); *id.* ("<u>the fundamentals of the business are growing and accelerating</u>."); *id.* ("<u>in the last week, we start to see a different trend on supply</u>").    Statements shortly thereafter reinforced these misrepresentations. *See* ¶212 ("What happened in Q1 is a unique case, and I call it <u>a bump, bump on the road to grow</u>."); *id.* (reaffirming mid- and long-term guidance). More fundamentally, Defendants' purported curative language cannot insulate them from liability, particularly because 1Q22 results were themselves inflated by Defendants' pull forward of revenue from 2Q22 into 1Q22, as discussed below.

---

days to be reasonable, not the six months at issue here. *Id.*

22

### (4) Statements Concerning the 1Q22 Revenue Pull Forward

Defendants pulled forward revenue from 2Q22 into 1Q22 to mask the severity of declining demand. ¶¶86-87, 92-93. When specifically asked by an analyst whether a particular transaction was, in fact, a pull forward, Defendant Rozner responded: "No. It was a timing issue . . ." ¶¶209, 211. Contrary to Rozner's denial, FE3 relayed that revenue for 2Q22 was brought in during 1Q22 to conceal the fact that Kornit was in a tailspin, by creating the appearance that Kornit was close to its revenue target. ¶93. FE3 was informed by the President of Kornit's Americas division, who reported directly to Defendant Samuel, that revenue was pulled forward. ¶93.[8]

Defendants contend that FE3 "is not alleged to have had any role in revenue forecasting or recognition," that the information concerning the pull forward came from a "more senior executive," and that FE3's statements must be completely disregarded by this Court. MTD at 19-20 (citing *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.,* 394 F.3d 126, 155 (3rd Cir. 2004). Not so. The Complaint details FE3's title and tenure, and reports that as part of his responsibilities, FE3 attended recurring calls concerning sales projections and revenue (¶92). FE3 specifically discussed the sales slowdown that began in November 2021 with both the President and Vice

---

[8] Defendants argue that the Complaint fails to allege a GAAP violation. MTD at 19. But no such allegation is required. *See, e,g.*, *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *11 (N.D. Cal. Aug. 17, 2022) (GAAP violation not required to plausibly allege misleading pull forward).

President of the Americas division. *Id.* This is sufficient to find that FE3's account of sales projections and revenue <u>is</u> reliable.[9] *See City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 691-92 (3d Cir. 2023) (the showing "that a confidential source, by virtue of his or her position, would have access to the information alleged [] can be made through a description of the duration of the confidential witness's employment along with explanations of how and when the confidential witness learned the information."); *see also DocuSign*, 2023 WL 3000583, at *19 (similar).

Defendants next claim that even crediting FE3's testimony, the Complaint does not allege any "duty to disclose the supposed pull-forward." MTD at 20. This is nonsensical. The false statement was, in part, made in direct response to an analyst question about whether there was a pull forward of revenue, to which Rozner falsely stated "*No*." ¶¶209-11. It is axiomatic that false statements are actionable even without a standalone duty to disclose. *See, e.g.*, *Odeh v. Immunomedics, Inc.*, 2020

---

[9] FE3 learned this information directly from the President of the Americas, which is sufficient to allege falsity. *See Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*, 2023 WL 8287681, at *11 (S.D.N.Y. Nov. 30, 2023) ("it is permissible for confidential witnesses to rely on indirect knowledge"); *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 17974627, at *5 (same). Even if the statements were hearsay, that "is irrelevant because at the motion to dismiss stage, the Court is required to accept all factual statements as true in order to test the legal sufficiency of the complaint." *Guzman v. Mana*, 2018 WL 10150989, at *2 n.2 (D.N.J. Dec. 6, 2018).

WL 4381924, at *6 (D.N.J. July 31, 2020).[10]

Defendants also argue that to the extent the undisclosed pull forward masked a decline in demand, it is not actionable given Kornit's disclosures of a slowdown in e-commerce. MTD at 20. This truth-on-the-market argument must fail at the pleading stage, as the purported curative disclosure that Defendants advance is itself alleged to be false (*see* ¶206), and Defendants made other statements specifically denying the existence of a negative demand trend. ¶207. Investors could not have fully and fairly appreciated the <u>extent</u> of the decline in demand concealed by Defendants' pull forward and related misrepresentations. *See Conduent*, 2020 WL 3026536, at *6 n.8 (truth-on-the-market "is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint.").

Indeed, had investors been sufficiently informed of the negative demand trend, analysts would not have called into question management's candor <u>or</u> specifically criticized their positive representations concerning growth both before and after 1Q22. *See* ¶109; *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) (rejecting truth-on-the-market argument given "sharp drop in the price" of defendant's stock."). Thus, Defendants' statements minimizing the existence of the

---

[10] The Complaint also specifically alleges that Defendants failed in their duty to disclose. *See, e.g.*, ¶210; *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 589 (D.N.J. 2001) ("obligation to provide an accurate representation of Campbell's then—current sales and earnings and their growth projections."); *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *10 (N.D. Cal. Aug. 17, 2022) (similar).

negative demand trend and related false assurances are actionable. *See, e.g.*, PX 1 (referencing ¶¶180, 190-93, 206-07, 209, 212-15).

### (5)  Statements Concerning KornitX

Throughout the Class Period, Defendants repeatedly touted the rapid adoption and growth of KornitX, the platform's robustness, and issued and reaffirmed a $100 million revenue growth target for the platform. *See, e.g.*, ¶119 ("experiencing huge interest from brands and fulfillers"); ¶130 ("is a robust platform"); ¶156 ("we see a great adoption. Actually, we see a very, very big adoption from . . . fulfillers"); ¶168 ("[w]e see [] very strong adoption"); ¶187 ("really driving major growth"); ¶214 ("KornitX is growing very fast").[11] These statements are plainly contradicted by numerous FEs and Defendants' own admissions that KornitX only generated a "couple million" dollars in revenue and that Kornit never fully "stabiliz[ed] the platform" during the Class Period. ¶¶72-75.

Defendants focus on a single statement by Defendant Samuel on January 10, 2022, in which Defendant Samuel claimed that KornitX was generating "multi-million-dollar revenue on transaction[s] to Kornit." MTD at 23. Defendants argue

---

[11] Defendants impermissibly recast some of their statements about KornitX as statements about "backlog," MTD at 12, but Plaintiffs do not allege that statements about Defendants' backlog were false. *See* ¶¶160, 162; *Shih v. Petal Card, Inc.,* 2020 WL 5659429, at *14 (S.D.N.Y. Sept. 23, 2020) (defendant's counterfactual narrative inappropriate at motion to dismiss). The remaining "backlog" statements (¶¶166, 170, 181, 183, 190, 191, 194, 206, 210) concern Defendants' medium- and long-term targets. *See* Section III.A.1.a.(3)-(4).

that FE3, who reported that KornitX "had not turned any kind of profit or generated any sales in the Americas" from July of 2021 through the Class Period (¶¶40, 74) is unreliable, because Plaintiffs purportedly admit that KornitX was a separate department. MTD at 23. This argument falls flat. FE3 was initially hired to work on KornitX, demonstrating knowledge and expertise concerning the platform, and was present for weekly calls concerning sales projections and revenue. ¶92. FE3's statements are also consistent with FE10, a former Project Sales Manager, who reported that Kornit failed to sell KornitX to any client during his tenure. ¶¶72-73. Both of their accounts are buttressed by that of FE11, a Software Architect at KornitX, who reported that the platform was simply not ready. ¶75.

Moreover, Defendant Samuel's statement on January 10, 2022 that "KornitX . . . [was] already generating multi-million-dollar revenue"—which according to Defendants means precisely $2 million (MTD at 23 n.15)—was followed by other statements touting KornitX's growth over the following months. *See, e.g.*, ¶187 (KornitX "is really driving major growth"); ¶214 ("KornitX is growing very fast" and "we see a massive growth coming into it"). Yet KornitX only ever generated a "couple" or a "few" million in revenue and, since the beginning of 2021, lost approximately 45% of its customer base. *See, e.g.*, ¶184; *compare* DX 1 at 16 (2020 Annual Report) ("approximately 300 customers") *with* DX 2 at 15 (2021 Annual

27

Report) ("approximately 250 customers") *and with* DX 22 at 17 (2022 Annual Report) ("approximately 166 customers").

KornitX's stagnating revenues and negative customer growth demonstrate the falsity of Defendants' statements concerning KornitX and related revenue targets. *See, e.g.,* PX 1 (referencing ¶¶119-20, 130-33, 139, 143, 148-50, 156, 160, 162, 166, 168, 175, 180, 187, 191, 199, 212, 214); *see also In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 493 (W.D. Pa. 2020) (finding statement that acquisition was "already showing significant returns" false and misleading statement of present fact); *Schottenfeld Qualified Assocs., L.P. v. Workstream, Inc.*, 2006 WL 4472318, at *3 (S.D.N.Y. May 4, 2006) (finding statements about "overall growth and momentum" of the company's business and "strength of our subscription and services revenues" actionable).

### (6) Statements Concerning Delta and Fanatics and the Company's Technology "Moat"

Defendants claim that they are insulated from their failure to disclose the known loss of Delta and Fanatics' business to M&R printing, because Kornit had no obligation to disclose market share losses. MTD at 12-13. Defendants again ignore the critical context that rendered their statements misleading. First, in direct response to analyst questions about Fanatics, Defendants represented that "Kornit was the perfect fit" for the customer and frequently touted "huge growth" from the Company's top 10 customers, which included both Delta and Fanatics. ¶146.

Second, Defendants also touted the Fanatics relationship as late as January 2022, noting that Fanatics was a customer that was one of the "biggest companies of the world," ¶186, and falsely cautioned that Kornit's "Top 10" customers would be different because of the *acquisition* of new and larger clients. ¶182. Third, Defendant Samuel admitted that since the quarter beginning in July 2021, Kornit knew that Delta had decided to acquire digital printing systems from one of Kornit's competitors. ¶99. Last, Defendants consistently minimized even the existence of viable competition while touting Kornit's purported technology "moat," or advantage over other printer manufacturers. *See, e.g.*, ¶¶136-38, 142-43, 146, 176, 182, 186, 190-92, 198-99, 206-08. Defendants' misrepresentations and the failure to disclose the loss of business from Delta and Fanatics rendered misleading their statements about Kornit's growth trajectory and the Company's medium and long-term forecasts. *See, e.g.,* PX 1 (referencing ¶¶166-67, 169, 175, 180, 182, 186, 190-92, 206-08, 212, 214, 215).

Defendants chose to tout Kornit's supposedly continued strong competitive position and relationship with Fanatics (Delta) in the face of increasing competition, while concealing contrary material facts. This rendered their statements so incomplete as to mislead. *In re Compuware Sec. Litig.*, 301 F. Supp. 2d 672, 682 (E.D. Mich. 2004) ("Defendants' choice to disclose anything about that relationship in its press releases and SEC filings mandated full disclosure concerning the

29

benefits, as well as the impediments, to realizing the full potential of that relationship."); *see also In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 761 (S.D.N.Y. 2017) ("having opened up that subject for discussion, [Defendant] was not at liberty to selectively omit" core material facts*)*; *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at \*10 (D.N.J. July 31, 2019) (falsity established where defendant was already facing increased competition).[12]

Creatively reinterpreting Defendant Samuel's admission concerning his knowledge of Fanatics' use of M&R printers, Defendants contend that Kornit did not know that Delta and Fanatics intended to direct a material amount of business away from Kornit before their March 2022 public announcement. MTD at 14. This argument contradicts Defendant Samuel's admission specifically noting that Fanatics' outsourcing of its <u>entire</u> business to Delta (using M&R equipment) was "the direction that we were foreseeing." DX 9 at 15. And the FEs plainly establish the materiality and the pervasive internal knowledge of the lost business as far back as November of 2021. *See* ¶64 (Fanatics and Delta had over 100 Kornit installations,

---

[12] Defendants cite *In re Anadigics, Inc., Sec. Litig.*, 2011 WL 4594845, at \*20 (D.N.J. Sept. 30, 2011) for the contrary proposition. MTD at 13. But *Anadigics* is inapposite insofar as the statement concerning competition was found not actionable because Defendants spoke about a segment of their business that was not subject to competition. *Id.* at \*25. Unlike *In re Tseng Labs, Inc. Sec. Litig.*, MTD at 13, Defendants here made repeated statements about the strength of their competitive position and specific customer wins. 954 F. Supp. 1024, 1028 n.8 (E.D. Pa. 1996) (citing *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 375 (3d Cir. 1993) ("With great detail, it also explained the intense competition")).

30

which were lost to the competition); ¶65 ("whole Company knew internally"); ¶65 ("Kornit knew . . . in November 2021"); ¶66 ("the drop-off in Kornit ink consumption would have started in the fourth quarter of 2021"). Thus, Defendants' statements concerning competition, Delta and Fanatics, and purported "growth" in their Top 10 customers were false and misleading when made.[13]

### b.     Defendants' Disclosures Omitted Material Facts

As discussed above, Defendants made statements throughout the Class Period that were misleading because they omitted relevant facts concerning, among other things, increased competition, an understaffed and ineffective service organization, and the failures related to the Company's KornitX platform. In addition, as demand shifted back to traditional retail channels, Defendants failed to disclose declining demand for Kornit's core products and attempted to conceal this negative trend by pulling forward revenue. Defendants were required to disclose these material facts given their otherwise misleading statements on these topics. *Immunomedics, Inc.*, 2020 WL 4381924 at *6 ("Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading."); *see also Curran v. Freshpet, Inc.*, 2018 WL 394878, at *5 (D.N.J. Jan. 12, 2018) (omission of

---

[13] In light of Defendants' arguments regarding their statements concerning ink and consumable products (MTD at 24-25), Plaintiffs no longer challenge those statements.

31

challenges with retailers and manufacturing problems materially misleading); *Perrigo*, 2019 WL 3451523, at *10 (statements about possibility of increased competition insufficient to counterbalance prior statements).

In response, Defendants argue that their generic warnings about potential negative outcomes insulate them from liability. *See, e.g.*, DX 1 at 3; DX 2-3 at 4 ("If we do not compete successfully, our revenues and demand for our solutions could decline."); *id.* at 4 ("our business would be adversely affected by a decline in sales"). Defendants are wrong. *See, e.g.*, *DocuSign*, 2023 WL 3000583, at *17 (as "the pandemic-related risks the company warned investors about during the earnings call had already come to fruition, [defendants'] disclosures were inadequate.").

For example, Defendants claim that they disclosed a variety of "challenges" associated with KornitX, and that they did not expect the platform to "significantly impact [Kornit's] results of operations" in the near term. MTD at 27 (citing DX 1 & 2 at 15-16). But the referenced language does not cure the misleading nature of Kornit's disclosures concerning KornitX. The problems with KornitX were significant and simply not conveyed in Defendants' contingent risk warnings. Kornit expressly noted that it did not expect KornitX to have "a material impact on our overall results of operations in the very near term." DX 2 at 15. And the referenced "challenges" are expressly limited to "required delivery of the service level agreements," *id.*, which Plaintiffs do not allege were breached. *See* ¶¶69-75.

32

These irrelevant warnings cannot absolve Defendants' specific misrepresentations concerning the platform and its growth. *See* ¶¶119, 130, 148, 156, 162, 168, 187.

In the context of defending other statements, Defendants advance *StoneMor*, 927 F.3d at 717 (MTD at 21-22) and *In re Amarin Corp. PLC Sec. Litig.*, 2012 WL 1171669 (D.N.J. Mar. 29, 2012). But in *StoneMor*, the defendants publicly disclosed "the mathematical reality that StoneMor was not able to fund its distributions primarily from its day-to-day operations"—the very fact those plaintiffs alleged that defendants had concealed in that case. *See StoneMor*, 927 F.3d at 717.[14] Here, Defendants have presented no such mathematical proof and, instead, failed to "sufficiently disclose[ the] facts and information that render [their] alleged misrepresentations not misleading." *Id.; see Conduent*, 2020 WL 3026536, at *6, *supra* at 16, 25. Had investors been fully and fairly informed of the true undisclosed facts, analysts would not have called into question management's candor or specifically criticized their positive representations concerning growth both pre-1Q21 and post-1Q22. *See* ¶109; *see, e.g.*, *Baxter*, 377 F.3d at 734.

### c.     The Safe Harbor Does Not Insulate Defendants from Liability

The PSLRA's safe harbor provision, 15 U.S.C. § 78u-5, "immunizes from

---

[14] *Amarin*, in which Defendants disclosed discussions with the FDA concerning the very risk at issue, is similarly distinguishable. 2021 WL 1171669, at *14. Unlike here, the court found that defendants had not put the adverse but undisclosed data "in play." *Id.* at *15.

liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254. However, the safe harbor does not apply to a "mixed present/future statement . . . with respect to the part of the statement that refers to the present." *Id.* at 255. Nor does the safe harbor apply to the extent Plaintiffs "sufficiently allege that Defendants omitted present facts from the challenged statements." *See Freshpet*, 2018 WL 394878, at *4.

First, many of the statements that Defendants characterize as forward-looking are, on their face, statements of present fact and therefore do not qualify for the safe harbor. *See, e.g.*, ¶214 ("all the fundamentals are very strong"); PX 1 (referencing ¶¶118, 119, 128, 132, 137, 142, 147, 148, 156, 162, 166, 167, 168, 169, 180, 182, 190, 191, 192, 207, 208, 212, 214, 215, 293).

Second, although some of Defendants' statements are prefaced with arguably forward-looking language or otherwise discuss the future, the statements all implicate Kornit's present and past strategy and misrepresentations related to poor service, inability to compete, and revenue manipulation. The statements accordingly are not protected by the safe harbor, because they omitted existing facts that bear on the forward-looking aspect of the statement. *See* PX 1 (referencing ¶¶118-20, 128, 132-33, 137, 139, 142-43, 146-49, 155, 156, 160, 162, 166, 167-69, 175, 180, 182,

34

190-93, 198, 206-08, 212, 214-15, 293); *see also In re Majesco Sec. Litig.*, 2006 WL 2846281, at *4 (D.N.J. Sept. 29, 2006) ("[A]llegations based upon omissions of existing facts or circumstances do not constitute forward looking statements protected by the safe harbor of the Securities Act."); *see also Perrigo*, 2019 WL 3451523, at *11-12.

Third, even if the statements were forward-looking, the safe harbor would not apply because they were not "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i); *see also* 15 U.S.C. § 78u-5(c)(2)(A). Defendants' argument that their statements are inactionable thanks to purported disclosures in Kornit's Annual Reports is unavailing. These generic disclosures were not extensive and specific and were thus insufficient to constitute meaningful cautionary language. *See In re PDI Sec. Litig.*, 2005 WL 2009892, at *12-15 (D.N.J. Aug. 17, 2005). Here, Defendants' statements warned generically that, for example, markets can be competitive, but failed to disclose known specific facts about increased competition, lost clients, and defective service that existed at the time the statements were made. Defendants purported warnings are "mere boilerplate disclaimers that warn generally of risks," and thus cannot fall within the safe harbor. *Perrigo*, 2019 WL 3451523, at *12.

Last, Defendants acted with actual knowledge of the falsity of each of their

35

statements and omissions. *See* Section III.A.1.c., *infra*. Accordingly, the safe harbor provision is inapplicable. *See Perrigo*, 2019 WL 3451523, at *11-12.

### d.      Defendants' Misstatements Are Not Puffery

Defendants contend that many of their challenged statements constitute immaterial puffery. MTD at 47. But "a statement is considered puffery only when it is immaterial." *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *13 (D.N.J. Dec. 15, 2015). "Materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." *Shapiro v. UJB Fin. Corp.*, 964 F. 2d 272, 280 n.11 (3d Cir. 1992). Thus, "'[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality'" is dismissal appropriate. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 275 (3d Cir. 2004).

Courts thus commonly find evaluations of a company's financial well-being—be they "conservative," "strong," "solid" or otherwise—actionable. *See, e.g.*, ¶166 ("[W]e enter 2022 with very <u>strong</u> business fundamentals"); ¶168 ("[w]e see [ ] very <u>strong</u> adoption" of KornitX); ¶191 ("<u>very, very, strong</u> new moat"). *See Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *2, *10 (D. Del. June 14, 2011) (similar); *In re U.S. Interactive, Inc. Class Action Sec. Litig.*, 2002 WL 1971252, at *18 (E.D. Pa. Aug. 23, 2002)

(statements about "incredible," "robust," and "strong" demand not puffery); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 166, 180, 182 (S.D.N.Y. 2003) ("healthy balance sheet" and "very strong position" statements not puffery when defendants were "aware of the financial precipice on which it stood").

Even if a statement expresses optimism, it is nonetheless misleading when defendants fail to completely and accurately represent information known to them. *See, e.g.*, ¶192 (stating that "Kornit has never been in a stronger position" and failing to disclose competitive losses, service failures, customers defections, negative demand trends, and related impacts on medium- and long-term forecasts); *Merck*, 2011 WL 3444199, at *10 (positive statements about commercial success misleading for failure to completely and accurately represent information known to defendants); *Industriens Pensionsfrosikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 186 (D.N.J. 2022) ("Defendants may not describe a favorable picture of a material issue without including the details that would have presented a complete and less favorable one.").

Many of Defendants' challenged statements were also concrete, verifiable representations of fact, not loose, vague generalities. *See, e.g.*, ¶118 ("[E]very machine that we are selling, we are selling it with a contract."); ¶126 ("high productivity and attractive total cost of ownership"); ¶130 (KornitX "is a robust platform"); ¶167 ("integrated a fleet of our Atlas systems into their business"). These

37

representations of fact, which are directly contrary to internal facts as reported by FEs and corroborated by Defendants' admissions, are actionable. *See, e.g.*, *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 342 (D. Mass. 2009) ("statements regarding the strength of past demand . . . are definite and important to a potential investor"). Similarly, Defendants' statements touting Kornit's continued dominant competitive position—e.g., that Kornit was well-positioned against competitors with an ever-widening technological moat—are "exactly the types of statements on which investors and markets rely." *See, e.g.*, *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 337 (D. Mass. 2002) (statement that company's leadership position gave it a "competitive advantage" actionable).

Moreover, "[m]ateriality is measured by whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Gerneth v. Chiasma, Inc.*, 2018 WL 935418, at *3 (D. Mass. Feb. 15, 2018). Here, many of the challenged statements were oft repeated and made in direct response to questions from securities analysts raising these concerns. *See, e.g.*, *In re Penn Treaty Am. Corp. Sec. Litig.*, 202 F. Supp. 2d 383, 392-93 (E.D. Pa. 2002) (response to analyst question not puffery); *City of Brockton Ret. Sys. v. CVS Caremark Corp.*, 2013 WL 6841927, at *4-5 (D.R.I. Dec. 30, 2013) (similar). Thus, Defendants' repeated assurances of, for example, continued "strong" or "accelerating" demand for Kornit's core products were not "so vague" that "a

38

reasonable investor would find [them] unimportant." *Smith & Wesson*, 604 F. Supp. 2d at 342.

### e. Defendants' Purported Opinion Statements Are Actionable

As an initial matter, many of the statements Defendants claim were mere opinions are in fact anything but—unadorned by any of the words that would even suggest that Defendants were expressing an opinion, and thus are not subject to protection. *See, e.g.*, ¶180 ("KornitX is already generating multi-million-dollar revenue,"); ¶187 ("KornitX is a platform that enable[s] connectivity"); ¶¶190-91 ("Kornit is the only company that offer[s] high-quality, on-demand mass production digital solutions"); ¶192 ("Kornit has never been in a stronger position"); ¶206 ("System revenue growth was very strong"); *see generally* PX 1.

To the extent any of Defendants' statements are considered opinions, they are still actionable because they reasonably implied untrue facts and omitted appropriate qualifying language that investors needed in order to appreciate the uncertainty of Kornit's revenue. *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at *14 (D.N.J. Apr. 28, 2017) (omission of material fact renders statement of opinion actionable); *see, e.g.*, ¶¶120, 130, 142, 155, 162, 167-69, 180, 190, 193, 206, 212, 215. Defendants repeatedly touted Kornit's revenue targets, growth, and "accelerating" business fundamentals while knowing of a material decline in customer growth since 4Q21. The failure to disclose these material facts and the

39

intentional concealment of this negative trend renders Defendants' statements actionable. *See Freshpet*, 2018 WL 394878, at *7 (omission of negative facts that affected growth precluded immunity for statements of opinion); *DocuSign, Inc.*, 2023 WL 3000583, at *18 (statements not puffery where defendants' "omission makes any opinions about [customer demand] misleading to a reasonable person who would hear or read that statement fairly and in context.").

## 2. The Complaint Sufficiently Pleads a Strong Inference of Scienter

The Complaint establishes Defendants' scienter by alleging a host of facts that, when considered together, raise a strong inference of either conscious or reckless misbehavior. *See Avaya*, 564 F.3d at 251. When assessing whether a complaint raises a strong inference of scienter, a court considers "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets [this] standard." *Tellabs*, 551 U.S. at 323. Scienter allegations "need not be irrefutable, i.e., of the 'smoking gun' genre." *Id.* at 324. Instead, the inference of scienter need only be "cogent and at least as compelling as any opposing inference." *Id.* If competing inferences are equally compelling, "the tie . . . goes to the plaintiff." *In re Salix Pharm, Ltd.,* 2016 WL 1629341, at *13 (S.D.N.Y. Apr. 22, 2016).

In the Third Circuit, scienter turns "not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole

40

factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269. Defendants adopt a strategy of "focus[ing] on particular types of allegations and argu[ing] for the insufficiency of each," which has been rejected by the Third Circuit. *Id.* at 272. Here, when the allegations are considered holistically—as they must be—the Complaint readily alleges a strong and compelling inference of scienter.

> **a.    Defendants Had Actual Knowledge of the True Facts and Access to Information Contradicting Their Statements**

"To adequately plead scienter, it is sufficient for plaintiffs to allege that defendants had knowledge of facts <u>or access to information that contradict[ed] their statements</u>." *In re Cambrex Corp. Sec. Litig.*, 2005 WL 2840336, at *11 (D.N.J. Oct. 27, 2005). Defendants undoubtedly had access to negative information that contradicted their public statements.

<u>First</u>, Defendants knew that Kornit's customers complained about the quality of Kornit's products and its ineffective service department. *See* ¶¶39-52. FE8 explained that he personally "attended meetings with Defendant Samuel where service and reliability problems were discussed." ¶232. FE4 similarly noted that "problems with customer service were discussed in meetings that included the CEO, Ronen Samuel, the president of [Kornit's] North America [division], Chuck Meyo, and the VP of sales." ¶67. FE4 learned about these meetings and discussions through

41

his own "weekly meetings with Chuck Meyo" who "mentioned every time that he had reported the customer service issues to Defendant Samuel." ¶67. Notably, these meetings even discussed specific customers. As FE4 explained, "customer service issues at Delta were discussed at frequent meetings beginning no later than early 2021 attended by Defendant Samuel." ¶232. FE3 corroborated FE4's account, reporting that other executives spoke frequently with Defendant Samuel "about sales and service issues." ¶233.

Second, Defendants knew that demand was slowing during the Class Period. FE2 explained the steps Defendants took to stem the impact of declining demand. ¶¶88-89. As FE2 described, Defendants offered its customers "significant discounts" of up to 30% "in order to meet the Company's revenue projections." ¶¶89, 231. These discounts were frequently approved by Defendant Samuel himself, the only person who could approve any discount above 7%. ¶¶89, 231. Eventually, in early 2022, unable to reverse these negative trends, Defendants pulled forward revenue to meet projections for that quarter. ¶93. FE3 explained that he learned of the pull-forward from Chuck Meyo, the President of Kornit's largest division. ¶93.

Third, Kornit repeatedly touted its real-time information meticulously detailing customers' use of Kornit's products. ¶¶76-86. Kornit's Konnect system, installed in every new Kornit machine, monitored "the garment [customers were] using, how much ink laydown they're doing, what type of jobs that they're printing."

42

¶¶83, 222. As Defendant Samuel explained, the Kornit Konnect system allowed Defendants to "know everything that our customer is doing." ¶¶83, 222. Kornit Konnect enabled Defendants to measure demand based on how many garments Kornit's customers printed, and subsequently use that data to evaluate trends. ¶83.

Finally, Kornit closely tracked its customers' ink usage and generated weekly reports with Kornit's "Ink Summary." ¶84. Ink usage was, as Defendant Samuel told investors, the "best indicator" of the strength of Kornit's business. ¶85. The Ink Summary included contemporaneous ink usage for every client with more than $65,000 in ink bookings. ¶84. The Ink Summary allowed Kornit to compare customer demand against management's quarterly and annual revenue forecasts. *Id.* FE4 explained that Kornit's ink usage reports "were available to every single person at Kornit, including management." ¶229. Defendants repeatedly acknowledged that they closely monitored customers' ink usage, ¶85, and thus would have seen demand declining. And in fact, FE4 confirmed that "by no later than November 2021, Defendants knew that demand for the Company's products was in decline and saw deeply concerning trends." ¶230.

Defendants knew and had access to detailed information reflecting the issues plaguing Kornit's business. "[I]t is sufficient for Plaintiffs to allege defendants' knowledge of facts or access to information contradicting their public statements; inference of recklessness may also be inferred from refusal to see the obvious, or to

43

investigate the doubtful." *Steamfitters Loc. 449 Pension Fund v. Alter*, 2011 WL 4528385, at *8 n.80 (E.D. Pa. Sep. 30, 2011) (quoting *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 315 (D.N.J. 2001)); *see also Freshpet*, 2018 WL 394878, at *5 (scienter established where "Plaintiffs have alleged that Defendants had extensive information about difficulties facing their [] customers"). Contrary to Defendants' suggestion, the Complaint does much more than allege that Defendants "must have had" information contradicting their statements. MTD at 37-38.[15]

### (1)   Credible Former Employee Allegations Establish Defendants' Knowledge

Defendants barely engage with the substance of the former employee allegations. Instead, they complain that the former employee accounts are "vague" or "uncorroborated." MTD at 40. Not so. As noted *supra* at 23-24, the Complaint establishes "the duration of each [former employee's] employment, the time period during which the [former employees] acquired the relevant information, and how each [former employee] had access to such information." *Avaya*, 564 F.3d at 263. No more is required at this stage.

---

[15] Defendants' cited case law is inapposite. *See* MTD 37-38. *Rahman v. Kid Brands, Inc.* simply noted that management's general awareness of the company's business did not establish scienter "at least absent some additional allegations of specific information conveyed to management and related to fraud." 736 F.3d 237, 247 (3d Cir. 2013). The Complaint pleads those additional allegations. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) and *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367 (D.N.J. 2010) are inapplicable for the same reason.

44

Indeed, the FEs explicitly identify the sources of their knowledge, which often included Kornit executives who were in meetings with Defendants and relayed the discussions that took place in those meetings. *See Plantronics*, 2022 WL 17974627, at *5 ("that alleged reports by the confidential witnesses at issue may have been based on hearsay does not preclude a finding that such reports are reliable, plausible, and coherent in light of the allegations in the SAC"); *see also Olo*, 2023 WL 8287681, at *11 (same); *Mana*, 2018 WL 10150989, at *2 n.2, *supra* at 24, n.9. The information the FEs provide is also credible because it is corroborated by other FE accounts, as well as Defendants' own statements. *See Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 844 (N.D. Ind. 2018) (former employee accounts reliable where "their accounts are partially corroborated by one another, as well as other evidence").

Defendants' argument that the FE allegations should be ignored because some of them may not have had direct contact with the Officer Defendants also runs directly counter to Third Circuit precedent. *See Avaya*, 564 F.3d at 268-69 (rejecting argument that confidential witness reports be ignored because none of them "claimed to have had any connection to or communication with [defendants], or knowledge about the information or records to which [they] had access").

Defendants' cited authorities are readily distinguishable. For instance, in *Kid Brands*, the witnesses did not have "any way of knowing what was discussed in those

45

closed-door meetings." 736 F.3d at 245. Here, the FEs each identified their sources of information. And in *Chubb*, the plaintiff did not allege when <u>any</u> of the former employees worked at the defendant company or "how <u>any</u> of these former employees had access to such information." 394 F.3d at 148. While Defendants claim that *Chubb* rejected allegations about information that was "well known" at the company, they omit the Third Circuit's reasoning; those statements were "attributed <u>to no source</u> and [we]re based <u>on nothing more</u> than speculation." *Id.* at 155.

### b. Defendants' Repeated Statements Support an Inference of Scienter

The Officer Defendants made repeated assertions during the Class Period touting (i) Kornit's sales pipeline and its "excellent visibility" into that pipeline, (ii) the total cost of ownership of Kornit's products, (iii) Kornit's technological advantage and lack of competition, (iv) the profitability of Kornit's service center, and (v) customers' adoption of KornitX. *See*, *e.g.*, ¶¶118, 138, 142-43, 146, 156, 162, 168, 174, 176, 207-09, 213-14. Defendants made detailed statements about sales to and relationships with particular customers, including Delta (¶¶99, 102), Fanatics (¶¶99, 102, 146, 186) and Sticker Mule (¶¶41, 167). "These officers were speaking as authoritative sources who possessed the information to support their statements." *SEB Inv. Mgmt AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018). Defendants' statements on the subjects of the fraud are discussed above, detailed further in the Complaint and in the accompanying chart at PX 1.

46

As discussed further below, Defendants reported to the public that Kornit had detailed understanding of its customers use, inventory demand and plans. *See* ¶¶83, 222. This level of understanding of customer supplies, inventory levels and client demand supports an inference of scienter. *See Salix*, 2016 WL 1629341, at *14 (statement to an analyst "concerning [company's] knowledge of precise inventory levels weighs in favor of scienter").

Similarly, even as demand began to decline in 2021 and into 2022, Defendants continued to tell investors that all trends pointed toward further growth. ¶¶190, 191, 192, 207, 212. That Defendants' statements were often made in response to direct questions from analysts only strengthens the inference of scienter. *See Roofer's Pens. Fund v. Papa*, 2018 WL 3601229, at *21 (D.N.J. July 27, 2018) (that defendants "repeatedly responded to pointed analyst questions" weighed in favor of scienter). It would be unreasonable to infer that the Officer Defendants did not know the truth about these topics, especially when their statements "implied that they had first-hand knowledge." *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *17-18 (D.N.J. Aug. 28. 2017). Such "statements evincing certitude" are strong evidence of scienter. *Avaya*, 564 F.3d at 270.

### c. Defendants' Post-Class Period Admissions Confirm Scienter

Defendants made several admissions after the Class Period that demonstrate they knew their prior statements were false. For instance, during Kornit's August

47

2022 earnings call, Defendant Samuel admitted that <u>during the first half of 2022</u> (i.e., during the Class Period), its customers' businesses were "<u>declining year-over-year</u>." ¶111. Defendant Samuel further admitted that customers had complained to Kornit about overcapacity <u>during the first half of 2022</u>. *Id.*

Several months later, during Kornit's November 2022 earnings call, Defendant Samuel admitted that KornitX had never achieved the adoption or growth that Defendants had previously touted to investors. ¶114. Specifically, Defendant Samuel divulged that Kornit was then <u>still</u> in the process of "stabilizing the platform itself." *Id.* He further acknowledged that KornitX had only ever generated a "few millions of dollars" of revenue, which he described as "still not meaningful enough." *Id.* Nearly a year after the end of the Class Period, Defendant Samuel acknowledged that in the "[b]eginning of 2022, we saw major decline within the business of our customers. They found themselves with overcapacity . . . they had overcapacity and they didn't buy additional systems during 2022." ¶113. Each of these admissions shows that Defendants knew or recklessly disregarded that their statements during the Class Period were false or misleading. *See E\*Trade*, 712 F. Supp. 2d at 191-92 ("contemporaneous facts" and "subsequent admissions" demonstrating statements were false when made strengthened the inference of scienter).

Defendants now claim that these admissions merely "acknowledged that a decline in demand began to manifest during Q1 2022" with "the benefit of

48

hindsight." MTD at 39. This self-serving reinterpretation ignores Defendants' admissions that they "saw" this decline in real time. ¶111. At most, Defendants attempt to create a factual dispute over what their statements meant, which cannot be resolved in their favor at this stage. *See Avaya*, 564 F.3d at 264 n.36.

### d.    The Temporal Proximity of Defendants' Statements to the Corrective Disclosures Strengthens the Inference of Scienter

The "temporal proximity" between a defendant's false statements and a corrective disclosure is regularly credited as evidence of scienter in the Third Circuit. *See Avaya*, 564 F.3d at 271-73. In June 2022, Defendant Samuel told investors during an analyst conference that "the fundamental of Kornit business is unbelievable in the best place that we could dream of" and downplayed the dismal first quarter 2022 results as being just a "bump on the road to grow." ¶¶105, 212-13, 235. He made similar statements the following day. *See* ¶¶214-15, 235. But just weeks later, Kornit disclosed disappointing results for the second consecutive quarter, causing Kornit's stock price to fall more than 25% in one trading day. ¶¶107-10, 235. The very short time between the statements and the revelation of the truth supports scienter. *See Avaya*, 564 F.3d at 271 ("the temporal proximity of" a defendant's statements to a corrective disclosure "strengthens the inference of scienter"); *Universal Am. Corp. v. Partners Healthcare Sols. Hldgs., L.P.*, 176 F. Supp. 3d 387, 395-96 (D. Del. 2016) (same).

49

Defendants cursorily claim that Plaintiffs have not "connected the dots" between the timing of the misstatements and Defendants' state of mind. MTD at 39. Setting aside Defendants' ambiguous standard for pleading scienter, Plaintiffs have sufficiently established the timeline of relevant events, demonstrating that Defendants knew of the sharp decline in Kornit's business months before they made these statements in June 2022. *See supra*, at 19-22, 42-43.  While Defendants suggest that the court in *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 285 (D.N.J. 2007) found that "temporal proximity of events is insufficient circumstantial evidence," MTD at 39, that language derives from a parenthetical summarizing a Ninth Circuit decision, *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001). *Ronconi*, however, merely found that temporal proximity, "<u>without more</u>," did not establish scienter. *Id.* But *Ronconi* recognized that "temporal proximity of an allegedly fraudulent statement or omission and a later disclosure" can "bolster a complaint." *Id*. Here, Plaintiffs have undoubtedly pled "more" than just temporal proximity. Moreover, *Intelligroup* predates the Third Circuit's ruling in *Avaya*, which forecloses Defendants' argument. In *Avaya*, the Third Circuit <u>dismissed</u> the defendants' assertion that "[c]ourts reject inferences premised on such proximity rationales." *Avaya*, 564 F.3d at 272. This Court should do the same.

### e.    The Fraud Concerned Kornit's Core Operations

Sales and service of Kornit's printer systems and platforms, as well as

50

Kornit's consumable products (such as ink), accounted for the overwhelming majority of Kornit's revenue. *See* ¶¶28-31, 234. "[U]nder the core operations doctrine, misstatements and omissions made on core matters of central importance to the company and its high-level executives gives rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *In re Urban Outfitters Sec. Litig.*, 103 F. Supp. 3d 635, 653-54 (E.D. Pa. 2015). Given how closely these issues were monitored by Kornit and their importance to the Company's success, it would be implausible to infer that Defendants were unaware of the true facts. *See Enzymotec*, 2015 WL 8784065, at *18 (inference of scienter enhanced where the "matter at issue" was "central to the core business of the Company,[] about which Defendants spoke regularly"); *Perrigo*, 2019 WL 3451523, at *16 ("Allegations that fraud related to a high-earning segment of a company have been found sufficient to support a core operations inference.").

Defendants briefly assert that the core operations doctrine "does not, without more," establish scienter. MTD at 38. This is yet another red herring; Defendants' reliance on *Nat. Junior Baseball League v. Pharmanet Dev. Grp. Inc.* is misplaced. 720 F. Supp. 2d 517 (D.N.J. 2010). *Pharmanet* merely held that when a plaintiff "has failed to allege other individualized allegations" indicative of scienter, the core operations doctrine may be insufficient to establish scienter <u>on its own</u>. *Pharmanet*, 720 F. Supp. 2d at 556. Defendants' invocation of *Advanta* is also inapposite. 180

51

F.3d 525 (3d Cir. 1999). The *Advanta* court rejected allegations that a defendant "must have known" a statement was misleading simply "because of his position within the company." *Id.* at 539. But unlike in *Advanta*, the Complaint alleges that Defendants <u>did</u> know their statements were misleading.[16]

### f.      Defendants Were Motivated to Commit Fraud

While Plaintiffs are not required to allege motive to adequately plead scienter, motive allegations can "amplify an inference of scienter as part of the holistic information available to the court." *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 349 (E.D. Pa. 2014). The Complaint alleges that Defendants had motive and opportunity to commit fraud in connection with (i) Defendant Samuel's suspicious insider trading and (ii) the November 2021 Secondary Offering.

### (1)   Defendant Samuel's Insider Trading Supports Scienter

Courts within the Third Circuit analyze insider trading allegations to assess whether the sales were unusual in scope (*e.g.*, compared to their total level of compensation or the size of previous sales) or timing (*e.g.*, compared to the timing of past trades). *See Enzymotec*, 2015 WL 8784065 at *18.

During the Class Period, Defendant Samuel filed Forms 144 concerning sales

---

[16] In any event, the Third Circuit has subsequently recognized that a defendant's position as a corporate officer is relevant to the scienter analysis. *See Avaya*, 564 F.3d at 269-70; *see also PTC Therapeutics*, 2017 WL 3705801, at *17 (same).

of more than 80,000 shares of Kornit stock for nearly ten million dollars. *See* ¶¶236-37; DX 23-25.[17] This netted Defendant Samuel more than <u>twenty-three times</u> his annual salary. *See* PX 2 at 80 (Annual Report filed March 2022) and PX 3 at 81 (Annual Report filed March 2023); *see also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277-78 (3d Cir. 2006) (sales earning defendant more than four times annual salary supported scienter).[18] By contrast, Defendant Samuel sold fewer than 20,000 shares for approximately $855,000 prior to the Class Period. *See* MTD at 43 n.31; DX 26-28. In other words, Defendant Samuel sold more than <u>four times</u> as many shares for more than <u>eleven times</u> the proceeds during the Class Period than before. These facts establish that the sales were "unusual in scope." *Suprema Specialties*, 438 F.3d at 277.

Defendants' arguments are unavailing. They first suggest that Samuel's Class Period trading was in line with prior practice. MTD at 43 n.31. But courts routinely

---

[17] Because Kornit is a foreign private issuer, insiders need to disclose only their proposed trades in the issuer's shares, and, concurrent with that disclosure, any trades within the past three months. *See* ¶¶236-37; DX 23-25. Defendants do not offer any facts to dispute that the sales alleged in the Complaint occurred. *See* MTD at 41-44.

[18] The Court may take judicial notice of PX 2 and PX 3, Kornit's Annual Report for 2021, filed March 30, 2022 (PX 2), and Kornit's Annual Report for 2022, filed on March 30, 2023 (PX 3). Defendants submitted excerpts of these documents (*see* DX 2 and DX 22), but those excerpts do not include the pages Plaintiffs cite in this Opposition. *See In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *3, n.5 (D.N.J. Aug. 28. 2017) (taking judicial notice of SEC filings).

find this level of deviation from a defendant's prior trading pattern indicative of scienter. *See, e.g.*, *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 473-74 (E.D. Pa. 2014) (sales worth $8 million during class period compared to $400,000 before class period supported scienter). The cases Defendants cite bear no resemblance to the facts of this case. *See Roofer's Pens. Fund*, 2018 WL 3601229, at *17 (defendants sold "greater or comparable amounts" before the Class Period); *Oran v. Stafford*, 226 F.3d 275, 289-90 (3d Cir. 2000) (five of seven defendants sold more stock before class period than during; other two had no class period sales).

Defendants next accuse Plaintiffs of "strategically" omitting information about Defendant Samuel's holdings of Kornit's stock. MTD at 42. Defendants claim that Kornit's Annual Report for 2022 (DX 22) establishes that Defendant Samuel "increased his shareholding" between the "beginning and end of the Class Period." MTD at 43. But this sleight of hand fails. First, that Annual Report was filed on March 30, 2023, almost nine months after the end of the Class Period. *See* DX 22. Second, the Annual Report includes a footnote indicating that the purported "total" amount of Defendant Samuel's holdings listed included shares and options that could be "exercised or settled" up through April 24, 2023—nearly a full year after the Class Period ended. *Id* at 96, n.5. Kornit's Annual Reports give no insight into Defendant Samuel's holdings during the Class Period, when he was offloading tens-of-thousands of shares at artificially inflated prices.

54

Nor does the existence of Defendant Samuel's 10b5-1 plan immunize these trades from the scienter analysis. *See* MTD at 43-44. Almost all of Samuel's shares were sold pursuant to a 10b5-1 plan adopted during the Class Period. ¶236. When "10b5–1 trading plans are entered into during the class period, they 'are not a cognizable defense . . . .'" *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012). Indeed, even Defendants' cases recognize that trades pursuant to "a 10b5–1 plan that is amended during the class period" are not insulated from the scienter analysis. *See In re Synchronoss Techs. Sec. Litig.*, 2019 WL 2849933, at *17 (D.N.J. July 2, 2019); *In re Audible Inc. Sec. Litig.*, 2007 WL 1062986, at *3, n.7 & 8 (D.N.J. Apr. 3, 2007) (plan created before class period). Unlike those cases, the Complaint plainly alleges that the Samuel's Rule 10b5-1 plan was entered into during the Class Period. Defendants' SEC filings confirm this. *See* ¶236; DX 24 at 2 and DX 25 at 2 (10b5-1 plan entered into on February 24, 2021).

Defendants next claim that the lack of insider sales by Defendant Rozner "undermine[s]" the scienter inference. MTD at 41. Not so. *See Suprema Specialties*, 438 F.3d at 277 (only two of six defendants sold stock); *see also Viropharma*, 21 F. Supp. 3d at 473 (only two of four defendants sold stock).  Moreover, Kornit's SEC filings suggest that Defendant Rozner did not own any shares of Kornit through at least April 29, 2022—approximately two weeks before the first corrective disclosure and two months before the end of the Class Period. *See* DX 1 at 82 (Annual Report

filed March 2021); DX 2 at 97, and n.2 (Annual Report filed March 2022). Thus, the fact that Defendant Rozner did not sell any Kornit shares during the Class Period is of no moment.

Finally, Defendants claim that the Class Period is somehow too long for the Court to infer scienter based on Samuel's sales. MTD at 42. But courts have noted that the length of a class period simply suggests that "Defendants were able to ride the wave of their misleading marketing for the entire" time. *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *15 (C.D. Cal. Oct. 1, 2013) (distinguishing *In re Vantive Corp., Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002)). *In re Hertz Global Hldgs.*, which Defendants also rely on, involved a 29-month class period (nearly twice as long as the Class Period here). 905 F.3d 106, 120 (3d Cir. 2018). Particularly considering the disparity between Defendant Samuel's trading before and during the Class Period, his trading strengthens holistic scienter inference.

### (2) Defendants Were Motivated to Maintain the Fraud in Connection with Kornit's Secondary Offering

The 2021 Offering gave Defendants additional motive to misrepresent the existence and extent of Kornit's problems to investors. ¶237. Kornit sold approximately 2.3 million shares for approximately $340 million in proceeds. ¶237. Had Defendants sold those shares after the full truth was revealed and Kornit's shares were trading at just $23.46, they would have been worth approximately $55

56

million. ¶237. In other words, Defendants' fraud allowed them to increase their proceeds from the 2021 Offering more than six-fold. *See In re Res. Am. Sec. Litig.*, 2000 WL 1053861, at \*6 (E.D. Pa. July 26, 2000) (desire to raise capital "gives rise to a strong inference of scienter"). Defendants did not address these scienter allegations in their opening briefing, and the Court should not consider any new arguments on reply. *See, e.g., Laborers' Int'l Union v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994).

### g.    The Complaint Alleges Corporate Scienter Against Kornit

As Plaintiffs allege scienter as to the Officer Defendants, scienter is imputed to Kornit because "[a] corporation is liable for statements by employees who have apparent authority to make them." *Avaya*, 564 F.3d at 252; *see also Carmack v. Amaya Inc.*, 258 F. Supp. 3d 454, 468 (D.N.J. 2017) (imputing scienter to company).

### 3.    The Complaint Sufficiently Pleads Control Person Liability Claims Under Section 20(a) of the Exchange Act Against the Officer Defendants

Because Plaintiffs adequately allege Section 10(b) violations, the Section 20(a) claim against Defendants Samuel and Rozner must also survive. Defendants do not contest that Defendants Samuel and Rozner controlled Kornit. *See* MTD at 50. And contrary to Defendants' claim, Plaintiffs need not allege that Samuel and Rozner "culpably participated" in a Section 10(b) violation. *See Roofer's Pens. Fund*, 2018 WL 3601229 at \*24 n. 24 (argument concerning "alleged lack of

57

culpable participation [] is unavailing"). Even if the Court applied Defendants' preferred standard, the Complaint pleads culpable participation. *See* Section III.A.

## B.    The Complaint Sufficiently Alleges Violations of the Securities Act

"Where a plaintiff's Section 11 . . . claims are not grounded in allegations of fraud, the liberal notice pleading requirements of Rule 8 apply." *Suprema Specialties*, 438 F.3d at 270; *see also Enzymotec*, 2015 WL 8784065, at *21 ("Section 11 . . . claims are generally not subject to the heightened pleading standards . . .; rather, the liberal notice pleading requirements of Rule 8 generally apply."). Here, allegations of fraud are specifically disclaimed, and therefore, Rule 8 applies. ¶297. The Complaint easily satisfies this standard, requiring a "short plain statement" that alleges enough facts to state a claim to relief that is plausible. *See Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### 1.    The Complaint Adequately Pleads Standing

"For the purposes of determining standing, the court must accept as true all material allegations set forth in plaintiffs' complaint and must construe those facts in favor of the plaintiffs." *Mariana v. Fisher*, 338 F.3d 189, 205 (3d Cir. 2003).

On November 19, 2021, Kornit sold 3,042,845 ordinary shares at $151.00. ¶286. That same day, Plaintiff Indiana State Police Pension Trust ("ISPPT") bought Kornit shares at $151.00 <u>from</u> Defendant Barclays, <u>in the Offering</u>. ¶268; ECF No.

58

23-1. In the Third Circuit, these allegations are sufficient to plead standing. *See, e.g.*, *Valeant*, 2017 WL 1658822, at *13 (rejecting same argument advanced here).

Defendants assert that this Court should abandon Third Circuit authority and follow *In re Century Aluminum Co. Sec. Litig.*, 729 F. 3d 1104, 1107 (9th Cir. 2013). In *Century,* the company issued multiple offerings and the court held that plaintiffs had not plausibly alleged traceability. *Id.* at 1105, 1110. *Century* is inapposite because the plaintiffs bought shares at significantly different prices and on multiple dates without any allegation as to the specific underwriter from whom offering shares were purchased in the offering. *Id.* at 1108. By contrast, Plaintiff ISPPT bought shares on the day of offering, at the price of offering, from an Underwriter Defendant. These allegations satisfy even the higher, out-of-circuit standing test and distinguish all of Defendants' cited authority.[19] UW MTD at 6 n.10; MTD at 45 n.32.

The UW Defendants similarly contend, relying on *Gustafson v. Alloyd Co.*, that Plaintiffs cannot allege Section 12(a)(2) standing because Plaintiffs' purchases necessarily occur in the "secondary market." 513 U.S. 561, 577 (1995); UW MTD at 8-9. The UW Defendants' circular argument concerning the "possibility" that the

---

[19] Even if Third Circuit law did not control, courts across the country that have adopted *Century* would still find standing adequate in this case. *See W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 670 (N.D. Ill. 2020) (standing sufficiently alleged where shares were purchased at the offering price and in the SPO); *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1114–15 (E.D. Cal. 2017) (similar).

shares came from a pre-existing pool may be readily dismissed because ISPPT adequately alleges that it purchased in the Offering. *Valeant*, 2017 WL 1658822, at *13. Further, opinions interpreting *Gustafson* hold that 12(a)(2) liability attaches not only when a defendant solicits the transaction, ¶309, but also when any underwriter or dealer, as here, sells shares subject to a prospectus delivery requirement, ¶286, in an offering or in the secondary market. *See, e.g.*, *Feiner v. SS&C Techs., Inc.*, 47 F. Supp. 2d 250, 253-55 (D. Conn. 1999); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 574 (S.D.N.Y. 2009) (declining to limit 12(a)(2) liability for aftermarket); *Brosious v. Children's Place Retail Stores*, 189 F.R.D. 138, 142-43 (D.N.J. 1999) (certifying 12(a)(2) subclass who did not purchase directly in offering).[20]

### 2. The Offering Materials Contained Misstatements and Omissions

Contrary to Defendants' contentions (UW MTD at 10-11, MTD at 45-49) Plaintiffs have sufficiently pled a "material misstatements or omission" under Rule 8 in connection with their Securities Act claims. *See Suprema Specialties*, 438 F.3d at 269. While the Securities Act section of the complaint might "not [be] as rich with

---

[20] Because Plaintiffs have pled Securities Act violations, the control person claims under Section 15 against Kornit's executives and directors also survive. *See, e.g.*, *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 2007 WL 81937, at *12 (E.D. Pa. Jan. 9, 2007) ("Allegations that a director signed a fraudulent SEC filing and was in a position to exercise control over the primary violator" found sufficient).

60

detail as [Defendants] might prefer, it need only set forth sufficient facts to support plausible claims." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211-12 (3d Cir. 2009).

Here, the Offering Materials warned that that Defendants' core products "may contain undetected errors or defects" when such errors and defects were al-ready in existence. ¶¶288-89. They also touted the "high productivity" and "attractive total cost of ownership" of these same products, but when existing defects rendered those statements false. ¶¶290-92. Relatedly, the Offering Materials stated that Kornit was "mak[ing] the appropriate investment in . . . services support" and "delivering best-in class customer experience" when Kornit's "attempt to turn its service business into a profit center materially impaired its ability to adequately service its customers, leading to customers refusing to order additional product or altogether defecting to Kornit's competitors." ¶¶293-94. Last, the Offering Materials touted that "KornitX was a robust platform" when, in truth, the system was not ready, the Company was "constantly working on it and figuring out the integration," and, as subsequently admitted by Defendant Samuel after the Class Period, the Company was still working on stabilizing the platform. ¶¶295-96. This Court is required to take these <u>factual</u> assertions as true. *See, e.g.*, *Baker v. Croda Inc.*, 2022 WL 19010312, at *2, n.3 (3d Cir. Oct. 21, 2022), certified question answered, 304 A.3d 191 (Del. 2023).

The Securities Act portion of the Complaint thus provides a short and plain statement giving "the defendant fair notice of what the . . . claim is and the grounds

61

upon which it rests." *See Twombly*, 550 U.S. at 555. Certainly, each of the facts alleged in support is summarized or directly quoted from the Exchange Act portions of the Complaint, but that does not render those facts "conclusory," as Defendants claim. *See, e.g.*, *Wood v. Bristol Virginia Util. Auth.*, 661 F. Supp. 3d 538, 546 (W.D. Va. 2023) ("Even after *Twombly* and *Iqbal*, the Rule 8 pleading requirements are not onerous. A plaintiff need not allege every fact essential to his claim.").[21]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied in their entirety. In the event that the Court grants Defendants' motions in full or in part, Plaintiffs request leave to amend the Complaint pursuant to Fed. R. Civ. P. 15.

Dated: February 16, 2024                    Respectfully submitted,

                                            By: *James E. Cecchi*
                                            James E. Cecchi
                                            **CARELLA, BYRNE, CECCHI,**
                                            **OLSTEIN, BRODY & ANGELLO, P.C.**
                                            Kevin G. Cooper
                                            5 Becker Farm Road
                                            Roseland, New Jersey 07068
                                            Telephone: (973) 994-1700
                                            Facsimile: (973) 994-1744
                                            jcecchi@carellabyrne.com
                                            kcooper@carellabyrne.com

---

[21] Defendants argue that the challenged statements are not actionable because (1) they disclosed with specificity the related risks, (2) they are puffery, and/or (3) they are forward-looking. MTD at 46-48. These arguments fail for the reasons discussed above. *See* Section III.A.1.b. (generic risk warnings); Section III.A.1.d. (not puffery); Section III.A.1.c. (no safe harbor), respectively.

*Liaison Counsel for Lead Plaintiffs Genesee County Employees' Retirement System, Kranot Hishtalmut Le Morin Tichoniim Havera Menahelet LTD, Kranot Hishtalmut Le Morim Ve Gananot Havera Menahelet LTD, and Hachshara Insurance Company Ltd.*

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
Hannah Ross *(*admitted *pro hac vice)*
Avi Josefson *(*admitted *pro hac vice)*
James A. Harrod *(*admitted *pro hac vice)*
Alec T. Coquin *(*admitted *pro hac vice)*
Mathews R. de Carvalho *(*admitted *pro hac vice)*
1251 Avenue of the America
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
avi@blbglaw.com
jim.harrod@blbglaw.com
alec.coquin@blbglaw.com
mathews.decarvalho@blbglaw.com

*Lead Counsel for Lead Plaintiffs*

Thomas C. Michaud
Francis E. Judd
**VANOVERBEKE MICHAUD
  & TIMMONY P.C.**
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
tmichaud@vmtlaw.com
fjudd@vmtlaw.com

*Additional Counsel for Lead Plaintiff*

63

*Genesee County Employees' Retirement System*

**COHEN MILSTEIN SELLERS
 & TOLL PLLC**
Steven J. Toll
Julie Goldsmith Reiser
1100 New York Ave NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
stoll@cohenmilstein.com
jreiser@cohenmilstein.com

*Counsel for Named Plaintiff Indiana State Police Pension Trust*

64