**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re Kornit Digital Ltd. Securities Litigation | No. 2:23-cv-00888-MCA-AME<br>*Document Filed Electronically*<br><br>CLASS ACTION<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**RETURN DATE:**<br>April 15, 2024 |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
CONSOLIDATED COMPLAINT**

OF COUNSEL:
Edmund Polubinski III (*pro hac vice*)
Dana Seshens (*pro hac vice*)
Daniel J. Schwartz (*pro hac vice*)
Marie Killmond (*pro hac vice*)
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
edmund.polubinski@davispolk.com
dana.seshens@davispolk.com
daniel.schwartz@davispolk.com
marie.killmond@davispolk.com

Samuel I. Portnoy
Danielle N. Craft
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
sportnoy@gibbonslaw.com
dcraft@gibbonslaw.com

*Counsel for Kornit Digital Ltd., Ronen Samuel, Alon Rozner, Guy Avidan, Yuval Cohen, Gabi Seligsohn, Ofer Ben-Zur, Stephen Nigro, Lauri Hanover, Alon Lumbroso, Yehoshua Nir, and Dov Ofer*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................1

ARGUMENT ........................................................................................................2

I.   Plaintiffs' Claims Under Section 10(b) of the Exchange Act and Rule 10b-5 Should Be Dismissed. ...............................................................2

    A.   The Complaint Lacks Any Plausible Allegations of False or Misleading Statements. ........................................................................3

        1.   The Challenged Statements Were Not False or Misleading and There Was No Duty to Disclose the Allegedly Omitted Information......................................................3

        2.   The Allegedly Omitted Information Was Disclosed. ...............14

        3.   The Alleged Misrepresentations Are Nonactionable Forward-Looking Statements Protected by the PSLRA Safe Harbor. ....................................................................15

        4.   The Alleged Misstatements Are Nonactionable Opinions. ......17

        5.   The Alleged Misstatements Are Nonactionable Corporate Puffery........................................................................18

    B.   Plaintiffs Fail to Plead the Requisite Strong Inference of Scienter. ....................................................................................20

        1.   Plaintiffs' Conclusory Allegations Do Not Plead Scienter....................................................................................20

        2.   The Confidential Witness Allegations Do Not Suffice. ...........23

        3.   Alleged Stock Sales Do Not Suffice to Plead Scienter............23

II.   Plaintiffs' Section 11 and 12(a)(2) Claims Should Be Dismissed. ...............26

III.   Plaintiffs Fail to Plead "Controlling Person" Liability Under Section 15 of the Securities Act or Section 20(a) of the Exchange Act.....................28

CONCLUSION.....................................................................................................28

i

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Bartesch v. Cook*,
941 F. Supp. 2d 501 (D. Del. 2013)....................................................................10

*Cal. Pub. Emps. Ret. Sys. v. Chubb Corp.*,
394 F. 3d 126 (3d Cir. 2004)...........................................................................9, 23

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
Nos. 17-10467, 18-2291, 18-674, 18-15382, 2019 WL 3451523 (D.N.J. July 31, 2019) ................................................................................................................17

*City of Brockton Ret. Sys. v. Avon Prod., Inc.*,
No. 11-4665, 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ...............................7

*City of Warren Police and Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023) .......................................................................... 17, 18

*Fowler v. UPMC Shadyside*,
578 F.3d 203 (3d Cir. 2009)...............................................................................28

*Guzman v. Mana*,
No. 17-2551, 2018 WL 10150989 (D.N.J. Dec. 6, 2018) ...................................10

*In re Aetna, Inc. Sec. Litig.*,
617 F.3d 272 (3d Cir. 2010)...............................................................................17

*In re Anadigics, Inc. Sec. Litig.*,
No. 08-5572, 2011 WL 4594845 (D.N.J. Sept. 30, 2011)....................................4

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)....................................................................... 22, 24

*In re Cambrex Corp. Sec. Litig.*,
No. 03-4896, 2005 WL 2840336 (D.N.J. Oct. 27, 2005) ...................................21

*In re DraftKings Inc. Sec. Litig.*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023) ................................................................10

ii

*In re EQT Corp. Sec. Litig.*,
   504 F. Supp. 3d 474 (W.D. Pa. 2020).....................................................................13

*In re Hertz Global Holdings, Inc. Sec. Litig.*,
   No. 13-7050, 2017 WL 1536223 (D.N.J. Apr. 27, 2017)............................ 17, 19

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
   No. 17-341, 2018 WL 4252537 (E.D. Pa. Sept. 5, 2018).......................................6

*In re Intelligroup Sec. Litig.*,
   527 F. Supp. 2d 262 (D.N.J. 2007) ......................................................................13

*In re Interpool, Inc. Sec. Litig.*,
   No. 04-321, 2005 WL 2000237 (D.N.J. Aug. 17, 2005)......................................25

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014) ....................................................................25

*In re Majesco Sec. Litig.*,
   No. 05-3557, 2006 WL 2846281 (D.N.J. Sept. 29, 2006)....................................17

*In re NAHC Sec. Litig.*,
   306 F.3d 1314 (3d Cir. 2002)..................................................................................5

*In re Nice Sys.*,
   135 F. Supp. 2d 551 (D.N.J. 2001).....................................................................8, 15

*In re Plantronics, Inc. Sec. Litig.*,
   No. 19-07481, 2022 WL 17974627 (N.D. Cal. Nov. 7, 2022)............................10

*In re Resource Am. Sec. Litig.*,
   No. 98-5446, 2000 WL 1053861 (E.D. Pa. July 26, 2000) ................................25

*In re Tseng Labs, Inc. Sec. Litig.*,
   954 F. Supp. 1024 (E.D. Pa. 1996) ........................................................................4

*In re Vivendi Universal, S.A.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003) ..................................................................19

*Institutional Invs. Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009)............................................................................ 22, 23

iii

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*,
   No. 09-799, 2011 WL 2444675 (D. Del. June 14, 2011) ............................ 19, 20

*Monk v. Johnson & Johnson*,
   No. 10-4841, 2011 WL 6339824 (D.N.J. Dec. 19, 2011) ...................................20

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
   720 F. Supp. 2d 517 (D.N.J. 2010) ......................................................................10

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
   834 F.3d 481 (3d Cir. 2016)...................................................................................6

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015).........................................................................................7, 18

*Ortiz v. Canopy Growth Corp.*,
   537 F. Supp. 3d 621 (D.N.J. 2021) ......................................................................17

*Paxton v. Provention Bio, Inc.*,
   No. 21-11613, 2022 WL 3098236 (D.N.J. Aug. 4, 2022)......................................7

*Rahman v. Kid Brands, Inc.*,
   736 F.3d 237 (3d Cir. 2013)........................................................................... 21, 23

*Rescue Mission of El Paso, Inc. v. K-Sea Transp. Partners L.P.*,
   No. 12-00509, 2013 WL 3087078 (D.N.J. June 14, 2013) ...................................7

*Steamfitters Loc. 449 Pension Fund v. Alter*,
   No. 09-4730, 2011 WL 4528385 (E.D. Pa. Sept. 30, 2011)...............................21

*Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*,
   No. 22-8228, 2023 WL 8287681 (S.D.N.Y. Nov. 30, 2023) ..............................10

*Tanaskovic v. Realogy Holdings Corp.*,
   No. 19-15053, 2021 WL 211049 (D.N.J. Jan. 21, 2021) ....................................19

*The Winer Fam. Tr. v. Queen*,
   No. 03-4318, 2004 WL 2203709 (E.D. Pa. Sept. 27, 2004)................................7

*Weston v. DocuSign, Inc.*,
   669 F. Supp. 3d 849 (N.D. Cal. 2023)................................................................14

iv

*Williams v. Globus Med., Inc.*,
  869 F.3d 235 (3d Cir. 2017)..................................................................................18

*Zucker v. Quasha*,
  891 F. Supp. 1010 (D.N.J. 1995)..........................................................................20

STATUTES & RULES

15 U.S.C. § 78u-5.....................................................................................................16

Fed R. Civ. P. 8 .......................................................................................................28

**\*\*\***

**Note on Citation Format:** Unless otherwise noted, all emphasis has been added to quotations, and all internal quotations, brackets, citations, and footnotes have been omitted.  References to the "Opening Brief" or "Br." correspond to the Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint (Dkt. 34-1); references to the "Underwriters' Opening Brief" or "UW Br." correspond to the Brief in Support of the Underwriter Defendants' Motion to Dismiss (Dkt. 36); references to the "Opposition" or "Opp." correspond to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Dkt. 37); and references to Ex.__ correspond to the exhibits attached to the Declaration of Edmund Polubinski (Dkt. 34-2).  All defined terms in the Opening Brief are incorporated herein.

## PRELIMINARY STATEMENT

Plaintiffs' Opposition makes clear that Plaintiffs seek to hold Defendants liable for not predicting a change in external market conditions following the COVID-19 pandemic.  But it is well-established that merely falling short on business objectives is not actionable under the federal securities laws.  Rather, Plaintiffs must identify *actual statements* that are false or misleading.  Instead of grappling with the deficiencies in their Complaint—which rests overwhelmingly on generalized, often forward-looking statements—Plaintiffs seek to meet their burden by selectively quoting isolated statements taken out of context and ignoring Kornit's significant and specific risk disclosures.  The Opposition also rehashes unsupported allegations from unnamed former employees, but it never seriously addresses the fact that none of these employees was in a position to know enough to undermine any of Kornit's public statements.  All of Plaintiffs' efforts fail.

As to their Exchange Act claims, Plaintiffs fail to identify any actionable misrepresentations and disregard Kornit's extensive disclosures addressing the very risks at issue.  Further, many of the statements Plaintiffs challenge are nonactionable puffery, opinions, or forward-looking statements—fatal defects to which the Opposition offers no meaningful response.  The Opposition likewise does nothing to address the Complaint's vague and implausible allegations of scienter.  Although Plaintiffs contend that Mr. Samuel's sales of Kornit stock

1

support an inference of scienter, there is no dispute that his overall Kornit holdings *increased* over the relevant time period. Under Third Circuit law, this dramatically undermines any inference of scienter.

Plaintiffs' Opposition all but concedes the inadequacy of their Securities Act claims. Plaintiffs devote little more than a page of their Opposition to their failure to plead any actionable misleading statements in the September 2020 registration statement or November 2021 prospectus. Further, they do not even attempt to explain how the Offering Defendants could possibly be liable for statements post-dating the effective date of the September 2020 registration statement.

For these reasons and those set forth in Defendants' Motion, Defendants respectfully submit that the Complaint should be dismissed with prejudice.

## ARGUMENT

### I. Plaintiffs' Claims Under Section 10(b) of the Exchange Act and Rule 10b-5 Should Be Dismissed.

As explained in Defendants' Motion, Plaintiffs' Section 10(b) claims should be dismissed for numerous reasons, including that none of the challenged statements was false or misleading, the allegedly omitted information was disclosed, and the alleged misstatements are not actionable under the securities laws. Br. 11–35. Plaintiffs' claims also must be dismissed for the independent reason that Plaintiffs fail to plead scienter at all, much less with the specificity required by the PSLRA. *Id.* at 36–44. Plaintiffs fail to overcome these arguments.

2

A.    **The Complaint Lacks Any Plausible Allegations of False or Misleading Statements.**

Faced with Defendants' arguments, Plaintiffs abandon their claims based on alleged misstatements concerning ink and consumables and backlog.[1]  Even as to the statements Plaintiffs attempt to defend, the Opposition fails to rehabilitate the fatal pleading deficiencies.

1.    **The Challenged Statements Were Not False or Misleading and There Was No Duty to Disclose the Allegedly Omitted Information.**

***Loss of Business from Delta and Fanatics***.  Plaintiffs do not dispute that they cannot base a claim on allegations that Delta and Fanatics shifted some of their business to M&R because, as Defendants demonstrated, *see* Br. 12–13, there is no abstract duty to disclose information about a customer's purchasing decisions, *see* Opp. 28–31.  Instead, Plaintiffs argue that Kornit's statements were misleading by omission because they purportedly did not include specific details about Delta and Fanatics.  *See id.*  This theory falls short on several fronts.

---

[1] Plaintiffs concede that they no longer challenge (1) Defendants' statements concerning ink and consumable products, Br. 24–26; Opp. 31 n.13, and (2) Defendants' statements regarding backlog as to KornitX were not false, Br. 12; Opp. 26 n.11.  While Plaintiffs imply that they address other challenged backlog statements "concern[ing] [Kornit's] medium- and long-term targets" elsewhere in their Opposition, Opp. 26 n.11, the cited sections make no reference to backlog, thereby conceding that those statements were not false.

3

First, Kornit disclosed the risks of "increased competition" from other manufacturers, including M&R *by name*.  Ex. 1 at 3–4; Ex. 3 at 4, *see also* Ex. 2 at 3 (similar).  Plaintiffs' entire theory—that Defendants' statements "minimized even the existence of viable competition," Opp. 29—is belied by Defendants' explicit warnings, which Plaintiffs conveniently ignore.  *See* Br. 26–28.[2]

Second, Plaintiffs have not adequately alleged that any challenged statement was misleading.  Most of the challenged statements do not reference Delta or Fanatics at all, and Plaintiffs do not meaningfully dispute that omitting information about them cannot render such statements misleading.  Br. 13–14; Opp. 28–31. The Complaint also does not sufficiently allege that Defendants knew of any slowdown in business from Delta or Fanatics before they announced their relationship with M&R in March 2022, and there is no duty to disclose unknown facts.  Br. 14–15; *see also Anadigics*, 2011 WL 4594845, at *25.  Plaintiffs'

---

[2] Plaintiffs fail to distinguish *In re Tseng Labs, Inc. Securities Litigation*, 954 F. Supp. 1024, 1028 n.8 (E.D. Pa. 1996), *aff'd*, 107 F.3d 8 (3d Cir. 1997).  *See* Opp. 30 n.12.  The court there rejected a duty to disclose, despite the allegation— also made by Plaintiffs here—that defendants had made certain misstatements "to prevent the impression that [defendant] was falling behind its competitors."  *Tseng*, 954 F. Supp. at 1028.  Plaintiffs likewise misconstrue *In re Anadigics, Inc. Securities Litigation*, *see* Opp. 30 n.12, which dismissed claims based on an allegedly undisclosed business loss because general statements regarding efforts to "build further market share" do not trigger a duty to disclose more.  No. 08-5572, 2011 WL 4594845, at *20 (D.N.J. Sept. 30, 2011), *aff'd*, 484 F. App'x 742 (3d Cir. 2012).  Both cases support dismissal here.

4

speculation that Defendants must have known of the alleged business loss by "July 2021" is unsupported—it is based on statements describing what Mr. Samuel knew ***nearly a year later***, in May 2022.  *See* Opp. 29, 30.

Further, even if Plaintiffs ***had*** alleged factual support for Kornit's knowledge by July 2021—which they have not—their claims that ***pre-July 2021*** statements were misleading for failure to disclose the business reduction would still fail.  *See CC* ¶¶ 136–38, 142–43, 146; *see, e.g.*, *In re NAHC Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) ("[L]iability cannot be imposed on the basis of subsequent events"); Br. 14–15.[3]  Nor did Defendants mislead investors by "tout[ing] the Fanatics relationship" in January 2022.  Opp. 29 (citing CC ¶ 186). Kornit simply listed Fanatics as a customer at that time—which Plaintiffs concede was true—without any implied guarantee of continued business from Fanatics that could be rendered misleading by omission.  *See* Br. 13 n.6.

***Alleged Decline in Customer Demand***.  The Opposition similarly cannot save Plaintiffs' claims based on an allegedly undisclosed trend of declining customer demand.  Br. 16–18.  Plaintiffs accuse Defendants of "creatively reinterpret[ing]" Mr. Samuel's supposed "admission" that the negative demand

---

[3] FE assertions that the "whole Company knew internally" about customer defections, or that there would have been a drop-off in ink consumption, Opp. 31, fall short of showing that ***Defendants*** had any reason to know that Delta/Fanatics were altering their relationship with Kornit to any material extent.  *See* Br. 15–16.

trend began in Q4 2021, Opp. 21, but Mr. Samuel made no such admission and no "reinterpretation" by Defendants was required.  Rather, Mr. Samuel stated that some customers, including Printful, informed Kornit "*[at] the end of Q1*" *2022* that they would reduce purchases after they had already "geared up" in 2021 by buying new systems, as well as "a load of supplies *in Q4*."  Ex. 17 at 12.  These statements fail to support—indeed, they refute—the allegation that any adverse demand issues had manifested before Q1 2022.  Moreover, Kornit promptly disclosed these issues when it reported Q1 2022 earnings.  Br. 17–18.[4]

Without the nonexistent "admissions," Plaintiffs' only support for an undisclosed decline in Q4 2021 demand is FE3's detail-free assertions that he participated in unspecified "calls" and "discussions."  Opp. 20.  But the Opposition fails to explain how these allegations are plausible, which is plainly insufficient.  Br. 16–17; *see, e.g.*, *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 496 (3d Cir. 2016) (discounting "fatal[ly] vague[]" confidential witness allegations);

---

[4] Plaintiffs' other purported "admissions" fail for the same reason—they establish that Kornit saw high business volume in Q4 2021, with no drop-off until Q1 2022.  For example, Mr. Samuel similarly stated at a 2023 investor conference that Kornit saw a business decline in the "*beginning of 2022*," *after* customers had "acquired many, many systems, inks and systems during the year of 2021." CC ¶ 113 (alleging that Mr. Samuel stated in 2023 that "last year"—i.e., *2022*—Kornit saw customer impressions drop).

*see also In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, No. 17-341, 2018 WL 4252537, at *8 (E.D. Pa. Sept. 5, 2018) (discounting uncorroborated allegations).

Plaintiffs also challenge statements in Kornit's Q1 2022 earnings call about demand issues that emerged during the quarter, contending that they misleadingly painted a rosy picture of Kornit's sales prospects.[5]  Opp. 21–22.  Because Kornit specifically disclosed the e-commerce slowdown and delayed orders on that call, however, its concurrent expressions of optimism were neither misleading nor actionable.  Br. 17–18.[6]  Plaintiffs cite no contrary case law and cannot distinguish *Rescue Mission of El Paso, Inc. v. K-Sea Transportation Partners L.P.*, No. 12-00509, 2013 WL 3087078, at *16 (D.N.J. June 14, 2013); *see also* Br. 18.  There,

---

[5] Disclosure in the quarter following a development, as here, is entirely appropriate.  *See, e.g.*, *City of Brockton Ret. Sys. v. Avon Prod., Inc.*, No. 11-4665, 2014 WL 4832321, at *24–25 (S.D.N.Y. Sept. 29, 2014) (approving October disclosure of June whistleblower letter) (cited approvingly by *Paxton v. Provention Bio, Inc.*, No. 21-11613, 2022 WL 3098236, at *13 (D.N.J. Aug. 4, 2022)).

[6] Contrary to Plaintiffs' erroneous assertion, Defendants are not advancing a "truth on the market" defense.  Opp. 25; *see also id.* at 16.  That doctrine permits defendants to "avoid liability for a false statement or one that reveals less than the truth of the matter by showing that the market was not affected by the representation because the truth of the matter was known already and had been factored into the market price." *The Winer Fam. Tr. v. Queen*, No. 03-4318, 2004 WL 2203709, at *4 (E.D. Pa. Sept. 27, 2004), *aff'd sub nom. Winer Fam. Tr. v. Queen*, 503 F.3d 319 (3d Cir. 2007).  But, to determine whether a statement is false or misleading in the first place, it must be evaluated in its full context.  *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015).  Here, in context, the statements at issue were neither false nor misleading, which is the import of Defendants' arguments.

as here, the company disclosed negative demand indicators, while expressing optimism about the current quarter. *Rescue Mission*, 2013 WL 3087078, at *16. Given the "significant qualifications" surrounding these statements, they were not actionable. *Id*. The same is true here.

**Statements Regarding Sticker Mule.** As Defendants demonstrated, Mr. Samuel's statements about Sticker Mule were true when made and cannot be rendered actionable by alleged subsequent events. Br. 18–19. The Complaint alleges that Sticker Mule purchased systems from Kornit in late 2021. CC ¶ 41; *see also* Br. 18–19. Mr. Samuel's contemporaneous statements about Sticker Mule's "integration" of new Kornit systems thus cannot be deemed misleading based on allegations that Sticker Mule subsequently resold those machines in *early 2022*. *See, e.g.*, *In re Nice Sys.*, 135 F. Supp. 2d 551, 577 (D.N.J. 2001); Br. 18–19. Plaintiffs do not dispute this, Opp. 17–19, but nevertheless assert that the word "integration" was still misleading because Sticker Mule allegedly "couldn't work the machines correctly," *id.* at 18. Plaintiffs, however, offer no plausible support for their inference that "integration" means—or would have been understood by a reasonable investor to mean—that Kornit was guaranteeing that Sticker Mule had not had and would never have any operational issues with the machines. To the contrary, Kornit regularly disclosed that operational issues had occurred, and could and would continue to occur, across its suite of products. Br. 9. The Opposition

8

therefore retreats to the assertions of FE4—allegedly a General Manager in Latin America.  Opp. 18, CC ¶ 41.  But Plaintiffs never explain how FE4 would have known that Sticker Mule, which is not alleged to have been a Latin America customer, supposedly was "unable to get" the machines to "run properly."  *Compare* Opp. 18 and CC ¶ 41, *with* Br. 18–19.  The allegation that he worked at Kornit (in what appears to be some unrelated capacity) at the time of the "integration" statement is insufficient.  *See, e.g.*, *Cal. Pub. Emps. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 152–53 (3d Cir. 2004).

**Statements Regarding Alleged Q1 2022 Revenue "Pull-Forward."**  Plaintiffs concede that they rely entirely on FE3—a customer service manager—for the allegation that Kornit "pulled forward" revenues from later periods into Q1 2022.  Opp. 23–24.  But FE3's assertions cannot be credited for multiple reasons, including (i) his total lack of detail, (ii) the absence of any corroboration for his claims, (iii) his unrelated role—which was multiple steps removed from the Individual Defendants and did not involve responsibilities related to revenue forecasting or tracking, and (iv) his complete reliance on hearsay from others at the company who are not, themselves, alleged to have firsthand knowledge.  Br. 16–17, 19–20.  In response, Plaintiffs assert only that, despite FE3's customer success role, he allegedly attended unspecified "calls" during which revenue and sales were "discussed."  Opp. 23 (citing CC ¶ 92).  But these generic allegations, which

9

could apply to virtually any employee at any company, are insufficient and, moreover, are not even FE3's alleged source for information about the supposed pull-forward. *See, e.g.*, *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 540, 542–43 (D.N.J. 2010) (rejecting confidential witness allegations as "speculative and conclusory" where they lacked "particularized" detail about where information came from, and witnesses did not "ha[ve] any involvement in [] reporting" allegedly misleading information); *see also In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 178 (S.D.N.Y. 2023) ("[U]ncorroborated and unconfirmed statements from anonymous employees . . . must be put aside."); *Bartesch v. Cook*, 941 F. Supp. 2d 501, 507 (D. Del. 2013) (steeply discounting allegations "not based on . . . personal knowledge, but rather on information . . . relayed" to the witness).[7]

---

[7] Although Plaintiffs argue that secondhand confidential witness allegations **can** satisfy the PSLRA, *see* Opp. 24 n.9, the cases on which they rely involved other indicia of reliability, unlike here. *See Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*, No. 22-8228, 2023 WL 8287681, at *11 (S.D.N.Y. Nov. 30, 2023) ("confidential witnesses" corroborated plaintiffs' theory; complaint sufficiently alleged they were in a position to possess information alleged); *In re Plantronics, Inc. Sec. Litig.*, No. 19-07481, 2022 WL 17974627, at *5 (N.D. Cal. Nov. 7, 2022) (noting that secondhand confidential witness statements were consistent with certain public statements and crediting reports from witnesses who "worked directly" with key players, while "not rely[ing]" on hearsay statements). *Guzman v. Mana* was an FLSA case in which the PSLRA's heightened pleading requirements did not apply. *See* No. 17-2551, 2018 WL 10150989, at *2 n.2 (D.N.J. Dec. 6, 2018).

***Statements Regarding Service Contracts***.  Plaintiffs also fail to allege any misstatement concerning Kornit's service contracts.  *See* Br. 20–23.  Mr. Samuel's statement that Kornit sells its customers contracts alongside its machines was neither false nor misleading because, as disclosed in Kornit's annual reports, Kornit provides a six-month warranty on every printing system it sells, customers can concurrently "purchase an additional year of support coverage," and such coverage can be renewed for multiple years at a time.  Ex. 1 at 46; Ex. 2 at 54; Ex. 3 at 43.  Plaintiffs do not allege that this disclosure was false.  Opp. 15.  Instead, Plaintiffs twist Mr. Samuel's words to argue that he "falsely represented that initial sales of equipment came with a mandatory multi-year contract," *id.*  But Mr. Samuel never used the word "mandatory."  *See* CC ¶ 118.  Plaintiffs also argue that, because service contract attachment rates purportedly were important to investors, this bolsters the actionability of Mr. Samuel's statements.  Opp. 16.  But the attachment rates were part of Kornit's services revenues, which were disclosed to investors—including on the same February 2021 call when Mr. Samuel made the challenged statements—and demonstrated that Kornit ***was*** experiencing exceptionally strong attachment rates at the relevant time.  Ex. 4 at 6 (disclosing 35% increase in service revenues over prior year); Ex. 13 at 5 (showing that Kornit's services business posted revenues of $39,369,000—a 38.6% increase from the prior year).  Plaintiffs, again, do not allege that those numbers were false.

11

The broader context thus undermines any argument that investors could have been misled by Mr. Samuel's statements.

***Statements About KornitX Revenue***.  Plaintiffs' claims based on alleged misstatements and omissions concerning KornitX revenue fail because those statements were not false or misleading and are not actionable under the securities laws in any event.  Br. 30–33.  Indeed, the vast majority of statements Plaintiffs challenge on this topic are self-evidently forward-looking (and accompanied by meaningful cautionary language, *see* Br. 9, 24; *see also* pp. 15–17, *infra*).  *See, e.g.*, CC ¶¶ 119 (KornitX presented "a huge opportunity . . . to build an incremental recurring business model"); 132 (Kornit "expect[ed] KornitX to generate approximately $100 million of revenues in 2026").  As to other statements, Plaintiffs do not even attempt to allege facts demonstrating falsity.

Citing the assertions of several FEs, Plaintiffs principally attack Mr. Samuel's January 10, 2022 statement that KornitX was generating "multi-million dollar revenue,"[8] Opp. 26–27, but, even assuming this is a statement of present fact, Plaintiffs do not adequately allege it was false.  None of the FEs was in a position to know about KornitX revenues at the time of the statement.  Plaintiffs

---

[8] Plaintiffs accuse Defendants of focusing on this statement to the exclusion of other statements regarding KornitX, Opp. 26, but, as pointed out in Defendants' Opening Brief, the remainder of statements on this topic are nonactionable puffery, opinion statements, or forward-looking statements, *see* Br. 23–24, 30–36.

assert, for example, that FE3 was originally hired to work on KornitX, but as Defendants demonstrated and Plaintiffs concede, FE3 never worked on KornitX and was in a "*separate business organization*."  Br. 23 (citing CC ¶ 74). Nor do Plaintiffs rebut that FE3's claims are *not actually inconsistent* with Mr. Samuel's statement.  Br. 23–24 & nn.15–16.  Similarly, FE4 had already left Kornit as of the time of the January 2022 statement, CC ¶ 41, while FE10's brief tenure at Kornit allegedly did not occur until months *later*, CC ¶ 73, and FE11 says nothing about revenues at all.[9]

Plaintiffs also do not deny that Kornit's software subscriptions—which included KornitX, Ex. 1 at 53; Ex. 2 at 63—steadily increased throughout the Class Period.[10]  *Compare* Ex. 1 at 53, *with* Ex. 2 at 63.  Plaintiffs contend that KornitX's customer base condensed over time, but fail to explain how it could be inaccurate to claim that a business with increasing revenues is growing—even if its customer base is simultaneously becoming more concentrated.  *See* Opp. 27–28.

---

[9] Moreover, FE10 and FE11 offered only subjective opinions that the projections were "kind of crazy" and that KornitX was "not ready," CC ¶¶ 73, 75, which "add nothing," *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 360 (D.N.J. 2007) (rejecting confidential sources' personal opinions).

[10] Plaintiffs' citation to *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474 (W.D. Pa. 2020), in which plaintiffs offered particularized allegations contradicting defendants' claim that a drilling process was "already showing significant returns," *id*. at 494–95, is therefore inapt.

13

### 2.    The Allegedly Omitted Information Was Disclosed.

Kornit extensively disclosed and discussed each of the risks—related to competition, customer loss, KornitX, defective products, and customer service—which Plaintiffs allege came to fruition.  Br. 6–10, 26–30.  Plaintiffs largely ignore these disclosures, arguing instead that, because the subject risks supposedly had already materialized, Kornit's disclosures were misleading.  Opp. 31–33.  But, as discussed in the Opening Brief, Kornit made clear that the risks at issue were not merely hypothetical, but present at the time of the disclosure.[11]  For example, Kornit disclosed that:

- its products had been found to contain "undetected errors or defects" "in the past" and this would likely continue to occur "from time to time" in the future, Br. 8;

- it presently "face[d] increased competition," including expressly from M&R, *id*. at 9; and

---

[11] The cases Plaintiffs cite, *see* Opp. 31–32, are not to the contrary because they involved risks that, unlike here, were both couched as hypothetical and alleged to have transpired and caused specific impacts at the time of the relevant statements.  *See, e.g.*, *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 878–79, at *17 (N.D. Cal. 2023) (risk disclosures misleading where they described how pandemic-related risks "may" impact DocuSign's business when they already had done so—including because customers had already informed DocuSign that they would not renew contracts post-pandemic).

- many of its competitors presently "have" advantages Kornit lacked, including "greater customer support resources," *id*.; *see also* Ex. 1 at 3–4; Ex. 3 at 4; Ex. 2 at 3.

The only relevant risk disclosures that Plaintiffs attempt to address in anything more than the most cursory fashion are those related to KornitX. Opp. 32–33. But Plaintiffs misconstrue these disclosures, claiming Kornit disclosed only that there could be issues related to "required delivery of the service level agreements." *Id*. at 32. In fact, this was only one of an expressly **non**exclusive list of potential problems that Kornit warned about. *See* Ex. 1 at 16; Ex. 2 at 15. And Plaintiffs do not dispute that Kornit was at all times clear that it (i) had not previously offered a subscription-based software service and (ii) did not expect KornitX to contribute significantly to its near-term results. *See* Ex. 1 at 16; Ex. 2 at 15. Fundamentally, Plaintiffs argue that Kornit was not sufficiently negative about KornitX's prospects, but "[m]isguided optimism [] is not a cause of action." *Nice Sys.*, 135 F. Supp. 2d at 575 ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future.").

### 3.  The Alleged Misrepresentations Are Nonactionable Forward-Looking Statements Protected by the PSLRA Safe Harbor.

As established in the Opening Brief, many of the challenged statements are forward-looking and thus shielded from liability by the PSLRA's safe harbor. Br.

15

30–33.  The Opposition concedes as much, recognizing that "some of Defendants' statements are prefaced with arguably forward-looking language or otherwise discuss the future."  Opp. 34.  More than "arguably," Defendants' statements are prefaced with textbook forward-looking qualifiers.  *See, e.g.*, CC ¶ 155 ("*[W]e expect that* [Kornit's] service organization will be even more profitable in the coming quarters."); CC ¶ 193 ("*We expect a strong start to the year* with first quarter revenues to be in the range of $87 million to $91 million . . .").

Unable to avoid this forward-looking language, Plaintiffs focus on a statement that Defendants *never argued was forward-looking*, but which is nonactionable on multiple other grounds.  *Compare* Opp. 34 (arguing that the statement "all the fundamentals are very strong" is ineligible for the safe harbor), *with* Ex. 30 at 42 (demonstrating that statement was nonactionable because it was not alleged to be false and is a statement of opinion and puffery).  Plaintiffs' efforts to mischaracterize Defendants' arguments must be rejected.

Plaintiffs next argue that Defendants' statements are actionable because they "all implicate Kornit's present and past strategy."  Opp. 34.  But forward-looking statements are expressly defined to include "the plans and objectives of management," and "any statement of the assumptions underlying or related to" such plans and objectives, 15 U.S.C. § 78u–5(i)(1)(B)–(D), and Plaintiffs' cited

16

cases do not hold otherwise.[12]  And even forward-looking statements that contain present-tense components remain within the safe harbor where, as here, any arguably present-tense elements cannot "meaningfully be distinguished" from future elements.  *See, e.g.*, *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 280 (3d Cir. 2010).

### 4.     The Alleged Misstatements Are Nonactionable Opinions.

Plaintiffs' Opposition cannot cure the Complaint's failure to adequately plead that Kornit's opinion statements are actionable.[13]  *See* Br. 34–35.  The Opposition never argues that Kornit's opinion statements were not "sincerely believed when made," or that they contained any "expressly embedded, untrue factual assertions," *City of Warren Police and Fire Ret. Sys. v. Prudential Fin.,*

---

[12] In *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, the statements fell outside the safe harbor where Defendants had made specific representations about their pricing that were at odds with existing facts *and* adequate cautionary language was lacking.  Nos. 17-10467, 18-2291, 18-674, 18-15382, 2019 WL 3451523, at *11–12 (D.N.J. July 31, 2019); *see also In re Majesco Sec. Litig.*, No. 05-3557, 2006 WL 2846281, at *3 (D.N.J. Sept. 29, 2006) (similar).  Plaintiffs here have not identified any existing fact that is inconsistent with Defendants' forward-looking statements.

[13] Plaintiffs incorrectly argue that a nonactionable opinion statement requires explicit "words" to "suggest" "express[ion of] an opinion."  Opp. 39.  This is false.  This Court has made clear that even statements that do not lead with "I believe," or "I think," can constitute opinions if the subject matter "requir[es] management to make ***estimates and judgments***," making the statement "inherently subjective."  *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 666–70 (D.N.J. 2021) (citing *In re Hertz Global Holdings, Inc. Sec. Litig.*, No. 13-7050, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017) (Arleo, J.)).

*Inc.*, 70 F.4th 668, 686 (3d Cir. 2023).  Instead, Plaintiffs allege that Kornit's opinion statements "implied untrue facts and omitted appropriate qualifying language," in that Kornit's discussion of "revenue targets, growth, and 'accelerating' business fundamentals" was supposedly misleading because Kornit allegedly "kn[ew] of a material decline in customer growth since 4Q21."  Opp. 39.

As a threshold matter, Plaintiffs fail to allege that any decline had materialized in 4Q21.  Br. 16–18; *see* pp. 5–8, *supra*.  Yet, even if Kornit had been aware of some reductions in sales at that time (which the Complaint does not adequately allege), "actual knowledge that sales from one source might decrease is not the same as actual knowledge that the company's overall sales projections are false."  *Williams v. Globus Med., Inc.*, 869 F.3d 235, 246 (3d Cir. 2017).  Likewise, an opinion statement is not misleading merely because an issuer does not mention a fact that may cut the other way.  *See City of Warren*, 70 F.4th at 686–67; *see also Omnicare*, 575 U.S. at 189–90.  Here, Plaintiffs do not adequately allege any countervailing facts, much less facts that could "eclipse the balance of the numerous other considerations" embedded in Kornit's opinion statements.  *City of Warren*, 70 F.4th at 687.  Thus, their allegations fail.

> ### 5.   The Alleged Misstatements Are Nonactionable Corporate Puffery.

The Complaint challenges dozens of statements that clearly constitute per se immaterial—and therefore nonactionable—corporate puffery under applicable law.

18

Br. 35–36.  Plaintiffs do not specifically distinguish any of the authority

Defendants cited for this point.  *See* Opp. 36–39.  Instead, they argue that questions

of materiality should not be resolved on a motion to dismiss.  *Id*. at 36.  That is

wrong; courts routinely dismiss claims premised on statements of corporate

puffery (like those at issue here) at the motion to dismiss stage.  *See, e.g.*,

*Tanaskovic v. Realogy Holdings Corp.*, No. 19-15053, 2021 WL 211049, at *20–

21 (D.N.J. Jan. 21, 2021); *Hertz*, 2017 WL 1536223, at *10–11.

Notably, Plaintiffs rely heavily on out-of-circuit authority to argue that

Kornit's general statements of optimism were ***not*** puffery.  *See* Opp. 38 (citing

cases from the Districts of Massachusetts and Rhode Island).  The law in ***this***

***Circuit***, however, is clear that statements about, e.g., Kornit's "strong" financial

results, "by far, the best technology," and "robust" programs are not "concrete"

and "verifiable," as Plaintiffs claim, *id*. at 37, but nonactionable puffery, *see* Br.

35–36.

In any event, the cases Plaintiffs cite are readily distinguishable.  Unlike

here, several of those cases involved positive assurances about a business allegedly

known to be doomed.  *See, e.g.*, *Local 731 I.B. of T. Excavators & Pavers Pension*

*Tr. Fund v. Swanson*, No. 09-799, 2011 WL 2444675, at *10 (D. Del. June 14,

2011) (finding actionable statements that yellow pages industry was "strong" and

downturn "temporary" given known, ***permanent*** shift away from print yellow

19

pages); *see also In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) (statements that Vivendi was "financially solid" actionable in light of imminent risk of debt rating downgrade and bankruptcy). Other cases cited by Plaintiffs simply did not address the kinds of statements that Defendants claim are puffery, and therefore provide no support for Plaintiffs' position that generalized optimistic statements are misleading if Defendants do not at the same time "completely and accurately represent" any additional "information known to them." Opp. 37. Rather, precisely because the challenged statements are generalized statements of corporate optimism, they do not trigger a duty to disclose more. *See, e.g.*, *Monk v. Johnson & Johnson*, No. 10-4841, 2011 WL 6339824, at *23 (D.N.J. Dec. 19, 2011).[14]

### B.      Plaintiffs Fail to Plead the Requisite Strong Inference of Scienter.

Plaintiffs offer a wide assortment of scienter arguments, but none meets their pleading burden for their Exchange Act claims. Br. 36–44.

### 1.      Plaintiffs' Conclusory Allegations Do Not Plead Scienter.

Plaintiffs first contend—citing outdated District Court cases—that Defendants' mere ***access*** to information allegedly contradicting their public statements is sufficient to plead scienter. Opp. 41–44. That is wrong. As

---

[14] Having failed to address Defendants' arguments regarding the Item 5(D) claims, Br. at 36, Plaintiffs have "implicitly abandoned" those claims. *Zucker v. Quasha*, 891 F. Supp. 1010, 1019 (D.N.J. 1995), *aff'd*, 82 F.3d 408 (3d Cir. 1996).

Plaintiffs later concede, the Third Circuit made clear in 2013 that "general awareness" of information is not enough. *Id*. at 44 n.15 (citing *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 247 (3d Cir. 2013)); *accord* Br. 37–38. Indeed, even Plaintiffs' cited cases involved particularized allegations that defendants were ***actually aware*** of contrary information. *See In re Cambrex Corp. Sec. Litig.*, No. 03-4896, 2005 WL 2840336, at *12–14 (D.N.J. Oct. 27, 2005); *Steamfitters Loc. 449 Pension Fund v. Alter*, No. 09-4730, 2011 WL 4528385, at *9 (E.D. Pa. Sept. 30, 2011). Here, the only supposedly contrary information Defendants allegedly ***knew*** were anecdotal "problems" with customer service and certain discounts. Opp. 41–42. But that could be said of any similar business; it does not support an inference that Defendants knew of a material business drop-off or that they intended to mislead.

Nor do Plaintiffs' allegations concerning the core operations doctrine or temporal proximity suffice to plead scienter. *See* Opp. 49–52. First, Plaintiffs do not dispute that the core operations doctrine is insufficient to allege scienter, *see id*. at 51–52, and it would not support scienter here in any case: Defendants' mere involvement in Kornit's sales and service, *id*. at 50–51, and "repeated statements" about their knowledge of the business, *id*. at 46–47, do not mean they knew of ***specific adverse facts*** conflicting with their public statements. Br. 38. Second, the Opposition attempts to create the appearance of temporal proximity between

21

certain statements and the alleged disclosure of the falsity of those statements by focusing on a handful of generalized expressions of optimism, followed weeks later by the disclosure of disappointing results. Opp. 49. But these expressions of optimism are obviously nonactionable, *see In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427–28 (3d Cir. 1997), and Plaintiffs do not allege that any other statements at issue during the lengthy class period were temporally proximate to a supposed corrective disclosure. In that way, this case is starkly different from *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 271–73 (3d Cir. 2009). Opp. 49–50. There, the Third Circuit focused on the short interval between an executive's "flat denials" of unusual discounting and his admission (on the heels of "horrid" results) that major discounts **had** been offered. *Avaya*, 564 F.3d at 271–72.

Likewise, Defendants' acknowledgment **with hindsight** that, in the "beginning of 2022, we saw major decline," Opp. 48–49, does not give rise to an inference of contemporaneous scienter. *See* Br. 39. Plaintiffs' allegation that Defendants "admi[tted] that they 'saw' this decline **in real time**," Opp. 49 (citing CC ¶ 111), is belied by the Complaint itself, which makes clear that the decline in the first half of 2022 was based on knowledge **as of August 2022**, CC ¶ 111.

Finally, Plaintiffs do not dispute that they cannot plead corporate scienter for Kornit without pleading scienter for an individual. Opp. 57.

22

### 2.      The Confidential Witness Allegations Do Not Suffice.

Plaintiffs try to rehabilitate the deficient FE allegations with out-of-circuit authority that they assert permits FEs to rely on hearsay.  Opp. 45.  But the FEs' secondhand allegations in ***this case*** do not suffice under ***this Circuit***'s law.  *See, e.g.*, *Rahman*, 736 F.3d at 245; *Chubb*, 394 F.3d at 148–50; *see also* Br. 39–41, n.7, *supra*.  Plaintiffs assert that, unlike in *Rahman*, the FEs here "each identified their sources of information."  Opp. 46.  That is incorrect, *see, e.g.*, Br. 20 n.12, and in any event misses the point, which is that the sources of information that the FEs identified are not plausible (e.g., FE3 claims he was "made aware of" the pull-forward by a senior executive, whose basis for knowledge is not alleged, CC ¶ 93).[15]

### 3.      Alleged Stock Sales Do Not Suffice to Plead Scienter.

Neither Mr. Samuel's alleged stock sales, nor those by certain officers and directors in Kornit's secondary offering, support an inference of scienter.  *See* Br. 41–44, 48.

---

[15] Plaintiffs misconstrue *Avaya*, 564 F.3d at 268–69, as "rejecting" an argument that a distant connection between confidential witnesses and defendants undermines scienter.  Opp. 45.  *Avaya* merely determined that, in light of "all of the allegations of scienter"—which went meaningfully beyond the confidential witness allegations—a strong inference of recklessness was present ***in that case***. 564 F.3d at 280.  Not so here.

Plaintiffs do not dispute that Mr. Samuel held essentially the *same* quantity of Kornit stock before and after the alleged class period.  They likewise do not dispute that the fact that his equity-based compensation was greater than his annual salary is irrelevant, as it is standard for "today's corporate executives [to be] compensated in terms of stock and stock options." *Burlington*, 114 F.3d at 1424.

Plaintiffs nevertheless try to make much of the fact that Mr. Samuel sold more shares during the Class Period than he had prior to the Class Period.  Opp. 52–53.  But they do not and cannot dispute that an obviously non-culpable inference to be drawn from this difference is that it is directly correlated with an increase in Mr. Samuel's overall holdings: He could not possibly have sold 80,000 shares before the Class Period because he did not own 80,000 shares at that time. *See* Br. 42–43.  In fact, the obvious non-culpable inference arising from Mr. Samuel's trades during the Class Period is that he was simply seeking to keep his holdings constant.

Plaintiffs do not and cannot dispute that Mr. Samuel owned slightly *more* shares after the Class Period than he did before, as reflected in Kornit's first public disclosure following the Class Period. *See id*.  Instead, they complain that Kornit's Annual Report was filed several months after the end of the Class Period.  Opp. 54.  But Plaintiffs—who bear the burden to allege facts supporting a compelling inference of scienter—do not and cannot allege that the number of shares that Mr.

24

Samuel owned was any lower on the last day of the Class Period.  Nor do Plaintiffs attempt to allege that Mr. Samuel's holdings decreased during the Class Period.

Even if Mr. Samuel's trades were suspicious—which they are not—his 10b5-1 plan would negate any inference of scienter.  Br. 43–44.  Plaintiffs' focus on the timing of his plan, Opp. 55, is unavailing.  Mr. Samuel executed his 10b5-1 plan *one week* into the Class Period, *see* Br. 44, and Plaintiffs do not allege that he possessed any material nonpublic information at that time or that he entered into the plan strategically.  His trades are thus entitled to the plan's full protection. Br. 44; *accord In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014).

Plaintiffs further concede that they have not alleged insider sales as to *any other Defendant*, Opp. 55–56—which, they do not dispute, undermines the existence of scienter.  Br. 41 (citing cases).

Finally, the secondary offering does not support scienter.  As set forth in the Opening Brief, seeking to sell shares at maximum profit is not probative of any fraudulent motive.  *See* Br. 41–42.  Rather, the desire to complete a successful secondary offering is a motive "generally possessed by most corporate directors and officers."  *In re Interpool, Inc. Sec. Litig.*, No. 04-321, 2005 WL 2000237, at *11 (D.N.J. Aug. 17, 2005) (rejecting *In re Resource America Securities Litigation*, No. 98-5446, 2000 WL 1053861 (E.D. Pa. July 26, 2000), on which Plaintiffs rely).

25

## II.     Plaintiffs' Section 11 and 12(a)(2) Claims Should Be Dismissed.[16]

Plaintiffs' Opposition all but concedes that the Complaint fails to allege any actionable misstatements or omissions in violation of the Securities Act.  Opp. 60–62.  Indeed, the Opposition devotes *only one paragraph* to these allegations, *id.* at 61, merely summarizing the Complaint, without even addressing the failures identified by Defendants, *see* Br. 46–48.  In short:

- The Opposition repeats the unsupported allegation that Kornit's risk disclosures about the possibility of "undetected errors" were misleading because the alleged risks "were al-ready [sic] in existence."  Opp. 61.  But it does not dispute that the Complaint cherry-picked these quotes and that Kornit had expressly disclosed that it *had* already identified errors in its products and expected more in the future.  *See* Br. 46; UW Br. 10.

- The Opposition repeats the conclusory allegation that Kornit's statements about "high productivity" and "attractive total cost of ownership" were rendered false by "existing defects."  Opp. 61.  But it ignores that Kornit disclosed the risk of defects; does not dispute that the Complaint never explains how the unspecified alleged defects rendered these generalized

---

[16] Defendants join the Underwriter Defendants' Reply Brief, including in the arguments set forth at Point I therein regarding the Plaintiffs' failure to allege standing.  *See* UW Br. 4–9; *see also* Br. 45 n.32.

26

statements misleading; and fails to offer any response to the case law that confirms these statements are nonactionable puffery.  *See* Br. 46–47.

- The Opposition repeats the allegation that Kornit's statements that it was "striv[ing]" to deliver a "best-in-class customer experience" and that its "investments in" customer service were "appropriate," CC ¶¶ 293–94, were misleading because Kornit was allegedly engaged in actions that impaired customer service.  Opp. 61.  But the Opposition again ignores that Kornit expressly disclosed drain on customer service resources and the possibility of customer defections, *see* Br. 8–9, 27–28 (citing disclosures)—and likewise offers no response to the fact that these statements of "management objectives" are not actionable, *see* Br. 47 (citing cases).

- Finally, the Opposition again asserts a generalized statement that KornitX was "robust" was misleading by citing to an unattributed quotation that Kornit was "constantly working on [KornitX] and trying to figure out the integration."  Opp. 61.  But the Opposition has no answer to Kornit's extensive disclosures about the risks related to KornitX, nor any explanation for why a statement that the platform was "robust" is not classic nonactionable puffery.  *See* Br. 47–48; *see also* UW Br. 10.

The Opposition asserts defensively that Securities Act claims need not be "rich with detail."  Opp. 60–61.  But Plaintiffs concede that, even under Rule 8,

they must "set forth **sufficient facts** to support **plausible claims**." *Id*. at 61 (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211–12 (3d Cir. 2009)).  They fail to do so here.  The Securities Act claims therefore must be dismissed in their entirety.

Separately, Plaintiffs do not even address—and thus concede—the additional bases for dismissal of the Securities Act claims against the Officer, Director, and Offering Defendants.  Br. 48–49.  These provide additional, wholly undisputed bases to dismiss the Securities Act claims as against those Defendants.

III.    **Plaintiffs Fail to Plead "Controlling Person" Liability Under Section 15 of the Securities Act or Section 20(a) of the Exchange Act.**

Plaintiffs do not dispute that their control person claims under both the Securities Act and Exchange Act also fail to the extent they are unable to plead a primary violation.  *See* Opp. 60 n.20.  Separately, Plaintiffs do not even address— and thus concede—that their failure to allege culpable participation or actual control as to Mr. Avidan and the Director Defendants provide additional bases to dismiss control person claims against those individuals.  *See* Br. 50.

## CONCLUSION

For the reasons set forth herein and in Defendants' Opening Brief, Defendants respectfully request that the Consolidated Complaint be dismissed with prejudice.

28

Dated: April 1, 2024
       Newark, New Jersey

Respectfully submitted,

**GIBBONS P.C.**

/s/ Samuel I. Portnoy
Samuel I. Portnoy
Danielle N. Craft
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
sportnoy@gibbonslaw.com
dcraft@gibbonslaw.com

**DAVIS POLK & WARDWELL LLP**

Edmund Polubinski III (*pro hac vice*)
Dana Seshens (*pro hac vice*)
Daniel J. Schwartz (*pro hac vice*)
Marie Killmond (*pro hac vice*)
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
edmund.polubinski@davispolk.com
dana.seshens@davispolk.com
daniel.schwartz@davispolk.com
marie.killmond@davispolk.com

*Counsel for Kornit Digital Ltd., Ronen Samuel, Alon Rozner, Guy Avidan, Yuval Cohen, Gabi Seligsohn, Ofer Ben-Zur, Stephen Nigro, Lauri Hanover, Alon Lumbroso, Yehoshua Nir, and Dov Ofer*

29