```
 1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
 2

 3   _____

     In Re KORNIT DIGITAL LTD.
 4   SECURITIES LITIGATION,              CIVIL ACTION NUMBER:

 5                                         2:23-cv-00888

 6                                       ORAL ARGUMENT
     _____
 7   MARTIN LUTHER KING BUILDING & U.S. COURTHOUSE
     50 Walnut Street
 8   Newark, New Jersey  07101
     August 15, 2024
 9   Commencing at 3:21 p.m.

10

11   B E F O R E:     THE HONORABLE MADELINE COX ARLEO,
                      UNITED STATES DISTRICT JUDGE
12

13   A P P E A R A N C E S:

14   CARELLA BYRNE CECCHI BRODY & AGNELLO, PC
     BY:  KEVIN COOPER, ESQUIRE
15   5 Becker Farm Road
     Roseland, New Jersey 07068
16   For the Plaintiff

17   BERNSTEIN LITOWITZ BERGER & GROSSMANN, LLP
     BY:  JAMES A. HARROD, ESQUIRE
18        MATTHEWS R. de CARVALHO, ESQUIRE
          ALEC COQUIN, ESQUIRE
19   1251 6th Avenue
     New York, New York 10020
20   For the Plaintiff

21

22

23        Diane DiTizii, Official Court Reporter
               973-776-7738
24        diane_ditizii@njd.uscourts.gov

25   Proceedings recorded by mechanical stenography; transcript
          produced by computer-aided transcription.
```

United States District Court
Newark, New Jersey

```
 1    A P P E A R A N C E S : (CONTINUED)

 2    COHEN MILSTEIN SELLERS & TOLL, PLLC
      BY: JULIE G. REISER, ESQUIRE
 3    Wall Street Plaza
      88 Pine Street, 14th Floor
 4    New York, New York 10005
      For the Plaintiff Indiana Police Retirement System
 5

 6    GIBBONS, P.C.
      BY: SAMUEL I. PORTNOY, ESQUIRE
 7    One Gateway Center,
      Newark, New Jersey 07102
 8    For the Kornit Defendants

 9

10    DAVIS POLK & WARDWELL, LLP
      BY: DANA M. SESHENS, ESQUIRE
          EDMUND POLUBINSKI, ESQUIRE
11    450 Lexington Avenue
      New York, New York 10017
12    For the Kornit Defendants

13

14    O'MELVENY & MYERS, LLP
      BY: ALLEN BURTON
15        JONATHAN ROSENBERG, ESQUIRE
      1301 Avenue of the Americas, Suite 1700
      New York, New York 10019-6022
16    For the Underwriter Defendants

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX
```

```
 2    TOPIC                                    PAGE

 3    Loss of Business                            7

 4        Mr. Harrod                              8

 5    Decline in Demand                          11

 6        Mr. Harrod                             12

 7    Sticker Mule                               27

 8        Mr. Harrod                             28

 9    Pull-forward                               30

10        Mr. Harrod                             31

11        Ms. Seshens                            36

12    Service Contracts

13        Ms. Seshens                            38

14    KornitX                                    39

15        Mr. Harrod                             40

16    SPO, Sections 11 and 12                    42

17        Mr. Harrod                             43

18        Ms. Seshens                            44
```

```
19

20

21

22

23

24

25
```

1

2   (PROCEEDINGS held in via video conference before the Honorable

3   MADELINE COX ARLEO, United States District Court Judge at 3:21

4   p.m.)

5                THE COURT:  All right, guys.  Good afternoon.

6                I know I'm really dark.  I don't know why but it's

7   probably because of my government commuter, but that's a whole

8   other -- you guys are all from the big firms that have the nice

9   computers.

10               Anyway, thank you for participating today and thank

11  you for being so patient.  I had a criminal matter that,

12  unfortunately, was taking longer than I anticipated; so thank

13  you for your patience.

14               All right.  So I scheduled this case for oral

15  argument in connection with the motion -- defendant's motion to

16  dismiss the Consolidated Complaint.  And I will tell you at the

17  onset I'd like to have a conversation, a discussion today about

18  some of the deficiencies that are in the Complaint.

19               I am going give plaintiffs an opportunity to replead,

20  which is what I believe is fair under existing third circuit

21  case law.  I think some of them could potentially be corrected;

22  some of them can't, but I want to just flag some of them and

23  have a little bit of oral argument on them and then we can set

24  a time frame up for plaintiff to replead and then for renewed

25  motions to dismiss.

```
1              So let me begin by telling you how I have approached
2    it, which is I have looked at some of the claims under 10b and
3    the various misrepresentations that were made by the defendants
4    and the evidence of falsity.
5              So let's go through them, and I sort of them have
6    pulled out from the briefs and from the Complaint, and tell you
7    what -- I'll hear from both sides.  I'll tell you what has me
8    troubled about them.  I put them in order.  There's, like, six
9    different I would say buckets of misrepresentations that are
10   the most discussed in the briefing and which give me most
11   pause.
12             I'd like to begin by talking about the loss of
13   business from Delta and Fanatics.
14             So the misstatement -- before we begin, I didn't put
15   appearances on the record, before I get to anything else.  Let
16   me ask everyone to put their appearances on the record and tell
17   me who will be handling the argument today for the various
18   parties.  Okay?
19             Let me start with plaintiff's counsel.
20             MR. HARROD:  Good afternoon.
21             MR. COOPER:  Good afternoon -- sorry, Jim.
22             Good afternoon, Your Honor.  This is Kevin Cooper
23   from Carella Byrne.  I'm joined here with my colleagues from
24   Bernstein Litowitz who will introduce themselves.
25             THE COURT:  Okay.
```

```
 1            MR. HARROD:  Thank you, Your Honor.  It's Jim Harrod
 2   from Bernstein Litowitz Berger & Grossmann.  I'm with my
 3   colleague Mat de Carvahlo and Alec Coquin.
 4            We're here representing plaintiffs today and I'm
 5   happy to see you.
 6            THE COURT:  Okay.  Thank you.
 7            MS. REISER:  Your Honor, Julie Reiser, also on behalf
 8   of an additional plaintiff, Indiana Police Retirement System,
 9   and I'm from Cohen Milstein Sellers & Toll.
10            THE COURT:  Okay.
11            MR. PORTNOY:  Good afternoon, Your Honor.  This is
12   Sam Portnoy with Gibbons for the Kornit defendants, and with me
13   from Davis Polk are Ted Polubinski and Dana Seshens, also for
14   the Kornit defendants, and Dana Seshens will be handling
15   argument.
16            THE COURT:  Thank you.
17            MR. BURTON:  Good afternoon, Your Honor.  This is
18   Allen Burton from O'Melveny & Myers on behalf of the
19   underwriter defendants, and my partner Jonathan Rosenberg, also
20   with O'Melveny will be addressing the Court on anything related
21   to the underwriting defendants.
22            THE COURT:  Thank you.
23            All right.  I think that's everyone.
24            So let's begin with some of the misrepresentation
25   claims under 10b.  Let's start with the loss of business from
```

1  Delta and Fanatics.

2          I'll put it in context.  Plaintiffs claim that

3  defendants failed to disclose the loss of two customers, Delta

4  and Fanatics to their competitor M&R.

5          Specifically, I think it's on paragraph 146, in

6  response to an analyst's questions about Kornit's customers

7  including Amazon, Adidas, and Fanatics, Samuel stated that,

8  quote, Kornit is actually the perfect fit for all of them

9  providing the on-demand sustainable production with no

10  limitations, and we see huge growth from net new and from our

11  top 10 customers.

12          Plaintiff's evidence of falsity is alleged in

13  paragraphs 99, 182 and 186.

14          99, Samuels admitted in May 2022 that since the

15  quarter beginning in July 2021, Kornit knew that Delta had

16  decided to acquire digital printing systems from one of

17  Kornit's competitors.

18          In January of 2020 -- this is in Paragraph 182 --

19  Samuel stated there will be different top 10 customers, so

20  Amazon will stay probably in number one, also will be number

21  one in 2026, but number two, three, and four will change

22  because we see some new markets entering, some new branding big

23  players, et cetera.

24          I query whether that statement is even technically

25  false.

8

```
 1              Then in paragraph 186, Samuel touted that the
 2    company's network of more than 1300 customers, including some
 3    of the biggest in the world.  Amazon is our biggest customer...
 4    many systems of Kornit all around the world, but other
 5    customers like Adidas and Fanatics and then Stakes and DSG,
 6    both from leading brands and fulfillers and marketplaces that
 7    are using our technology.
 8              So I query whether, at that point, Fanatics was still
 9    a customer, whether that statement is even technically false.
10              But let's focus on the first one, and here's what I'm
11    concerned about.  The statement that Samuel admitted that in
12    May of 2022 that since the quarter beginning in July of '21,
13    Kornit knew that Delta had decided to acquire digital printing
14    systems, but one of Kornit's competitors, I guess this M&R,
15    that that happened -- July of 2021 is after June of 2021 when
16    the statement was made.
17              So how does that demonstrate falsity?  I mean, the
18    timing issue here seems to be a little off.
19              Who would like to address that from the plaintiffs?
20              MR. HARROD:  Your Honor, I can -- I can address that,
21    if you'd like.
22              THE COURT:  Sure.
23              MR. HARROD:  And thanks for taking the time to walk
24    through what your concerns are about these statements.
25              I think that the way that we focus on these
```

1 statements is a little bit more broad in the sense and thinking

2 about statements being misleading as opposed to necessarily

3 false.

4          What we allege is that there is a downturn in

5 business with these two customers in particular that is known

6 about beginning in July of 2021.  So your point is well taken

7 about the June statement, but the way that we've addressed the

8 other statements that you mentioned, and many other statements

9 that talk about the competition that Kornit says it's not

10 facing is that, in fact, from the beginning of the Class

11 Period, multiple former employees reported to us that it was

12 known that M&R was a great competitor and was actually going to

13 steal -- it's stealing business or winning business from Kornit

14 during that time period.

15          And so it's misleading to say things about these

16 particular customers, but also in general about the competitive

17 marketplace when you know that you are facing strong

18 competition from a worthy competitor, which they were.  So

19 that's one way of looking at this.

20          And we think the statements -- we kind of view the

21 statements about Delta and Fanatics as another piece with the

22 general statements of our competition, which we identified in

23 our brief, some of which are incorporated in the statements you

24 made.  But broadly speaking, they know from July, at least, of

25 '21 that they're going to lose some of the business.

```
1             And they continue to make statements not only about

2    Fanatics later than that into '22 and about the top 10

3    customers, but they make many, many statements which we've

4    identified in the complaint about competition.  And so --

5             THE COURT:  Let me stop you for a second, Mr. Harrod.

6             MR. HARROD:  Sure.

7             THE COURT:  I hear you, but the problem is that the

8    one direct statement about Fanatics that was either false or

9    misleading occurred right before -- happened in June and Samuel

10   admitted in May of '22 that it was since the beginning -- the

11   quarter beginning in July of 2021.

12            Let's be honest.  I know you have a theory here but

13   10b is no joke and you have to prove it by a heightened

14   pleading standard.

15            So every company has, We're going to lose business,

16   We're afraid of losing a customer, and then you keep the

17   customer and you don't lose the customer.  It can't be based

18   on, Well, there was talk about maybe we'll lose the customer.

19            That's not enough because that's in every business in

20   America including law firms.  Right?

21            So you need to have a false misleading statement and

22   that just isn't.  You need to put more meat on the bones of

23   this one if you want it to survive a motion.  Because, you

24   know, the later statements aren't technically false.  In

25   January of 2022 -- there was just a passing reference in
```

```
1    paragraph 186 to Fanatics by name and they were still
2    technically a customer in January of '22.  The statement was
3    not technically false.
4            So you hear what my concern is.  Think what you can
5    do -- I'll give you an opportunity to replead this again -- but
6    to address those concerns about timing.  Okay?
7            MR. HARROD:  Understood.  Thank you, Your Honor.
8            THE COURT:  All right.  Let's move on.
9            This is related, I guess, from what you said a minute
10   ago, Mr. Harrod -- and we can talk about this one too -- the
11   alleged decline in customer demand, right?
12           MR. HARROD:  Yes.
13           THE COURT:  And so the statement is that Kornit knew
14   of a negative demand trend in fourth quarter of '21 but did not
15   disclose the true extent of the decline in demand until third
16   quarter of 2022.
17           So you allege in paragraph 166, on November 10 of
18   2021 -- this would be the fourth quarter of 2021 where you say
19   the trend began, We enter into 2022 with strong business
20   fundamentals supported by broad-based demand for our leading --
21   industry leading solutions.
22           That's a misstatement that he made, and here's what
23   your evidence of falsity was.  The Kornit Konnect System, the
24   way it's pled, it's unclear what it was and what data it
25   provided.  If it's just a portal online where you can -- where
```

1   it chose some data, some raw data, but no one knew about the

2   data, no one accessed the data, no one utilized the data, no

3   one in the company ever really looked at Kornit Konnect.

4   There's data and there's data, right?  It does not assert or

5   explain how the metrics demonstrated who viewed them, what they

6   disclosed.  That's the first thing.

7           92, paragraph 92, you say there was statements from

8   the Former Employee No. 3, but there's really not a lot of

9   detail about timing in context for that -- for that employment.

10  That's something I would like to see become a little bit more

11  specific.

12          Three, let's talk about Printful.  There's a

13  June 7th, '22 statement that one customer, Printful, started to

14  feel a slowdown by the end of 2021 until Kornit at the end of

15  first quarter, quarter one of 2021, that it would not order

16  more systems in 2022.

17          But if you look at the whole statement, it's really

18  referring to Printful, and query whether the end of 2021 -- how

19  that timing relates and whether it predates the November 2021

20  statement by Samuel.  It's unclear from the Complaint.

21          MR. HARROD:  So, Your Honor, is it okay if I respond?

22          THE COURT:  Sure, of course.

23          MR. HARROD:  Thank you.

24          Look, I think -- the issue with demand -- let me

25  respond first about the way demand worked and how closely they

1  tracked it.  I think defendants say -- and I'll try and find

2  the quote -- himself said that they know everything that their

3  customers are doing.

4         So the way Kornit's business works is that they sell

5  printers.  The printers are very expensive, and the way their

6  printers work is that you have to buy ink from Kornit, too.

7  About 33 percent of their revenue is in the form of

8  consumables.  They have software on the printers called Kornit

9  Konnect that allows the company to track what the printers are

10 doing in real time.

11        Defendant Samuel said, We know everything that the

12 customer is doing.  So he himself said that.

13        And we also have allegations that we got from a

14 former employee who reported that there's a document called an

15 Ink Report that provides further detail about the consumption

16 of the customer's ink.

17        So it would make sense given that 33 percent of their

18 revenue is from ink that the customers were required to buy

19 from Kornit that they want to know -- they know what the

20 customers are buying in terms of the inks, they have the

21 revenue and the receivables from that, but they're also

22 tracking it because it's their best knowledge way of tracking

23 the demand of the customers.

24        And so we think that there's very strong allegations,

25 in fact, that they knew about the decline in demand.

1          The decline in demand --

2          THE COURT:  But the decline in demand is not just

3   based on consumables and ink.  It's based on losing whole

4   clients, not having new clients, right?

5          Because the misstatement is what Samuel said in

6   November of 2021.  We enter 2022 with very strong business

7   fundamentals supported by broad-based demand.

8          So demand isn't just the ink, right?  It's demand for

9   printers and other things which is 66 percent of its business.

10          MR. HARROD:  Correct, and those two things,

11   obviously, conjoined, right?

12          So the capacity, the amount of excess capacity that

13   the customers have in terms of both their equipment and the

14   consumables makes up most of all of their revenues, services

15   being the other part of it.  So if the customers are at a

16   hundred percent capacity and their printers are running all the

17   time and they're buying tons of ink, then the likelihood, the

18   necessity for the customer that they're going to buy new

19   machines, which will then consume more ink.

20          That's the growth story that Kornit provided at the

21   beginning of the Class Period.

22          So what's happening is they're tracking those things

23   because they are linked.  So the demand for the products is not

24   just about machines, it's about consumables, too.  But,

25   obviously, the two things are related.  And so the CEO is

```
1   saying he knows everything that the customers are doing, based

2   on this system, and we have allegations based on other things.

3           Now, as to the timing of that decline, it's clear

4   that different people said different things.  One of our --

5           THE COURT:  Let me just stop you for a minute.

6           Tell me -- explain to me about what revenue is based

7   on?  You have consumables which is 33 percent.  The sale of

8   machines, they're not leased, are they?  They're sold.

9           Are there any leases?

10          MR. HARROD:  I don't believe so.

11          THE COURT:  So they're sold.  So there's not

12  recurring lease fees.  There are repair fees?  Is repair done

13  by Kornit?

14          MR. HARROD:  One of the other false statements that I

15  hope we get to talk about is the services revenue that the

16  company generates from service contracts whereby they have

17  technicians that provide maintenance and fix machines when they

18  are broken.  That's another part of their revenue.

19          THE COURT:  Is that part of Kornit's revenue that

20  it's been reported?

21          MR. HARROD:  Yes, yes.

22          THE COURT:  What percentage of it is that?

23          MR. HARROD:  I don't know off the top of my head.

24  It's low.  My understanding is it's under 10 percent.

25          THE COURT:  Okay.
```

```
 1          MR. HARROD:  They were trying to grow that part of

 2   the business because the consumables and the service are more

 3   of a form of revenue, unlike what would be capital expenditure

 4   for their customer to buy a printer.

 5          THE COURT:  So the printers are the bulk of -- are

 6   the lion's share of the sales, right?

 7          MR. HARROD:  I think that's correct, yes.

 8          THE COURT:  Is the expectation that more customers

 9   keep buying -- new customers buy it, or you have customers

10   expanding and buying more and more machines?

11          MR. HARROD:  Well, Amazon was their biggest customer

12   during the Class Period and I think Delta and Fanatics combined

13   were also in the top 10.  Their revenue is concentrated -- the

14   CS says that, I think, during the third quarter of '21 that the

15   top 10 customers represent 65 percent of their revenue.  I

16   don't think that's broken out between the machines and the

17   consumables and service, but those large customers who are

18   buying machines pretty continuously at that point is where the

19   revenue comes from.

20          And, importantly, I think Your Honor is on to

21   something else that we allege, which is that the story that the

22   company is telling during the Class Period about demand and

23   about growth is based on the idea that these customers have --

24   effectively will double their purchases of everything between

25   2022 and 2026.  And so you have to think about whether or not
```

United States District Court
Newark, New Jersey

```
 1    that's a credible statement in light of the things that we
 2    allege in our Complaint.
 3              But anyway, that's --
 4              THE COURT:  We're talking about declining customer
 5    sales, it's all framed around the November 10th, 2021, Samuel
 6    statement, right?  That's the key statement about the alleged
 7    decline in customer demand.  That's in paragraph 166.
 8              MR. HARROD:  They make a number of statements about
 9    demand well into the Class Period.  They describe the business
10    as going great until June of '22.  After the --
11              THE COURT:  So, Mr. Harrod, there's two different --
12    you know -- it can't just be broad strokes.
13              MR. HARROD:  Sure.
14              THE COURT:  It can't be, right?  They said this is a
15    great business and then the business tanked.  That's not
16    enough.  You have to allege clear -- like, who, what, where,
17    when and why misstatements, and then you have to have evidence
18    of the misrepresentation or falsity of the statement.  That's
19    how it works, right?
20              So I'm trying to isolate, and this is what makes
21    these -- you know, at the core they're negligence and they are
22    mini negligence and fraud cases, all these 10b-6 cases that I
23    look at.  And companies speak through different people at
24    different times and making all different kinds of statements.
25    Some of them are puffery, some are forward looking.  But you
```

1  try to isolate and you have to isolate under the law what are

2  these statements that they said that were false.

3          To say that business is doing well or I know

4  everything that's going on in my business is different than

5  saying we enter 2022 with strong business fundamentals.  And

6  your theory is when he made that statement, he knew that they

7  were in decline.  Right?

8          So I'm trying to understand what are all those

9  statements because you talk about Kornit Konnect, that has to

10  be more specific.  It's just not.  What he knew, how he knew.

11          The fact that he says, We know everything that

12  customers are doing, in my mind, that's what a lot of people

13  say.  People run law firms, I know what everyone's doing.  And

14  it's not the kind of -- it's not the kind of statement that

15  really speaks to whether he -- that coupled with something else

16  may be more helpful.  But if you're basing it on this Kornit

17  Konnect, you need to put a little bit more expression of what

18  was it, you know, who looked at it, and what exactly did it

19  show.  Okay.

20          The Former Employee 3, there's a lot -- it's kind of

21  vague about, in paragraph 29, what he knew in November and

22  December of 2021 when that statement was made.

23          That's what I'm trying to get at.  You tell me --

24  because maybe you need to reorganize this in a way that really

25  explains this whole -- part of your whole case is the customer

1    demand thing is big, but there was a decline going on in the

2    business.  Customers were leaving.  They weren't recurring with

3    the consumption of ink.  They weren't buying new machines.

4    They weren't using the service contracts.  And at the same

5    time, Samuel and others are saying the business was strong.

6            That's your case.  I just don't see the evidence -- I

7    see the one statement by Samuel and I don't see a lot of

8    evidence of falsity of that statement.

9            MR. HARROD:  Well, Your Honor, I don't want to

10   belabor this because it sounds like I'm not, probably, going to

11   change your mind today, and I appreciate the opportunity to

12   have another shot at pleading this Complaint.  But I do just

13   want to say a couple of things about that, what you just said.

14           The defendants made statements, and these are kind of

15   similar statements that existed -- you had a case called Fresh

16   Pet probably about five or six years ago now where the CEO made

17   the same types of sort of business-directional statements that

18   the people at Kornit are making.  And, in fact, they're making

19   them throughout the beginning of 2022 through the end of the

20   Class Period in June of '22.  And they're saying things like

21   we're entering -- this is on January 10th.  We're entering very

22   strong into '22.  We have massive momentum coming from both

23   existing customers and many new customers.  He's saying in

24   February, We have good visibility into the business.  They

25   started '22 with outstanding momentum.

United States District Court
Newark, New Jersey

```
 1              So I understand your concern that those statements
 2     are not specific.  They're not quantitative statements, but
 3     they're qualitatively describing the demand underlying the
 4     business and they provide the sort of understructure for this
 5     somewhat amazing goal that they had presented to the market and
 6     becoming a one-billion dollar revenue company.  They can't say
 7     that credibly without saying these other things that turned out
 8     to not be true.
 9              As to the underlying basis for why those statements
10     beginning in November of --
11              THE COURT:  What are the statements?  I know you said
12     there were statements throughout the time, but your papers talk
13     about, and the Complaint speaks to the statement by Samuel in
14     November 10, 2021.  There wasn't repeats of those statements
15     saying our customer demand is increasing, we're doing -- you
16     know, we're really improving from one year to the other, post
17     that November 10, 2021 statement.
18              MR. HARROD:  Your Honor, respectfully, if I could
19     just disagree with you.
20              THE COURT:  Yes.  Tell me where in the Complaint.
21     Why don't you show me in the Complaint?
22              MR. HARROD:  On January 10th, in paragraph 180.  I
23     don't know what page that is.
24              THE COURT:  Page 70.
25              MR. HARROD:  So defendant -- I'm looking at just my
```

1  notes but this is a quote from the Complaint.

2          He says -- this is at a conference with the analyst

3  at Needham, Samuel says:  The Company was entering very, very

4  strong into 2022 and had massive momentum coming from both

5  existing customers and many new customers.

6          He admits about in May of '22 that they knew there

7  was a downturn by the end of 2021.

8          That statement is false.  It's inconsistent.

9          THE COURT:  But here's the thing about timing,

10  Mr. Harrod.  This is right on the tails of the November 10th

11  statement.  We're talking about a trend that began at the last

12  quarter.  So this is literally a month before the statement was

13  made.  Let's focus on timing.

14          And when does the Class Period end again?

15          MR. HARROD:  July 5th, of '22.  Seven months.

16          THE COURT:  So this is the beginning, right?  So this

17  is the beginning January 10th of 2022.

18          Your theory is it started in the last quarter, which

19  is October, November, December, and this was, right, of '21,

20  and that it went through to -- and he was making his

21  misstatement again in January of '22.

22          Anything post the January '22 frame where he

23  reiterated this?

24          MR. HARROD:  In February -- in paragraph in 191, he

25  makes statements during -- that's their fourth quarter earnings

1    release.  In the press release with their earnings, Samuel

2    attributed the following language.  This is from paragraph 191:

3    Our good visibility into the business, combined with our

4    experienced team, gives us the confidence that we can deliver

5    on our commitments for the balance of '22 and into '23.

6         They had said earlier prior to this that 2023 was the

7    year that they would achieve a run rate of $500-million a year,

8    which basically meant $125-million in quarterly revenue.  They

9    never got close to that.  They still haven't gotten close to

10    that.  He said that.  That's in February.

11         The same day during the conference call, he said,

12    Kornit started -- this is paragraph 191, I'm sorry -- started

13    2022 with outstanding momentum and the mega-trends that have

14    been fueling our business are intensifying in magnitude and

15    transformation.

16         So what he's saying there is not only are things

17    going good, they're actually getting better.  He had internal

18    information, he says, in May.  We knew, our customers told us,

19    you know, by the end of 2021 that things weren't going as well.

20    We have former employees saying that this -- this was known

21    within the company months before this.  In May of 2022 when

22    they come out with their poor first quarter earnings, they try

23    to save it.  He says on that date, this is paragraph 207, All

24    the fundamentals of the business are growing and accelerating.

25         So you will continue -- I'm skipping parts of it and

1  going to the bolded language:  So you will continue seeing from

2  the global strategic account revenue -- and that's the

3  customers that he's losing, Delta and Fanatics -- coming not

4  only in Q2, but in Q3 and Q4, and definitely also in 2023.

5        So he continues to make these statements even after

6  May, a month before the end of the Class Period when the bottom

7  falls out of the stock further.  He says -- and this is

8  paragraph 212 -- What happened in Q1 is a unique case.

9        They had bad earnings in Q1 but he's trying to save

10  it.

11        He says, I call it a bump, a bump on the road to

12  grow.  First of all, we mentioned next year we are going to be

13  a $500-million run business before Q4 2023.

14        He then says, We're going to bring it earlier.  We're

15  going to hit that $500-million target earlier.

16        So I understand Your Honor's point.

17        THE COURT:  Let's stop you there.  Let's talk about

18  the evidence of falsity of those statements, right?

19        MR. HARROD:  Yes.

20        THE COURT:  So we have the Kornit Konnect.  I get

21  that.  A little detail will be helpful.  We don't have any

22  business in the company, Kornit Konnect shows the consumption

23  of ink, whatever.  Whatever he knows.

24        I'm looking at paragraph 92 about the statement of

25  Former Employee 3.  You know, first of all, pulling the revenue

1   in '22.  He's a customer service person, right?  He doesn't

2   speak for the whole company, right?  He's a pretty low-level

3   person.  He's not a management person, he's a customer service

4   person.

5          MR. HARROD:  His title is director of professional

6   services.  My understanding of what his job is is that he's

7   effectively an executive within the part of the company that

8   provides customer service to -- actually, he's running sort of

9   part of that organization.

10         And I think what the allegations are, that he's in

11  meetings where customer service and other sales issues are

12  discussed.  So he's selling service.  He's a manager, an

13  executive in that group, and that's why he knows this

14  information about --

15         THE COURT:  So "service" meaning the service

16  contracts, repairing of equipment?

17         MR. HARROD:  Yes, and I think that the point of

18  that -- those --

19         THE COURT:  That's less than 10 percent of the

20  business, according to you.  The bulk of the business is

21  selling of copiers or printers, and another chunk is the

22  consumption of consumer goods like ink that's 33 percent.

23         So he's talking about, while he's still in his role,

24  a sort of slowdown in the sales, in November and December it's

25  typically busy, it wasn't as busy; saw the negative effects on

1    the fourth quarter.

2           You need a little bit more to establish the falsity.

3    Maybe you need to have a little bit more detail.  He has less

4    than 10 percent of the business he's involved in.  Maybe there

5    was a slowdown in customer service, but the statements that we

6    just went through -- and I agree with you, they were not

7    puffery, they are statements that we're going to do a great job

8    this year, aren't really -- you could still be doing very, very

9    well and not -- and have a slowdown in customer service because

10   that's less than 10 percent of your business.

11          I think you need a little bit more here to

12   demonstrate falsity than you have.  Maybe you could repackage

13   it.  Maybe you can replead it.  But this is -- I know you look

14   at all of them together, but I just -- I think there needs to

15   be a little bit more.  Maybe you have it there, maybe you need

16   to repackage it, but I'm not -- I'm giving you a heads-up, I

17   think you need more.

18          MR. HARROD:  Okay.  I understand.

19          I just want to make one statement.

20          THE COURT:  Sure.

21          MR. HARROD:  FE3 attributes this information.  He

22   explains how he got it.  He learned of this information in

23   meetings that he had with the president of the Americas.  A man

24   named Chuck Meyo, who I believe is not at Kornit anymore.  But

25   he was the person who was the executive in charge of all of

```
 1    Kornit's business in the Americas, which I understand to be
 2    North and South America.  That's a person who would know that
 3    and that's who told him and that's what he said to us.
 4              THE COURT:  Can you get a statement from him?
 5              MR. HARROD:  From Mr. Meyo?
 6              THE COURT:  I'm just telling you I'm not saying that
 7    is enough.
 8              MR. HARROD:  I don't know that he'll talk to me.
 9              THE COURT:  Let's move on.  You get my point.
10              Tell me what you want to say.
11              MR. HARROD:  I understand.  I'm pointing back to
12    Mr. Samuel's own words.  I know I said this to you before so I
13    don't want to belabor it.
14              In paragraph 83, we quote him as saying:  Kornit is
15    continuously measuring everything.  So we have a Konnect system
16    connecting to all our installed base for all the systems that
17    we are selling, and we know everything that our customer is
18    doing.
19              I think that that's a statement that has to be
20    credited against him.  Either he's not saying the truth --
21              THE COURT:  But what you just explained to me
22    though -- and I don't want to belabor it either -- you know, if
23    there's a slowdown in ink sales that's a fraction -- that's a
24    third of the business.
25              So, you know, replead it as specifically as you can,
```

1    but I don't see just because the -- there's data in a system

2    that is accessible coupled with a guy saying I know everything

3    that's going on.  You know, it would be helpful if there was a

4    little bit more than that.  That's all.

5            MR. HARROD:  Thank you, Your Honor.

6            THE COURT:  You're welcome.

7            Let's talk about Sticker Mule and customer growth.

8    Paragraph 167:  Recently Sticker Mule integrated a fleet of our

9    Atlas systems into their business and are utilizing the growing

10   customer base to support a strong directed garment revenue

11   channel.

12           And that was in November -- a lot of things were

13   being said in November of 2021, right?

14           So here's one of the problems:  Sticker Mule decides

15   to start -- this is in paragraph 41, and this is Former

16   Employee 4's statement:  Sticker Mule decides to start printing

17   t-shirts and had purchased three or four of Kornit's largest

18   machines, the Atlas, at the end of 2021, but Kornit was unable

19   to get them to run properly, pushing Sticker Mule to get rid of

20   its Kornit machines in the beginning of 2022.

21           So if they purchased them at the end of 2021 and

22   Sticker Mule resold them in early '22, that would be after the

23   2021 integration statement.  At the time of the statement

24   wasn't integration integrated by Kornit.

25           What's going on with Sticker Mule?  It looks like

1    there's a timing issue with this one as well.

2          MR. HARROD:  Understood.  The defendants have made a

3    similar observation or argument, which I will respectfully

4    disagree with, and the explanation for that is that FE4 says

5    that they were unable to get printers to run properly at any

6    time.

7          So if you combine those allegations with, and

8    contrast them with what the CEO says on November 10th, you have

9    a customer who bought the system around -- in the fourth

10   quarter.  We have a person who says they never got them to run.

11   He says they sold them to some other, you know, user.

12         We have another former employee that says, in fact,

13   that's correct, they sold them to another company.  And one of

14   those people is also saying they never got them to work.  And

15   on November 10th the CEO is saying they were integrated and

16   being utilized.

17         So if you credit the allegations from the former

18   employees, as I believe you should, then that statement can't

19   be true.

20         And it also sort of defies common sense that you

21   would buy this expensive, pretty complicated machine and you

22   would have it for less than three months, but that somebody who

23   works for the company that sold it to you could say to their

24   investors, touting it, saying they utilized it and integrated,

25   when you thought it didn't -- somebody said it didn't work, it

1    never worked, which is borne out by the fact that they sold it

2    three months later.  I mean, I never spent a lot of money on

3    something that worked, had it for three months and then sold

4    it.  I'm sure that they didn't get more than they paid for

5    those machines when they sold them to somebody else.

6           THE COURT:  Here's what paragraph 41 says.  It's

7    careful.  It says:  FE4, who worked as a General Manager for

8    Latin America from February '19 until December of 2021 -- so

9    that employee was gone by the end of the year -- corroborated

10   FE3's account -- hold on a second -- explaining that Sticker

11   Mule decided to start printing t-shirts and had purchased three

12   or four of the largest machines at the end of 2021, but Kornit

13   was unable to get them to run properly, pushing Sticker Mule to

14   get rid of its Kornit machines in the beginning of 2021 and

15   purchase a competitor's product instead.

16          So what you're saying to me now is a little bit

17   different than what's in this Complaint.  They had problems

18   from the get-go.  They never worked right.  It doesn't say that

19   clearly in 41.  If that can be said that they never worked and

20   there was problems from day one and within three months they

21   got rid of them, that's a little bit different than the way

22   it's carefully pled in 41.  So I'm not satisfied that it is

23   clear enough.

24          An equally plausible construction of paragraph 41 is

25   they had them, and they did -- they tried to get them working

1    and then ultimately they could never get them working properly

2    and then two months later they got rid of them.  But he didn't

3    make that statement in December or January or February, he made

4    it November 10th when he probably first -- do you know when

5    they first delivered the machines to Sticker Mule?

6              MR. HARROD:  I don't think we know that exactly.

7              THE COURT:  Okay.

8              MR. HARROD:  I appreciate Your Honor's comment about

9    the way paragraph 41 is worded, but it is clear or it does say

10   Kornit was unable to get them to run properly, like, at any

11   point.

12             THE COURT:  Listen to me.  Make it clear.  It's not

13   that clear.

14             MR. HARROD:  Okay.

15             THE COURT:  All right?  Take another shot.

16             The defense is doing great, by the way.  All right.

17   No need to talk yet.

18             All right.  Let's talk about the pull-forward which

19   is sort of connected to the trends, right?

20             Plaintiff alleged that Kornit pulled forward revenue

21   to meet revenue guidance in Q1 of 2022.  This is in paragraph

22   209.

23             Defendant Rozner stated that during the Q1 2022

24   earnings call that the pull-forward was a timing issue.

25             So 92 says the following.  Again, the famous customer

service executive FE3 says there was, Recognizable trend issues recognized by some of the Company and ignored by others until it was too late to stop the tailspin.

He said that in November and December of 2021, that's the last quarter, when he was still in his role at Customer Success, Kornit saw a slowdown in their sales. As FE3 explained, they're typically very slow -- I'm sorry. Very busy season when they produced a tremendous amount of product and that period wasn't as busy as the last couple of years and not as busy as Kornit had projected; that FE3 reported that as soon as the pandemic mandates ended, everyone got back outside and Kornit saw the negative effects of their sales in the fourth quarter of 2021.

FE was in weekly and sometimes twice weekly calls concerning sales projections and revenues. He had discussions with the president and vice president of the Americas division about what was going on with the 2021 slowdown.

FE3's statements do not refute the alleged -- here's my concern: He talks about the slowdowns, but this whole thing about whether there was a push forward of revenue, I'm not sure that's clearly false.

MR. HARROD: Your Honor, there's some -- I think there's some noise around this. The defendants say that they didn't have to disclose the pull-forward, maybe that's right.

That's not what we allege. What we allege is that

 1    Rozner -- the analyst suspected this because what Samuel said

 2    on the call -- this is a little bit of a deep cut.  On the Q1

 3    call Samuel says --

 4            THE COURT:  Q1 in 2022?

 5            MR. HARROD:  Yes.  That's when this transaction

 6    occurred, said we had some late arriving revenue.

 7            So the analyst, smart, says, like, that sounds weird.

 8    Did you pull forward any revenue from the second quarter?

 9    Rozner says no.  He affirmatively says no.  So that's one

10    thing.

11            So what we allege is false about this is really in

12    paragraph --

13            THE COURT:  So -- wait.  The late arriving revenue

14    from -- that came in 2022 that was attributable to 2021?

15            MR. HARROD:  No, no, no.  He's talking to the analyst

16    about the quarter.

17            THE COURT:  And this is what time?  This is the

18    beginning of?

19            MR. HARROD:  The statements are made -- these

20    statements are made in May; they relate to the quarter that

21    ended in March.

22            THE COURT:  May of '22?

23            MR. HARROD:  Correct.

24            THE COURT:  And this is in the Complaint?

25            MR. HARROD:  This is in the Complaint.  In paragraph

United States District Court
Newark, New Jersey

1   93 we talk about this, and FE3 was told that this happened.  So

2   Rozner says it didn't happen, our witness says it did.

3            THE COURT:  What did happen?  What happened?

4            MR. HARROD:  That revenue was pulled forward.  He

5   says he learned this from the president of Kornit's largest

6   division, president of Americas, this is Mr. Meyo, who reported

7   directly to Samuel.  That's paragraph 93 of the Complaint.

8            According to FE3, the decision to bring forward

9   revenue was a direct result of the reports of the slowdown

10  being given to management.

11           That's the last sentence.

12           And the second sentence of that paragraph 93 says, To

13  cover the anticipated miss in first quarter 2022 forecasts,

14  according to FE3, projected revenue for the second quarter of

15  2022, or book to bill revenue, was brought into the first

16  quarter to stave off the inevitable reality that Kornit was in

17  a tailspin.

18           So this person sent this.

19           FE2 indicated -- and this is in paragraph 89.  He

20  talks about Samuel, the CEO, calling up salespeople at the end

21  of the quarter and saying, like, we need more revenue.  So this

22  is something that the CEO is known to do.

23           Now, just to be clear, I want to be honest, FE2

24  didn't say -- he didn't have knowledge specifically of this

25  Amazon pull-forward, but he has Amazon -- he has knowledge of

1  the CEO calling salespeople up and doing this.

2           THE COURT:  Where is that in the Complaint?

3           MR. HARROD:  That's paragraph 89, Your Honor.

4           THE COURT:  Okay.

5           MR. HARROD:  And so, you know, there's evidence of

6  this.  And then FE7 -- this is in paragraph 90 -- says that the

7  company had the ability to accelerate revenue from Amazon.

8           One other corroborating fact here beyond those is

9  that they took money basically from the second quarter and put

10 it in the first quarter.  The second quarter of 2022, that's

11 when the Class Period ends, when they preannounce the results,

12 was terrible.  So it was borne out.  They borrowed money from

13 one quarter, moved it up a quarter.  And guess what happened in

14 the next quarter?  It wasn't good at all.

15          So they tried to save one quarter for the next.

16 Maybe they were hopeful that something -- some future event

17 would save them, it did not, and this sort of came out in that

18 manner.

19          So we have one person who said it happened.  We have

20 an analyst who is suspicious that it happened.  We have two

21 other people who make statements that there was behavior within

22 the company consistent with it happening.  And then you have a

23 really bad second quarter that the revenue was pulled from

24 which further corroborates or supports our conclusion.

25          THE COURT:  Let me ask you a question.  It's a matter

 1  of degree, too, isn't it?  Do you have any idea how much was

 2  pulled forward?

 3          MR. HARROD:  We don't allege that, Your Honor.

 4          THE COURT:  So in other words, because what

 5  defendants are saying is that it doesn't violate GAP.  There's

 6  no reason to say that -- you can't move -- if it comes in late,

 7  you can move it back.

 8          I would think it all goes -- if you're saying that

 9  this was part of an effort to cover up the other issues we

10  talked about, a decline, a trend, a decline, to make it look

11  better than it is, to show better numbers to the analysts, it

12  has to be a matter of degree.  So do you have any sense through

13  your witnesses how much we're talking about?

14          MR. HARROD:  Well, I can't -- I don't know the answer

15  to that question, Your Honor, because I don't have the facts.

16          What I do know is that the CFO was asked if you do

17  it; he said no.  Our witnesses say he did it.  That's false.

18          Whether it's -- I mean, it's obviously, I assume, a

19  material amount of money or the CEO would have just, I guess,

20  told the truth and said, yeah, there was some revenue from

21  Amazon, we accelerated it.  It was you know, a hundred thousand

22  dollars.  It would have been a rounding error, nobody would

23  have cared, it would have been fine.

24          But he didn't say that.  We cite the Plantronics

25  case.  There's lots of cases that we can cite for Your Honor

1    that say not every statement has to represent a GAP violation

2    to be false.  We're not alleging that the accounting was false.

3    I would love to be able to do that.  Maybe I'll be able to do

4    that in my next complaint.

5             But what I say in this Complaint, the CFO got asked a

6    pointblank question.  He gave an answer that we allege to be

7    not true.  It's material.  They don't allege it's not material.

8             THE COURT:  I hear you.  Let me see if anyone from

9    the defense would like to respond.

10            MS. SESHENS:  Yes.  Thank you, Your Honor.  Dana

11   Seshens from Davis Polk.

12            A couple of points on this, Your Honor.  I think,

13   number one, the allegation in 209 is the question and answer

14   from the analyst and the CFO who doesn't just say no but gives

15   a detailed explanation of what actually happened.

16            When you look at what FE3 has to say, it's entirely

17   vague and not firsthand, and bear in mind that they have failed

18   to allege that FE3 has a basis for this knowledge.  This is the

19   former --

20            THE COURT:  Customer service rep.

21            MS. SESHENS:  Who basically ran the service

22   department.  And the allegation is that Chuck Meyo told him at

23   some undetermined time, in some undetermined way, and there's

24   no allegations of Chuck Meyo's source of this information.  And

25   so what Chuck teaches and it's following is there has to be a

1  credible basis from which to infer that the FE allegations here

2  are plausible or credible and that the Former Employee would

3  have a basis to know the information, and that's just

4  completely missing.

5           The other allegations as well that Mr. Harrod

6  referenced in terms of trying to get more revenue at the end of

7  the quarter, those are of an entirely different nature.  Those

8  are cut deals, the allegations are.  I'm not, obviously, saying

9  they're true, but that is, strike a deal if you can, we want to

10  enhance the revenue, as they've alleged it.  That's very

11  different than saying we're going to pull forward from one

12  quarter to another.  It's apples and oranges.

13           The only evidence of the alleged falsity of

14  Ms. Rozner's statements about the pull-forward that the analyst

15  asked is FE3, which we would submit, Your Honor, is not

16  credible and insufficiently pled.

17           THE COURT:  So I'm going to tell Mr. Harrod to -- I

18  think there's some concern from the Court about the facts --

19  the basis for FE3's knowledge.  So if he relied on someone else

20  and you need to really pull that together in a more clear and

21  unmistakable way.

22           There's, again, as counsel just pointed out, he is a

23  customer service person, or she, FE3.  If he's relying on

24  information from someone else, FE3 statements need to have more

25  concrete facts demonstrating the falsity of the statements.  So

1  I'm going to give you an opportunity to do that when you

2  replead.

3           All right.  Let's talk about the service contracts

4  that we talked about a minute ago.

5           All right.  Paragraph 118:  Defendant Samuel in

6  response to an analyst question about whether the Company's

7  service contracts were singular year with the potential for

8  renewal for multi year, that every machine we are selling, we

9  are selling it with a contract.  There's no other way to buy a

10  machine; it's not for one year.  It's for multiple year

11  contracts.

12           And plaintiff says the reality was that they provide

13  a six-month warranty and customers could buy an additional one

14  year when they had the option to renew.

15           So I guess my question to defendant, isn't that

16  factually false?  I mean, he said there's no way and it's not

17  for one year and the contracts were for six months.

18           MS. SESHENS:  So, Your Honor, I think that statement

19  has to be read in the context of the question that was being

20  asked, which is from an analyst who was saying can you sort of

21  tell us more about the increase or the improvement in the

22  attached rate, which means how many people are sticking with

23  their contracts.  Is that from single year contracts or is that

24  from multi year contracts?  And the basis for that question

25  derives from Kornit's disclosures about how they run their

1  contracts.  And that's in its 20-Fs year after year.

2  Plaintiffs don't dispute that those disclosures are false.

3       So in the context of answering that question,

4  Mr. Samuel is talking about, well, we sell the machines with a

5  contract.  That is not alleged to be false.  That is consistent

6  with the disclosures and we don't understand plaintiffs to be

7  challenging that.

8       He then goes on in response to the question about the

9  attached rate to say that they were multi year contracts.  And

10  in the context of that, we would submit it's not false.  He was

11  addressing the question.  The 20-Fs are clear as to how this

12  all works and in the broader context of what he was addressing

13  there that it is not factually false.

14       THE COURT:  I don't need anything more on this.  I'll

15  take this one under advisement.

16       All right.  KornitX revenue, Defendant Samuel, in

17  paragraph 187, touted KornitX as a major revenue driver, noting

18  KornitX is a platform that enables connectivity between any

19  marketplace, any a brand, any e-commerce network, et cetera.

20       Then on June 8th, he restated that:  Of course,

21  KornitX is growing very fast, and, we see a massive growth

22  coming into it.

23       Here we are again with federal -- I mean, Former

24  Employee 3, he says, there was no revenue coming from KornitX,

25  and Former Employee 10 called it crazy, kind of crazy given

1   internal sales target.  And Samuel shortly after the Class

2   Period stated that KornitX only generated a couple million,

3   although we know there was a couple million -- that was, in

4   fact, true, it was a couple million, it was still working on

5   stabilizing the platform.

6           Let's talk about the falsity issues, Mr. Harrod.

7           I'm a little concerned again about the lack of

8   specificity and timing of the statements by the employees.

9           MR. HARROD:  I appreciate that.

10          Look, I mean, we have three different former

11  employees who weigh in here who provide different information

12  that is consistent with the idea, which the CEO said in

13  November of '22, which is that it didn't generate not

14  meaningful enough revenue and that it needed to be stabilized.

15  They're talking about this as a hundred-million-dollar revenue

16  source two years -- one year after these statements in '22 are

17  being made.

18          So the FE10 says that the targets -- he describes in

19  detail what the quarterly targets were for the second, third,

20  and fourth quarters -- this is in paragraph 73 -- which total

21  under two-million dollars.  There's four salespeople, he says,

22  and a manager.  So if I -- by my math, if I add that up and

23  then multiply it times by five, it's under $2 million.

24          So the target that the company had for this product

25  was under $2 million for '22, and the people also say that it

```
 1   didn't work.  He says he didn't sell any of it in the time that
 2   he was at the company.  And this is corroborated by the CEO's
 3   statement that it needed to be stabilized.
 4          So they're making statements.  They're using this,
 5   again, as sort of the beam under the house of a billion dollar
 6   company and they're saying it's a robust platform.  That's
 7   paragraph 130.
 8          Paragraph 156:  We see great adoption.
 9          Paragraph 168:  We see strong adoption.
10          180:  KornitX is already generating
11   multi-million-dollar revenue on transactions to Kornit.
12          That was in the middle of '22.  I don't know how that
13   could be true if it had only generated, by the CEO's own
14   estimation, $2 million at the end of that year.
15          THE COURT:  I hear you.  I hear you.  I understand
16   the argument, but in terms of the other employees, to the
17   extent that you can give more timing details, it would
18   strengthen the argument.  So I'm going to give you an
19   opportunity to replead that.
20          Let's talk about -- I just want to say I'm not going
21   to address every issue that was raised.  Some of them are legal
22   issues; some of them are issues that I have already sort of
23   come to terms with, but I know these are critical to the 10b
24   claims and I want talk about the Section 11 and Section 12
25   claims.  I hear the issues at standing and that's something I
```

1    don't think I need any further briefing on, I'm just going to

2    make a call on.

3            But I also want to talk about the SPO misstatements.

4    I think that's really critical to the Section 11 and the

5    Section 12 claims.  I know Section 12 is a standing issue,

6    that's pretty significant, but I want to talk about the Section

7    11 claims and the misstatements.  Okay.

8            So let's talk about -- so there was initial public

9    offering back on '15 and there was a second public offering I

10   guess -- what's the date?  March -- what's the date of the

11   second public offering?

12           MR. HARROD:  The second was in November of '21.

13           THE COURT:  November 23rd of '21.  It was the 2021

14   offering, right?  The registration statement was filed

15   September 14th.

16           So let's look at these statements pretty carefully

17   because, again, I think I'm going to require -- I'm going to

18   give plaintiff the opportunity to replead some of these

19   misstatements as well.

20           All right.  Kornit Systems, Inc., and other

21   consumables may contain undetected errors when first introduced

22   and that such problems could cause to incur significant

23   warranty and repair costs, et cetera.

24           And the allegations, that at that time, the risk had

25   already been materialized.  Not may contain but did, in fact,

Case 2:23-cv-00888-MCA-AME    Document 56    Filed 08/20/24    Page 43 of 47 PageID: 1484

```
1   contain undetected errors.

2              Is that your argument, Mr. Harrod?

3              MR. HARROD:  Yes, that's right.

4              THE COURT:  All right.  And remind me, what are the

5   facts that demonstrated that the risks had already materialized

6   was false?

7              MR. HARROD:  So I want to start by saying something

8   that I know Your Honor knows, which is that we're talking on

9   the Securities Act Claims on the Sections 11 and 12.

10             THE COURT:  Right.

11             MR. HARROD:  So Rule 8 -- so we're in the Rule 8

12  world.

13             THE COURT:  I know.  Different world.  I'm still in

14  the fraud world but I'll go back to the negligence world.

15  Okay.

16             MR. HARROD:  Right.  So here we are -- our

17  understanding is that the standard is plausibility.  I can tell

18  you from our briefing and from our Complaint what the

19  underlying allegations are that relate to this.  I think that

20  we talk about many of these kinds of statements and underlying

21  facts in the Complaint in the 10b section.  I think -- we think

22  this is enough of a basis for falsity under the Rule 8

23  standard.

24             But just to give you some framework, we have

25  allegations in the Complaint that the service department was a
```

United States District Court
Newark, New Jersey

1  mess.  FE2 I think says it sometimes took customers up to 12

2  days to get a service call; that the executives were aware that

3  there weren't enough service technicians; that the CEO and CFO

4  said there's no more budget for service.  There are discussions

5  of product breakdowns.

6        THE COURT:  Let me stop you for a second.  That's

7  another part of the 20-F, right, that talks about Kornit's

8  aspiration to make the appropriate investment and service

9  support and had to strive to deliver the best customer

10  experience.  That's a different part.

11        I'm talking about the first part of it which talks

12  about, May contain undetected errors.  Okay?  And you allege at

13  the time, the risk already materialized, right?

14        You have about five different concerns that show that

15  these were misleading statements, right?

16        MR. HARROD:  I think -- I was focusing on the second

17  part of the statement which incurs -- May cause us to incur

18  significant warranty and repair costs, divert the attention of

19  our engineers.

20        THE COURT:  Okay.  So continue.

21        MR. HARROD:  That's what I would say about that

22  statement, but we think the defendants have a sufficient

23  roadmap to understand why we think that statement is false.

24        THE COURT:  I'll hear from defendants.

25        MS. SESHENS:  Your Honor, I think on this point in

United States District Court
Newark, New Jersey

1    particular, there's no basis for falsity because this risk that

2    they're claiming had already manifested was disclosed as

3    something that had happened.  And the 20-F is clear that the

4    language in, We have experienced these errors -- talking about

5    products and defects or defects in the past during the

6    introduction of the new systems and system upgrades, and we

7    expect that these errors or defects will be found from time to

8    time going forward.

9         So under the law, they can't base a Section 11 claim

10    on that kind of statement being false and misleading when the

11    very risk they claim wasn't disclosed, in fact, was.

12         I think whatever their allegations of falsity they

13    may claim on the plaintiff said, they fall apart and they can't

14    withstand the actual disclosure that was made which precludes

15    this claim as a matter of law.

16         THE COURT:  Because of the statement that Kornit had

17    experienced these errors or defects in the past?

18         MS. SESHENS:  Yes.  Their theory is that these things

19    may happen was false or misleading because they, in fact, did

20    happen, but the disclosure was, in fact, these things have

21    happened and they may happen again in the future.

22         THE COURT:  Mr. Harrod, that is what it says.  Had

23    experienced these errors or defects in the past and expect

24    these errors would be found from time to time in the future,

25    and they may contain additional undetected errors.

```
1              MR. HARROD:  It sounds to me that they're saying that

2      the issue -- that the 20-F says that the issue was in the past

3      and was resolved.  And I also think that the argument that

4      they're making, effectively, requires the Court to determine

5      what -- get into the mind of investors and understand basically

6      that the truth is on the market, which I don't think you can do

7      at this state.

8              THE COURT:  That the what is on the market?

9              MR. HARROD:  The truth, truth, that weighing, you

10     know, this is what this disclosure says, this is what the

11     alleged false statement is in coming to a conclusion about --

12             THE COURT:  I hear you.

13             All right.  I will take this under advisement.

14             Anything else -- is there anything else anyone would

15     like to add before we conclude?

16             MR. HARROD:  No, Your Honor.  I mean, there's a lot

17     of things I would like to add.

18             THE COURT:  I know you do.

19             MR. HARROD:  I appreciate your time and appreciate

20     what you do did for us today.

21             THE COURT:  Okay.

22             So here's what I want you to do.  I want you to meet

23     and confer.  You seem like lovely people and you get along.

24     It's not like, you know, we're gonna have problems here.  Meet

25     and confer and figure out a time for filing a new complaint,
```

1    first amended, I guess, complaint, and then a briefing

2    schedule.  As soon as that can be done, send me a letter so I

3    know when to expect it.

4         I wish it could be done tomorrow so it would be fresh

5    in my mind but, of course, my short-term memory is not as good

6    as it used to be.  So we continue.

7         So get me that schedule whatever time you need and we

8    will reconvene when the new briefing is done.

9         Thank you, guys.  You did a great job on the briefs,

10   I really appreciate it, and your oral argument was excellent.

11         Thank you.  Have a great weekend.

12         MR. HARROD:  Thank you, Your Honor.

13         MS. SESHENS:  Thank you.

14         THE COURT:  Take care, bye-bye.

15              (Time noted: 4:22 p.m.)

16

17

18   -------------------------------------------------

19    I certify that the foregoing is a correct transcript

20   from the record of proceedings in the above-entitled matter.

21

22

23   /S/Diane DiTizii, CCR, CRR, RMR, RDR        08/16/2024

24   Federal Official Court Reporter                Date

25