# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re Kornit Digital Ltd. Securities Litigation | Civil Action No. 2:23-cv-00888-MCA-AME |
| | Hon. Madeline Cox Arleo |
| | <u>CLASS ACTION</u> |
| | <u>JURY TRIAL DEMANDED</u> |

# AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

Page

THE EXCHANGE ACT CLAIMS ................................................................. 1

I.    INTRODUCTION ........................................................................ 1

II.    JURISDICTION AND VENUE .................................................... 9

III.    THE EXCHANGE ACT PARTIES ............................................... 9

    A.    Plaintiffs ............................................................................ 9

    B.    Corporate Defendant ....................................................... 10

    C.    Officer Defendants .......................................................... 10

IV.    SUMMARY OF THE FRAUD .................................................... 11

    A.    Background And Kornit's Business .................................. 11

    B.    Defendants Misrepresent Various Aspects Of Kornit's Products And Services And Paint A Misleading Picture Of Demand And Growth Prospects ......................................................................... 18

        2.    Kornit Had Multiple Undisclosed Reliability And Customer Service Issues .................................................. 21

            a.    Kornit's Printers Had Significant Reliability Problems That Were The Subject of Frequent Customer Complaints ........................... 21

            b.    Kornit's Customer Service Was Deficient, Understaffed, Lacked Basic Resources, And Caused Customer Dissatisfaction ............. 23

            c.    In An Effort To Portray The Profitability Of Kornit's Service Department, Defendant Samuel Misrepresented The Length Of Service Contracts ...................................... 31

            d.    Defendants Misrepresent That an Important New Customer—Sticker Mule—"Integrated" Kornit Printers When They Were "Never Used In Production" ......................... 33

            e.    Defendants Misrepresent The "Return on Investment" and Total Cost of Ownership of Kornit's Products ....................................... 36

        3.    Defendants Touted Kornit's Purported Technological Advantage And Competitive "Moat" While Their Largest Customers Turned To Kornit's Main Competitor .................................. 39

4.    Defendants Touted The Purported Value Of KornitX, Even As The Program Failed To Get Off The Ground And Then Stagnated ................. 44

5.    Defendants Misrepresented Declining Demand In Kornit's Business, Touted Their Strong "Backlog" Of Orders, And Then Accelerated Revenue To Deceive Investors ............................................. 47

        a.    Defendants Made Baseless Statements About Revenue Growth Without Having Even Assessed The Size Of The Market ............ 47

        b.    Defendants Had Access To, And Reviewed, Information Showing That Their Statements Were False and Misleading ...................... 51

        c.    Defendants Realize That Demand For Kornit's Products Is Declining And Eventually Pull Forward Revenue To Mask That Decline ......................................................................................... 54

V.    THE TRUTH EMERGES ................................................................................ 60

    A.    May 11, 2022—In A Partial Disclosure, Defendants Issue Disappointing Results For The First Quarter of 2022 And Lackluster Financial Guidance For The Second Quarter Of 2022 ........................................................... 60

    B.    July 5, 2022—Kornit Reports Shockingly Bad Results For The Second Quarter Of 2022 ............................................................................... 64

VI.    POST-CLASS PERIOD ADMISSIONS BY DEFENDANTS ........................................ 66

VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........................................................................................ 68

    A.    False And Misleading Statements And Omissions Concerning Service And Service Contracts ................................................................... 68

    B.    False and Misleading Statements And Omissions Concerning Sticker Mule's "Integration" of Kornit Printers And Customer Growth ....................... 72

    C.    False And Misleading Statements And Omissions Concerning The First Quarter 2022 Revenue Pull Forward ..................................................... 73

    D.    False And Misleading Statements And Omissions Concerning Kornit's Technology And Competition ............................................................... 74

    E.    False And Misleading Statements And Omissions Concerning Demand ............. 77

    F.    False And Misleading Statements And Omissions Concerning Kornit's Revenue Growth .................................................................................. 81

    G.    False And Misleading Statements And Omissions Concerning KornitX ............. 88

H. Statements Treating Already-Materialized Risks As Hypothetical ..................... 92

VIII. LOSS CAUSATION ........................................................................................ 94

IX. ADDITIONAL ALLEGATIONS OF SCIENTER ............................................. 94

X. INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................... 104

XI. PRESUMPTION OF RELIANCE ................................................................... 104

XII. EXCHANGE ACT COUNTS ......................................................................... 106

COUNT I ......................................................................................................................... 106

COUNT II ........................................................................................................................ 108

SECURITIES ACT CLAIMS .......................................................................................... 109

XIII. THE SECURITIES ACT CLAIMS ................................................................ 109

A. Jurisdiction And Venue ...................................................................... 110

B. The Securities Act Parties ................................................................... 110

1. Plaintiff ................................................................................... 110

2. The Securities Act Defendants ................................................ 111

C. Kornit And The 2021 Offering ........................................................... 112

D. The Untrue Statements And Facts Omitted In The Offering Materials ............. 112

1. Reliability Problems Plaguing Kornit's Printers .................................... 113

2. Kornit's Deficient Customer Service .......................................... 115

3. The "Return on Investment" and Total Cost of Ownership of Kornit's Products ............................................ 122

4. The Purported Value Of KornitX ......................................... 125

E. The Offering Materials Contained Untrue Statements Of Material Fact and Omitted Other Facts Necessary To Make The Statements Made Not Misleading ................................................................... 127

XIV. SECURITIES ACT COUNTS ...................................................................... 130

COUNT III ...................................................................................................................... 130

COUNT IV ....................................................................................................... 132

COUNT V ........................................................................................................ 133

XV.    CLASS ACTION ALLEGATIONS ........................................................ 134

XVI.   PRAYER FOR RELIEF ......................................................................... 136

XVII.  JURY DEMAND .................................................................................... 137

Court-appointed Lead Plaintiffs Genesee County Employees' Retirement System, Kranot Hishtalmut Le Morim Tichoniim Havera Menahelet LTD, Kranot Hishtalmut Le Morim Ve Gananot Havera Menahelet LTD, and Hachshara Insurance Company Ltd. (together, "Lead Plaintiffs"), along with Additional Named Plaintiff Indiana State Police Pension Trust (together with Lead Plaintiffs, "Plaintiffs"), by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, inter alia, counsel's investigation, which included review and analysis of: (i) regulatory filings made by Kornit Digital Ltd. ("Kornit" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, presentations, and media reports issued by and disseminated by the Company and its subsidiaries and affiliates; (iii) analyst and media reports concerning Kornit; (iv) information from former Kornit employees, industry professionals, and other knowledgeable persons; and (v) other public information regarding the Company.

## THE EXCHANGE ACT CLAIMS

## I.     INTRODUCTION[1]

1.       Kornit sold itself to investors as a growth story. The advanced technology of Kornit's printers insulated the Company from competition, creating what Defendants called a defensive "moat" around the Company. Sales of high-margin ink and other consumables for Kornit printers were driving growth, with ink and printer usage closely tracked through the Company's "Kornit Konnect" system and other reports. The Company's service business was a profit center, with every customer buying a two-year service contract. A major new customer had installed a "fleet" of Kornit's expensive printers. And there was already strong adoption of KornitX, the

---

[1] Unless otherwise indicated, all emphasis in quotations contained in this Complaint is added.

Company's lucrative new software platform. The problem is that these representations were false, and concealed declining demand and a raft of major problems with Kornit's printers, customer service and KornitX software system.

2.      Kornit's pre-Class Period growth was driven by the Covid pandemic. Despite that, and with knowledge of Kornit's reliability and service problems, Defendant Ronen Samuel, Kornit's CEO, told investors that rapid growth was the new normal for Kornit. Samuel repeatedly, unequivocally told investors that Kornit's revenue would grow to ***$500 million per year*** before the end of 2023 and to ***$1 billion*** soon after. This would have been an outstanding achievement but, based on new accounts from inside Kornit, these targets were not backed up by ***any analysis of the addressable market for Kornit's products***. Kornit never did such an analysis until 2023, well after the end of the Class Period. Defendants knew that achieving those revenue targets would have required unprecedented growth in printer and ink sales, service revenue, and immediate adoption of the Company's new, untested KornitX software product. They also knew that such growth was not achievable in light of the growing customer anger with Kornit's unreliable printers and woefully deficient customer support.

3.      Among other things, Defendants Samuel and Rozner, both of whom knew the truth about Kornit's problems, were unequivocal in misleading investors about: the length of service contracts, which were mostly for one year—not two, as Defendant Samuel told investors; the impact of customer service and reliability problems, combined with competition, which led to customer losses; the "pull-forward" of revenue in the first quarter of 2022 to mask declining demand; and the instability of KornitX and lack of sales. Those misrepresentations helped make their $500 million and $1 billion revenue targets seem plausible, but grossly misled investors about Kornit's actual operations. Defendants' unbridled false assurances also drove Kornit's share price

to a high of $176 in November 2021. When investors learned the truth in May and July 2022, Kornit's stock price cratered to just $23.46 per share, wiping out over $1.3 billion in Kornit's market capitalization. Critically, while the stock was at or near these highs, Defendant Samuel filed to sell nearly $10 million worth of his personal Kornit stock, and the Company sold approximately $340 million of stock (net of fees) in a November 2021 public offering. By the end of the Class Period, those proceeds would have been worth less than 20% of those amounts.

4.    The Class Period runs from February 17, 2021, until July 5, 2022 (the "Class Period").[2] Prior to the Class Period, Kornit—a manufacturer of commercial textile printers and the ink and supplies needed to use them—was a beneficiary of the notable shift towards e-commerce, as traditional retail channels were constricted by public health mandates.

5.    Kornit offered a premium product and faced stiff competition from lower-cost competitors whose machines offered a better "return on investment" ("ROI"). The Company's pitch to its clients highlights and depends on the low "total cost of ownership" or the ROI of its printers. These representations are highly material to customers because Kornit's machines are very expensive compared to competing technologies. To make up for the large capital investment required to purchase a printer from Kornit, the machine needs to reliably deliver a high volume of impressions (prints) at a reasonable cost, and needs to do so without frequent downtime. Former employees, however, described these expensive Kornit printers as "garbage" that required extensive technical support to keep them running. Kornit did not train customers on how to operate the complicated machines, and was unable to provide the required customer support, owing to insufficient staff of technicians and a lack of the basic customer support infrastructure. The quality deficiencies of Kornit printers were exacerbated during the Class Period, as Defendants accelerated

---

[2] The first statement made by Defendants that Plaintiffs allege as false and misleading was made after the market closed on February 16, 2021. Therefore, the Class Period begins the following day, February 17, 2021.

the production of new printers, materially impacting reliability and the uptime that customers depended on to realize a return on their significant investments.

6.     To "optimize" its customers' machine uptime and impressions, and to deliver on the Company's promise of an "attractive" total cost of ownership throughout the Class Period, Kornit offered (and purportedly required its customers to purchase) service contracts with each machine sold. Indeed, as a cornerstone of Defendants' strategy to make Kornit's customer service business profitable, Defendant Samuel stated at the beginning of the Class Period that customers could not purchase a Kornit printer without a two-year service contract. This representation was false, as Kornit did not mandate a two-year service contract with the sale of new printers and many customers who purchased a one-year service contract cancelled early.

7.     Kornit's statements about service and growth masked massive inherent reliability and customer service issues. Despite touting service as a new profit center, at the beginning of the Class Period Kornit lacked basic infrastructure to provide that service. It did not even have a ticketing system to track customer service requests, and lacked enough technicians to properly and timely service its expensive machines. These service issues exacerbated reliability problems with Kornit's printers, which were rushed through production to ensure that Kornit could keep up with the revenue expectations Samuel had baselessly and improvidently promised to investors.

8.     Defendants had direct knowledge of the extensive downtime customers experienced with Kornit printers. Through its "Kornit Konnect" software, the Company closely tracked each printer's usage of ink and the number of "impressions" (print jobs) being executed. This information was of critical importance to Defendants because sales of ink and other consumables were a key component of Kornit's recurring revenues, and a leading indicator of existing customers' demand for additional printers. Defendants told investors that they tracked this

information using Kornit Konnect, and they therefore had direct knowledge about how often Kornit printers were offline, and how the unreliability of those printers negatively impacted the number of impressions and the usage of ink and other consumables.

9.      The unreliability of Kornit's expensive printers and the Company's inability to provide customer support made Kornit customers irate. Multiple Kornit employees report confrontations with "screaming" customers who complained about these issues. Acknowledging these problems, Kornit was forced to bring in a new senior sales executive—Jeff Loomis—to go on an "apology tour" to mollify unhappy customers. When Loomis completed his trip, he reported no new sales, and his only claim to success was his belief that none of Kornit's customers would sue the Company.

10.     Key examples highlight the quality and customer service deficiencies that were endemic to Kornit throughout the Class Period. Defendants touted in November 2021 that a new customer—Sticker Mule—had bought and "integrated" a "fleet" of the Company's expensive Atlas printers. But Sticker Mule's printers never worked, were never used in actual production, and were sold shortly after delivery to a third party at steep discount. The situation was described internally as a "disaster." In addition to rendering false Defendants' statements about Sticker Mule itself, this "disaster" demonstrates the quality and service issues that were driving customers away from Kornit during the Class Period.

11.     Despite the issues with service, and the loss of touted new customers like Sticker Mule, Defendants repeatedly misrepresented the lack of any "threat" from competitors due to Kornit's technological superiority, which purportedly provided a wide "moat." In truth, Defendants Samuel and Rozner also knew by early 2021 that M&R Equipment, among others, was a serious competitor that had at least partially displaced Kornit's products at Delta and Fanatics,

5

two of Kornit's largest customers. But Defendants concealed these facts from investors; in truth, the advanced technology in Kornit printers was not a "moat" but a major liability, contributing to the frequent downtime of Kornit printers and the difficulty in operating and repairing them.

12.    In addition, just prior to the Class Period, Kornit expanded its business and began offering software services to its customers. KornitX, which Defendants dubbed the "Uber" of printing, was promoted to investors as a revolutionary system that was allowing brands to order items at any of Kornit's participating customers, for delivery within 24 hours to the end consumer. Thus, Kornit claimed it would not only collect a fee for its software and for each impression sold through the KornitX network, but would also make money from sales of ink and other consumables required to fulfill the order. Defendants repeatedly claimed throughout the Class Period that KornitX was experiencing great adoption and growing rapidly. But after the Class Period, Defendant Samuel would admit that KornitX was still in the process of being "*stabiliz[ed]*" and that it had only generated a ***couple million*** in revenue. Multiple former employees confirm that KornitX generated no meaningful revenue and was effectively inoperative during the Class Period.

13.    On the strength of these and similar representations, Defendants told investors that they would achieve their $500 million revenue run rate target earlier than anticipated in 2023, and further proclaimed that Kornit would be a $1 billion company by 2026, if not earlier. That $1 billion target relied in part on a staggering $100 million contribution from KornitX.

14.    Defendants' statements were false and created a misleading and fundamentally incorrect impression of Kornit's business and growth prospects. Defendants knew that, during the Class Period, Kornit's machines were plagued by downtime that Kornit's vaunted service department was systematically unable to fix in a timely manner. This systemic failure, corroborated by multiple former Kornit employees, dramatically impacted Kornit's customers'

return on their investment. As a result, sales of equipment to both new and existing customers suffered as many defected to the competition. Moreover, Defendants' statements about KornitX's purported success starkly differed from reality, corroborated by former Kornit employees, that KornitX simply was not ready and was difficult to sell. Indeed, a former Kornit employee who worked as a Platform Sales Manager for KornitX described Kornit's public statements about achieving $100 million in KornitX revenue by 2026 as "kind of crazy" based on internal sales targets and the Company's failure to sell KornitX to any client during his tenure.

15.     Starting in November of 2021, Kornit began to experience a deceleration in growth as end consumers returned to more traditional buying patterns. Samuel later admitted that Defendants knew by the end of 2021 that there was a deceleration in demand. But Defendants continued to tout Kornit's growth and obscured the serious business issues it was facing through July 2022. While knowing of this deceleration in sales and customer losses to competitors, Defendants conducted a secondary public stock offering, unloading approximately $340 million of stock (net of fees) at inflated prices. Defendant Samuel himself profited handsomely during the Class Period, filing to sell more than $10 million worth of his own personal holdings of Kornit stock at inflated prices, nearly 8 times his sales in comparable periods.

16.     A former Kornit employee indicated that the first quarter of 2022 was when "the sh*t hit the fan." This caused Kornit's Vice President of Sales, Don Whaley, to rush manufacturing of printers to empty the pipeline of sales that was closely tracked in the Company's "Rev Rec" (revenue recognition) process. Instead of disclosing the material trend negatively impacting Kornit's customers in 2021 or even in early 2022, Defendants boldly embarked in a final effort to conceal the severity of the decline in their business by "pulling forward" revenue from the second quarter of 2022 into the first quarter of 2022, enabling them to just "barely" exceed the high end

of their public guidance. The pull-forward caused an anomalous and unprecedented $30 million increase in Kornit's trade receivables.

17.     When confronted by analysts about Kornit's ballooning receivables and late quarter transactions, Defendant Rozner flatly denied that there was a revenue pull forward during the quarter. But, as confirmed by former Kornit employees, Kornit not only had the ability to pull forward revenues, but did pull forward revenues in the first quarter of 2022, with full knowledge and at the direction of the Company's executives.

18.     Up until the very end of the Class Period, Defendants continued to misrepresent critical aspects of Kornit's business and demand. As late as June 2022, Defendants said that Kornit would hit the $500 million annual revenue goal "earlier" than expected and touted "great adoption and great growth." These statements were indefensible and reflect a clear intent to deceive investors—within mere weeks the bottom would fall out of Kornit's stock price as it revealed a massive decline in revenue. Samuel later admitted that Kornit knew throughout the first half of 2022 that demand was "declining year-over-year."

19.     The truth concerning Defendants' misrepresentations and omissions was revealed on May 11, 2022 and July 5, 2022. Those disclosures admitted the impact of competition, a decline in demand, and revealed the poor overall performance in Kornit's business due to problems with reliability, service and KornitX. Analysts were astonished, downgrading Kornit en masse and calling management's candor into question. Kornit ordinary shares cratered in response to the May and July news, which caused share price declines of 33.3% and 25.7%, respectively. This wiped out $1.3 billion in market capitalization and left Kornit's shares trading at $23.46, a fraction of the Class Period high ($171 per share). Kornit's poor performance in the first half of 2022 was not a short-term interruption in its growth—it reflects the reality of the Company's business since

Defendants' fraud was revealed. For example, Kornit's 2023 revenue was just $219 million and its 2024 first-half revenue totaled just $92 million, which is much less than half of the $500 million "run-rate" that Defendants' repeatedly touted during the Class Period.

## II. JURISDICTION AND VENUE

20.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21.     Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Kornit maintains its United States headquarters in Englewood, New Jersey, which is situated in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. THE EXCHANGE ACT PARTIES

### A.    Plaintiffs

22.     Lead Plaintiff Genesee County Employees' Retirement System ("GCERS") is a multi-employer defined benefit plan that provides retirement and survivor benefits for employees of Genesee County, Michigan. As previously represented to the Court in the certifications filed with the motion for appointment as Lead Plaintiff, GCERS purchased Kornit ordinary shares at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein (ECF No. 12-4).

23.    Lead Plaintiffs Kranot Hishtalmut Le Morim Tichoniim Havera Menahelet LTD and Kranot Hishtalmut Le Morim Ve Gananot Havera Menahelet LTD (together, the "Teachers Funds") are investment funds based in Israel. As previously represented to the Court in the certifications filed with the motion for appointment as Lead Plaintiff, the Teachers Funds purchased Kornit ordinary shares at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein (ECF No. 12-4).

24.    Lead Plaintiff Hachshara Insurance Company Ltd. ("Hachshara") is an insurance company based in Israel. As previously represented to the Court in the certifications filed with the motion for appointment as Lead Plaintiff, Hachshara purchased Kornit ordinary shares at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein (ECF No. 12-4).

**B.    Corporate Defendant**

25.    Defendant Kornit is based in Israel and is incorporated under the laws of Israel. Kornit maintains its United States headquarters at 480 South Dean Street, Englewood, New Jersey. The Company's ordinary shares are listed and trade on NASDAQ under the ticker symbol "KRNT." As of November 14, 2022, Kornit had over 49 million ordinary shares outstanding, owned by hundreds or thousands of investors.

**C.    Officer Defendants**

26.    Defendant Ronen Samuel ("Samuel") is, and was at all relevant times, Kornit's Chief Executive Officer.

27.    Defendant Alon Rozner ("Rozner") was, at all relevant times, Kornit's Chief Financial Officer, having worked in that role from December 2020 until November 2022.

28.    Defendants Samuel and Rozner are collectively referred to herein as the "Officer Defendants." The Officer Defendants, because of their positions within Kornit, possessed the

power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Officer Defendants was provided with copies of the Company's reports, presentations, and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV.    SUMMARY OF THE FRAUD

### A.    Background And Kornit's Business

29.    Kornit was founded in 2002 in Israel, and since 2005 has developed, designed, and marketed digital printing technology for the textile industry. Kornit's business is centered on the textile printing industry, and particularly the fashion, apparel, and home décor sectors. As Kornit told investors both before and during the Class Period, its "mission is to revolutionize the fast-changing [textile printing] industry" away from "analog processes that have not evolved for decades."

30.    Kornit went public through an initial public offering in 2015. For the first several years after its IPO, Kornit experienced steady growth. Then, in 2018, the last of Kornit's original founders left the Company and new management, including Defendant Samuel, was installed. Kornit immediately posted back-to-back years with tremendous revenue growth of 25% and promised even further growth.

31.    Kornit's pitch to customers—and investors—is simple: the Company claimed to create technologies that allow its customers to print designs directly onto their fabrics or finished

garments, in a way that is faster, cheaper, and more environmentally friendly than traditional "screen" printing. The aim of Kornit's business was to allow textile manufacturers to transition away from traditional brick-and-mortar, where those manufacturers must often carry and stock more inventory than they need. Instead, by using Kornit's technology, customers would be able to print on-demand or made-to-order models where the fabric is only printed on, and the products are only finished, once the end-customer actually places an order. Thus, Kornit's services were designed to allow the Company's customers to control their inventory without needing to perfectly predict demand. Kornit also touted its production lead times and the low total cost of ownership of its products.

32.    Kornit's business is largely focused on two types of printing: direct-to-garment ("DTG") and direct-to-fabric ("DTF"). In DTG printing, an inkjet printer prints directly onto the textile. DTG printing allows for printing images and designs onto finished textiles, such as t-shirts that have already been sewn and dyed. In DTF printing, by contrast, rolls of fabric pass in-line through wide-format inkjet printers that are utilized to directly print images and designs onto rolling fabric. The rolling fabric is then subsequently converted into finished textiles. Kornit sells "proprietary digital printing systems" for both its DTG and DTF processes. During the Class Period, 90% of Kornit's revenues came from its DTG business, which featured a variety of high-end printers. Kornit's printer product line included the Kornit Atlas, Avalanche, Vulcan, and Presto machines, each of which was designed to print directly onto rolled fabric or garments. Kornit's most expensive printers can cost up to nearly a million dollars. Moreover, Kornit's printers were expensive relative to the Company's competition. For example, Kornit's Atlas printer cost approximately $500,000, and a printer with comparable output from Kornit competitor M&R Printing was priced at just $60,000 to $70,000.

33.     Kornit supports its printing business by selling ink and other consumable parts that are intended to be used with Kornit's proprietary printers, as well as the accompanying software that runs the printers. In addition, Kornit offers maintenance and support contracts that are designed to "optimize" the number of prints that a customer can create in a set period of time, purportedly allowing the customer to maximize its return on investment. These service contracts included the option for Kornit's customers to purportedly have a devoted team of Kornit's employees on-site for maintenance and repairs of that customer's Kornit machines. A table depicting Kornit's revenue, disaggregated by category between 2020 and 2022 is below.

| Kornit Revenue | | | |
|---|---|---|---|
| | **2020** | **2021** | **2022** |
| Printer Systems | 45.4% | 56.3% | 43.8% |
| Ink and Consumables | 39.9% | 31.4% | 38.1% |
| Services, Service Contracts, and Software Subscriptions | 14.6% | 12.2% | 18.1% |

34.     While the majority of the Company's revenue during the Class Period was generated through the sale of printers, Kornit itself explained that the sale of ink and other consumables generated better margins for the Company, and was therefore a key area of focus. Indeed, Kornit explicitly told investors that it aimed "to increase our sales to existing customers, particularly sales of our ink and other consumables." This was, in part, because sales of ink generated higher profits than sales of printers. For example, in its SEC filings, Kornit explained that "during the third and fourth quarters, when customer spending is at its highest levels, we enjoy a more favorable revenue mix, generating greater revenues from the sales of ink and other consumables than in the first quarter" and that "***sales of ink and other consumables generate higher gross margins than systems sales***."

35.     Sales of ink and other consumables were also closely correlated with, and highly predictive of, demand for capital equipment. Indeed, Kornit told investors that ink sales had

"historically offered us a degree of visibility into a significant component of our results of operations." As Kornit explained in the Company's annual reports, as demand "continues to grow, so does utilization of our systems, which in turn print more impressions, consume more ink and once used to their full capacity, require purchasing of more systems." In other words, when the on-demand printing business was strong, Kornit's customers would use more ink to meet their own demand. As they reached their existing output capacity based on the number of printers they had, those customers would have to purchase additional printers from Kornit. Conversely, when business slowed, Kornit's customers would utilize less ink and would not fully maximize their printing capacity, and would therefore not purchase additional capital equipment. Thus, ink usage was the leading indicator of demand for printers to be purchased. As discussed below, the Company closely monitored its customers' ink usage in real time, and therefore had detailed information about printer capacity and the demand for new printing systems.

36.     Fluctuations in Kornit's ink sales told the Company whether business was increasing or decreasing, and whether its customers were printing more or fewer jobs or impressions. As Defendant Samuel told investors, "the best indicator, leading indicator for our business is the health of our customers. And the health of our customer is what we call impression. What is the trend on the impression? How many impressions they are printing? Is it going up or going down?" Kornit's goal, of course, was to maximize the number of impressions, which would have resulted in the Company's customers both using more ink and buying more printers: "Our objective is to help customers operate their businesses more efficiently, ***print more impressions and increase utilization of their systems***, ***thereby requiring more ink and other consumables purchases as well as potential investment in new systems*** as they require additional capacity."

37.     While Kornit is an international business with customers across many parts of the world, during the Class Period its business was substantially concentrated in the Americas, with a few very large customers in that region. In addition to the Officer Defendants—Kornit's CEO Samuel and former CFO, Rozner—another key Kornit executive during the Class Period was Chuck Meyo, Kornit's former President of the Americas, who reported directly to Defendant Samuel. The Kornit Americas region—the one that Meyo ran—was by far the Company's most important and profitable region. As Kornit explained in its annual reports, throughout the Class Period, the Americas region generated approximately 70% of Kornit's revenue. According to Kornit's SEC filings, Meyo was Kornit's third-highest paid employee in 2022. By virtue of his senior role, as well as his routine and frequent meetings with management, including with the Officer Defendants, Meyo developed an intimate knowledge of Kornit's business.

38.     Kornit's largest customer is the e-commerce company, Amazon. Kornit's other large customers during the Class Period included apparel and activewear brand, Delta Apparel and its subsidiary DTG2Go, as well as Fanatics, a provider of licensed sports merchandise. The Company's ten largest customers, which included Delta Apparel and Fanatics, accounted for approximately 60% of Kornit's revenues. Because such a sizable portion of Kornit's revenue was concentrated among its largest "Top 10" customers, referred to as the "strategic accounts" or "global strategic accounts," it was crucial that the Company maintain business with these customers and continue to expand its customer base to achieve Kornit's ambitious goal of a $500 million revenue run rate by 2023 and $1 billion in revenue by 2026.

39.     Moreover, given analyst concerns about significant concentration in large clients, such as Amazon, it was imperative that Kornit diversify its client base to include smaller and mid-size customers. As discussed further below, this is why Kornit emphasized sales to middle market

customers, including companies like Sticker Mule. For instance, in May 2021 at Kornit's Investor Meeting, Defendant Samuel discussed the importance of Kornit's new, smaller customers. As Defendant Samuel explained, as Kornit entered into "new market segments," the Company was "getting net new customers that today they're small," and while those customers were "starting with one, two systems," in just "a few months they're accelerating and growing very fast." That same month, during a conference hosted by Barclays, Defendant Samuel again focused on Kornit's work to identify new customers. He explained that Kornit was "putting a lot of effort to develop new customers. So today, majority of our machines that we are selling in terms of deals out to new customers, okay. Some of them will stay small, with one or two machines. But from those new customers, some of them will become very big and we saw it."

40.     Just prior to the Class Period, Kornit expanded its business and began offering software services to its customers, including a platform called KornitX, a suite of end-to-end fulfillment and production solutions. Through KornitX, the Company provided customers with, among other things, automated production systems as well as workflow and inventory management. KornitX, which Kornit dubbed the "Uber" of printing, was marketed to investors throughout the Class Period as a revolutionary system that would allow brands to order items at any of Kornit's participating customers, for delivery within 24 hours to the end consumer. Thus, Kornit claimed that it would not only collect a fee for its software **and** for each "impression" sold through the KornitX network, but would also make money from sales of ink and other consumables required to fulfill the order.

41.     By the start of the Class Period in early 2021, Kornit had experienced a boom in its business during the first year of the coronavirus pandemic. The pandemic negatively impacted brick-and-mortar shopping, but accelerated e-commerce and online ordering, which was favorable

to Kornit's clients and therefore to Kornit's business model. Thus, by the start of the Class Period, Kornit's business appeared to be stronger than ever. Defendants made numerous material misrepresentations concerning the strength of the Company's products, service, competitive position, and growth rate. Building upon those misrepresentations were the highly aggressive statements that the Company would achieve a revenue run rate of $500 million by 2023 (i.e., quarterly revenue of $125 million) and reach $1 billion in full-year revenue by 2026. This astounding growth would only be achievable if Kornit were to grow its quarterly revenues by a staggering 78% before the end of 2023,[3] and then double its yearly revenues between 2023 and 2026. Such growth was simply not attainable, and Defendants knew it. As discussed below, Defendants were uniquely situated to understand and assess the demand for Kornit's products, leading investors to believe that Kornit would be able to head off any issues that may arise from competition and fluctuating customer demand. And based on Kornit's incredible visibility into its sales pipeline, when Defendants continued to assure investors that the Company was on track to meet its financial projections, investors believed those statements.

42.    As reflected in the graphic below, Kornit would have had to achieve a miraculous rate of growth to achieve any of its stated goals. And the baseline for that growth was already the Covid-fueled demand that was historically aberrational. Still Defendants promised investors that these sales and growth rates were not only a new normal, but a jumping off point for even faster growth. And this is without factoring in the numerous operational and demand problems Kornit experienced. The true reality of the scale and value of Kornit's business is reflected in the revenue volumes and share prices from before and after the Class Period, which are very similar. Tellingly,

---

[3] On February 16, 2021, Kornit announced that it had achieved $72.3 million in revenues in the fourth quarter of 2020, which is typically the best quarter of the year. Kornit would need to grow its quarterly revenue by 78% to achieve its much touted $500 million run rate before the end of 2023.

Kornit continues to operate at revenue levels well below the Covid-induced highs, and at a share price that is between 20% and 30% of the fraud-inflated prices seen during the Class Period. For example, in the first half of 2024 Kornit has reported revenue of just $92 million, or an annual "run-rate" of under $200 million. This is just 40% of the $500 million annual revenue that Defendants said the Company would achieve in 2023.



### B. Defendants Misrepresent Various Aspects Of Kornit's Products And Services And Paint A Misleading Picture Of Demand And Growth Prospects

43.    Throughout the Class Period, Defendants made material misrepresentations concerning several aspects of Kornit's business and growth. In order to achieve Kornit's lofty $500 million and $1 billion revenue targets, each of Kornit's business segments would need to grow drastically and generate significant business for the Company. Defendants made these misrepresentations to bolster the credibility of these very lofty growth goals, but they knew that

such growth was impossible due to a host of significant issues that severely undermined Kornit's business.

44.      *First*, as part of that effort, Defendants misrepresented basic facts about the Company's service offerings to customers. Fundamentally, Defendant Samuel misrepresented the length and nature of Kornit's service contracts—telling investors that they were for a compulsory two-year term. Defendants also touted the service department's newfound "profitability" to investors. Moreover, Defendants' statements were misleading for failing to disclose that Kornit's service department was systematically unable to provide timely service to customers, leading to outright refusals to purchase additional equipment and customer departures that materially impacted revenues during the Class Period. These included specific misrepresentations concerning the "integration" of Kornit products at Sticker Mule.

45.      *Second*, while Defendants touted Kornit's printers' purportedly best-in-class return on investment, those statements were in sharp conflict with reality. Kornit's customers experienced frequent failures and the outright unreliability of the Company's equipment, which was being rushed out of the factory to meet revenue targets, and only exacerbated the Company's ongoing service problems. The ensuing "downtime" of customers' printers adversely impacted the purportedly favorable "total cost of ownership" that Defendants had exaggerated to prospective clients.

46.      *Third*, throughout the Class Period, Defendants minimized and misrepresented the threat posed by industry competitors. Frustrated with the significant cost of Kornit's printers, and as a result of Kornit's numerous reliability and service problems, Kornit customers defected to the competition.

47.    ***Fourth***, even in the face of deteriorating market conditions exacerbated by Kornit's operational deficiencies, Defendants assured investors that the Company's products were in high demand and that business was continuing to grow rapidly. By the end of 2021, Defendants had clear knowledge that demand, which from 2020 had been driven by the unusual Covid-related retail conditions, was rapidly decreasing as lockdowns eased and conditions normalized. Defendants misrepresented this decline and Kornit masked a revenue shortfall in the first quarter of 2022 by pulling forward revenue from the subsequent quarter. Then, when asked directly about whether Defendants had accelerated revenue, Defendant Rozner falsely denied having done so.

48.    ***Fifth,*** throughout the Class Period, Defendants repeatedly touted Kornit's continuing massive growth, indicating that revenue would accelerate to $1 billion in just a few short years. These statements about growth were inconsistent with the problems the Company was experiencing in terms of customer dissatisfaction—stemming from poor reliability and service, and unachievable ROI—as well as competition and declining demand due to overall market conditions. The revenue growth statements were also made without any basis in fact, as Kornit had never even attempted to determine the possible size of the market for its products.

49.    ***Finally***, Defendants repeatedly exaggerated the growth prospects and adoption of KornitX, a software designed to supposedly automate workflow and inventory. Throughout the Class Period, Defendants repeatedly told investors that KornitX was being heavily adopted by its customers, and as a result, KornitX would generate $100 million in revenue by 2026 as part of Kornit's broader $1 billion revenue target. In truth, even after the Class Period, KornitX had only generated a few million dollars in revenue and Defendants had still not "stabilized" the platform for customer use.

### 2. Kornit Had Multiple Undisclosed Reliability And Customer Service Issues

50.     A root cause of the issues underlying Defendants' misrepresentations to the market was the poor reliability of Kornit's printers, and the inadequate and understaffed Customer Success department that was charged with providing training and fixing machines. These problems resulted in customer complaints and losses, including Delta/DTG2go and Sticker Mule, poor customer ROI, and overall slackening demand for Kornit's products.

### a. Kornit's Printers Had Significant Reliability Problems That Were The Subject of Frequent Customer Complaints

51.     Several Kornit Former Employees ("FE") confirmed the existence of significant and well-known problems with the reliability of Kornit's products.[4] These reliability issues were the subject of frequent complaints from Kornit's customers.

52.     FE12 was a Marketing Director at Kornit from August 2021 through August 2023. FE12 reported to the Vice President of Sales, Don Whaley, who reported to President of the Americas, Chuck Meyo (who, in turn reported directly to Defendant Samuel). In FE12's role, he had "full oversight" of sales coming in and knew Kornit's customers and their feedback. FE12 was the direct connection between marketing and sales; given his role in marketing, his customer contacts, and reporting line to Whaley, FE12 had clear information about what the sales team was doing. FE12 oversaw customer interactions and anything that had to do with marketing operations. FE12 was the main person responsible for managing and attending customer events, including trade shows, across the United States. This put him in frequent, direct contact with a wide range of Kornit's existing and potential customers.

---

[4] The terms "Former Employees" and "FE" refer to the former Kornit employees whose reports are discussed in this Complaint. In order to preserve the Former Employees' anonymity while maintaining readability, the Complaint uses the pronouns "he" and "his" in connection with all of the Former Employees, regardless of their actual gender. Appendix A attached hereto lists the titles and tenures for each of the FEs referenced in this Complaint.

53.    Moreover, in his role, FE12 attended Kornit's Quarterly Business Reviews ("QBRs"). FE12 confirmed that the QBRs were internal meetings attended by Defendants Samuel and Rozner, as well as a number of other senior executives. According to FE12, in addition to Samuel and Rozner, participants in the QBRs included Kornit's Chief Operating Officer ("COO"), Arnon Dror, and corporate Vice Presidents (including both Whaley and Meyo). The QBRs included reports from numerous groups within Kornit. Samuel and the COO provided reports at the QBRs and there were similar reports from sales and human resources. FE12 presented his own information during the QBRs and there were also reports about KornitX. These reports included slide presentations that detailed each group's own successes and "misses," and included a lot of data.

54.    FE12 said a lot of Kornit's top customers complained that the printers had high breakdown levels. FE12 stated that breakdowns became more frequent during his tenure because Kornit pushed printers out of the factory and the Company built the machines "less carefully."FE12 said the printers were very complex but Kornit wanted the machines to be built and shipped out faster. This led the Company to cut corners, and printers were shipped before they were ready, which in turn caused more frequent breakdowns and led more customers to complain.

55.    FE1 worked as a Customer Success Manager from July 2016 until February 2022, and as a Customer Success Contract Administrator from February 2022 until February 2023. In his role as a Customer Success Manager at Kornit, he tried to secure service contracts on the equipment, which were for service, parts, and labor, from customers. According to FE1, there were problems with the quality of Kornit's machines. FE1 said that nine times out of ten there were issues with new Kornit models. Kornit would do some beta testing with a few customers, but every

single time they rolled out a new system there were issues. FE1 stated that this was true during his entire tenure, and the ensuing service problems caused technician burn out.

56.     FE9 was the Vice President of Marketing and President for North America at Kornit from August 2015 to September 2017 and currently works at a competitor to Kornit. FE9 said that Kornit's machines break down all the time. He confirmed that from a quality perspective, if you ask any of their existing customers, Kornit's products "are garbage." Typically, by the time a Kornit customer calls FE9, they are really upset.

57.     FE9 confirmed that he frequently speaks to current Kornit customers who are unhappy.

58.     FE8, a sales manager for South America at Kornit from April 2019 to February 2022, explained that Kornit claims the stability of their machines is very good, but it is 100% not. For example, FE8 explained that Kornit's Presto printer has a lot of problems in terms of stability.

59.     FE12 said a lot of Kornit's top customers complained that the breakdown levels on the Company's printers were too high, so they were moving over to competitors with more reliable machines.

60.     FE12 said a typical customer complaint regarded how many millions they spent on the machines only to have them break down and sit on location, not working. Customers said having a non-working Kornit printer was akin to having a Lamborghini in the garage that would not start. FE12 reported that machine uptime was critical to those customers who needed to repay their loans, but the machines were so technical that customers could not fix things themselves.

**b.      Kornit's Customer Service Was Deficient, Understaffed, Lacked Basic Resources, And Caused Customer Dissatisfaction**

61.     Kornit failed to invest in and fund customer service, or "Customer Success," which included both training on new printers and the service function that Kornit provided under its

service contracts. The need for strong customer training and service was critical in light of the reliability problems and complexity of Kornit's products. Multiple former employees confirmed that Kornit had an inadequate customer service infrastructure, which was understaffed and lacked basic software tools to track customer complaints. These deficiencies led to significant customer downtime, service delays and customer complaints and dissatisfaction.

62.      One significant issue was simply that Kornit did not have enough service technicians to timely repair customers' printers. FE5 worked as an Implementation Manager and Service Team Lead at Kornit from March 2017 until June 2023. FE5 confirmed that Kornit's service organization was overstretched. FE5 estimated Kornit would need a total of thirty technicians for the entire United States. FE5 confirmed that at all times he was at Kornit, the Company had only twenty technicians in the United States, six of whom reported to him. FE5 said he got written up for repeating to his manager a customer's complaint that Kornit was making them wait a week or two to get a technician, and that when this first technician got there, they didn't actually know the machine that well, so Kornit was basically wasting the customer's time. According to FE5, this was a pretty common complaint from customers who were paying a lot of money for service. Indeed, FE5 relayed that every time he went to a new customer site, customers were complaining about the last technician that Kornit had sent.

63.      FE1—the Customer Success Manager and Contract Administrator—said he tried to secure service contracts on the equipment, which were for service, parts, and labor, from customers. Most of the accounts FE1 worked with were existing customers. FE1 recounted that customers were paying for service contracts but could not get technicians out to their site as quickly as they should have been able to. FE1 stated that when employees raised the need for more

technicians with management, they were told there were enough. FE1 indicated that this issue persisted over his entire tenure at Kornit.

64.     FE8 worked as a Sales Manager for Kornit South America from April 2019 until February 2022. FE8 confirmed that Kornit has very bad service. FE8 said that he attended meetings in which Samuel and other executives participated, where people brought up the issues with the machines and service.

65.     FE2, who was a Roll-to-Roll Sales Manager for Europe, Middle East, and Africa ("EMEA") in the Netherlands from October 2012 to December 2022, corroborated that service was an issue, adding that some customers did leave because of service and even tried to bring legal action. FE2 elaborated that if you look at the amount of systems and the amount of problems Kornit had, and the number of engineers (technicians), it was clear they could not keep up. According to FE2, the more systems they installed, the more engineers would be needed, and the gap was always getting bigger. FE2 added that as the systems got more and more complex, the time to repair a system got longer over time. That timing gap was also always growing.

66.     FE12 similarly said Kornit never had enough technicians to fix the printers quickly enough; there was, at times, a long waiting list of printers to fix. FE12 had conversations with Kornit's Head of Customer Service, Udi Har-Nof, and learned that Har-Nof was totally overwhelmed. FE12 ascertained this through conversations with Har-Nof.

67.     Former employees also acknowledged that customers, even Kornit's largest customers, experienced frequent, significant delays in receiving technical support. Further, Kornit's protocol for customers' service requests was overly complicated and created further delays, which exacerbated the downtime those customers experienced. These delays were in sharp

contrast with the customer service experience of customers who worked with Kornit's competitor M&R.

68.      FE6 was a Strategic Accounts Manager at Kornit from January 2021 to July 2022, with responsibility for managing sales to the bigger United States customer accounts. FE6 recounted how pervasive these service issues were across Kornit's major clients and strategic accounts. FE6's accounts included Printful, Monster Digital, Spoonflower, and Vistaprint. FE6's account volume was around $16m annually. According to FE6, all of the accounts were having issues with service, with the biggest issue being that even though they were Kornit's largest customers, they weren't getting serviced immediately. FE6 elaborated that there was a whole protocol customers had to go through, and then wait for a response. FE6 reported that Kornit's technicians weren't available the next day.

69.      According to FE6, one of Kornit's biggest competitors is M&R Printing Equipment, and one of FE6's customers told him that when they called M&R, a technician would be there the next day. Executive management definitely knew that service was an issue, according to FE6. The response that FE6 heard directly from Chuck Meyo and Udi Har-Nof, the head of customer service, was that customers needed to follow the protocol and that they didn't have the budget to hire more technicians. Jeff Loomis, Kornit's Director of National and Global Accounts, told FE6 that he was very concerned about the issues with service, but the customer success team was not very responsive to those concerns.

70.      FE7 was a Senior Program Manager for Kornit from June 2020 until September 2022, located in Texas. His team was repurposed to support strategic accounts in the first quarter of 2022 since some of those customers were having issues. According to FE7, strategic accounts included Printful, DTG2go, and Fanatics. FE7 elaborated that there were nine strategic accounts

in total, and Kornit was "kind of fretting" because it did not have enough people on the team for that many accounts. According to FE7, several strategic customers, including Printful and DTG2go, said they were not going to buy any more machines from Kornit unless the Company improved its service.

71.     Customer downtime due to a lack of adequate training added to the demands on Kornit's service organization and were a significant component in customer losses. Customers often did not how to fix machines or even how to run them properly. This created additional stress on the Company's service department and led to customer dissatisfaction. FE3, a critical senior executive who was responsible for Customer Success and later served as Chief of Staff to Chuck Meyo (President of the Americas), detailed the problems caused by the confluence of Kornit's poor training and inadequate service infrastructure.

72.     FE3 worked as Kornit's Director of Professional Services Sales from July 2021 until August 2022. In that role, FE3 oversaw the service department at Kornit. FE3 explained that while his title was Director of Professional Services Sales, from December 2021 through August 2022, he was more directed towards Kornit's marketing function. He then worked as Kornit's Director of Americas Category Management and Chief of Staff to Chuck Meyo (the President of Kornit Americas) from August 2022 until December 2022. Indeed, it was Meyo who hired FE3 at Kornit, after the two had worked together at another company for several years.

73.     It was well known that Meyo and FE3 had a close relationship. FE12 shared an office with FE3. FE12 confirmed that FE3 had been brought to Kornit by Meyo, that the two had previously worked together, and also had played soccer together. FE12 confirmed that based on FE3's close, long-standing personal and professional relationship with Meyo, FE3 had access to very high-level information about Kornit's business and operations.

74.     According to FE3, the complexity of Kornit's printers and lack of adequate training created situations where technicians would have to go back to repair the machine again and again. FE3 said Kornit wasn't funding customer success properly, so they didn't have the number of technicians necessary to meet the additional business generated by the lack of training, elaborating that customers couldn't get a technician if the machine broke, and that it would take Kornit a week or longer to get someone in to fix it. FE3 elaborated that Kornit did not invest in training customers on their machines, which are fairly technical.

75.     Several FEs also reported that due to the issues with service, customers frequently complained about or refused to extend their service contracts. For example, FE9 said that the biggest complaint he heard from customers was about the service contract. FE8 confirmed that in addition to providing very bad service, Kornit's service contract is very expensive.

76.     FE1 further confirmed that a lot of customers would cancel the service contract *as soon as the six-month warranty was up*. That happened quite a bit. FE1 said getting customers to renew service contracts was a "very tough sell," estimating that only about *twenty percent renewed contracts.*

77.     FE1 elaborated that he knew of several customers who were sold systems and told that there were three technicians in their area when there were not. FE1 said the service issues "absolutely" impacted sales. According to FE1, Kornit's technicians got so burnt out that they would just quit, and then a new technician would have to learn the machines.

78.     Customers complained about service and pricing, noting that budget constraints on Kornit's service department—Customer Success—limited the amount of resources available to expand the infrastructure to meet client needs. These limitations included trying to get customers to solve issues themselves to avoid Kornit having to send a service technician to the client's

location, especially because to properly fix the machines, technicians often had to make multiple visits.

79.     FE2 confirmed that the service department is also a profit center and has very strict budgets. These budget concerns caused Kornit to engage in behavior to actively limit its response to customers' service needs. FE2 said that Kornit made efforts to prevent technicians from going to the customer's site to save money. FE2 added that Kornit also tried to save money by booking multiple service visits in the same area to avoid costs (of multiple trips). FE2 elaborated that there was a database that tracked when a message was sent and how long it took for a technician to go out for that repair, noting that on average, *it took seven to twelve days to get a technician on-site*.

80.     Kornit's reliability issues were exacerbated by the Company's failure to put in place basic tools for customer service. For example, at the beginning of the Class Period, Kornit lacked an infrastructure for tracking customer service calls and needs. These issues were well known and reported to senior management at the Company during the Class Period. These customer service deficiencies also prevented Kornit from scaling its business to properly meet the needs of its customers.

81.     FE12 confirmed there were basic customer service elements missing when he started at Kornit, such as a ticket system to track customer service requests. Specifically, FE12 confirmed there *was no ticket system* for service calls from customers when he first started at Kornit in the summer of 2021. FE12 further said that Kornit's Customer Relationship Management ("CRM") system was a complete disaster. FE12 stated that these issues were examples of how Kornit could not scale its business to meet customer needs.

82.     FE12 said that he "flipped out" to Kornit's leadership about the Company's lack of a system to manage customer service calls and problems with the CRM system. FE12 aired his

frustrations with Whaley, specifically that Kornit's systems were not prepared to handle complaints by and service for the customers. FE12 also voiced these same concerns to Kornit's COO, Arnon Dror, and explained that Meyo was aware of them as well.

83.    These service deficiencies led to service delays, customer complaints, and losses to competitors.

84.     FE12 reported that customer complaints were frequent: it was "screaming customers all day" because customers were upset. FE12 stated that a lot of customers purchased Atlas machines[5] only to be ignored afterwards. FE12 also said customers frequently complained they could not get attention or even get someone to call them back, and that customers were mad that Kornit could not service their machines properly.

85.    Similarly, FE12 said that when he attended trade shows on behalf of Kornit, customers sought him out and "ripped" into him with complaints. FE12 had to spend long stretches of time tending to customer complaints and trying to "simmer" down angry customers.

86.    The same was true for technicians who went to service Kornit's machines. FE12 said that when the Company sent technicians to customers, the customer would yell at the technicians for an hour before they could even start to fix the machine. FE12 stated that there were many cases where technicians told him about angry customers yelling at them.

87.    FE3 similarly reported that during the Class Period, customers were screaming that they couldn't get technicians.

88.    The customer service problems and dissatisfaction were well known at Kornit and eventually the Company began to take efforts to mollify angry customers. Service and reliability issues were also discussed during the QBRs.

---

[5] According to Defendant Samuel, the "street" price of an Atlas machine in June 2021 was approximately $550,000. Defendant Samuel represented that the "list price" was even higher.

89.    In January of 2022, Kornit hired Jeff Loomis into the role of Director of National and Global Accounts, which reflected that Kornit's senior leadership was aware of the major customer service issues and dissatisfaction.

90.    FE12 reported that in early 2022, there was a new charter to take care of customers better. Kornit hired Jeff Loomis to go on what FE12 described as an "apology tour" to the Company's customers. FE12 said because Kornit's machines were not being serviced and Kornit could not cover the SLAs (service level agreements), Loomis flew all around to visit Kornit customers and convince them not to sue Kornit. FE12 said Loomis was supposed to get additional sales, but no one was buying; it was an apology tour.

### c.    In An Effort To Portray The Profitability Of Kornit's Service Department, Defendant Samuel Misrepresented The Length Of Service Contracts

91.    Kornit touted its service business as a source of recurring revenue and future profitability for Kornit, but prior to the Class Period, this segment of Kornit's business had not achieved profitability. Kornit told investors that its services business would become profitable in the fourth quarter of 2020, just before the Class Period, and that the service department would be a significant and profitable recurring revenue center for the Company going forward.

92.    At the beginning of the Class Period, Defendant Samuel touted Kornit's strategy to make Kornit's service center profitable. On February 16, 2021, Kornit released its quarterly results for the fourth quarter of 2020, filed with the SEC on Form 6-K. Kornit disclosed that it had achieved a year-over-year increase in service revenue of 70%, totaling $10.9 million in the fourth quarter of 2020. As part of this initiative, Defendant Samuel disclosed for the first time during Kornit's earnings call that day that Kornit customers were obligated to purchase a ***two-year*** service contract with each printer, and that there was ***no other way*** to purchase a Kornit printer. This was intended to convey that Kornit's service contract revenues were locked in for at least two years

after every printer sale and would thus provide a stable source of profits for the Company. Analysts paid attention to this material update. For example, analysts from Needham noted the impressive growth in service revenue, which they understood "benefit[ed] from strong service-contract attach rates." These and other similar statements were buttressed by additional statements made directly to investors, as Defendants assured the market during Kornit's May 2021 earnings call for example, that "we continued to outperform our profitability goals on services."

93.    However, Defendant Samuel's representations about the length of Kornit's service contracts, their value to customers, and thus the recurring nature of the Company's service revenue and profits, were false. Former Kornit employees confirm that there was never a requirement that customers purchase a two-year service contract when buying a printer.

94.    FE1, the Customer Success Manager and Customer Success Contract Administrator at Kornit, dealt with customers' service contracts in that role. FE1 said that initial service contracts were almost always **one year in length**, and only occasionally would Kornit do a two-year contract **and give the customer a discount**.

95.    FE2, who worked as a Roll-to-Roll Sales Manager for Kornit EMEA from October 2012 until December 2022, corroborated FE1's statement concerning the length of service contracts, reporting that Kornit systems automatically came with **a one-year** service agreement. FE12 confirmed Kornit customers were not obligated to purchase a two-year service contract with each printer, as Defendant Samuel had told investors.

96.    Defendant Samuel's statements misrepresenting the length and attach rate of service contracts, and those statements throughout the Class Period touting the Company's service organization also concealed troubling deficiencies within the service organization itself that compounded the defects and high cost of Kornit's machines. These concealed deficiencies not only

impacted Kornit's customers' return on their investment but also forced those customers into the arms of Kornit's competitors, materially impacting Kornit's revenues.

> **d.    Defendants Misrepresent That an Important New Customer— Sticker Mule—"Integrated" Kornit Printers When They Were "Never Used In Production"**

97.    As discussed above, Kornit made efforts to show that it had diversified its customer base. During Kornit's third quarter 2021 investor call on November 10, 2021, Defendant Samuel said that Sticker Mule had successfully "***integrated*** a ***fleet*** of our Atlas systems into their business and are ***utilizing*** the growing customer base to support a ***strong DTG revenue channel***." These statements were completely false.

98.    The Sticker Mule situation provides a stark example of Kornit's unreliable printers and poor customer service during the Class Period. The printers Kornit sold to Sticker Mule never worked properly, were never used for actual production in Sticker Mule's business, and were sold on the secondary market shortly after their purchase.

99.    FE4, who worked as a General Manager for Kornit Latin America from February 2019 until December 2021, explained that Sticker Mule decided to start printing t-shirts and had purchased three or four of Kornit's largest machines (the Atlas) at the end of 2021, ***but Kornit was unable to get them to run properly***. In other words, the machines were ***never used for production***, and they were ***never integrated*** with Sticker Mule's business. According to FE4, this pushed Sticker Mule to get rid of its Kornit machines in the beginning of 2022 and purchase a competitor's product instead.

100.    As noted above, others at Kornit were aware of the problems with integration at Sticker Mule, because the machines that Sticker Mule had purchased were quickly being re-sold to at least one other potential Kornit customer—Fortune Screen Printing LLC of San Diego,

California. This secondary market sale meant that Kornit would not make sales of printers to Fortune Screen, and this was discussed internally at Kornit.

101.    FE3 corroborated that Sticker Mule had not been able to integrate the Kornit machines, and that Sticker Mule was seeking to sell their "fleet" of Atlas printers. FE3, who was responsible for onboarding and training new customers, confirmed that Sticker Mule was a Kornit customer that canceled orders from Kornit because they couldn't work the machines correctly and because of the Company's inadequate training programs. FE3 was also personally in conversations where other potential customers canceled potential orders from Kornit because they ended up buying the machines being sold by Sticker Mule.

102.    The problems with Sticker Mule were also consistent with FE4's statement, discussed above, that Kornit did not invest in training customers on their machines, which are fairly technical.

103.    FE12 also confirmed that the onboarding of Sticker Mule as a customer was "terrible." FE12 said Kornit had shipped them a bunch of machines, but Sticker Mule could not get them to work; Sticker Mule left with "bad blood," and that incident was a "disaster."

104.    Public information further confirms that Sticker Mule was never able to use the Kornit printers in its business. In an online listing posted by Sticker Mule, trying to sell one of Kornit's machines that it installed in September of 2021, Sticker Mule stated that the Atlas machine was "***never used in production***, ***just for testing***," and that it "worked less than 100hrs." Sticker Mule listed the printer for approximately $250,000—less than half the price generally paid for Atlas printers.

**Description**

Kornit Atlas T-shirt printer for sale, never used in production, just for testing.

The machine was installed on September 2021, it worked less than 100hrs.

it was uninstalled by Kornit technicians with relative uninstallation report and closed in a wooden crate ready for shipping.

Advantageous price as some interventions need to be done to replace the print heads as having been stopped for some time the ink has dried in the channels.
The cost estimated by Kornit for the setup is around €120,000 + VAT, to practically have a new machine

105.    In its SEC filings, Kornit estimates that Atlas machines will run between approximately 2,600 hours and 4,000 hours per year. In other words, Sticker Mule's Kornit machine ran for approximately 2-4% of its expected yearly run time before Sticker Mule gave up because it could not get Kornit's machines to run properly.

106.    FE4 explained that after Sticker Mule sold its Kornit machines, Sticker Mule bought new printers from Epson. One press release described Sticker Mule's purchases as the "largest ever installation of Epson Direct to Garment printers." Sticker Mule's founder and CEO lauded Epson, stating that Epson "deserved credit for being a great company ***in an industry of underperformers***."

107.    Despite the issues with Kornit's installation that were present from at least September of 2021, Defendant Samuel announced the sale during Kornit's November third quarter 2021 investor call, and specifically touted that Sticker Mule had successfully "***integrated*** a fleet of our Atlas systems into their business and are ***utilizing*** the growing customer base to support a ***strong DTG revenue channel***." That the printers were only ever used for "testing" purposes, and

not for production, directly contradicts Defendant Samuel's statement that the printers were "integrated" and being "utiliz[ed]" in production.

    **e. Defendants Misrepresent The "Return on Investment" and Total Cost of Ownership of Kornit's Products**

  108. The reliability and service issues discussed above undermined the Company's disclosures concerning the acceptance of its products and its ability to grow the business exponentially. In particular, the service and reliability issues materially affected the ROI of Kornit's printers.

  109. During the Class Period, Kornit offered numerous products to its customers and rolled out several additional new products. One important factor to customers in deciding which company to buy printing equipment from was the cost associated with those products—meaning, not just the purchase price of the printer itself, but the total cost of ownership associated with the device; consumables such as ink; operating the device; and necessary maintenance and repair costs. Investors were similarly focused on this issue. Kornit thus made multiple statements throughout the Class Period touting its products' total cost of ownership as a strong benefit to the Company. For example, in Kornit's annual reports filed on Form 20-F, the Company stated that "the differentiation across our new line of HD systems is mainly based on system productivity and total cost of ownership, with a clear benefit to our higher productivity systems." The Company also described its products as having "attractive total costs of ownership" or the "best total cost of ownership" in their class.

  110. But contrary to Defendants' statements, the total cost of ownership of Kornit's products was drastically misrepresented, and in truth, Kornit's products cost the Company's customers much more than Kornit had told them. When customers learned this—only after

purchase—it led to customer losses and declining demand. One customer simply stopped using the machine altogether—they just turned it off.

111.    According to FE8, Kornit told customers the new Atlas machine will cost five cents per garment to produce, but the real cost is more like fifteen cents per garment. FE8 is good friends with a Kornit customer in Brazil that has one plant in Miami. The customer told FE8 that Kornit told them the cost per t-shirt would be ten cents, but it was actually twenty. Similarly, according to FE8, when a customer in Colombia realized it was going to cost twice as much to produce as Kornit had told them, they turned off the machine; another customer in Brazil returned the machine after four months for the same reason. FE8 explained that Kornit tells customers they can have fashion brand quality with the new Atlas Max machine, but they don't mention that in order to get it, you have to use double of a lot of elements, such as white ink and primer. According to FE8, the machine also has to do more passes to make more layers of the ink, but no one explains that when they do customer demonstrations.

112.    FE2 provided a similar account. According to FE2, the total cost of ownership turned out to be much higher than what Kornit claimed to customers during the sales process. FE2 explained that Kornit would help any potential customer make a calculation on how quickly they could get their investment to break even or make money. Kornit came up with those numbers using an ROI (return on investment) tool where a customer could put in specific figures and then it calculated the cost and put out an ROI. FE2 reported that the biggest thing you have to calculate is the ink consumption, because that is the most expensive part of the calculation. According to FE2, with the calculator, Kornit would determine the milliliters of ink needed for a specific design or garment, but then it would turn out that if customers wanted to print at the quality they saw during the Kornit demonstrations, they would need to use much more ink than calculated during

the sales process. FE2 stated that where a customer might have seen a $1.00 estimate in the calculator, the reality is that it would actually cost them up to 60% more to print the design.

113.    According to FE9, Kornit's former Vice President of Marketing, the way the Kornit machines perform versus the way they are sold is completely different, and that the machines also break down all the time. FE9 similarly confirmed that for most of their machines, "Kornit has grossly, grossly over-marketed the outputs of their machines." The actual output is half of what Kornit markets according to FE9, because the machines use more ink and take longer to print than Kornit markets.

114.    FE8 provided a similar account. FE8 explained that Kornit's Presto printer has stability problems, and the business output Kornit claims is not real.

115.    The issues with product quality, reliability, and service were particularly acute given the expense of Kornit's printers, and the need for them to have as much "uptime" as possible to achieve the return on investment that Kornit promises in its marketing. The combination of the high cost of Kornit's printers, and poor reliability and service, capped Kornit's potential market and growth while also driving customers to competitors like M&R and ROQ, which made machines that could produce similar quality prints, with greater reliability and less cost.

116.    As noted above, Kornit provided customers with ROI modeling reflecting the return they could achieve by purchasing and operating the printers. Kornit also espoused the importance of the ROI of its printers to investors. However, the ROI information provided to customers in the sales process was not representative of how Kornit's printers worked in the "real world," when considering downtime and reliability issues in particular.

117.    FE12 said that if the printers were down, customers could not get the ROI. FE12 elaborated that "downtime breaks the KPI" (or Key Performance Indicator, which measures

38

performance), and that the ROI analysis (provided to customers) was based on how many impressions per hour the printers were capable of, but that was always under the "best conditions." Based on what he knew, downtime was not factored into those ROI calculations.

118.    As noted herein, for Kornit's small and midsized customers, the loss of one or two printers could materially impact the operation of their business and adversely impact the ROI that they were promised by Kornit.

### 3.    Defendants Touted Kornit's Purported Technological Advantage And Competitive "Moat" While Their Largest Customers Turned To Kornit's Main Competitor

119.    Kornit's business is largely dependent on its ability to create printers, software platforms, and consumable products (such as ink) that are better than its competitors' products. Investors were thus keenly focused on the quality of Kornit's products relative to its competitors' versions. To reassure investors, Defendants made various statements concerning the Company's purported technological advantages over its competitors and the oft-touted "moat," or gap, that the Company had created between itself and those competitors.

120.    For example, on May 19, 2021, Defendants Samuel and Rozner participated in the Barclays Americas Select Franchise Conference. During that conference, Defendant Samuel assured investors that Kornit did not "see today any [competitor] that we can say that it's any threat on us," "mainly due to the moat that we manage[d] to build around our technology." This moat, or gap, between Kornit and its competitors, was supported by the purported superiority of Kornit's products, which Kornit claimed to have "brought it to the level of quality that's much better than any conventional technology." In response to a direct question about protecting Kornit's technology from competition during another analyst conference on June 1, 2021, Defendant Samuel rejected the notion that Kornit faced any real competition, stating that the reality was "Actually, the opposite. What we see in the market today that's we are opening much bigger moat

versus our competitors." As detailed further below, these representations continued throughout the Class Period, as Defendants routinely assured investors that the threat of competition was "not something that we are worried about" and that those perceived competitors' "level of the quality is not the same" as Kornit.

121.    Analysts credited these statements concerning the unmatched quality of Kornit's products and competitive moat. For example, immediately following the Americas Select Franchise Conference, analysts from Barclays lauded Kornit's "new technologies which have digitized specialized processes which could only be done using analog ways of productions until now" and proclaimed these technologies as "unique" to Kornit. Later that year, in October 2021, analysts from Berenberg Capital Markets issued a highly favorable valuation for Kornit and explained: "We believe the valuation is justified considering the long-term growth prospects of the business and competitive moat." Analysts continued to believe Kornit's representations as the Class Period continued. For example, in February 2022, Barclays analysts stated that they saw Kornit as "the company best positioned to capitalize on the industry's digital transformation thanks to its best-in-class products and cutting-edge technology."

122.    But, as reported by several former Kornit employees, Kornit experienced significant competition, including from M&R Printing Equipment, during the Class Period. This intense competition eventually resulted in the complete or partial loss of two of Kornit's top 10 clients, Delta Apparel and Fanatics, who accounted for more than 10% of Kornit's recurring revenues during 2021.

123.    Public information corroborates the existence of competition, especially from M&R. On March 28, 2022, Delta Apparel and Fanatics announced that they were expanding their "digital print business through the installation and utilization of newly developed digital print

technology." Delta's press release announcing this expansion informed the public for the first time that Delta and Fanatics had worked closely with M&R, one of Kornit's main competitors, to design and supply this new technology. Delta explained that this "unique digital production process will allow custom orders to be produced, packaged and shipped to the end consumer within twenty-four hours from receipt of order"—essentially replacing Kornit. Delta Apparel further revealed that it had ***already installed*** this new M&R technology in four of its existing digital print facilities and planned to install additional equipment in the near future.

124.    Similarly, as noted above, Sticker Mule sold the unusable printers it had ordered from Kornit before ever using them commercially, and purchased an array of garment printers from Epson.

125.    FE3, Kornit's Director of Professional Services Sales, reported that internally at Kornit, M&R was considered serious competition. This fact was corroborated by other former Kornit employees. For example, FE1 similarly said that it was not true that Kornit did not have competition in the market. Despite this knowledge, Defendants repeatedly affirmed that they were insulated from competition by their purported ever-widening moat.

126.    According to FE1, Kornit's biggest competitor is M&R and it was generally known in the sales organization that M&R was a big competitor. FE1 was aware of Delta and Fanatics moving their business elsewhere because he had to cancel the service contracts. According to FE1, executives at Kornit were well-aware of the issues customers experienced.

127.    FE12 also said a lot of the top customers complained that they were not receiving proper service and the printers had high breakdown levels, so they were moving over to competitors with more reliable machines. FE12 said these competition issues were sometimes discussed in the QBRs, which were attended by Defendants Samuel and Rozner.

128.    FE12 heard salespeople complain they were going to lose their accounts to M&R and that they had gone to visit their customers only to find M&R machines on site. FE12 recalled that M&R was a big threat for Kornit—the M&R machines only cost $60,000 or $70,000 and could produce more product; they also had a higher ROI. FE12 said if you compare a garment printed with the basic seven colors, you couldn't tell the difference in output between Kornit and M&R. In addition, FE12 said the M&R printers don't require a skilled operator. Those machines only require a line worker for their system; for Kornit you need a "next level type person." FE12 reported that because of this, a lot of customers were using M&R and the price of the Kornit product was ten times more.

129.    Similarly, throughout the Class Period, Defendants repeatedly touted that the composition of Kornit's top 10 clients would change as Kornit **added** larger customers. But Defendants' statements about the composition of Kornit's top 10 clients was misleading in failing to disclose that their top 10 clients **had** changed because Kornit had **lost** business from Fanatics and Delta Apparel. According to FE4, a General Manager for Kornit Latin America, Fanatics and Delta had over 100 Kornit installations, which were lost to the competition. Fanatics and Delta were two of Kornit's top 10 clients.

130.    According to FE4, Kornit knew there was a problem in the relationship with Delta Apparel, but never disclosed it. Indeed, FE4 recounted that it was never formally communicated, but the whole Company knew internally. FE4 indicated that Delta started placing orders with the competition in the beginning of 2021, and by the end of that year they had fifteen units installed and had placed an order with the competition for fifty more. According to FE4, Kornit knew about this by the time that Kornit conducted a secondary offering of its ordinary shares in November

2021 (the "2021 Offering") but did not disclose it. FE4 knew this because it was discussed in meetings prior to the 2021 Offering.

131.    FE4 believes customers left Kornit, including Delta, due to terrible customer service. FE4 explained that Kornit had a customer service team in-house at Delta. FE4 knew about the problems with customer service because it was discussed in meetings that included Defendant Samuel; the president of North America, Chuck Meyo; and the Vice President of sales, Don Whaley. According to FE4, these issues started being discussed at the end of 2020 or the beginning of 2021.

132.    FE4 remembers DTG2go switching to the competition and believes that Delta was already *using* the competitor's equipment by the fourth quarter of 2021. FE4 explained that this means the units were probably installed six months before that, and bought nine months before the fourth quarter, so they would have purchased the competitor's equipment in the first quarter of 2021. Further, as FE4 explained, the drop-off in Kornit ink consumption would have started in the fourth quarter of 2021 as DTG2go was replacing their Kornit machines. According to FE4, and as detailed below in the discussion of Kornit's ability to monitor ink consumption and impressions, Kornit knew it was happening and just pretended it wasn't.

133.    Further, according to FE4, the CEO and CFO of Kornit had a very strong relationship with the CFO of Delta and DTG2Go. Kornit's CEO and/or CFO spoke with Delta's CFO every month, if not every week. But the relationship broke down. FE4 stated that this was discussed in meetings that included the management team in the United States, the head of strategic accounts in the United States, and the service director. FE4 confirmed that Delta did not buy any new Kornit units and that there was conflict with Kornit management. He doesn't know exactly what the conflict was about, but he knows there was a big discussion about service. This was in

the second quarter of 2021. According to FE4, the problems with customer service were discussed in meetings that included the CEO, Ronen Samuel, the president of North America, Chuck Meyo, and the VP of sales, Don Whaley. These meetings took place frequently. FE4 was not personally part of those meetings, but he had weekly meetings with Chuck Meyo, and Meyo mentioned every time that he had reported the customer service issues to Defendant Samuel, as did Whaley, to whom FE4 reported.

134.    FE7, a Senior Program Manager for Kornit, corroborated FE4's account. According to FE7, several strategic customers said they were not going to buy any more machines from Kornit unless they improved their service, including Printful and DTG2go.

### 4.    Defendants Touted The Purported Value Of KornitX, Even As The Program Failed To Get Off The Ground And Then Stagnated

135.    As described above, KornitX was a suite of end-to-end fulfillment and production offerings. KornitX was designed to automate workflow and inventory by allowing brands to order items at any of Kornit's participating customers, with delivery to the end consumer within 24 hours. KornitX was intended to accelerate Kornit's overall growth.

136.    Even before the Class Period, Defendants touted the benefits that KornitX would bring to the Company. For example, Kornit held a conference call for investors in connection with its acquisition of KornitX (then known as Custom Gateway) in August 2020. During that call, Defendant Samuel described KornitX as a product that would "enable brands, retails to move into on-demand manufacturing" and "enable[e] the brands to produce [garments] after they got their orders and not to produce to forecast and being stuck with huge waste."

137.    These statements continued throughout the Class Period, as Defendants touted KornitX as "a breakthrough . . . that [ ] will change the market" and told investors that "[w]e see a great adoption on the KornitX" by customers. In addition, Defendants repeatedly claimed that

$100 million of Kornit's 2026 $1 billion revenue target "directly will come from transaction out of this KornitX."

138.    Since the end of the Class Period, Defendants have made subsequent statements that confirm that their prior statements about the success of KornitX and their expectations for future growth were false. After the Class Period, Defendants admitted that KornitX only ever generated a **_couple million_** in revenue and that the Company was still working on "**_stabilizing the platform_**." This is because, as reported by former Kornit employees, KornitX simply wasn't ready to market and was difficult to sell in the Americas to clients who already had customized software. According to these former employees, it would take Kornit much longer than they disclosed to get the $100 million in sales they needed by 2026. Indeed, a former Kornit employee described Kornit's public statements about achieving $100 million in revenue by 2026 as "kind of crazy" based on internal sales targets and the Company's failure to sell KornitX to **_any_** client during his tenure.

139.    FE10 was a Platform Sales Manager for KornitX from March to July 2022. He was hired as part of a sales team that was tasked with selling KornitX to both customers that had Kornit printers, and other potential customers that were demand generators who might want customization. When told that Kornit had said that it expected to get to $100 million revenue per year for KornitX by 2026, FE10 said that number was "kind of crazy" because, according to an internal document he had, the targets per salesperson were $51k for the second quarter, $97k for the third quarter, and $176k for the fourth quarter, totaling about $325k per sales manager. FE10 explained that there were four sales managers total for KornitX and one boss, who was also responsible for sales.

140. Similarly, FE3 explained that KornitX was one of the reasons he joined Kornit. FE3 stated that originally, marketing KornitX was supposed to be part of his role. However, FE3 explained, it became a separate organization with its own president, and then the product never came to market. According to FE3, by the time he left it had been three years since Kornit acquired Custom Gateway (from which the KornitX technology had been acquired), and it had not turned any kind of profit or generated any sales in the Americas.

141. FE11 worked as a Software Architect at KornitX from July 2021 until November 2021. According to FE11, KornitX was not ready and they were constantly trying to figure out the integration.

142. According to FE12, the Director of Marketing, the KornitX software was never properly integrated; there was no way to practically apply the software, and it never worked right. FE12 said Kornit had to redo the software; it was not orchestrated correctly. He also said there was never a good alignment on the institutionalization of the software or how the hierarchy worked at KornitX—the business was not organized; they didn't have a good way to operate it, to piece it all together.

143. Kornit's public filings further confirm that Defendants' statements touting the platform's rapid growth, adoption, and related revenue targets were false when made. KornitX saw a consistent *decline* in customers during the Class Period. Specifically, KornitX had 300 customers as of March 25, 2021 (at the beginning of the Class Period), but in disclosures from March 30, 2023 (after the Class Period) Kornit revealed that at the end of fiscal 2022, KornitX had just 166 customers. The rapid and consistent decline in KornitX's customer base contradicts Defendants' statements that the platform was "*see[ing] great adoption*," "*great momentum*," "*very strong adoption*," "*growing very fast*," and that "*we see a massive growth coming into it*." Further, the

revenues generated by KornitX, which underpinned Defendants' $1 billion revenue target, also stagnated during the Class Period. Kornit reported software sales for KornitX in an aggregate category for "services revenue." "Services Revenue" included revenue from services, spare parts, system upgrades and "software sales," which presumably included any revenue that would have come from KornitX, but possibly other software revenue. None of those components is broken out or quantified, effectively concealing the actual revenue (if any) KornitX might have generated. But in the annual reports prior to 2022, even that opaque disclosure attributed growth to one or more of those factors. But after the Class Period, Kornit admitted that in 2022 there was no growth in "software sales," and possibly no revenue, from KornitX. Specifically, Kornit's March 30, 2023 annual report, which covers the last two quarters of the Class Period, reported that the increase in service revenue was due to factors other than software sales. In other words, KornitX's purported "*massive growth*" had no impact whatsoever on Kornit's service revenue.

### 5. Defendants Misrepresented Declining Demand In Kornit's Business, Touted Their Strong "Backlog" Of Orders, And Then Accelerated Revenue To Deceive Investors

#### a. Defendants Made Baseless Statements About Revenue Growth Without Having Even Assessed The Size Of The Market

144.    Throughout the Class Period, investors were focused on whether Kornit could maintain its strong momentum and meet its financial projections, including the Company's medium- and long-term guidance. Kornit had announced plans to hit $500 million in revenue per year before the end of 2023, and to follow that up by hitting $1 billion in revenue by 2026. To reassure investors that it was on track to meet their expectations, Defendants made various statements in Kornit's SEC filings concerning the demand for the Company's products and touted their high visibility into that demand.

145.    For example, on February 16, 2021, Kornit reported its results for the fourth quarter of 2020, as well as its full-year results. In its earnings release, Defendant Rozner touted the Company's "significant order backlog" and its "solid pipeline position," which he claimed positioned Kornit to "drive sizable growth and profitability in 2021 and beyond." Defendant Samuel echoed these statements, similarly touting the Company's "impressive backlog" of orders and Kornit's "extremely robust pipeline." Defendant Rozner further assured investors that Kornit had "strong visibility" into its pipeline and the orders that the Company would get in 2021.

146.    Defendants buttressed these statements with similar assurances during Kornit's regular conference calls with investors. For example, on the earnings call held that day, Defendant Samuel claimed that Kornit's "very strong" outlook for 2021 was supported by "the highest level of visibility" into its order flow in the Company's history. Similarly, Defendant Rozner repeatedly touted the purportedly "strong demand" for Kornit's products, including its printers and consumable products such as ink.

147.    These statements continued throughout the Class Period. In various quarterly earnings releases and calls, as well as investor conferences, Kornit reassured investors that it had it a "strong backlog" in orders that would continue to drive revenue for Kornit and clear "visibility" into future business in "2022 and beyond." These representations concerning Defendants' visibility permeated their discussions with investors. For example, in August 2021, an analyst asked Defendants to speak about any potential supply chain issues that might impact Kornit's business. In response, Defendant Samuel dismissed concerns that supply chain problems would have any negative effect, because Kornit had "very, very good visibility for this year and we have excellent visibility for next year." Defendant Rozner immediately followed up, explaining that

"because of the great visibility, we were able to secure production floor as well as the main lead times for quarters ahead."

148.    Analysts credited these statements. For example, a Barclays analyst report released the day after the February 16, 2021 earnings release and call echoed management's assertions concerning their "robust pipeline and backlog" in orders, as well as the "***strong demand for all its product lines and consumables***." Analysts from Needham immediately increased their first quarter 2021 revenue estimates for Kornit by nearly 25% and issued a report referencing management's statements that Kornit "entered 2021 with the highest level of visibility in its history." Similarly, William Blair confirmed its "outperform" rating on Kornit's stock, crediting management's claims of "***visibility at the highest level in the company's history***" as well as a "strong backlog" of orders and a "robust project pipeline."

149.    Analysts continued to believe these assurances and factor them into their valuations of Kornit throughout the Class Period. For example, analysts from Berenberg Capital Markets noted Kornit's "***strong visibility into FY21 & FY22***" in August 2021 while "increas[ing] our estimates" for Kornit's performance. Then, in November 2021, Barclays noted with approval management's pointing "to good visibility heading into 2022." Later in February 2022, William Blair credited the assertion that "Kornit's backlog provides excellent visibility into 2022."

150.    During the Class Period, Defendants repeatedly promised that Kornit's growth would continue exponentially to $1 billion in annual revenue, but those numbers ***had no basis in reality or support from a market analysis***. The promised revenue growth numbers were completely aspirational. This is because prior to 2023, Kornit had not even attempted to determine the size of the "addressable" market for its products. Kornit simply did not know how many potential customers were out there; what the potential demand for Kornit's printers was; and what

49

the future revenue streams from those customers would be if Kornit were successful in identifying them, and bringing them on as customers. Rather than using a market analysis to assess the potential for growth, Defendant Samuel's internal plan, or dream, was that Kornit could continue to grow by "finding another Amazon." When that market analysis was done in 2023—after the Class Period—it indicated that Kornit's printers were too expensive and the market for them was too small to achieve the revenue goals that Defendants repeatedly touted.

151.    With respect to the revenue scaling claims made by Defendant Samuel that Kornit would become a $1 billion per-year revenue business, FE12 said that "corporate never backed up how" they were going to achieve that. FE12 said these revenue figures were totally unrealistic. For example, Defendant Samuel specifically said to FE12, during an in-person meeting at a sales conference, that "We need to find another Amazon." FE12 and his colleagues said to each other, "Are they crazy?" FE12 noted there is only one Amazon and that Samuel's comment was comical; it was just an example of how unrealistic the financial goals were.

152.    In 2023, FE12 performed a market analysis, which showed that there were not enough customers that could afford Kornit's printers. Prior to his 2023 market analysis, FE12 relayed that Kornit corporate had never performed market sizing. FE12 said Kornit did not want to face the truth about what the market looked like for printers. FE12's 2023 analysis established that the market for Kornit products was very small.

153.    The market for Kornit's products was also quite limited given the expense of purchasing their printers, the skill required to operate them, and the frequent service issues.

154.    FE12 confirmed this; he told management that to grow the business, Kornit had to go down market, to build a machine that would only cost a couple hundred thousand dollars. FE12 said that Kornit's Atlas printer was very expensive and Kornit's printers required a more skilled

operator than a screen-printing carousel.[6] FE12 said there were not enough potential customers to reach out to who wanted the Kornit product or had the wherewithal (to purchase it). FE12 said that if a customer is going to buy a half million-dollar machine, their revenue needs to be a million or more; in reality it (the cost of the machine) should be one or two percent of your revenue. FE12 provided this illustration: Kornit "built this rocket ship and said, sell it," without regard for the fact that competitors' machines were a fraction of the cost and produced the same product.

### b. Defendants Had Access To, And Reviewed, Information Showing That Their Statements Were False and Misleading

155.    Defendants' visibility into Kornit's demand and revenues was also supported by the fact that, as Defendants told investors in January 2022, many of Kornit's customers operated on two-year purchasing plans, providing unique visibility into future ordering patterns. Moreover, according to Defendant Samuel, Kornit's largest customer and "global strategic account," Amazon, operated on a three-year plan, providing Kornit with even more information. Based in part on these long-term customer plans, Defendant Samuel represented on January 10, 2022, that "*we have the visibility so we can place order[s] already for 2023 with* our suppliers to secure the needed supplies that we need."

156.    Defendants' visibility into sales, by their own admission, was also buttressed by live data received from each of its installed printers that uses Kornit Konnect which, among other things, reports detailed usage metrics to Kornit—effectively in real time.

157.    Defendants repeatedly touted their use of Kornit Konnect as a way to monitor the Company's clients and their use of Kornit's products. This information was invaluable for

---

[6] For example, M&R manufactures several "carousel" type screen printing machines that can be purchased at a fraction of the cost of Kornit printers with similar output specifications: https://www.mrprint.com/equipment/insignia-insignia-b-zero-multicolor-graphics-screen-printing-presses. As noted above, M&R's competitive product was priced in the $60,000-$70,000 range.

Defendants to understand demand trends. As customers maximized capacity for their current set of Kornit machines, they would need to purchase new machines to meet demand. Conversely, Defendants could see when customers stopped using Kornit's machines to capacity.

158.    According to information released by the Company, Kornit Konnect provided numerous data points, including (i) the number of impressions (prints) that a customer created each day, (ii) the production speed (impressions per hour), (iii) total ink consumption, (iv) the overall availability for each printer (how many **more** impressions a printer could run per hour or day based on its current usage), and (v) how long each print takes.

159.    Defendants frequently boasted about the information that Kornit Konnect provided. Even prior to the Class Period, Defendant Samuel told investors in January 2021 that by using the Kornit Konnect system, Defendants were actively "**measuring**" the "success of each customer **on a daily basis**, helping them to grow and **making sure that they are buying more ink and more system from us**."

160.    In June 2021, Defendant Samuel explained more about the system, stating that Kornit is continuously "**measuring everything**. So we have a Konnect system that connecting to all our installed base for all new system that we are selling, and **we know everything that our customer is doing.** We know what are the garment that they're using, how much ink laydown they're doing, what type of jobs that they're printing. **So we have a very good visibility for the trends**."

161.    In other words, by Defendant Samuel's own admissions, Kornit both (i) **had access to** in-depth information concerning its customers' use habits, and (ii) **actively used this information** to drive additional sales and evaluate demand trends for the Company's products. In addition, FE3 further confirmed that Kornit had access to live data from its machines through

Kornit Konnect, which provided the company with information concerning impressions and ink usage. According to FE3, Chuck Meyo (the President of the Americas division), would personally give this information to management.

162.    Moreover, as revealed by internal Company documents provided by a former Kornit employee, ink usage was closely monitored each week by Kornit during the Class Period for purposes of financial planning in an "Ink Summary." The Ink Summary reported, among other things, contemporaneous ink bookings for every client with more than $65,000 in ink bookings, which represented more than 80 percent of revenues generated from ink sales. The Ink Summary also compared quarter-to-date revenues against both management's revenue forecast for the quarter and Kornit's "AOP" or annual operating plan. For example, the Ink Summary from the second quarter of 2021 lists both DTG2GO and Fanatics as top clients, with each representing five percent of more of Kornit's total ink sales.

163.    As Defendants have also admitted, this live, granular visibility into system and ink usage corelates closely with system sales, utilization rates, and ink sales. Usage rates were determined by impressions. Indeed, after the Class Period, Defendant Samuel acknowledged that "*the best indicator, leading indicator for our business* is the health of our customers. And the health of our customer is what we call impression. What is the trend on the impression? How many impressions they are printing? Is it going up or going down?" Defendant Rozner made a similar admission on November 9, 2022, stating that "if the peak season will be strong as it started—and I can tell you that the initial indication are very, very nice from ordering of ink, then we believe that it will open the market a bit more for investment in new equipment next year." Thus, as impressions and ink usage increase, Kornit's customers are more likely to order additional systems to meet demand. Conversely, as impressions and ink usage decline, Kornit customers are unlikely

to order additional systems, ink, or supplies given existing unused capacity. As a result of their various lines of sight into their customers' use of Kornit's products, Defendants were able to plan accordingly.

### c.    Defendants Realize That Demand For Kornit's Products Is Declining And Eventually Pull Forward Revenue To Mask That Decline

164.    Despite this crystal-clear visibility into business trends, Defendants continued to make material misrepresentations to customers that demand for Kornit's products was strong, and that Kornit had a significant "backlog" of orders that would keep the Company on track toward its stated financial targets. And when asked directly about whether Kornit was pulling forward revenue to meet its projections, Defendants unequivocally denied that this had happened.

165.    In truth, however, demand for Kornit's business was rapidly cratering, particularly beginning in late 2021 and into 2022. Despite this, Kornit continued to set unrealistic targets, and when those proved to be unattainable, pulled forward revenue in order to meet its guidance.

166.    ***First***, Kornit relied on a top-down system to set "unrealistic" revenue targets that were disconnected from market demand. According to FE2, the Roll-to-Roll Sales Manager, goals were set by headquarters in Israel and it was Defendant Samuel in particular who always came up with the revenue numbers the Company should deliver. FE2 explained that sales projections were based on the revenue number that Defendant Samuel wanted to hit. According to FE2, the regional presidents then had to come up with plans to achieve those targets. FE2 did not attend these meetings, but explained that after the meetings, his director would come to him and disclose the target numbers for the next year. As FE2 stated, the targets were not based on previous sales or what the market could bear. FE2 stated that there was no input related to market situations or market challenges.

167.    FE2 confirmed that the targets were "unrealistic, by far," and believed that Kornit doubled the numbers that were actually reachable. When discussing the disconnect between targets and demand, FE2 stated that the response from management was: "Stop complaining. There is always someone else who will do it." FE2 stated that management weren't willing to listen, but added that toward the end of a quarter, everything was possible. Specifically, towards the end of the quarter, Kornit's CEO would contact the salespeople and say, "We need revenue. Do what you need to make the deal." The end of quarter deals, which could be discounted by up to 30%, were not always a discount on pricing and could include extended payment terms or free service contracts. According to FE2, all these discounts had to be approved by Defendant Samuel. Even the 5% and 7% discounts eventually would also be approved by Defendant Samuel, but anything above 7% could *only* be approved by Defendant Samuel alone. There was no deal where Defendant Samuel did not give the final go-ahead.

168.    ***Second***, Kornit had the ability to accelerate revenue with its most important client, Amazon. Specifically, according to FE7, a Senior Program Manager, there was always a discussion of when to upgrade more machines based on when they wanted to declare the revenue from Amazon. As FE7 explained, in 2021 Kornit installed more than 100 machines for Amazon. According to FE7, Amazon told Kornit that the machines had to be safety rated, so Kornit undertook an extensive safety upgrade program for all of Amazon's machines, which included installing updated electronics and pneumatics. The safety upgrades would culminate with the application of a sticker indicating that the machine had completed such safety upgrades. FE7 explained that his team would be told to upgrade more or fewer machines depending on what Kornit wanted to recognize for the quarter. FE7 understood that when he gave Amazon the test

results and sticker for the machine, that would constitute the official acceptance from Amazon, which is when Kornit would recognize the revenue for that machine.

169.    Indeed, as admitted by Kornit only recently, the equipment sold to Amazon, and on which Kornit recognized revenue in 2022, were only in the process of being installed in *2023*. Similarly, according to FE9, the Amazon plant that was "delayed" (and purportedly contributed to the 2022 second quarter earnings miss) was in Philadelphia. FE9 explained that Amazon took the machines because they had an agreement with Kornit. According to FE9, however, even though Amazon took the machines, Kornit knew that Amazon was not going to be buying ink for the machines right away because of the delay at the plant in Philadelphia, and therefore revenue should have dropped.

170.    *Last*, contrary to Defendant Rozner's express representation, Kornit in fact pulled forward approximately *$30 million in revenue* into the first quarter of 2022, which was otherwise slated for the second quarter of that year. Kornit's baseline receivables during the Class Period remained flat at roughly $50 million per quarter through the end of 2021. But then, at the end of the first quarter of 2022 (when Kornit pulled forward revenue), receivables jumped to $80 million, a staggering sixty percent increase, representing approximately 36% of Kornit's first quarter revenues. As Defendant Rozner himself admitted during that quarter's earnings call, that increase was fully attributable to Kornit's largest customer, who Kornit had shipped product to "relatively close to the end of the quarter." Put differently, Kornit accelerated approximately $30 million in revenue from Amazon into the first quarter, allowing Kornit to meet its revenue targets.

171.    These trends were particularly apparent based on Kornit's ability to track customer usage volume, ink volumes and impressions, which information was available through Kornit Konnect and reflected in the "Ink Summary" discussed above.

172.    FE3, Kornit's Director of Professional Services Sales (and later, Chief of Staff to Chuck Meyo, President of the Americas), stated that there were "recognizable trend issues that were recognized by some at the Company and ignored by others until it was too late to stop the tailspin." FE3 added that in November and December 2021 when he was still in his role at Customer Success, Kornit saw a slowdown in their sales. As FE3 explained, November and December are typically a very busy season for Kornit's customers, when they produce a tremendous amount of product. According to FE3, that period in 2021 wasn't as busy as the last couple years, and not as busy as Kornit had projected. This trend was recognizable; as FE3 explained and Defendants themselves repeatedly stated, Kornit's machines are monitorable. In other words, as FE3 stated, Kornit can see the utilization of each machine. Indeed, FE3 reported that as soon as the pandemic mandates ended and Kornit saw the negative effects on their sales in the fourth quarter of 2021. FE3 was in weekly, and sometimes twice weekly, calls concerning sale projections and revenue. FE3 had discussions with the President and Vice President of the Americas division about the 2021 slowdown.

173.    This trend continued into the first quarter of 2022 as Kornit's customers, including its largest account, experienced additional slowdowns in business and purchased substantially less product from Kornit than they had in the past. To cover the anticipated miss in first quarter 2022 forecasts, according to FE3, projected revenue for the second quarter of 2022, or booked to bill revenue, was *brought in to the first quarter* to "stave off the inevitable reality that Kornit was in a tailspin" and to create the appearance that Kornit was on or just short of its target for Q1 2022. FE3 explained that he was made aware of the sales being pulled forward by Chuck Meyo, and that he had conversations about this directly with both Chuck Meyo (the President of the Americas Division) and Don Whaley (Kornit's VP of Sales). FE3 added that executives were definitely

aware of the problems in the first quarter of 2022, and that was *why they chose* to bring in the revenue from the next quarter. FE3 stated that he also knew executives were aware of the sales and service problems because he was in meetings where presentations covered these issues, and he knows from speaking with Meyo that Meyo told executives about the issues. FE3 explained that Meyo told FE3 that Meyo was sharing all of these issues about sales and service with executive management, and they weren't listening. According to FE3, the decision to bring revenue forward was a direct result of the reports of the slowdown being given to management.

174.    Additional allegations about the process by which Kornit recognized revenue further corroborate the pull-forward of revenue in the first quarter of 2022 and the decline in demand, which was linked to poor reliability and service, from the end of 2021.

175.    Kornit recognized revenue when the printers were shipped. As discussed below, Kornit's "Rev Rec" process tracked printers that had been ordered and were in the queue or buffer for production so that Kornit could track the amount of revenue in its pipeline. As the Class Period progressed and demand declined, Kornit sped up the revenue recognition timeline by shipping printers out more quickly to report revenue consistent with its growth goals. As a result, Kornit's reliability also declined because Kornit was building and pushing out machines to customers too quickly, before they were fully tested, in order to keep up with the massive revenue expectations provided to investors by Defendants. The demand issues that began at the end of 2021 became acute in the first quarter of 2022, when the buffer of printers that Kornit expected to earn revenue on was "depleted" to accelerate as much revenue as possible into that quarter. This led to the extremely poor performance in the second quarter of 2022 and further pushed lower quality printers out to Kornit's customers.

176.    As noted above, FE12 said Kornit pushed printers out of the factory more quickly and built them "less carefully" over his tenure. FE12 said the Company cut corners and printers were shipped before they were ready for the purpose of recognizing revenue sooner.

177.    FE12 confirmed Kornit had a document that detailed a process called "Rev Rec." FE12 said the focus of the Rev Rec process was to get revenue "in." FE12 reported that Kornit was counting how many printers shipped; they "wanted the money in;" they rapidly got the machines out.

178.    The pressure to build machines and drive revenue through "Rev Rec" increased by the end of 2021. In the first quarter of 2022, Kornit accelerated revenue by emptying the buffer—the hastily manufactured printers that were in its future revenue pipeline—to boost first quarter revenue and stave off public acknowledgement of a decline in demand.

179.    FE12 said that Kornit had kept a buffer of printers that were being manufactured and could be shipped to customers in the near term. FE12 reported that "going into 1Q2022 the sh*t hit the fan" and Kornit had emptied that buffer; specifically, Whaley (the Vice President of Sales) had emptied the buffer. FE12 believed the directive to empty the buffer came from Samuel; Whaley would not have taken instructions from anyone except Defendant Samuel or Meyo (President of the Americas).

180.    Later, in May 2022, Kornit would announce disappointing results for the first quarter of the year, and Defendant Rozner would admit that a substantial amount of Kornit's sales that quarter, which allowed the Company to meet its target, came late in the quarter.

181.    To this day, Kornit's financial performance has continued to decline, underscoring that Defendants' financial projections and revenue targets had no reasonable basis. In 2021, Kornit attained $322 million in revenue. Kornit's revenue in 2022, the last year of the Class Period, totaled

$271.5 million. In 2023, that figure dropped to just $219.8 million. And through the first half of 2024, Kornit's revenue has totaled a mere $92.4 million.

## V.    THE TRUTH EMERGES

182.    The truth concerning Kornit's misleading statements and omissions was not fully revealed until the end of the Class Period on July 5, 2022, and was disclosed to investors through a series of partial corrective disclosures and/or the risks concealed by Defendants' misrepresentations and omissions materialized, as explained below.

### A.    May 11, 2022—In A Partial Disclosure, Defendants Issue Disappointing Results For The First Quarter of 2022 And Lackluster Financial Guidance For The Second Quarter Of 2022

183.    On May 11, 2022, Kornit reported its financial results for the first quarter of 2022. Kornit reported a net loss of $5.2 million, compared to a profit of $5.1 million for the first quarter of 2021, representing more than a $10 million negative swing in profit year over year. Kornit also reported a GAAP operating loss of $6.9 million for that quarter. The Company reported $83.3 million in revenue for the first quarter of 2022, which was nearly $5 million below Kornit's guidance range of $87-91 million, but excluding $8 million in non-cash warrants given to one of Kornit's largest customers, Kornit reported total revenue of $91.3 million, just over the Company's guidance range. The Company also issued weaker-than-expected revenue guidance for the second quarter of 2022, telling investors to expect Kornit to generate between $85 million and $95 million of revenues in the second quarter of 2022, well below the street consensus expectations of approximately $103 million. Furthermore, Kornit issued operating margin guidance between a range of -2% to 2%, significantly below the nearly 12% consensus estimate of analysts covering the Company.

184.    Analysts were surprised by these disclosures, indicating that the disappointing results were attributable to competitive pressures that Defendants had denied the existence of,

specifically noting that "competition was worth watching." For example, Barclays commented that a "Tough 1H raises some questions" and noting that Kornit's "1Q results and the 2Q22 revenue guidance missed [its] estimates." Analysts from Needham noted that the "weak Q1 revenue guidance has left investors understandably skeptical that this is a temporary issue, as evidenced by the sharp drop in KRNT's share price today." Needham also noted that "All eyes will be on how KRNT exits the June quarter" and lowered its revenue estimate for the second quarter of 2022 from $104 million down to $86 million, a more than 17% decrease.

185.    Kornit also held a conference call with analysts and investors to discuss those results, during which the Company attributed its disappointing guidance to a slowdown in orders in the e-commerce segment, including from Kornit's large global customers. The Company's conference call that day also revealed additional information concerning Kornit's relationship with certain of its largest customers.

186.    During the call, an analyst asked Defendants to "update us on any specifics around the strength of your relationship with Fanatics and Delta Apparel," referring to the March 2022 announcement discussed above. In response, Defendant Samuel **admitted** that, for **at least the previous two quarters**, Kornit knew that Delta Apparel, one of Kornit's largest customers, had decided to acquire digital printing systems from one of Kornit's competitors. Defendant Samuel also admitted that he "kn[e]w a bit more on that" but told analysts that he would "not get into it." Thus, Samuel acknowledged Kornit had been aware since the quarter beginning in July 2021 that it faced significant competitive risk from M&R and loss of sales at Delta and Fanatics, two of its largest and most important customers.

187.    On this news, the price of Kornit ordinary shares declined by $18.78 per share, or 33.3%, from a closing price of $56.41 per share on May 10, 2022, to a closing price of $37.63 per

share on May 11, 2022. This decline wiped out approximately $932 million in Kornit's market capitalization.

188.    Kornit's disclosure, however, did not reveal the full truth. To the contrary, Defendants continued to make additional false statements to soothe the market and conceal the full truth concerning Kornit's financial health and its customer relationships. For example, in the earnings release, Defendant Samuel continued to tout Kornit's plan to "deliver, ahead of plan, on the $125 million run-rate [in quarterly revenue] business we originally targeted for the fourth quarter 2023," and reiterated that the Company remained "confident in our journey to become a billion-dollar business in 2026." Likewise, Defendant Rozner tried to reassure investors that Kornit's "pipeline of opportunities" remained strong.

189.    Defendants continued their campaign to reassure investors during the earnings call that day. For example, Defendant Samuel characterized these results as simply a "very short-term bump on the road." Then, in response to the question about Fanatics and Delta Apparel, Defendant Samuel falsely attempted to minimize the impact of the customer loss and material impact on Kornit's revenues, noting that the "few" competing machines that Delta was purportedly trying out were "more of a replacement for screen, not for short run, not for one-off, not for direct to consumer." Defendant Samuel's assurances were false. Not only did it contradict the press release issued by Delta Apparel announcing its new partnership with Fanatics and M&R, which provided that "this business process is the first of its kind as it will allow custom orders to be produced, packaged, and shipped to the end consumer within 24 hours from receipt of order" but Defendant Samuel's reference to the "few" machines was also false. Indeed, in its March 28, 2022, press release, Delta Apparel noted that in addition to four currently installed *sites*, that additional machines would be installed in the *first* quarter of 2022. And, that same day, on Delta Apparel's

earnings call, Delta's CEO further indicated that the technology to be supplied by M&R to be used in its business with Fanatics, would represent a huge part of Delta's business: "we expect [Fanatics] to be our biggest customer in DTG2Go. It might be our biggest customer in any business given a few quarters and the power behind the Fanatics brand and what they're doing in the marketplace." Similarly, as noted above, FE4 indicated that Delta had had installed fifteen units from Kornit's competitor by the end of 2021 and had placed an order for fifty more. This is ***much more*** than the "few" that Samuel mentioned.

190.    In addition, one analyst specifically asked Defendant Rozner whether Kornit had pulled forward revenue from the second quarter of 2022 into the first quarter. Defendant Rozner flatly denied that Kornit had pulled forward revenue, claiming instead that Kornit's late-quarter sales in Q1 2022 "was a timing issue of making decisions and getting the paperwork."

191.    Defendants' false assurances worked. Based on these representations, investors— even the analysts who revised downward their short-term outlooks—understood (mistakenly) that Kornit's disappointing results were a one-off, and that the Company maintained strong fundamentals that would drive a positive valuation. Comforted by Defendants' statements, analysts at Berenberg stated that they "remain[ed] bullish in our thesis." Likewise, analysts at Needham concluded that the "selloff" in response to the disappointing earnings release was "overdone, particularly given what appears to be a solid line of sight into 2H demand." Finally, analysts at William Blair continued to credit Defendants' assurances that "Kornit continues to have a robust pipeline of opportunities and invest in the business to support the company's growth initiatives."

192.    Defendants continued to make similar false statements to soothe the market in the weeks that followed. For example, on June 7, 2022, Defendants Samuel and Rozner attended the William Blair Growth Stock Conference. During that conference, an analyst from William Blair

noted that "the second quarter guidance surprised some people in being below the consensus estimate in terms of revenue and operating margin." In response, while acknowledging that Kornit's customers had seen a slowdown "[b]y the end of 2021," Defendant Samuel assured investors that "the fundamental of Kornit business is unbelievable in the best place that we could dream of." Defendant Samuel further noted that market "trends are really pushing into digital," which would benefit Kornit, and that the "fundamental of our business [is] very, very strong moving forward." He went on to again describe the first quarter results as merely a "bump on the road" and reaffirmed that Kornit would achieve a $500 million revenue run rate in 2023, and specifically projected $125 million in revenue for the fourth quarter of 2022. Defendant Samuel also stated that Kornit was selling more product than it had been earlier in the year, and that the Company was seeing "real time supplies coming back, back into growth."

193.    The next day, Defendants Samuel and Rozner attended the Stifel Cross Sector Insight Conference and continued to make false assurances to the market. For example, Defendant Samuel opened the conference by stating that "the fundamentals of what Kornit is driving in our business is better than ever" and again describing the first quarter as just a "bump on the road" that had already passed as Kornit saw "a new normalization" and "continued growth." Defendant Samuel also continued to tout KornitX's value, representing that demand for the product "is growing very fast."

**B.    July 5, 2022—Kornit Reports Shockingly Bad Results For The Second Quarter Of 2022**

194.    On July 5, 2022, after the market closed, Kornit stunned investors by announcing disappointing preliminary financial results for the second quarter of 2022. In its earnings release, the Company disclosed that it expected revenue for the second quarter to be in the range of $56.4 million to $59.4 million. That represented a dramatic reduction of more than 35% at the midpoint

of the $85-95 million guidance that the Company issued less than two months prior. Furthermore, Kornit cryptically told investors that it expected results for the third quarter of 2022 to be "at or above" second quarter levels, which implied a substantial decrease to consensus expectations based on Kornit's prior representations. Kornit attributed these poor results to "a significantly slower pace of direct-to-garment (DTG) systems orders in the second quarter as compared to our prior expectations."

195.    Analysts were astonished, given Defendants' previous statements. For example, analysts at Craig-Hallum downgraded Kornit to "hold," remarked on the "surprisingly weak results," and expressed that "visibility has become increasingly challenged" given the "sizeable revenue and profitability miss." Analysts at Berenberg Capital Markets stated that the "other shoe drops" as the July 5 disclosure "shows sobering results." Berenberg went on to say that these results showed "significant weakness in demand which far exceeded both consensus and market expectations."

196.    Moreover, analysts immediately called management's candor into question. For example, analysts at Berenberg Capital Markets stated: "we believe management regaining the trust of the investment community will prove to be a long and winding road." Indeed, analysts at Craig-Hallum were particularly puzzled by "the delta between [second quarter] results and expectations given management's generally bullish tone in early to mid-June at several conferences," such as those discussed above. Analysts at Barclays even noted that "our conversations with investors point to some concerns about management coming across as overly confident about the pace of growth / level of interest, both pre-1Q (with 2Q guide missing consensus on revenues) and post-1Q (with management pointing to recovery in 2H)."

197.    Kornit's decline in revenue in the second quarter of 2022 reflected the effects of the $30 million in revenue that was pulled forward in the first quarter, which had covered the revenue drop-off and deficit relative to expectations in that period. But having depleted that "buffer," Kornit had no way of continuing to conceal the decline, and missed the revenue target it had previously provided by approximately the same $30 million it had taken in early during the prior period.

198.    As a result of these disclosures, the price of Kornit ordinary shares declined by an additional $8.10 per share, or 25.7%, from a closing price of $31.56 per share on July 5, 2022, to a closing price of $23.46 per share on July 6, 2022. This decline wiped out approximately an additional $402 million in Kornit's market capitalization.

## VI.    POST-CLASS PERIOD ADMISSIONS BY DEFENDANTS

199.    On August 10, 2022, Kornit held a conference call to discuss its second quarter 2022 earnings results. During that call, Defendant Samuel made statements that confirmed that Defendants' Class Period statements were false or misleading. For example, contrary to Defendants' statements throughout the first half of 2022 that business was increasing rapidly, Defendant Samuel admitted during the earnings call that, now in the third quarter of 2022, Kornit had finally seen that "some customers [were] going back into the growth phase. But *in H1, they were declining year-over-year*." Defendant Samuel also admitted that some customers had been complaining of overcapacity in the *first half* of the year and had therefore declined to upgrade to the Atlas Max.

200.    Analysts questioned what Defendants' admissions meant for Kornit's long-term growth goals. When an analyst from William Blair asked specifically about the "longer-term $1 billion revenue target and your confidence in getting there," Defendant Samuel withdrew the Company's 2023 and 2026 growth targets. Despite vigorously reaffirming that target at two

conferences less than three weeks before the close of the second quarter, he now quickly backtracked: "Now, as for timeframe, we are working very closely and planning very details to be the – with 2026. We will come back to you in a later stage. Let us take the next few months to see the progress on the business. As for the $500 million in 2023, at this moment, we do not want to commit to bringing it in 2023."

201.    On November 9, 2022, during Kornit's earnings call for the third quarter of 2022, Defendant Samuel also admitted, with respect to KornitX, that Defendants were *still* working on "*stabilizing* the platform itself" and that "KornitX generates [a] few millions of dollars" of revenue, which was "still not meaningful enough." These admissions flatly contradicted *six* quarters of repeated representations by Defendants concerning KornitX's adoption, growth, and prospects.

202.    Defendant Samuel made similar representations nearly a year later in May 2023. During Kornit's earnings call for the first quarter of 2023, Defendant Samuel stated that "And last year *we saw the impression in many customers going down*, and we started to talk about in H2 that we're starting to see a new trend that it's *starting* to move up."

203.    Just one month later, during a conference hosted by William Blair, Defendant Samuel gave more information that contradicted Defendants' Class Period statements. Defendant Samuel admitted that by no later than the start of 2022, Defendants had already seen a "major" decline in its customers' business, which negatively impacted Kornit's own profitability. Defendant Samuel stated that "[a]fter the huge growth that we were experiencing during 2020 and 2021, mainly through our customers, the e-commerce was booming. *Beginning of 2022, we saw major decline within the business of our customers*. They found themselves with overcapacity. They acquired many, many systems, inks and systems during the year of 2021 and the first and the

second half of 2020. And they had overcapacity and they didn't buy additional systems during 2022."

## VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

204.    The Class Period begins on February 17, 2021, the trading day after Kornit announced its financial results for the fourth quarter and full year ended December 31, 2020. Defendants made materially false and misleading statements and omitted to disclose material facts that they were required to disclose during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Throughout the Class Period, Defendants' SEC filings, press releases, and analyst and investor presentations included material misstatements and omissions concerning the Company's financial condition which included, among other misrepresentations, statements concerning Kornit's vulnerability to competition and demand for the Company's products and services.[7]

### A.    False And Misleading Statements And Omissions Concerning Service And Service Contracts

205.    On February 16, 2021, after the market closed, Kornit held a conference call with analysts and investors to discuss the Company's financial results for the fourth quarter and full year of 2020. Eager to portray the service business as a stable, high margin profit center, Defendant Samuel, in direct response to an analyst question about whether the Company's service contracts were "singular year" contracts with the potential for renewal or "multi year" contracts, represented that "*every machine that we are selling, we are selling it with a contract. There's no other way to buy from us a machine and it's not for one year. It's for multiple year contracts and we see a*

---

[7] In this section of the complaint, the language that is emphasized in *bold italic* type is quoted from Defendants' public statements and disclosures and is the language that Plaintiffs specifically allege to be materially false and misleading as set forth in this paragraph and the paragraphs that follow. The reasons why Defendants' statements are materially false and misleading are summarized within this section of the complaint, and discussed in greater detail throughout the document.

*very nice recurring revenue coming from the service business*." Defendant Rozner elaborated, stating that "*[w]e continue to improve our service contract attach rate, which is growing our recurring revenue stream*," and that the Company's strong gross margins for the fourth quarter were the result, in part, of profitable service revenue.

206.    The statements in ¶205 above were materially false and misleading when made, and omitted material facts. As detailed above, according to former Kornit employees, both initial and renewal service contracts were *one year* in length—not multiple years—and approximately 80% of customers would decline to renew service contracts because of poor service or the unjustified cost of the service contract. Defendant Samuel thus misrepresented the mandatory length of service contracts and the attach rate. In truth, the service contracts did not generate the "very nice recurring revenue" that Defendant Samuel claimed.

207.    During that call, Defendant Samuel also emphasized that the Company's "*[s]ervices [business] continue[d] to outperform our expectation on growth and profitability*," and led investors to believe that this was the result of "*the execution of our customer success teams*."

208.    On March 25, 2021, Kornit filed its annual report with the SEC on Form 20-F, which was signed by Defendants Samuel and Rozner. Kornit's 20-F also represented that "Strategic accounts are an important and valued part of our business and future growth, and *we continue to make the appropriate investments in ensuring we serve their needs as it comes to sales, application consulting and services support*. We expect to continue developing our strategic accounts practice in a combination of dedicated regional and corporate resources as we strive to help these important customers improve their business performances by delivering *best-in-class customer experience*."

209.    On June 1, 2021, Defendants Samuel and Rozner participated in the William Blair Growth Stock Conference on behalf of Kornit. During the conference, Defendant Samuel further represented that "it's not only the technology" that differentiates the Company from its competitors, but also Kornit's ability "*to service and support our customers*, having an install base of more than 1,200 customers within them."

210.    On June 10, 2021, Defendants Samuel and Rozner participated in the Citi Silicon Valley Tech Virtual Tech Bus Tour on behalf of Kornit. During the conference Defendant Samuel also touted the profitability of the service department, stating: "*Services used to be a lost P&L, now is profitable and is becoming more and more profitable*."

211.    On July 13, 2021, Defendant Samuel and Rozner attended the CJS Securities New Ideas Summer Conference on behalf of Kornit. During the conference, Defendant Samuel touted the Company's service department: "We move from a lost business on the service to *a profitable business to service* and we expect that service organization *will be even more profitable in the coming quarters*."

212.    On August 10, 2021, Kornit held a conference call with analysts and investors to discuss the Company's financial results for the second quarter of 2021. During the call, Defendant Samuel touted Kornit's purportedly "*very strong growth* not only in our systems and consumables businesses *but also in our service organization*."

213.    On November 10, 2021, Kornit held a conference call with analysts and investors from its Customer Experience Center in New Jersey to discuss the Company's financial results for the third quarter of 2021. During the call, Defendant Rozner touted the success and profitability of the Company's service business and represented that it "*will continue to be as such*," emphasizing that "*[w]e are investing a lot in customer support*."

214.    On May 11, 2022, Kornit announced its financial results for the first quarter ended March 31, 2022 and held a conference call to discuss those results. Defendant Rozner also commented on the service department, stating "Overall, we are keep investing and building our service organization, and it very much depends on specific projects. Overall, ***we continue to see continuous growth and improvement in service profitability***. And this is the way we plan it going forward."

215.    The statements in ¶¶207-214 above were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendants to tout the purported quality, profitability and success of Kornit's service department. As further detailed above, contrary to Defendants' statements, Kornit's service department repeatedly failed to repair customers' printers on a timely basis, and the Company did not have the number of technicians necessary to service its clients effectively. Kornit also lacked the basic infrastructure to properly provide timely service to customers, such as ticketing and functional CRM systems. These shortcomings led to frequent customer complaints, refusals to purchase additional equipment, customers selling or not using their Kornit printers (impacting sales of consumables) and even order cancellations. This also impacted customers' willingness to pay for renewals on the Company's service contracts, which were supposed to generate recurring revenue for Kornit. According to a former Kornit employee, approximately 80% of customers would decline to renew service contracts because of poor service or the unjustified cost of the service contract. Kornit's woefully deficient service department exacerbated issues with the Company's frequently broken equipment and caused significant customers to complain and ultimately defect to the competition.

**B.      False and Misleading Statements And Omissions Concerning Sticker Mule's "Integration" of Kornit Printers And Customer Growth**

216.    On November 10, 2021, Kornit held a conference call with analysts and investors from its Customer Experience Center in New Jersey to discuss the Company's financial results for the third quarter of 2021. Defendant Samuel, as proof of Kornit's purported "great progress with customers," touted the onboarding of Sticker Mule, noting: "Recently, Sticker Mule, a global leader of fully customized B2C products, ***integrated a fleet of our Atlas systems into their business and are utilizing the growing customer base to support a strong DTG revenue channel***."

217.    The statements in ¶216 above were materially false and misleading, and omitted material facts, as further detailed above. It was materially false and misleading for Defendants to assert that Sticker Mule had "integrated a fleet of Atlas systems into their business" and was "utilizing" those systems to support a growing customer base. In truth, Sticker Mule ***never*** integrated Kornit's systems into its business. In fact, an online listing created by Sticker Mule to ***resell*** a Kornit Atlas machine specifically stated that the machine was "***never used in production***, just for testing." The loss of Sticker Mule further impacted Kornit's business; FE3 explained that he participated in conversations where other potential customers canceled orders because they ended up buying the used machines from Sticker Mule. Moreover, at least one of the Sticker Mule machines was resold to another potential Kornit customer, meaning that Kornit itself was unable to make a sale. FE4 corroborated FE3's account, explaining that while Sticker Mule had purchased several of Kornit's Atlas printers, Sticker Mule was ***unable to get them to run properly***. As a result, Sticker Mule never used the machines in production. FE12 confirmed that the Sticker Mule situation was a "disaster" that reflected bad blood between Sticker Mule and Kornit.

### C.    False And Misleading Statements And Omissions Concerning The First Quarter 2022 Revenue Pull Forward

218.    On May 11, 2022, Kornit announced its financial results for the first quarter ended March 31, 2022 and held a conference call to discuss those results. During the earnings call, Defendant Rozner represented that Kornit "*came off a strong peak season in the fourth quarter and ramped order during the second half of the first quarter*. The *timing of sales* later in the first quarter to our largest strategic account *grew receivables materially quarter-over-quarter*."

219.    Later during the call, an analyst specifically asked whether Defendants had pulled forward revenue from the second quarter of 2022 into the first quarter of 2022:

> **Question** – Gregory William Palm: And then, on the receivables comment for my follow-up, I think you blamed that on late quarter sales. *I think you said specifically to that global strategic*. *Was that a pull forward of activity into Q1 from Q2* or was it, I don't know, maybe a push out of shipments from maybe mid quarter to late quarter? It wasn't exactly clear what happened there.

> **Answer** – Alon Rozner: *No.* It was a timing issue of making decisions and getting the paperwork. So, the start of the year and the quarter was relatively weak after a very busy peak season. So, people took some time off to relax. And then, we saw the quarter building up at the second half of the quarter when we got the POs of the planned business for the quarter. And then, we shipped relatively close to the end of the quarter. And just in a matter of timing, most of the AR adjusts, they're not due, and will be collected mostly in the second quarter

220.    The statements in ¶¶218-19 above were materially false and misleading, and omitted material facts, as further detailed above. Defendant Rozner's denial that first quarter sales were a pull forward from the second quarter was simply false. Contrary to his statement, Kornit had pulled forward sales from the second quarter into the first quarter in order to cover the revenue gap caused by the negative demand trends that Kornit was experiencing, and allow Defendants' to just barely exceed the top end of Kornit's first quarter guidance. FE7 explained that Kornit had the ability to accelerate revenue through its global strategic account (Amazon), and FE3 confirmed that, based on discussions he had with the President of the Americas Division, Kornit had in fact

accelerated revenue to mask declining demand. FE12 explained that "going into 1Q2022 the sh*t hit the fan" and Kornit had emptied its buffer of printers. FE12 stated that he believed the directive to empty the buffer came from Samuel. As FE12 explained, Whaley would not have taken instructions from anyone except Defendant Samuel or Meyo (President of the Americas). Indeed, the spike in Kornit's trade receivables further supports that revenue was accelerated, as trade receivables jumped from approximately $50 million at the end of Q4 2021 to over $80 million in Q1 2022. As Defendant Rozner stated, the growth in receivables was entirely attributable to Kornit's largest customer, Amazon, to which Kornit made sales "relatively close to the end of the quarter."

### D.    False And Misleading Statements And Omissions Concerning Kornit's Technology And Competition

221.    On May 19, 2021, Defendants Samuel and Rozner participated in the Barclays Americas Select Franchise Conference on behalf of Kornit. During the conference, Defendant Samuel boasted that "if we're talking about the [DTG market] and we're talking about the industrial space, the space that we are focusing on, *we don't see today any [competitor] that we can say that it's any threat on us*" and "this is . . . mainly due to the *moat that we manage[d] to build around our technology*." Buttressing this moat was the purported advantage of Kornit's DTG process, which the Company assured investors it had "*brought it to the level of quality that's much better than any conventional technology*."

222.    Defendant Samuel similarly elaborated that Kornit's technology is enmeshed with its customers' infrastructure: "*We are well integrated into their system. So, it will be very difficult to bring new technology in*." Defendant Samuel also claimed that the Company was "looking very carefully" at what the "competition is doing," and that "*we don't see today any competitive that we can say that it's any threat on us*."

223.    Also, during the conference, Defendant Samuel stated that "*[w]e really have unique technologies that no one has*" and that this "*provides . . . a huge differentiator*." Defendant Samuel, in direct response to an analyst question on the topic of Atlas Max revenue, similarly touted the profitability of the printer, stating that "[t]he machine is 20% faster. Another reason is because the assumption is that the [sic] all ATLAS MAX, most ATLAS MAX will be sold with automation. So, another 20%, it's 40% faster. So only by that, it's 40% more supplies that you are going to generate."

224.    On June 1, 2021, Defendants Samuel and Rozner participated in the William Blair Growth Stock Conference on behalf of Kornit. During the conference, in response to an analyst's question about the competition Kornit faced, Defendant Samuel stated that "*this is not something that we are worried about*" and that "*we know what is coming in the future is that bringing the next level of technology*." Defendant Samuel explained that some of the digital ink jet printers produced by competitors require different processes than what Kornit uses and stated that "*[t]he level of the quality is not the same.*"

225.    During the conference, Defendant Samuel sought to further assuage investor concerns about competition, stating that "[t]he biggest customers of the world, if it's [ ] Amazon or [ ] Adidas, that already tested . . . our technology, approved it and [are] going with us" and so "*[i]t will be very difficult to enter there*."

226.    And, in response to a question about competition, Defendant Samuel specifically rejected the notion that "There will be competitors that will bring a technology that can disrupt our technology or can do similar thing that we can do today," stating: "*Actually, the opposite. What we see in the market today that's we are opening much bigger moat versus our competitors*."

227.    On December 7, 2021, Defendant Samuel participated in the Barclays Global Technology, Media, and Telecommunications Conference on behalf of Kornit. During the conference, an analyst asked: "what are your biggest concerns, the challenges? What keeps you up at night, if anything?" Defendant Samuel reaffirmed Kornit's competitive moat, stating "***Yeah, we are not worried about competition***. We are a market leader. ***We are, by far, the best technology. We are, by far, faster and innovative versus any other companies out there***."

228.    On February 15, 2022, Kornit held a conference call with analysts and investors to discuss the Company's financial results for the fourth quarter and full year of 2021. During the call, Defendant Samuel touted the Company's "***very, very, strong new moat***" around its Max line of products and assured investors that the Company's "***competitive position is unmatched***."

229.    On May 11, 2022, Kornit announced its financial results for the first quarter ended March 31, 2022 and held a conference call to discuss those results. During the earnings call, in direct response to an analyst question about competition, Defendant Samuel stated: "I'm not concerned. Actually, I believe that we built a very, very strong new ***moat around our technology, around our products***. In the last two years, actually, ***we've developed our products and we created much bigger gap versus any of our competitors***."

230.    The statements in ¶¶221-29 above were materially false and misleading, and omitted material facts, as detailed above. Specifically, it was false and misleading for Defendants to represent that there was a lack of competition in the market. It was also false and misleading for Defendants to tout Kornit's "unique" technologies and the purported "moat" that they had built around Kornit's technology. Contrary to Defendants' statements, the Company's machines did not function as advertised and were plagued by various reliability issues, in part because production was rushed by management as part of their effort to achieve their unrealistic revenue targets.

Kornit's printers also failed to achieve the marketed ROI because in actual operation they required more ink, operated more slowly and suffered from significant downtime. As a result of these considerations, Kornit's customers were losing market share, and as a result, turning to Kornit's competitors. Poor service performed by Kornit exacerbated issues with the Company's frequently broken equipment and caused significant customers, including Delta/DTG2go and Sticker Mule, to complain and ultimately defect to the competition. Furthermore, and as reported by numerous former Kornit employees, Kornit experienced significant competition, including from M&R, resulting in the complete or partial loss of two top 10 clients, Delta Apparel and Fanatics, who accounted for more than 10% of Kornit's recurring revenues.

### E.    False And Misleading Statements And Omissions Concerning Demand

231.    On November 10, 2021, Kornit announced its financial results for the third quarter ended September 30, 2021. In the press release issued by Kornit, which the Company also filed with the SEC on Form 6-K, Defendant Samuel touted the Company's "phenomenal third quarter performance." Defendant Samuel also stated that "*[w]e enter 2022 with very strong business fundamentals supported by broad-based demand for our industry leading solution*s" and "*[t]his growing demand* and market acceptance *puts us firmly on the path [to] becoming a $1 billion revenue company in 2026*." Similarly, Defendant Rozner stated that "[w]e are focused on ending the year strong and supporting our customers to ensure they are ready for their peak season" and that Kornit would "*enter 2022 in a phenomenal position with outstanding business fundamentals, a robust backlog and strong pipeline*."

232.    That day, Kornit also held a conference call with analysts and investors from its Customer Experience Center in New Jersey to discuss the Company's financial results for the third quarter of 2021. During the call, Defendant Rozner touted Kornit's "great progress with new

customers, *while continuing our very strong momentum with large strategic customers*, *which we expect to continue for the balance of 2021 and throughout 2022*."

233.    On January 10, 2022, Defendants Samuel and Rozner participated in the Needham Growth Conference on behalf of Kornit. During the conference, Defendant Samuel represented that the Company was "*entering very, very strong into 2022*" and had "*massive momentum coming from both existing customers and many new customers* both in the [direct-to-garment] and in the [direct-to-fabric markets]."

234.    On February 15, 2022, Kornit announced its financial results for the fourth quarter and full year ended December 31, 2021. In the press release issued by Kornit, which the Company also filed with the SEC on Form 6-K, Defendant Samuel touted the Company's "*outstanding execution on the huge market opportunity we are pursuing* and the strength of our unique business model." Defendant Samuel also stated that for Kornit 2022 would be "*a year with strong growth* and a remarkable pipeline of ground-breaking new product introductions, starting already in the first quarter." Defendant Samuel further claimed that Kornit has "*never been in a better position as a company and we are extremely confident in our ability to meet our $1B revenue goal by 2026, if not before*." In the press release, Defendant Rozner also represented that "*[o]ur good visibility into the business, combined with our experienced team, gives us the confidence that we can deliver on our commitments for the balance of 2022 and into 2023*."

235.    That same day, Kornit held a conference call with analysts and investors to discuss the Company's financial results for the fourth quarter and full year of 2021. During the call, Defendant Samuel represented that Kornit "*started 2022 with outstanding momentum*" and "[t]he *mega-trends that have been fueling our business are intensifying in magnitude and transformation to digital on-demand sustainable production continue[s] to accelerate*."

78

Defendant Samuel also represented that Kornit was poised to further capitalize on these trends because "***Kornit is the only company*** that offer[s] high-quality, on-demand mass production digital solutions that can deliver to this massive need and is also the only company that seamlessly connects the virtual and physical walls of the textile industry." Accordingly, Defendant Samuel told investors that for 2022, Kornit was "gear[ing] up for ***very strong growth*** and a remarkable amount of groundbreaking new product introductions starting already in the first quarter" with a "backlog of orders" for its technology that was "***very strong***" and was providing a "***tremendous tailwind into 2022***."

236.    Also, during the call, Defendant Samuel represented that "***our fundamentals are excellent, the market opportunity we are after is endless and our competitive position is unmatched***," and that "Kornit has ***never been in a stronger position***." Further, Defendant Rozner touted the Company's "great traction with new accounts, which accounted for half of the systems' order[s] and excellent progress and strength with existing strategic accounts."

237.    On May 11, 2022, Kornit announced its financial results for the first quarter ended March 31, 2022 and held a conference call to discuss those results. During the earnings call, Defendant Samuel stated that Kornit "***delivered a good start to the year, with revenues coming just about the high end of our guidance and operating margins in line with our expectations***. For the first quarter, ***total revenues grew by 26% year-over-year to $83.3 million***, net of $8 million in warrants related to our global strategic account. ***System revenue growth was very strong*** and overall system contribution to the revenue mix was very high."

238.    Defendant Samuel stated that "we see Q2 kind of ***a bump on the road***." Defendant Samuel elaborated on his view of the "bump on the road," stating that "we have a line of sight to major orders. Some of them is from our global strategic accounts. So, ***you will continue seeing***

*from the global strategic account revenue coming not only in Q2, but in Q3 and Q4*, *and definitely also in 2023*." Speaking about an uptick in ink supplies, Defendant Samuel added, "*Actually, in the last week, we start to see a different trend on supply*."

239.    On June 7, 2022, Defendant Samuel participated in the William Blair Growth Stock Conference on behalf of Kornit. During the conference, Defendant Samuel touted the fundamental trends purportedly affecting the Company, stating: "I must say that the fundamental of Kornit business is *unbelievable in the best place that we could dream of*. *All the market trends that we were talking about years ago just accelerated*." In direct response to an analyst question asking Defendants "about what you're seeing now in the second quarter—real time what you're seeing is that—when you mentioned it's coming back," Defendant Samuel Responded "*Yes. Yeah. Yeah* . . . *So in terms of supplies, we see real time supplies coming back, back into growth*."

240.    On June 8, 2022, Defendant Samuel participated in the Stifel Cross Sector Insight Conference on behalf of Kornit. During the conference, Defendant Samuel was asked: "Is there any update you can provide at least on the near-term outlook with the full understanding that you have kind of reset at least the near-term outlook?" In response, he stated that "*all the fundamentals are very strong*." Defendant Samuel also falsely reassured conference participants that the glut in capital equipment and ink sales was nothing but a "*bump on the road*" and that the "Amazon [business] is booming. They didn't see any slowdown. They continue to grow very fast."

241.    The statements in ¶¶231-240 above were materially false and misleading, and omitted material facts, as detailed further above. Contrary to Defendants' statements, Kornit's business began experiencing significant negative demand trends, particularly beginning in late 2021. Defendant Samuel himself *admitted this fact in June 2022*, when he told investors that "*by the end of 2021*," major customers had started to experience a slowdown in growth. Based on

information provided to him by Chuck Meyo—the President of Kornit's largest division—FE3 confirmed that there were "recognizable trend issues" related to a slowdown *in sales* in November and December 2021, which were not as busy as Kornit had projected and negatively impacted sales in the fourth quarter of 2021. FE3 explained that there were "recognizable trend issues" related to a slowdown in sales in November and December 2021, and that those months were not as busy as they had been in previous years. FE12 explained that Kornit pushed printers out of the factory and they built the machines "less carefully." This caused more frequent breakdowns and more customers to complain. FE12 explained that "going into 1Q2022 the sh*t hit the fan" and Kornit had emptied its buffer of printers. According to FE12, he believed the directive to empty the buffer came from Samuel. As FE12 explained, Whaley would not have taken instructions from anyone except Defendant Samuel or Meyo (President of the Americas).

242.    After the end of the Class Period, Defendant Samuel made further admissions confirming both the falsity of Defendants' statements and their knowledge of these negative trends. In May 2023, Defendant Samuel admitted that in 2022, Defendants "*saw* the impression[s] in many customers going down" and that "*we saw major decline* within the business of our customers" by the "*[b]eginning of 2022*." Rather than disclose this "major decline" that Defendants—by their own admission—saw, they continued to make material misstatements to investors, even as the negative trends persisted throughout the end of the Class Period in July 2022.

### F.    False And Misleading Statements And Omissions Concerning Kornit's Revenue Growth

243.    On February 16, 2021, after the market closed, Kornit held a conference call with analysts and investors to discuss the Company's financial results for the fourth quarter and full year of 2020. Defendant Rozner touted the Company's 2023 revenue guidance of $500 million,

noting that "*we are more confident than ever in our ability to achieve our $500 million run rate goal ahead of plan* while expanding gross margin and profitability."

244.    On May 19, 2021, Defendants Samuel and Rozner participated in the Barclays Americas Select Franchise Conference on behalf of Kornit. In light of Kornit's purported competitive advantages, Defendant Samuel falsely represented that the Company's guidance was "*conservative*," noting: "Now yesterday, it was nice to hear one of our analysts that thought that maybe *we are conservative about our goal* with – *he knows us really very well*… *we can even bring even more than that earlier than what we were forecasting*." Defendant Samuel also reiterated the Company's long-term guidance, noting that the $500 million run rate would be hit "*earlier than expected*." "*And we put a target to become $1 billion company, revenue, in 2026*."

245.    On June 10, 2021, Defendants Samuel and Rozner participated in the Citi Silicon Valley Tech Virtual Tech Bus Tour on behalf of Kornit. During the conference, Defendant Rozner reiterated both the Company's medium- and long-term guidance, stating "Currently, we feel very confident in our ability to meet this target and actually, *we are confident that we'll be able to meet this target ahead of plan*. Again, it's the annual rate, $500 million, which means $125 million a quarter. And so this is kind of a mid-term target for us."

246.    On June 10, 2021, Defendants Samuel and Rozner participated in the Stifel Cross Sector Insight Conference on behalf of Kornit. Based on the purported strengths in the Company's business model, Defendant Rozner also touted the "really realistic" nature of the Company's long-term guidance, noting "We believe that our long-term model is *really realistic*. There is some way to go there. But it seems realistic. And there is also *an upside opportunity from our point of view* . . . . So, all in all, . . . *we feel very comfortable with the target that we set of $1 billion*."

247.    On August 10, 2021, Kornit announced its financial results for the second quarter ended June 30, 2021. In the press release issued by Kornit, which the Company also filed with the SEC on Form 6-K, Defendant Samuel stated that "[o]ur pipeline and visibility have never been stronger as the industry accelerates its digital transformation with Kornit leading the way." Defendant Samuel also stated that "[w]e are more confident than ever in our outlook for the remainder of this year and into next year," leading investors to believe that Kornit was "***well on [its] way to becoming*** the operating system for on demand sustainable fashion and a ***$1 billion revenue company in 2026***."

248.    On December 7, 2021, Defendant Samuel participated in the Barclays Global Technology, Media, and Telecommunications Conference on behalf of Kornit. Based in part on this unique visibility into Amazon's roadmap and Kornit's purported competitive strengths, Defendant Samuel also reiterated the Company's long-term guidance, noting "***So, in terms of the $500 million, we already mentioned this, we'll bring it much earlier***. So, expect to get news when are we going to bring it, but ***it will be much earlier than Q4 2023*** in terms of the target of $125 million. ***In terms of the $1 billion, we believe that we will be $1 billion in 2026, it's not the run rate, it's the full year $1 billion***. This $1 billion will be a bid out of $400 million of systems, $400 million of ink, $100 million of services, ***and $100 million of KornitX***."

249.    On February 15, 2022, Kornit held a conference call with analysts and investors to discuss the Company's financial results for the fourth quarter and full year of 2021. Based on the purported strength of KornitX and the Company's "***very, very, strong new moat***" around its Max line of products, Defendant Samuel also reiterated that he was "***more confident than ever in our technology and ability to reach the $1 billion in 2026***."

250.    On May 11, 2022, Kornit announced its financial results for the first quarter ended March 31, 2022 and held a conference call to discuss those results. Discussing the current macroeconomic climate, Defendant Samuel represented "our customers and us are not fully immune to the overall macro headwinds and certain post-pandemic dynamics. We started this year with a strong backlog and robust pipeline. But as we move deeper into the first quarter, we *begin to see the macroeconomic volatility* weighed on the pace of consumer purchases and on capital allocation decision of certain customers." Despite these "headwinds," Defendant Samuel nevertheless represented that "*we continue to expect to deliver ahead of plan the $125 million run rate business* we originally targeted for the fourth quarter of 2023 and *remain confident in our journey to become a $1 billion business in 2026*."

251.    Defendant Rozner also provided guidance for the second quarter of 2022, stating "given the macroeconomic impact on consumables and capital allocation decisions of certain customers and overall near-term volatility, *we currently expect second quarter revenues to be between $85 million to $95 million*." Elaborating on second quarter guidance in response to an analyst question on the topic, Defendant Samuel stated "we see Q2 kind of *a bump on the road*. We believe in the $500 million run rate *earlier than expected* than Q4 2023. We believe in the long-term vision of the *$1 billion in 2026 or before*.

252.    On June 7, 2022, Defendant Samuel participated in the William Blair Growth Stock Conference on behalf of Kornit. Defendant Samuel also downplayed the first quarter results, noting: "What happened in Q1 is a unique case, and I call it *a bump, bump on the road to grow*. First of all, we mentioned, *next year, we are going to be $500 million run rate business before Q4 2023*. We promised five years ago, we will be $500 million run rate, which means $125 million in Q4. *We are going to bring it earlier*. We also—on the run rate for $1 billion in 2026, with

84

operating profit above 20%. We believe in that. We are building all the plans to meet it, and we are confident to deliver on that."

253.    On June 8, 2022, Defendant Samuel participated in the Stifel Cross Sector Insight Conference on behalf of Kornit. Based on these purported strengths, Defendant Samuel also reiterated Kornit's short- and long-term growth plans, stating "I must say, people are probably sitting here and saying $1 billion in 2026 sounds too long and too ambitious or not too ambitious. Guys, four years ago, we said we are going to be a $500 million run rate business by 2023, in Q4 2023. *We are going to bring it earlier than Q4 2023*." Defendant Samuel also touted the "*great adoption and great growth*" of the Atlas Max and the automation upgrade available for that system, which would contribute "mainly in Q2."

254.    The statements in ¶¶243-253 above were materially false and misleading when made, and omitted material facts, as detailed further above. Specifically, it was materially false and misleading for Defendants to represent that Kornit would achieve a $500 million run rate by 2023 and would become a $1 billion revenue company in 2026, in light of the known but undisclosed impact of printer unreliability, poor service, the lack of adoption of KornitX, and increased competition.

255.    *First*, the Company's machines did not function as advertised and were plagued by various reliability issues. As a result, Kornit's customers were losing market share, and as a result, turning to Kornit's competitors. Poor service performed by Kornit exacerbated issues with the Company's frequently broken equipment and caused significant customers, including DTG2go and Sticker Mule, to complain and ultimately defect to the competition. Furthermore, and as reported by numerous former Kornit employees, Kornit experienced significant competition from

M&R in the beginning of 2021, resulting in the complete or partial loss of two top 10 clients, Delta Apparel and Fanatics, who accounted for more than 10% of Kornit's recurring revenues.

256.    **Second,** Kornit's service department repeatedly failed to repair customers' printers on a timely basis, and the Company did not have the number of technicians necessary to service its clients effectively, and did not even have a ticketing system or other basic infrastructure components necessary to operate a successful customer service function. These issues were particularly significant for the Company due to the high rate at which Kornit printers broke down or were otherwise offline, necessitating a high level of technical support. The deficiencies in Kornit's customer service led to frequent customer complaints, refusals to purchase additional equipment, sales or disuse of Kornit printers and even order cancellations. This also impacted customers' willingness to pay for renewals on the Company's service contracts, which were supposed to generate recurring revenue for Kornit. According to a former Kornit employee, approximately 80% of customers would decline to renew service contracts because of poor service or the unjustified cost of the service contract. Kornit's woefully deficient service department exacerbated issues with the Company's frequently broken equipment and caused significant customers to complain and ultimately defect to the competition.

257.    **Third**, KornitX was "not ready" for market use during the Class Period, and would not make a material contribution to revenue. Kornit struggled to sell the platform to customers in the Americas—Kornit's largest market. FE11, a Software Architect at KornitX, explained that Kornit was constantly figuring out the integration of KornitX, during his time with the Company. As FE3 explained, KornitX generated ***no revenue*** from the Americas division during his entire tenure with Kornit. And as FE10 explained, the $100 million revenue forecast for the platform was "kind of crazy" given internal sales targets shared with former employees responsible for selling

the software during the Class Period. FE12 further alleged that KornitX lacked practical application and never worked right; FE12 also said Kornit had to redo the software and that there was never a good alignment on the institutionalization of the software or how the KornitX business was organized.

258.    Defendants' statements concerning the profitability and adoption of KornitX were further materially misleading; Defendant Samuel would subsequently admit that, ***even after the Class Period***, Kornit was still working on "stabilizing" the platform, and that by that time, KornitX had only generated a couple million in revenue.

259.    ***Fourth***, Defendants' projections were made without any reasonable basis in fact. As FE12 explained, Kornit had never performed any sort of market size analysis or attempted to determine the size of the "addressable" market for its products. It was not until 2023 that FE12 performed a market analysis, and this analysis showed that there were not enough customers who could afford Kornit's products.

260.    In addition and as discussed further above, the statements in ¶¶248-253, which were made beginning in December 2021 through the end of the Class Period, were materially false and misleading for additional reasons.

261.    Contrary to Defendants' statements, Kornit's business began experiencing significant negative demand trends, particularly beginning in late 2021. Defendant Samuel himself ***admitted this fact in June 2022***, when he told investors that "***by the end of 2021***," major customers had started to experience a slowdown in growth. Based on information provided to him by Chuck Meyo—the President of Kornit's largest division—FE3 confirmed that there were "recognizable trend issues" related to a slowdown ***in sales*** in November and December 2021, which were not as busy as Kornit had projected and negatively impacted sales in the fourth quarter of 2021.

262.    After the end of the Class Period, Defendant Samuel made further admissions confirming both the falsity of Defendants' statements and their knowledge of these negative trends. In May 2023, Defendant Samuel admitted that in 2022, Defendants "saw the impression[s] in many customers going down" and that "*we saw major decline* within the business of our customers" by the "*[b]eginning of 2022*." Rather than disclose this "major decline" that Defendants—by their own admission—saw, they continued to make material misstatements to investors, even as the negative trends persisted throughout the end of the Class Period in July 2022.

263.    The declining demand that Kornit experienced even caused Defendants to pull forward revenue from the second quarter of 2022 into the first quarter of 2022, in order to create the appearance that Kornit was continuing to meet its projections and, ultimately, making progress toward its stated revenue targets for 2023 and 2026.

### G.    False And Misleading Statements And Omissions Concerning KornitX

264.    On February 16, 2021, after the market closed, Kornit held a conference call with analysts and investors to discuss the Company's financial results for the fourth quarter and full year of 2020. During the call, Defendant Samuel stated that its new business line, a "unique" cloud-based software workflow service platform called KornitX, was, even in its early stages, "*experiencing huge interest from brands and fulfillers* looking to adopt on-demand business models at a global scale, as well as automate and optimize the production flows." Defendant Samuel stated that this provided the Company with "*a huge opportunity for Kornit to build an incremental recurring business model*, and we have an exciting roadmap of new software application and value-added services."

265.    On March 25, 2021, Kornit filed its annual report with the SEC on Form 20-F, which was signed by Defendants Samuel and Rozner. In addition, Kornit's 20-F also stated that KornitX, "Kornit's cloud workflow software solution, based on the acquisition of Custom

Gateway, *is a robust platform with a wide range of services to digitally transform our customers' operations* . . . ."

266.    On May 18, 2021, Kornit held a Company investor meeting. During that meeting, Defendant Rozner touted the strength of Kornit's business model, representing that "*we already see the huge value [KornitX] brings to our customers and the potential for us*" and that Kornit "expect[ed] KornitX to generate approximately *$100 million of revenues in 2026* at a very high profitability."

267.    On June 1, 2021, Defendants Samuel and Rozner participated in the William Blair Growth Stock Conference on behalf of Kornit. During the conference, Defendant Samuel also represented that the Company's software and workflow solution, KornitX, would allow Kornit to realize "*very strong stickiness*" with customer retention, stating that "*[o]nce customer[s] [for which] we are managing their production flow and brands are using this workflow to connect to our customers, this is the strongest stickiness that you have . . . to the company and our technology*."

268.    On June 10, 2021, Defendants Samuel and Rozner participated in the Citi Silicon Valley Tech Virtual Tech Bus Tour on behalf of Kornit. During the conference, Defendant Samuel also proclaimed KornitX to be "*a breakthrough . . . that [ ] will change the market*" and told investors that "*[w]e see great adoption on the KornitX*" by customers. Accordingly, Defendant Samuel represented that KornitX was already poised "to be [a] *$100 million software [as a service] business . . . by 2026*."

269.    On July 13, 2021, Defendant Samuel and Rozner attended the CJS Securities New Ideas Summer Conference on behalf of Kornit. In direct response to an analyst question asking "where are you on the development curve of KornitX," Defendant Samuel answered, "*we see a*

*great adoption*. Actually, *we see a very, very big adoption from – both from the fulfillers* that would like to connect to this network and get connected to brands and retails and marketplaces. And now, *we are really dealing and scaling up our operation team to support this growth* of their fulfiller. On the other hand, we are engaging many multiple project across the world with mega brands of taking part of their business and really transforming them to on-demand manufacturing. If it's on the local level, like in the UK *or specifically in the US* or in the global or a brand that would likely to spread all over the world to use this system. So, *great adoption*, we see a lot—*very good growth on the impressions and in the transaction*. . . ."

270.    On August 10, 2021, Kornit held a conference call with analysts and investors to discuss the Company's financial results for the second quarter of 2021. Defendant Samuel then assured investors that "our pipeline has never been stronger," including with the KornitX business line where the Company "*continue[s] to see great momentum*." In response to an analyst's questions about KornitX, Defendant Samuel stated that "*we have a big long list of orders for more than 80 projects right now to implement the KornitX* both with fulfillers that would like to join the network both with marketplaces, with brands" and "[t]here's huge interest also from the retail environment." Defendant Samuel further represented that "*we are very, very pleased with the adoption of KornitX* and the vision that we are driving and the change we are driving in the marketplace."

271.    On November 10, 2021, Kornit held a conference call with analysts and investors from its Customer Experience Center in New Jersey to discuss the Company's financial results for the third quarter of 2021. During the call, in response to an analyst's question about KornitX, Defendant Samuel stated that "*we have great, great feedback from many, many brands, retailers,*

marketplaces" and "[w]e *believe KornitX will be a major driver of growth and change for this industry*" and "*[w]e see [ ] very strong adoption*."

272. On January 10, 2022, Defendants Samuel and Rozner participated in the Needham Growth Conference on behalf of Kornit. During the conference, Defendant Samuel also described the Company's KornitX service as "*the secret sauce of Kornit*" that would "*drive Kornit to a multi-billion-dollar revenue company in the next coming years, so beyond 2026*." Defendant Samuel further stated that "*KornitX is already generating multi-million-dollar revenue on transaction[s] to Kornit, and the aim is to scale it very quickly*."

273. On January 12, 2022, Defendant Samuel participated in the CJS Securities New Ideas for the New Year Conference on behalf of Kornit. Defendant Samuel also touted KornitX as a major revenue driver, noting "*KornitX is a platform that enable* connectivity *between any marketplace, any brands, any e-commerce to a network of fulfillers using our technology and is really driving major growth* . . . ."

274. On February 15, 2022, Kornit held a conference call with analysts and investors to discuss the Company's financial results for the fourth quarter and full year of 2021. Defendant Samuel also touted growing revenues from KornitX, claiming that "*we will start to see a meaningful revenue coming from KornitX [in the second half of 2022]*, and we expect KornitX really to accelerate growth in 2023."

275. On June 8, 2022, Defendant Samuel participated in the Stifel Cross Sector Insight Conference on behalf of Kornit. During the conference, Defendant Samuel also added that "of course, *KornitX is growing very fast*" and that "*we see a massive growth coming into it*."

276. The statements in ¶¶264-275 above were materially false and misleading, and omitted material facts, as detailed further above. Defendants' statements concerning the

profitability and adoption of KornitX were materially misleading because *even after* the Class Period, Defendant Samuel would admit that Kornit was *still* working on "*stabilizing*" the platform, and that by that time, KornitX had only generated a *couple million* in revenue. It was materially false and misleading for Defendants to tout the KornitX platform because, contrary to Defendants' statements, KornitX was "not ready" for market use during the Class Period, and Kornit struggled to sell the platform to customers in the Americas—Kornit's largest market. FE11, a Software Architect at KornitX, explained that Kornit was constantly figuring out the integration of KornitX, during his time with the Company. As FE3 explained, KornitX generated *no revenue* from the Americas division during his entire tenure with Kornit. And as FE10 explained, the $100 million revenue forecast for the platform was "kind of crazy" given internal sales targets shared with former employees responsible for selling the software during the Class Period. As FE12 explained, the software never worked correctly, and Kornit had to "redo" the software.

### H.    Statements Treating Already-Materialized Risks As Hypothetical

277.    On March 25, 2021, Kornit filed its annual report with the SEC on Form 20-F, which was signed by Defendants Samuel and Rozner. Kornit's 20-F included a risk factor concerning potential "undetected errors or defects." That risk factor stated that Kornit's "*systems, ink and other consumables, and associated software may contain undetected errors or defects when first introduced or as new versions are released*," and that those "*problems may cause us to incur significant warranty and repair costs*, divert the attention of our engineers from our product development and customer service efforts *and harm our reputation*."

278.    The statements in ¶277 above were materially false and misleading when made, and omitted material facts, as detailed further above. Specifically, it was false and misleading for Defendants to claim that its products "may" contain defects or errors, or that those defects "may" result in significant costs or reputational harm because the risk that the Company's products would

contain defects or that those defects might result in significant repair costs had already materialized. Poor service performed by Kornit exacerbated issues with the Company's frequently broken equipment that was rushed into production, and caused significant customers, including DTG2go (Delta) and Sticker Mule, to complain and ultimately defect to the competition.

279.    On March 25, 2022, Kornit filed its annual report with the SEC on Form 20-F, which was signed by Defendants Samuel and Rozner. The Form 20-F included several purported "risk factors" with respect to Kornit's business.

280.    *First*, Kornit's 20-F included a risk factor concerning the Company's largest customers. That risk factor stated that "***the loss of either Amazon or another one of our significant customers, or variability in their order flows, could materially adversely affect our revenues or results of operations***."

281.    *Second*, Kornit's 20-F included a risk factor concerning potential "undetected errors or defects." That risk factor stated that Kornit's "***systems, ink and other consumables, and associated software may contain undetected errors or defects when first introduced or as new versions are released***," and that those "***problems may cause us to incur significant warranty and repair costs, divert the attention of our engineers from our product development and customer service efforts and harm our reputation***."

282.    The risk factors in ¶¶280-81 above were materially false and misleading when made, and omitted material facts, as detailed further above. First, the purported "risk" that Kornit could lose one of its significant customers, or that there could be significant variability in their order flows, had already materialized. By the time that Kornit filed this Form 20-F, as Defendants later admitted, Kornit already knew that two of its major customers were working directly with one of Kornit's main competitors to design printing technology that would replace, in whole or in

part, their need for Kornit's products. It was therefore false and misleading to describe that risk as merely a hypothetical risk, when, in fact, that risk was then-existing.

283.    Second, it was false and misleading for Defendants to claim that its products "may" contain defects or errors, or that those defects "may" result in significant costs or reputational harm because the risk that the Company's products would contain defects or that those defects might result in significant repair costs had already materialized. Poor service performed by Kornit exacerbated issues with the Company's frequently broken equipment that was rushed into production, and caused significant customers, including DTG2go (Delta) and Sticker Mule, to complain and ultimately defect to the competition.

## VIII.    LOSS CAUSATION

284.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

285.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Kornit ordinary shares and operated as a fraud or deceit on the Class (defined below). Later, including on May 11, 2022 and July 5, 2022, when Defendants' prior misrepresentations and fraudulent conduct were partially and fully disclosed to the market and/or the concealed risks materialized, the price of Kornit ordinary shares fell precipitously as the prior artificial inflation came out of the share price. As a result of their acquisition of Kornit ordinary shares during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## IX.    ADDITIONAL ALLEGATIONS OF SCIENTER

286.    Numerous allegations set forth above and summarized below give rise to the strong inference that Kornit and the Officer Defendants knew that they were making the above-detailed

materially false and misleading statements and omissions of material fact, or, at minimum, acted recklessly in making those statements and omissions.

287.    ***First***, the Defendants repeatedly made emphatic public statements touting both their sales pipeline and their purportedly excellent visibility into that pipeline. As Defendants explained throughout the Class Period, they had near-perfect information in real-time concerning their customers' use of Kornit's products, including through the Kornit Konnect system. Kornit Konnect in particular allowed Defendants to monitor, among other things, how many garments a customer printed each day, how fast customers printed, how much ink customers used, and utilization rates—meaning, how close Kornit's customers were to maximizing the capacity of their current machines. Kornit understood that once customers maximized capacity, they would come back to Kornit to buy more printers. As Defendant Samuel explained, using the Kornit Konnect system, Defendants measured the "success of each customer ***on a daily basis***," to "***mak[e] sure that they are buying more ink and more system[s] from us***."

288.    Indeed, Defendant Samuel told investors, "***we know everything that our customer is doing***. We know what are the garment that they're using, how much ink laydown they're doing, what type of jobs that they're printing." This system formed the foundation for the "excellent visibility" that Kornit repeatedly emphasized to investors. Internal Kornit documents confirm that Kornit closely monitored its customers' ink usage during the Class Period, allowing Kornit to understand when its customers would need to buy more of Kornit's products. And as a result, Kornit was able to analyze and predict trends in the demand for its products and prepare months in advance. As Defendant Rozner told investors, "because of the great visibility, we were able to secure production floor as well as the main lead times for quarters ahead."

289.    Kornit's excellent visibility into its sales pipeline was further buttressed by the fact that the Company's bigger customers provided it with multi-year plans that gave Kornit unparalleled access into those customers' ordering patterns. As Defendant Samuel told investors most of the Company's customers operated on two-year purchase plans with Kornit, while the Company's largest customer provided Kornit with a three-year purchase plan. Defendant Samuel explained in early 2022 that, based on the information Kornit learned through these multi-year plans, the Company had sufficiently clear "visibility so we can place order[s] already for 2023 with our suppliers to secure the needed supplies that we need."

290.    The Officer Defendants understood that these statements were of vital importance to investors and analysts throughout the Class Period. As a result, during nearly every earnings call, Defendants went out of their way to emphasize the significant "backlog" of business, their "strong visibility" into Kornit's sales pipeline, and specifically reassured investors that they were able to preview business more than a year into the future. Defendants repeated these and similar statements during industry conferences attended by analysts and market participants.

291.    Importantly, investors both credited and relied on Defendants' repeated public assurances concerning these issues. For example, early in the Class Period, analysts from Needham lauded the fact that Kornit "entered 2021 with the highest level of visibility in its history." Then in August 2021, analysts from Berenberg Capital Markets noted Kornit's "strong visibility into FY21 & FY22." In February 2022, William Blair credited the assertion that "Kornit's backlog provides excellent visibility into 2022."

292.    That Defendants (i) had such robust information concerning its sales pipeline and the demand for Kornit's products, and (ii) repeatedly made very detailed statements concerning

these issues, including in response to direct analyst questions, supports a strong inference of scienter.

293.    *Second*, Defendants admitted after the Class Period that they had seen significant decline in their business during the Class Period, contrary to their public statements. For example, in August 2022, during Kornit's earnings call for the second quarter of that year, Defendant Samuel admitted that throughout the entire ***first half of 2022***, its customers were already "declining year-over-year." In June 2023, Defendant Samuel acknowledged once again that in the "***[b]eginning of 2022***, we saw major decline within the business of our customers. They found themselves with overcapacity. They acquired many, many systems, inks and systems during the year of 2021 and the first and the second half of 2020. And they had overcapacity and they didn't buy additional systems during 2022."

294.    Defendants' admissions that they "saw [a] major decline" in their customers' business through the first half of 2022 directly contradict their repeated public statements to investors that, for example, Kornit had "never been in a better position as a company" at the start of 2022. Defendants' acknowledgement of real-time awareness that their statements were false further strengthens the inference of scienter.

295.    After the Class Period, Defendants also made statements indicating that their prior claims regarding the success and viability of KornitX had been grossly overstated. In November 2022, Defendant Samuel admitted that KornitX had generated only a "few millions of dollars" and that Defendants were still in the process of "***stabilizing*** the platform itself."

296.    *Third*, various former Kornit employees confirm that Defendants had access to, and were aware of, the significant negative trends in Kornit's business, and that demand for Kornit's products was rapidly decreasing. For example, FE4 explained that Kornit's ink usage reports were

regularly generated and were available to every single person at Kornit, including management. These reports gave Kornit real-time information on the amount of ink that its customers were using, and as a result, Kornit had almost perfect insight into the demand for its consumable products.

297.    In addition, FE4 explained that Defendant Samuel and Rozner were in nearly constant communication with the CFO of Delta and DTG2Go, speaking at least once a month, if not every week.

298.    Based on Kornit's access to nearly real-time information concerning its customers' business, FE4 also confirmed that by no later than November 2021, Defendants knew that demand for the Company's products was in decline and saw deeply concerning trends. This decline continued into 2022, and according to FE3, Defendants intentionally pulled forward revenue from the second quarter of 2022 in order to just barely hit their first quarter guidance. The fact that revenue was accelerated is corroborated by a dramatic increase in trade receivables. At the end of the fourth quarter of 2021, Kornit had approximately $50 million in trade receivables. But at the end of the first quarter of 2022, when Kornit pulled revenue into that quarter from the second quarter, trade receivables spiked drastically to over $80 million. And as Defendant Rozner himself admitted during the Q1 2022 earnings call, the growth in receivables was completely attributable to Kornit's largest customer, Amazon, to whom Kornit had shipped product "relatively close to the end of the quarter." In other words, Kornit accelerated approximately $30 million in revenue from Amazon to meet its first quarter revenue targets.

299.    FE12 further corroborated that in the first quarter of 2021 the "sh*t hit the fan," which caused Don Whaley (Vice President of Sales) to accelerate the shipment of printers that were in the revenue pipeline, as tracked by Kornit's Rev Rec process. FE12 confirmed regarding

this acceleration, that Whaley would not have taken instructions from anyone except Defendant Samuel or Meyo (President of the Americas).

300.    To address declining demand, Defendants also offered significant discounts, particularly at the end of quarters, to customers in order to meet the Company's revenue projections. These discounts would sometimes reach 30%, and Defendant Samuel, in particular, was intimately involved with this process. According to FE2, a Roll-to-Roll Sales Manager, even discounts of 5% and 7% eventually would be approved by Samuel, but anything above 7% could *only* be approved by Samuel. In other words, Samuel gave the final go-ahead on every significant discount. That Defendants knew of these significant negative trends and actively took measures to mask the decline in demand and its impact on Kornit's reported financial results further strengthens the inference of scienter.

301.    *Fourth,* former employees confirmed that Defendants Samuel and Rozner were aware of the pervasive issues with Kornit's customer service and the existence of strong competition that was in direct conflict with Defendants' public statements. These subjects were communicated to them directly and also discussed at meetings, including Quarterly Business Reviews (QBRs) that both Samuel and Rozner attended and participated in. For example, FE8, a sales manager for South America at Kornit, reported that he attended meetings with Defendant Samuel where service and reliability problems were discussed. Similarly, FE4 reported that customer service issues at Delta were discussed at frequent meetings beginning no later than early 2021 attended by Defendant Samuel, Chuck Meyo, (President of the Americas), and Don Whaley, Kornit's VP of Sales.

302.    In addition, both FE3 and FE6, a Strategic Accounts Manager at Kornit, reported that Chuck Meyo, who was President of the Americas at all times during the Class Period and

reported directly to CEO Samuel, was well aware of the service issues plaguing Kornit, which eventually led to key customer losses and were explicitly misrepresented by Defendants during the Class Period. FE3 reported that Meyo spoke to senior Kornit executives, including Defendant Samuel, frequently about sales and service issues. FE6 similarly reported that Kornit's executive management definitely knew about the service issues.

303.    FE12, who was a Marketing Director at Kornit during the Class Period attended Kornit's QBRs, which were also attended by numerous Kornit executives and senior management, including Defendants Samuel and Rozner. FE12 said that Samuel and the COO provided reports at the QBRs, as did sales, human resources, marketing and KornitX. These reports included slide presentations that detailed each group's own successes and "misses," and included a lot of data.

304.    FE12 was also aware of and reported customer service and customer complaints to Kornit's senior executives. For example, FE12 reported that he "flipped out" to leadership about Kornit's lack of a system to manage customer service calls and problems with the CRM system. FE12 complained to Don Whaley; he explained that the systems were not prepared to handle the customers. FE12 also raised his concerns to Kornit's Chief Operating Officer (Dror). In addition, FE12 stated that Chuck Meyo was aware of these problems. As detailed above, FE12 also observed various service and reliability problems, including irate customer complaints about printer downtime, unreliability, and long waits for service. FE12 also indicated that these issues were causing customers to move to competitors, including M&R. FE12 said these competition issues were sometimes discussed in the QBRs, attended by Defendants Samuel and Rozner.

305.    In January of 2022, Kornit hired Jeff Loomis into the role of Director of National and Global Accounts, which reflected that Kornit's senior leadership was aware of the major customer service issues and dissatisfaction. According to FE12, Loomis was hired in connection

with an effort to take care of customers better and immediately sent him on an "apology tour" to the Company's customers.

306.     **Fifth**, the alleged fraud concerned the most important aspects of Kornit's business. For example, Kornit's systems, comprised of its printers and platforms, generally accounted for approximately half of the Company's revenue during the Class Period, and Kornit's consumables brought in more than one third of its revenue. In light of their importance, the Company's printers, the accompanying consumables, and Kornit's ability to service its machines were the subject of intense market scrutiny and concern. In other words, either the Officer Defendants were intimately familiar with the defects plaguing Kornit's machines and the Company's woefully inadequate service department, or they were reckless in making those statements. That Defendants' misrepresentations concerned the most important aspects of Kornit's business further strengthens the inference of scienter.

307.     **Sixth**, Defendants made several false statements close in time to the dates on which the truth was revealed to investors. For example, on June 7, 2022 Defendant Samuel told investors at a William Blair conference that "the fundamental of Kornit **business is unbelievable in the best place that we could dream of**. All the market trends that we were talking about years ago just accelerated." Defendants made similar statements the following day at a Stifel investor conference, touting the Company's business and demand for Kornit's products. Then, just weeks later, in July 2022, Kornit announced staggeringly low results for the second quarter of 2022 which revealed that Defendants' prior statements were false. The temporal proximity between the alleged false statements and the revelation of the true facts supports a strong inference of scienter.

308.     **Seventh**, Defendant Samuel was highly motivated to conceal the Company's problems. As indicated by Forms 144 which Defendant Samuel filed with the SEC throughout the

Class Period, Defendant Samuel initiated the process to execute the sale of more than 80,000 shares of Kornit stock during the Class Periods for proceeds of nearly $10 million. This stands in stark contrast to Defendant Samuel's trading history during the equivalent prior period of time. During that time, Defendant Samuel sold approximately 26,500 shares for only $1.2 million in proceeds. Most of his trades were made pursuant to a Rule 10b-5 plan initiated after the start of the Class Period and Defendants' first false statements. Defendant Samuel was motivated to make the misleading statements he made during the Class Period to ensure that he would reap significant proceeds from those sales at artificially inflated prices. Defendants made those statements to assure investors about the quality of Kornit's products, that Kornit had the ability to accurately assess its sales pipeline, that its customer relationships were strong, and that there was no competition for Kornit's products. The fact that Defendant Samuel personally benefitted from the impact that these false statements had on Kornit's stock price supports a strong inference of scienter.[8]

309.    Defendants were also influenced and motivated to misrepresent the existence and extent of Kornit's problems to increase the value of the November 2021 Secondary Offering. Kornit sold over 2,335,000 of its ordinary shares at a net price of $145.72, for proceeds totaling more than $340 million in the 2021 Offering. Had those shares been sold immediately following the end of the Class Period, when Kornit shares traded at just $23.46 each, the proceeds from the 2021 Offering would have been reduced by over $285 million. By making the material misrepresentations and misleading statements detailed above Defendants were able to increase the proceeds from the 2021 Offering by a factor of *six*.

---

[8] Kornit's annual reports filed on Form 20-F during the Class Period suggest that Defendant Rozner did not own any shares of Kornit stock through at least April 29, 2022 (just two months before the end of the Class Period). Thus, the fact that Defendant Rozner does not appear to have sold any shares during the Class Period does not undermine the inference of scienter.

310.    ***Eighth,*** Defendants made detailed, and often repeated, statements (as set forth above in Section VII) based on their personal knowledge about: (i) the length of the Company's service contracts; (ii) the purported "integration" of Kornit's printers at Sticker Mule; (iii) the profitability of the Company's service department; (iv) the purportedly low total cost of ownership of Kornit's products; (v) Kornit's purported technological advantage and lack of competition; (vi) the value of KornitX; (vii) denying the "pull forward" of revenue in the first quarter of 2022, and (viii) trends that impacted Kornit's business. These statements made clear to investors that Defendants were intimately knowledgeable of those issues. For example, Defendants Samuel and Rozner frequently rejected the notion that they faced any serious competition in the market, claiming that it was "Actually, the opposite. What we see in the market today that's we are opening much bigger moat versus our competitors." In addition, Defendants repeatedly touted the value that KornitX brought to the Company, claiming that Kornit "already s[aw] the huge value [KornitX] brings to our customers and the potential for us" and that Kornit "expect[ed] KornitX to generate approximately $100 million of revenues in 2026 at a very high profitability." Even as the market for Kornit's business deteriorated in 2022, Defendants continued to assure investors that Kornit was "in the best place that we could dream of," and that "[a]ll the market trends that we were talking about years ago just accelerated." Defendants' false public statements repeatedly emphasizing these topics further strengthens the inference of scienter as those statements reflect that: (a) these Defendants investigated and had actual knowledge of the underlying facts (as alleged above), which made clear that the statements were materially false and misleading; or (b) Samuel and Rozner failed to investigate the underlying facts, making their misrepresentations highly reckless. Under either scenario Defendants Samuel and Rozner acted with scienter.

103

## X.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

311.    Kornit's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. Many of the specific statements described herein were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

312.    Kornit and the Officer Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Kornit who knew that the statement was false.

313.    None of the historic or present tense statements made by Kornit and the Officer Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Kornit and the Officer Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XI.    PRESUMPTION OF RELIANCE

314.    At all relevant times, the market for Kornit ordinary shares was an efficient market for the following reasons, among others:

    a.    Kornit's ordinary shares met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market, with an average daily trading volume of over 409,000 shares;

    b.    Kornit filed periodic public reports with the SEC and NASDAQ;

    c.    Kornit regularly and publicly communicated with investors via established market

communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.      Kornit was followed by several securities analysts employed by major brokerage firm(s), including but not limited to Barclays, Craig Hallum, Needham & Co., and William Blair & Co., who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

315.    As a result of the foregoing, the market for Kornit ordinary shares promptly digested current information regarding Kornit from all publicly available sources and reflected such information in the price of Kornit ordinary shares. Under these circumstances, all purchasers of Kornit ordinary shares during the Class Period suffered similar injury through their purchase of Kornit ordinary shares at artificially inflated prices and the presumption of reliance applies.

316.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on material omissions. Because this action involves a failure to disclose material adverse information regarding Kornit's business and operations—information that was required to be disclosed—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the significance of Kornit's purported technology advantages, revenue streams, and relationships with customers, that requirement is satisfied here.

## XII.   EXCHANGE ACT COUNTS

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against Defendants Kornit, Samuel, and Rozner**

317.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

318.    This Count is asserted on behalf of all members of the class against Defendants Kornit, Samuel, and Rozner for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, in connection with the statements each such Defendant made, as identified above.

319.    During the Class Period, Defendants Kornit, Samuel, and Rozner carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Kornit ordinary shares at artificially inflated prices.

320.    Defendants Kornit, Samuel, and Rozner: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ordinary shares in an effort to maintain artificially high market prices for Kornit ordinary shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

321.    Defendants Kornit, Samuel, and Rozner, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce, and/or of the mails,

engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

322.    During the Class Period, Defendants Kornit, Samuel, and Rozner made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

323.    Defendants Kornit, Samuel, and Rozner had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants Kornit, Samuel, and Rozner engaged in this misconduct to conceal Kornit's true condition from the investing public and to support the artificially inflated prices of Kornit ordinary shares. As demonstrated by these Defendants' omissions and misstatements, these Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discovery whether those statements were false or misleading.

324.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Kornit ordinary shares was artificially inflated. In ignorance of the fact that the market price of Kornit ordinary shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by these Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or recklessly disregarded, by

these Defendants, but not disclosed in public statements by Defendants, Lead Plaintiffs and other members of the Class acquired Kornit ordinary shares at artificially high prices.

325.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Kornit ordinary shares. Lead Plaintiffs and the Class would not have purchased Kornit ordinary shares at the prices they paid, or at all, had they been aware that the market prices for Kornit ordinary shares had been artificially inflated by these defendants' fraudulent course of conduct. It was also foreseeable to these Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Kornit's securities and that the ultimate disclosure of this information, or the materialization of the risks concealed by their material misstatements and omissions would cause the price of Kornit securities to decline.

326.    By virtue of the foregoing, Defendants Kornit, Samuel, and Rozner violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

327.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's ordinary shares during the Class Period.

328.    This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchase of securities giving rise to the cause of action.

## <u>COUNT II</u>

### For Violations of Section 20(a) of the Exchange Act
### Against Defendants Samuel and Rozner

329.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

330.     The Officer Defendants acted as controlling persons of Kornit within the meaning of § 20(a) of the Exchange Act, 15 U.S.C. §78t(a), as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading. The Officer Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to have been misleading prior to, and/or shortly after, these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

331.     As set forth above, the Exchange Act Defendants violated §10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions, as alleged in this Complaint.

332.     By virtue of their positions as controlling persons, the Officer Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and other members of the class suffered damages in connection with their purchases of the Company's securities.

## SECURITIES ACT CLAIMS

## XIII.   THE SECURITIES ACT CLAIMS

333.     Plaintiffs specifically disavow any allegations or averments of fraud in connection with the claims pleaded below under the Securities Act.

334.    As set forth in the Certification previously filed with the Court, Plaintiff Indiana Police purchased Kornit shares directly in the 2021 Offering and was damaged as a result of that purchase.

### A.    Jurisdiction And Venue

335.    The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o). This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 22 of the Securities Act, 15 U.S.C. § 77v because this is a civil action arising under the laws of the United States and Section 22 of the Securities Act grants jurisdiction to claims under the Securities Act to Courts of the United States.

336.    Venue is proper in this District under Section 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1391(b). Kornit maintains its United States headquarters in Englewood, New Jersey, which is situated in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information in the Offering Materials, occurred in and/or were issued from this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### B.    The Securities Act Parties

#### 1.    Plaintiff

337.    Additional Named Plaintiff Indiana State Police Pension Trust ("Indiana Police") is a defined benefit plan that provides retirement benefits for police officers in the state of Indiana. As reflected in the certification previously submitted to the Court (ECF 23-1), Indiana Police purchased Kornit ordinary shares directly in the 2021 Offering from Defendant Barclays (defined below) at the offering price of $151.00 and was damaged thereby. Indiana Police purchased shares

in the 2021 Offering on November 19, 2021, the time during which the 2021 Offering was being held. At no point on November 19, 2021, did the price of Kornit ordinary shares trade at $151.00 in open market trading. Indeed, on November 19, 2021 Kornit ordinary shares traded at prices between $157.50 and $181.38.

### 2.    The Securities Act Defendants

338.    In addition to Defendants Kornit, Samuel, and Rozner, the following Defendants are liable to Plaintiffs and the Class under the Securities Act for the material misstatements and omissions in the Offering Materials for the 2021 Offering.

339.    Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter and underwriter representative for the 2021 Offering. As an underwriter of the 2021 Offering, Defendant Citigroup was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2021 Offering Materials.

340.    Defendant Barclays Capital Inc. ("Barclays") served as an underwriter and underwriter representative for the 2021 Offering. As an underwriter of the 2021 Offering, Defendant Barclays was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2021 Offering Materials.

341.    Defendant Goldman Sachs & Co. LLC ("Goldman") served as an underwriter and underwriter representative for the 2021 Offering. As an underwriter of the 2021 Offering, Defendant Goldman was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2021 Offering Materials.

342.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter and underwriter representative for the 2021 Offering. As an underwriter of the 2021 Offering, Defendant Morgan Stanley was responsible for ensuring the truthfulness and accuracy

of the various statements contained in or incorporated by reference into the 2021 Offering Materials.

343.    Defendants Citigroup, Barclays, Goldman, and Morgan Stanley are collectively referred to in this Complaint as the "Underwriter Defendants."

### C.    Kornit And The 2021 Offering

344.    Kornit is a company incorporated in Israel with its United States headquarters in Englewood, New Jersey. Kornit's business is centered on the textile printing industry as applied to the fashion, apparel, and home décor sectors. The Company offers various printing services, including direct-to-garment printing and direct-to-fabric printing with its proprietary printing equipment. Kornit complements its printing offerings by selling various consumable accessories, such as ink for its printers. Kornit also offers service contracts for when its equipment breaks down. The Company was established in 2002 and completed its initial public offering in 2015.

345.    On or around November 23, 2021, Kornit conducted the 2021 Offering pursuant to a registration statement that the Company initially filed on September 14, 2020 and was declared effective by the SEC on September 17, 2020 (the "Registration Statement"). On November 19, 2021, Kornit filed a Prospectus Supplement on Form 424B5 (the "Prospectus Supplement"), which formed part of the Registration Statement (together, the "Offering Materials"). The Registration Statement was signed by Defendant Samuel and Kornit's directors. By means of the Offering Materials, Kornit and a selling shareholder, an affiliate of Amazon.com, Inc., offered and sold 3,042,845 Kornit ordinary shares at $151.00 per share. The 2021 Offering resulted in over $339 million in net proceeds to Kornit.

### D.    The Untrue Statements And Facts Omitted In The Offering Materials

346.    Facts demonstrating that the Offering Materials contained untrue statements and omitted material facts are set forth below.

### 1.    Reliability Problems Plaguing Kornit's Printers

347.    Several Kornit Former Employees ("FE") confirmed the existence of significant and well-known problems with the reliability of Kornit's products.[9] These reliability issues were the subject of frequent complaints from Kornit's customers.

348.    FE12 was a Marketing Director at Kornit from August 2021 through August 2023. FE12 reported to the Vice President of Sales, Don Whaley, who reported to President of the Americas, Chuck Meyo (who, in turn reported directly to Defendant Samuel). In FE12's role, he had "full oversight" of sales coming in and knew Kornit's customers and their feedback. FE12 was the direct connection between marketing and sales; given his role in marketing, his customer contacts and reporting line to Whaley, FE12 had clear information about what the sales team was doing. FE12 oversaw customer interactions and anything that had to do with marketing operations. FE12 was the main person responsible for managing and attending customer events, including trade shows, across the United States. This put him in frequent, direct contact with a wide range of Kornit's existing and potential customers.

349.    Moreover, in his role, FE12 attended Kornit's Quarterly Business Reviews ("QBRs"). The QBRs included reports from numerous groups within Kornit. Samuel and the COO provided reports at the QBRs and there were similar reports from sales and human resources. FE12 presented his own information during the QBRs and there were also reports about KornitX. These reports included slide presentations that detailed each group's own successes and "misses," and included a lot of data.

---

[9] The terms "Former Employees" and "FE" refer to the former Kornit employees whose reports are discussed in this Complaint. In order to preserve the Former Employees' anonymity while maintaining readability, the Complaint uses the pronouns "he" and "his" in connection with all of the Former Employees, regardless of their actual gender.

350.    FE12 said a lot of Kornit's top customers complained that the printers had high breakdown levels. FE12 stated that breakdowns became more frequent during his tenure because Kornit pushed printers out of the factory and the Company built the machines "less carefully." FE12 said the printers were very complex but Kornit wanted the machines to be built and shipped out faster. This led the Company to cut corners, and printers were shipped before they were ready, which in turn caused more frequent breakdowns and led more customers to complain.

351.    FE1 worked as a Customer Success Manager from July 2016 until February 2022, and as a Customer Success Contract Administrator from February 2022 until February 2023. In his role as a Customer Success Manager at Kornit, he tried to secure service contracts on the equipment, which were for service, parts, and labor, from customers. According to FE1, there were problems with the quality of Kornit's machines. FE1 said that nine times out of ten there were issues with new Kornit models. Kornit would do some beta testing with a few customers, but every single time they rolled out a new system there were issues. FE1 stated that this was true during his entire tenure, and the ensuing service problems caused technician burn out.

352.    FE9 was the Vice President of Marketing and President for North America at Kornit from August 2015 to September 2017 and currently works at a competitor to Kornit. FE9 said that Kornit's machines break down all the time. He confirmed that from a quality perspective, if you ask any of their existing customers, Kornit's products "are garbage." Typically, by the time a Kornit customer calls FE9, they are really upset.

353.    FE9 confirmed that he frequently speaks to current Kornit customers who are unhappy.

354.    FE8, a sales manager for South America at Kornit from April 2019 to February 2022, explained that Kornit claims the stability of their machines is very good, but it is 100% not. For example, FE8 explained that Kornit's Presto printer has a lot of problems in terms of stability.

355.    FE12 said a lot of Kornit's top customers complained that the breakdown levels on the Company's printers were too high, so they were moving over to competitors with more reliable machines.

356.    FE12 said a typical customer complaint regarded how many millions they spent on the machines only to have them break down and sit on location, not working. Customers said having a non-working Kornit printer was akin to having a Lamborghini in the garage that would not start. FE12 reported that machine uptime was critical to those customers who needed to repay their loans, but the machines were so technical that customers could not fix things themselves.

### 2.    Kornit's Deficient Customer Service

357.    Kornit failed to invest in and fund customer service, or "Customer Success," which included both training on new printers and the service function that Kornit provided under its service contracts. The need for strong customer training and service was critical in light of the reliability problems and complexity of Kornit's products. Multiple former employees confirmed that Kornit had an inadequate customer service infrastructure, which was understaffed and lacked basic software tools to track customer complaints. These deficiencies led to significant customer downtime, service delays and customer complaints and dissatisfaction.

358.    One significant issue was simply that Kornit did not have enough service technicians to timely repair customers' printers. FE5 worked as an Implementation Manager and Service Team Lead at Kornit from March 2017 until June 2023. FE5 confirmed that Kornit's service organization was overstretched. FE5 estimated Kornit would need a total of thirty technicians for the entire United States. FE5 confirmed that at all times he was at Kornit, the

Company had only twenty technicians in the United States, six of whom reported to him. FE5 said he got written up for repeating to his manager a customer's complaint that Kornit was making them wait a week or two to get a technician, and that when this first technician got there, they didn't actually know the machine that well, so Kornit was basically wasting the customer's time. According to FE5, this was a pretty common complaint from customers who were paying a lot of money for service. Indeed, FE5 relayed that every time he went to a new customer site, customers were complaining about the last technician that Kornit had sent.

359.    FE1—the Customer Success Manager and Contract Administrator—said he tried to secure service contracts on the equipment, which were for service, parts, and labor, from customers. Most of the accounts FE1 worked with were existing customers. FE1 recounted that customers were paying for service contracts but could not get technicians out to their site as quickly as they should have been able to. FE1 stated that when employees raised the need for more technicians with management, they were told there were enough. FE1 indicated that this issue persisted over his entire tenure at Kornit.

360.    FE8 worked as a Sales Manager for Kornit South America from April 2019 until February 2022. FE8 confirmed that Kornit has very bad service. FE8 said that he attended meetings where people brought up the issues with the machines and service.

361.    FE2, who was a Roll-to-Roll Sales Manager for EMEA in the Netherlands from October 2012 to December 2022, corroborated that service was an issue, adding that some customers did leave because of service and even tried to bring legal action. FE2 elaborated that if you look at the amount of systems and the amount of problems Kornit had, and the number of engineers (technicians), it was clear they could not keep up. According to FE2, the more systems they installed, the more engineers would be needed, and the gap was always getting bigger. FE2

added that as the systems got more and more complex, the time to repair a system got longer over time. That timing gap was also always growing.

362.    FE12 similarly said Kornit never had enough technicians to fix the printers quickly enough; there was, at times, a long waiting list of printers to fix. FE12 had conversations with Kornit's Head of Customer Service, Udi Har-Nof, and learned that Har-Nof was totally overwhelmed. FE12 ascertained this through conversations with Har-Nof.

363.    Former employees also acknowledged that customers, even Kornit's largest customers, experienced frequent, significant delays in receiving technical support. Further, Kornit's protocol for customers' service requests was overly complicated and created further delays, which exacerbated the downtime those customers experienced. These delays were in sharp contrast with the customer service experience of customers who worked with Kornit's competitor M&R.

364.    FE6 was a Strategic Accounts Manager at Kornit from January 2021 to July 2022, with responsibility for managing sales to the bigger United States customer accounts. FE6 recounted how pervasive these service issues were across Kornit's major clients and strategic accounts. FE6's accounts included Printful, Monster Digital, Spoonflower, and Vistaprint. FE6's account volume was around $16m annually. According to FE6, all of the accounts were having issues with service, with the biggest issue being that even though they were Kornit's largest customers, they weren't getting serviced immediately. FE6 elaborated that there was a whole protocol customers had to go through, and then wait for a response. FE6 reported that Kornit's technicians weren't available the next day.

365.    According to FE6, one of Kornit's biggest competitors is M&R Printing Equipment, and one of FE6's customers told him that when they called M&R, a technician would

be there the next day. FE6 heard directly from Chuck Meyo and Udi Har-Nof, the head of customer service, that customers needed to follow the protocol and that they didn't have the budget to hire more technicians. Jeff Loomis, who was Kornit's Vice President of sales at the end of FE6's tenure, told FE6 that he was very concerned about the issues with service, but the customer success team was not very responsive to those concerns.

366.    FE7 was a Senior Program Manager for Kornit from June 2020 until September 2022, located in Texas. His team was repurposed to support strategic accounts in the first quarter of 2022 since some of those customers were having issues. According to FE7, strategic accounts included Printful, DTG2go, and Fanatics. FE7 elaborated that there were nine strategic accounts in total, and Kornit was "kind of fretting" because it did not have enough people on the team for that many accounts. According to FE7, several strategic customers, including Printful and DTG2go, said they were not going to buy any more machines from Kornit unless the Company improved its service.

367.    Customer downtime due to a lack of adequate training added to the demands on Kornit's service organization and were a significant component in customer losses. Customers often did not how to fix machines or even how to run them properly. This created additional stress on the Company's service department and led to customer dissatisfaction. FE3, a critical senior executive who was responsible for Customer Success and later served as Chief of Staff to Chuck Meyo (President of the Americas), detailed the problems caused by the confluence of Kornit's poor training and inadequate service infrastructure.

368.    FE3 worked as Kornit's Director of Professional Services Sales from July 2021 until August 2022. In that role, FE3 oversaw the service department at Kornit. FE3 explained that while his title was Director of Professional Services Sales, from December 2021 through August

2022, he was more directed towards Kornit's marketing function. He then worked as Kornit's Director of Americas Category Management and Chief of Staff to Chuck Meyo (the President of Kornit Americas) from August 2022 until December 2022. Indeed, it was Meyo who hired FE3 at Kornit, after the two had worked together at another company for several years.

369.    It was well known that Meyo and FE3 had a close relationship. FE12 shared an office with FE3. FE12 confirmed that FE3 had been brought to Kornit by Meyo, that the two had previously worked together, and also had played soccer together. FE12 confirmed that based on FE3's close, long-standing personal and professional relationship with Meyo, FE3 had access to very high-level information about Kornit's business and operations.

370.    According to FE3, the complexity of Kornit's printers and lack of adequate training created situations where technicians would have to go back to repair the machine again and again. FE3 said Kornit wasn't funding customer success properly, so they didn't have the number of technicians necessary to meet the additional business generated by the lack of training, elaborating that customers couldn't get a technician if the machine broke, and that it would take Kornit a week or longer to get someone in to fix it. FE3 elaborated that Kornit did not invest in training customers on their machines, which are fairly technical.

371.    Several FEs also reported that due to the issues with service, customers frequently complained about or refused to extend their service contracts. For example, FE9 said that the biggest complaint he heard from customers was about the service contract. FE8 confirmed that in addition to providing very bad service, Kornit's service contract is very expensive.

372.    FE1 further confirmed that a lot of customers would cancel the service contract **as soon as the six-month warranty was up**. That happened quite a bit. FE1 said getting customers to

renew service contracts was a "very tough sell," estimating that only about **twenty percent renewed contracts**.

373.     FE1 elaborated that he knew of several customers who were sold systems and told that there were three technicians in their area when there were not. FE1 said the service issues "absolutely" impacted sales. According to FE1, Kornit's technicians got so burnt out that they would just quit, and then a new technician would have to learn the machines.

374.     Customers complained about service and pricing, noting that budget constraints on Kornit's service department—Customer Success—limited the amount of resources available to expand the infrastructure to meet client needs. These limitations included trying to get customers to solve issues themselves to avoid Kornit having to send a service technician to the client's location, especially because to properly fix the machines, technicians often had to make multiple visits.

375.     FE2 confirmed that the service department is also a profit center and has very strict budgets. FE2 elaborated that there was a database that tracked when a message was sent and how long it took for a technician to go out for that repair, noting that on average, **it took seven to twelve days to get a technician on-site**.

376.     Kornit's reliability issues were exacerbated by the Company's failure to put in place basic tools for customer service. For example, at the beginning of 2021, Kornit lacked an infrastructure for tracking customer service calls and needs. These customer service deficiencies also prevented Kornit from scaling its business to properly meet the needs of its customers.

377.     FE12 confirmed there were basic customer service elements missing when he started at Kornit, such as a ticket system to track customer service requests. Specifically, FE12 confirmed there **was no ticket system** for service calls from customers when he first started at

Kornit in the summer of 2021. FE12 further said that Kornit's Customer Relationship Management ("CRM") system was a complete disaster. FE12 stated that these issues were examples of how Kornit could not scale its business to meet customer needs.

378.    These service deficiencies led to service delays, customer complaints, and losses to competitors.

379.    FE12 reported that customer complaints were frequent: it was "screaming customers all day" because customers were upset. FE12 stated that a lot of customers purchased Atlas machines[10] only to be ignored afterwards. FE12 also said customers frequently complained they could not get attention or even get someone to call them back, and that customers were mad that Kornit could not service their machines properly.

380.    Similarly, FE12 said that when he attended trade shows on behalf of Kornit, customers sought him out and "ripped" into him with complaints. FE12 had to spend long stretches of time tending to customer complaints and trying to "simmer" down angry customers.

381.    The same was true for technicians who went to service Kornit's machines. FE12 said that when the Company sent technicians to customers, the customer would yell at the technicians for an hour before they could even start to fix the machine. FE12 stated that there were many cases where technicians told him about angry customers yelling at them.

382.    FE3 similarly reported that customers were screaming that they couldn't get technicians.

383.    The customer service problems and dissatisfaction were well known at Kornit and eventually the Company began to take efforts to mollify angry customers. Service and reliability issues were also discussed during the QBRs.

---

[10] According to Defendant Samuel, the "street" price of an Atlas machine in June 2021 was approximately $550,000. Defendant Samuel represented that the "list price" was even higher.

121

384.    FE12 reported that in early 2022, Kornit acknowledged its customer service and there was a new charter to take care of customers better. Kornit hired Jeff Loomis into the role of Director of National and Global Accounts to go on what FE12 described as an "apology tour" to the Company's customers. FE12 said because Kornit's machines were not being serviced and Kornit could not cover the SLAs (service level agreements), Loomis flew all around to visit Kornit customers and convince them not to sue Kornit. FE12 said Loomis was supposed to get additional sales, but no one was buying; it was an apology tour.

### 3.    The "Return on Investment" and Total Cost of Ownership of Kornit's Products

385.    The reliability and service issues discussed above undermined the Company's disclosures concerning the acceptance of its products and its ability to grow the business exponentially. In particular, the service and reliability issues materially affected the ROI of Kornit's printers.

386.    Kornit offered numerous products to its customers and rolled out several additional new products. One important factor to customers in deciding which company to buy printing equipment from was the cost associated with those products—meaning, not just the purchase price of the printer itself, but the total cost of ownership associated with the device; consumables such as ink; operating the device; and necessary maintenance and repair costs.

387.    But contrary to Defendants' statements, Kornit's products cost the Company's customers much more than Kornit had told them. When customers learned this—only after purchase—it led to customer losses and declining demand. One customer simply stopped using the machine altogether—they just turned it off.

388.    According to FE8, Kornit told customers the new Atlas machine will cost five cents per garment to produce, but the real cost is more like fifteen cents per garment. FE8 is good friends

with a Kornit customer in Brazil that has one plant in Miami. The customer told FE8 that Kornit told them the cost per t-shirt would be ten cents, but it was actually twenty. Similarly, according to FE8, when a customer in Colombia realized it was going to cost twice as much to produce as Kornit had told them, they turned off the machine; another customer in Brazil returned the machine after four months for the same reason. FE8 explained that Kornit tells customers they can have fashion brand quality with the new Atlas Max machine, but they don't mention that in order to get it, you have to use double of a lot of elements, such as white ink and primer. According to FE8, the machine also has to do more passes to make more layers of the ink, but no one explains that when they do customer demonstrations.

389.    FE2 provided a similar account. According to FE2, the total cost of ownership turned out to be much higher than what Kornit claimed to customers during the sales process. FE2 explained that Kornit would help any potential customer make a calculation on how quickly they could get their investment to break even or make money. Kornit came up with those numbers using an ROI (return on investment) tool where a customer could put in specific figures and then it calculated the cost and put out an ROI. FE2 reported that the biggest thing you have to calculate is the ink consumption, because that is the most expensive part of the calculation. According to FE2, with the calculator, Kornit would determine the milliliters of ink needed for a specific design or garment, but then it would turn out that if customers wanted to print at the quality they saw during the Kornit demonstrations, they would need to use much more ink than calculated during the sales process. FE2 stated that where a customer might have seen a $1.00 estimate in the calculator, the reality is that it would actually cost them up to 60% more to print the design.

390.    According to FE9, Kornit's former Vice President of Marketing, the way the Kornit machines perform versus the way they are sold is completely different, and that the machines also

break down all the time. The actual output is half of what Kornit markets according to FE9, because the machines use more ink and take longer to print than Kornit markets.

391.    FE8 provided a similar account. FE8 explained that Kornit's Presto printer has stability problems, and the business output Kornit claims is not real.

392.    The issues with product quality, reliability, and service were particularly acute given the expense of Kornit's printers, and the need for them to have as much "uptime" as possible to achieve the return on investment that Kornit promises in its marketing. The combination of the high cost of Kornit's printers, and poor reliability and service, capped Kornit's potential market and growth while also driving customers to competitors like M&R and ROQ, which made machines that could produce similar quality prints, with greater reliability and less cost.

393.    As noted above, Kornit provided customers with ROI modeling reflecting the return they could achieve by purchasing and operating the printers. Kornit also disclosed the importance of the ROI of its printers to investors. However, the ROI information provided to customers in the sales process was not representative of how Kornit's printers worked in the "real world," when considering downtime and reliability issues in particular.

394.    FE12 said that if the printers were down, customers could not get the ROI. FE12 elaborated that "downtime breaks the KPI" (or Key Performance Indicator, which measures performance), and that the ROI analysis (provided to customers) was based on how many impressions per hour the printers were capable of, but that was always under the "best conditions." Based on what he knew, downtime was not factored into those ROI calculations.

395.    As noted herein, for Kornit's small and midsized customers, the loss of one or two printers could materially impact the operation of their business and adversely impact the ROI that they were promised by Kornit.

### 4.    The Purported Value Of KornitX

396.    KornitX was a suite of end-to-end fulfillment and production offerings. KornitX was designed to automate workflow and inventory by allowing brands to order items at any of Kornit's participating customers, with delivery to the end consumer within 24 hours. KornitX was intended to accelerate Kornit's overall growth.

397.    Since the 2021 Offering, Defendants have admitted that KornitX only ever generated a ***couple million*** in revenue and that the Company was still working on "***stabilizing the platform***." This is because, as reported by former Kornit employees, KornitX simply wasn't ready to market and was difficult to sell in the Americas to clients who already had customized software. According to these former employees, it would take Kornit much longer than they disclosed to get the $100 million in sales they needed by 2026. Indeed, a former Kornit employee described Kornit's public statements about achieving $100 million in revenue by 2026 as "kind of crazy" based on internal sales targets and the Company's failure to sell KornitX to ***any*** client during his tenure.

398.    FE10 was a Platform Sales Manager for KornitX from March to July 2022. He was hired as part of a sales team that was tasked with selling KornitX to both customers that had Kornit printers, and other potential customers that were demand generators who might want customization. When told that Kornit had said that it expected to get to $100 million revenue per year for KornitX by 2026, FE10 said that number was "kind of crazy" because, according to an internal document he had, the targets per salesperson were $51k for the second quarter, $97k for the third quarter, and $176k for the fourth quarter, totaling about $325k per sales manager. FE10 explained that there were four sales managers total for KornitX and one boss, who was also responsible for sales.

399.    Similarly, FE3 explained that KornitX was one of the reasons he joined Kornit. FE3 stated that originally, marketing KornitX was supposed to be part of his role. However, FE3 explained, it became a separate organization with its own president, and then the product never came to market. According to FE3, by the time he left it had been three years since Kornit acquired Custom Gateway (from which the KornitX technology had been acquired), and it had not turned any kind of profit or generated any sales in the Americas.

400.    FE11 worked as a Software Architect at KornitX from July 2021 until November 2021. According to FE11, KornitX was not ready and they were constantly trying to figure out the integration.

401.    According to FE12, the Director of Marketing, the KornitX software was never properly integrated; there was no way to practically apply the software, and it never worked right. FE12 said Kornit had to redo the software; it was not orchestrated correctly. He also said there was never a good alignment on the institutionalization of the software or how the hierarchy worked at KornitX—the business was not organized; they didn't have a good way to operate it, to piece it all together.

402.    Kornit's public filings further confirm that Defendants' statements touting the platform's rapid growth, adoption, and related revenue targets were false when made. KornitX saw a consistent ***decline*** in customers. Specifically, KornitX had 300 customers as of March 25, 2021, but in disclosures from March 30, 2023 Kornit revealed that at the end of fiscal 2022, KornitX had just 166 customers. The rapid and consistent decline in KornitX's customer base contradicts Defendants' statements that the platform was "***see[ing] great adoption***," "***great momentum***," "***very strong adoption***," "***growing very fast***," and that "***we see a massive growth coming into it***." Further, the revenues generated by KornitX, which underpinned Defendants' $1 billion revenue

target, also stagnated. Kornit reported software sales for KornitX in an aggregate category for "services revenue." "Services Revenue" included revenue from services, spare parts, system upgrades and "software sales," which presumably included any revenue that would have come from KornitX, but possibly other software revenue. None of those components is broken out or quantified, obscuring the actual revenue (if any) KornitX might have generated. But in the annual reports prior to 2022, even that opaque disclosure attributed growth to one or more of those factors. But Kornit admitted that in 2022 there was no growth in "software sales," and possibly no revenue, from KornitX. Specifically, Kornit's March 30, 2023 annual report stated that the increase in service revenue was due to factors other than software sales. In other words, KornitX's purported "*massive growth*" had no impact whatsoever on Kornit's service revenue.

### E. The Offering Materials Contained Untrue Statements Of Material Fact and Omitted Other Facts Necessary To Make The Statements Made Not Misleading

403.     The Offering Materials incorporated by reference Kornit's annual report filed with the SEC on Form 20-F on March 25, 2021, which was signed by Defendants Samuel and Rozner. The Form 20-F included several purported "risk factors" with respect to Kornit's business.

404.     *First*, Kornit's 20-F included a risk factor concerning potential "undetected errors or defects." That risk factor stated that Kornit's "systems, ink and other consumables, and associated software *may* contain undetected errors or defects when first introduced or as new versions are released," and that those "problems *may cause us to incur significant warranty and repair costs*, divert the attention of our engineers from our product development and customer service efforts *and harm our reputation*."

405.     The statements in ¶404 above were untrue statements of material fact when made or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, as discussed above in this Section. Specifically, it was false and misleading

for Defendants to claim that its products "may" contain defects or errors, or that those defects "may" result in significant costs or reputational harm because the risk that the Company's products would contain defects or that those defects might result in significant repair costs had already materialized. Poor service performed by Kornit exacerbated issues with the Company's frequently broken equipment that was rushed into production, and caused significant customers, including DTG2go (Delta) and Sticker Mule, to complain and ultimately defect to the competition.

406.    **Second**, Kornit's 20-F included several statements concerning the total cost of ownership of its products. For example, Kornit touted the benefits of its Atlas product line, claiming that the Atlas boasted "retail-grade print quality, ***high productivity and attractive total cost of ownership***."

407.    As discussed above in this Section, the statements in ¶406 above were untrue statements of material fact when made or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. It was untrue and misleading to state, for example, that Kornit's products maintained "high productivity." In truth, Kornit's products suffered from significant defects and were significantly less productive than its competitors' products.

408.    It was also untrue and misleading to state that Kornit's products, boasted "attractive total cost of ownership." As a result of the significant defects and repair costs, as well as the lack of productivity of Kornit's products, the total cost of ownership of those products was significantly higher than Kornit's customers had been led to believe.

409.    **Third**, Kornit's 20-F also represented that "Strategic accounts are an important and valued part of our business and future growth, and ***we continue to make the appropriate investments*** in ensuring we serve their needs as it comes to sales, application consulting ***and***

*services support*. We expect to continue developing our strategic accounts practice in a combination of dedicated regional and corporate resources as we strive to help these important customers improve their business performances *by delivering best-in-class customer experience*."

410.    The statements in ¶409 above were materially false and misleading, and omitted material facts, as discussed above in this Section. It was materially false and misleading for Defendants to tout the purported quality, profitability and success of Kornit's service department. As further detailed above, contrary to Defendants' statements, Kornit's service department repeatedly failed to repair customers' printers on a timely basis, and the Company did not have the number of technicians necessary to service its clients effectively. Kornit also lacked the basic infrastructure to properly provide timely service to customers, such as ticketing and functional CRM systems. These shortcomings led to frequent customer complaints, refusals to purchase additional equipment, customers selling or not using their Kornit printers (impacting sales of consumables) and even order cancellations. This also impacted customers' willingness to pay for renewals on the Company's service contracts, which were supposed to generate recurring revenue for Kornit. According to a former Kornit employee, approximately 80% of customers would decline to renew service contracts because of poor service or the unjustified cost of the service contract. Kornit's woefully deficient service department exacerbated issues with the Company's frequently broken equipment and caused significant customers to complain and ultimately defect to the competition.

411.    *Fourth*, Kornit's 20-F also touted that KornitX, "Kornit's cloud workflow software solution, based on the acquisition of Custom Gateway, *is a robust platform with a wide range of services to digitally transform our customers' operations* . . . ."

412.    As discussed above in this Section, the statements in ¶411 above were untrue statements of material fact when made or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. Contrary to Defendants' statements, KornitX was *not* a "robust platform."

413.    In fact, Defendant Samuel admitted in late 2022 that Kornit was *still* working on "*stabilizing*" the platform, and that by that time, KornitX had only generated a *couple million* in revenue. KornitX was "not ready" for market use during the Class Period, and Kornit struggled to sell the platform to customers in the Americas—Kornit's largest market. FE11, a Software Architect at KornitX, explained that Kornit was constantly figuring out the integration of KornitX, during his time with the Company. As FE3 explained, KornitX generated *no revenue* from the Americas division during his entire tenure with Kornit. And as FE10 explained, the $100 million revenue forecast for the platform was "kind of crazy" given internal sales targets shared with former employees responsible for selling the software during the Class Period. As FE12 explained, the software never worked correctly, and Kornit had to "redo" the software.

## XIV.    SECURITIES ACT COUNTS

### COUNT III

**For Violations of Section 11 of the Securities Act Against Kornit**

414.    Plaintiffs repeat, incorporate, and reallege the allegations set forth above under Section XIII only, as if fully stated in this Count. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that Kornit acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

415.    This Count is brought under Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired Kornit ordinary shares sold pursuant or traceable to the 2021 Offering, and who were damaged thereby.

416.    Kornit is the registrant for the 2021 Offering. Kornit was responsible for the contents and dissemination of the Offering Materials.

417.    As the issuer of the shares, Kornit is strictly liable to Plaintiffs and the Class for the misstatements and omissions contained in the Offering Materials.

418.    Liability on this Count is predicated on the 2021 Offering, which was conducted pursuant to the Offering Materials. The Offering Materials were false and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated in the Offering Materials.

419.    Indiana Police purchased shares directly in the 2021 Offering from Defendant Barclays.

420.    The value of Kornit ordinary shares has declined substantially as a result of Defendants' violations, causing damage to those members of the Class that purchased or otherwise acquired Kornit ordinary shares in and/or traceable to the 2021 Offering.

421.    Less than one year has elapsed since the time that Plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based, and initiated the action. Less than three years have elapsed since the time that the securities at issue in this Complaint were *bona fide* offered to the public.

422.    By reason of the foregoing, Kornit is liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class under Section 11(e).

## COUNT IV

**For Violations of Section 12(a)(2) of the Securities Act**
**Against the Underwriter Defendants**

423.    Plaintiffs repeat, incorporate, and reallege the allegations set forth above under Section XIII only, as if fully stated in this Count. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that the Underwriter Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

424.    This Count is brought under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Kornit ordinary shares in and/or traceable to the 2021 Offering, and who were damaged thereby.

425.    Kornit's officers and directors signed the Registration Statement, which formed the Offering Documents.

426.    The Underwriter Defendants named in this count were statutory sellers and offerors and/or solicitors of purchases of the Kornit ordinary shares that were registered in the 2021 Offering pursuant to the Registration Statement and sold by means of the Offering Materials. By means of the Offering Materials, the Underwriter Defendants sold millions of Kornit ordinary shares through the 2021 Offering to Plaintiffs and members of the Class. The Underwriter Defendants were at all relevant times motivated by their own financial interests. In sum, the Underwriter Defendants named in this count were sellers and/or solicitors of sales of the stock that was sold in the 2021 Offering by means of the materially false and misleading Offering Materials.

427.    The Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, and failed to disclose material facts, as alleged above.

428.    Less than one year has elapsed since the time that Plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based, and initiated the action. Less than three years have elapsed since the time that the securities at issue in this Complaint were **bona fide** offered to the public.

429.    By reason of the foregoing, the Underwriter Defendants named in this Count are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired Kornit ordinary shares in and/or traceable to the 2021 Offering, and who were damaged thereby.

## COUNT V

### For Violations of Section 15 of the Securities Act
### Against Defendants Samuel and Rozner

430.    Plaintiffs repeat, incorporate, and reallege the allegations set forth above under Section XIII only, as if fully stated in this Count. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

431.    This Count is brought under Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who purchased or otherwise acquired Kornit ordinary shares in and/or traceable to the 2021 Offering, and who were damaged thereby.

432.    As alleged in Count Three (III) above, Kornit is strictly liable under Section 11 of the Securities Act for untrue statements and omissions of material fact in the Offering Materials

433.    Defendants Samuel and Rozner, by virtue of their positions, voting power, ownership, rights as against Kornit, and/or specific acts were, at the time of the wrongs alleged in this Complaint and as alleged in this Count, controlling persons of Kornit within the meaning of Section 15 of the Securities Act. These Defendants also had the power and influence, and exercised the same, to cause Kornit to engage in the acts described in this Complaint, including by causing Kornit to conduct the 2021 Offering pursuant to the Offering Materials.

434.    By reason of the foregoing, the Defendants named in this Count each were culpable participants in the violations of Section 11 of the Securities Act as alleged in Count Three above, based on their having signed or authorized the signing of the Registration Statement and/or having otherwise participated in the process that allowed the 2021 Offering to be successfully completed. The Defendants named in this Count are liable for the aforesaid wrongful conduct and are liable, to the same extent Kornit is liable under Section 11 of the Securities Act, to Plaintiffs and members of the Class who purchased or otherwise acquired Kornit ordinary shares sold pursuant or traceable to the 2021 Offering, and who were damaged thereby.

## XV.    CLASS ACTION ALLEGATIONS

435.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired Kornit ordinary shares: (i) pursuant and/or traceable to the Company's 2021 Offering; and/or (ii) during the Class Period (the "Class"), and were damaged thereby. Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

436.    The members of the Class are so numerous that joinder of all members is impracticable. Following the 2021 Offering, Kornit ordinary shares were actively traded on the NASDAQ. As of November 14, 2022, Kornit had over 49 million ordinary shares outstanding. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Kornit, its transfer agent or securities' brokers, and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

437.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a.    Whether Defendants violated the Securities Act;

    b.    Whether Defendants violated the Exchange Act;

    c.    Whether the Offering Materials were negligently prepared and contained inaccurate statements of material fact, omitted other facts necessary to make the statements made therein not misleading, and omitted material information required to be stated therein;

    d.    Whether Kornit and the Officer Defendants omitted and/or misrepresented material facts;

    e.    Whether statements made by Kornit and the Officer Defendants omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    f.    Whether the Offering Materials' signatory Defendants are personally liable for the alleged untrue statements of material fact and omissions of material fact described herein;

    g.    Whether    the    Officer    Defendants    are    personally    liable    for    the    alleged

misrepresentations and omissions described herein;

h.       Whether Kornit and the Officer Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

i.       Whether Defendants' conduct impacted the price of Kornit ordinary shares;

j.       Whether Defendants' conduct caused the members of the Class to sustain damages; and

k.       The extent of damage sustained by Class members and the appropriate measure of damages.

438.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct in violation of federal law complained of herein.

439.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

440.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XVI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

a.       Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.       Awarding compensatory, rescissory or statutory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial,

including interest thereon;

c.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XVII.  JURY DEMAND

Plaintiffs demand a trial by jury in this action of all issues so triable.

Dated: November 8, 2024                        Respectfully submitted,

By: /s/ *James E. Cecchi*
James E. Cecchi
**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**
Kevin G. Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Plaintiffs*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Hannah Ross (*pro hac vice*)
Avi Josefson (*pro hac vice*)
James A. Harrod (*pro hac vice*)
Alec T. Coquin (*pro hac vice*)
Mathews R. de Carvalho (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
avi@blbglaw.com
jim.harrod@blbglaw.com
alec.coquin@blbglaw.com
mathews.decarvalho@blbglaw.com

*Lead Counsel for Lead Plaintiffs*

Thomas C. Michaud
Francis E. Judd
**VANOVERBEKE MICHAUD**
   **& TIMMONY P.C.**
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
tmichaud@vmtlaw.com
fjudd@vmtlaw.com

*Additional Counsel for Lead Plaintiff Genesee*
*County Employees' Retirement System*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll
Julie Goldsmith Reiser
1100 New York Ave NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
stoll@cohenmilstein.com
jreiser@cohenmilstein.com

*Counsel for Named Plaintiff Indiana State Police*
*Pension Trust*

**Appendix A**

**Kornit Former Employees**

| Former Employee No. | Title and Tenure |
|---|---|
| FE1 | Customer Success Manager from July 2016 until February 2022, and Customer Success Contract Administrator from February 2022 until February 2023 |
| FE2 | Roll-to-Roll Sales Manager for EMEA from October 2012 until December 2022 |
| FE3 | Director of Professional Services Sales from July 2021 until August 2022 and Director of Americas Category Management; Chief of Staff to the President of Kornit Americas from August 2022 until December 2022 |
| FE4 | General Manager for Kornit Latin America from February 2019 until December 2021 |
| FE5 | Implementation Manager and Service Team Lead at Kornit from March 2017 until June 2023 |
| FE6 | Strategic Accounts Manager at Kornit from January 2021 until July 2022 |
| FE7 | Senior Program Manager for Kornit from June 2020 until September 2022 |
| FE8 | Sales Manager for Kornit South America from April 2019 until February 2022 |
| FE9 | Vice President of Marketing and President for North America at Kornit from August 2015 to September 2017 |
| FE10 | Platform Sales Manager for KornitX from March until July 2022 |
| FE11 | Software Architect at KornitX from July 2021 until November 2021 |
| FE12 | Marketing Director at Kornit from August 2021 until August 2023 |