# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

In re Kornit Digital Ltd. Securities
Litigation

No. 2:23-cv-00888-MCA-AME
*Document Filed Electronically*

<u>CLASS ACTION</u>

**ORAL ARGUMENT
REQUESTED**

**RETURN DATE:**
May 5, 2025

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT

OF COUNSEL:
Edmund Polubinski III (*pro hac vice*)
Dana Seshens (*pro hac vice*)
Daniel J. Schwartz (*pro hac vice*)
Marie Killmond (*pro hac vice*)
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
edmund.polubinski@davispolk.com
dana.seshens@davispolk.com
daniel.schwartz@davispolk.com
marie.killmond@davispolk.com

Samuel I. Portnoy
Michael V. Caracappa
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
sportnoy@gibbonslaw.com
mcaracappa@gibbonslaw.com

*Counsel for Kornit Digital Ltd., Ronen Samuel, and Alon Rozner*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................... 1

BACKGROUND .................................................................................. 4

ARGUMENT ....................................................................................... 10

I.    Plaintiffs' Exchange Act Claims Should Be Dismissed ................................ 11

    A.    The Complaint Lacks Plausible Allegations that Any Statements Were False or Misleading .................................. 11

        1.    The Challenged Statements Were Not False or Misleading and There Was No Duty to Disclose the Alleged Omissions .................................... 12

        2.    The Allegedly Omitted Information Was Disclosed ............... 28

        3.    The Alleged Misrepresentations Are Nonactionable Forward-Looking Statements Protected by the PSLRA .......... 32

        4.    The Alleged Misstatements Are Nonactionable Statements of Opinion ............................................... 36

        5.    The Alleged Misstatements Are Nonactionable Puffery .......... 37

    B.    Plaintiffs Fail to Plead Particularized Facts Giving  Rise to the Requisite Strong Inference of Scienter ............................... 38

        1.    Alleged Stock Sales by Mr. Samuel Fail to Plead a Motive to Commit Fraud ............................................. 38

        2.    Plaintiffs' Conclusory Allegations Do Not Give Rise to Any Inference of Scienter ........................................... 41

        3.    The Confidential Witness Allegations Do Not Give Rise to a Strong Inference of Scienter ............................. 46

II.   Plaintiffs' Section 11 and 12(a)(2) Claims Should Be Dismissed ............... 47

    A.    The Section 11 and 12(a)(2) Claims Are Subject to—and Fail to Satisfy—Rule 9(b)'s Heightened Pleading Standard ................................................................... 48

i

B.  The Section 11 and 12(a)(2) Claims Should Be Dismissed for Failure to Plead an Actionable Misstatement or Omission.................50

C.  Plaintiffs Fail to Plead "Controlling Person" Liability .......................54

CONCLUSION ......................................................................................54

## TABLE OF AUTHORITIES

P<small>AGE</small>(<small>S</small>)

*In re Adolor Corp. Sec. Litig.*,
  616 F. Supp. 2d 551 (E.D. Pa. 2009) ................................................... 39

*In re Advanta Corp.*,
  180 F.3d 525 (3d Cir. 1999) .............................................. 43, 44, 45

*In re Aetna, Inc. Sec. Litig.*,
  617 F.3d 272 (3d Cir. 2010) ...................................... 32, 33, 34, 37

*Alberici v. Recro Pharma, Inc.*,
  2020 WL 806719 (E.D. Pa. Feb. 14, 2020) ..................................... 16

*In re Alpharma Inc. Sec. Litig.*,
  372 F.3d 137 (3d Cir. 2004) ................................................... 42

*In re Amarin Corp. PLC Sec. Litig.*,
  2021 WL 1171669 (D.N.J. Mar. 29, 2021) ...................................... 29

*In re Anadigics, Inc., Sec. Litig.*,
  2011 WL 4594845 (D.N.J. Sept. 30, 2011) .................................... 28

*In re Audible Inc., Sec. Litig.*,
  2007 WL 1062986 (D.N.J. Apr. 3, 2007) ....................................... 40

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ........................................................... 35

*Berk v. New Jersey Dep't of Hum. Servs.*,
  2024 WL 3639442 (D.N.J. Aug. 2, 2024) ....................................... 54

*Buck v. Hampton Tp. School Dist.*,
  452 F.3d 256 (3d Cir. 2006) .................................................... 4

*In re Burlington Coat Factory*,
  114 F.3d 1410 (3d Cir. 1997) .......................................... 37, 39, 40

*Cal. Pub. Emps. Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2003) ..................................................................... *passim*

*Castlerock Mgmt., Ltd. v. Ultralife Batteries, Inc.*,
   68 F. Supp. 2d 480 (D.N.J. 1999) ................................................................... 48

*City of Edinburgh Council v. Pfizer, Inc.*,
   754 F.3d 159 (3d Cir. 2014) ............................................................................ 11

*City of Warren Police and Fire Ret. Sys. v. Prudential Fin., Inc.*,
   70 F.4th 668 (3d Cir. 2023) ............................................................................. 36

*Dang v. Amarin Corp. plc*,
   2024 WL 4285900 (D.N.J. Sept. 25, 2024) ..................................................... 46

*Davis v. City of Philadelphia*,
   821 F.3d 484 (3d Cir. 2016) ............................................................................ 10

*In re Donald J. Trump Sec. Litig.*,
   7 F.3d 357 (3d Cir. 1993) ................................................................................ 13

*Fan v. StoneMor Partners, LP*,
   927 F.3d 710 (3d Cir. 2019) ............................................................................ 29

*Foote v. Mehrotra*,
   2023 WL 7214728 (D. Del. Nov. 2, 2023) ....................................................... 53

*In re Gentiva Sec. Litig.*,
   932 F. Supp. 2d 352 (E.D.N.Y. 2013) .............................................................. 53

*GSC Partners CDO Fund v. Washington*,
   368 F.3d 228 (3d Cir. 2004) ............................................................................ 11

*Henry v. Futu Holdings Ltd.*,
   2024 WL 4285129 (D.N.J. Sept. 25, 2024) ..................................................... 29

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
   2017 WL 1536223 (D.N.J. Apr. 27, 2017) ........................................... 34, 37, 38

*In re Hertz Glob. Holdings Inc.*,
  905 F.3d 106 (3d Cir. 2018) ...................................................................40

*In re Incyte S'holder Litig.*,
  2014 WL 707207 (D. Del. Feb. 21, 2014) ................................... 24, 25

*Inst. Inv. Grp. v. Avaya*,
  564 F.3d 242 (3d Cir. 2009) ............................................................. 41

*In re Intelligroup Sec. Litig*,
  527 F. Supp. 2d 262 (D.N.J. 2007) .......................................... *passim*

*Lewakowski v. Aquestive Therapeutics, Inc.*,
  2023 WL 2496504 (D.N.J. Mar. 14, 2023) ..................................... 53

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  363 F. Supp. 3d 476 (D. Del. 2019) ................................................ 53

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ........................................................................... 11

*In re Merck & Co., Inc. Sec. Litig.*,
  432 F.3d 261 (3d Cir. 2005) ............................................................. 33

*In re Merck & Co., Inc. Sec., Derivative & Erisa Litig.*,
  2012 WL 3779309 (D.N.J. Aug. 29, 2012) ..................................... 54

*In re Milestone Sci. Sec. Litig.*,
  103 F. Supp. 2d 425 (D.N.J. 2000) ................................................. 38

*Monk v. Johnson & Johnson*,
  2011 WL 6339824 (D.N.J. Dec. 19, 2011) ...................................... 40

*Moriarty v. Dibuonaventura*,
  2015 WL 1469515 (D.N.J. Mar. 30, 2015) ..................................... 54

*In re NAHC, Inc. Sec. Litig.*,
  306 F.3d 1314 (3d Cir. 2002) .................................................. 15, 35

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp.*,
   720 F. Supp. 2d 517 (D.N.J. Mar. 30, 2010) .................................................. 34, 44

*In re Nice Sys., Ltd. Sec. Litig*,
   135 F. Supp. 2d 551 (D.N.J. Mr. 8, 2001) ............................................. 37, 38, 53

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
   834 F.3d 481 (3d Cir. 2016) .............................................................................. 16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*,
   575 U.S. 175 (2015) ................................................................................... 36, 51

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000) ............................................................................... 4

*Ortiz v. Canopy Growth Corp.*,
   537 F. Supp. 3d 621 (D.N.J. 2021) .............................................................. 33, 37

*Pamcah-UA Loc. 675 Pension Fund v. BT Grp. PLC*,
   2021 WL 3415060 (3d Cir. Aug. 5, 2021) ........................................................ 38

*Paxton v. Provention Bio, Inc.*,
   2022 WL 3098236 (D.N.J. Aug. 4, 2022) ......................................................... 18

*Peruto v. TimberTech Ltd.*,
   126 F. Supp. 3d 447 (D.N.J. 2015) .................................................................... 52

*Rahman v. Kid Brands, Inc.*,
   736 F.3d 237 (3d Cir. 2013) ......................................................... 43, 44, 46, 47

*Rescue Mission of El Paso, Inc. v. K-Sea Transp. Partners L.P*,
   2013 WL 3087078 (D.N.J. June 14, 2013) ....................................................... 18

*Shapiro v. UBJ Fin. Corp.*,
   964 F.2d 272 (3d Cir. 1992) ........................................................................48, 49

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*,
   499 F. Supp. 3d 49 (D. Del. 2020) .................................................................... 17

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006) ................................................................. 54

*In re Synchronoss Sec. Litig.*,
    705 F. Supp. 2d 367 (D.N.J. 2010) ........................................... 32, 33, 40, 41, 43

*In re Synchronoss Techs., Inc. Sec. Litig.*,
    2019 WL 2849933 (D.N.J. July 2, 2019) ......................................... 16

*Tanaskovic v. Realogy Holdings Corp.*,
    2021 WL 211049 (D.N.J. Jan. 21, 2021) ......................................... 38

*In re Tseng Labs, Inc. Sec. Litig.*,
    954 F. Supp. 1024 (E.D. Pa. 1996) .................................................. 13

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ........................................................ 40

*In re Vonage Initial Pub. Offering Sec. Litig.*,
    2009 WL 936872 (D.N.J. Apr. 6, 2009) .................................... 48, 49, 50

*Wallace v. Sys. & Comput. Tech. Corp.*,
    1997 WL 602808 (E.D. Pa. Sept. 23, 1997) .................................... 25

*Winer Fam. Tr. v. Queen*,
    503 F.3d 319 (3d Cir. 2007) ............................................................ 11

## STATUTES & RULES

15 U.S.C. § 77z-2 ............................................................................. 53

15 U.S.C. § 78u-4 ............................................................................. 38

15 U.S.C. § 78u-5 ......................................................................... 32, 34

Fed. R. Civ. P. 8 .......................................................................... 4, 48

Fed. R. Civ. P. 9 ........................................................................ *passim*

\*\*\*

**Note on Citation Format**:  Unless otherwise noted, emphasis has been added to quotations, and internal quotations, brackets, citations, and footnotes have been omitted.  References to Ex.__ correspond to the exhibits attached to the Declaration of Edmund Polubinski, filed contemporaneously herewith.

## <u>PRELIMINARY STATEMENT</u>

The Amended Consolidated Complaint—Lead Plaintiffs' second attempt to plead federal securities claims against Kornit Digital Ltd. and certain officers and directors—offers no more substance or detail than did Plaintiffs' deficient original complaint.  It again should be dismissed—this time with prejudice.  This Court allowed Plaintiffs a chance to replead, notwithstanding the Court's conclusion that only *some* of the prior complaint's defects "could potentially be corrected [while] some of them can't."  The Complaint, however, fails to correct *any* of Plaintiffs' pleading failures.  While Plaintiffs have reshuffled allegations and introduced a handful of new and equally defective ones, their sprawling Complaint still fails to remedy the core deficiencies this Court identified.

Despite its nearly 140 pages, more than 430 allegations, and 12 former employees, the Complaint still rests on impermissible allegations of fraud by hindsight.   As in the prior complaint, Plaintiffs allege that Kornit—an innovative leader in the digital printing space—somehow should have predicted a post-COVID business downturn before it happened, without supplying the required factual details showing what Defendants supposedly knew *when they made the challenged statements* that would have rendered them materially false or misleading.  Such allegations fail under both the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act").

*Exchange Act Claims*:  The Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b) impose a heightened standard for pleading Section 10(b) claims.  The prior complaint fell short of that standard for at least two principal reasons.  First, it turned almost entirely on information sourced from anonymous FEs who had no alleged involvement in the subjects of the challenged statements: setting revenue targets, dealing with key customers, overseeing customer support, and managing the KornitX business line.  As a result, Plaintiffs failed to plead any reasonable basis for even the vague and conclusory allegations the FEs offered.  Second, Plaintiffs repeatedly disregarded Kornit's express disclosures of the very information that supposedly had been omitted, which demonstrated that the challenged statements were not false or misleading at all.

The Amended Complaint suffers from these same deficiencies.  Plaintiffs did not follow the Court's directive to "replead [] as specifically as you can."  Instead, they added marginal details from an additional FE, but—again—fail to allege what that FE supposedly learned, how he came to learn it, or any information shared with or known by any Individual Defendant that conflicted with Kornit's public statements.  Plaintiffs also continue to ignore Kornit's express disclosures—highlighted in Defendants' prior briefing (and Kornit's public filings)—which make clear that Defendants' challenged statements were not false or misleading.  Further, many of the challenged statements continue to be forward-

looking statements protected by the PSLRA's safe harbor or otherwise are nonactionable statements of opinion or puffery.

Plaintiffs' deficient scienter allegations—which are virtually unchanged from their prior pleading—independently require dismissal of their claims.  The Amended Complaint still fails to plead any *motive* to deceive investors, and Plaintiffs' makeweight allegations regarding stock sales by a single Defendant— CEO Ronen Samuel—cannot fill the gap because Plaintiffs still cannot explain how he would have benefited from committing fraud when his Kornit stockholdings *increased* during the Class Period.  Plaintiffs also continue to rely on scienter theories that courts in this Circuit have rejected, including that the Individual Defendants were hands-on managers who must have known information concerning Kornit's "core operations" and theoretically had *access* to unspecified information allegedly conflicting with their public statements.

*Securities Act Claims*:  As in the prior complaint, the Securities Act claims are based on a handful of alleged statements made (or incorporated by reference) in the offering materials for Kornit's November 2021 secondary offering, which make up a small subset of the statements underlying Plaintiffs' Exchange Act claims.  Plaintiffs attempt to bolster their deficient Section 11 and 12 claims by copying and pasting into the Securities Act section many of the same deficient FE allegations that are offered in support of Defendants' alleged *fraud* under Section

10(b).  Because Plaintiffs allege that Kornit *knew* that the challenged statements were false or misleading, their Securities Act claims "sound in fraud," subjecting them to Rule 9(b)'s heightened pleading standard under which they fail for the same reasons as the Section 10(b) claims.  But even evaluated under Rule 8(a)'s plausibility standard, the Amended Complaint still fails to allege any actionable misstatement or omission.

Even with the benefit of this Court's guidance and insight, Plaintiffs still have not pled a viable securities claim.  It is clear they cannot do so.  Accordingly, the Amended Complaint should be dismissed with prejudice.

## **BACKGROUND**[1]

Defendant Kornit Digital Ltd. ("Kornit") is an Israel-based company that develops, designs, and markets innovative digital printing solutions for the global printed textile industry.  ACC ¶ 25; Ex. 1 (2020 20-F) at 36.  Ordinary shares of its stock trade on the Nasdaq Global Select Market.  ACC ¶ 25.  Defendant Ronen Samuel is Kornit's CEO, and Defendant Alon Rozner was Kornit's CFO during the

---

[1] The facts in this section are drawn from the factual allegations in Plaintiffs' Amended Consolidated Complaint (the "Complaint" or "ACC"), which are assumed to be true solely for purposes of this motion, and from the documents relied upon or integral to the Complaint, or incorporated therein by reference, and such other materials—including Kornit's securities filings—that the Court may consider on a motion to dismiss and of which it may take judicial notice.  *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000).

alleged Class Period (February 17, 2021 to July 5, 2022).  *Id.* ¶¶ 4, 26–27.

Kornit's products include digital printing systems that enable companies to print designs on garments or rolls of fabric; the inks and other consumables used with its systems; and software that, among other things, monitors system productivity.  *Id.* ¶¶ 32–33.  Kornit also sells maintenance and support service contracts beyond the six-month warranty that comes standard on its systems. *Id.* ¶¶ 6, 33; Ex. 2 (2021 20-F) at 54; Ex. 1 (2020 20-F) at 46.  In August 2020, Kornit expanded its business by acquiring a company with technology enabling end-users to print to any participant in a "global fulfillers network," which Kornit later broke out into a subscription-based business line called "KornitX."  ACC ¶¶ 12, 40; Ex. 2 (2021 20-F) at 46; Ex. 1 (2020 20-F) at 45–46.

On November 23, 2021, Kornit conducted a secondary offering, issuing additional shares of its common stock, underwritten by the Underwriter Defendants.[2]  ACC ¶ 345.  The November 2021 Offering was conducted pursuant to a November 19, 2021 prospectus supplement and a registration statement that became effective on September 17, 2020 (together, the "Offering Materials").  *Id.* ¶¶ 339–42, 345.

---

[2] The Underwriter Defendants are Citigroup Global Markets Inc., Barclays Capital Inc., Goldman Sachs & Co. LLC, and Morgan Stanley & Co. LLC.

## A.    Plaintiffs' Allegations and Kornit's Detailed Disclosures

Plaintiffs challenge as false and misleading dozens of statements made by Kornit and its management during the Class Period.  ACC ¶¶ 205–83, 403–13. The Complaint generally alleges that Kornit's Offering Materials, securities filings, press releases, earnings calls, and conference presentations omitted information about alleged product defects and customer service operations; the increasing competition it allegedly faced, including from M&R Printing ("M&R"); the loss of some business from key customers Delta and Fanatics, as well as from Sticker Mule; the length of its service contracts; and its alleged inability to generate revenues through KornitX.

The Complaint also alleges that, in analyst calls and investor presentations, Kornit misled investors about its ability to meet forward-looking projected revenue targets of $500 million by 2023 and $1 billion in 2026.  The Complaint, for example, alleges that Kornit overstated the success of its service department and of KornitX, as well as the strength of post-COVID demand for its products.  *See, e.g.,* ACC ¶¶ 2–3, 13–14.  Plaintiffs further allege that Kornit attempted to conceal its inability to hit targets in the first quarter of 2022 by "pulling forward" revenues that otherwise would have accrued later.  *See, e.g., id.* ¶¶ 3, 16.  Plaintiffs seek to support these allegations with statements attributed to 12 FEs, largely low- or mid-level managers in customer success and sales roles, multiple levels below senior

6

management.  *Id*. ¶¶ 52, 55, 56, 62, 64, 65, 68, 70, 72, 99, 139, 141.

Kornit, however, extensively and repeatedly disclosed throughout the Class Period that it had experienced, and expected to continue experiencing, challenges concerning precisely the risks that Plaintiffs allege were omitted.  As reflected in Kornit's annual reports on Form 20-F—documents that are integral to and incorporated by reference in the Complaint, and to which Kornit repeatedly referred investors when making the challenged statements—Kornit disclosed throughout the Class Period that it faced substantial hurdles to achieving its revenue targets in any given year or quarter:

- **Market Uncertainty**:  Kornit might not "correctly estimate demand for our solutions" and "sales may not grow as quickly as expected and [] share price could decline" "[i]f the market for digital textile printing does not develop as we anticipate."  Ex. 1 (2020 20-F) at 2; Ex. 2 (2021 20-F) at 2; Ex. 3 (2019 20-F) at 3.

- **Heightened COVID-Related Performance Uncertainty**:  The "impact of the pandemic on [Kornit's] customers" made it "more difficult to predict [Kornit's] future performance" and "more challenging to estimate pipeline conversion rates due to the economic uncertainty," presenting a "greater risk that any guidance [Kornit] provide[s] to the market may turn out to be incorrect."  Ex. 1 (2020 20-F) at 17; Ex. 2 (2021 20-F) at 16.

- **Slow and Variable Sales**:  Customers might delay expected purchases due to "a change in their priorities or business plans, including as a result of adverse general economic conditions," which, in turn, might cause Kornit not "to meet market expectations for any given quarter."  Ex. 1 (2020 20-F) at 5; Ex. 2 (2021 20-F) at 4; Ex. 3 (2019 20-F) at 5.

- **Customer Concentration**:  A "significant portion" of Kornit's sales are "concentrated among a small number of customers," and Kornit's "business

would be adversely affected by a decline in sales to, or the loss of, those customers." Ex. 1 (2020 20-F) at 4; Ex. 2 (2021 20-F) at 4; Ex. 3 (2019 20-F) at 4.

- **Product Issues**: Kornit's "systems, ink and other consumables, and associated software may contain undetected errors or defects"; Kornit had "experienced these errors or defects in the past" and "expect[ed] that" they "will be found from time to time" in the future. Ex. 1 (2020 20-F) at 15; Ex. 3 (2019 20-F) at 15; *see also* Ex. 2 (2021 20-F) at 13 (similar).

- **Adverse Effects of Product Issues on Customer Service and Revenues**: Product defects "may harm [Kornit's] business and results of operations," including by causing Kornit to "incur significant warranty and repair costs" and "divert[ing] the attention of [Kornit's] engineers from [its] product development and customer service efforts and harm[ing] [Kornit's] reputation," which could also delay revenues "as a result of [Kornit's] systems' inability to meet agreed performance metrics." Ex. 1 (2020 20-F) at 15; Ex. 3 (2019 20-F) at 15; *see also* Ex. 2 (2021 20-F) at 13 ("[p]roduct quality . . . issues could negatively impact consumer confidence in [Kornit's] brand and . . . business").

- **Competition from M&R and Others**: Kornit "face[d] increased competition," with its "principal competition for [its] digital printing systems com[ing] from manufacturers of analog screen printing systems, textile printers and ink, such as M&R"; "many of these competitors" have "greater customer support resources than [Kornit] ha[s]," and Kornit might face reduced margins to the extent its competitors market "products with similar or superior functionality to [Kornit's] solutions at prices comparable to or lower than [Kornit's]." Ex. 1 (2020 20-F) at 3–4; Ex. 3 (2019 20-F) at 4; Ex. 2 (2021 20-F) at 3.

- **Length of Service Contracts**: In 2019, Kornit began providing "a six-month warranty" on its printing systems, while also allowing customers to "purchase an additional year of support coverage at the time of purchase," after which they "can renew their support contract by purchasing a" multi-year "support package" that, among other things, includes "on-site yearly maintenance." Ex. 1 (2020 20-F) at 46; Ex. 2 (2021 20-F) at 54; Ex. 3 (2019 20-F) at 43.

- **Shortcomings and Limited Contribution of KornitX**: Custom Gateway—the new business line that became KornitX—faced various risks, including

"software bugs and defects that adversely impact [] customers' production processes" and "challenges providing support to software users," and, because KornitX had been sold without "a subscription-based software service to manage on-demand production," Kornit "d[id] not expect [KornitX] . . . to significantly impact [its] results of operations in the near term." Ex. 1 (2020 20-F) at 16; *see also* Ex. 2 (2021 20-F) at 15 (similar); *see also id.* at 2.

In every earnings release and earnings call throughout the Class Period, Kornit directly called out the statements made by the company and management as "forward-looking," disclosed that they were subject to substantial risks, and directed investors to the above-described risk disclosures.[3]

### B. The Original Consolidated Complaint and the Decision on Defendants' Motion to Dismiss

As the Court is aware, the Complaint is not Plaintiffs' first attempt to plead that Kornit's disclosures to investors were false or misleading. Plaintiffs previously filed a Consolidated Complaint, ECF No. 23 ("Original Consolidated Complaint" or "OCC"), that primarily relied on the same theories and allegations as the now-operative Complaint, *see* ECF No. 61-A (blackline between OCC and ACC). Defendants moved to dismiss that complaint in December 2023. ECF No. 34. At oral argument on the motion, the Court noted multiple deficiencies in

---

[3] *See* Ex. 4 (2/16/2021 Q4 2020, FY 2020 Call Tr.) at 4; Ex. 5 (5/18/2021 Special Call Tr.) at 4; Ex. 6 (8/10/2021 Q2 2021 Call Tr.) at 4; Ex. 7 (11/10/2021 Q3 2021 Call Tr.) at 4; Ex. 8 (2/15/2022 Q4 2021 Call. Tr.) at 4; Ex. 9 (5/11/2022 Q1 2022 Call Tr.) at 4; *see also* Ex. 10 (2/16/2021 6-K, Ex. 99.1 (press release)) at 4; Ex. 11 (8/10/2021 6-K, Ex. 99.1 (press release)) at 3; Ex. 12 (11/10/2021 6-K, Ex. 99.1 (press release)) at 3; Ex. 13 (2/15/2022 6-K, Ex. 99.1 (press release)) at 3.

Plaintiffs' pleading, including that it lacked "more concrete facts demonstrating the falsity of the statements" regarding the alleged Q1 2022 pull-forward, that FEs were "vague about" what they knew and when regarding an alleged decline in demand, and that the general "lack of specificity and timing of the [FEs'] statements" raised concerns. *See* ECF No. 56 ("Oral Argument Tr.") at 18:20– 19:8, 37:22–38:2, 40:7–8, 41:15–19. The Court dismissed the prior complaint without prejudice, affording Plaintiffs an opportunity to address these deficiencies.

But the changes Plaintiffs made to the operative Complaint are largely cosmetic and organizational edits lacking any new substance. Plaintiffs have added one new FE—FE12, a Marketing Director, ACC ¶ 52—whose statements suffer from the same vagueness and lack of detail afflicting the other FEs' accounts. As set forth below, Plaintiffs have entirely failed to correct the deficiencies this Court identified.

## **ARGUMENT**

The Complaint should be dismissed because it still fails—despite Plaintiffs' superficial amendments—to allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Davis v. City of Philadelphia*, 821 F.3d 484, 488 (3d Cir. 2016). Plaintiffs fail to plead any actionable claims under Section 10(b) of the Exchange Act or Sections 11 and 12 of the Securities Act. The controlling person claims under both statutes also must be dismissed for

failure to allege any primary violation or culpable participation.

## I.    Plaintiffs' Exchange Act Claims Should Be Dismissed

Plaintiffs' Section 10(b) claim fails because they do not plead facts supporting any actionable misstatement or omission of a material fact or a strong inference of scienter with the particularity required by Rule 9(b) and the PSLRA. *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 166, 176 (3d Cir. 2014); *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 236–37 (3d Cir. 2004).

### A.    The Complaint Lacks Plausible Allegations that Any Statements Were False or Misleading

Plaintiffs allege that numerous Kornit statements are actionable because they omitted certain information. But "[t]he securities laws do not require a defendant provide the public with all material information," *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 329 (3d Cir. 2007); *accord Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44–45 (2011). Rather, "[d]isclosure is required . . .  only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx*, 563 U.S. at 44 (second alteration in original); *see also Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 265 (2024) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."). Plaintiffs here fail to allege plausibly that any of the challenged statements were misleading or that Defendants had a duty to disclose the allegedly omitted information, which Defendants disclosed in any event.

11

### 1.    The Challenged Statements Were Not False or Misleading and There Was No Duty to Disclose the Alleged Omissions

***Statements Regarding Competition.***  Plaintiffs allege that various Kornit statements about the quality of its technology versus that of competitors, ACC ¶¶ 221–29, misleadingly omitted that (i) Kornit's machines experienced "various reliability issues"; (ii) Kornit experienced "significant competition, including from M&R"; and (iii) these factors allegedly caused "the complete or partial loss" of "significant customers," including Sticker Mule and "two top 10 clients, Delta Apparel and Fanatics," ACC ¶ 230.  These arguments fail.

First, Kornit regularly disclosed the existence of competition, including from M&R.  *See* Section I.A.2, *infra*.  It also regularly disclosed that it had experienced, and expected to continue to experience, product defects.  *Id*.  As for Sticker Mule, the Complaint does not allege Sticker Mule's significance to Kornit's business, nor does it explain how one customer's nonuse of a few printers could render misleading broader statements about the state of competition.[4]  As a result, Plaintiffs' only remaining basis for claiming Kornit's statements about competition were misleading is the departure of Delta and Fanatics.  *See* ACC ¶¶ 122–23.  But

---

[4] Further, Sticker Mule's alleged sale of previously purchased Kornit machines allegedly occurred in early 2022, ACC ¶ 99, *after* all but two of the allegedly misleading statements about competition.  Plaintiffs do not explain how Sticker Mule's alleged defection could rendered misleading statements that predated it.

Plaintiffs have not identified any alleged statements by Kornit that *even described* its relationships with Delta and Fanatics, much less represented that Kornit expected them to continue purchasing at any particular volume. Given Kornit's consistent disclosures about key customer loss and competition, *see supra* at 7–8, Plaintiffs' claims based on alleged nondisclosures about Delta and Fanatics fail.[5]

Second, these claims fail because Plaintiffs do not allege that Kornit *knew* that Delta and Fanatics intended to direct a material amount of business away from Kornit to M&R before their March 2022 public announcement. Plaintiffs allege that Mr. Samuel supposedly "admitted" such knowledge on the May 11, 2022 earnings call for Q1 2022. ACC ¶¶ 183, 185–186. But that is belied by Mr. Samuel's actual statement, which was that he was aware, "[i]n the last 2 quarters," that Delta had "decided also to acquire a few systems from one of our competitors" for long-term testing purposes. Ex. 9 (5/11/2022 Q1 2022 Call Tr.) at 15. There was nothing to suggest Kornit previously had been aware of the risk of any material loss of business; in fact, Mr. Samuel noted on the same call that Kornit

---

[5] To the extent Plaintiffs suggest that Kornit had a duty to disclose the alleged loss of business from Delta and Fanatics absent any alleged misstatement, that argument likewise fails as an issuer has "no obligation to disclose" that it is "losing its market share to its competitors." *In re Tseng Labs, Inc. Sec. Litig.*, 954 F. Supp. 1024, 1028 n.8 (E.D. Pa. 1996), *aff'd*, 107 F.3d 8 (3d Cir. 1997) (citing *In re Donald J. Trump Sec. Litig.*, 7 F.3d 357, 375–76 (3d Cir. 1993)).

"continue[d] to support" Delta and Fanatics as customers.[6]  *Id.*

In addition, the vague FE statements on which Plaintiffs rely fail to demonstrate Kornit's supposed pre-disclosure knowledge.  Although FE1 claims to have been "aware" that Delta and Fanatics were "moving their business elsewhere" because he supposedly "had to cancel the service contracts," ACC ¶ 126, FE1 does not aver when the cancellations allegedly occurred or that they occurred before the first quarter of 2022.  Similarly, the Complaint fails to allege any credible basis for FE4—*a general manager in Latin America*, *id.* ¶ 99—to know that Messrs. Samuel and Rozner spoke frequently with Delta's CFO before their "relationship" purportedly "broke down" in the second quarter of 2021, particularly given the Complaint's allegations that FE4 "doesn't know exactly what the conflict was about" and "was not personally part of th[e] meetings" where such issues supposedly were discussed, *id.* ¶¶ 133, 297.  *See Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 148–49 (3d Cir. 2003) (rejecting reliance on "low-level, locally sited former employees without alleging how or why such employees

---

[6] The Complaint suggests that Kornit lost *all* its business from Delta, ACC ¶¶ 230, 255, 278, 283, 405, but the cited press release and investor call nowhere reflect that was the case, Ex. 14 (3/28/2022 Press Release); Ex. 15 (3/28/2022 Delta Shareholder Call Tr.), and Delta's CEO subsequently confirmed that "Kornit supplies digital print equipment, and we have a good bit of it and we run it every day," Ex. 16 (5/3/2022 Delta Call Tr.) at 9–10.

14

would have knowledge" of facts alleged).[7]

***Alleged Decline in Customer Demand.*** Plaintiffs allege that Kornit knew of supposed "negative demand trends" beginning in late 2021, but allegedly did not "fully reveal[]" the true extent of "declining demand" until the 2022 Q2 earnings call on July 5, 2022. ACC ¶¶ 15–16, 182, 220, 241, 261. This theory fails on two fronts, just as it did in Plaintiffs' prior pleading. First, Plaintiffs fail to allege that any such trend existed in Q4 2021, and, second, Plaintiffs ignore that Kornit *did* disclose indicators of negative demand in its Q1 2022 earnings call.

As a threshold matter, Plaintiffs do not plausibly allege (let alone with particularity) that a negative demand trend existed in Q4 2021, and therefore do not allege that such a decline existed when the challenged statements were made. *See, e.g., In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002). Plaintiffs rely principally on the implausible statements of FE3—generic assertions that there was a purported "slowdown" in November and December 2021 about which he allegedly had "discussions with the President and Vice President of the Americas division," who (he claims) "told executives about the issues." ACC

---

[7] Although the Complaint also adds alleged statements from FE12 regarding Kornit's competition with M&R, ACC ¶¶ 127–28, these allegations do not add anything because FE12 says nothing more than what Kornit consistently disclosed: that it faced competition, including from M&R. *See, e.g.,* Ex. 1 (2020 20-F) at 3–4; Ex. 2 (2021 20-F) at 3; Ex. 3 (2019 20-F) at 4.

¶¶ 172–73.[8]  As this Court observed with respect to the nearly identical allegation in the OCC, ECF No. 61-A (blackline between OCC and ACC) at 75–76, these allegations are "vague about . . . what [FE3] knew in November and December of 2021 when [the alleged] statement[s] w[ere] made," Oral Argument Tr., 18:20–19:8.  The Complaint does not add meaningful detail regarding the timing or content of these alleged statements, and FE3's statements still cannot be credited without "independent corroboration."[9]  *Alberici v. Recro Pharma, Inc.*, 2020 WL 806719, at *18 (E.D. Pa. Feb. 14, 2020).[10]

The only other alleged basis for a known negative demand trend in Q4 2021

---

[8] *See also* ACC ¶ 220 (referring to FE3's "discussions . . . with the President of the Americas Division"); *id.* ¶ 241 (referring to "information provided to [FE3] by Chuck Meyo").

[9] Plaintiffs' claim that another former employee, FE12, allegedly knew about FE3's relationship with Mr. Meyo and "confirmed," on that basis, that FE3 "had access to very high-level information about Kornit's business and operations," ACC ¶¶ 73, 369, does nothing to corroborate FE3's account.  FE12's second-hand "knowledge" is based on FE12 "shar[ing] an office" with FE3, *id.* ¶¶ 73, 369, and his belief about what FE3 would know is both speculative and "fatal[ly] vague[]." *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 496 (3d Cir. 2016) (discounting "fatal[ly] vague[]" confidential witness allegations); *cf. In re Synchronoss Techs., Inc. Sec. Litig.*, 2019 WL 2849933, at *10 (D.N.J. July 2, 2019) (discounting testimony from confidential witness that "amount[ed] to nothing more than second-hand retelling and generalized rumor").

[10] Plaintiffs attempt to bolster their argument with FE12's claims that "going into 1Q2022 the sh*t hit the fan," that Kornit emptied a "buffer of printers," and that FE12 "belie[ved]" this was done to conceal a demand decline, ACC ¶ 179, but these vague, subjective allegations fail for the reasons set forth at 22–23, *infra*.

16

remains the allegation that Mr. Samuel stated in June 2022 that "'by the end of 2021' major customers had started to experience a slowdown in growth." *E.g.*, ACC ¶¶ 241, 261. But Plaintiffs continue to distort and take out of context Mr. Samuel's statements. *See SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 60 (D. Del. 2020) (statements evaluated in the context of "all of the company's disclosures and the entirety of market information"), *aff'd*, 2022 WL 3442353 (3d Cir. Aug. 17, 2022). What Mr. Samuel *actually said* was that *one* customer (Printful) started to feel a slowdown "by the end of 2021" and first told Kornit at "*the end of Q1*" 2022 that it would not order more systems in 2022 after it had bought "many systems . . . in 2021," including "a load of supplies *in Q4*." Ex. 17 (6/7/2022 William Blair Tr.) at 11–12. Even if reduced purchases from one customer could constitute a trend (which it does not), Plaintiffs have not alleged that Kornit knew about it until sometime in Q1 2022.[11]

---

[11] Contrary to Plaintiffs' characterizations, Mr. Samuel's other post-Class Period statements similarly explain that the demand decline from existing customers only began at the "beginning of 2022," following "huge growth during 2020 and 2021," during which time customers acquired "many systems." Ex. 18 (6/6/2023 William Blair Tr.) at 2; *see* ACC ¶¶ 203, 293. Kornit also disclosed that it believed that any negative change in demand was largely limited to the beginning of 2022. Ex. 18 (6/6/2023 William Blair Tr.) at 2 (explaining that, following 2022 Q1, Kornit was "starting to see a nice growth" with customers again); *see also* Ex. 19 (5/10/2023 Q1 2023 Call Tr.) at 7–10 (explaining that "last year, we saw the pressure in many customers going down" but "started to talk about in H2 that we're starting to see a new trend"). Indeed, Plaintiffs themselves allege that executives were "aware of the problems *in the first quarter of 2022*." ACC ¶ 173.

Moreover, Kornit *disclosed* emerging negative demand trends on its Q1 2022 earnings call.  *See Paxton v. Provention Bio, Inc.*, 2022 WL 3098236, at *13 (D.N.J. Aug. 4, 2022) ("[D]efendants are permitted a reasonable amount of time to evaluate potentially negative information and to consider appropriate responses before a duty to disclose arises.").  Kornit stated, for example, that "some of [customers'] purchases and expansion plans are now shifting out into later quarters"; "[w]e, like our customers, are not fully immune to overall macro pressures," particularly "post-pandemic dynamics"; and Kornit had perceived a "slowdown" in the "e-com segment."  Ex. 9 (5/11/2022 Q1 2022 Call Tr.) at 5, 6, 9.  Thus, even if a known negative trend existed, Kornit disclosed it and was "under no duty to provide more dire specifics while disclosing [its] true, generally positive" results.  *Rescue Mission of El Paso, Inc. v. K-Sea Transp. Partners L.P*, 2013 WL 3087078, at *16 (D.N.J. June 14, 2013).

**Statements Regarding Sticker Mule.**  Plaintiffs also challenge certain statements during Kornit's November 10, 2021 earnings call regarding Sticker Mule's integration and utilization of Kornit systems.  ACC ¶¶ 97–107.  As with the OCC, Plaintiffs still fail to explain why these statements were misleading.

In the OCC, Plaintiffs attempted to support their theory of falsity through alleged statements by FE3 and FE4 that this Court determined were inadequate.  Specifically, Plaintiffs alleged FE4 had stated that Sticker Mule purchased "three

or four" Kornit printers "at the end of 2021" but "Kornit was unable to get them to run properly, pushing Sticker Mule to get rid of [them] in the beginning of 2022," and that FE3 had "confirmed that Sticker Mule . . . couldn't work the [printers it purchased] correctly," OCC ¶ 41. At oral argument, the Court held these allegations insufficient because Plaintiffs alleged that Sticker Mule "resold [the printers] in early [20]22, [which] would be after the [November] 2021 integration statement"—and did not plead that the printers did not run properly *as of* the November 2021 statement. Oral Argument Tr., 27:21–23, 29:16–19. Plaintiffs thus had not alleged that the printers "*never* worked," *id*. at 29:19, and an "equally plausible construction" of Plaintiffs' allegations was that, as of the November 2021 statement, Sticker Mule was "tr[ying] to get [the printers] working," *id*. 29:24–25.

The Complaint merely recycles FE3's and FE4's prior, inadequate allegations. ACC ¶¶ 99, 101. Though Plaintiffs also add (1) alleged statements by FE12 concerning Sticker Mule and (2) an online listing for a Kornit printer, these new allegations fail to cure the deficiencies that the Court identified.

First, FE12's "confirm[ation] that the onboarding of Sticker Mule as a customer was 'terrible'" and statement that "Kornit had shipped [Sticker Mule] a bunch of machines, but Sticker Mule could not get them to work," ACC ¶ 103, are substantively identical to the statements from FE3 and FE4 in the OCC described above. FE12 adds no detail regarding timing. Thus, his statements, like those of

19

FE3 and FE4, do not permit a reasonable inference that the November 10, 2021 statements regarding Sticker Mule were false or misleading *when made*.

Second, the online sale listing for a Kornit printer that the Complaint excerpts makes no reference to Sticker Mule; thus, it provides no basis to believe Sticker Mule published the listing or that it corresponds to one of the "fleet" of printers Sticker Mule allegedly purchased "at the end of 2021" and sold in early 2022. ACC ¶¶ 97, 99, 104. Even if there were some indication that Sticker Mule had published this listing, it still would not address the core issue the Court identified. The listing itself is undated, and its reference to a single printer that was *installed* in September 2021 says nothing about how that printer (or any other printers in the "fleet") functioned at any particular time or when it was uninstalled. *Id.* ¶ 104. It thus does not support Plaintiffs' allegation that Sticker Mule's printers did not work at the time of the November 10 earnings call.[12]

### *Statements Regarding Alleged Q1 2022 Revenue "Pull-Forward."*

Plaintiffs also allege that Mr. Rozner denied in the Q1 2022 earnings call that

---

[12] Even if Plaintiffs had adequately alleged that Kornit was aware in November 2021 that Sticker Mule's printers did not "run properly," ACC ¶ 217, that would not show that the November 2021 statement regarding Sticker Mule's printer "integration" was false. Plaintiffs offer no plausible support for their inference that "integration" means that Kornit was guaranteeing that Sticker Mule had not had and would never have operational issues with the machines. Indeed, Kornit regularly disclosed that operational issues had occurred, and could and would continue to occur, across its products. *See supra* at 8; *infra* at Section I.A.2.

Kornit "had pulled forward sales from the second quarter [of 2022] into the first quarter." ACC ¶¶ 218–19. As an initial matter, Plaintiffs do not contend that Kornit violated any accounting rules in allegedly "pulling forward" revenue, improperly recognized any revenue, or did anything inherently unlawful. Rather, Plaintiffs' only contention is that Mr. Rozner allegedly misrepresented that a pull-forward had not occurred, but Plaintiffs do not allege why—even if his statement was wrong—it would have been material to any reasonable Kornit investor. *See, e.g., Peifa Xu v. Gridsum Holding Inc.*, 2020 WL 1508748, at *9 (S.D.N.Y. Mar. 30, 2020) (dismissing claim based on allegedly misstated line item in absence of materiality allegations).

In asserting this claim in the OCC, moreover, Plaintiffs relied solely on secondhand statements by FE3, a Director of Professional Services Sales, OCC ¶ 40, who allegedly "explained that he was made aware of [certain] sales being pulled forward by Chuck Meyo," *id*. ¶ 93. The Court identified "concern" about "the basis for FE3's knowledge" as a "customer service person . . . relying on information from someone else," and held that "more concrete *facts* demonstrating the falsity of the statements" were needed. Oral Argument Tr., 37:18–25. The Complaint does not supply these facts. FE3's allegations remain largely unchanged, except that he now claims to have discussed the alleged pull-forward with "Don Whaley (Kornit's VP of Sales)" in addition to Meyo. ACC ¶ 173. But

FE3 still offers no detail about *what* he discussed with them, *how* it conflicted with public statements, or *when* the discussions occurred.  This is insufficient.

Plaintiffs also introduce new allegations from FE12 in an attempt to support the pull-forward theory, but those statements do not conflict with Mr. Rozner's. FE12 merely states that Kornit "kept a buffer of printers that . . . could be shipped to customers in the near term" and that, by Q1 2022, "sh*t hit the fan" and "Kornit had emptied that buffer," i.e., shipped many printers.  *Id*. ¶ 179.  That is exactly what Mr. Rozner said on the earnings call (absent the profanity):  Kornit received the bulk of purchase orders toward "the end of the second half of the quarter" and made shipments "relatively close to the end of the quarter."  Ex. 9 (5/11/2022 Q1 2022 Call Tr.) at 18.

While the Complaint alleges that the *intent* behind the decision to empty the "buffer" was to boost Q1 revenue (because revenue was allegedly recognized upon shipment), ACC ¶ 173, FE12 (like FE3) offers no particularized *factual* detail to support this contention.  FE12 does not allege, for example, that the "buffer" printers had been slated to be shipped in the second quarter of 2022 and were instead shipped sooner; that any specific executive told him on any specific occasion that the purpose of shipping the "buffer" printers was to boost Q1 revenue; or that the timing of these shipments was otherwise unusual.  Indeed, he does not offer *any* facts showing that the depletion of the "buffer" was an artificial

22

"pull-forward" as opposed to an ordinary-course response to customer need or preference.[13]  And, to the extent Plaintiffs seek to rely on FE12's alleged assertion that the "sh*t hit the fan," it is not even clear what this statement means in this context.  In short, FE12 offers no facts that could render Mr. Rozner's statement false or misleading.

***Statements About Service and Service Contracts.***  As in their prior pleading, Plaintiffs challenge Mr. Samuel's statement during Kornit's Q4 2020 earnings call that "[e]very machine that we are selling, we are selling it with a contract.  There's no other way to buy from us a machine, and it's not for 1 year, it's for multiple year contracts.  And we see a very nice recurring revenue coming from the service business."  Ex. 4 (2/16/2021 Q4 2020, FY 2020 Call Tr.) at 10; *see* ACC ¶ 205.  Plaintiffs again fail to show that these statements were false or misleading in context.  That context, importantly, includes the question to which Mr. Samuel responded, which was whether "*some of*" Kornit's service contract "attach rates are now for multiyear type of service agreements,"  as opposed to "singular year contracts."  Ex. 4 (2/16/2021 Q4 2020, FY 2020 Call Tr.) at 10.

---

[13] Plaintiffs also allege that, according to FE7, "Kornit had the ability to accelerate revenue through its global strategic account (Amazon)."  ACC ¶ 220.  FE7 does not allege, however, that a pull-forward actually occurred, nor would such an allegation be plausible coming from FE7, a *senior program manager in Texas* with no role in revenue recognition or reporting.  *Id.* ¶ 70.

Taking each component of Mr. Samuel's response in turn:

- "*Every machine that we are selling, we are selling with a contract. There's no other way to buy from us a machine[.]*": Plaintiffs do not challenge this statement, and their allegations—that Kornit systems "automatically" came with contracts, ACC ¶ 95—are consistent with it. The statement also aligns with Kornit's unchallenged statements in SEC filings. *See supra* at 8.

- "*[I]t's not for 1 year, it's for multiple year contracts.*": Here, Mr. Samuel responded directly to the analyst's question, confirming that *some of* Kornit's attach rates were for multi-year service contracts, which Plaintiffs do not dispute, *see* ACC ¶ 94 (alleging existence of two-year contracts). Mr. Samuel's statement was not a representation that "Kornit customers were [] obligated to purchase a two-year service contract with each printer," as Plaintiffs suggest, *id*. ¶ 95. Nor could it reasonably have been misinterpreted as such, as Kornit repeatedly disclosed that it provided a *six-month* warranty with each printing system, and that customers could buy an additional one-year service contract after which they had the option to renew with a multi-year package. *See supra* at 8. Kornit directed investors to these very disclosures at the beginning of the Q4 2020 earnings call and in the accompanying earnings release. Ex. 4 (2/16/2021 Q4 2020, FY 2020 Call Tr.) at 4; Ex. 10 (2/16/2021 6-K, Ex. 99.1 (press release)) at 4.

- "*[W]e see a very nice recurring revenue coming from the service business.*": Plaintiffs do not attempt to challenge this statement; Kornit's services business posted revenues of $28,413,000 in 2020, a 22.1% increase from 2019. *See* Ex. 10 (2/16/2021 6-K, Ex. 99.1 (press release)) at 4.

Plaintiffs thus fail to allege anything false or misleading in Mr. Samuel's February 16, 2021 statement. They likewise fail to explain how any inaccuracy could possibly have been material to investors given Kornit's repeated, unchallenged disclosures about service contract terms. This claim thus warrants dismissal on the separate basis that Kornit's "SEC Filings . . . disclose[d] the very information [allegedly] necessary to make their public statements not misleading." *In re Incyte*

*S'holder Litig.*, 2014 WL 707207, at *10 n.15 (D. Del. Feb. 21, 2014) (citing

*Wallace v. Sys. & Computer Tech. Corp.*, 1997 WL 602808, at *10 (E.D. Pa. Sept.

23, 1997)).

Plaintiffs also allege that various positive statements about Kornit's service

organization, including statements about its financial performance and growth,

were misleading because of undisclosed product defects and service issues. *See*

ACC ¶¶ 207–14. All these assertions fail. First, Kornit's financial results, which

Plaintiffs do not challenge, show that its services organization *was* growing

throughout the class period. *See, e.g.*, Ex. 3 (2019 20-F) at 43 (reporting services

revenue of $23.3M and services contracts in place with 32% of industrial and mass

production installed base); Ex. 1 (2020 20-F) at 46 ($28.4M and 75%); Ex. 2 (2021

20-F) ($39.4M and 43%). Second, Kornit repeatedly disclosed that it had

experienced and expected to continue to experience product defects and service

issues, precluding any liability for allegedly omitting this information. *See infra* at

Section I.A.2. High-level statements about "best in class customer experience"

and "making appropriate investments to serve [customer] needs," ACC ¶ 208, are

too general to be actionable. *See infra* at Section I.A.5.

***Statements Regarding KornitX's Value.*** Plaintiffs allege that Defendants

made misleading statements about KornitX's functionality, potential future value

and demand, ACC ¶¶ 264, 265–66, customer adoption and retention, *id.* ¶¶ 267–68,

402, and actual revenues, *id.* ¶ 402. These allegations fail.

First, Plaintiffs allege as misleading Mr. Samuel's statement at a January 10, 2022 conference that KornitX was generating "multi-million-dollar revenue on transaction[s] to Kornit," based on FE3's statement that, "by the time he left" in August 2022, KornitX "had not turned any kind of profit or generated any sales in the Americas." ACC ¶¶ 140, 272, 276, 399. Plaintiffs not only fail to provide details "to support the probability" that FE3, a customer service and marketing executive, ACC ¶ 72, would be knowledgeable about KornitX, *see Chubb*, 394 F.3d at 148, but also *admit* that KornitX was part of a "separate organization" outside of FE3's business, ACC ¶¶ 140, 399. As to Mr. Samuel's January 2022 statement, Plaintiffs also draw a false comparison, because the statement—that KornitX had generated "multi-million-dollar *revenue*"—is not inconsistent with FE3's assertion that it "had not turned any kind of *profit*," *id.*, a *different metric*.[14]

Plaintiffs point to FE10's statement that he believed Kornit's projections for KornitX to be "kind of crazy" based only on internal targets for salespeople. ACC ¶¶ 138–39, 257, 276, 398, 413. Yet, Plaintiffs again fail to allege any facts to

---

[14] Nor can Plaintiffs plead falsity based on Mr. Samuel's alleged post-class-period statement that KornitX was generating a "couple million" in revenue, ACC ¶ 397, because a "couple million" *is* "multiple millions." Mr. Samuel's statements also are not inconsistent with FE3's statement that KornitX had not achieved sales in the Americas, as Kornit has significant operations *outside* the Americas. *See* Ex. 2 (2021 20-F) at 59, 96.

support crediting a "Platform Sales Manager," with no alleged involvement in

KornitX and employed for all of *five months*, ACC ¶ 139, with knowledge about

KornitX's external revenue projections months earlier, *see Chubb*, 394 F.3d at 148.

Finally, Plaintiffs contend that Defendants misled investors by "tout[ing] the

KornitX platform" because FE11 and FE12 claim that Kornit was "figuring out"

how to "properly integrate[]" KornitX.  ACC ¶¶ 141–42, 257, 276, 401.  These

statements are too vague to plead falsity, *see In re Intelligroup Sec. Litig.*, 527 F.

Supp. 2d 262, 290 (D.N.J. 2007).  At most, they simply describe a newly

developed platform; that a new platform is still being integrated does not render

false or misleading Defendants' optimism about the platform's future potential.

Instead of addressing the Court's concern "about the lack of specificity and

timing of the statements by the employees," Oral Argument Tr., 40:7–8, 41:15–19,

Plaintiffs have merely added more vague statements attributed to another former

employee.  ACC ¶ 142.  But increasing the number of insufficiently vague former-

employee accounts does not allow Plaintiffs to sidestep their obligation to plead

their claims with particularity.  *See Chubb*, 394 F.3d at 155 ("[T]he sheer volume

of confidential sources cannot compensate for [pleading] inadequacies.").

To the extent Plaintiffs maintain that Mr. Samuel's statements suggested that

KornitX was contributing substantial revenue to Kornit's reported results, that

theory disregards Kornit's express warning that it did not expect KornitX "to

significantly impact [its] results of operations in the near term." Ex. 1 (2020 20-F) at 16; *see also* Ex. 2 (2021 20-F) at 15 (similar). Further, Kornit disclosed increases in services revenue in 2020 and 2021, attributed in part to "revenues generated from sale of software subscription[s]," which include KornitX. Ex. 1 (2020 20-F) at 53; Ex. 2 (2021 20-F) at 63.[15] Plaintiffs still do not challenge the accuracy of these disclosures, which are entirely consistent with Mr. Samuel's statements. *See In re Anadigics*, *Inc. Sec. Litig.*, 2011 WL 4594845, at *25 (D.N.J. Sept. 30, 2011) (unchallenged SEC filings reporting ongoing sales to customer defeated confidential witness claim that issuer had "lost all credibility" with that customer).

### 2.    The Allegedly Omitted Information Was Disclosed

As set forth above, Kornit "sufficiently disclosed facts and information that would render [its] alleged misrepresentations not misleading"—foreclosing

---

[15] Although Plaintiffs' claim that "KornitX saw a consistent decline in customers during the Class Period," ACC ¶ 143, they also do not deny that Kornit's software subscriptions—which included KornitX, *see* ACC ¶¶ 143, 402—steadily increased throughout the Class Period. *Compare* Ex. 1 (2020 20-F) at 53, *with* Ex. 2 (2021 20-F) at 63. Plaintiffs fail to address that a business with increasing revenue could be accurately described as "growing," even if its customer base was simultaneously becoming more concentrated. Plaintiffs newly claim that Kornit's use of a "services revenue" category "conceal[ed] the actual revenue (if any) KornitX might have generated," ACC ¶¶ 143, 402, but Plaintiffs do not and cannot explain how this was so, given that Kornit used this revenue category before and after KornitX's introduction. *See, e.g.*, Ex. 1 (2020 20-F) at 53.

Plaintiffs' omission-based claims. *Fan v. StoneMor Partners, LP*, 927 F.3d 710, 717 (3d Cir. 2019); *accord In re Amarin Corp. PLC Sec. Litig.*, 2021 WL 1171669, at *14 (D.N.J. Mar. 29, 2021) (no omission where issuer "warn[s] of the exact risk that Plaintiffs argue they failed to disclose"), *aff'd*, 2022 WL 2128560 (3d Cir. June 14, 2022); *Henry v. Futu Holdings Ltd.*, 2024 WL 4285129, at *16 (D.N.J. Sept. 25, 2024) (no liability for nondisclosure of alleged regulatory noncompliance when company warned of risk it could be deemed noncompliant and "consequences that would result if that occurred"). Kornit provided detailed and comprehensive disclosures throughout the Class Period, addressing the very risks Plaintiffs claim it failed to disclose.

For example, Plaintiffs allege that Kornit misleadingly claimed "there was a lack of competition in its market" and failed to disclose "significant competition, including from M&R." ACC ¶ 230. This is simply inaccurate. While Kornit spoke optimistically of its own product offering and market position, it also repeatedly disclosed that it faced "increased competition" from competitors that might offer products with "similar or superior functionality," and *specifically identified M&R as a key competitor.* Ex. 1 (2020 20-F) at 3–4; Ex. 2 (2021 20-F) at 3; Ex. 3 (2019 20-F) at 4.

Plaintiffs also claim that Kornit failed sufficiently to disclose that customers might "defect to the competition." ACC ¶ 230. But Kornit *did* disclose that its

"business would be adversely affected by a decline in sales to, or the loss of [the small number of key] customers" on which it heavily relied.  Ex. 1 (2020 20-F) at 4; Ex. 2 (2021 20-F) at 4; Ex. 3 (2019 20-F) at 4.[16]  Similarly, Plaintiffs maintain that Kornit's statements regarding KornitX were misleading because the platform had not generated significant revenue and was allegedly still being "stabiliz[ed]," *see, e.g.*, ACC ¶276—but ignore that Kornit disclosed a variety of "challenges" associated with that new business line, such that it did not expect KornitX to "significantly impact [its] results of operations" in the near term.  Ex. 1 (2020 20-F) at 16; *see also* Ex. 2 (2021 20-F) at 15 (similar).

While Plaintiffs acknowledge that Kornit disclosed the risk that its products could contain defects, Plaintiffs suggest that Kornit misleadingly downplayed these risks as hypothetical.  ACC ¶¶ 277–78, 281–83.  Not so.  Kornit expressly told investors that it had already "experienced [product] errors or defects *in the past*" and "expect[ed] that these errors or defects will be found from time to time" in the future.  Ex. 1 (2020 20-F) at 15.  Kornit also disclosed that such defects adversely

---

[16] Further, Plaintiffs allege no duty to disclose loss of business from specific customers and disregard Kornit's disclosure of the alleged negative demand trend at its earliest awareness.  *Supra* at 12–18.  While Plaintiffs claim the above-mentioned risk disclosure in Kornit's 2021 20-F was misleading because Kornit supposedly "already knew" of the loss of business from Delta and Fanatics at the time of the disclosure—which predated Delta's announcement that it was working with M&R—Plaintiffs' *only* basis for such a contention is the uncorroborated account of FE4, ACC ¶¶ 132–34, 282, whose allegations fail, *see supra* at 14–15.

affected its "customer service efforts" in a manner that could "harm [its] business and results of operations."  *Id*.  Plaintiffs therefore identify no actionable omission regarding equipment issues or customer service.

Plaintiffs' claims that Kornit's revenue projections were misleading in light of the allegedly "known but undisclosed impact of printer unreliability, poor service, the lack of adoption of KornitX, and increased competition," ACC ¶ 254, necessarily fail:  Kornit disclosed each of those risks and their potential impact. While Kornit expressed optimism about its future results, it also unambiguously disclosed that its "share price could decline" because "the market for digital textile printing" may not "develop as [] anticipate[d]"—among a laundry list of other disclosed factors that could negatively impact Kornit's performance and results. Ex. 1 (2020 20-F) at 2; Ex. 2 (2021 20-F) at 2; Ex. 3 (2019 20-F) at 3.

Finally, Plaintiffs fault Kornit for not disclosing that its pre-Class Period growth was the result of "historically aberrational" "Covid-fueled demand." ACC ¶ 142.  But Kornit repeatedly disclosed the pandemic's "swift and significant" impact on the textile industry during the Class Period.  *See* Ex. 1 (2020 20-F) at 26; Ex. 2 (2021 20-F) at 28.  Kornit further disclosed that, while the pandemic accelerated certain trends favorable to its business, Ex. 1 (2020 20-F) at 27; Ex. 2 (2021 20-F) at 29, it also invited grave economic uncertainty that made it "more challenging" for Kornit to "estimate pipeline conversion rates" and "predict

[its] future performance." Ex. 1 (2020 20-F) at 16–17; Ex. 2 (2021 20-F) at 15–16. As the pandemic waned and e-commerce sectors faltered, Kornit's "pipeline conversion rates" suffered and some of the "guidance [it had] provide[d] to the market" did not come to fruition. Ex. 1 (2020 20-F) at 17; Ex. 2 (2021 20-F) at 16. But Kornit had warned investors of precisely these risks and further informed investors as they came to fruition, *see supra* at 15–18. In short, Plaintiffs attempt to fault Kornit for its "failure to predict" the future, *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 407–08 (D.N.J. 2010)—a liability theory routinely rejected under the securities laws, and a particularly tall order in the face of an unprecedented global pandemic.

### 3.    The Alleged Misrepresentations Are Nonactionable Forward-Looking Statements Protected by the PSLRA

The PSLRA creates a safe harbor that renders nonactionable "forward-looking statements"—including "projections of future performance, plans and objectives for future operations, and assumptions underlying statements about future financial, economic or operational performance." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 282 (3d Cir. 2010); 15 U.S.C. § 78u-5(i)(1)(A), (D). To qualify for the safe harbor, the statements must be (1) identified as forward-looking and accompanied by meaningful cautionary language; *or* (2) immaterial; *or* (3) the plaintiff must fail to prove that they were made with actual knowledge that the statement was false or misleading. *See* 15 U.S.C. § 78u-5(c)(1). These categories

are disjunctive; a statement within *any* prong is protected. *See Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 641 (D.N.J. 2021). Under the first prong, the cautionary statements need not be in the same instrument as the forward-looking statement; they may be incorporated by reference. *Aetna*, 617 F.3d at 279; *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 273 n.11 (3d Cir. 2005).

Many of the statements Plaintiffs challenge—reorganized, but otherwise largely unchanged from the OCC—are quintessential forward-looking statements, accompanied by comprehensive risk disclosures, and therefore nonactionable For example, revenue projections in Kornit's SEC filings and earnings calls—such as the statement that Kornit was "well on [its] way to becoming . . . a $1 billion revenue company by 2026," ACC ¶ 247—are "self-evidently [] forward-looking" because they are "prediction[s] of future events."[17] *Synchronoss*, 705 F. Supp. 2d at 401. These statements were identified as forward-looking in each earnings call and securities filing and were accompanied (either in the same document or others incorporated by reference) by comprehensive disclosures about risks that could cause Kornit's results to differ materially from projections.[18] Whether Plaintiffs

---

[17] *See also* ACC ¶¶ 193, 205, 208, 214, 231–232, 234–35, 243, 250–52, 266, 271.

[18] *See* Ex. 4 (2/16/2021 Q4 2020, FY 2020 Call Tr.) at 4; Ex. 5 (5/18/21 Special Call Tr.) at 4; Ex. 6 (8/10/2021 Q2 2021 Call Tr.) at 4; Ex. 12 (11/10/2021 6-K, Ex. 99.1 (press release)) at 3; Ex. 8 (2/15/2022 Q4 2021, FY 2021 Call Tr.) at 4; Ex. 13 (2/15/2022 6-K, Ex. 99.1 (press release)) at 3; Ex. 9 (5/11/2022 Q1 2022 Call Tr.) at 4.

now believe, in hindsight, that these goals were unrealistic, *see* ACC ¶¶ 42, 151, 165–67, is irrelevant.  Investors knew the difference between Kornit's reported revenue and its forward-looking targets and were informed of a variety of reasons Kornit's goals might not be achieved.  Because Kornit provided "clear warning to investors" regarding the relevant risks, its forward-looking statements are not actionable.  *Aetna*, 617 F.3d at 283.

Other forward-looking statements—including those regarding KornitX's future contributions to the business[19] and expectations regarding business and customer strategy[20]—are similarly protected.  *See, e.g.*, *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, *13 (D.N.J. Apr. 27, 2017), *aff'd sub nom. In re Hertz Glob. Holdings Inc.*, 905 F.3d 106 (3d Cir. 2018); *Nat'l Junior Baseball League v. Pharmanet Dev. Grp., Inc.*, 720 F. Supp. 2d 517, 529–30 (D.N.J. 2010); *see also* 15 U.S.C. § 78u-5(i)(1)(B)-(C).

Reiterations of Kornit's long-term guidance at analyst conferences also are nonactionable under the safe harbor because such statements—when originally made in Kornit's earnings releases and earnings calls—were identified as forward-

---

[19] ACC ¶¶ 235, 264, 266, 270–71, 310 (earnings calls and SEC filings); *see also id*. ¶¶ 268, 275, 402 (other contexts).

[20] ACC ¶¶ 97, 107, 208, 216, 218, 231–32, 236, 238, 247, 271, 280, 409 (earnings calls and SEC filings); *see also id*. ¶¶ 209–211, 222–26, 253, 269 (other contexts).

looking and made subject to Kornit's cautionary risk disclosures.[21]  When later repeated at other investor conferences, these statements were either directly accompanied by cautionary language, *see* Ex. 20 (6/7/2022 William Blair Pres.) at 10, Ex. 21 (6/8/2022 Stifel Pres.) at 10, or referenced and incorporated the earnings calls and SEC filings that formally delivered the guidance (and the cautionary language therein), *see* Ex. 22 (5/19/2021 Barclays Tr.) at 4 (stating that "yesterday"— on a May 18, 2021 investor call—"we shared our business plan for the next 5 years" and proceeding to discuss financial projections); ACC ¶ 245 (alleging that Kornit "reiterated" guidance at June 10, 2021 conference).[22]

Finally, all of the forward-looking statements are protected under the safe harbor's third prong because, as set forth below, Plaintiffs fail to allege any facts to

---

[21] *See* ACC ¶¶ 244 (May 19, 2021 Barclays Conference) (reiterating $1 billion revenue goal by 2026), ¶¶ 137, 245, 268 (June 10, 2021 Citi Conference) (same, and reiterating 2026 $100 million revenue goal for KornitX), ¶ 248 (Dec. 7, 2021 Barclays Conference) (reiterating $500 million and $1 billion revenue goals); ¶ 272 (January 10, 2022 Needham Conference) (reiterating goal to become multi-billion-dollar revenue company "beyond 2026"); ¶¶ 192, 239, 252 (June 7, 2022 William Blair Conference) (reiterating and discussing $500 million run rate goal and related goals), ¶ 253 (June 8, 2022 Stifel Conference) (same).

[22] In any event, such statements are also protected under the safe harbor's second prong because they are immaterial.  As Plaintiffs acknowledge, Kornit repeatedly communicated these targets over the years.  *See, e.g.*, ACC ¶ 248.  No reasonable investor would understand these targets differently because executives reiterated them several *additional* times at analyst conferences, and they therefore do not "alter[] the 'total mix' of information available."  *NAHC*, 306 F.3d at 1330 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–232 (1988)).

plausibly support a strong inference of scienter.  Plaintiffs therefore have not even alleged that they were made with actual knowledge of falsity.

### 4. The Alleged Misstatements Are Nonactionable Statements of Opinion

Opinion statements are generally nonactionable unless Plaintiffs plead with particularity one of three limited exceptions for statements "(i) [] not sincerely believed when made; (ii) contain[ing] an expressly embedded, untrue factual assertion; or (iii) reasonably impl[ying] untrue facts and omit[ting] appropriate qualifying language." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023) (describing three prongs of opinion liability recognized in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*, 575 U.S. 175 (2015)).  Plaintiffs challenge several opinion statements but consistently fail to plead any applicable exception.[23]

For example, statements that Kornit management "*believe[d]*" revenue goals were "realistic" and were "comfortable with them," ACC ¶ 246, "*s[aw]*" a dip in Q2 2022 revenue as "a bump on the road," *id*. ¶ 251, were "very pleased with the adoption of KornitX," *id*. ¶ 270, and "*believe[d]* KornitX will be a major driver of growth and change," *id*. ¶ 271, are all opinions. Revenue projections, too, are

---

[23] *See* ACC ¶¶ 205, 207–09, 211–14, 218, 221–29, 231–40, 243–53, 264–75, 277, 280–81.

opinion statements because, as "estimation[s] of [] amount[s]," they are "inherently subjective." *Hertz*, 2017 WL 1536223, at *12; *see also Ortiz*, 537 F. Supp. 3d at 670–71 (holding that defendant's "statements of its revenue were opinions," as "any estimate will require the application of management's judgment"). Plaintiffs' failure to plead scienter precludes them from alleging all these opinions were not honestly held when made, *see infra* at Section I.B; and, as demonstrated above, *supra* at Sections I.A.1–2, Plaintiffs fail to allege, much less with particularity, facts suggesting that these opinion statements embed false facts or imply untrue assertions without qualifying language. These statements thus are not actionable.

## 5.    The Alleged Misstatements Are Nonactionable Puffery

Many of the statements that Plaintiffs challenge also are nonactionable as immaterial corporate "puffery"—"vague and non-specific expressions of corporate optimism on which reasonable investors would not have relied." *Aetna*, 617 F.3d at 284.[24] For example, Mr. Samuel's statements that Kornit has "by far, the best technology" and is "by far, faster and [more] innovative versus any other companies out there," ACC ¶ 227, are all nonactionable "general, non-specific statements of optimism or hope." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997); *see also, e.g.*, *In re Nice Sys. Sec. Litig.*, 135 F.

---

[24] *See* ACC ¶¶ 97, 109, 192, 205, 208–210, 212–14, 216, 221–29, 231–37, 239–40, 243, 246–47, 249, 253, 264–66, 269–75, 307, 310, 406, 409, 411.

Supp. 2d 551, 580 (D.N.J. 2001) ( "leading" or "dominan[t]" market position);

*Tanaskovic v. Realogy Holdings Corp.*, 2021 WL 211049, at *20 (D.N.J. Jan. 21,

2021) (focus on "maintaining business momentum"); *Hertz*, 2017 WL 1536223, at

*10–11 ("strong" financial results and "sustained operational excellence"); *In re*

*Milestone Sci. Sec. Litig.*, 103 F. Supp. 2d 425, 458 (D.N.J. 2000) ("very pleased

with the amount of orders we have").

### B.    Plaintiffs Fail to Plead Particularized Facts Giving Rise to the Requisite Strong Inference of Scienter

Even if Plaintiffs had adequately alleged an actionable misstatement or

omission—which they have not—their Exchange Act claims would fail for the

independent reason that Plaintiffs have not pleaded the required "strong inference"

of scienter, i.e., that Defendants acted with "the intent to deceive, manipulate, or

defraud either knowingly or recklessly." *Pamcah-UA Loc. 675 Pension Fund v.*

*BT Grp. PLC*, 2021 WL 3415060, at *1 (3d Cir. Aug. 5, 2021) (citing 15 U.S.C. §

78u-4(b)(2)(A)).  Instead, Plaintiffs' allegations are vague, conclusory, and

attenuated.  This failure independently requires dismissal.

### 1.    Alleged Stock Sales by Mr. Samuel Fail to Plead a Motive to Commit Fraud

Plaintiffs allege that stock sales by Mr. Samuel during the Class Period

furnish a motive for him to commit fraud, ACC ¶ 308, but these allegations fail to

support the requisite strong inference of scienter for a number of reasons.  As an

initial matter, Mr. Samuel's stock sales offer no conceivable basis to infer fraudulent intent on the part of Mr. Rozner, who is not alleged to have sold any stock during the Class Period. It is telling that Plaintiffs make no effort to plead unusual sales by anyone other than Mr. Samuel; allegations of unusual sales by only one Defendant undermines any claim of motive. *See, e.g., Burlington*, 114 F.3d at 1423.

Even as to Mr. Samuel himself, the stock sale allegations are inadequate. First, contrary to Plaintiffs' allegations, Mr. Samuel's stock sales during the Class Period were not in "stark contrast" to his prior trading practices. The Complaint's omission of any details concerning Mr. Samuel's total holdings of Kornit stock means that Plaintiffs cannot offer any "basis to infer that [his] sales were unusual or suspicious." *See id.*, 114 F.3d at 1423. This alone should end the matter. But the judicially noticeable facts show that Mr. Samuel maintained a significant personal stake in Kornit at all relevant times, increasing from 44,848 shares at the Class Period's beginning (*see* Ex. 1 (2020 20-F at 82); to 46,282 shares at the Class Period's end (*see* Ex. 23 (2022 20-F) at 96). That Mr. Samuel *increased* his shareholding when Plaintiffs allege he was orchestrating fraud "raises a compelling inference against scienter under Third Circuit law." *Monk v. Johnson & Johnson*, 2011 WL 6339824, at *12 n.12 (D.N.J. Dec. 19, 2011); *see also In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 572–73 (E.D. Pa. 2009) (similar).

In any event, Courts "will not infer fraudulent intent from the mere fact that some officers sold stock." *Burlington*, 114 F.3d at 1424. Mr. Samuel's alleged profits from his stock sales also do not supply that inference; it is only "natural for any trader of securities, including insiders, to try to sell their shares at maximum profit." *Synchronoss*, 705 F. Supp. 2d at 410. The inference of scienter based on stock sales is particularly weak where, as here, the Complaint alleges episodic stock sales over a 17-month Class Period. The Third Circuit has explicitly recognized that a lengthy class period "makes it difficult to infer intent from the mere fact of a stock sale, as it is not unusual for insiders to trade at some point during their tenure with a company." *Hertz*, 905 F.3d at 120 (deeming a class period lengthy if it is "over a year"). Any suggestion that Mr. Samuel sought to artificially prop up the stock price over a 17-month Class Period so that he could engage in a few, discrete stock sales defies logic. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (abrogated on other grounds) (stock sales during "unusually long class period of sixty-three weeks"—or 15 months— failed to raise a strong inference of scienter).

In addition, as Plaintiffs acknowledge, "[m]ost of [Mr. Samuel's] trades were made pursuant to a Rule 10b-5 plan." ACC ¶ 308. Stock trades made under such plans do not establish scienter. *See In re Audible Inc., Sec. Litig.*, 2007 WL 1062986, at *12 (D.N.J. Apr. 3, 2007) (stock sales under Rule 10b5–1 plans are

"prevent[ed] . . . from being considered in the motive and opportunity analysis");

*see also Inst. Inv. Grp. v. Avaya*, 564 F.3d 242, 279 (3d Cir. 2009).  Plaintiffs try to

overcome this authority by arguing that Mr. Samuel's latest 10b5-1 plan was

executed on February 24, 2021, one week after the Class Period began.  ACC ¶

308; *see also* Ex. 24 (8/26/2021 Form 144) at 2.  But this does not help them, as

the Complaint offers no particularized basis to infer that Mr. Samuel's "10b5-1

plans were adopted a time when [he] possessed" material nonpublic information—

the only relevant inquiry.  *Synchronoss*, 2019 2849933 at *17.  His trades are

therefore entitled to full 10b5-1 protection and are of "minimal value in

establishing an inference of scienter."  *Id*. at *16.

### 2.    Plaintiffs' Conclusory Allegations Do Not Give Rise to Any Inference of Scienter

In the absence of viable motive allegations, the strength of Plaintiffs'

circumstantial evidence of intent or recklessness "must be even greater."

*Intelligroup*, 527 F. Supp. 2d at 285.  Plaintiffs resort to a theory of scienter based

on Defendants' alleged sales pipeline visibility and general access to Kornit

business trends through Defendants' Kornit Konnect system, but these

circumstantial allegations are similarly insufficient.  ACC ¶¶ 287–92, 296, 298.

Plaintiffs suggest that, because Kornit officers had access to certain data about

current customers' use of their existing machines through Kornit Konnect and an

"Ink Summary" that was "available to every single person at Kornit," Defendants

must have had "almost perfect insight" into Kornit demand. *Id.* ¶¶ 155–63, 287–88, 296. But Plaintiffs still fail to allege how any knowledge Defendants might learn from the Kornit Konnect data would render Defendants' statements false or misleading in the first place. As this Court recognized, "the decline in demand is not just based on consumables and ink," but also on "losing whole clients" and "not having new clients"—factors into which Kornit Konnect could provide no insight. Oral Argument Tr. 14:2–9.

Plaintiffs' allegations about the *types* of data Kornit Konnect collects, *see, e.g.*, ACC ¶ 158, thus do not support their claims. These allegations plead, at best, that Defendants had *access* to company data, but do not explain what the data showed at any particular time, what (if anything) Defendants allegedly learned from the data, how or when they became aware of it, and how (if at all) it conflicted with any public statement. As this Court acknowledged, the existence of "data in a system that is accessible coupled with" a general statement that the company is aware of "everything" is insufficient to plead scienter. Oral Argument Tr. 26:11–27:4; *see* ACC ¶ 161. *See, e.g., Chubb*, 394 F.3d at 147 (finding inadequate allegation that memorandum "went to [a] branch" without specifying who reviewed it); *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 151 (3d Cir. 2004) (abrogated on other grounds) (deeming inadequate allegation that information "sent to [] headquarters" was "available for . . . review").

42

Plaintiffs try to plug this hole by alleging that FE3 said that "Chuck Meyo . . . would personally give this information [about ink usage and impressions] to management." *Id.* ¶ 161. This allegation fails for two reasons. First, as discussed below, *see infra* at Section I.B.3, such vague, uncorroborated, secondhand statements from confidential witnesses cannot be credited. *See Intelligroup*, 527 F. Supp. 2d at 290. Second, there is no allegation as to what specific data or summaries from Kornit Konnect management would have been given or reviewed. It strains credulity to believe that management was provided with or reviewed daily each data point for every customer's prints, impressions per hour, ink consumption, printer availability, and print duration. *See* ACC ¶¶ 158–60; Oral Argument Tr. 11:23–12:6 (noting Plaintiffs "do[] not assert or explain how the metrics demonstrated who viewed them, what they disclosed"). Plaintiffs' allegations based on Kornit Konnect thus do not support an "unambiguous[] indicat[ion]" of Defendants' fraudulent state of mind. *Synchronoss*, 705 F. Supp. 2d at 399; *see also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) (abrogated on other grounds) ("[A] pleading of scienter may not rest on a bare inference that a defendant must have had knowledge of the facts.").

Plaintiffs also invoke the "core operations" doctrine, but mere allegations, without more, that the fraud concerned the "most important aspects of Kornit's business," ACC ¶ 306, do not support scienter. *See, e.g., Rahman v. Kid Brands,*

*Inc.*, 736 F.3d 237, 247 (3d Cir. 2013) ("[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter."); *Pharmanet*, 720 F. Supp. 2d at 556 ("It is not automatically assumed that a corporate officer is familiar with certain facts just because these facts are important to the [] business.").  These are "precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny."  *Advanta*, 180 F.3d at 539.

Similarly, the alleged temporal proximity between certain alleged misstatements and the Q2 2022 earnings call—when Plaintiffs allege the "truth was revealed," ACC ¶ 307—does not support a strong scienter inference.  Even assuming the statements Plaintiffs deem suspiciously "close in time" to the Q2 2022 earnings call were actually false (which Plaintiffs in no way adequately allege), Plaintiffs have again failed to "present clear facts verifying [their] deductions with respect to defendant's state of mind." *Intelligroup*, 527 F. Supp. 2d at 285.  Because Plaintiffs have not connected the dots between (1) the timing of the alleged misstatements and (2) Defendants' state of mind when making them, this theory cannot support a strong inference of scienter.  *See id*. at 285 (observing that a "temporal proximity of events is insufficient circumstantial evidence").

Plaintiffs further allege that certain post-Class Period statements support an inference of scienter because they are (1) admissions that Kornit had experienced

supposedly undisclosed customer declines in early 2022, and (2) evidence that Defendants' past claims about the success and viability of KornitX were "grossly overstated."  ACC ¶¶ 293, 295.  First, as explained above, *see supra* at 17, Defendants' June 2022 statement about customer demand at most acknowledged that a single client informed Kornit *at the end of Q1 2022* that it previously had been experiencing a decline in demand—*after* Defendants made the February 2022 statements that Plaintiffs allege to be contradictory.  Similarly, Defendants' post-Class Period statement that KornitX generated a "few millions of dollars" was not inconsistent with their Class Period statements, including Mr. Samuel's statement that KornitX was "generating multi-million-dollar revenue."  *Id.* ¶ 272; *see supra* at 25–28.  Further, what Defendants acknowledged with the benefit of hindsight does not give rise to an inference of contemporaneous knowledge or scienter.  *See Advanta*, 180 F.3d at 538 ("Rule 10b-5 liability does not attach merely because at one time the [defendant] bathes itself in a favorable light but later . . . discloses that things are less rosy.").

Finally, Plaintiffs allege that the fact Defendants spoke on the topics about which Plaintiffs allege fraud is sufficient to plead either that Defendants knew or were reckless in not knowing the allegedly omitted information on those topics.  ACC ¶ 310.  But "the fact that a company officer makes a statement about a topic does not necessarily support the inference that he knows all facts relevant to that

topic." *Dang v. Amarin Corp. plc*, 2024 WL 4285900, at *25 (D.N.J. Sept. 25, 2024). Indeed, as discussed above, *see supra* at Sections I.A.3 and I.A.5, the statements' "content and context" reveal them largely to be "general" and "broad statements of Defendants' priorities," many of which are forward-looking or puffery; such general statements do not support an inference that Defendants knew of the allegedly omitted information. *Id*.

### 3. The Confidential Witness Allegations Do Not Give Rise to a Strong Inference of Scienter

The Complaint's scienter pleading also relies heavily on numerous allegations from the 12 unnamed FEs. This requires Plaintiffs to allege "(1) the time period that the confidential source worked at the defendant-company, (2) the dates on which the relevant information was acquired, and (3) the facts detailing how the source obtained access to the information." *Intelligroup*, 527 F. Supp. 2d at 290. As in the OCC, the Complaint's FE statements are vague and uncorroborated.

The FEs all worked at least two levels—and frequently more—below the Individual Defendants and, with the sole exception of FE8 (who makes only generic allegations), none claims to have ever interacted with those Defendants. *See, e.g., Rahman*, 736 F.3d at 245 (rejecting allegations where confidential witnesses had no "way of knowing what was discussed in those closed-door meetings . . . [with company] leadership"). Though FE12 references quarterly

46

meetings where departments presented reports that "included a lot of data," and "sometimes" included discussion of "competition issues," he does not describe with particularity what "issues" were discussed or what the "data" showed and when. ACC ¶ 303–04. Thus, the Complaint does not and cannot allege that any Individual Defendant had information contradicting their public statements at the time they were made, precluding scienter. *See, e.g., Chubb*, 394 F.3d at 148.

Under Third Circuit law, Plaintiffs cannot overcome this defect through allegations about what the FEs "believe[]," ACC ¶¶ 65–66, 130–32, 179, 366, or claim was "generally known" within "the whole Company," *id.* ¶¶ 125–26, 130. *See, e.g., Chubb*, 394 F.3d at 155 (rejecting allegations that information "was well known within Chubb" as "conclusory" and "based upon rumor or conjecture"). Nor should the Court credit FEs' speculation about what executives were "well aware" of, "definitely knew," or "would not have" done, *id.* ¶¶ 126, 299, 301–02, 305. *Chubb*, 394 F.3d at 155. Allegations based on hearsay allegedly shared with the FEs—which pervade the Complaint, *e.g.*, ACC ¶¶ 133, 173—likewise do not supply a strong inference of scienter. *See, e.g., Rahman*, 736 F.3d at 245. And because the FE allegations are all individually insufficient, Plaintiffs' reliance on multiple FEs is unavailing. *Chubb,* 394 F.3d at 155.

## II.    Plaintiffs' Section 11 and 12(a)(2) Claims Should Be Dismissed

Like their Section 10(b) claim, Plaintiffs' claims under Sections 11 and

12(a)(2) of the Securities Act fail because (1) Plaintiffs are subject to—and fail to satisfy—Rule 9(b)'s heightened pleading standard, and, (2) even under Rule 8's plausibility standard, Plaintiffs fail to state a claim because they do not allege an actionable misstatement or omission.

### A. The Section 11 and 12(a)(2) Claims Are Subject to—and Fail to Satisfy—Rule 9(b)'s Heightened Pleading Standard

Plaintiffs' Section 11 and 12(a)(2) claims fail for many of the same reasons as their Section 10(b) / Rule 10b-5 claims:  Plaintiffs do not plead an actionable misstatement or omission or scienter with the particularity required by Rule 9(b). Where a plaintiff's claim under Section 11 or 12(a)(2) "sound[s] in fraud . . . compliance with the pleading requirements of [Rule] 9(b) is required." *Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.,* 68 F. Supp. 2d 480, 485 (D.N.J. 1999) (citing *Shapiro v. UBJ Fin. Corp.,* 964 F.2d 272, 288 (3d Cir. 1992)).

Claims "sound in fraud"—and thus trigger Rule 9(b)—where they "allege intentional, knowing, or reckless conduct." *In re Vonage Initial Pub. Offering Secs. Litig.*, 2009 WL 936872 at *5 (D.N.J. Apr. 2, 2009); *see also Chubb*, 394 F.3d at 144.  For example, in *Vonage,* the court concluded that Rule 9(b) applied because the complaint included allegations "associated with knowing and intentional conduct," including an allegation that the defendant's management had instructed its retention department "to refuse cancellation requests in order to keep the average monthly churn rate down."  2009 WL 936872 at *6; *see also Shapiro,*

964 F.2d at 287–88 (applying Rule 9(b) where plaintiffs "repeatedly aver[red] that [the] defendants 'intentionally,' 'knowingly,' or 'recklessly' misrepresented and omitted . . . information"); *Chubb,* 394 F.3d at 161 (applying Rule 9(b) where defendant allegedly "conceal[ed] key facts from its public disclosures until after the merger closed").

Plaintiff's allegations here undoubtedly "allege intentional, knowing, or reckless conduct" and therefore require application of Rule 9(b). *Vonage,* 2009 WL 936872 at *5. Indeed, the allegations underlying Plaintiffs' Section 11 and 12(a)(2) claims are simply a subset—largely copied and pasted verbatim—of the allegations pled in support of Plaintiffs' Section 10(b) fraud claims. Plaintiffs allege, for example, that several FEs "confirmed the existence of significant and *well-known problems* with the reliability of Kornit's products," and that "customer service problems and dissatisfaction were *well known at Kornit*." ACC ¶¶ 51, 347, 383. Similarly, the Complaint alleges that FE10 described Kornit's revenue goals as "'*kind of crazy*' based on [Kornit's] internal sales targets." *Id*. ¶¶ 139, 398. In these circumstances, where the same factual allegations are alleged in support of both fraud-based Section 10(b)and Securities Act claims, the Securities Act claims sound in fraud, triggering Rule 9(b)'s particularity requirements. *See, e.g., Caiafa v. Sea Containers, Ltd*., 331 Fed. Appx. 14, 16 (2d Cir. 2009) (Rule 9(b) applies where "plaintiffs' Section 11 claim relies on the same factual allegations that

served as a basis for their Section 10(b) claim"); *see also Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (similar); *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 629 (4th Cir. 2008) (similar).

Because Plaintiffs' Section 11 and 12(a)(2) claims allege Defendants *knowingly* made false and misleading statements, their attempted disavowal of "allegations or averments of fraud in connection with the [Securities Act] claims," ACC ¶ 333, has no effect.  That formulaic recitation "is insufficient to divorce the claims from their fraudulent underpinnings."  *Chubb,* 394 F.3d at 161.  Rule 9(b) thus applies, requiring the Complaint to plead, among other things, "a specific false representation of material fact," and "knowledge by the person who made [it] of its falsity."  *Vonage,* 2009 WL 936872 at *7.  For the reasons discussed above, Plaintiffs have failed to plead a specific false representation of material fact or the Kornit Defendants' knowledge of the statements' alleged falsity.  *See supra* at Sections I.A–B.

### B.  The Section 11 and 12(a)(2) Claims Should Be Dismissed for Failure to Plead an Actionable Misstatement or Omission

The alleged omissions on which Plaintiffs premise their Securities Act claims are a limited subset of the alleged bases for their Exchange Act claims: namely, four statements in Kornit's Form 20-F annual report for 2020, which was filed with the SEC on March 25, 2021 and allegedly incorporated by reference into

the Offering Materials.[25]  For the reasons set forth below, none of these statements

adequately plead an actionable misstatement or omission.

*First*, Plaintiffs challenge Kornit's disclosure that its "systems, inks and

other consumables, and associated software *may contain undetected errors or

defects*."  ACC ¶¶ 404–05.  They allege this statement was misleading because the

subject risk had materialized, but omit the language between their cherry-picked

excerpts:  Kornit *"ha[d] experienced these errors or defects in the past*," and

"expect[s] that these errors or defects will be found from time to time" going

forward.  Ex. 1 (2020 20-F) at 15; *see also supra* at 30–31.  Plaintiffs' citation of

additional statements from certain FEs likewise fails to support an allegation of

any material omission, *see* ACC ¶¶ 350–56, as the FEs merely restate what Kornit

had already disclosed about the possibility and reality of errors and defects.[26]

When Kornit's statements are considered "fairly and in context," *see Omnicare*,

575 U.S. at 194, it is clear that Kornit disclosed the risk of product defects—past,

present, and future.

*Second*, Plaintiffs label as misleading statements that Kornit's products

maintained "high productivity" and an "attractive total cost of ownership."

---

[25] *Compare* ACC ¶¶ 404, 406, 409, 411, *with id.* ¶¶ 109, 208, 265, 277.

[26] One set of statements—those of FE9—should be discounted because they purport to characterize the experience of Kornit's customers during the Class Period while FE9 left the company in 2017.  ACC ¶¶ 352–53, 371, 390.

ACC ¶¶ 406–08.  Plaintiffs allege that, "[a]s a result of the significant defects and repair costs," the products were less productive and more expensive than "customers had been led to believe."  *Id*. ¶ 408.  This allegation fails because (i) Plaintiffs do not plead that Kornit's products did *not* have "the best total cost of ownership for large production facilities with high volumes for mass customization print jobs," Ex. 1 (2020 20-F) at 43, and none of the FE accounts says otherwise, *see* ACC ¶¶ 388–91, 394; (ii) Kornit disclosed the risks of product defects, *see supra* at 30–31; and (iii) the statement is nonactionable puffery and opinion, *see supra* at Section I.A.4 –5; *see also Peruto v. TimberTech Ltd.*, 126 F. Supp. 3d 447, 458 n.10 (D.N.J. 2015) (stating that a product is "attractive" and "high-quality" is "puffery as a matter of law").

*Third*, Plaintiffs allege that it was misleading for Kornit to state that it would "strive" to "deliver[] best-in-class customer experience" because Kornit's service department allegedly "failed to repair customers' printers on a timely basis" and lacked certain infrastructure and sufficient technicians.  ACC ¶¶ 409–10.  But Kornit adequately disclosed the drain on its customer service resources and the potential for customer dissatisfaction as a result.  *Supra* at 8, 30–31.[27]  These

---

[27] As with Plaintiffs' other Section 11 and Section 12(a)(2) claims, Plaintiffs have added alleged statements by certain FEs in support of this theory.  ACC ¶¶ 358–62, 364–73, 375, 377, 379–82, 384.  These alleged statements, however, similarly fail to support Plaintiffs' claim in light of Kornit's disclosures.  *See supra* at 8, 30–31.

challenged statements of "management objectives" are also protected forward-looking statements, *see* 15 U.S.C. § 77z-2(i)(1)(B), statements of opinion, and nonactionable, aspirational puffery insofar as they set out what Kornit "strive[s]" to do, *see Lewakowski v. Aquestive Therapeutics, Inc.*, 2023 WL 2496504, at *9 (D.N.J. Mar. 14, 2023); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013) (description of compliance program as "best-of-class" is puffery); *Foote v. Mehrotra*, 2023 WL 7214728, at *6 (D. Del. Nov. 2, 2023) ("aspirational statement of a goal" constituted "no more than 'inactionable puffery'"); *see also supra* at Section I.A.5.  The claim of lost business is also an impermissible attempt at hindsight pleading; the Complaint alleges no loss of business as of March 2021. *Supra* at 13–14.  The securities laws do not require "clairvoyan[ce]."  *Nice Sys.*, 135 F. Supp. 2d at 586.

*Finally*, Plaintiffs challenge the statement that KornitX was a "robust platform" because it allegedly "was not ready."  ACC ¶¶ 411–13.  This fails (i) in light of the disclosures about KornitX's limited contributions to revenue and technical issues, which preclude any omission claim, *see supra* at 8–9, 30; and (ii) because the statement is nonactionable puffery and opinion, *supra* at Sections I.A.4–5; *see Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 488 (D. Del. 2019) (statement that compliance program was "robust" was puffery); *see also W. Palm Beach Firefighters' Pension Fund v. Conagra Brands,*

*Inc.*, 495 F. Supp. 3d 622, 649 (N.D. Ill. 2020) (statement that portfolio was "robust" was opinion), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, 2022 WL 1449184 (7th Cir. May 9, 2022).[28]

### C.    Plaintiffs Fail to Plead "Controlling Person" Liability

Plaintiffs' "controlling person" claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act also fail because Plaintiffs do not adequately allege any primary violations of either statute. *In re Suprema Specialties*, *Inc., Sec. Litig.,* 438 F.3d 256, 284 (3d Cir. 2006). For the reasons discussed in Point I.B, Plaintiffs also fail to allege "culpable participation," as required. *In re Merck & Co., Inc. Sec., Derivative & Erisa Litig.*, 2012 WL 3779309, at *9 (D.N.J. Aug. 29, 2012).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Complaint be dismissed with prejudice.[29]

---

[28] Plaintiffs also cite to alleged statements by certain FEs. *See* ACC ¶¶ 397–401. As explained above, *see supra* at 8–9, 25–28, 31, these alleged statements do not support Plaintiffs' claim in light of Kornit's disclosures.

[29] Courts routinely dismiss with prejudice amended complaints where, as here, the court "specifically enumerated deficiencies in the original pleading, which Plaintiffs wholly failed to rectify." *See, e.g., Berk v. New Jersey Dep't of Hum. Servs.*, 2024 WL 3639442, at *10 (D.N.J. Aug. 2, 2024) (dismissing amended complaint with prejudice on this basis); *Moriarty v. Dibuonaventura*, 2015 WL 1469515, at *4 (D.N.J. Mar. 30, 2015) (similar).

Dated:  January 24, 2025

Respectfully submitted,

**GIBBONS P.C.**

<u>*s/ Samuel I. Portnoy*</u>
Samuel I. Portnoy
Michael V. Caracappa
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
sportnoy@gibbonslaw.com
mcaracappa@gibbonslaw.com

**DAVIS POLK & WARDWELL LLP**

Edmund Polubinski III (*pro hac vice*)
Dana Seshens (*pro hac vice*)
Daniel J. Schwartz (*pro hac vice*)
Marie Killmond (*pro hac vice*)
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
edmund.polubinski@davispolk.com
dana.seshens@davispolk.com
daniel.schwartz@davispolk.com
marie.killmond@davispolk.com

*Counsel for Kornit Digital Ltd., Ronen
Samuel, and Alon Rozner*