# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re Kornit Digital Ltd. Securities Litigation | Civil Action No. 2:23-cv-00888-MCA-AME |
| | Hon. Madeline Cox Arleo |
| | <u>CLASS ACTION</u> |
| | <u>JURY TRIAL DEMANDED</u> |
| | **ORAL ARGUMENT REQUESTED** |

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ......................................................................................1

II. STATEMENT OF FACTS ........................................................................6

    A.    Before the Class Period, Kornit Experiences Anomalous Growth Due to the Pandemic and Announces Lofty Revenue Goals...................................................................................................6

    B.    Defendants Misrepresent the Company's Business and Prospects Throughout the Class Period.................................................7

    C.    The Truth Is Revealed and Post-Class Period Admissions Confirm Defendants' Knowledge of the Fraud..................................13

    D.    Procedural History of This Litigation ...............................................15

III. ARGUMENT............................................................................................16

    A.    The Complaint Sufficiently Pleads Violations of the Exchange Act ....................................................................................................16

            1.    The Complaint Sufficiently Pleads Defendants' Materially False and Misleading Statements...........................16

                  a.    Statements About Service and Service Contracts ..........17

                  b.    Statements Concerning Sticker Mule's "Integration" of Kornit's Printers and Customer Growth .........................................................................21

                  c.    Statements Concerning Demand ....................................23

                  d.    Statements Concerning Q1 22 Revenue Pull Forward...........................................................................27

                  e.    Statements Concerning KornitX......................................30

                  f.    Statements Concerning Competition and the Company's Technology "Moat"......................................32

i

g.     Defendants' Baseless Revenue Growth Statements.......35

h.     Defendants' Risk and Other Disclosures Omitted Material Facts ................................................................36

i.      The Safe Harbor Does Not Insulate Defendants ...........38

j.      Defendants' Misstatements Are Not Puffery ................41

k.     Defendants' "Opinion" Statements Are Actionable.......43

2.    The Complaint Pleads a Strong Inference of Scienter.............44

a.     Defendants Knew About Reliability and Service Problems, Competition, and Declining Demand...........45

b.     Former Employees Confirm Defendants' Knowledge....................................................................48

c.     Defendants' Detailed and Repeated Statements Support Scienter............................................................49

d.     Defendants' Admissions Confirm Scienter...................50

e.     The Temporal Proximity of Defendants' False Statements to the Corrective Disclosures.......................51

f.      The Fraud Concerned Kornit's Core Operations ...........52

g.     Defendants Were Motivated to Commit Fraud .............53

(1)    Samuel's Insider Trading Supports Scienter........53

(2)    Kornit's Secondary Offering Provided Additional Motive .................................................55

B.   The Complaint Sufficiently Alleges Violations of the Securities Act ........................................................................................56

1.    Rule 8 Applies to the Securities Act Claims.............................56

2.    The Offering Materials Contained Material Misstatements and Omissions....................................................58

ii

C.    The Complaint Sufficiently Pleads Control Person Claims................60

IV.    CONCLUSION................................................................................60

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*In re Adams Golf, Inc. Sec. Litig.*,
    381 F.3d 267 (3d Cir. 2004) ...................................................................41

*In re Adolor Corp. Sec. Litig.*,
    616 F. Supp. 2d 551 (E.D. Pa. 2009)....................................................54

*In re Advanta Corp. Secs. Litig.,*
    180 F.3d 525 (3d Cir. 1999) ................................................................53

*In re Allaire Corp. Sec. Litig.*,
    224 F. Supp. 2d 319 (D. Mass. 2002)..................................................43

*In re Amarin Corp. PLC Sec. Litig.*,
    2012 WL 1171669 (D.N.J. Mar. 29, 2012) .........................................38

*In re Anadigics, Inc., Sec. Litig.*,
    2011 WL 4594845 (D.N.J. Sept. 30, 2011) .........................................34

*In re Apple Inc. Sec. Litig.*,
    2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ...............................27, 51

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................58

*Asher v. Baxter Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2004) ..............................................................38

*In re AT&T Corp. Sec. Litig.*,
    2002 WL 31190863 (D.N.J. Jan. 30, 2002).........................................36

*Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...........................................................................58

*In re Audible Inc. Sec. Litig.*,
    2007 WL 1062986 (D.N.J. Apr. 3, 2007).............................................54

*In re Bank of America Corp. Sec., Deriv., & Emp. Ret. Income Sec.*
*Act ("ERISA") Litig.*,
   757 F. Supp. 2d 260 (S.D.N.Y. 2010) .................................................20

*Bauer v. Prudential Fin., Inc.*,
   2010 WL 2710443 (D.N.J. June 29, 2010) ..........................................58

*In re Braskem S.A. Sec. Litig.*,
   246 F. Supp. 3d 731 (S.D.N.Y. 2017) ..................................................34

*Cal. Pubs. Emps.' Ret. Sys. v. Chubb*,
   394 F.3d 126 (3d Cir. 2004) .........................................................49, 57

*In re Cambrex Corp. Sec. Litig.*,
   2005 WL 2840336 (D.N.J. Oct. 27, 2005) ...........................................45

*Carmignac Gestion, S.A. v. Perrigo Co.*,
   2019 WL 3451523 (D.N.J. July 31, 2019) ...................................*passim*

*Castlerock Mgmt., Ltd. v. Ultralife Batteries, Inc.*,
   68 F. Supp. 2d 480 (D.N.J. 1999) .......................................................58

*In re Champion Enter., Inc., Sec. Litig.*,
   144 F. Supp. 2d 848 (E.D. Mich. 2001), *aff'd sub nom. Miller v.*
   *Champion Enter. Inc.*, 346 F.3d 660 (6th Cir. 2003) ..........................40

*City of Brockton Ret. Sys. v. CVS Caremark Corp.*,
   2013 WL 6841927 (D.R.I. Dec. 30, 2013) ............................................28

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
   477 F. Supp. 3d 123 (S.D.N.Y. 2020) ..................................................23

*City of Warwick Ret. Sys. v. Catalent, Inc.*,
   2024 WL 3219616 (D.N.J. June 28, 2024)..............................45, 46, 48

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
   2018 WL 3772675 (D.N.J. Aug. 8, 2018) .............................................49

*In re Coinbase Glob., Inc. Sec. Litig.*,
   2024 WL 4053009 (D.N.J. Sept. 5, 2024)...............................47, 57, 58

*Curran v. Freshpet, Inc.*,
   2018 WL 394878 (D.N.J. Jan. 12, 2018)...........................36, 38, 44, 47

*Dang v. Amarin Corp. plc*,
　2024 WL 4285900 (D.N.J. Sept. 25, 2024) ......................................................50

*In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*,
　7 F.3d 357 (3d Cir. 1993) ...............................................................................34

*Emps. Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent Inc.*,
　2020 WL 3026536 (D.N.J. June 5, 2020)....................................................19, 38

*In re Enzymotec Sec. Litig.*,
　2015 WL 8784065 (D.N.J. Dec. 15, 2015)..................................................38, 41

*In re EQT Corp. Sec. Litig.*,
　504 F. Supp. 3d 474 (W.D. Pa. 2020)..............................................................32

*Fan v. StoneMor Partners, LP*,
　927 F.3d 710 (3d Cir. 2019) ............................................................................38

*Frater v. Hemispherx Biopharma, Inc.*,
　996 F. Supp. 2d 335 (E.D. Pa. 2014)................................................................53

*Freudenberg v. E\*Trade Fin. Corp.*,
　712 F. Supp. 2d 171 (S.D.N.Y. 2010) ..............................................................51

*George v. China Auto. Sys., Inc.*,
　2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012)....................................................54

*Guzman v. Mana*,
　2018 WL 10150989 (D.N.J. Dec. 6, 2018)......................................................25

*In re Hertz Global Hldgs., Inc.*,
　905 F.3d 106 (3d Cir. 2018) ............................................................................55

*In re Incyte S'holder Litig.*,
　2014 WL 707207 (D. Del. Feb. 21, 2014).......................................................20

*Industriens Pensionsforsikring A/S v. Becton, Dickson & Co.*,
　620 F. Supp. 3d 167 (D.N.J. Aug. 11, 2022)..............................................35, 40

*Institutional Invs. Grp. v. Avaya, Inc.*,
　564 F.3d 242 (3d Cir. 2009) ....................................................................*passim*

*Laborers' Int'l Union v. Foster Wheeler Corp.*,
  26 F.3d 375 (3d Cir. 1994) ...................................................................47, 56

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v.*
  *Swanson*,
  2011 WL 2444675 (D. Del. June 14, 2011) .......................................42

*In re Majesco Sec. Litig.*,
  2006 WL 2846281 (D.N.J. Sept. 29, 2006) ........................................39

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ..............................................................................17

*In re Merck & Co., Inc. Sec. Deriv. & "ERISA" Litig.*,
  2011 WL 3444199 (D.N.J. Aug. 8, 2011) ....................................17, 42

*Monk v. Johnson & Johnson*,
  2011 WL 6339824 (D.N.J. Dec. 19, 2011) ........................................54

*Nat'l. Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) ....................................................52

*Odeh v. Immunomedics, Inc.*,
  2020 WL 4381924 (D.N.J. July 31, 2020) ....................................36, 37

*Paxton v. Provention Bio, Inc.*,
  2022 WL 3098236 (D.N.J. Aug. 4, 2022) ..........................................26

*In re PDI Sec. Litig.*,
  2005 WL 2009892 (D.N.J. Aug. 17, 2005) ........................................41

*Peifa Xu v. Gridsum Holding Inc.*,
  2020 WL 1508748 (S.D.N.Y. Mar. 30, 2020) ....................................29

*In re Penn Treaty Am. Corp. Sec. Litig.*,
  202 F. Supp. 2d 383 (E.D. Pa. 2002) ............................................28, 43

*Phillips v. Cnty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ...............................................................16

*In re Plantronics, Inc. Sec. Litig.*,
  2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ...................................28

*In re Plantronics, Inc. Sec. Litig.*,
    2022 WL 17974627 (N.D. Cal. Nov. 7, 2022) ...................................................25

*In re PTC Therapeutics, Inc. Sec. Litig.*,
    2017 WL 3705801 (D.N.J. Aug. 28, 2017) .......................................................53

*In re Questcor Sec. Litig.*,
    2013 WL 5486762 (C.D. Cal. Oct. 1, 2013).......................................................55

*Rahman v. Kid Brands*,
    736 F.3d 237 (3d Cir. 2013) ................................................................49

*In re Res. Am. Sec. Litig.*,
    2000 WL 1053861 (E.D. Pa. July 26, 2000) ......................................................55

*Rescue Mission of El Paso, Inc.*,
    2013 WL 3087078 (D.N.J. June 14, 2013)........................................................27

*Roofer's Pens. Fund v. Papa*,
    2018 WL 3601229 (D.N.J. July 27, 2018) ...........................................48, 50, 60

*Schottenfeld Qualified Assocs., L.P. v. Workstream, Inc.*,
    2006 WL 4472318 (S.D.N.Y. May 4, 2006) ......................................................32

*SEB Inv. Mgmt AB v. Endo Int'l, PLC*,
    351 F. Supp. 3d 874 (E.D. Pa. 2018)...........................................................49, 50

*Sec. & Exch. Comm'n v. Farnsworth*,
    692 F. Supp. 3d 157 (S.D.N.Y. 2023) .............................................................20

*Semerenko v. Cendant Corp.*,
    223 F.3d 165 (3d Cir. 2000) ................................................................19

*Shapiro v. UJB Fin. Corp.*,
    964 F. 2d 272 (3d Cir. 1992) .....................................................................41, 57

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
    604 F. Supp. 2d 332 (D. Mass. 2009)..............................................................43

*Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n
    Pension Fund v. Olo Inc.*,
    2023 WL 8287681 (S.D.N.Y. Nov. 30, 2023)...................................................25

*In re Suprema Specialities , Inc. Sec. Litig,*
    438 F.3d 256 (3d Cir. 2006) ..........................................................................*passim*

*In re Synchronoss Techs. Sec. Litig.,*
    2019 WL 2849933 (D.N.J. July 2, 2019) ...........................................................54

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
    551 U.S. 308 (2007)...................................................................................16, 44

*In re Toronto-Dominion Bank Sec. Litig.,*
    2018 WL 6381882 (D.N.J. Dec. 6, 2018)...........................................................56

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976)........................................................................................28

*In re Tseng Labs, Inc. Sec. Litig.,*
    954 F. Supp. 1024 (E.D. Pa. 1996) ..................................................................34

*In re U.S. Interactive, Inc. Class Action Sec. Litig.,*
    2002 WL 1971252 (E.D. Pa. Aug. 23, 2002) ....................................................42

*In re Under Armour Sec. Litig.,*
    719 F. Supp. 3d 438 (D. Md. 2024)..................................................................29

*In re Urban Outfitters Sec. Litig.,*
    103 F. Supp. 3d 635 (E.D. Pa. 2015).................................................................52

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.,*
    2017 WL 1658822 (D.N.J. Apr. 28, 2017).........................................................44

*In re Viropharma Inc. Sec. Litig.,*
    21 F. Supp. 3d 458 (E.D. Pa. 2014)............................................................53, 55

*In re Vonage Initial Pub. Offering (IPO) Sec. Litig.,*
    2009 WL 936872 (D.N.J. Apr. 6, 2009).............................................................58

*Weston v. DocuSign,*
    669 F. Supp. 3d 849 (N.D. Cal. 2023).........................................................37, 44

*Wu v. GSX Techedu,*
    738 F. Supp. 3d 527 (D.N.J. 2024)...................................................................50

## Statutes and Rules

15 U.S.C. § 77l ............................................................................................ 57

15 U.S.C. § 78u-4 ....................................................................................... 17

15 U.S.C. § 78u-5 ....................................................................................... 38

15 U.S.C. § 78u-5(c)(1)(A)(i) ..................................................................... 40

15 U.S.C. § 78u-5(c)(2)(A) ......................................................................... 40

17 C.F.R. § 240.10b-5 ............................................................. 16, 54, 56, 58

Fed. R. Civ. P. 8 ..................................................................... 56, 57, 58

Fed. R. Civ. P. 9(b) ........................................................... 17, 56, 57, 58

Fed. R. Civ. P. 12(b)(6) ........................................................................ 16

Fed. R. Civ. P. 15 ................................................................................... 60

## Other Authorities

Meriam Webster Dictionary (2022) ............................................................. 23

**Note on Citation Format and Abbreviations:** Plaintiffs submit this omnibus memorandum of law in response to the two briefs submitted by the Defendants in this Action: (a) the Kornit Defendants' brief (ECF No. 64-1, "MTD"); and (b) the Underwriter Defendants' brief (ECF No. 65-1, "UW MTD"). Unless otherwise noted: (i) all capitalized terms have the same meanings ascribed to them in the Amended Consolidated Complaint (ECF No. 61, the "AC"); (ii) all references to "¶__" are to paragraphs in the AC; (iii) all references to "PX __" are to exhibits to the accompanying Declaration of James A. Harrod; (iv) all references to "DX __" are to exhibits to the Declaration of Edmund Polubinski filed with the MTD (ECF No. 64-02); (v) all references to "Tr." are to the August 15, 2024 Oral Argument Transcript, ECF No. 56; and (vi) all emphasis is added, and internal quotations and citations are omitted.

Plaintiffs respectfully submit this memorandum of law in opposition to Defendants' motions to dismiss the Amended Complaint (ECF No. 61, the "AC").

## I.   INTRODUCTION

This case arises from Defendants' efforts to falsely convince investors that the quality of Kornit's direct-to-garment printers would fuel virtually unlimited growth after a pandemic-driven spike in demand. Defendants were desperate to convince investors that this boom was sustainable and reflected a new normal for Kornit's growth, announcing highly ambitious revenue targets of $500 million per year by 2023, and then $1 billion by 2026. In an effort to make these targets seem credible, Defendants made materially false and misleading statements touting a broadening market with new customers like Sticker Mule, expanding service revenue through multi-year contracts, and generating exponential growth through the Company's KornitX software. Defendants' misleading statements concealed massive problems with reliability, customer service and dissatisfaction, and declining demand. Those false statements were effective—they drove the Company's share price to a height of $176 per share during the Class Period (February 17, 2021 through July 5, 2022). Unfortunately for investors, the realities at Kornit eventually became known, causing Kornit's share price to lose *87% of its value,* wiping out $1.3 billion in market capitalization. This case seeks to recover those losses.

Following the Court's ruling on the prior motion to dismiss, Plaintiffs added

numerous allegations—including detailed information from Kornit's former Director of Marketing (FE12); additional information on the relationships between certain FEs and Chuck Meyo (the head of Kornit's largest division); details further confirming that Kornit's customer Sticker Mule never "integrated" the Company's printers; a quantification that the "pull-forward" of revenue in Q1 2022 was $30 million; information reflecting the known failure of KornitX; and details indicating that Kornit's lofty revenue targets were baseless and made prior to the Company having done any analysis of the size of the potential market. At the same time, Plaintiffs focused their claims, eliminating certain statements identified by the Court during oral argument, while strengthening the Securities Act claims.

With these changes, the AC's focused, detailed allegations make clear that Defendants fundamentally and knowingly misrepresented the strength of the Company's business across several categories while concealing major problems. First, Defendants repeatedly touted the supposedly superior return on investment that Kornit's premium products generated. In reality, however, Kornit's machines were very complicated to use and highly prone to defects. Former Kornit employees described the machines as "garbage," and customers frequently called "screaming" about Kornit's printers, which spent significant amounts of time offline, inoperable.

Second, these reliability issues were compounded by Kornit's understaffed and ineffective service department, which Defendants misleadingly touted as "best

in class," able to adequately address customer needs, and as a profit center. But in truth, the service center lacked basic infrastructure—new information shows that Kornit did not even have a way to track service requests from its customers and was forced to send a senior executive on an "apology tour." But nothing could stop customers from cancelling their service contracts (which, contrary to Defendants' statements, were *not* for two years) and switching to Kornit's competition (which Defendants strenuously denied even existed).

Third, Defendants grossly misrepresented the success and traction gained by the KornitX platform, which Defendants misleadingly touted as the "Uber" of printing. Defendants sold investors on the idea that KornitX was a "robust" platform that would revolutionize the printing industry and generate significant revenue for the Company. In truth, however, the platform was not even "stable" enough for customer use—as Defendants only admitted after the end of the Class Period.

Desperate to sustain investors' perception of growth as demand slowed in late 2021, Defendants rushed the production and shipment of their printers and offered massive discounts to customers in order to bring in revenue. But Defendants continued to misrepresent that demand for Kornit's products remained high. New allegations confirm that to continue this façade, Defendants pulled forward approximately *$30 million in revenue* from the Company's largest customer during the first quarter of 2022. Then, in response to a direct question from an analyst about

whether Kornit had pulled forward revenue, Rozner unequivocally stated: "No." All the while, Defendants continued to tell investors that the Company was well-positioned for significant future growth and would even hit Kornit's $500 million and $1 billion revenue targets *earlier than expected*. None of this was true.

The truth was revealed in two corrective disclosures, beginning in May 2022, when Defendants reported disappointing financial results for the first quarter of 2022. Analysts were surprised by this news, given Defendants' prior representations and were left "understandably skeptical," as Kornit's stock price dropped *by over 33%* in one day. Defendants, however, continued to deceive, telling the market that the Q1 results were "just a bump on the road" and similar false statements at investor conferences in May and June 2022. Weeks later, Defendants were ultimately forced to disclose that Kornit would miss its guidance by more than 35% in Q2 2022, primarily based on "significantly" lower demand. Once again, the market was stunned, as analysts specifically called out "*the delta between*" Kornit's announcement and Defendants' "generally bullish tone" in prior statements. In other words, the market finally realized that Defendants' narrative had no basis in reality, causing Kornit's stock to crater *by more than 25%*.

After the Class Period, Defendants made several shocking admissions confirming that their prior representations to investors were false and misleading. Defendants admitted, for instance, that at the "*[b]eginning of 2022*, we saw major

decline within the business of our customers," as customers "found themselves with overcapacity" and refused to "buy additional" printers from Kornit. Defendants also admitted that, even months after the Class Period, Kornit was still working on "stabilizing" the KornitX platform for customer use, demonstrating that their earlier statements about KornitX's fantastic adoption and customer reception were false.

Confronted with these allegations, Defendants assert in their motions to dismiss that Plaintiffs fail to plead any claims under either the Exchange Act or Securities Act. Defendants argue that they made no material misrepresentations or omissions, and that the Company sufficiently disclosed all material information. Defendants also assert that their statements were simply forward-looking projections or constitute inactionable opinions and mere puffery—even ignoring this Court's statements to the contrary from oral argument. Defendants' arguments fail, as do their tortured, cynical efforts to re-write their statements and ignore their own words.

Defendants next argue that the AC fails to establish scienter. In other words, while simultaneously claiming to have disclosed all relevant facts to investors, Defendants assert that they had no idea of the problems facing Kornit—even as they misrepresented those same facts to investors. The AC alleges a strong inference of scienter through copious detailed statements from former Kornit employees, Defendants' knowledge of and access to relevant information, and their own admissions confirming that they knew the truth. The AC establishes that Defendants

took advantage of their insider knowledge to reap massive profits from their fraud.

Defendants' motions to dismiss should be denied.

## II.     STATEMENT OF FACTS

### A.     Before the Class Period, Kornit Experiences Anomalous Growth Due to the Pandemic and Announces Lofty Revenue Goals

Kornit develops and sells high-end garment printers. ¶¶29-32. Kornit also generates recurring revenue through sales of "consumables," mostly ink (¶¶8, 33-36). A third major source of revenue is through maintenance and service contracts offered to customers. Because Kornit's printers need to be running around the clock to achieve their marketed return on investment ("ROI"), the availability of adequate and timely service was essential to the Company's success. ¶¶6, 33. In 2022, Kornit's printer sales accounted for approximately 44% of the Company's revenue; sales of ink and consumables were 38%; and services revenue and software subscriptions generated 18% of Kornit's revenue. ¶33 (table). Ink usage and sales are especially important to Kornit: they generate "higher gross margins than [printer] sales," and ink usage is a reliable real-time measure of demand. ¶¶34-36; *see also* ¶¶155-63 (ink sales "leading indicator for our business").

Prior to the Class Period, Kornit experienced a massive increase in sales as a result of the COVID-19 pandemic. ¶42 (graphic). When stores closed in 2020, e-commerce boomed, and Kornit experienced 67% year-over-year revenue growth between 2020 and 2021. *Id.* Defendants Ronen Samuel and Alon Rozner (the

Company's CEO and CFO, respectively) seized on that momentum and announced two highly-ambitious revenue targets shortly before the Class Period: Kornit would (i) achieve a revenue run rate of $500 million by 2023 (i.e., quarterly revenue of $125 million), and (ii) reach $1 billion in annual revenue by 2026. ¶¶41-49. These lofty targets required Kornit's revenue to grow by 73% before the end of 2023, *and then* double between 2023 and 2026. To achieve either of these goals, Kornit's revenue growth rate would have to exceed the growth experienced during the pandemic, and replicate that rate of growth for several years.

### B.    Defendants Misrepresent the Company's Business and Prospects Throughout the Class Period

Kornit's astronomical revenue targets created a high-stakes environment where Defendants needed to build a narrative that would make such growth appear plausible. Defendants (Samuel, in particular) built a false infrastructure around their $1 billion goal—misrepresenting the nature of Kornit's revenue-generating service contracts, growth through broadening its customer base with customers like Sticker Mule, and portraying KornitX as a growth lever, all while belying clear problems: poor reliability, inadequate service, low ROI, and formidable competition.

Critically, Kornit's revenue targets were emblematic of a culture that did not care about truthful and accurate disclosure. For example, the revenue targets were not merely ambitious: they were plucked from thin air by Defendant Samuel. ¶¶166-67. New allegations from Kornit's Marketing Director (FE12) revealed that the

Company did not conduct **any analysis** of the addressable market for its products **until 2023**, years after the targets were announced, and **after** the Class Period. ¶¶48, 150-54. When FE12 belatedly did that analysis in 2023, it confirmed that the market was too "small" to **ever reach $1 billion** in revenue. ¶¶152-54.

The underpinnings for the growth targets were similarly false and misleading, misrepresenting the truth of Kornit's business across a host of interconnected issues.

*Kornit's Unreliable Printers and Poor Customer Service Lead to Low ROI, Customer Dissatisfaction, and Reduced Demand.* Kornit's printers are significantly more expensive than comparable printers. ¶¶5, 32. As a result, Defendants understood that for Kornit's customers to recoup that significant upfront investment, the printers needed to operate reliably and minimize any downtime. Defendants marketed the printers on their purportedly low "total cost of ownership," high ROI, premium quality of output and reliability. ¶¶5-6, 31, 45, 108-18. As an added bonus—according to Defendants—Kornit purportedly required its customers to purchase service contracts with every printer, which would increase customer ROI while growing and diversifying Kornit's revenue. ¶¶3, 6, 33, 44.

As numerous Kornit former employees described, Kornit's machines were unreliable, prone to frequent breakdowns, and required significant technical support to function. ¶¶54-60; 61-66. All of these factors negatively impacted customers' ROI, taxed Kornit's inadequate service infrastructure, and customers ultimately

8

refused to extend their service contracts because they did not add value. ¶¶74-77.

The low ROI, service and reliability problems also led to customer dissatisfaction and losses. ¶¶67-73; 78-91. Important new customers such as Sticker Mule cancelled orders with Kornit and sold their existing printers on the secondary market, specifically because they were unable to get the printers to work correctly. ¶¶100-103. As discussed further below (Section III.A.1.b), new allegations confirm that the printers that Sticker Mule purchased were "***never used in production, just for testing.***" ¶¶10, 97-107. This directly contradicts Samuel's claim that Sticker Mule had "integrated" a "fleet" of Kornit printers into its business. ¶¶104-06. Other major customers, such as Delta and Fanatics, took business to Kornit's competitors, including because of poor service and reliability problems. ¶¶122-23, 126, 129-33.

New allegations from inside Kornit confirm that these problems compounded as Kornit began to cut corners to meet revenue targets. ¶¶175-77. In their rush to "push[] printers out of the factory more quickly," Kornit built machines "less carefully," and failed to conduct adequate testing. As a result, customer complaints only became more frequent. *Id.* But as numerous FEs explained, the Company did not have nearly enough technicians to adequately service all its customers, and the technicians that Kornit hired were ineffective. ¶¶7, 62-69, 74, 77-79. Worse still, new information reveals that Kornit had no mechanism to track service calls from customers, because Kornit did not even have a ticketing system in place. This led to

a chaotic environment where customers frequently faced significant delays for service—and attendant, ROI-depleting downtime. ¶¶7, 54-82. As a result of these shortcomings, approximately 80% of customers "would cancel the service contract as soon as the six-month warranty was up." ¶76. Defendants were well-aware of these reliability and service problems. According to the new account of FE12, Defendants Samuel and Rozner attended Kornit's Quarterly Business Reviews (QBR), meetings where these issues were discussed (and which FE12 also attended). ¶¶53, 88, 127, 301-05; *see also* ¶133. Acknowledging these problems internally, in January 2022, Defendants hired Jeff Loomis, as Director of National and Global Accounts, to bolster customer relationships, and sent him on an apology tour to appease Kornit's irate customer base, which did not result in any sales, just the hope that no customers would sue the Company. ¶¶69, 89-90; *see* ¶¶84-86.

### *Kornit's Purported Technological Advantage and the Lack of Competition.*

Despite crippling service and reliability issues, Defendants further touted Kornit's purported technological advantage and the lack of any competition. ¶¶11, 119-34. Defendants repeatedly assured investors that Kornit's advanced technology created a "moat" between Kornit and its competitors, and that there was no credible "threat" from competition. ¶¶119-20. Analysts credited these claims, specifically basing their valuation of the Company on this "competitive moat." ¶121.

But as noted above, in reality, numerous key customers became increasingly

frustrated with Kornit, including because of the high breakdown rates of Kornit machines and poor service. ¶¶127, 130-31. As the new account from FE12 confirms, many of the Company's biggest customers switched to Kornit's competitors. ¶127. These and other allegations demonstrate that Defendants knew that Kornit *was* "losing whole clients," and address the concerns raised by the Court during the motion to dismiss hearing. Tr. at 14:3-4; *see also* ¶¶88, 127, 133, 301-03.

*KornitX.* Defendants also misrepresented the value and adoption of KornitX. ¶¶12-14, 40, 49, 135-43. Kornit marketed KornitX as a high-end system that allowed brands to order items at any of Kornit's participating customers, for delivery within 24 hours to the end consumer. *Id.* Defendants repeatedly touted the "great adoption" that KornitX was purportedly experiencing, and even claimed it was "growing very fast" and within a few years would generate $100 million annually. ¶¶137-38, 143.

In truth, KornitX was losing customers, and its revenues stagnated. Kornit set the 2022 sales target for KornitX at just over $1.5 million in the aggregate for the year. ¶139. Kornit would need to increase its sales of KornitX by nearly 70x to achieve the sales Defendants told investors to expect by 2026. But this would be impossible: a new account confirms what numerous other FEs had already said— KornitX was "never properly integrated" and "never worked right." ¶142. Indeed, after the Class Period, Defendant Samuel admitted that Kornit was *still* "stabilizing" the platform for customer use. ¶¶12, 138, 201.

11

*Declining Demand.* As these problems all mounted and hamstrung Kornit's business, Defendants continued to misrepresent the true demand for Kornit's products. As stores reopened in 2021, Kornit's demand declined rapidly. ¶¶172-74. Throughout late 2021 and well into 2022, however, Defendants made numerous misrepresentations touting the purported strength of the business (¶¶231-40), and as this Court noted, assuring investors that Kornit was "going to do a great job" in 2022. Tr. at 25:6-7. In fact, just weeks before the end of the Class Period, Samuel told investors that Kornit's business was "in the best place that we could dream of" and that the "fundamental of our business [was] very, very strong." ¶¶239-40.

In reality, Defendants knew that demand was cratering because they monitored it extensively. First, as Defendant Samuel repeatedly told investors, Defendants used their proprietary Kornit Konnect system to measure customers' printer usage "*on a daily basis*." ¶¶159, 287. The Konnect system reported how many garments a customer printed each day, how much ink customers used, and how close customers were to hitting maximum capacity. ¶¶156-61, 287-88. Second, Defendants also used their internal Ink Summaries to track printer usage and compare demand against Kornit's revenue forecasts. ¶¶162, 171. Third, former employees and senior executives at Kornit informed management about the sharp drop-off in demand. ¶¶161, 172-73.

Defendants also offered significant discounts to customers to boost sales.

¶¶167, 300. Then, Kornit shipped printers more quickly—without testing—and accelerated approximately $30 million in revenue from Q2 2022 into Q1 2022, a last-ditch effort to maintain the appearance of growth. ¶¶168-70, 173-179, 197, 298. This allowed Kornit to barely meet guidance for Q1, but decimated Q2. ¶¶197, 298.

### C.     The Truth Is Revealed and Post-Class Period Admissions Confirm Defendants' Knowledge of the Fraud

The truth began to emerge on May 11, 2022, when Kornit reported financial results for Q1 2022, revealing a multi-million-dollar loss, disappointing revenues, and surprisingly low guidance for Q2 2022. ¶183. During the earnings call that day, Defendant Samuel *admitted for the first time* that Kornit had known *for at least the two previous quarters* that it was losing business from Fanatics and Delta Apparel, two of its biggest customers. ¶186. In light of the poor results and apparently declining demand, when asked directly whether Kornit had accelerated revenue, Defendant Rozner flatly denied having done so. ¶¶190, 218-19.

Shocked analysts remarked that Kornit's announcement "left investors understandably skeptical that this is a temporary issue," and noted that a "Tough [first half] raise[d] some questions." ¶184. In response to these disclosures, Kornit's *share price declined by $18.78 per share, or 33.3%*. ¶187. But Defendants continued to make false statements to calm the market. For instance, weeks later, Defendants represented that business was still "in the best place that we could dream of" and described their shocking Q1 results as just a "bump on the road." ¶¶191-93.

Then less than a month later, on July 5, 2022, Kornit revealed further disappointing results. ¶194. This time, Kornit disclosed that it would miss the Q2 quarterly guidance it had provided in May by more than 35%—or approximately the same as Defendants' $30 million revenue pull-forward. *Id.* On this news, Kornit's share price cratered again, losing another 26% of its value ($8.10 per share). ¶198. Analysts immediately questioned management's candor, stating that "regaining the trust of the investment community" would be "a long and winding road," specifically noting the massive "delta between [second quarter] results and expectations given management's generally bullish tone in early to mid-June." ¶¶195-96.

After the Class Period, Defendants made several admissions confirming the falsity of their prior representations. During Kornit's August 10, 2022 earnings call, Defendant Samuel admitted that in the first half of 2022, business had been "declining year-over-year," and various customers had complained that they had too much capacity. ¶199. During that call, Defendant Samuel specifically noted Printful—one of Kornit's biggest customers—as ***one "example"*** of this broader trend. DX 17 at 11-12. And finally, in May and June 2023, Defendant Samuel admitted once again that by no later than the beginning of 2022, Kornit "***saw***" a "major decline within the business of our customers," as they "found themselves with overcapacity" and refused to "buy additional systems." ¶¶202-03. These admissions stand in stark contrast to Defendants' prior representations.

### D.  Procedural History of This Litigation

Plaintiffs filed the Consolidated Complaint in October 2023. ECF No. 23. The Court heard oral argument on Defendants' prior motions to dismiss in August 2024, and instructed Plaintiffs to replead the claims by supplementing the allegations and to "repackage" certain aspects of the case, noting that Plaintiffs needed "a little bit more to establish the falsity" of Defendants' statements. ECF No. 55; Tr. at 25:1-17. Plaintiffs filed the AC, with substantial additional factual allegations. The new allegations, including an account from a new former employee—FE12, a former Kornit Marketing Director—provide the detail that the Court requested, and give additional context for Defendants' false statements and scienter.

More specifically, the AC alleges additional facts that the Court noted would help establish falsity, including: (1) specific information about the Kornit Konnect system indicating "what it was and what data it provided" (Tr. at 11:23-24); (2) facts confirming that Sticker Mule never used Kornit's printers in production (*id.* at 29:19-20); (3) particularized allegations demonstrating that Defendants knew about the decline in demand while they made ***repeated*** false statements ***throughout*** late 2021 ***and into 2022***, and even took drastic steps to mask that decline (¶¶166-81); and (4) facts answering the question of "how much [revenue] was pulled forward" by Defendants in early 2022—approximately $30 million (Tr. at 35:1-2) (¶170). The AC also adds allegations clarifying the basis for certain FEs' knowledge, in

particular FE3's relationship with Chuck Meyo. Tr. at 37:19.

In response to the Court's concerns, Plaintiffs also narrowed the scope of false statements alleged, eliminating certain statements regarding the composition of Kornit's customer base. *See* ECF No. 23 ¶¶182, 186; Tr. at 6:25-8:18. The Securities Act claims were also: (a) supplemented with additional factual allegations, (b) allegations regarding standing (which is no longer challenged) were augmented, and (c) narrowed in such a way to better match particular claims to defendants' roles.

## III. ARGUMENT

On a Rule 12(b)(6) motion, a court must treat the pleaded facts as true and draw all reasonable inferences in Plaintiffs' favor. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 321-22, 324 (2007). Dismissal is inappropriate even if "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 231 (3d Cir. 2008).

### A.    The Complaint Sufficiently Pleads Violations of the Exchange Act

As to the Section 10(b) claim, Defendants only challenge falsity and scienter. The Complaint readily states claims against Defendants Kornit, Samuel, and Rozner for making false statements with scienter.

#### 1.    The Complaint Sufficiently Pleads Defendants' Materially False and Misleading Statements

The Complaint sets forth each of the alleged misrepresentations and omissions, which Defendant(s) made each statement, when the statement was made,

and the reasons each was false or misleading. *See* ¶¶204-283 (Exchange Act claims), ¶¶403-413 (Securities Act claims). Nothing more is required under the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b).

In determining whether the Complaint adequately pleads a misstatement or omission, the Court must draw all inferences in Plaintiffs' favor and evaluate the statements in the context they would have been understood by a reasonable investor. *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 46-47 (2011). "Some statements, ***although literally accurate***, can become through their context and manner of presentation, devices which ***mislead investors***." *In re Merck & Co., Inc. Sec. Deriv. & "ERISA" Litig.*, 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011). Moreover, once a party chooses to speak, it must "speak truthfully about that subject." *Id.*

### a.    Statements About Service and Service Contracts

By the start of the Class Period, Defendants had set the highly aggressive revenue growth targets discussed above. To create the appearance that such goals were achievable, Kornit needed to broadly expand its revenue. In that context, Defendant Samuel emphasized the growth in service revenue and profit—which was largely based on service contracts entered into when customers purchased printers.

However, in touting Kornit's ability to make service profitable, Defendant Samuel falsely stated that: "***Every machine that we are selling, we are selling it with a contract***. . . . ***it's not for one year. It's for multiple year contracts*** and we

see a very nice recurring revenue coming from the service business." ¶205. *See also id.* ("We continue to improve our service contract attach rate"). Defendant Samuel represented that the mandatory multi-year contract was ***the*** reason Kornit was growing "our recurring revenue stream." *Id.*; DX 4 at 6. That was "factually false," as confirmed by multiple FEs. *See* ¶¶91-96; Tr. at 38:12-17. Service contracts were almost always one year long; only occasionally longer; and the longer terms were not compulsory. ¶¶94-95.

Defendants' main argument for dismissal of these statements relies on tortured logic and "context" that purportedly makes the statements true or immaterial. MTD at 23-25. First, by operation of the word "some," Defendants say the question posed to Samuel was limited to an undefined subset of machines sold:

> Analyst: [Y]ou talked about the increasing attach rates. Can you give a little bit color if ***some*** of those attach rates are now for multiyear type of service agreements? Or are they still kind of singular year contracts, which you have to get "renewals" with these customers? (DX 4 at 10.)

Samuel's full response, announcing the Kornit policy applicable to "every machine," eviscerates Defendants' proposed interpretation:

> [*A*]***bout 1.5 years ago, we moved to a full contract. Every machine*** that we are selling, we are selling it with a contract. ***There's no other way to buy from us a machine, and it's not for 1 year***, it's for multiple year contracts. (*Id.*)

Given Samuel's straightforward, unequivocal, and emphatic statement, Defendants' alternative meaning is nonsensical. It is clear from Samuel's statement

that he was trying to convey, and did falsely convey that "every machine" Kornit sold came with a multi-year service contract. Any other interpretation is highly implausible and contrary to both common-sense English and the foundational premise that "all reasonable inferences" must be drawn "in a light most favorable to [] Plaintiffs." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 180 (3d Cir. 2000).

Second, Defendants argue that investors could not have been misled, thanks to purportedly curative disclosures in Kornit's annual reports. MTD at 24-25. Not so. If the length and mandatory nature of Kornit's service contracts was clear to investors, there would have been ***no reason*** for an analyst to ask about their duration. Moreover, the annual reports say nothing about "multi-year" contracts, only that one-year service contracts are mandatory for "each industrial system" sale—not "every machine that we are selling." *Compare* DX 1 at 46 with DX 1 at 37 (differentiating between entry level, industrial, and mass production solutions). Whether investors understood the annual report as corrective of Samuel's false statement—which was itself made in direct response to an analyst and reported on favorably—is an "intensely fact-specific" truth-on-the-market defense that is "rarely an appropriate basis for" dismissal. *Emps. Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent Inc.*, 2020 WL 3026536, at *6 n.8 (D.N.J. June 5, 2020).

Defendants' cited authority to the contrary is inapposite, as the allegedly omitted information was fully disclosed in those cases. *See* MTD at 24-25, citing *In*

re Incyte S'holder Litig., 2014 WL 707207, at *10 n.15 (D. Del. Feb. 21, 2014).

Here, by contrast, Defendant Samuel's statement is **inconsistent** with Kornit's other

public disclosures about the relevant length and mandatory nature of the service

contracts. *See Sec. & Exch. Comm'n v. Farnsworth*, 692 F. Supp. 3d 157, 183

(S.D.N.Y. 2023) ("the existence of countervailing information in securities filings

does not render extrinsic statements immaterial as a matter of law"); *In re Bank of

America Corp. Sec., Deriv., & Emp. Ret. Income Sec. Act ("ERISA") Litig.,* 757 F.

Supp. 2d 260, 300–02 (S.D.N.Y. 2010) (press accounts contrary to defendants'

public statements did not establish truth on the market at pleading stage).

Last, Defendants argue that their other statements concerning the service

organization were not misleading because the service department was growing.

¶¶205–14; *see* MTD at 25. But Defendants' statements conveyed more than the

notion that the service department was "growing," representing that Kornit was

making the "appropriate investments in . . . services support" (¶208; *see* ¶213), and

that service was "profitable and is becoming more and more profitable" (¶210; *see*

¶211). These statements were false and misleading in light of the many service and

reliability problems alleged in the AC and now augmented by new allegations. ¶215.

Indeed, unknown to investors, approximately 80% of customers declined to renew

service contracts because of these problems (*id.*), a critical metric Samuel failed to

even discuss when misrepresenting the length and mandatory nature of Kornit's

service contracts. Plaintiffs further allege that even if Kornit's service revenues were growing, the growth was unsustainable and did not render Defendants' statements about the quality of and "investment" in services not misleading. *Compare* ¶¶50-90, with MTD at 25.

### b.    Statements Concerning Sticker Mule's "Integration" of Kornit's Printers and Customer Growth

On November 10, 2021, Defendant Samuel made the very specific and false statement that a new mid-market customer, Sticker Mule, had "***integrated a fleet of our Atlas systems into their business*** and are ***utilizing*** the growing customers base to support a strong DTG revenue channel." ¶216. The AC explains the importance of this statement to investors, who were keenly focused on Kornit's ability to diversify its highly concentrated client base. *See, e.g.*, ¶39. In fact, Sticker Mule did not "integrate" the printers, which were never "utilized" in production at all. Sticker Mule was unable to get the printers to work properly (¶99) and sold them to third parties who otherwise would have purchased printers directly from Kornit. ¶100.

The AC readily answers the Court's question about the timing of purported "integration" and "utilization" by Sticker Mule of Kornit's printers, *see* Tr. at 28-30, MTD at 17-19, by incorporating an online advertisement ***published by*** Sticker Mule establishing that its Kornit printers were ***never*** "integrated" in production. Instead, as the AC pleads, Samuel's statement concerning the successful "integration" of Kornit's printers by Sticker Mule was materially false and misleading when made.

Defendant Samuel's concrete statements about the "integrated" fleet of Atlas printers and "utilization" of those machines by Sticker Mule to support "strong" revenue are contradicted by FE3, FE4, and FE12, who each confirm that "Kornit was unable to get [Sticker Mule's Atlas printers] to run properly," including new allegations that Sticker Mule could not get the printers to work. ¶¶97-106.

The AC's new allegations corroborate the FE accounts. According to Sticker Mule's own online advertisement, the printer was "***never*** used in production, ***just for testing***" and for less than "100hrs."[1] ¶104. These facts unequivocally establish that the printer, which operated for less than 3.8% of its total annual capacity (¶105) was never "integrated" or "utilized" to support Sticker Mule's customer sales. Defendants argue that Sticker Mule's listing "says nothing about how that printer functioned" at any given time. MTD at 20. Nonsense. The listing unambiguously establishes that that the Atlas printer, which was installed in September 2021, was ***only*** ever used for ***testing*** purposes.

To wit, Defendants make a semantic argument, positing that Samuel's use of the word "integration" was not a guarantee "that Sticker Mule had not had and would never have operational issues with the machines." MTD at 20. This strawman

---

[1] Defendants claim the online advertisement is not attributable to Sticker Mule, despite the AC's express representation to the contrary. MTD at 20; ¶104. But this well pled fact is supported by correspondence that establishes that the seller was, in fact, Sticker Mule. *See* PX 1.

argument fails. Defendant Samuel stated the printers were "integrated," which the Court must give its ordinary meaning. *See* Meriam Webster Dictionary (2022) (Integrate: to form, coordinate, or blend into a ***functioning*** or unified whole); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 130 (S.D.N.Y. 2020) (words carry their "ordinary meaning"). Samuel's statement was false: the printers were only used for testing and were never integrated.

### c.    Statements Concerning Demand

Defendants made repeated and highly material statements touting the continuing and sustainable demand for Kornit's products when, in truth, demand was declining. *See* ¶¶231-242; *e.g.,* ¶231 (Samuel: "[w]e enter 2022 with very strong business fundamentals supported by broad-based demand"); Tr. at 25:5-7 (Court: "the statements that we just went through -- and I agree with you, they were not puffery"). By November 2021, Defendants knew of and concealed the severity of declining demand for the Company's consumables and printers, rendering misleading a host of their positive statements to the contrary. ¶¶231-42.

Defendants first argue that the AC does not allege the existence of a declining demand trend in Q4 2021. Not so. ***First***, Defendant Samuel admitted on June 7, 2022, that major customers such as Printful started to experience a slowdown in growth and cancelled orders "by the end of 2021." ¶241; *see* DX 17 at 11-12 ("***By*** the ***end of 2021***, they started to feel a slowdown."). Defendants' sole rebuttal to this

dispositive timing admission is that Defendant Samuel was speaking about a single customer and not a generalized trend. MTD at 17. This contradicts what Defendant Samuel *actually said*: Printful was "an example" that Kornit "saw" as representative of "other customers without getting to names." DX 17 at 11–12. Moreover, as discussed in Section III.A.2.a, below, Defendants knew that their major customers were experiencing a slowdown in demand "at" and "by" the end of 2021 because they had "live" visibility into demand through software (Konnect) installed on client printers, which reflected the number of impressions (prints) that a customer created each day, the unused capacity of the customers' printers, and ink consumption. ¶¶155-63; *see also* ¶¶159-60. Consistent with these admissions, Defendant Samuel also admitted that the trend worsened "[b]eginning of 2022, [when] we saw major decline within the business of our customers." ¶203.

*Second*, FE3 independently corroborates Defendant Samuel's timing admissions. FE3 attended recurring calls concerning sales projections and revenue, and specifically discussed the Q4 2021 sales slowdown with his President and Vice President. ¶172 ("FE3 added that in November and December 2021 . . . Kornit saw a slowdown in their sales," which occurred "as soon as the pandemic mandates ended"). FE12 similarly reported that to counter slowing demand, the pressure to drive revenue through "Rev Rec" increased *by* the end of 2021. ¶178.

Defendants' attacks on the reliability of FE3's allegations fail. FE3 attended

regular calls concerning sales projections and revenue, *i.e.*, the forum for discussing demand concerns. ¶172. Further, FE3 discussed the declining demand trend that began in November 2021 with both the President and Vice President of the Americas. *Id.* New allegations by FE12, who shared an office with FE3, also buttress the reliability of the information reported by FE3. According to FE12, FE3 was brought to Kornit by the President of the Americas (Chuck Meyo). The two had previously worked together and played soccer together. FE12 confirmed that based on FE3's close, long-standing personal and professional relationship with the President of the Americas, FE3 had access to very high-level information about Kornit's business and operations. ¶73. Nothing more is required to establish FE3's reliability.[2] Defendants' citation to *Alberici v. Recro Pharma, Inc.*, actually supports FE3's reliability, as the *Alberici* court found falsity established based on a single FE's access to negative data.

**Third,** Defendants argue that Kornit's purported disclosures of negative demand indicators in its earnings call for the first quarter of 2022, on May 11,

---

[2] *See Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.,* 2023 WL 8287681, at *11 (S.D.N.Y. Nov. 30, 2023) ("it is permissible for confidential witnesses to rely on indirect knowledge"); *In re Plantronics, Inc. Sec. Litig.,* 2022 WL 17974627, at *5 (N.D. Cal. Nov. 7, 2022) (same). Even if the statements were hearsay, that "is irrelevant because at the motion to dismiss stage, the Court is required to accept all factual statements as true in order to test the legal sufficiency of the complaint." *Guzman v. Mana,* 2018 WL 10150989, at *2 n.2 (D.N.J. Dec. 6, 2018).

2022—a full six months after the beginning of the trend—are exculpatory. *See* MTD at 18.[3] But Defendants' statements both before and after the May 2022 earnings call, including on February 15, 2022, plainly denied the existence and severity of the negative demand trend. *See, e.g.*, ¶234 (Kornit has "never been in a better position as a company"); ¶235 ("started 2022 with outstanding momentum"); *id.* ("[t]he mega-trends that have been fueling our business are intensifying in magnitude and transformation"). Statements made during the May 11, 2022 earnings call also had the effect of misleading investors concerning the decline in demand. *See, e.g.*, ¶238 ("we see Q2 kind of a bump on the road). As did Defendants' misleading June statements, which told investors that Kornit's business was "unbelievable in the best place that we could dream of," and that "[a]ll the market trends" benefitting Kornit had "accelerated," just **weeks** before disclosing the complete opposite. ¶¶239-40.

As noted above, Defendants' own later admissions establish without question that by February 2022, there was a severe negative demand trend that had begun the prior year. *See* ¶203 ("***Beginning of 2022, we saw major decline within the business of our customers.***"); ¶199 (admitting to customer overcapacity in H1 2022); ¶¶170-80 ($30 million pull forward). *See In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at

---

[3] Defendants cite *Paxton v. Provention Bio, Inc.,* to suggest they are allowed a "reasonable amount of time" to evaluate negative information before disclosure. 2022 WL 3098236, at *13 (D.N.J. Aug. 4, 2022); MTD at 17. But *Paxton* found four days to be reasonable, not the six months at issue here. *Id.*

*10 (N.D. Cal. Nov. 4, 2020) ("close timing between misleading statements and disclosure of inconsistent facts suggests that (1) the facts existed at the time the challenged statements were made, and (2) the facts were not caused by intervening factors"). *Rescue Mission of El Paso, Inc.* (MTD at 18), is distinguishable; those defendants made only "measured" statements that fully warned investors of a demand decline. 2013 WL 3087078, at *2, *16 (D.N.J. June 14, 2013).

### d.    Statements Concerning Q1 22 Revenue Pull Forward

When specifically asked whether the Company pulled forward revenue in the first quarter of 2022, Defendant Rozner unequivocally responded: "No." ¶¶218-20. This was false. In truth, Defendants pulled $30 million in revenue into Q1 2022. *Id.*

New allegations from FE12 independently establish that in the first quarter of 2022, Kornit accelerated revenue by emptying "the buffer"—Kornit's future revenue pipeline—to boost first quarter revenue. ¶¶178-79. The AC also adds allegations quantifying the pull forward at $30 million in revenue. ¶170. This was highly material, as confirmed by Kornit's significantly reduced Q2 2022 guidance (announced on May 11, 2022 (¶183)), and the subsequently announced Q2 revenue miss of $32 million (announced on July 5, 2022 (¶194)). Both disclosures resulted in highly material declines in Kornit's stock price. ¶¶183, 194.

These new allegations corroborate those from FE3, who indicated that revenue for Q2 2022 was pulled into Q1 2022 to create the appearance that Kornit

was close to its revenue target. ¶173. FE3 learned this from the President of Kornit's Americas division, and FE3 also discussed the pull forward with Don Whaley, VP of Sales, who was responsible for implementing the revenue acceleration. *Id.*[4]

Defendants puzzlingly contend that Plaintiffs have not alleged how a $30 million dollar pull forward—representing more than 45% percent of Kornit's company-wide Q1 revenues—is material. **First**, materiality is fact-specific and not generally appropriate for a motion to dismiss. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (materiality "assessments are peculiarly ones for the trier of fact"). **Second**, the statement at issue—a response by the Company's CFO to an analyst's question about whether first quarter revenue was augmented by pulling in revenue from the next quarter—is material on its face, as evidenced by the very fact that it was the subject of an analyst inquiry. *See, e.g.*, *In re Penn Treaty Am. Corp. Sec. Litig.,* 202 F. Supp. 2d 383, 392-93 (E.D. Pa. 2002) (response to analyst question material); *City of Brockton Ret. Sys. v. CVS Caremark Corp.,* 2013 WL 6841927, at *4-5 (D.R.I. Dec. 30, 2013) (similar).

**Third**, even Defendants' own authority supports materiality, as a five percent change can be a "basis for a preliminary assumption of materiality." MTD at 21

---

[4] Defendants argue that the AC fails to allege a GAAP violation or that Defendants did anything unlawful. MTD at 20-21. But no such allegation is required. *See, e,g., In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *11 (N.D. Cal. Aug. 17, 2022) (GAAP violation not required to plausibly allege misleading pull forward).

citing *Peifa Xu v. Gridsum Holding Inc.*, 2020 WL 1508748, at *8 (S.D.N.Y. Mar. 30, 2020). **Fourth**, the Complaint clearly explains that Kornit executives executed the pull-forward to cover the revenue gap caused by the negative demand trends Kornit was experiencing. That $30 million boost allowed Kornit to just barely exceed the top end of its first quarter guidance, creating the appearance that the Company was continuing to experience high demand and make progress toward its $1 billion revenue goal. ¶¶220; 263. **Last**, courts routinely find that a "failure to disclose [a] pull-forward tactic[] to investors" is materially misleading, because it "create[s] an inaccurate impression as to the financial health of the Company." *See, e.g.*, *In re Under Armour Sec. Litig.*, 719 F. Supp. 3d 438, 459 (D. Md. 2024).

Defendants argue that FE3 does not describe what he discussed with Chuck Meyo and Don Whaley (the VP of Sales responsible for implementing the pull forward (¶179)), how it conflicted with Defendant Rozner's statement, or when the discussion occurred. MTD at 21-22. These arguments improperly contest the Complaint's allegations, and the demand for superfluous detail is unfounded where both executives discussed the "pull forward" with FE3, thereby establishing it occurred (¶173), which renders false Defendant Rozner's express representation to the contrary. Defendants further attempt to reframe Rozner's express ***denial*** of a pull forward as consistent with FE12's allegations is nonsensical, as both FE12 and FE3 independently establish that Kornit intentionally depleted its future revenues in order

29

to meet Q1 expectations.[5] MTD at 22.

### e.    Statements Concerning KornitX

Defendants made misleading statements about KornitX's functionality (¶¶264, 265-66), customer adoption and retention (¶¶267-68), and revenues (¶402). These statements are contradicted by both FEs and Defendants' admissions that KornitX only generated a "couple million" dollars in revenue and that Kornit never fully "stabiliz[ed] the platform" during the Class Period. ¶¶135-143.

Defendants focus on a statement by Defendant Samuel on January 10, 2022, in which he claimed that KornitX was generating "multi-million-dollar revenue on transaction[s] to Kornit." MTD at 26. Defendants argue that FE3, who reported that KornitX "had not turned any kind of profit or generated any sales in the Americas" from July of 2021 through the end of the Class Period (¶¶140, 399) is unreliable, because Plaintiffs purportedly admit that KornitX was a separate department. MTD at 26. This argument falls flat. FE3 was initially hired to work on KornitX, demonstrating knowledge of the platform, and was present for weekly calls concerning sales projections and revenue. ¶¶140, 172. Moreover, FE10, a former Project Sales Manager, also reported that Kornit failed to sell KornitX to any client during his tenure and that the aggregate 2022 revenue target was just over $1.5

---

[5] As noted above, FE12 also buttresses the reliability of the information reported by FE3 based on his close, long-standing personal and professional relationship with the President of the Americas. ¶369.

million. ¶¶138-39; 397-98. Both accounts are buttressed by FE11, a Software Architect at KornitX, who reported that the platform was simply not ready for use (¶141), and FE12, who reported that the software was never properly integrated and that it never worked correctly (¶142).

Moreover, Defendant Samuel's statement on January 10, 2022 that "KornitX . . . [was] already generating multi-million-dollar revenue" was followed by other statements touting KornitX's growth over the following months. *See, e.g.*, ¶272 (KornitX "is really driving major growth"); ¶275 ("KornitX is growing very fast" and "we see a massive growth coming into it"). Yet KornitX only ever generated a "couple" or a "few" million in revenue and, since the beginning of 2021, ***lost*** approximately 45% of its customer base. ¶143. The rapid and consistent decline in KornitX's customer base and stagnating revenues contradicts Defendants' statements that the platform was "see[ing] great adoption," "great momentum," "very strong adoption," and that "we see a massive growth coming into it."

Corroborating the falsity of Defendants' statements, after the Class Period, Kornit admitted that in 2022 there was ***no growth*** in "software sales," and possibly no revenue, from KornitX. *See* ¶143. In other words, KornitX's purported "massive growth" had no impact whatsoever on Kornit's service revenue. Defendants again devolve into semantics in arguing the KornitX statements are inactionable. Plaintiffs readily appreciate the distinction between "a couple" and "a few," as well as between

31

"profits" and "revenues." MTD at 26-27.[6] But however fine Defendants attempt to slice their public disclosures, it is undisputed that KornitX was losing money ***and*** clients during the Class Period and that its revenues were, ***at best***, stagnating.[7] Courts routinely find statements false under similar circumstances. *See, e.g.*, *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 493 (W.D. Pa. 2020) (finding statement that acquisition was "already showing significant returns" actionable); *Schottenfeld Qualified Assocs., L.P. v. Workstream, Inc.*, 2006 WL 4472318, at *3 (S.D.N.Y. May 4, 2006) (statements about "overall growth and momentum" of the company's business and "strength of our subscription and services revenues" actionable).

### f.    Statements Concerning Competition and the Company's Technology "Moat"

Throughout the Class Period, Defendants repeatedly stated that they experienced no threats from competitors, and drastically overstated the quality of Kornit's technology and the purportedly unique "moat" it provided against competition. *See* ¶¶119-21; 221-30; 404. The existence of stiff competition, including from M&R, was known to defendants and widely discussed internally.

---

[6] Defendants' parsing is inapt anyway. Revenue and sales are basically the same. FE3's statement that KornitX did not "generate any sales in the Americas" is thus inconsistent with and corresponds to disclosures concerning KornitX's revenue.

[7] Defendants argue that service revenues, which include KornitX, increased during the Class Period. MTD at 28. But Kornit sold software other than KornitX, *see* DX 1 at 45, and Plaintiffs are aware of no disclosure quantifying KornitX's revenues beyond those alleged to be misleading.

¶¶115, 122-28. Contrary to these statements, Kornit's machines did not function as advertised and were plagued by reliability issues. ¶¶50-90. Kornit's printers also failed to achieve the marketed ROI for customers, because in actual operation they required more ink, operated more slowly, and suffered from significant downtime. ¶¶108-18. Poor service performed by Kornit exacerbated issues with the Company's frequently broken equipment. These reliability, ROI, and service problems caused significant customers, including Delta/DTG2go, Fanatics, and Sticker Mule, to defect to the competition. ¶¶119-134, 230.

In response, Defendants first rehash their meritless arguments concerning Kornit's generic and ineffective risk disclosures. *See infra*, Section III.A.1.h.

Defendants next argue that they are insulated from their failure to disclose the known loss of Delta and Fanatics' business to M&R's DTG printers because Kornit had no obligation to disclose market share losses when repeatedly touting its unrivaled competitive moat. MTD at 13-14. Not so. In choosing to speak about their unique technology and its superiority over the competition, Defendants had a duty not to mislead. The new allegations from FE12 make clear that these representations were misleading. FE12 recalled that M&R was a big threat for Kornit—the M&R machines only cost $60,000 or $70,000, did not require a skilled operator, were faster, and had a higher ROI with indistinguishable output. FE12's summary of Kornit's true competitive status, as corroborated by numerous other FEs (¶¶119-34)

confirms that Defendants' unadorned statements about their competitive moat were deeply misleading. *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 761 (S.D.N.Y. 2017) ("having opened up that subject for discussion, [Defendant] was not at liberty to selectively omit" core material facts). Compare *Carmignac Gestion, S.A. v. Perrigo Co.*, 2019 WL 3451523, at *10 (D.N.J. July 31, 2019) (falsity where defendant was already facing increased competition) with DX 1 at 4 ("Our current and potential competitors in both the [DTG] and [DTF] markets ***may*** also develop and market new technologies that render our existing solutions ... less competitive.").

Defendants cite *In re Anadigics, Inc., Sec. Litig.*, 2011 WL 4594845, at *20 (D.N.J. Sept. 30, 2011) for the contrary proposition. MTD at 13. But *Anadigics* is inapposite: there, Defendants spoke about a segment of their business that was, in fact, ***not*** subject to competition. 2011 WL 4594845, at *25. Unlike *In re Tseng Labs, Inc. Sec. Litig.*, (MTD at 13), Defendants here made repeated statements about the strength of their competitive position while ***knowing*** that M&R was winning over clients, such as Delta and Fanatics. 954 F. Supp. 1024, 1028 n.8 (E.D. Pa. 1996) (citing *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 375 (3d Cir. 1993) ("With great detail, it also explained the intense competition")); *see infra* at III.A.1.h.[8]

---

[8] Contrary to Defendants' assertion, MTD at 14, n.6, the AC nowhere asserts that Kornit lost all business with Delta. Rather, Kornit lost all its business with Fanatics, which outsourced its production requirements to Delta on M&R printers.

g.    **Defendants' Baseless Revenue Growth Statements**

Even as Kornit's competitive position deteriorated and Defendants actively concealed a major decline in the business of their customers, they continued to repeatedly and aggressively tout their entirely baseless $500 million and $1 billion revenue targets. ¶¶243-63. As newly reported by FE12, Defendants' targets had no basis in reality, as they were set without ever having performed an analysis of the size of Kornit's "addressable" market.[9] ¶151. When that analysis was performed in 2023, it showed that there were not enough customers who could afford Kornit's products. FE12 said Defendants had "built this rocket ship and said, sell it," without regard for the fact that competitors' machines were a fraction of the cost and had similar production. ¶154. *See, e.g, Industriens Pensionsforsikring A/S v. Becton, Dickson & Co.*, 620 F. Supp. 3d 167, 191 (D.N.J. Aug. 11, 2022) ("A projection lacks a reasonable basis if it was made after inadequate consideration . . . .").

Compounding Defendants' failure to consider critical available information in setting these targets was the fact that they were "unmoored from the Company's immediate reality" insofar as they ignored the known but undisclosed impact of slowing demand, unreliability, poor service, the lack of adoption of KornitX, and increased competition. *See id.* at 192; *supra*, Section II.B; ¶¶254-63. Courts in this

---

[9] FE12's allegations are corroborated by FE2, who reported that the targets were not based on previous sales or what the market could bear. FE2 added that there was no input related to market situations or market challenges. ¶166.

District routinely find financial targets actionable under similar circumstances. S*ee Curran v. Freshpet, Inc*., 2018 WL 394878, at *5 (D.N.J. Jan. 12, 2018) (financial projection actionable where defendants failed to disclose manufacturing problems); *In re AT&T Corp. Sec. Litig.*, 2002 WL 31190863, at *15 (D.N.J. Jan. 30, 2002) (growth projections actionable where at odds with "serious operational problems").

### h.   Defendants' Risk and Other Disclosures Omitted Material Facts

Defendants misled investors by failing to disclose relevant facts concerning, among other things, increased competition, an understaffed and ineffective service organization, and the KornitX failures. In addition, as demand shifted back to traditional retail channels, Defendants failed to disclose declining demand and concealed this negative trend, including by pulling forward revenue. Defendants were required to disclose these material adverse facts given their otherwise misleading statements. *Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at *6 (D.N.J. July 31, 2020) ("[o]nce a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading"); *see also Freshpet*, 2018 WL 394878, at *5 (omission of challenges with retailers and manufacturing problems materially misleading); *Perrigo*, 2019 WL 3451523, at *10 (disclosure of possibility of increased competition insufficient to counterbalance prior statements).

Defendants' generic warnings are actionable for failing to disclose that the

36

relevant risks had already been realized. *See, e.g.*, DX 1-2 at 3; DX 3 at 4 ("***If*** we do not compete successfully, our revenues . . . ***could*** decline."); *id.* at 4 ("our business ***would*** be adversely affected by a decline in sales").[10] *See Weston v. DocuSign*, 669 F. Supp. 3d 849, 879 (N.D. Cal. 2023) (as "the pandemic-related risks the company warned investors about during the earnings call had already come to fruition, [defendants'] disclosures were inadequate."); *Immunomedics*, 2020 WL 4381924, at *6 n.6 (risk disclosure treated issue that had occurred as "hypothetical issue").

For example, Defendants claim that they disclosed "challenges" associated with KornitX, and that they did not expect the platform to "significantly impact [Kornit's] results of operations" in the near term. MTD at 30. But the referenced language does not cure the misleading nature of Kornit's disclosures concerning KornitX. The problems with KornitX were significant and simply not conveyed in Defendants' contingent risk warnings, and cannot absolve Defendants' specific and repeated misrepresentations concerning the platform and its growth. *See* ¶¶264-276.

In the context of defending their generic warnings, Defendants advance *Fan v. StoneMor Partners, LP,* 927 F.3d 710, 717 (3d Cir. 2019) (MTD at 21) and *In re Amarin Corp. PLC Sec. Litig.,* 2012 WL 1171669 (D.N.J. Mar. 29, 2012) (MTD at 28-29). But in *StoneMor,* the defendants publicly disclosed "the mathematical reality

---

[10] The specific risk of competition from M&R was not adequately disclosed, as they reference M&R as an analog manufacturer and make ***no*** mention of M&R's DTG capabilities that resulted in the loss of Delta and Fanatics. DX 1 & 2 at 3; DX 3 at 4.

that StoneMor was not able to fund its distributions primarily from its day-to-day operations"—the very fact those plaintiffs alleged that defendants had concealed. *StoneMor,* 927 F.3d at 717.[11] Here, Defendants have simply failed to "sufficiently disclose [the] facts and information that render [their] alleged misrepresentations not misleading." *Id.; see Conduent,* 2020 WL 3026536, at *6. Had investors been fully informed of the undisclosed facts, analysts would not have questioned management's candor or criticized their positive representations. *See* ¶196; *see Asher v. Baxter Int'l Inc.,* 377 F.3d 727, 734 (7th Cir. 2004).

### i.    The Safe Harbor Does Not Insulate Defendants

The PSLRA's safe harbor provision, 15 U.S.C. § 78u-5, does not apply to a "mixed present/future statement . . . with respect to the part of the statement that refers to the present." *Id.* at 255. Nor does the safe harbor apply to the extent "Defendants omitted present facts from the challenged statements," *see Freshpet*, 2018 WL 394878, at *4, or where the cautionary language fails to disclose known risks. *See In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *11 (D.N.J. Dec. 15, 2015) (rejecting cautionary language where the "risks had already come to pass").

First, Defendants argue that many of their false and misleading statements are "quintessential" forward looking statements. They are not. *See, e.g.*, ¶193 ("our

---

[11] *Amarin,* in which Defendants disclosed discussions with the FDA concerning the very risk at issue, is similarly distinguishable. 2021 WL 1171669, at *14. The court found that defendants had not put the adverse, undisclosed data "in play." *Id.* at *15.

business *is* better than ever"); ¶205 ("*we are* selling it with a contract."); ¶208 ("we *continue* to make the appropriate investments"); ¶¶231-32 ("we enter 2022 with very strong business fundamentals"); ¶¶234-35 (Kornit has "*never been in a better position as a company*"); ¶243 ("we *are* more confident than ever in our ability to achieve"); ¶266 ("*we already see* the huge value [KornitX] *brings* to our customers"). *See also* ¶¶209, 214, 216, 269, 275 and 281.

To the extent some of these statements touch on the future, they all implicate Kornit's present and past strategy and misrepresentations related to poor service, inability to compete, and revenue manipulation. *See, e.g.*, ¶222 ("*we don't see today*"); ¶223 ("*[w]e really have*"); ¶224 ("this *is* not"); ¶226 ("we see in the market *today*"); ¶¶231-32 ("*continuing* our very strong momentum"); ¶¶235-36 ("our fundamentals *are* excellent"); ¶238 ("*in the last week, we start to see a different trend*"); ¶264 (KornitX "*experiencing* huge interest"); ¶266 ("*we already see*"); ¶268 ("*[w]e see* great adoption"); ¶270 ("*continue to see* great momentum"); ¶271 ("*we have*"); ¶280 (risk already materialized). *See also* ¶¶209-11, 225, 247 and 253. Such statements are not protected because they omitted existing facts that bear on the forward-looking aspect of the statement. *See In re Majesco Sec. Litig.*, 2006 WL 2846281, at *4 (D.N.J. Sept. 29, 2006) ("[A]llegations based upon omissions of existing facts or circumstances do not constitute forward looking statements protected by the safe harbor of the Securities Act."); *see also Perrigo*, 2019 WL

3451523, at *11-12.

Second, as discussed above, the subset of statements concerning Kornit's revenue targets or guidance *are* actionable because they were issued without a reasonable basis or meaningful cautionary language. *See, e.g*, *Industriens*, 620 F. Supp. 3d at 191 ("A projection lacks a reasonable basis if it was made after inadequate consideration of available information."); *see* ¶¶42, 151, 165–67.

Third, even if the statements were forward-looking, the safe harbor would not apply because they were not "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i); *see also* 15 U.S.C. § 78u-5(c)(2)(A). Defendants' oral statements made on May 19, 2021 (¶¶221-23; 244), and June 7, 2022 (¶¶239, 252) were not "accompanied" by *any* cautionary language and therefore do not qualify for protection.[12] Defendants' argument that their statements are inactionable thanks to purported disclosures in Kornit's annual reports is also unavailing. Those generic disclosures were not

---

[12] The safe harbor for oral statements explicitly requires a disclosure "that the actual results might differ materially from those projected." 15 USCA § 78u-5(c)(2)(A). Contrary to Defendants' unsupported assertion (MTD at 35), failure to contemporaneously read the disclaimer is not excused by a bald reference to another communication. *See In re Champion Enter., Inc., Sec. Litig.*, 144 F. Supp. 2d 848, 865 (E.D. Mich. 2001), *aff'd sub nom. Miller v. Champion Enter. Inc.*, 346 F.3d 660 (6th Cir. 2003) (no safe harbor where speaker "failed to state that factors discussed in the document to which she refers could cause actual results to materially.'").

extensive and specific, and were thus insufficient to constitute meaningful cautionary language. *See In re PDI Sec. Litig.*, 2005 WL 2009892, at *12-15 (D.N.J. Aug. 17, 2005). Defendants' purported warnings are themselves misleading (*supra* Section III.A.1.h), or are "mere boilerplate disclaimers that warn generally of risks," and thus not entitled to safe harbor protection. *Perrigo,* 2019 WL 3451523, at *12.

Last, Defendants acted with actual knowledge of the falsity of each of their statements and omissions. *See* Section III.A.2., *infra.* Accordingly, the safe harbor provision is inapplicable. *See Perrigo,* 2019 WL 3451523, at *11-12.

### j.    Defendants' Misstatements Are Not Puffery

Defendants contend that many of their challenged statements constitute immaterial puffery. MTD at 47. But "a statement is considered puffery only when it is immaterial." *Enzymotec*, 2015 WL 8784065, at *13. "Materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." *Shapiro v. UJB Fin. Corp.*, 964 F. 2d 272, 280 n.11 (3d Cir. 1992). Dismissal is appropriate "'[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality.'" *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 275 (3d Cir. 2004).

Courts thus commonly find evaluations of a company's financial well-being—be they "conservative," "strong," "solid" or otherwise—actionable. *See,*

*e.g.*, ¶231 ("[W]e enter 2022 with very strong business fundamentals"); ¶271 ("[w]e see [ ] very strong adoption" of KornitX); ¶228 ("very, very, strong new moat"). *See Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *2, *10 (D. Del. June 14, 2011) (similar); *In re U.S. Interactive, Inc. Class Action Sec. Litig.*, 2002 WL 1971252, at *18 (E.D. Pa. Aug. 23, 2002) (statements about "incredible," "robust," and "strong" demand not puffery).

Even if a statement expresses optimism, it is nonetheless misleading when defendants fail to completely and accurately represent information known to them. *See, e.g.*, ¶236 (stating that "Kornit has never been in a stronger position" and failing to disclose competitive losses, service failures, customers defections, and negative demand trends); *Merck,* 2011 WL 3444199, at *10 (positive statements about commercial success misleading for failure to completely and accurately represent information known to defendants).

Many of Defendants' challenged statements were also concrete, verifiable representations of fact, not loose, vague generalities. *See, e.g.*, ¶205 ("[E]very machine that we are selling, we are selling it with a contract."); ¶406 ("high productivity and attractive total cost of ownership"); ¶265 (KornitX "is a robust platform"); ¶216 ("integrated a fleet of our Atlas systems into their business"). These representations of fact, which are directly contradicted by internal facts as reported by FEs and corroborated by Defendants' admissions, are actionable. *See, e.g.*, *In re*

42

*Smith & Wesson Holding Corp. Sec. Litig.,* 604 F. Supp. 2d 332, 342 (D. Mass. 2009) ("statements regarding the strength of past demand . . . are definite and important to a potential investor"). Similarly, Defendants' statements touting Kornit's continued dominant competitive position—*e.g.*, that Kornit was well-positioned against competitors with an ever-widening technological moat—are "exactly the types of statements on which investors and markets rely." *See, e.g., In re Allaire Corp. Sec. Litig.,* 224 F. Supp. 2d 319, 337 (D. Mass. 2002) (statement that company's leadership position gave it a "competitive advantage" actionable).

Here, many of the challenged statements were repeated and made in response to questions from securities analysts raising these concerns, demonstrating that they were, in fact, material to investors. *See, e.g.*, *In re Penn Treaty Am. Corp. Sec. Litig.,* 202 F. Supp. 2d 383, 392-93 (E.D. Pa. 2002) (response to analyst not puffery).

### k. Defendants' "Opinion" Statements Are Actionable

As an initial matter, many of the statements Defendants claim were opinions are in fact anything but—unadorned by any of the words that would even suggest expression of an opinion. *See, e.g.*, ¶205 ("***every machine that we are selling, we are selling it with a contract***"); ¶¶207–09 ("***[s]ervices [business] continue[d] to outperform our expectation on growth and profitability***"); ¶213 ("***[w]e are investing a lot in customer support***"); ¶218 ("The ***timing of sales*** later in the first quarter . . . ***grew receivables materially quarter-over-quarter***.").

43

To the extent any of Defendants' statements are considered opinions, they are actionable because they reasonably implied untrue facts and omitted appropriate qualifying language. *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at *14 (D.N.J. Apr. 28, 2017) (omission of material fact renders statement of opinion actionable). For example, Defendants repeatedly touted Kornit's revenue targets, growth, and "accelerating" business fundamentals while knowing of a material decline in customer growth since Q4 2021. The failure to disclose these material facts and the intentional concealment of this negative trend renders Defendants' statements actionable. *See Freshpet*, 2018 WL 394878, at *7 (omission of negative facts that affected growth precluded immunity for statements of opinion); *DocuSign*, 669 F. Supp. 3d at 881 (statements not puffery where defendants' "omission makes any opinions about [customer demand] misleading to a reasonable person").

## 2. The Complaint Pleads a Strong Inference of Scienter

A plaintiff must allege facts "giving rise to a strong inference of either reckless or conscious behavior." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 267 (3d Cir. 2009). This inference "need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324. The inference of scienter is "strong" when it is as likely as any other inference—a tie goes to the plaintiff. *See id.* at 314. Scienter turns "on a practical judgment about whether, accepting **the whole factual picture** painted by the complaint, it is at least

44

as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269.

### a. Defendants Knew About Reliability and Service Problems, Competition, and Declining Demand

"To adequately plead scienter, it is sufficient for plaintiffs to allege that defendants had knowledge of facts *or* access to information that contradict[ed] their statements." *In re Cambrex Corp. Sec. Litig.*, 2005 WL 2840336, at *11 (D.N.J. Oct. 27, 2005). The AC alleges both.

*First*, Defendants closely tracked demand through customers' use of Kornit's products in real time. Defendants were highly focused on customers' printer and ink usage because they were indicative of broader demand trends. Ink sales were "the best indicator" of the Company's business. ¶¶35-36.

Using Kornit's Konnect system, Defendants monitored, among other things, how many garments a customer printed each day, how fast customers printed, how much ink customers used, and utilization rates. ¶¶156-61, 287-88. But Defendants did not merely have *access* to this information; Defendant Samuel told investors that Defendants *used* the Kornit Konnect system *specifically to measure* the "success of each customer *on a daily basis*," to "mak[e] sure that they are buying more ink and more system[s] from us." ¶¶159, 287. Based on this, as Samuel stated, Defendants "**kn[e]w everything that our customer is doing**." ¶¶160, 288. *See City of Warwick Ret. Sys. v. Catalent, Inc.*, 2024 WL 3219616, at *15 (D.N.J. June 28, 2024) (scienter where defendants represented they were "constantly looking at what our customers'

45

needs are"). Chuck Meyo, the President of Kornit's largest division, would personally provide management with data from Kornit Konnect. ¶161. Defendants also closely tracked customers' ink usage using Kornit's Ink Summary, comparing customer demand against management's revenue forecasts. ¶¶162-63, 171, 296.

Moreover, Defendants admitted they "saw" the "major decline" in business in real-time. The AC pleads more than "a general statement" of knowledge. ¶¶203, 293. *See* MTD at 43.[13] Courts routinely credit similar allegations. *See Catalent*, 2024 WL 3219616, *15 (scienter where defendants "had access to company information" through multiple databases that "monitored various metrics"). Contrary to Defendants' suggestion (MTD at 42), the AC alleges Defendants' ***existing*** customers did not use the Company's products enough to justify their cost and were defecting to Kornit's competition—Defendants were, in fact "losing whole clients." *Id.*; *see supra* at 11. And once a customer switched to a competitor, Kornit Konnect and the Ink Summary would have revealed as much.

***Second***, it is clear that Defendants knew about the decline in demand because they took steps to mask it. FE2 explained that—under Samuel's direction—Defendants offered customers "significant discounts" of up to 30% "to meet the

---

[13] Defendants wrongly assert that there is "no allegation" as to what data was given to Samuel and Rozner. MTD at 43. Not so. The AC specifically alleges that Chuck Meyo gave management the information concerning impressions and ink usage ***generated by Kornit Konnect***. ¶161. Defendants' attacks on FE3 are further unavailing for the reasons discussed *infra* at Section III.A.2.b.

Company's revenue projections," and *only* Defendant Samuel could approve a discount above 7%. ¶¶167, 300. But this was not enough to maintain the façade of strong demand, so Defendants also rushed to ship machines—"deplet[ing]" their buffer of printers, and pulled forward approximately $30 million in revenue to meet Kornit's first quarter target. ¶¶170-79, 197, 298. Courts infer scienter where Defendants take "affirmative steps to mitigate" impending risks, because the very act of taking those steps indicates knowledge. *In re Coinbase Glob., Inc. Sec. Litig.*, 2024 WL 4053009, at *21 (D.N.J. Sept. 5, 2024). Defendants do not address their actions to mask the decline in demand, and thus waive the argument. *See Laborers' Int'l Union v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994).

*Third*, Defendants were repeatedly warned about the low quality of Kornit's products, its ineffective service department, and increased competition. *See Freshpet*, 2018 WL 394878, at *5 (defendants "had extensive information" and "were presented" with "updates" that "reflected manufacturing problems," which included the "frequent breakdown of equipment"). Numerous former employees confirm Defendants' knowledge. For example, FE12 explained that these issues were discussed during QBRs and other meetings, which Samuel and Rozner attended. ¶¶53, 64, 127, 131-33. Other former employees, including FE8 (¶301), FE4 (¶¶131, 133) and FE3 (¶302) confirmed this information was shared with Defendants. Kornit even ultimately sent a sales executive on an "apology tour" to

customers, confirming their knowledge of the issues. ¶¶90, 305.

### b.    Former Employees Confirm Defendants' Knowledge

Defendants gloss over the extensive former employee allegations in this case and merely describe them as "vague and uncorroborated." MTD at 46. They are wrong. The AC establishes "the duration of each [former employee's] employment, the time period during which the [former employees] acquired the relevant information, and how each [former employee] had access to such information." *Avaya*, 564 F.3d at 263. Plaintiffs must merely "support the probability that the [FEs] did possess the information alleged." *Catalent*, 2024 WL 3219616, at *15 n.24.

Defendants argue that the Court should ignore the FEs because some of them did not have direct contact with Samuel and Rozner. MTD at 46. This runs counter to Third Circuit precedent. *See Avaya*, 564 F.3d at 268-69 (rejecting argument that FE reports be ignored because none of them "claimed to have had any connection to or communication with" defendants). The FEs explicitly identify the sources of their knowledge, and Defendants do not dispute that the FEs were in positions that would give them access to the information alleged.[14] *See Roofer's Pens. Fund v. Papa*, 2018 WL 3601229, at *23 (D.N.J. July 27, 2018) (crediting FEs who "spoke to issues within their sphere of knowledge"). In addition, the FE allegations are corroborated

---

[14] The AC adds allegations explaining, as the Court requested, "the basis for FE3's knowledge," including his relationship with Meyo. Tr. at 37:18-20. *See* ¶¶71-73.

by each other, and their statements were ultimately confirmed when the truth emerged and by Defendants' subsequent admissions. *See In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at \*16 (D.N.J. Aug. 8, 2018) (crediting FEs where statements were corroborated by subsequent company announcement).

The FE allegations establish that Defendants had "information contradicting their public statements" and do not hinge on any FE's personal belief or speculation. MTD at 47. Defendants' cited authorities are inapposite. In *Rahman v. Kid Brands*, witnesses did not have "any way of knowing what was discussed in those closed-door meetings." 736 F.3d 237, 245 (3d Cir. 2013). Here, the FEs each identified their sources. In *Cal. Pubs. Emps.' Ret. Sys. v. Chubb*, the plaintiff did not allege when *any* of the FEs worked at the defendant company, and some allegations were "attributed *to no source*" whatsoever. 394 F.3d 126, 148, 155 (3d Cir. 2004).

### c.    Defendants' Detailed and Repeated Statements Support Scienter

Defendants made detailed statements concerning the subjects of the fraud, including the "integration" at Sticker Mule, and repeated assertions concerning other issues, such as: (i) product quality and customer service capabilities (¶¶205-15); (ii) Kornit's purported technological advantage (¶¶221-30); (iii) KornitX (¶¶264-76); and (iv) demand for Kornit's products, revenue and customer growth. ¶¶216-20, 231-63. "These officers were speaking as authoritative sources who possessed the information to support their statements," *SEB Inv. Mgmt AB v. Endo Int'l, PLC*, 351

F. Supp. 3d 874, 906 (E.D. Pa. 2018), and their "statements evincing certitude" are strong evidence of scienter. *Avaya*, 564 F.3d at 270.

Defendants claim that the "context" of their statements exculpates them. MTD at 45-46. Defendants rely on *Dang v. Amarin Corp. plc*, 2024 WL 4285900, at *25 (D.N.J. Sept. 25, 2024), but in *Dang*, there were ***no*** "allegations that the Individual Defendants were ever asked about" the allegedly undisclosed information. Judge Kirsch suggested that the outcome may have been different "had analysts asked about the" issue. *Id*. Here, Defendants "repeatedly responded to pointed analyst questions" with misrepresentations. *Roofer's*, 2018 WL 3601229, at *21. *See, e.g.*, ¶¶205, 219, 224, 226, 227, 229, 239, 240, 269, 270, 271. And in many cases— including Rozner's denial concerning whether Kornit accelerated revenue (¶219)— Defendants "answered the questions without any hedge." *Wu v. GSX Techedu*, 738 F. Supp. 3d 527, 561 (D.N.J. 2024). Faced with "sharp, detailed, and recurring questions," Defendants either "did not investigate before providing the false information," ***or*** "investigated, determined the truth, but made a false statement anyway." *Id*. Either one supports scienter.

### d.    Defendants' Admissions Confirm Scienter

After the Class Period, Defendants made several admissions that confirm falsity and scienter. Defendant Samuel admitted that: (1) during the first half of 2022, Kornit saw customers' business "declining year-over-year" (¶¶199, 293); (2)

KornitX was *still* not functioning properly, and Kornit was still "stabilizing the platform itself" (¶¶138, 201, 295); and (3) in the "*[b]eginning of 2022*," Defendants "*saw major decline* within the business of our customers." ¶¶202-03, 293. *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 191-92 (S.D.N.Y. 2010) ("subsequent admissions" strengthen scienter).

The only post-Class Period admission Defendants address directly is Samuel's statement concerning KornitX, which they merely claim "was not inconsistent" with prior statements.[15] MTD at 45. They are wrong for the reasons discussed *supra* at Section III.A.1.e., and Defendants thus concede that their other admissions *do* indicate scienter. While Defendants claim they made these statements with "the benefit of hindsight" (*id.*), this self-serving interpretation ignores their admission that they "*saw*" the decline in real time. At most, this is a factual dispute that cannot be resolved in Defendants' favor at this stage. *Avaya*, 564 F.3d at 264 n.36.

### e. The Temporal Proximity of Defendants' False Statements to the Corrective Disclosures

The "temporal proximity" between a defendant's false statements and a corrective disclosure "strengthens the inference of scienter." *Avaya*, 564 F.3d at 271-73; *see also Apple*, 2020 WL 6482014, at \*10 (same). Defendants made numerous

---

[15] Defendants primarily discuss a statement by Samuel from June 2022—that he made during the Class Period. *See* MTD at 45. In any event, Defendants' interpretation of that statement is incorrect for the reasons discussed *supra* at 14, 23-24.

misrepresentations shortly before the truth emerged, assuring investors, for instance, on June 7, 2022, that "the fundamental of Kornit business is unbelievable in the best place that we could dream of." ¶307. This statement was corrected on July 5, 2022. ¶194. It is unreasonable to infer that the true underlying facts suddenly changed in less than a month. Defendants offer only their conclusory assertion that Plaintiffs have "not connected the dots" between the misstatements and Defendants' state of mind. MTD at 44. Not so. The AC amply alleges that by late 2021, Defendants knew of declining demand. *See supra* at 12-13; 23-27.

### f.    The Fraud Concerned Kornit's Core Operations

Misstatements concerning core matters of central importance to a company support an inference of scienter. *See In re Urban Outfitters Sec. Litig.*, 103 F. Supp. 3d 635, 653-54 (E.D. Pa. 2015). Here, sales and service of Kornit's printers and consumables generated 80% of the Company's revenue. ¶33 (table); ¶306. *See Perrigo*, 2019 WL 3451523, at *16 ("fraud related to a high-earning segment . . . sufficient to support a core operations inference"). Defendants merely argue that core operations do not, "without more," establish scienter. MTD at 43-44. But the AC alleges numerous other facts indicative of scienter. The cases Defendants rely on are not to the contrary. *See, e.g.*, *Nat'l. Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517 (D.N.J. 2010) (no additional "individualized allegations" of scienter). *In re Advanta Corp. Secs. Litig.* is equally inapposite; the

court simply rejected allegations that a defendant "must have known" a statement was false "because of his position." 180 F.3d 525, 539 (3d Cir. 1999).

### g.    Defendants Were Motivated to Commit Fraud

While Plaintiffs are not required to plead motive to establish scienter, motive allegations can "amplify an inference of scienter as part of the holistic" analysis. *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 349 (E.D. Pa. 2014).

### (1)    Samuel's Insider Trading Supports Scienter

During the Class Period, Defendant Samuel sold more than 80,000 shares of Kornit stock for nearly $10 million. *See* ¶308. Defendant Samuel sold more than three times as many shares for more than ***eight times*** the proceeds during the Class Period than he did in the 18 months before. *Id. See In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 473-74 (E.D. Pa. 2014) (sales worth $8 million during class period compared to $400,000 before class period supported scienter). Defendant Samuel's sales also netted him more than ***twenty-three times*** his annual salary. *See* PX 2 at 80 and PX 3 at 81. *See In re Suprema Specialities , Inc. Sec. Litig,*438 F.3d 256, 277-78 (3d Cir. 2006) (scienter where sales earned defendant just four times annual salary).[16]

Defendants first complain that Samuel "maintained a significant personal

---

[16] The Court may take judicial notice of PX 2 and PX 3, Kornit's annual reports for 2021 and 2022, respectively. *See In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *3, n.5 (D.N.J. Aug. 28, 2017).

stake in Kornit," because he purportedly increased his holdings during the Class Period. MTD at 39. Defendants overreach: the document they point to shows Samuel's holdings as of April 24, 2023—nearly a year *after* the Class Period ended. *See* DX 23 at 96, n.5. Defendants' cases (MTD at 39) are also inapposite. In *Monk v. Johnson & Johnson,* 2011 WL 6339824 (D.N.J. Dec. 19, 2011), insiders increased holdings *during* the relevant period. *In re Adolor Corp. Sec. Litig.,* 616 F. Supp. 2d 551 (E.D. Pa. 2009) is even further afield; there were "no allegations" of insider sales, and the court noted that "if Defendants had sold their [] stock before the value of the stock dropped, Plaintiffs would have a sufficient factual basis to allege scienter." *Id.* at 573. That is the case here.

Nor do Samuel's Rule 10b5-1 trading plans negate motive (MTD 40-41), as nearly all of his sales were made pursuant to plans *adopted during the Class Period*. ¶308; *see George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012). Defendants' cases are not to the contrary. *See In re Synchronoss Techs. Sec. Litig.*, 2019 WL 2849933 (D.N.J. July 2, 2019) (no facts showing when plan adopted); *In re Audible Inc. Sec. Litig.*, 2007 WL 1062986 (D.N.J. Apr. 3, 2007) (plan created before class period).

Nor does the lack of sales by Rozner, who became CFO just weeks before the Class Period (¶27), "undermine" the scienter inference. MTD at 39. This is a red herring—Rozner did not *own any shares* of Kornit through *at least* April 29, 2022,

54

just two weeks before the first corrective disclosure. *See* ¶308, n. 8. Even if certain defendants did not sell shares, "the insider sales of other Defendants still support" scienter. *Viropharma*, 21 F. Supp. 3d at 473-74 (scienter where only two of four defendants sold stock); *Suprema*, 438 F.3d at 277 (similar).

Finally, Defendants assert that the Court should ignore Samuel's insider trading because their fraud lasted 17 months, which—in Defendants' view—is too "lengthy" to infer scienter from. MTD at 40. But Defendants omit key language from *In re Hertz Global Hldgs., Inc.*, 905 F.3d 106, 120 (3d Cir. 2018), which merely noted that if a Class Period is "*well* over a year" long, this might weigh against scienter. Indeed, *Hertz* concerned a 29-month class period (nearly twice as long as in this case) and relied on another case with a 44-month class period.[17]

### (2) Kornit's Secondary Offering Provided Additional Motive

Defendants were also motivated to misrepresent the truth ahead of the November 2021 offering (¶309), which generated more than $340 million in proceeds. Had Defendants conducted the offering after the truth was fully revealed, those same shares would have been worth just $55 million. *Id.*; *see In re Res. Am. Sec. Litig.*, 2000 WL 1053861, at *6 (E.D. Pa. July 26, 2000) (desire to raise capital

---

[17] A lengthy class period simply suggests that "Defendants were able to ride the wave of their misleading marketing for the entire" time. *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *15 (C.D. Cal. Oct. 1, 2013).

"gives rise to a strong inference of scienter"); *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *19 (D.N.J. Dec. 6, 2018) (offering "probative of scienter"). Defendants fail to address these allegations and thus waive the argument. *See Foster Wheeler Corp.*, 26 F.3d at 398.[18]

## B.    The Complaint Sufficiently Alleges Violations of the Securities Act

Plaintiffs sufficiently allege Securities Act claims. Based on the Court's guidance during the August 15, 2024 hearing, the AC added numerous allegations supporting the Securities Act claims, satisfying the liberal Rule 8 plausibility standard. Defendants desperately assert that Rule 9(b) should apply, but even if it did—which it does not—Plaintiffs' claims satisfy that standard as well.

### 1.    Rule 8 Applies to the Securities Act Claims

"Where a plaintiff's Section 11 . . . claims are not grounded in allegations of fraud, the liberal notice pleading requirements of Rule 8 apply." *Suprema,* 438 F.3d at 270. In the Third Circuit, Securities Act claims do not sound in fraud when "ordinary negligence is expressly pled in connection with those claims." *Id.* at 272–73. "In such a case, the fraud allegations [that are part of a Section 10(b) claim] cannot be said to 'contaminate' the Section 11 and Section 12(a)(2) claims if the allegations are pled separately." *Id.* Rule 8 applies to Securities Act claims where

---

[18] Because the AC alleges scienter as to the Officer Defendants, it also alleges Kornit's scienter. *See Avaya*, 564 F.3d at 252 (A "corporation is liable for statements by employees who have apparent authority to make them.").

the plaintiffs, as here, "expressly pled negligence in the opening paragraphs of the Securities Act Claims" and "clearly separated their claims under the Exchange Act and the Securities Act, and did not incorporate allegations from the Exchange Act Claims into the Securities Act Claims." *Coinbase*, 2024 WL 4053009, at *21.

*First*, Plaintiffs "specifically disavow[ed] any allegations or averments of fraud in connection with the claims pleaded below under the Securities Act." ¶333. Plaintiffs also included repeated disclaimers that the claims allege strict liability and negligence and not fraud, intentional or reckless conduct, or scienter. *See* ¶¶414, 423, 430. "Plaintiffs expressly pled negligence." *Coinbase*, 2024 WL 4053009, at *21. *Second,* the AC has "a clear conceptual separation . . . between claims sounding in negligence and those sounding in fraud." *Suprema*, 438 F.3d at 273.[19]

The cases Defendants cite are inapplicable (MTD 48-50), as they do not involve complaints that expressly alleged negligence and separated Securities Act claims from fraud-based claims. As the *Suprema* court stated, "[b]oth *CALPERS* and *Shapiro* . . . presented complaints containing allegations of fraud exclusively; no allegations of negligence were pled in support of the Securities Act claims." *Id.* at 272 (discussing *CALPERS*, 394 F.3d 126, and *Shapiro v. UJB Fin. Corp.*, 964 F.2d

---

[19] The analysis is particularly clear as to the Underwriter Defendants, who are only named on the Securities Act Section 12(a)(2) claim. Despite their argument to the contrary (UW MTD at 2), Rule 9(b) is "not implicated when a defendant stands accused of nothing more than negligence." *Suprema,* 438 F.3d at 274.

272 (3d Cir. 1992)). Moreover, *CALPERS* "expressly incorporate[d] by reference" the complaint's "scienter and scheme allegations." *Bauer v. Prudential Fin., Inc.*, 2010 WL 2710443, at \*4 (D.N.J. June 29, 2010). Defendants' other cited cases are similarly inapposite. *See Castlerock Mgmt., Ltd. v. Ultralife Batteries, Inc.*, 68 F. Supp. 2d 480 (D.N.J. 1999) (predates *Suprema*; did not allege negligent conduct); *In re Vonage Initial Pub. Offering (IPO) Sec. Litig.*, 2009 WL 936872 (D.N.J. Apr. 6, 2009) (negligence not alleged). And, contrary to Defendants' claim, any similarity between Plaintiffs' allegations under the Securities Act and Exchange Act is immaterial. *See Coinbase*, 2024 WL 4053009, at \*21.

## 2. The Offering Materials Contained Material Misstatements and Omissions

The AC easily satisfies the Rule 8 standard, which requires a "short plain statement" alleging enough facts to state a claim for relief that is plausible. *See Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Contrary to Defendants' contentions (UW MTD at 2-3; MTD at 50-54), Plaintiffs have sufficiently pled "material misstatements or omissions." *Suprema*, 438 F.3d at 269. But even if Rule 9(b) applied, the Securities Act claims are actionable for the same reasons as the Exchange Act claims. *See Coinbase*, 2024 WL 4053009, at \*21 n.30 ("Even if the Court applied Rule 9(b)'s heightened pleading standard," claims would survive given arguments under Section 10(b)).

***First,*** the Offering Materials misleadingly warned that that Defendants' core

58

products "may contain undetected errors or defects," ¶404, when such errors and defects were *already* in existence. *See* ¶¶347-246, 405. *See supra*, Section III.A.1.h.

**Second,** the Offering Materials touted the "high productivity" and "attractive total cost of ownership." ¶406. But those statements were untrue and misleading in light of the significant defects and lower productivity of Kornit's products compared to its competitors, and the true total cost of ownership that was not disclosed to Kornit customers in advance. ¶¶379, 385-395, 406-407. *See supra*, Section III.A.1.

**Third,** the Offering Materials stated Kornit was "mak[ing] the appropriate investment in . . . services support" and "delivering best in class customer experience," but Kornit's customer service department was deficient and caused customers to turn to Kornit's competition. ¶¶357-384, 409-10. *See supra*, Section III.A.1.a., b., f.

**Fourth,** the Offering Materials represented that "KornitX was a robust platform," when, in truth, KornitX was not even ready for use by the time of the Offering, the Company was "constantly trying to figure out the integration," and "it never worked right." ¶¶396-402, 411-13. KornitX saw a consistent decline in customers and stagnating revenues. ¶402. *See supra*, Section III.A.1.e.[20]

---

[20] Defendants argue their statements are not actionable because they (1) disclosed the related risks, (2) are puffery and/or opinions, (3) are forward-looking, and/or (4) involve hindsight pleading. MTD at 51-54. These arguments fail. *See* Section III.A.1.h. (generic warnings); Section III.A.1.j.-k. (not puffery or opinions);

### C.    The Complaint Sufficiently Pleads Control Person Claims

Plaintiffs adequately allege primary violations of the Exchange Act and the Securities Act. Thus, the control person claims against Defendants Samuel and Rozner under Section 20(a) and Section 15, respectively, also survive. Defendants do not contest that Samuel and Rozner controlled Kornit. *See* MTD at 54. Defendants' "one independent basis for dismissal—the alleged lack of culpable participation—is unavailing." *Roofer's*, 2018 WL 3601229, at *24 n. 24. The AC amply establishes culpable participation based on their scienter. *See* Section III.A2.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied in their entirety. In the event the Court grants Defendants' motions in full or in part, Plaintiffs request leave to amend the AC pursuant to Fed. R. Civ. P. 15.

---

Section III.A.1.i. (no safe harbor). And contrary to Defendants' suggestion that the AC pleads merely fraud by hindsight, the AC amply leads that the statements were false when made. *See generally* Section III.A.1.

60

Dated: March 10, 2025             Respectfully submitted,

**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & ANGELLO, P.C.**

By: *James E. Cecchi*
James E. Cecchi
Kevin G. Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs Genesee
County Employees' Retirement System,
Kranot Hishtalmut Le Morin Tichoniim
Havera Menahelet LTD, Kranot Hishtalmut
Le Morim Ve Gananot Havera Menahelet
LTD, and Hachshara Insurance Company
Ltd.*

**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**
Hannah Ross (*pro hac vice*)
Avi Josefson (*pro hac vice*)
James A. Harrod (*pro hac vice*)
Alec T. Coquin (*pro hac vice*)
Mathews R. de Carvalho (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
avi@blbglaw.com
jim.harrod@blbglaw.com
alec.coquin@blbglaw.com
mathews.decarvalho@blbglaw.com

*Lead Counsel for Lead Plaintiffs*

Thomas C. Michaud
Francis E. Judd
**VANOVERBEKE MICHAUD
 & TIMMONY P.C.**
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
tmichaud@vmtlaw.com
fjudd@vmtlaw.com

*Additional Counsel for Lead Plaintiff
Genesee County Employees' Retirement
System*

**COHEN MILSTEIN SELLERS
 & TOLL PLLC**
Steven J. Toll
Julie Goldsmith Reiser
1100 New York Ave NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
stoll@cohenmilstein.com
jreiser@cohenmilstein.com

*Counsel for Named Plaintiff Indiana State
Police Pension Trust*