# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re Kornit Digital Ltd. Securities Litigation | No. 2:23-cv-00888-MCA-AME<br>*Document Filed Electronically*<br><br>CLASS ACTION<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**RETURN DATE:**<br>May 5, 2025 |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT

OF COUNSEL:

**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*Counsel for Defendants Kornit Digital Ltd.,
Ronen Samuel, and Alon Rozner*

**O'MELVENY & MYERS LLP**
1301 Avenue of Americas
New York, New York 10019
Tel: (212) 326-2000

*Counsel for Defendants Citigroup
Global Markets Inc., Barclays
Capital Inc., Goldman Sachs & Co.
LLC, and Morgan Stanley & Co. LLC*

[additional counsel information listed on signature page]

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ........................................................................................................2

I.    Plaintiffs' Exchange Act Claims Should Be Dismissed.................................2

    A.    Plaintiffs Fail to Plausibly Allege that Any Statements Were
False or Misleading When Made ........................................................3

        1.    The Challenged Statements Were Not False or
Misleading and There Was No Duty to Disclose the
Alleged Omissions ........................................................3

        2.    The Allegedly Omitted Information Was Disclosed ...............16

        3.    The Alleged Misrepresentations Are Nonactionable
Forward-Looking Statements....................................................18

        4.    The Alleged Misstatements Are Nonactionable
Statements of Opinion................................................................20

        5.    The Alleged Misstatements Are Nonactionable Puffery ..........21

    B.    Plaintiffs Fail to Plead Particularized Facts Giving  Rise to the
Requisite Strong Inference of Scienter ...............................................23

        1.    Alleged Stock Sales by Defendant Samuel Fail to Plead a
Motive to Commit Fraud ........................................................23

        2.    Plaintiffs' Conclusory Allegations Do Not Give Rise to
Any Inference of Scienter ........................................................26

        3.    The Confidential Witness Allegations Do Not Give Rise
to a Strong Inference of Scienter ..............................................30

II.    Plaintiffs' Securities Act Claims Should Be Dismissed................................31

    A.    The Section 11 and 12(a)(2) Claims Fail to Satisfy Both
Rule 9(b) and Rule 8 .........................................................................31

III.    Plaintiffs Fail to Plead "Controlling Person" Liability................................35

Conclusion ........................................................................................................35

## TABLE OF AUTHORITIES

CASES

PAGE(S)

*In re Adams Golf, Inc. Sec. Litig.*,
   381 F.3d 267 (3d Cir. 2004) ............................................................... 23

*In re Aetna, Inc. Sec. Litig.*,
   617 F.3d 272 (3d Cir. 2010) ............................................................... 19

*Alberici v. Recro Pharma, Inc.*,
   2020 WL 806719 (E.D. Pa. Feb. 14, 2020) ........................................ 8

*In re Apple Inc. Sec. Litig.*,
   2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ............................... 28, 29

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
   28 F.4th 343 (2d Cir. 2022) ............................................................... 25

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ............................................................ 28

*Caiafa v. Sea Containers, Ltd.*,
   331 Fed. Appx. 14 (2d Cir. 2009) ..................................................... 32

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) ................................................. 8, 30, 33

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
   2019 WL 3451523 (D.N.J. July 31, 2019) .......................................... 4

*City of Brockton Ret. Sys. v. CVS Caremark Corp.*,
   2013 WL 6841927 (D.R.I. Dec. 30, 2013) ........................................ 12

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin. Inc.*,
   70 F.4th 668 (3d Cir. 2023) ......................................................... 20, 21

*City of Warwick Ret. Sys. v. Catalent, Inc.*,
   2024 WL 3219616 (D.N.J. June 28, 2024) ........................................ 27

*In re Coinbase Glob., Inc. Sec. Litig.*,
   2024 WL 4053009 (D.N.J. Sept. 5, 2024) .......................................... 32

*Cozzarelli v. Inspire Pharms., Inc.*,
    549 F.3d 618 (4th Cir. 2008) ............................................................. 32

*Curran v. Freshpet, Inc.*,
    2018 WL 394878 (D.N.J. Jan. 12, 2018) ........................................... 18

*In re Donald J. Trump Casino Sec. Litig.*,
    793 F. Supp. 543 (D.N.J. 1992) ......................................................... 5

*Emps.' Ret. Sys. of P.R. Elec. Power Auth. v. Conduent Inc.*,
    2020 WL 3026536 (D.N.J. June 5, 2020) .......................................... 17

*In re EQT Corp. Sec. Litig.*,
    504 F. Supp. 3d 474 (W.D. Pa. 2020) ............................................... 16

*Fox v. Dream Tr.*,
    743 F. Supp. 2d 389 (D.N.J. 2010) ................................................... 12

*In re Hertz Glob. Holdings, Inc.*,
    905 F.3d 106 (3d Cir. 2018) ....................................................... 25, 26

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
    2017 WL 1536223 (D.N.J. Apr. 27, 2017) .................................... 20, 22

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ......................................... 26, 28, 29, 31

*In re Interpool, Inc. Sec. Litig.*,
    2005 WL 2000237 (D.N.J. Aug. 17, 2005) ...................................... 26

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*,
    2011 WL 2444675 (D. Del. June 14, 2011) ..................................... 22

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
    2017 WL 3891676 (D. Del. Sept. 6, 2017) ...................................... 33

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014) ............................................... 25

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    601 U.S. 257 (2024) ......................................................................... 4

*In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*,
    2011 WL 3444199 (D.N.J. Aug. 8, 2011) ........................................ 23

*Monk v. Johnson & Johnson*,
    2011 WL 6339824 (D.N.J. Dec. 19, 2011) ...................................................... 23

*In re Nice Sys. Sec. Litig.*,
    135 F. Supp. 2d 551 (D.N.J. 2001) .................................................... 18

*Odeh v. Immunomedics, Inc.*,
    2020 WL 4381924 (D.N.J. July 31, 2020) ......................................... 18

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015) ................................................................... 21

*Ortiz v. Canopy Growth Corp.*,
    537 F. Supp. 3d 621 (D.N.J. 2021) .................................................... 20

*In re Penn Treaty Am. Corp. Sec. Litig.*,
    202 F. Supp. 2d 383 (E.D. Pa. 2002) ................................................ 12

*Rahman v. Kid Brands, Inc.*,
    736 F.3d 237 (3d Cir. 2013) .......................................................... 8, 9

*Rescue Mission of El Paso, Inc. v. K-Sea Transp. Partners L.P.*,
    2013 WL 3087078 (D.N.J. June 14, 2013) ........................................ 7

*In re Res. Am. Sec. Litig.*,
    2000 WL 1053861 (E.D. Pa. July 26, 2000) ..................................... 26

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) ................................................... 32, 33

*Schottenfeld Qualified Assocs., L.P. v. Workstream, Inc.*,
    2006 WL 4472318 (S.D.N.Y. May 4, 2006) .................................... 16

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
    351 F. Supp. 3d 874 (E.D. Pa. 2018) ............................................. 28

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
    604 F. Supp. 2d 332 (D. Mass. 2009) ............................................. 23

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006) ............................................... 25, 32, 33

*In re Synchronoss Techs., Inc. Sec. Litig.*,
    2019 WL 2849933 (D.N.J. July 2, 2019) ........................................ 30

*Tanaskovic v. Realogy Holdings Corp.*,
  2021 WL 211049 (D.N.J. Jan. 21, 2021) ......................................................... 22

*In re Tseng Labs, Inc. Sec. Litig.*,
  954 F. Supp. 1024 (E.D. Pa. 1996) ..................................................................... 4

*In re Under Armour Sec. Litig.*,
  719 F. Supp. 3d 438 (D. Md. 2024) .................................................................. 10

*In re U.S. Interactive, Inc.*,
  2002 WL 1971252 (E.D. Pa. Aug. 23, 2002) .................................................. 22

*In re Viropharma Inc. Sec. Litig.*,
  21 F. Supp. 3d 458 (E.D. Pa. 2014) ................................................................. 25

*Wayne Cnty. Emps.' Ret. Sys. v. Mavenir, Inc.*,
  2021 WL 311284 (D. Del. Jan. 29, 2021) ........................................................ 12

*Weston v. DocuSign, Inc.*,
  669 F. Supp. 3d 849 (N.D. Cal. 2023) .............................................................. 18

*Williams v. Globus Med., Inc.*,
  869 F.3d 235 (3d Cir. 2017) .............................................................................. 21

*Wu v. GSX Techedu Inc.*,
  738 F. Supp. 3d 527 (D.N.J. 2024) ................................................................... 29

STATUTES & RULES

Fed. R. Civ. P. 8 ....................................................................................... 2, 31, 34

Fed. R. Civ. P. 9 ..................................................................................... 31, 33, 34

\*\*\*

**Note on Citation Format**:  Unless otherwise noted, emphasis has been added to quotations, and internal quotations, brackets, citations, and footnotes have been omitted.  References to the "Opening Brief" or "Br." correspond to the Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Consolidated Complaint (Dkt. 64-1); references to the "Underwriters' Opening Brief" or "UW Br." correspond to the Underwriter Defendants' Joinder in the Kornit Defendants' Motion to Dismiss Plaintiffs' Amended Consolidated Complaint (Dkt. 65-1); references to the "Opposition" or "Opp." correspond to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Dkt. 66); and references to Ex.__ correspond to the exhibits attached to the Declaration of Edmund Polubinski (Dkt. 64-2). All defined terms in the Opening Brief are incorporated herein.

## PRELIMINARY STATEMENT

As Defendants' Opening Brief explained, Plaintiffs' Amended Consolidated Complaint suffers from numerous defects requiring dismissal with prejudice. Plaintiffs' Opposition in no way alters that outcome. It fails to meaningfully rebut Defendants' arguments or explain away the numerous pleading deficiencies. If the ACC is Plaintiffs' best effort to abide by the Court's directive to "replead as specifically as you can," it is now clear that Plaintiffs *cannot* plead claims that are even plausible, let alone adequately particularized.

Plaintiffs' Exchange Act claims are largely premised on the same inadequate theories that animated their prior pleading. The various ancillary and cosmetic changes that Plaintiffs made in the ACC (and repeatedly cited in Opposition) make no difference. Plaintiffs and the low-level FEs on whom they rely still fail to identify particularized *facts* that plausibly could render Defendants' challenged statements false or misleading when made. Nor do Plaintiffs' theories of falsity account for Kornit's detailed and specific disclosures, which addressed the very circumstances and risks Plaintiffs claim were omitted. The Opposition also fails to rehabilitate the ACC's deficient scienter allegations. Instead, Plaintiffs merely repeat scienter arguments that courts in this circuit frequently reject, including that the purported fraud involved Kornit's "core operations" and was revealed in unspecified reports from databases Defendants allegedly could access. These

allegations fail, as do Plaintiffs' allegations about Mr. Samuel's stock sales during the Class Period, because—despite those sales, which Plaintiffs concede were made pursuant to a Rule 10b5-1 plan—Mr. Samuel undisputedly ended up with more shares after the Class Period than before.

Plaintiffs' Securities Act claims fare no better.  These claims are subject to a heightened pleading standard because they sound in fraud and are premised on alleged knowing misrepresentations.  But, even if judged by Rule 8(a)'s plausibility standard, the Securities Act claims still fail because Plaintiffs do not allege anything misleading about the statements at issue when they were made, rather than in hindsight.

In light of the ACC's deficiencies and Plaintiffs' failure to remedy them—despite having insight into Defendants' arguments, the benefit of the Court's guidance, and multiple chances to do so—the Amended Complaint should be dismissed with prejudice.

## **<u>ARGUMENT</u>**

### **I.    Plaintiffs' Exchange Act Claims Should Be Dismissed**

As explained in the Opening Brief, Plaintiffs' Section 10(b) claims should be dismissed for numerous reasons, including many uncorrected flaws that the Court identified in Plaintiffs' prior pleading.

### A.    Plaintiffs Fail to Plausibly Allege that Any Statements Were False or Misleading When Made

The ACC fails to allege actionable misstatements or omissions because none of the challenged statements is alleged to have been false or misleading when made, the allegedly omitted information was disclosed, and the alleged misstatements otherwise are not actionable as protected forward-looking statements or statements of opinion.  Br. 11–38.

#### 1.    The Challenged Statements Were Not False or Misleading and There Was No Duty to Disclose the Alleged Omissions

***Statements Regarding Competition.***  Plaintiffs' claim that Defendants misleadingly omitted information related to competition fails because Defendants made consistent, specific disclosures on that topic and had no duty to disclose any additional information.  Br. 12–15.  As Defendants demonstrated, Kornit disclosed the existence of competition and product defects, precluding liability.  *See* Br. 8–9, 12–13, 28–31.  Plaintiffs do not and cannot dispute that Kornit even disclosed competition from M&R—the competitor on whom Plaintiffs focus—by *name*.  Br. 8, 12, 29.  Although Plaintiffs attempt to challenge the effectiveness of these risk disclosures, *see* Opp. 32–34, 37 n.10, they cannot do so.

To start, as Defendants have shown, Kornit had no duty to disclose a purported loss to M&R of some business from Delta and Fanatics, let alone any duty to do so before it did.  Br. 12–15.  The Opposition does not and cannot

identify any of Defendants' affirmative statements that were rendered misleading by this nondisclosure, as required. *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 260 (2024). Indeed, as Plaintiffs fail to dispute, Kornit never described its relationship with Delta or Fanatics *at all*, much less guaranteed their future business. Br. 13. Nor do Plaintiffs contest that Kornit made extensive cautionary disclosures about competition, including its dependence on a small number of key customers. Br. 7–8.[1] For this reason, Plaintiffs cannot rely on *Carmignac Gestion, S.A. v. Perrigo Co. PLC,* 2019 WL 3451523 (D.N.J. July 31, 2019); *see* Opp. 34, where—unlike here—Defendants made specific pricing representations that were at odds with existing facts and did not adequately disclose applicable risks. *Carmignac*, 2019 WL 3451523, at *11–12.

Further, even if Plaintiffs could show that Kornit had an affirmative duty to disclose the alleged loss of Delta's and Fanatics' business, this claim would still fail because Plaintiffs have not alleged that Kornit was aware of this alleged loss when the challenged statements were made. Br. 13–15. In trying to assert otherwise, Opp. 33–34, Plaintiffs abandon the ACC's reliance on a purported

---

[1] Plaintiffs also fail to meaningfully distinguish *In re Tseng Labs, Inc. Securities Litigation*, 954 F. Supp. 1024 (E.D. Pa. 1996), *aff'd*, 107 F.3d 8 (3d Cir. 1997). *See* Opp. 34. The court there rejected a duty to disclose loss of business to competitors despite the allegation—also made by Plaintiffs here—that defendants had made certain misstatements "to prevent the impression that [defendant] was falling behind its competitors." *Tseng*, 954 F. Supp. at 1028.

4

"admi[ssion]" by Defendant Samuel and on statements from FE1 and FE4 as support for their claim.  ACC ¶¶ 126, 129–33, 186.  Instead, Plaintiffs lean heavily on new FE12, ACC ¶¶ 127–28, but FE12 ultimately says nothing more than what Kornit consistently disclosed—that it faced competition, including from M&R— and his statements thus fail to support a claim.  *See, e.g., In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543, 561 (D.N.J. 1992) (dismissing claim that prospectus "fail[ed] to disclose the existence of competition" because disclosure identified company's competitors for customers and business), *aff'd sub nom. In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357 (3d Cir. 1993).

Plaintiffs next challenge as false and misleading statements about the technology "moat" separating Kornit's technology from that of its competitors, Opp. 32–34 (citing ACC ¶¶ 119–21, 221–30, 404), but do not actually allege that these statements were false.  Plaintiffs do not, for example, provide any factual support for the inference that competitors had superior technology to Kornit. Instead, Plaintiffs simply repurpose their allegations that Kornit knew "of stiff competition, including from M&R," and that Kornit's printers experienced technical difficulties that led some customers to move some business to competitors.  *Id.* at 32–33.  As demonstrated above and in Defendants' Opening Brief, however, all of this was explicitly disclosed, negating Plaintiffs' claims.

***Alleged Decline in Customer Demand.***  Plaintiffs' claims based on an

allegedly undisclosed trend of declining customer demand fail because they do not allege any such trend emerged in Q4 2021 and because Kornit proactively disclosed emerging negative demand indicators in its Q1 2022 earnings call.  Br. 15–18.  Though Plaintiffs continue to insist that Defendants knew of a declining demand trend "by November 2021," Opp. 23–27, the ACC does not allege this.

Plaintiffs also continue to mischaracterize Mr. Samuel's statement on June 7, 2022 as an "admission" that a negative demand trend began in Q4 2021.  Opp. 23–24.  Plaintiffs, however, never meaningfully address Defendants' argument that their claims are at odds with the plain text of what Mr. Samuel actually said.  Br. 16–17.  As Defendants showed, Mr. Samuel made clear that one customer— Printful—placed orders with Kornit "*in Q4*," but did not share until "the end of *Q1*" 2022 that it was not planning to order additional systems due to a slowdown Printful had started to experience in the prior quarter.  Ex. 17 at 11–12.[2]  Plaintiffs seize on the idea that Printful was just "an example" of "other customers[']" experience, Opp. 24, but this misses the point.  Regardless of how many customers

---

[2] In support of the claim that Printful's *internal* business slowdown in Q4 was visible to Kornit—despite Printful affirmatively placing orders in that quarter—Plaintiffs offer only generalized allegations that Kornit had visibility into its customers' use of its systems.  Opp. 24 (citing AC ¶¶ 155–63).  But such allegations cannot show that Kornit had sufficient information about, e.g., Printful's pipeline and customer relationships to holistically assess the state of Printful's business.

experienced slowdowns, Mr. Samuel was offering Printful as "an example" of "[w]hat happened . . . *in Q1*" 2022, Ex. 17 at 11–12—and Kornit extensively disclosed faltering demand in its Q1 2022 earnings call.  Br. 18.  Mr. Samuels' statement thus provides no support for Plaintiffs' claim that Kornit knew of a demand decline earlier.

Plaintiffs assert that disclosures of emerging declining demand in the Q1 earnings call were insufficient because Kornit's statements allegedly painted a misleadingly rosy picture of its future sales prospects.  Opp. 25–27.  But Plaintiffs do not dispute that Kornit specifically disclosed the e-commerce slowdown and delayed orders on that earnings call, nor do they allege that Kornit omitted anything about the negative indicators it was then aware of that could render these statements misleading.  Kornit's concurrent expressions of optimism were therefore neither misleading nor actionable.  Br. 18.  Plaintiffs attempt to distinguish *Rescue Mission of El Paso, Inc. v. K-Sea Transportation Partners L.P.*, as containing "only 'measured' statements that fully warned investors of a demand decline," Opp. 27, but that is no distinction at all given the "significant qualifications" Kornit disclosed with respect to its optimism around the current quarter, 2013 WL 3087078, at *16 (D.N.J. June 14, 2013); Ex. 9 at 5–6, 9.

Unable to base their claims on these disclosures, Plaintiffs revert to relying on FE3's detail-free allegations about "recurring calls" and "discuss[ions] . . . with

his President and Vice President" and FE12's vague statement about "pressure." Opp. 24–25. But these are the types of allegations the Court already held were too vague to support any inference of an actionable misstatement or omission. Br. 15–16. Instead of addressing the Court's direction about FE3— that Plaintiffs needed "more here to demonstrate falsity," ECF No. 56 ("Oral Argument Tr.") 23:24–25:17—or obtaining a statement from Chuck Meyo, the alleged source of FE3's information, *id.* 25:21-26:7, Plaintiffs merely point to FE12's generalized allegations that FE3 was "close" with Mr. Meyo. Opp. 25. But FE12 adds no specificity to FE3's claims about Defendants' knowledge of declining demand in Q4 2021. Br. 15–16 & n.9.[3]

Plaintiffs emphasize that courts have occasionally permitted confidential witnesses to rely on indirect knowledge, Opp. 25 & n.2, but, even if that were the case, the secondhand information provided by the FEs fails to provide the requisite factual detail. Plaintiffs do not describe their sources—or their sources' sources— "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 146 (3d Cir. 2004); *see also Rahman v.*

---

[3] Plaintiffs' characterization of *Alberici v. Recro Pharma, Inc.* as having "found falsity established based on a single FE's access to negative data" is also perplexing; there the court did not analyze falsity because "the lack of scienter" allegations were "fatal." 2020 WL 806719, at *8 (E.D. Pa. Feb. 14, 2020).

*Kid Brands, Inc.*, 736 F.3d 237, 244 (3d Cir. 2013).

**Statements Regarding Sticker Mule.**  Plaintiffs' claims related to certain November 2021 statements regarding Sticker Mule's utilization and integration of Kornit systems also fail because they allege no *facts* that could demonstrate the statements were false or misleading *when made* in November 2021.  Br. 18–20.

In resisting this conclusion, Plaintiffs recycle the allegations from FE3 and FE4 that the Court previously rejected to try to show that the Kornit printers did not run properly *as of* the November 2021 statement.  *Compare* Opp. 22 *with* Br. 18–19 (quoting Oral Argument Tr.).  Although Plaintiffs also point to new allegations from FE12, Opp. 22, FE12's statements are substantively identical to the already-rejected statements from FE3 and FE4 and thus similarly fail to cure the deficiencies the Court previously identified.  Br. 19–20.

Plaintiffs also attempt to rely on an online sale listing for a Kornit printer purportedly posted by Sticker Mule.  As explained in the Opening Brief, this fails for a number of reasons.  Br. 20 (citing ACC ¶ 104).  In Opposition, Plaintiffs attempt to cure *one* of these deficiencies by submitting (improperly) a curious standalone email from a customer service representative of the sales platform on which the listing was allegedly posted to *Plaintiffs' counsel*; the email attributes the listing to Sticker Mule.  Opp. Ex. 1.  But this exhibit does not address the Court's core concern and provides no support for an inference that a *fleet* of

Sticker Mule's Kornit printers did not work *as of Mr. Samuel's November 2021 statements*. *See* Br. 19-20.

***Statements Regarding Alleged Q1 2022 Revenue "Pull-Forward."*** As explained in the Opening Brief, Plaintiffs have not adequately alleged that Mr. Rozner falsely denied a Q1 2022 revenue "pull-forward." Br. 20–22. They do not allege (but merely speculate) that Kornit's *disclosed* shipment of orders late in Q1 2022 was outside the ordinary course of Kornit's business, and they do not plead that the relevant statement was material. *Id.* In light of Plaintiffs' concession that nothing about Kornit's Q1 2022 revenue recognition was inconsistent with GAAP or unlawful, Opp. 28 n.4, Plaintiffs fail to identify anything false or misleading regarding Mr. Rozner's statement.[4]

Plaintiffs attempt to salvage their claim by repeating FE3's allegations that he discussed the alleged pull-forward with Mr. Meyo (President of the Americas Division) and Mr. Whaley (VP of Sales). Opp. 27–28. But, as Defendants showed, Br. 21–22, FE3's allegations are little changed from those the Court

---

[4] The District of Maryland summary judgment opinion Plaintiffs cite for the proposition that nondisclosure of a pull-forward can be misleading involved more detailed factual support, including evidence that the defendant intentionally "incentivized one of its largest customers to pay down its accounts receivable balances early to conceal the disparity in revenue growth and accounts receivable growth." *In re Under Armour Sec. Litig.*, 719 F. Supp. 3d 438, 450 (D. Md. 2024). Here, by contrast, Kornit did not conceal its high receivables in Q1 2022; indeed, Mr. Rozner affirmatively explained the reason for them.

rejected in the OCC, observing that Plaintiffs needed to provide "more concrete facts demonstrating the falsity of the statements" at issue. Oral Argument Tr., 37:17–25. In response, Plaintiffs once more turn to new FE12's allegations to "corroborate those from FE3." Opp. 27. The Opening Brief demonstrated, however, that FE12's allegation that Kornit maintained a "buffer" of printers to fill late quarter orders, and that this buffer was used to fulfill the late quarter Q1 2022 orders, actually corroborates and is fully consistent with *Mr. Rozner*'s statements on the Q1 2022 earnings call. Br. 22–23. The Opposition offers no response.

Plaintiffs claim that their attempted "quantification" of the supposed pull-forward at $30 million and 45% of Q1 revenues establishes its materiality, Opp. 28, but their assertion challenges a strawman argument that Defendants did not make. What Defendants showed was that even if a pull-forward had occurred, Plaintiffs derive their $30 million number from a *disclosed* increase in Kornit's accounts receivable in Q1 2022, ACC ¶ 170, which Mr. Rozner *expressly explained* arose from late-quarter shipments. *See id.*; Br. 22. Thus, even if the $30 million in late quarter shipments resulted from a pull-forward (which Plaintiffs fail to support), there are no allegations in the ACC to explain why reasonable investors would have cared about that, given the lack of *any* allegations that the printers were shipped and revenues were recognized (i) earlier than they would have been in the ordinary course, and (ii) for the purpose of concealing a decline in

11

demand.  The absence of these details dooms Plaintiff's theory.  Br. 21.[5]

*Statements About Service and Service Contracts.*  Plaintiffs also fail to allege that any statements about Kornit's service contracts were misleading when viewed in context.  Br. 23–25.  Mr. Samuel's answer to an analyst's question on the Q4 and FY 2020 earnings call that Kornit sells its customers contracts alongside its machines was neither false nor misleading because, as disclosed in Kornit's annual reports, Kornit typically provides a six-month warranty on every printing system it sells, customers can concurrently "purchase an additional year of support coverage" and such coverage can be renewed thereafter.  *Id.* at 8; *see* Ex. 1 at 46; Ex. 2 at 54; Ex. 3 at 43.  Plaintiffs continue to twist Mr. Samuel's words, claiming he "falsely stated" that the initial "mandatory multi-year contract was *the* reason Kornit was growing '[its] recurring revenue stream.'"  Opp. 17–18 (emphasis in original).  But, as Defendants demonstrated, Mr. Samuel said no such

---

[5] Despite Plaintiffs' argument to the contrary, Opp. 28, courts can and often dismiss complaints for failure to adequately allege materiality.  *See, e.g., Wayne County Emps.' Ret. Sys. v. Mavenir, Inc.,* 2021 WL 311284, at *6 (D. Del. Jan. 29, 2021), *report and recommendation adopted*, 2021 WL 1147042 (D. Del. Mar. 25, 2021); *Fox v. Dream Tr.,* 743 F. Supp. 2d 389, 402–03 (D.N.J. 2010).  The cases cited by Plaintiffs for the proposition that an analyst question on an issue definitively renders that issue material are inapposite, as neither case so holds.  *See City of Brockton Ret. Sys. v. CVS Caremark Corp.,* 2013 WL 6841927, at *4–*5 (D.R.I. Dec. 30, 2013) (alleged denial in response to analyst question would support scienter if sufficiently alleged to be false); *In re Penn Treaty Am. Corp. Sec. Litig.,* 202 F. Supp. 2d 383, 392–93 (E.D. Pa. 2002) (statement in response to analyst question not "puffery" because it was not "vague or generally optimistic").

thing.  *See* Br. 23–25; *see also* ACC ¶ 205; Ex. 4 at 10.[6]  Plaintiffs, moreover, do not contest—and therefore concede—their failure to allege anything false about Kornit's statement that it was seeing "a very nice recurring revenue stream coming from the service business."  Br. 23–24 (citing Exs. 4, 10); Ex. 13 at 5 (showing that Kornit's services business posted revenues of $39,369,000 in 2021—a 38.6% increase from the prior year).

As Defendants also established, there are no facts alleged in the ACC to suggest that any analyst misunderstood him to be saying—in conflict with Kornit's consistent and unambiguous disclosures in its securities filings both before and after—that Kornit only sold multi-year service contracts.  *See* Br. 24–25.  Plaintiffs thus miss the point in arguing that "[w]hether investors understood [Kornit's] annual report as corrective of Samuel's false statement . . . is an 'intensely fact-specific' truth-on the-market defense."  Opp. 19.  Kornit's disclosures were entirely consistent with Defendants' statements, which did not require correction. To the extent additional information was needed to place Defendants' statements in

---

[6] Plaintiffs assert that analysts would have had no reason to ask about service contract duration if Kornit's disclosures were clear, but Kornit disclosed that customers "usually" purchased a year of support coverage, Ex. 1 at 46; Ex. 2 at 54; it thus is not surprising that an analyst asked about whether some contracts had multiyear terms.  Moreover, the analyst's question had nothing to do with the clarity of Kornit's disclosures but rather was seeking additional detail on Mr. Rozner's statement about improved service contract attach rate.  Ex. 4 at 6, 10.

context, Kornit's disclosures provided that information.

Finally, Plaintiffs barely defend their allegations that various positive statements about Kornit's services businesses were somehow actionably misleading. Opp. 20–21.[7] For the reasons set forth in Defendants' Opening Brief, they were not. Br. 25.

***Statements Regarding KornitX's Value.*** Plaintiffs' claims based on alleged misstatements and omissions concerning KornitX functionality, customer adaption and retention, and revenues fail because those statements were not false or misleading and are not actionable under the securities laws in any event. Br. 25–28. Indeed, the vast majority of statements Plaintiffs challenge on this topic are self-evidently forward-looking (and accompanied by meaningful cautionary language), and therefore are protected under the PSLRA's safe harbor. *See* Br. 32–36; Section I.3, *infra*; ACC ¶¶ 264; 266. As to certain other statements, Plaintiffs do not even attempt to allege facts demonstrating falsity or respond to Defendants' arguments. *See, e.g.,* Br. 26 n.14.

---

[7] Plaintiffs fault Mr. Samuel for failing to disclose that "approximately 80% of customers declined to renew service contracts because of [service and reliability] problems," claiming this rendered a litany of statements misleading. Opp. 20–21. But Plaintiffs' sole source is *one* customer success manager's "estimat[e]," ACC ¶¶ 55, 76, and that FE offers no basis or context for his claim, such as the size of his customer portfolio or the time period of which he speaks. Such allegations fail to render Defendants' service contract statements actionable.

Citing the assertions of several FEs, Plaintiffs nonetheless attack Mr. Samuel's January 10, 2022 statement that KornitX was generating "multi-million-dollar revenue" and subsequent statements about KornitX's growth.  Opp. 30–32.  Even assuming these were statements of present fact, Plaintiffs do not adequately allege they were false.  As the Opposition confirms, none of the FEs was in a position to know about KornitX revenues at the time of the statement.  Plaintiffs assert, for example, that FE3 was originally hired to work on KornitX, *id.* at 30, but FE3 never did so and instead was part of a "separate organization."  Br. 26 (citing ACC ¶¶ 140, 399).  Plaintiffs offer no explanation for how the job FE3 was "supposed" to have would have given him knowledge about the revenues subsequently generated by a business in which he concededly never had any involvement.  *See* ACC ¶ 140.  Moreover, FE3's allegation that he participated in weekly sales calls, Opp. 30, is irrelevant because that allegation says nothing about whether *KornitX* was discussed on those calls, ACC ¶ 172, and does not otherwise explain why FE3 would know about the performance of that product.

Nor do Plaintiffs rebut that FE3's claims are not actually inconsistent with Mr. Samuel's statement.  Br. 26 & n.14.[8]  While Plaintiffs also point to assertions

---

[8] Plaintiffs' claim that "[r]evenue and sales are basically the same" fails to engage with the fact that, even if KornitX generated no sales in America, it could easily generate a "couple million" in revenue when accounting for Kornit's significant operations outside of America.  *Compare* Opp. 32 n.6 *with* Br. 26 n.14.

15

by FE10, FE11 and FE12 to "buttress[]" their claims, Opp. 30–31, those FEs were in no better position to know about KornitX than FE3, as FE10's brief tenure at Kornit allegedly did not occur until months after Mr. Samuel's statement, and FE11 and FE12 say nothing about revenues at all. Br. 26–27.

Plaintiffs also do not deny that Kornit's service revenues—which included KornitX—steadily increased throughout the Class Period.[9] *Compare* Ex. 1 at 53, *with* Ex. 2 at 63. Instead, Plaintiffs claim that Kornit "admitted that in 2022 there was no growth in 'software sales,' and possibly no revenue," since Kornit's 2022 annual report attributed its nearly $10 million increase in services revenue from the previous year to "factors other than software sales." ACC ¶ 143; *see* Opp. 31–32. But that software sales were not identified as a primary driver of the increase in services revenue in no way equates to an "admi[ssion]" that software sales did not contribute to the increase in revenue *at all*—nor are Plaintiffs' claims about Kornit's revenues in any way "undisputed." Opp. 31–32.

### 2.    The Allegedly Omitted Information Was Disclosed

Kornit routinely and extensively discussed each of the risks—e.g.,

---

[9] Plaintiffs' citation to *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474 (W.D. Pa. 2020), in which plaintiffs offered particularized allegations contradicting defendants' claim that a drilling process was "already showing significant returns," *id*. at 493–95, is therefore inapt. Because Plaintiffs have not adequately alleged that KornitX was not growing, *Schottenfeld Qualified Assocs., L.P. v. Workstream, Inc.*, 2006 WL 4472318, at *3 (S.D.N.Y. May 4, 2006), is also inapposite.

competition, customer loss, KornitX, defective products, and customer service—
that Plaintiffs allege were omitted, thereby precluding any claims based on
purportedly misleading nondisclosures.  Br. 7–9, 28–32.  Largely disregarding the
actual language of Kornit's comprehensive disclosures, Plaintiffs incorrectly
contend that the disclosures were themselves misleading because the subject risks
supposedly had already materialized and Kornit's disclosures were "generic" or
framed in "contingent" language.  Opp. 36–38.  Not so.  As discussed in the
Opening Brief, Kornit made clear that the risks at issue were not merely
hypothetical, but had already occurred and were expected to recur.  For example:

- Kornit's products had been found to contain previously "undetected errors or defects" "in the past" and this likely would continue to occur "from time to time" in the future, Br. 8;

- Kornit presently "face[d] increased competition," including expressly from M&R, *id.*;[10] and

- many of Kornit's competitors presently "have" advantages Kornit lacked, including "greater customer support resources," *id.*; *see also* Ex. 1 at 3–4; Ex. 3 at 4; Ex. 2 at 3.[11]

---

[10] Plaintiffs contend that these disclosures were inadequate because they allegedly "reference M&R as an analog manufacturer and make no mention of M&R's DTG capabilities."  Opp. 37 n.10.  But Kornit identified M&R as a competitor for Kornit's "digital printing systems" and disclosed that competitors may "develop and market new technologies," Ex. 1 at 3–4; Ex. 2 at 3; Ex. 3 at 4— precisely what Plaintiffs allege M&R did.  ACC ¶ 123.

[11] Plaintiffs' cited cases are thus distinguishable.  *See Emps.' Ret. Sys. of P.R. Elec. Power Auth. v. Conduent Inc.*, 2020 WL 3026536, at *6 (D.N.J. June 5, 2020), (defendant did not disclose that certain "technological issues could have a
(….continued)

The only disclosures that Plaintiffs attempt to address in anything other than a cursory fashion are those related to KornitX.  Opp. 37.  Rather than engage with the actual language of the disclosures, however, Plaintiffs merely assert that "[t]he problems with KornitX were significant and simply not conveyed in Defendants' contingent risk warnings."  *Id.*  But, as the Opening Brief demonstrated, there were ample disclosures about the risks to KornitX, including that the company had not previously offered a subscription-based software service and did not expect KornitX to contribute significantly to its near-term results.  Br. 8–9, 30–31; Ex. 1 at 16; Ex. 2 at 15.  Fundamentally, Plaintiffs argue that Kornit was not sufficiently negative about KornitX's prospects, but "[m]isguided optimism [] is not a cause of action."  *In re Nice Sys. Sec. Litig.*, 135 F. Supp. 2d 551, 575 (D.N.J. 2001).

### 3.    The Alleged Misrepresentations Are Nonactionable Forward-Looking Statements

As established in the Opening Brief, many of the challenged statements are forward-looking and thus shielded from liability by the PSLRA's safe harbor.  Br.

---

significant impact on the company"); *Curran v. Freshpet, Inc.*, 2018 WL 394878, at *5 (D.N.J. Jan. 12, 2018) (defendants did not disclose "*any* information" regarding allegedly ongoing "challenges with retailers and manufacturing problems"); *see also Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 878–79 (N.D. Cal. 2023) (disclosure that pandemic-related risks "may" impact business were misleading where customers had already informed DocuSign that they would not renew contracts post-pandemic); *Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at *6 n.6 (D.N.J. July 31, 2020) (disclosure that company may receive FDA notice of violations was misleading when it already had received notice).

18

32–36.  The Opposition even concedes that "some of these statements touch on the future."  Opp. 39.  Indeed, many of Defendants' statements are prefaced with textbook forward-looking qualifiers.  *See, e.g.*, ACC ¶ 208 ("***We expect*** to continue developing our strategic accounts practice . . . ."); *Id.* ¶ 266 (Kornit ***expected KornitX to generate approximately $100 million of revenues in 2026 . . . .***").

Unable to avoid this forward-looking language, Plaintiffs highlight other portions of these statements to argue that they are "mixed present/future statements," while omitting that many of these statements are inactionable for other reasons, such as puffery.  *Compare* Opp. 38–39 *with* Br. 37 (citing as puffery paragraphs 205, 208–209, 214, 216, 231–32, 234–35, 243, 266, 269, and 275).  Moreover, Plaintiffs ignore that forward-looking statements that contain present-tense components remain within the safe harbor where, as here, any arguably present-tense elements cannot "meaningfully be distinguished" from future ones.  *See, e.g.*, *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 280 (3d Cir. 2010).

Finally, Plaintiffs argue that Defendants' statements lacked "a reasonable basis or meaningful cautionary language," Opp. 40–41, but do not elaborate on how this is so, much less explain why they were not "meaningful."  Br. 28–32.[12]

---

[12] Plaintiffs also claim that Defendants' June 7, 2022 statements were not accompanied by cautionary language, but this is not true.  *See* Ex. 20 (6/7/2022 William Blair Pres.) at 10 (providing cautionary language).

For example, Plaintiffs allege that Kornit's disclosures were "generic" rather than "specific," but ignore, for example, that Kornit disclosed the existence of competition, identified M&R specifically as a key competitor, and noted Kornit's vulnerability due to its few key customers.  Br. 29–30.

### 4. The Alleged Misstatements Are Nonactionable Statements of Opinion

Many of the challenged statements are also nonactionable statements of opinion.  Br. 36–37.  Plaintiffs' Opposition cannot cure the ACC's failure to adequately plead that these opinion statements are actionable.[13]  The Opposition never argues that Kornit's opinion statements were not "sincerely believed when made" or that they contained any "expressly embedded, untrue factual assertions." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin. Inc.*, 70 F.4th 668, 686 (3d Cir. 2023).  Instead, Plaintiffs allege that Kornit's opinion statements "implied untrue facts and omitted appropriate qualifying language."  Opp. 44.  Plaintiffs point to the example of Kornit's discussion of "revenue targets, growth, and

---

[13] Plaintiffs incorrectly argue that nonactionable opinion statements require explicit "words that would . . . suggest expression of an opinion." Opp. 43.  This is indisputably not so.  This Court has made clear that even statements that do not lead with "I believe" or "I think" can constitute opinions if the subject matter "requir[es] management to make estimates and judgments," rendering the statement "inherently subjective."  *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 666–71 (D.N.J. 2021) (citing *In re Hertz Global Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017)).

'accelerating' business fundamentals," which they argue was supposedly misleading because Kornit allegedly "kn[ew] of a material decline in customer growth since Q4 2021." *Id.*

As discussed, however, Plaintiffs fail to allege that Kornit knew of any decline in demand in Q4 2021. Br. 15–17; *see supra* at 5–9. Yet, even if Kornit had been aware of some reductions in sales at that time, "actual knowledge that sales from one source might decrease is not the same as actual knowledge that the company's overall sales projections are false." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 246 (3d Cir. 2017). Likewise, an opinion statement is not misleading merely because an issuer does not mention a fact that may cut the other way. *See City of Warren*, 70 F.4th at 686–67; *see also Omnicare*, *Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* 575 U.S. 175, 189–90 (2015). Here, Plaintiffs do not adequately allege any countervailing facts, much less facts that could "eclipse the balance of the numerous other considerations" embedded in Kornit's opinion statements. *City of Warren*, 70 F.4th at 687.

### 5. The Alleged Misstatements Are Nonactionable Puffery

The Complaint challenges dozens of statements that constitute nonactionable puffery under applicable law. Br. 37–38. Plaintiffs do not specifically distinguish any of the authority Defendants cited for this point. *See* Opp. 41–43. Instead, Plaintiffs argue that Defendants' statements are not "so obviously unimportant"

21

that they could be deemed nonactionable at the motion to dismiss stage. *Id*. at 41. But courts routinely dismiss claims premised on statements of puffery like those here. *See, e.g.*, *Tanaskovic v. Realogy Holdings Corp.*, No. 19-15053, 2021 WL 211049, at *20–21 (D.N.J. Jan. 21, 2021); *Hertz*, 2017 WL 1536223, at *10–11.

Notably, Plaintiffs rely heavily on out-of-circuit authority to argue that Kornit's general statements of optimism were ***not*** puffery. *See* Opp. 43 (citing cases from the District of Massachusetts). The law in ***this Circuit***, however, is clear that statements about, e.g., Kornit's "strong" financial results, "by far, the best technology," and "robust" programs are not "concrete" and "verifiable," *id*. at 42, and thus nonactionable. *See* Br. 36–37. In fact, the court in *In re U.S. Interactive, Inc.*, cited by Plaintiffs, Opp. 42, held—consistent with *Defendants'* argument here—that statements about a company's competitiveness, its role in the market, and its optimistic outlook were nonactionable statements of puffery. 2002 WL 1971252, at *6, 10–11, 15 (E.D. Pa. Aug. 23, 2002).

Plaintiffs' other cited cases are readily distinguishable. Unlike here, certain of those cases involved positive assurances about a business allegedly known to be doomed, *see, e.g.*, *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, No. 09-799, 2011 WL 2444675, at *2, *10 (D. Del. June 14, 2011) (holding actionable statements that yellow pages industry was "strong" and downturn "temporary" given known, *permanent* shift away from print yellow

pages), while others simply did not address the kinds of generalized optimistic statements that Defendants have established as puffery, *see, e.g.*, *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 275 (3d Cir. 2004) (holding that it could not determine the materiality of the statement that the company possessed a "limited number" of golf clubs while possessing 5,000); *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, 2011 WL 3444199, at *9–10 (D.N.J. Aug. 8, 2011) (finding actionable omission of data about serious health risks of drug); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 336, 342–43 (D. Mass. 2009) (finding actionable specific statements about demand). Precisely because the challenged statements here are generalized and optimistic, they do not trigger a duty to disclose more. *See, e.g.*, *Monk v. Johnson & Johnson*, No. 10-4841, 2011 WL 6339824, at *23 (D.N.J. Dec. 19, 2011).

### B. Plaintiffs Fail to Plead Particularized Facts Giving Rise to the Requisite Strong Inference of Scienter

Plaintiffs offer a wide assortment of scienter arguments; none meets their pleading burden for their Exchange Act claims.  Br. 38–47.

### 1. Alleged Stock Sales by Defendant Samuel Fail to Plead a Motive to Commit Fraud

Alleged stock sales by Mr. Samuel—the *only* Defendant alleged to have sold shares during the Class Period—do not support any inference of scienter.  Br. 38–

23

41.[14]  First, Plaintiffs do not dispute that Mr. Samuel held roughly the *same* quantity of Kornit stock before and after the alleged Class Period.  Br. 39. Plaintiffs nevertheless try to make much of the allegation that Mr. Samuel sold more shares during the Class Period than prior to the Class Period.  Opp. 53.  But they omit any details about Mr. Samuel's pre-Class Period Kornit holdings and trading practices and ignore that Mr. Samuel could not possibly have sold 80,000 shares before the Class Period because he did not own 80,000 shares at that time. *See* Br. 39; Ex. 1 (2020 20-F) at 82.  Indeed, the obvious non-culpable inference arising from Mr. Samuel's trades during the Class Period—which Plaintiffs ignore—is that he was simply seeking to keep his holdings constant.

In fact, Mr. Samuel owned slightly *more* shares after the Class Period than he did before, as Plaintiffs do not and cannot dispute.  *See* Br. 39; Ex. 23 (2022 20-F) at 96.  Instead, they complain that Kornit's Annual Report was filed several months after the end of the Class Period.  Opp. 54.  But Plaintiffs—who bear the burden to allege facts supporting a compelling inference of scienter—do not and cannot allege that the number of shares that Mr. Samuel owned was any lower on the last day of the Class Period.  Nor do Plaintiffs attempt to allege that Mr.

---

[14] Plaintiffs concede that they have not alleged insider sales as to any other Defendant, Opp. 54–55, and cite no case in which a single defendant's alleged sales suffice to establish motive by a different defendant.  Opp. 55.

Samuel's holdings decreased during the Class Period.

Even if Mr. Samuel's trades were suspicious—which they are not—Plaintiffs also do not dispute that his trades were made pursuant to Rule 10b5-1 trading plans, which negate any inference of scienter. Br. 40–41. Plaintiffs' focus on the timing of when his plan was executed—*one week* into the Class Period—is unavailing. *Compare* Opp. 54 *with* Br. 41. Plaintiffs do not allege that Mr. Samuel possessed any material nonpublic information at that time or that he entered into the plan strategically. His trades are thus entitled to the plan's full protection. Br. 40–41; *accord Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355–56, 356 n.4 (2d Cir. 2022); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014).

Plaintiffs' cited cases are unavailing. Opp. 53–54. They involve uncharacteristically large stock sales made outside of any 10b5-1 plans mere weeks before other events occurred that cast suspicion on those sales—a far cry from Mr. Samuel's plan sales over seventeen months. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277–78 (3d Cir. 2006) (sales "just six weeks before" resignation); *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 473-74 (E.D. Pa. 2014) (sales "just weeks before the FDA issued their denial of exclusivity").[15]

---

[15] In claiming that a seventeen-month period would not weigh against scienter because *In re Hertz Global Holdings, Inc.* involved and cited a case

(….continued)

### 2.    Plaintiffs' Conclusory Allegations Do Not Give Rise to Any Inference of Scienter

Plaintiffs' hodgepodge of other scienter allegations likewise is insufficient. Br. 41–46.  Plaintiffs contend, for example, that Kornit's November 2021 secondary offering provides a motive to commit fraud to increase the proceeds. Opp. 55–56.  But seeking to offer shares at high prices for maximum profit does not give rise to an inference of scienter because that is a motive "generally possessed by most corporate directors and officers."  *In re Interpool, Inc. Sec. Litig.*, No. 04-321, 2005 WL 2000237, at *11 (D.N.J. Aug. 17, 2005) (rejecting *In re Resource America Securities Litigation*, No. 98-5446, 2000 WL 1053861 (E.D. Pa. July 26, 2000), on which Plaintiffs rely); *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 279 (3d Cir. 2009) ("Corporate officers always have an incentive to improve the lot of their companies, but this is not, absent unusual circumstances, a motive to commit fraud.").

Further, Defendants' mere *access* to information allegedly contradicting their public statements does not—contrary to Plaintiffs' assertions, Opp. 45–46— suffice to plead scienter, as the Court observed in dismissing Plaintiffs' prior Complaint.  Oral Argument Tr. 26:21-27:4 (explaining that "just because . . .

---

involving longer class periods, Opp. 40, Plaintiffs conveniently omit that the second case the court relied on involved an "unusually long class period" of fifteen months.  905 F.3d 106, 120 (3d Cir. 2018) (alterations in original).

there's data in a system that is accessible coupled with a guy saying I know everything that's going on" is insufficient); *see* Br. 41–43.  Even Plaintiffs' cited cases involved particularized allegations that Defendants were *actually aware* of *specific* contrary information.  *See City of Warwick Ret. Sys. v. Catalent, Inc.*, 2024 WL 3219616, at *14 (D.N.J. June 28, 2024) ("The Amended Complaint additionally includes many specific allegations that the individual Defendants were made aware of certain situations . . . .").  By contrast, Plaintiffs here simply assert that management received unspecified "data from Kornit Konnect" at unspecified times and speculate regarding what the data "would have revealed."  Opp. 46.  This is insufficient.  Nor do Plaintiffs' allegations that Defendants knew of anecdotal "problems" with customer service and certain discounts, Opp. 47–48, support an inference of an intent to mislead.[16]

Plaintiffs' allegations concerning the core operations doctrine or temporal proximity are similarly deficient.  *Compare* Opp. 43–45 *with* Br. 44.  Plaintiffs do not dispute that the core operations doctrine, without more, is insufficient to allege scienter, *see* Opp. 52–53, and Plaintiffs have not adequately alleged any "more," referring, as they do, merely to "numerous other facts indicative of scienter" that

---

[16] Plaintiffs' claim that Defendants "took steps to mask" a decline in demand, Opp. 46–47, fall flat for the reasons discussed in Defendants' Opening Brief and herein for why each of these supposed "steps to mitigate" risks were inadequately pled.  Br. 20–23; 46–47; *supra* at 10–12.

are not identified in their Opposition, *id.* at 52.  Likewise, generalized allegations of Defendants' involvement in Kornit's sales and service and statements about their knowledge of the business are inadequate to allege that any Defendant knew of *specific adverse facts* conflicting with their public statements.  Br. 43–44.[17]

The Opposition also misleadingly attempts to create the appearance of temporal proximity between certain of Defendants' statements and the alleged disclosure of contradictory information.  The Opposition focuses on a handful of generalized expressions of optimism, followed weeks later by the disclosure of disappointing results.  Opp. 51–52.  But these expressions of optimism are nonactionable, *see In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427–28 (3d Cir. 1997), and, in any event, are not in any way inconsistent with the alleged information Defendants subsequently disclosed.  Plaintiffs further do not allege that other (specific) statements at issue during the lengthy Class Period were temporally proximate to a supposed corrective disclosure.

In these ways, this case is starkly different from *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009) and *In re Apple Inc. Securities*

---

[17] Plaintiffs' reliance on *SEB Investment Management AB v. Endo International, PLC*, 351 F. Supp. 3d 874 (E.D. Pa. 2018), is misplaced.  In that case, unlike here, plaintiffs alleged that defendants had made detailed public statements about clinical data, indicating that they "possessed the information to support their statements" and strongly suggesting that they also knew of contrary negative clinical data at the time the statements were made.  *Id.* at 906.

28

*Litigation*, 2020 WL 6482014 (N.D. Cal. Nov. 4, 2020). Opp. 49–52. In *Avaya*, the Third Circuit focused on the short interval between an executive's "flat denials" of unusual discounting and his admission (on the heels of "horrid" results) that major discounts *had* been offered, *Avaya*, 564 F.3d at 271–72, which gave rise to a strong inference that he knew of that specific fact when he made the earlier statement. Similarly, in *Apple*, Apple cut production lines as soon as four days after its CEO made allegedly misleading statements about demand in China, *Apple*, 2020 WL 6482014, at *11, which strongly suggested that he possessed information about declining demand when he made the statement; the "competing inference that defendants decided to cut production lines . . . based on only a few days' worth of data" was "itself implausible." *Id.*[18] Nothing similar is alleged here.

Likewise, Defendants' acknowledgment *with hindsight* that, in the "beginning of 2022," Defendants "saw major decline" and that some customers' demand in the first half of 2022 was "declining year-over-year," Opp. 50–51, does

---

[18] *Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527 (D.N.J. 2024), is equally inapposite. There, defendants allegedly had been "repeatedly" presented with "detailed information that directly suggested precisely the opposite conclusion" of their public statements, including particular reports about which the defendants "expressed the sorts of opinions . . . that can only be based on reviewing them." *Id.* at 561, 564–65. Here, the only statement Plaintiffs identify as purportedly irreconcilable with information that Defendants possessed was Mr. Rozner's alleged denial of a revenue "pull-forward" in Q1 2022. Opp. 50. But, as demonstrated above, Plaintiffs fail to allege any facts supporting the occurrence of a "pull-forward," let alone that Mr. Rozner knew of such nonexistent facts.

not give rise to an inference of contemporaneous scienter. *See* Br. 45. Plaintiffs'

allegation that Defendants "admi[tted] that they 'saw' th[is] decline *in real time*,"

Opp. 51, is belied by the ACC itself, which makes clear that the decline in the first

half of 2022 was based on knowledge *as of August 2022*. ACC ¶¶ 199, 293.

### 3. The Confidential Witness Allegations Do Not Give Rise to a Strong Inference of Scienter

As Defendants demonstrated previously, the FEs' vague, uncorroborated

allegations cannot save Plaintiffs' scienter theory. Br. 46–47. Plaintiffs try to

rehabilitate these allegations by claiming that the FEs "identify the sources of their

knowledge" and that their claims "do not hinge on any FE's personal belief or

speculation." Opp. 48–49. As an initial matter, this is not true: the FE allegations

are frequently unsourced, speculative, and outside the FE's sphere of knowledge.

Br. 46–47 (citing examples). FE9, for example, left his role as Vice President of

Marketing and President for North America at Kornit almost three and a half years

before the start of the Class Period, currently works at a Kornit competitor, and

conceded that he typically only had reason to interact with customers unhappy with

Kornit, giving him no reasonable or reliable basis to conclude that Kornit's

products are poor quality. *See* ACC ¶ 56.

In addition, the FE allegations attributed to secondhand sources are

inherently less credible. *See* Br. 46–47. *See Chubb*, 394 F.3d at 155; *In re

Synchronoss Techs., Inc. Sec. Litig.*, 2019 WL 2849933, at *10 (D.N.J. July 2,

2019) (discounting confidential witness's "second-hand retelling and generalized rumor"). These secondhand allegations also fail because they do not specifically identify the information the FEs' purported sources possessed, how the sources obtained the information, when they conveyed it to the FE, or how it conflicted with Defendants' statements. Opp. 48; *see* Br. 46–47, 21–22 (e.g., FE3 claims he was "made aware of" the pull-forward by more senior executives, whose basis for knowledge is not alleged).[19]

## II.    Plaintiffs' Securities Act Claims Should Be Dismissed

As explained in Defendants' Opening Brief, Plaintiffs' Securities Act claims fail under both Rule 9(b) (which applies because the claims sound in fraud) and Rule 8. Br. 47–54; UW Br. 1–3. Plaintiffs fail to rebut these arguments.

### A.    The Securities Act Claims Fail Under Both Rule 9(b) and Rule 8

Where, as here, Securities Act claims sound in fraud, Rule 9(b)'s heightened pleading standard applies. Br. 48. Plaintiffs argue that their Section 11 and 12(a)(2) claims are not subject to Rule 9(b) because Plaintiffs disavow any allegations of fraud and separate the Securities Act claims into a distinct section of

---

[19] Plaintiffs misconstrue *Avaya*, 564 F.3d at 268–69, as "rejecting" an argument that a distant connection between confidential witnesses and defendants undermines scienter. Opp. 48. *Avaya* merely determined that, in light of "all of the allegations of scienter"—which went meaningfully beyond confidential witness allegations—a strong inference of recklessness was present ***in that case***. 564 F.3d at 280. That is not the case here.

the ACC.  Opp. 57.  Plaintiffs do not dispute, however, that the ACC uses the same allegations to plead falsity and scienter for both the fraud-based Section 10(b) claims and the Securities Act claims.  Br. 49–50.

Instead, relying on *Suprema*, 438 F.3d, Plaintiffs try to dismiss this parallel pleading as "immaterial."  Opp. 58.  But the *Suprema* court's holding hinged on the complaint's "express[]" pleading of "ordinary negligence" in the Securities Act allegations that were, at worst, "somewhat commingled" with fraud allegations. 438 F.3d at 272–73; *see also In re Coinbase Glob., Inc. Sec. Litig.*, 2024 WL 4053009, at *21 (D.N.J. Sept. 5, 2024) (Securities Act claims sounded in negligence because they alleged failure to exercise reasonable care).  Here, although Plaintiffs nod to negligence, ACC ¶¶ 414, 423, their entire theory is fraud: the ACC's Securities Act section is replete with allegations of *knowing misconduct* lifted directly from the Exchange Act section.  *See, e.g.,* Br. 49 (citing ACC ¶¶ 51, 139, 347, 383, 398).  As multiple circuit courts have acknowledged, a Securities Act claim that "relies on the same factual allegations that served as a basis for [plaintiffs'] Section 10(b) claim" is more than "somewhat comingled"—it sounds in fraud.  Br. 48–50; *see Caiafa v. Sea Containers, Ltd.*, 331 Fed. Appx. 14, 16 (2d Cir. 2009); *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009); *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 629 (4th Cir. 2008). Plaintiffs make no attempt to address these cases—or any other cases in which a

plaintiff raised identical allegations to support both fraud and non-fraud claims.

Plaintiffs' disavowal of fraud and separation of the Exchange Act and Securities Act claims cannot insulate the Securities Act claims from Rule 9(b). *See Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 2017 WL 3891676, at *2 (D. Del. Sept. 6, 2017) (applying Rule 9(b) "despite an express disavowal of fraud" and "superficial[]" division of Exchange Act and Securities Act claims). Where "a complaint employs the exact same factual allegations to allege violations of [the Securities Act] as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, *we can assume that it sounds in fraud*" without examining the "language and structure of the complaint." *Rubke*, 551 F.3d at 1161. As in *Chubb* and similar post-*Suprema* cases, "[a]n examination of the factual allegations that support Plaintiffs' [S]ection 11 claims" in the ACC "establishes that [Plaintiffs'] claims are indisputably immersed in unparticularized allegations of fraud." *Suprema*, 438 F.3d at 270 (citing *Chubb*, 394 F.3d at 160); *see also* Br. 48–50.

Because Rule 9(b) applies, Plaintiffs claims must be dismissed because, as set forth above, they fail to plead falsity, let alone scienter, with the requisite particularity. *Supra* at Section I. It is also irrelevant that, as Plaintiffs point out, the Underwriter Defendants are named only in the non-fraud Section 12(a)(2) claim. Opp. at 57 n.19. Plaintiffs' leveling at the Underwriter Defendants the exact same allegations that undergird the fraud claims threatens precisely the

33

reputational harm Rule 9(b) was designed to prevent, UW Br. 1–2—another argument Plaintiffs do not try to refute.

But even under Rule 8(a)'s plausibility standard, Plaintiffs cannot salvage their Section 11 and 12(a)(2) claims because they have not pleaded that any of the four statements upon which they base their claims was false or misleading. *See* Br. 50–54; UW Br. 2–3. In fact, Plaintiffs all but concede as much; they barely attempt to respond to Defendants' arguments as to these statements, Opp. 58–59.

*First*, Plaintiffs' challenge to Kornit's statements that its "systems, inks and other consumables, and [] software may contain undetected errors or defects" as misleadingly contingent, Opp. 58–59; ACC ¶¶ 404–05, fails because Kornit undisputedly disclosed contemporaneously that it "*had experienced*" such defects in the past and expected them to recur, *supra* at 17; Br. 51.

*Second*, Plaintiffs barely attempt to refute Defendants' showing that vague statements concerning Kornit products' productivity and cost of ownership were not actually alleged to be false and, in any event, are not actionable. Indeed, Plaintiffs' responses consist of a cross-reference to a section of the Opposition addressing puffery (which fails, *see supra* at Section I.A.5) and the conclusory contention that the statements were "untrue and misleading." Opp. 59 & n.20.

*Third*, Plaintiffs argue that statements about "appropriate investments" in customer support and striving to deliver a "best in class customer experience" were

34

false because several confidential witnesses say so. Opp. 20–21 (citing ACC ¶¶ 357–84, 409–10). But Plaintiffs fail to address (and therefore concede) the threshold issue—these statements were simply too vague to be actionable, Br. 53—and, in any event, the relevant risks were disclosed, *see* Br. 8, 30–31.

*Finally*, Plaintiffs' challenge to Kornit's statements that KornitX was a "robust platform" fail given Kornit's unequivocal disclosures that KornitX experienced "software bugs and defects that adversely impact [] customer[s'] production processes" and "challenges providing support to software users." Br. 8–9. Plaintiffs also do not address Defendants' arguments that describing a platform as "robust" constitutes inactionable puffery. Br. 53–54 (citing cases).

## III. Plaintiffs Fail to Plead "Controlling Person" Liability

Plaintiffs' control person claims fail because Plaintiffs have not pleaded any primary violation and because they also fail to allege culpable participation on the part of either Individual Defendant. *See* Br. 54; *supra*.

## CONCLUSION

For the foregoing reasons and those set forth in the Opening Brief, Defendants respectfully request that the Court dismiss the ACC with prejudice.

Dated:  April 25, 2025
Respectfully submitted,

**GIBBONS P.C.**

*s/ Samuel I. Portnoy*
Samuel I. Portnoy
Michael V. Caracappa
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
sportnoy@gibbonslaw.com
mcaracappa@gibbonslaw.com

**DAVIS POLK & WARDWELL LLP**

Edmund Polubinski III (*pro hac vice*)
Dana Seshens (*pro hac vice*)
Daniel J. Schwartz (*pro hac vice*)
Marie Killmond (*pro hac vice*)
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
edmund.polubinski@davispolk.com
dana.seshens@davispolk.com
daniel.schwartz@davispolk.com
marie.killmond@davispolk.com

*Counsel for Defendants Kornit Digital
Ltd., Ronen Samuel, and Alon Rozner*

*s/ Allen W. Burton*
Allen W. Burton
Jonathan Rosenberg (*pro hac vice*)
William Sushon (*pro hac vice*)
O'MELVENY & MEYERS LLP
1301 Avenue of the Americas,
  Suite 1700
New York, New York 10019

36

Tel: (212) 326-2000
aburton@omm.com
jrosenberg@omm.com
wsushon@omm.com

*Counsel for Defendants Citigroup Global Markets Inc., Barclays Capital Inc., Goldman Sachs & Co. LLC, and Morgan Stanley & Co. LLC*