UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____

In Re KORNIT DIGITAL LTD.
SECURITIES LITIGATION,                    CIVIL ACTION NUMBER:

                                              2:23-cv-00888

                                              ORAL ARGUMENT
_____
MARTIN LUTHER KING BUILDING & U.S. COURTHOUSE
50 Walnut Street
Newark, New Jersey  07101
September 4, 2025
Commencing at 1:07 p.m.


**B E F O R E:        THE HONORABLE MADELINE COX ARLEO,
                     UNITED STATES DISTRICT JUDGE**


A P P E A R A N C E S:

CARELLA BYRNE CECCHI BRODY & AGNELLO, PC
BY:  KEVIN COOPER, ESQUIRE
5 Becker Farm Road
Roseland, New Jersey 07068
For the Movant Institutional Investors Group and Plaintiffs

BERNSTEIN LITOWITZ BERGER & GROSSMANN, LLP
BY:  JAMES A. HARROD, ESQUIRE
     MATTHEWS R. de CARVALHO, ESQUIRE
     ALEC COQUIN, ESQUIRE
1251 6th Avenue
New York, New York 10020
For the Plaintiff




                Diane DiTizii, Official Court Reporter
                        973-776-7738
                diane_ditizii@njd.uscourts.gov

Proceedings recorded by mechanical stenography; transcript
          produced by computer-aided transcription.

United States District Court
Newark, New Jersey

A P P E A R A N C E S: (CONTINUED)

COHEN MILSTEIN SELLERS & TOLL, PLLC
BY: JULIE G. REISER, ESQUIRE
Wall Street Plaza
88 Pine Street, 14th Floor
New York, New York 10005
For the Plaintiff Indiana Police Retirement System


GIBBONS, P.C.
BY: SAMUEL I. PORTNOY, ESQUIRE
One Gateway Center,
Newark, New Jersey 07102
For the Kornit Defendants


DAVIS POLK & WARDWELL, LLP
BY: EDMUND POLUBINSKI, ESQUIRE
     DANA M. SESHENS, ESQUIRE
450 Lexington Avenue
New York, New York 10017
For the Kornit Defendants


O'MELVENY & MYERS, LLP
BY: WILLIAM J. SUSHON ESQUIRE
     RYAN J. FENNELL, ESQUIRE
1301 Avenue of the Americas, Suite 1700
New York, New York 10019-6022
For the Underwriter Defendants


A L S O   P R E S E N T:

CARELLA BYRNE CECCHI BRODY & AGNELLO, PC
ARYANA DEHGHAN, Law Clerk
MATTHEW WHIPPLE, Law Clerk

INDEX

| TOPIC | PAGE |
|---|---|
| Service Contract Attach Rates | |
| The Court | 7 |
| Mr. Polubinski | 8 |
| Mr. Harrod | 13 |
| Ruling | 15 |
| | |
| Service Profitability | |
| The Court | 15 |
| Mr. Harrod | 17 |
| Mr. Polubinski | 19 |
| Ruling | 20 |
| | |
| Sticker Mule Integration | |
| The Court | 21 |
| Mr. Harrod | 22 |
| Mr. Polubinski | 28 |
| Ruling | 28 |
| | |
| Q1 Revenue Pull-forward | |
| The Court | 29 |
| Mr. Polubinski | 31 |
| Mr. Harrod | 32 |
| Ruling | 33 |
| | |
| Competitive Moat Around Products | |
| The Court | 34 |
| Mr. Harrod | 37 |
| Mr. Polubinski | 42 |
| Ruling | 43 |
| | |
| Declining Demand | |
| | |
| Re: November 2021 and January 10, 2022 statements | |
| The Court | 43 |
| Mr. Harrod | 45 |
| Mr. Polubinski | 46 |
| Ruling | 47 |
| | |
| Re: February 15, 2022 statements | |
| The Court | 47 |
| Mr. Polubinski | 49 |
| Mr. Harrod | 51 |
| Ruling | 53 |

Re: May 2022 statements
    The Court                                                    53
    Mr. Polubinski                                               55
    Mr. Harrod                                                   56
    Ruling                                                       57

Re: June 2022 statements
    The Court                                                    57
    Mr. Harrod                                                58, 61
    Mr. Polubinski                                               60
    Ruling                                                       61

Revenue Growth
 Pre-2022 statements
    The Court                                                    62
    Mr. Harrod                                                   63
    Mr. Polubinski                                               69
    Ruling                                                       70

Post 2022 statements
    The Court                                                    71
    Mr. Harrod                                                   71
    Mr. Polubinski                                               74
    Ruling                                                       74

KornitX
    The Court                                                    75
    Mr. Harrod                                                   76
    Mr. Polubinski                                               81
    Ruling                                                       82

2026 financial projections
    The Court                                                    82

Materialized Risk as Hypothetical
    The Court                                                    83
    Mr. Polubinski                                               84
    Mr. Harrod                                                   86
    Ruling                                                       87

Section 11 and 12(a) (2) Claims
    The Court                                                    88
    Mr. Harrod                                                   88
    Mr. Polubinski                                               90
    Mr. Sushon                                                   93
    Ruling                                                       94

United States District Court
Newark, New Jersey

(Proceedings held via TEAMS before the Honorable Madeline Cox Arleo, United States District Court Judge at 1:07 p.m.)

THE COURT: All right. Good afternoon, everyone. This is Judge Arleo.

We're here for oral argument in In Re *Kornit Digital Securities Litigation*.

This is a Motion to Dismiss, second time filed, Second Amended Complaint.

Can I begin with appearances of counsel, please.

MR. COOPER: Good afternoon, your Honor. This is Kevin Cooper from Carella Byrne on behalf of the Plaintiffs. I'm joined by two of our law clerks here, Aryana Dehghan and Matthew Whipple.

My colleagues from Bernstein Litowitz will introduce themselves.

THE COURT: Okay.

MR. HARROD: Thank you.

Good afternoon, Jim Harrod from Bernstein Litowitz Berger & Grossman for the Plaintiffs. I'm joined by my colleagues Alec Coquin and Matthew de Carvalho.

THE COURT: Thank you.

MR. PORTNOY: Good afternoon, your Honor. Sam Portnoy for Gibbons for the Kornit Defendants, and with me also for the Kornit is Ted Polubinski from Davis Polk, and I believe he's joined by Dana Seshens from Davis Polk as well.

THE COURT:  All right.  Thank you.

MR. SUSHON:  Bill Sushon from O'Melveny & Myers for the Underwriter Defendants, and with me here in the conference room is my colleague Ryan Fennell.

THE COURT:  Thank you.

MR. SUSHON:  Thank you, your Honor.

THE COURT:  Okay.  I think we have everyone here.

So, again, this is a motion to Dismiss a Second Amended Class Action Complaint.  We had this last argument quite some time ago.  It was not -- I made rulings from the bench and granted Plaintiff's motion to file the Second Amended Complaint, which is now the subject of this Motion to Dismiss.

I'd like to go through today at the outset and I have grouped the statements for the 10(b)-5 claims in nine -- eight or nine broad category, nine broad categories of statements. It was a little difficult for me to discern what new allegations were added because the whole complaint was restructured, and I can tell you at the outset we'll go through each of these subject matter claims and I'm inclined to let a few of them go forward but I'm not satisfied that the bulk of them meet the appropriate standard under 10b-5, 10(b) and we'll go through them and we can discuss them.

There may be one or two opportunities or possibilities that, depending on more fulsome descriptions from a former employee that there may be -- there may be room for

one additional amended complaint, but we'll talk about how I want that -- I don't want to just have another shot of restructuring and re-alleging a lot of claims that I'm fairly convinced are not actionable, they're puffery, they're opinions.  We'll go through them, but if we have a third iteration, I want it to be very focused.  But let's go through them subject matter by subject matter.

Let's talk about, the first one -- I'm going to say one other thing as some of my prefatory comments.  We have a Class Period of February 7th, 2021 until July 5th of 2022.  The comments that I find -- I'm inclined to find are most likely to allow to move forward are really contained in the first half of 2022.  It seems you have a very broad period beginning in early 2021 with the exception of one claim that we'll start with. The few comments that I'm going to allow to go forward, the few misstatements really are in the beginning of the 2022 frame.

But let me begin with the first statement and that is the statements surrounding the Service Contract Attach Rates. So let me put it in some context.

Early on in February of 2021 there was a conference call discussing 2020 Q40 and full year results.  In response to an analyst question concerning whether some of the attached rates are now for multiyear type of service agreements instead of single year contracts for which they need to get renewals, Samuel responds that every machine comes with a contract and

8

it's not for one year.  Quote, it's for multiple year contracts and we see a nice recurring revenue.

Plaintiff argued that the initial service contracts are for one year in length, not multiple years, after which customers could renew.  Defendants indicate that the initial contract was for one year; afterwards they could -- disclosures indicate that the initial contract was for one year, after which they could renew.  And FE1 indicates that 80 percent of customers declined to renew their contracts and though Kornit would occasionally sell a two-year contract, it was at a discount.

Let me hear from defendants on this one because I'm inclined to let this one go forward.

MR. POLUBINSKI:  Sure, your Honor.  Thanks so much.

I guess I'd say a couple of things about this.  In context, this equivocal and, frankly, I think confusing couple of sentences is not misleading.  As I read this one, I think that the most natural way to read it is that there's no way to buy a machine without a one-year contract and the multiyear renewals are generating -- are generating good recurring revenue.

In light of the confusing nature of this -- and again, putting it in context, this is a statement that's in answer to a single question by someone for whom English is not a first language.  In light of the confusing nature of the

statement, I think it's very important to consider the remainder of the context around this, including clear disclosures from the companies 20-Fs which were incorporated by refers and the 20-F that appeared only weeks later. And so I think in context, it's not misleading.

But the other point I would make, your Honor, is that in our last argument, we didn't focus on scienter at all. I think for this particular statement, any allegation of scienter here is unusually weak and the Plaintiffs had not alleged facts that give rise to a strong inference of scienter. And particularly, you're looking at this in the context of the *Tellabs* case and weighing competing inferences. I don't think there's any plausible way to deem that there's any inference here on Mr. Samuel's part to mislead.

Again, what we're talking about is a single equivocal answer to a sentence by someone, you know, again for whom English is not a first language. The opposite of the kind of conclusive answer that the Court was focused in the *Avaya* case -- the Third Circuit was focused on in the *Avaya* case. And even if you could assume the answer was clearly false, the fact that the accurate answer was concededly out there in the Company's annual filings, and then the Company would be repeating that accurate answer only weeks after Mr. Samuel delivered this statement, all that is totally inconsistent with any inference that he intended to mislead anybody.

I think the most plausible inference here, considerably more plausible than any inference of fraud is that he misspoke or that his answer just wasn't clear, or perhaps even that his understanding was wrong.  But it's very hard to discern any inference to mislead based on the equivocal answer here in light of the fact that the truth was readily available to anybody who printed out the annual report.

THE COURT:  Was that annual report from the prior year from 2020 where they disclosed that there was?

MR. POLUBINSKI:  Yes.

THE COURT:  Tell me what that disclosure said and the date of that disclosure.

MR. POLUBINSKI:  Sure.  Let's see.  I'm going to have to --

THE COURT:  Hold on.

MR. POLUBINSKI:  I'm sorry your Honor.  I need to take a minute.

THE COURT:  That's all right.  Take your time.  I'm looking, too.

MR. POLUBINSKI:  2019 20-F, your Honor, which is the one that would have been out there, is Exhibit 3, I believe. And, again, we're trying to get you the page number on this.

THE COURT:  Page 43, I think.

MR. POLUBINSKI:  Thank you.  Sorry not to have it at my fingertips.

So the answer, which I think there's no dispute this is an accurate answer, is in the section here on Maintenance and Support. And then the Company issued the exact same answer, again, not alleged to have been misleading in Exhibit 1, which is the 2020 annual report. The date on that -- again, I don't have the exact date, but I think it was just, again, it was in March, the end of March of 2021. So, again, we're talking about just a matter of weeks after Mr. Samuel's -- that Mr. Samuel made the statement. Again, not conceded at all to be inaccurate and, in fact, this is where the accurate answer is pulled from.

So, again, what we've got here is a situation where the accurate answer is out there in the Company's public filings, and reissued, too. If indeed Mr. Samuel's intent here was to mislead, it would make zero sense for him to sign off on a 20-F that disclosed a supposed --

THE COURT: But here's the problem, the SEC disclosure is inconsistent with what his statement is, because all this says, you read this, they can renew. They -- our customers can purchase an additional year's support at the time of purchase. After the period, the customers can renew support by purchasing a support package that includes remote support, et cetera.

What he says here is we are selling them. It's not per year, it's multiple year contracts and we see a very nice

recurring revenue.

So it's potentially misleading because someone hears that, they say yeah, the SEC says they may renew and this suggests that they do renew.  It's for multiple year contracts and we see a very nice recurring revenue coming from the service business.

So you read that line, and I appreciate that English may not be Mr. Samuels's first language, but I'm going to read it in plain English because that's how an investor is going to understand it.  There's no safe harbor for well, you know, he spoke imprecisely and it was just a mistake.

This is what he said:  There's no other way to buy a machine and it's not for one year, it's for multiple year contracts and we see a nice recurring revenue coming from that income stream.

That does not -- that disclosure doesn't say that. The disclosure says they may buy it.  This says we see an income stream and it's for multiple year contracts.

And that's the difference.  This was not a fulsome disclosure.  You could read this -- you could read that disclosure and say, yeah, but Samuel is telling us we're getting multiple year contracts and we see a very nice income stream from it.  And that's what I'm struggling with.

Let me hear from Plaintiff's counsel.

MR. HARROD:  Thank you, your Honor.

I agree with you. I mean, I think there's only -- they're two different readings of what defense counsel just articulated. One is that it's an admission that the statement was false. So if the SEC filing is the correct disclosure, then it's an admission the statement was false.

I think the better reading is what your Honor just identified, which is that the statements sort of exist somewhat in parallel. And I think the reason why the analyst asked this question is because the disclosure in the SEC filings is somewhat ambiguous, and they're touting -- the purpose of this statement is to tout to the market the increasing attach rate and revenue from service contracts.

The CEO of the company, who I don't think gets a pass because English is his second language, said something very emphatic and specific in service of showing that the service revenue increased. He's saying we're going to have two-year contracts on every single machine. His language is, I think, unequivocal and very specific and as, again, in service of showing the market that service revenue is going to increase. That's the purpose of this statement.

So I think it's pretty clearly false. I think it pretty clearly doesn't leave room. I think it's also a hundred percent correct that if Kornit decided that they wanted to issue a correction to the statement, they could have.

They're -- you know, when you are on one of these

conference calls for an earnings release for a company, a public company, there are many other executives and management employees who participate who are listening who are on the phone at the same time, and certainly one of them could have slipped him a note, suggested that this was an incorrect statement themselves, or otherwise corrected it through a press release later.

None of that was done.  So the idea that this was not an intended false statement is wrong.

I also think and we cite cases to the effect that this is effectively a truth on the market defense and it's really not appropriate to decide that question now because it's asking the Court in the vacuum of the pleadings to decide which of the statements that the Defendants have proffered are out in the market was more material, and that we have cases in our brief that say that that's inappropriate.

On the scienter point, we sent cases to this effect too.  The CEO of the Company is making a highly explicit and specific statement about the nature of service contracts which is a key aspect of the Company's business by his own admission by making this statement.  The statement is so specific that it has to assume either that he knew the contracts were not two years or multiple years or he was grossly reckless in making such a specific statement in light of the reality being other than what it was.

So there's other allegations in the Complaint that I think supports an answer on this statement but those are the ones I think are most critical.

MR. POLUBINSKI:  Your Honor --

THE COURT:  I'm letting it go forward.  I'm satisfied -- we have a lot of get through and I let you speak for ten minutes and we have probably a hundred statements to go through today.  So we're going to move this quickly and the record will speak for itself.

I'm satisfied that this statement meets the standard.  It's false.  It's not saved by the SEC filing.  It is plain English, it's a misstatement, and it is actionable.  I'm going to move forward.

Let's move forward to Service Profitability.  I am not convinced that any of these statements are -- I'm going to put it right out there -- are actionable.

So let me put it in context:  In addition to selling printers, Kornit had service contracts with their customers to assist in the repair, maintenance, and upgrade of printers.  Rozner and Samuel repeatedly touted during the Class Period that their profitability from the service sector was increasing, very strong growth, for example.  They expected it to continue to increase.  Leadership also noted that they were investing in the service department and generally spoke about Kornit's ability to serve its customers or provide

best-in-class customer service.

Many of Plaintiff's arguments are premised on the idea that Kornit was not providing good customer service; that these were -- there were constant complaints; there was refusal to buy additional equipment and even cancellations.  That is the context about which these statements are alleged to be false or misleading.

So let me begin by one of the first points, and I'm going to lead you -- I'm going to refer you to sections, of the Second Amendment Complaint, 207, 210, 211, 212, 213 and 214.

The service department was increasing in profitability, so I don't see these statements as actually false or misleading.  And that to the extent that they are forward-looking in part, they're accompanied by meaningful disclosures in the SEC filings.  And that's a 2020 fiscal year report filed for 2021 and 2022.

I just want to set up the argument.

Second, it is not apparent that Kornit needed to disclose the issues with the service department to render the present statements not misleading.

The Company experienced significant growth throughout '21 and '20 and the service department had not caught up.

Plaintiff includes multiple former employee allegations concerning the state of the service department, but that allegation of, I think it's FE7 just isn't specific enough

to rise to the level of an actionable misrepresentation.

The allegations lack specifics like when the customers left, how significant the business was.  Printful and DTG2go said they wouldn't purchase more machines unless service improved.  While we could infer that those conversations took place in 2022, Quarter 1, it's not clear if FE7 received that information firsthand or from someone else, or if those threats were communicated to Defendants.

Other materials suggest there may have been different reasons that Printful and the DTG2go slowed down their purchases.  For example, Delta/Fanatics release mentioned nothing about services but indicated the move to M&R was related to different tech initiative and that they still use the Kornit printers.  And Printful allegedly told Kornit it was experiencing a slowdown with its own customers and that's why it did not purchase any more printers.

Those FE allegations I'm not satisfied provide enough context concerning the scale of the actual impact on sales and profits.

So those are some of my concerns.

I'll hear from Plaintiff's counsel.

MR. HARROD:  Thank you, your Honor.

I think of it as a totality of this.  They are portraying or attempting to portray the service department as a profit center for the Company.  They're talking about it as

being necessarily supportive of the sales of their printers to make sure that the customers have a good experience.  I think in paragraph 208 we refer to best-in-class customer experience.

I think one of the key statements here is that they're investing in the service department.  That's from August 10th of 2021.  Very strong growth, growth not only in our systems and consumables business but also in our service organization.

I think, you know, they said on November 10th, 2021 -- this is paragraph 213 -- we're investing a lot in customer support.

So I understand your Honor's concern about the specificity of the allegations.  That's something we talked about last year.  I do think in light of the pleading standard, we've satisfied that with these statements which reflect overall a -- for example, in paragraph 62, FE5 said they needed thirty technicians; for the United States they had twenty.

FE12, who's added in this Complaint, indicates that at the time that he joined the company in the summer of 2021, the Company didn't even have a tracking system, a ticketing system for tracking customer service calls and complaints, which he flipped out about and discussed with the vice president of sales for America, Mr. Whaley, the chief operating officer, Mr. Dror.  And he knew that Chuck Meyo, who is president of the Americas, knew about that too.  That's in

paragraphs 81 through 84.

And the customer's complaint, he dealt with customers who complained all the time about service. And they, in fact, hired this fellow James Loomis to go on an apology tour of customers who are upset about the reliability and service issues.

So we think those allegations reflect a lack of investment, a lack of best-in-class service, which are actionable statements in light of the context in which the Company's trying to tell investors they're going to make money doing this and that they're going to provide good service which will enable customers to keep returning to them.

So I do appreciate -- I could say more but I think those are the main points that address your Honor's concerns as best I can.

THE COURT: Okay.

I'll hear from Defendants.

MR. POLUBINSKI: Your Honor, needless to say, we agree with your take on this.

THE COURT: I thought you would. I thought you would.

MR. POLUBINSKI: Yes. I think among other things, your Honor -- and I'll be very brief about this unless there's questions you have -- the Company did disclose very specifically that service revenue from services increasing

every year considerable amounts, and on this one I do have page numbers for you.  Pages 43 of Exhibit 3, page 46 of Exhibit 1 -- I think, actually, I misspoke.  I don't have a page number for Exhibit 2.

But the revenue increases every year, and the kind of statements we're talking about, things like best-in-class and appropriate are puffery in any event.

THE COURT:  This one isn't going forward for the reasons I've said earlier.  A lot of these high-level statements are just best-in-class, investments in service, ability to support customers.  That's puffery.  That's not actionable.

I want to add to what I said earlier, one other point.  Even if I were to accept FE's allegations as true, they really don't have enough context concerning the scale of the actual impact on Kornit sales and profits.  Saying what you just said, we should have more service people or more helpers, it doesn't really speak to scale.  To say it another way, the allegations do not support that the negative impacts on the service department were so imminent or inevitable to require disclosures to make them not misleading.

And further, Plaintiffs themselves allege that Kornit eventually started to make efforts to address the needs of its customers around January 2022, if not earlier.  This included hiring Jeff Loomis to fly around and meet with customers in

implementing a new charter to take care of customers better in early '22.

So evaluated in context, I am satisfied that the issues -- the alleged misstatements involving service profitability cannot go forward.

Let's talk about Sticker Mule Integration. There's been a lot about Sticker Mule.

I'll put it in context that Samuel discussed a company Sticker Mule and how it had recently integrated a fleet of Kornit Atlas systems into their business. Kornit was, quote, utilizing the growing customer base to support a strong DTG channel.

Plaintiffs are complaining that Sticker Mule was never able to get the printers to work correctly, leading to Sticker Mule selling them off. The big beef here is with the word integrated.

I'm not inclined to find that this statement, the statements about Sticker Mule, were false and misleading. There's not even a context here of how important the Sticker Mule business was even to Kornit in the sense of current and future sales, which raises questions about whether there was materiality adequately pled here.

But I'll hear first from Plaintiff's counsel on Sticker Mule integration.

MR. HARROD: Okay. Thank you, your Honor.

Just to start with your last point which is the materiality point, we added allegations in what is paragraph 39 of the Complaint, and there are other allegations but that's the most focused, I think, discussion of this about why the discussion of Sticker Mule was material and that's because the -- and this was, I think, a more prominent feature of the first Complaint, but the Company has a concentration of customers that it was highly dependent upon and there was concern, I think, at the Company end in the investor community about its reliance on those and what happens if some of those customers leave or start to slow down in their purchases.

Sticker Mule is a middle market business and the reason why it was discussed explicitly is because it represented a departure from reliance on large customers who were purchasing a number of Atlas systems which amounted to multimillion dollars in revenue and it was important for them to convey to the market the expansion of their customer base in that way.  So that's the point about materiality.

The second point, or your first point really was about the question of the statement itself and whether it's actionable to say that Sticker Mule had integrated a fleet of our Atlas systems into their business and then I think the other important words are:  And are utilizing the growing customer base to support a strong DTG revenue channel.

So that statement, Integrated a fleet of Atlas

23

systems into our business and are utilizing the growing customer base to support a strong DTG revenue channel. The DTG revenue channels Sticker Mule's saying they've integrated our printers, they're utilizing them, and they're making money off of the prints from our printers.

That is not true. We've added a number of allegations to what was already in the Complaint reflecting that these machines never worked. They never worked. They were sold in the secondary market to other customers.

So I'll start with I think what is probably maybe the most controversial and maybe also the most salient, which is that there's an advertisement that we've attributed to Sticker Mule where it's trying to sell these printers, or at least one of these printers in the secondary market.

The advertisement says that they were only used for testing, they were never used in production -- this is paragraph 104 -- and the machine worked less than 100 hours.

In paragraph 105 we allege the capacity of the Atlas system for a year, this is two to four percent of that. This is confirming that they were never used in production. They could not have been integrated and utilized to produce revenue for Sticker Mule because they were only used for testing.

THE COURT: And when did that occur? In other words, the statement that you allege was false I guess occurred when -- a November 10th, 2021 call, and then in 104 you're

United States District Court
Newark, New Jersey

talking about that you sold off the printers at a later time. So the issue is even if that happened down the road, was it false at the time that Samuel made this comment in November of 2021?

MR. HARROD:  I believe so because they were never used --

THE COURT:  Do we know the date that this was made?

MR. HARROD:  I think the date of this advertisement is after November.  To be honest with you, I don't think we have the exact date because we had to go through a lot of machinations to try to find it.

But what we know is that the ad itself whatever it was -- whenever it was issued said the machine that was being sold was never used for production, which is consistent with three different former employee statements about the Sticker Mule installation which was described as a disaster, which was -- two people said it was never used.  They could never integrate the system.

So we have three former employees of the Company who are knowledgeable about that.  We have an advertisement by the Company, the purchaser of the Company, saying that it was never used in production, and we know that at least -- in addition to the ad, in paragraph 100 we allege there was a secondary market sale to a costumer --

THE COURT:  Let me just stop you because one of the

difficulties for me in this case is that you throw a lot out at me and then you have to kind of back it down and say when did it happen and who said it and what's the specificity.

So I'm looking at paragraph 217 and we go back to, they never integrated it and you go back to the paragraph you just drew my attention to where they said after the fact, sometime after November of 2021 they sold off the printers because they weren't working right, and that FE3 explained that he participated in conversations with other -- this is all from 217 -- where other potential customers canceled orders because they ended up buying used machines from Sticker Mule, was sold to another potential customer of Kornit.

Again, none of this has any date added.  What we're talking about is when he stood up at that conference call in November of '21 and he said we're integrating into our business.  This is all after-the-fact stuff that happened and there's no date -- again, there's no dates in it again.  It's just some general talk about after the fact, it could have been six months from now, and they weren't integrated and they didn't work and then they were selling them off and they talked to other people that bought the machines.

But it's knowing -- at the time he said that comment, he knew that these problems existed already.  These were post-fact comments or post-fact events, not contemporaneous events.

MR. HARROD:  Your Honor, I understand what you're saying, but I don't understand how you could square the allegation that the machines were never used.  Sticker Mule says in their ad trying to sell the machine it was never utilized in production.  The statement -- even if that statement postdates November, which I don't know that it does, even if it did, how could Samuel's statement that they were integrated and being utilized to generate revenue be true?  Those two things can't be squared.

THE COURT:  What did their advertisement say, at some unknown date in the future?  What did they say when they went to sell it?

MR. HARROD:  They said it had never been utilized in production.  That's what the ad says.

THE COURT:  But never utilized doesn't mean it wasn't -- you know, who knows why it wasn't used.  It does matter.  I mean, all he said was, he said it had recently integrated a fleet into their business.

And integrated means they bought it.  I mean integrated -- I'm not even sure what integrated means.  It doesn't say they were up and running, they were using these and it was very successful.  It says they integrated, which meant they got them and then years later they're going to sell it and it's like, well, we never really used it.

It's an advertisement.  People in advertisements,

it's not a fact, it's just an advertisement that people sell used products and try to, you know, bolster them.  I mean, that's a plausible construction of that.

From that comment months later when they sold it, to say that meant -- because they advertised that it wasn't working -- or they never used it before, that when he made the statement in November of '21 it was knowingly false, that's a stretch.

MR. HARROD:  Your Honor, I just want to make one point because I understand what you're saying and I don't want to belabor this, but the ad says never.  We have other people saying they've never worked.

So never means at no time.  At no time could that statement have been true.  There's no way -- the second part of the statement from Samuel says:  They integrated the systems into their business and are utilizing the growing customer base to support a strong DTG revenue channel.

They're saying they're using them to produce things that Sticker Mule could sell and generate revenue.  There's multiple data points in the Complaint that say that that never happened.

THE COURT:  They're saying they utilized it in the growing customer base.  That's what they're saying.

MR. HARROD:  For a revenue channel.  They're saying they're selling -- the ad says that they were never utilized

for production, they were only used for testing.  These machines run thousands of hours a year.  The ad says they were only used for a hundred for testing.

THE COURT:  That's a for sale ad.  That's an ad to sell it down the road.

MR. HARROD:  Well, certainly there's --

THE COURT:  Let me hear from -- finish it up because I want to move on.  You're not convincing me.

Can I hear from defense counsel?

MR. POLUBINSKI:  Of course, your Honor.

The only other -- I don't have anything to add other than the thing that I would note about the ad is that it talks about a sale of a single printer and the statement here related to a fleet of printers.

In addition to that, in addition to being undated, because it doesn't correct the timing issue that your Honor identified, it also doesn't say the printer never worked.  If anything it says quite the opposite.  It was actually workable and usable for testing.

THE COURT:  Yeah.  I'm not -- for those additional reasons.  We're talking about a fleet of printers, they sold one printer at some unknown date in the future and they said it had never been used doesn't move the needle for me.

I'm not allowing the Sticker Mule Integration alleged misrepresentation to go forward.

United States District Court
Newark, New Jersey

Let's talk about the Revenue Pull Forward.  This is one where I am inclined to allow part of it to go forward, and really on the new allegations for FE3.

So let's go through a couple of them.  There's two statements here, right?  Let's look at 218 and 219.  Let's talk about the FE3 and Meyo's relationship.

Let me back up a little bit and put it in a little bit of context.

So Rozner says that Kornit's timing of sales in the latter half of Q1 increased its quarter-over-quarter, and when asked pointblank by an analyst whether this was just a result of timing or a pull-forward of revenue, Rozner said no, it was not a pull-forward but a timing issue.

Plaintiff says this was false and misleading because the revenue was pulled forward from 2022 Q2 to Q1 to mask a decline in demand.

FE3 says there's a conversation with Chuck Meyo, president of the Americas, and Don Whaley, the VP of sales, about the pull-forward and Chuck Meyo is the one who made him aware of it.  FE3 alleges that the executives were definitely aware of the Q1 slowdown which is why they chose to accelerate their revenue.

And in paragraph 173, the Plaintiffs allege that executives were aware of these issues because he was in meetings that covered them, and that Meyo told him he told the

executives about the issues.

In 172 FE3 also alleges that Kornit's machines are monitorable, so they would have to be able to see the Q4 2021 slowdown and that FE3 both attended calls concerning revenue projects and discussed with Meyo and Whaley concerning the 2021 slowdown.  He had a close personal relationship with Meyo that's also set forth in paragraph 72 and 73.

And FE3/12 also says that problems arose in 2022; so Kornit's emptied out their buffer of printers.

So it's a close call but I'm inclined to let it move forward because it really -- you know, you have the Defendants on one hand saying it was just a timing issue, and I'm not satisfied that this is immaterial.  It's true that Defendants did explicitly disclose that a large portion of their sales came in the second half of the quarter, and in SEC disclosures Kornit discusses their reliance on Amazon and discusses how closing a transaction to one quarter can adversely affect sales in a subsequent quarter.  But if it was pulled forward, according to the Plaintiffs, with the intent to cover up decline, this may have well been material to an investor.  One side is saying it's timing, the other side is saying to cover up decline and we -- Plaintiff have sort of added a little more information with FE3.

So I'll hear from Defendant first on this one.

MR. POLUBINSKI:  Thanks, your Honor.

So on this it's important just to start with the fact that when Mr. Rozner answered the question, he actually did specifically say that orders didn't come in until the end of the second quarter and that the shipments were made relatively close to the quarter. In addition to that, the way that the Plaintiffs make their materiality argument is by pulling concededly accurate information out of the public filings, which was available to investors. So the only question then is whether it was right or not right to characterize this as a pull-forward, whatever that means.

Your Honor pointed out at the last hearing that FE3's allegations on this were not based on any personal knowledge. FE3 had no involvement at all in revenue recognition; had no personal contact at all.

And they did. You're right. They added allegations that related to FE3's contact with Mr. Meyo and Mr. Whaley, but the statements that we're talking about are still undated. They still don't tell us precisely what Mr. Meyo or Mr. Whaley actually said. For example, one of the statements that Plaintiffs added that your Honor just read was that Mr. Meyo told FE3 about the issues. It doesn't say what the issues were.

And likewise for FE12, what FE12 describes here about Kornit keeping a buffer and then emptying the buffer, all of that is completely consistent with what Mr. Rozner actually

said on the call about what happened, which is that there was a lot of material that was shipped at the end of the quarter all of which was disclosed accurately in the public filings.

In light of that, your Honor, I don't think the Plaintiffs have met their burden under *Chubb* here to actually provide enough information from the confidential witnesses to support an allegation that the statement was false or misleading here, and likewise, that there's no information here to suggest that Mr. Rozner intended to mislead anybody.  He was simply answering the question and providing accurate information about what the company sold and when it shipped the materials it shipped.

THE COURT:  Plaintiff's counsel?

MR. HARROD:  Thank you, your Honor.

I'm inclined to agree with your assessment of this. The reason why the statement was important is because there was a decline in revenue that became abjectly manifest in the next quarter at the end of the Class Period on July 5th.  The idea that investors were aware by his -- by Mr. Rozner's statement denying a pull-forward is belied by the fact that the stock dropped 25 percent when they preannounced their results for the following quarter on July 5th, because they'd basically taken money from the second quarter and moved it into the first.

That was very important because the timing of that revenue shows the market what the arc and the trajectory of the

Company's business is, and they basically masked the decline by pulling what we allege to be 30 million dollars from the second quarter into the first and then in the second quarter that money wasn't there and the stock dropped by 25 percent.

So I don't know if there's more that I could say -- I mean, there are more things I can say about materiality but in light of your Honor's sort of intention as stated, I don't think I'll belabor that.

I mean, Mr. Rozner's statement he says -- the question is: Was the revenue pulled forward. He explicitly says no. So he's misleading the market at that point. He's the CFO of this Company being asked questions in particular about this specific issue and gave the answer he gave, and the market was clearly misled as borne out by what happened on July 5th when the stock dropped by 25 percent in connection with the release of the Q2 revenue numbers.

THE COURT: Okay. I'm going to let this one go forward. I began that it was a close call but it has turned into a he said/she said. It's an important statement or misstatement. It's big difference if you say it's just a timing issue and depending on the timing of things, and you have FE3 saying this was to cover up decline in sales.

So I think it meets the standard. It's a close call but I am satisfied it is actionable. I am going to let the revenue pull-forward misstatements move forward.

Let's talk about the Competitive Moat Around Products.

Let me give it some context.  Rozner and Samuel in statements to analysts boast that they are not concerned about competition because they have built a competitive moat around their products.  They also boast about how they are the best and most innovative.

I am not convinced that these competitive moat statements are actionable.  There's a few of them.  I'm not satisfied they fall in any of the *Omnicare* exceptions.  They seem opinions, puffery, high-level statements.

Some of the Q4 '21 and Q4 '21 and post-Q4 '21 are a closer call but they're not actionable.  From what I can tell -- I'll let Plaintiff respond, but let me just put this in a little more context.

Again, I mentioned, the *Omnicare* exceptions.  He gives opinions in SAC 221 to 223.  He feels there is competition -- about whether Samuel feels there is competition, he says in 224 he's not worried about competitors, we see that Kornit is opening a bigger moat than competitors.

First, there's no indication that they actually believed that their printers were -- did not believe that the printers were superior.  There are plenty of examples throughout the record how Kornit printers, maybe more expensive, maybe having a higher return on investment and

having comparable outcomes to cheaper printers, but they did have some unique technological capabilities.  That's set forth throughout the Complaint.  And that Kornit and M&R have the same outcomes of seven basic colors but fails to compare Kornit's printers across measures of capability.  Right?

So there's that first thing.  What did they believe?  And there was certainly enough evidence that they believed they were superior.

And under *Omnicare* they have not pleaded that these statements included expressly embedded untrue facts.

The SEC disclosures specifically listing their competitors of concern like M&R, it would be silly to think there weren't competitors.  They disclosed them.  And I cannot find that failing to qualify their statements by detailing their potential competitors or disclosing technical issues of printers imply untrue facts or that omitting the information alter the total mix of information already available, particularly since there are no allegations that Defendants knew that Delta, for example, was beginning to purchase printers from M&R during this time period.

Some of the statements are also forward-looking.  Kornit has disclosed concerns about competition and issues with its printers.  In 222:  It will be difficult for companies to bring in new tech if they are already integrated with Kornit; they're not worried about future competition; and third, they

have not adequately pled that the statements concerning superior quality can be deemed false or misleading in context. As stated above, Kornit printers have unique capabilities, even if they were not the cheapest. The word quality has many meanings. That's for sure.

The later statements in 2022 are a closer call. Some statements were puffery: We have the best technology, our competitive positions are unmatched.

Sort of rallying cry boasting about their results.

I want to hear from Plaintiff on this. I'm not satisfied they plausibly pleaded an *Omnicare* exception. First, they have not plausibly pleaded that Defendants did not believe that their technology was superior; that they had not pleaded an expressly embedded untrue fact. The plaintiffs have not given enough context to determine that the Plaintiffs omitted known and material facts to make their statements misleading given the total mix of information available.

M&R was disclosed as a competitive risk in the SEC filings.

And then we move on to FE4 and the December -- in response to the December 7, 2021 statement that We are not worried about competition, the Complaint has not plausibly pled that Samuel knew the extent of Delta's movement to M&R at that point. FE4 says Delta's purchase of M&R printers, 15 units installed by the end of '21 and 50 more ordered, was discussed

in meetings prior to November '21. But FE4 does not squarely allege that he was part of those meetings or that Samuel was either.

He alleges that customer service issue with Delta were discussed in '20 and 2021 but, again, he does not squarely allege he was part of the meetings or what was discussed or that Delta was moving elsewhere at this point.

He also alleges that Kornit would have noticed an ink drop-off in Q4 2021, but again, the statement was made prior to the end of Q4. So it's not clear that Defendants would have had enough time to evaluate a trend, as opposed to a temporary drop-off in purchases.

FE4 alleges that there's a falling out between Delta and Kornit leadership in Q1 2021, but he admits he didn't know what it was all about.

I am just not satisfied that this is enough.

So I want to go a little bit more about the May 22 statement about the moat, but I'm not seeing it. The moat statements don't -- competitive moat statements, I struggle to find that any were opinions that were based on false facts or otherwise actionable to *Omnicare*.

So let me hear from Plaintiff on that one. There's a lot there.

MR. HARROD: Thank you, your Honor. I'll try to be succinct because I think there's a few points that are the most

salient.

THE COURT:  Okay.  Good.

MR. HARROD:  On the *Omnicare* exception, I think many of the statements embed the omission of the fact they were aware and concerned internally about competition.

So a statement like in paragraph 227, Yeah, we are not worried about competition, we are a market leader, we don't allege that to be false.  But we are, by far, the best technology; we are, by far, faster and innovative versus any other companies out there.

So if you contrast that, I think that there's an embedded statement or an omission of the fact that they were in fact internally concerned, in particular about M&R.  We have reports from -- in the Complaint from FE12, paragraphs 115 and 122 through 128, they were aware of and concerned about stiff competition from M&R, that salespeople would go to customer locations and see M&R machines there.  Specifically, they knew that there were some large customers like Delta and Fanatics that they would lose business to as a result of them purchasing lower cost --

THE COURT:  Don't -- doesn't Kornit disclose M&R and various other competitors in their SEC filings around this time?

MR. HARROD:  Sure.  I wouldn't argue that they don't do that, but I think if you look at these statements in

United States District Court
Newark, New Jersey

context, by saying that we're not worried about the competition, I think we have allegations saying they were worried about the competition.

So that statement, even if rendered as an opinion, omits the underlying fact of their concern internally about the existence of M&R which has a lower cost product and a higher ROI product invading their space in the market.

So I think I could argue -- articulate an argument to say it's not a statement of fact, not an opinion, but I don't think it matters because I think even if it's considered under the *Omnicare* standard as an opinion, the exception for the omission of an underlying fact applies, and the underlying fact there is that they were concerned internally about competition.

THE COURT: All right. Let me go forward and ask you about the March 22nd statement -- I'm sorry, May 2022. Samuel qualified his statements by acknowledging that Kornit always had and will always have competition.

That's Exhibit 9 at 11. That's one of his calls, I think, right? One of his calls.

He acknowledged later in the call that Delta had purchased a few printers from M&R but maintained that Delta remained a client. Delta by this time had already released a statement concerning its partnership with M&R and stated on a public call that they still worked with Kornit and ran their printers every day.

Further, while FE4 alleges that Delta had a fleet of 100 Kornit printers which were lost to the competition -- I'm not even sure what that means -- this allegation seems to be belied by Delta's public statements, does not provide clarity regarding whether Delta had 100 printers in total from Kornit that it stopped using, or it had more than 100 printers but 100 of them were replaced by M&R; and does not provide a time period and does not provide a basis for FE4's knowledge of fact.

And the statement that Samuel stated on February 15, 2022 that there's a very, very strong new moat, I couldn't find that in the call transcript. It appears that it was from a later call on May 11 of 2022.

But I guess just in short, it remains difficult from the record to fully discern the extent of Delta's collaboration with M&R and the materiality of its impact on Kornit's overall competitive outlook. Particularly if, as the record indicates, Delta continued to work with Kornit and only used M&R for a particular type of printing.

And from another perspective, even if Samuel's statement was knowingly misleading and made more so by his assertion that Delta had purchased a few printers as Plaintiffs themselves allege, other information was on the market, wouldn't that have rendered it immaterial? I mean, it was public that Delta had moved away from Kornit at that time.

So do you want to talk a little bit about Samuel's statements in May of 2022 would seem to squarely address the competition?

MR. HARROD:  Well, I think those statements address the existence of the competition with a few customers, right? So if the argument is, from the Defendants, that these statements are rendered, you know -- the qualification that the customer is doing business, at least some business with M&R makes the statement not actionable, my response to that is that they were still overall telling the market that they had a moat around their technology, around our products.  We've developed our products and we created a much bigger gap versus than any of our competitors.

Well, we know by this point what is happening with Delta and Fanatics, but they weren't the only customers who M&R was competing with.  They were competing with them for all of the customers, and I think that the internal reality reflected at Kornit at this time and well prior to this time was concern about the impact of sales of losing business to competitors like M&R.

THE COURT:  But M&R and Delta are the only two that are alleged in the Complaint, aren't they?

MR. HARROD:  The only two customers who are alleged who specifically purchased products from M&R?

THE COURT:  Right.

MR. HARROD:  I don't know if I can answer that because I haven't committed it to memory but it's probably correct.  I don't think that -- I get defying that there were other customers who were buying products from M&R negates the allegation that internally people were concerned that customers, other customers were buying from M&R.

THE COURT:  Thank you.

I'll hear from defense counsel.

MR. POLUBINSKI:  Thank you, your Honor.  I'll also be brief but I'll try to focus on just the May 22 statement since those are the ones that I think your Honor said you were most focused on.

I guess a couple of points to make about this:  The first is, as you said, Mr. Samuel acknowledged competition on that call.  That was also something that was amply disclosed in the 20-F, including competition from M&R.

The statements about moat, you know, even setting aside whether or not that's puffery totally don't pass the *Omnicare* test.  The reason for that is that the Plaintiffs haven't alleged that -- they haven't alleged there's any reason why Mr. Samuel would not believe Kornit's technology was superior.  There are no allegations about that.

There are allegations about competition, true, but there are no allegations that would support an assertion that Mr. Samuel didn't honestly believe at the time that Kornit did

have superior technology.

THE COURT:  I'm not letting these go forward for all the reasons I articulated earlier.  I'm not going to repeat myself, but I am satisfied that they are not actionable.  They're opinions.  They're not based on -- you know, they're embedded facts that were not disclosed.  He believed they were superior.  For the reasons I've stated earlier, he disclosed competition May of 2022.

There's just not enough there to allow those statements by Samuel to move forward and I'm not allowing it to move forward.

Let me tell you where I have a couple of concerns, and this is the last group I will give you the heads-up where there are some statements that I'm inclined to let move forward.  Just a couple of them perhaps, and that's the Declining Demand.  Let me place it in context.

Defendant touted Kornit's business successes, discussing its strong business fundamentals entering into 2022, including a robust order backlog and strong pipeline, and continuing to tout the strength of these fundamentals to the end of the Class Period, even in the face of harmful macroeconomic headwinds.

The Plaintiffs say that Defendants knew that customer demand was declining in Q4 of 2021 -- we talked about that earlier -- but failed to adequately disclose it to its

investors and continued to make material misrepresentations to investors even as the negative trends in demand persisted throughout the end of the Class Period, and that Defendants' post-class period admissions confirm this decline.

Let me tell you where I stand. There's a number of -- there's a lot here in Declining Demand and I just want to go through it. Let's talk about them briefly for each of the set of alleged misrepresentations.

The first one is November of 2021. There was a November 10th, 2021 call reported on Q3 2021 results and FE3's allegation from the SAC indicate that any negative decline began in November and December of Q4 2021. Not apparent that it yet manifested this early in November, and even if it did, it could not have formed a trend yet.

So to my mind the Plaintiffs have not demonstrated that these statements, earlier statements were false or misleading when made, especially against a backdrop of a very successful 2021 in general.

So that's one, the November '21.

Then there's a January 10th statements are close call, but even if I accept FE3's allegations as true that high-level employees and even executives were aware of the negative sales trends towards the end of 2021, these statements are too high-level to be actionable and vague corporate optimism. Phrases like massive momentum can mean many things.

Further just ten days into Q1 2022, I guess the beginning of January, Defendants may well have still been analyzing data demonstrating any trends even if they did have data from Kornit Konnect.

So I'm not inclined to let those first batch of misstatements early on -- I'm not satisfied they're actionable because I don't think there's any real strong allegation that they're false, but I'll hear from Defendants on it -- I'm sorry, from Plaintiff on it.

MR. HARROD:  Thank you, your Honor.

I think I can be quick here because I don't want -- a lot of the allegations support these statements as a group and we allege that based on FE3, now FE12, that the decline occurred in the fourth quarter of 2022.  We've added, what I think your Honor asked for at the last argument, which was detail on the monitoring through the Kornit Konnect system. We've added a number of allegations about that which discuss that that information is monitored daily.  It includes information about impressions, about the amount of uptime on the machines, about the consumption of ink, and how Mr. Samuel himself talks about how that is what the Company uses to sort of monitor demand, and it happens in realtime.

So we don't think that there's a lag -- a Company that is a revenue-driven business like this one was, was undoubtedly, based on their own statements about how they

monitored these things, very, very focused on measurement of where they were with their customers in terms of revenue.  They talk about consumption and impressions as the best indicator of future demand for both consumables and the printers themselves.

So I think we have an allegation that must be credited because we are in a motion to dismiss stage, and an allegation from a credible internal employee that the decline was seen -- or actually two -- in the fourth quarter of 2021.

So the statements from November and from early January are actionable on that bases.

The January 10 statement, I mean, understandably I hear what your Honor is saying about entering very, very strong into 2022 with massive momentum.  If there is a downturn and you are actually going to push 30 million dollars in revenue from the second quarter into the first to mask that, I think saying on January 10th that entering 2022 very, very strong with massive -- massive momentum coming from both existing customers and many new customers is a false and misleading statement.

So we believe these statements are actionable.  I understand your Honor's perspective on this.

THE COURT:  Thank you.

Counsel.

MR. POLUBINSKI:  Thank you, your Honor.

I guess I'll say two things on this:  The first is

that the confidential witness statements that Mr. Harrod referred to don't include specifics. They don't include the who, what, when, and where, and they certainly don't suggest that Mr. Samuel had knowledge of the supposed declines in demand back in November of 2010.

On Kornit Konnect, your Honor spent a good deal of time talking about this at the last hearing and explaining that you need to actually make allegations about what the data purportedly showed, not just that there was data, and also when it showed it and who saw it. None of the new allegations do that.

So for all those reasons and the one your Honor said, the statements from those two time periods are not actionable.

THE COURT: For those reasons I agree. You know, this is also about trends. And you're right about Kornit Konnect, there's no specificity. This was very early in the beginning of January.

I'm not satisfied that you've met the standard. I'm not allowing those statements to go forward.

Let's talk about the February 15, 2022 statement which I think may be actionable in part. Some of the statements in context are reflections on 2021 and appear to be corporate optimism, outstanding execution of the huge market opportunity; other statements saying it would be a year -- 2022 would be a year with strong growth or that Kornit was gearing

United States District Court
Newark, New Jersey

up for a very strong growth are, again, vague corporate optimism and fundamentally forward-looking, accompanied by SEC disclosures.

These statements are accompanied by specific examples of where Defendants expect their growth and no allegations in the SAC contend that these expectations are baseless; Discussing order backlogs, upgrades to Atlas printers, internal interest in QUEST software. Same with statements that Kornit is the only company to provide this technology. This is immaterial.

Other statements during the call cross the line from puffery, in my judgment, and corporate optimism to actionable misleading statements. Statements like Kornit has never been in a better position, even if based on a subjective evaluation of the present circumstances, which it would be an opinion, omits information that a reasonable investor might find significant enough to alter the total mix of information.

If sales were slowing down at the end of 2021 or the beginning of 2022, this may have been important to disclose to investors, even if, generally speaking, Kornit's fundamentals, order backlogs and other pipelines painted an overall positive picture.

And I'm going to refer to *Maiden Holdings*, a recent Third Circuit case where the Third Circuit said: The complexity of Maiden's loss reserve determinations did not give

Maiden free rein to omit any known contradictory evidence so long as it did not hide the single most important evidence.

Here, by February of 2022, I'm satisfied that they had enough of that information and that those statements are actionable.

Counsel, defense?

MR. POLUBINSKI:  Your Honor, thank you.

THE COURT:  Counsel, what is your name?  Let me stop.  What is your name?

MR. POLUBINSKI:  Sorry, your Honor.  My name is Ted Polubinski.

THE COURT:  You know why?  I only have -- I didn't write everyone's name down and I usually have a sign-in sheet when I'm in person.  This is an unusual group because usually the link has -- I see Jim Harrod, Samuel Portnoy, but yours just say Davis Polk New York.  So I don't want to call you Davis Polk because that's not your name.  So it's just a little difficult for me.  Names are not my best.  That's why I like paper sign-in sheets.

But, anyway, I apologize for that but feel free to move forward.

MR. POLUBINSKI:  Your Honor, you can call me whatever you'd like.  Polk is much easier than Polubinski, but whatever works.

THE COURT:  Mr. Polk.

MR. POLUBINSKI:  Fair enough.

So a few points, your Honor.  The first is that never been in a better position as a Company I think also is puffery, but even setting aside whether it is or it isn't, what I focus on here is *Chubb* and what *Chubb* requires from confidential witnesses in terms of alleging specificity about what it was that the specific Defendants knew, when they knew it, with detailed allegations that give rise to a basis upon which the Court can conclude that the witnesses who are -- the confidential witnesses who are offering this information actually had a basis to know it.

What we're talking about here, it's at best hearsay statements that FE3 is reporting that he purportedly heard from somebody else.  But, again, we don't have detail on when that information was conveyed and exactly what the information even was.

We're talking about also, this is mid-quarter in the first quarter of 2022.  As I'm sure your Honor is very aware, the Company did disclose that there was a slowdown in demand and that it saw a slowdown in demand by the end of that quarter.  But there's no allegation that the Company knew about the decline in demand before quarter closed, halfway through the quarter, which is the time period that we're talking about.

So particularly in light of the vagueness of the statements and, never been in a better position as a Company, I

don't think the Plaintiffs have done the job here that *Chubb* requires them to do to allege falsity with specificity or to allege scienter; to allege that the speaker actually understood at the time that this wasn't true and was inconsistent with his own personal opinion about whether from his personal perspective they were in a better position as a company.  It doesn't pass the *Omnicare* test.

THE COURT:  I'll hear from Mr. Harrod.

MR. HARROD:  Thank you, your Honor.

I think the principal argument I'm hearing is that the FE3 information is not detailed enough.  We disagree with that.  We I think the *Avaya* case makes clear that it's perfectly's acceptable.

In fact, we can talk about hearsay.  I think we cited this case in our brief, *Guzman vs Mana*, even if a statement were hearsay, that is irrelevant because at the motion to dismiss stage, the court is required to accept all factual statements as true.  And that's true for all of these allegations.

What I hear a lot from what Mr. Polubinski's arguing is that we should sort of be at a level of expert reports or trial here.

The statement from the FE is that there was a negative trend that started in the fourth quarter, and that the other allegation, some of which we talked about already, is

that the bottom fell out, they emptied a buffer, they pulled 30 million dollars into the first quarter.

So in the context of all of those things, all of those things are alleged, and the statement from the FE is actually the inverse of the statement that you were talking about from the CEO of the company.

So I think we satisfied the who, what, when, and where. Hearsay is okay unless, you know, if they would like to give me discovery of their executives prior to the Motion to Dismiss, I'd be happy to take it but I don't think that they're going to do that and I understand why that's not the law.

But given this is a complaint, I think we ought to evaluate the allegations as if they're in a complaint and under the appropriate standard, which is here we think *Avaya*, hearsay is okay under the *Guzman* case. So I think all of those things are fine.

I think the statement is, in fact, a mirror image and does directly contradict the statement. There is no lack of detail in the Complaint. And then I would again point to the fact that these statements from the FEs are corroborated and consistent with statements that the Defendant themselves later made saying that they saw slowdown in the first half of 2021. The customers stopped ordering things.

So it's not as if our allegations exist in a vacuum of what later actually was disclosed by the people who are

being accused of this themselves.

I would, as the last point, point to just the reality context of this Company's business.  If you look at paragraph 42 of the Complaint, there's a graph in there that shows the revenue before, during, and after the Class Period; the stock price before, during, and after the Class Period.  I think that imagery tells a lot about what was happening at this Company during this period of time.  The demand was falling off rapidly and the Company misrepresented that.

THE COURT:  Okay.  I'm going to allow -- as my initial thought, I'm going to allow part of the statements made in February of 2022 to go forward as actionable misstatements.

The ones I described earlier that are puffery I am convinced are puffery:  Outstanding execution on the huge market; we're hoping for a year with strong growth; gearing up for a very good strong growth, et cetera, are not actionable.

But I'm satisfied that where Defendant crossed the line from puffery to corporate optimism is, Kornit has never been in a better position.  Because even if, as I said earlier, based on a subjective evaluation under present circumstances, omits information that a reasonable investor may find significant enough to alter the total mix of information.  I'm going to let that statement move forward.

There's a May 2022 statement from the Q1 earnings that I also think are actionable in part.  I'll let you both be

heard in a minute.  I'm satisfied or I'm inclined to find that those statements are arguably misleading because Defendants have omitted to disclose that revenue was pulled forward, same issue again, to artificially create the results.

That's from the SAC at 237.  This is consistent with my earlier ruling.

So that part of the statement -- that part of the May 2022 statement I would allow to go forward but I don't reach the same conclusion with other opinions that were accompanied by hedges and cautionary language and I'm not so sure are adequately alleged to be false or misleading.

For example, Samuel in that May 11, 2022 statement said he sees Q2 as a bump in the road and that's his opinion. They also disclosed helpful cautionary language to render it not incomplete or misleading.  Hitting capacity, plateauing, declines, a bump in the road, but they hopefully will rebound in the next two quarters or years thereafter.

That's in the same statement or his statement at Exhibit 9.  He acknowledges that there's a bump in the road and he's not sure if he has all the information.

So I'm not inclined to let those other statements go forward, only the statement about growth revenue and pulling forward.

So I'll hear first from either of you.  Maybe defense counsel first and then I'll let Plaintiff respond.

MR. POLUBINSKI:  Sure, your Honor.  Thanks.

The one thing I really want to emphasize about May of 2022 is that the Company actually did in this disclosure talk about weakening demand.  So it was pretty stark about it.  It talked about an e-commerce slowdown and delayed orders and the like.  So any statements that were made here were made in that context, in the context of a truthful statement to the effect that the demand had indeed slowed.  By that point it was evident to them at the end of the first quarter.

Especially given that, I don't -- I don't see how Plaintiffs could allege that they've met their burden in scienter and that there was any intent to mislead here, that they were coming forward and saying quite clearly that there had been a slowdown in demand.

The *Rescue Mission of El Paso* case, which we cited in our papers, is on point on this in the sense that Kornit here tempered its optimism at that time with significant qualifications.  Those qualifications were quite specific and significant in terms of the slowdown in revenue.

So whatever conclusion your Honor might reach about statements that were made prior to May of 2022, I think at that point the Company started to be clear about demand issues that, from our perspective, was only just beginning to proceed.

THE COURT:  I'll hear from Plaintiff's counsel.

MR. HARROD:  They're talking about, in paragraph --

so the context for this is that this is May.  On July 5th, which is the last day of the Class Period, they preannounce the results for the quarter, and May is the second quarter.  So they're talking about the first quarter results and they're describing those results as a bump in the road.  They have at this point, as I've already said, pulled 30 million dollars from that first quarter -- from the second quarter into the first quarter; they have realtime monitoring of customer usage, which Samuel himself passed the existence and importance of, and they're saying things like Q2 is a bump in the road.

And I'll point your Honor back to paragraph 42 in the chart there, it was not a bump in the road.  The Company never recovered from this.  The demand was falling off; it has never come back.  It was an attempt to caution the market and, you know, assuage investors' concerns about a serious decline in revenue which was happening.  All of these statements are grossly inconsistent with the reality inside the company that they were specifically aware of.

And so to the extent that you could say, oh, well, they were telling the market that it wasn't -- that it was bad and it was going to get worse, that's not what they said.

And the stock, again, on July 5th wouldn't have dropped by 25 percent if investors had appreciated what the reality was.  So May 11th is less than two months before July 5th and this trend has now been going on for at least five

or six or seven months.  So any statements that, you know, belie the existence of that trend are material, not puffery, and actionable based on all the allegations.

THE COURT:  Well, I am allowing that one portion of the May 11 statement that refers back to the pull-forward.  I think it's in paragraph 237 where Kornit said during -- where Samuel said, Delivered a good start to the year, with revenues coming just about the high end of our guidance and operating margins in line with our expectations.  For the first quarter, total revenue grew by 26 percent year-over-year.  And that, again, refers back to the pull-forward.  I'm going to let that go forward.  But I'm not satisfied that the rest of those statements with the qualifying language acknowledging a decline is actionable and I'm not letting that go forward for reasons I stated earlier.

I'm inclined to reach the same conclusion with respect to the June '22 statement and I just want to put it in context.

Investors were already apprised of the slowdown from the May 11th conference call that I just talked about.  Second, Samuel's discussion of fundamentals in June, at least at the June 7th conference, makes clear to me that he's referring to broader market trends, not related to Q1 or 2 slowdown.  Because he discusses broader trends.  He talks about off-shore product, generational preferences, social media impact,

increased concerns about sustainability.

The discussions of fundamentals in other calls and conferences indicates that Samuel uses that phrasing generally to describe mega-trends.  And the Complaint as is does not adequately allege that these mega-trends in the market, the change, for example, from analog to digital is misleading, and Samuel also discloses slowdown in the June 7th call.

And, again, rendering an opinion that the current drop in demand is a bump in the road is not misleading in light of the SEC disclosures.  There was even a slide presentation back in June of 2022; prior disclosures in the May 11th call that we just talked about.  We assess statements were false or misleading when made and not whether good faith opinions turn out to be wrong down the line.

I'm not inclined to let the June statements but I'll let Plaintiff's counsel be heard on that.

MR. HARROD:  Your Honor, as I understand it, I think you're saying that these are not actionable in light of the broader context, but I think it's hard to read a statement like all the market trends that we were talking about years ago just accelerated.  That talks about a lot of things, and it's certainly misleading to say all of the market trends that we were talking about years ago accelerated when the bottom is dropping out of their business, which is like undoubtedly what happens.  This is now less than a month from them disclosing

horrendous revenue and operating results.

THE COURT: Let me just stop you. If they're talking about market trends, how is that false and misleading?

MR. HARROD: Because the most important market trend for Kornit's business was people buying printers and ink, and while he's making the statement on June 7th of 2022, the bottom is falling out of that market trend in his business.

THE COURT: But a lot of that has been disclosed. I mean, it's not like he's painting this rosy picture contemporaneously and he disclosed a lot of the problems in the SEC disclosure. In the May 11th call, he talks about bumps in the road and then he just talked about some high-level comments about mega-trends. He didn't really say anything about -- he didn't make the qualitative comments he was making four months earlier. That's where I get stuck. I have to look at it at the time and you have to look at exactly what was said.

MR. HARROD: That's exactly what was said. If you're talking about every market trend or all the market trends, I mean, the one that the investors in this company cared most about was how many printers are Kornit's customers buying. How much volume of business are Kornit's customers doing in terms of printing?

Those market trends were abjectly adverse at the point of this statement being made. On July 5th they missed their guidance that they just issued in May by I think 50

percent or 40 percent.

So as this is happening, the business is running very, very poorly. To come out and say to investors all of the market trends we're talking about just accelerated, we see realtime supplies -- so in terms of supplies, we see realtime supplies coming back, back into growth, how do you say that on June 7th when on July 5th you're going to announce terrible revenue numbers?

Those two things I don't think can be squared based on the allegations of the Complaint and I think the statement is intended and was understood by investors to allay their concerns about the business dropping off, which they were clearly surprised by on July 5th because they sold the stock that caused it to go down 25 percent. They were surprised. They were not -- this information did not convey to investors the reality of what was happening in the business.

THE COURT: But it wasn't false. I mean, that's the problem. It wasn't false.

Anyway, I hear you.

Would defense counsel would like to respond?

MR. POLUBINSKI: Yes, your Honor.

I would say the same thing that you did. I mean, at the end of the day, it wasn't false and I don't have anything to add to that beyond your Honor's points on this.

The one thing I would say is that Mr. Harrod has said

a bunch of times here that because the stock price later dropped, some statement that happened in, you know, the previous weeks or months or whatever must have been false. That's not the way it works. There needs to actually be a connection between the two of them. The fact that the stock price later dropped doesn't mean it dropped because some previously hidden piece of information was suddenly revealed.

So, again, I think for all the reasons your Honor said, including because the client demand was disclosed so completely in May of 2022, like I said in answer to the last question, there isn't anything that is misleading about this statement.

MR. HARROD: Your Honor, if I may just respond to that last point about the stock drop, because I agree, not every stock drop indicates that something false was said before. But if the defense to the prior statement that it not be false was that it informed the market of what was happening at the Company, this one didn't because those two things are the same. What happened on July 5th was they had a really bad financial result for a quarter and he's talking about trends accelerating and selling more ink, which didn't happen and wasn't happening. So the two things are related in this instance and I think I just wanted for the sake of --

THE COURT: So noted. I'm not letting it go forward. I'm not satisfied it's false or misleading.

Guys, it's now 2:30.  We've been on this for an hour and a half.  I have a criminal matter, a plea that I think I need to take.

Amy, are they still there?

COURTROOM DEPUTY:  Yes, your Honor.  They're waiting outside the courtroom.

THE COURT:  Why don't we take a break and I'll take care of that and I'll come back in a half an hour.  We'll finish up.

I want you to focus on Revenue Growth, KornitX, and Materialized Risks As Hypothetical, and then we'll talk a little bit about the Section 11 claims.  So we'll take a half an hour break.  If I'm going to be longer than that, we'll let you know.

Stay tuned.  I'll be right back.

(Recess in proceeding)

THE COURT:  We're back on the record.

Let's pick up where were left off, which is Revenue Growth.  Let me put it in context.

While acknowledging a slowdown in growth in Q4 2021 and the beginning of 2022, Defendants continued to express bullish confidence in their ability to be a 500-million-dollar run rate by Q4 2023, and 1-billion-dollar revenue in 2026 through the end of the Class Period.

Plaintiffs say it's false and misleading for the

Defendants to represent that Kornit would achieve that kind of 500-million-dollar run rate, become a billion dollar company in 2026, considering the known but undisclosed impact of printer reliability, poor service, lack of adoption of KornitX, and increased competition.

So what concerns me is that I hear what Defendant is saying in hindsight, but we don't use a hindsight analysis. We have to look at the statements in present time and what was known. I need to discern between forward-looking statements that are not actionable and whether these statements at the time they were made were intentionally misleading or false.

So let's talk about the pre-2022 statements. They are found in the Complaint at 243.

I'm not inclined to let these go forward but I'll hear first from Plaintiff's counsel. First talk pre-2022 and then the post-2022 statements. Okay?

MR. HARROD: Sure. Thank you, your Honor.

So I think where I would start with this is the goal of setting these revenue targets was communicating a lot of important information in the market in general about the Company's business and its success. Those statements were undermined by all of the things you just mentioned: By the existence of competition; the issues for liability that we've talked about in the Complaint at length; the issues with service with the failure of the KornitX platform. Most

importantly this is an allegation that we added from FE12.

The statements were really made without any basis. So they can be carved out with the exception of four monthly statements on that basis because there was no way they could ever be true. Because at the time that they started being made as early as the beginning of the Class Period November 16th of 2021, Kornit had done nothing to justify a target of 1 billion dollars in revenue or 500 million dollars in revenue by what was then pretty soon 2023.

So FE12, who's the director of marketing, was tasked after the Class Period of 2023 for the very first time to assess the size of the addressable market for Kornit's products. At that time he did it and the conclusion was they could never achieve the numbers they were talking about during the Class Period because the market was just too small. There weren't enough customers who would buy the kinds of products that Kornit made to do this.

There's no way those statements could have been anything but plausible. What FE12 reports back to us is that Defendant Samuel said go find another Amazon. They were going to reach this number by going and finding another Amazon.

I will represent to the Court that there's not another Amazon to be found. There is no way they were going to do that, and so for them to say this -- and we have, I believe, just in 2021, one, two -- I think eight iterations of this

statement to the market, you know, extreme confidence.  And they continue into 2022, even after the business starts to go south.  So, you know, I think the amalgam of the allegations that we have about the operational and competitive issues the Company implied in these statements, but most importantly, and as to your Honor's question about them being forward-looking, the critical fact that they just simply had no basis in fact to make these statements.

THE COURT:  Let's talk about, I think you described the marketing person --

MR. HARROD:  Yes.

THE COURT:  -- who there's a general allegation that the projections are misleading because they never performed a market survey until 2023, but there's no context concerning what such a survey entailed, what DATAcoin it was utilizing in its earlier exception, whether a reasonable investor would expect Kornit to have performed such an inquiry before announcing it's forward-looking projections.  There's no detail about it.

So your argument is because we did one in 2023, they should have had that knowledge earlier?  I mean, the one thing that is out there, you know, there's some reference in one of -- I believe in one of the investor statements that 25 billion T-shirts are printed every year and only one percent are being designed using digital printing and they thought that

was a potential market.

So I appreciate that you added in another employee but I'm not sure it moves the needle.

MR. HARROD:  Your Honor, I don't understand.  If you don't know -- one of the conclusions of the marketing study -- of the market science study was that there weren't -- even if there was a large vessel market for digital printed garments that many of those potential customers who would make such garments couldn't afford to buy -- this is in I think it's paragraph 154 -- couldn't afford to buy the kind of products that Kornit was selling.

So I don't know how you make an assessment that you're going to grow -- this was a huge increase of allegations about it.  It's multiples in the pre-Class Period -- many multiples of the pre-Class Period revenue.  They would have had to achieve multiples of the kind of growth they were achieving at the beginning of the Class Period for several years after that.

THE COURT:  Right, but here's my point, and this is the struggle I have in this case:  You throw a lot of facts out that tell a story like an opening statement, but that's not how this works.  The market analysis, as alleged in paragraph 123, was performed at some point in 2023 and I'm looking at comments -- I said I want to focus first on pre-2022 statements.  There was no market study until 2023.

MR. HARROD:  In 151 FE12 said that corporate never backed up how they were going to achieve that.  FE12 said the revenue figures were totally unrealistic.

This is where the quote about Amazon comes from, and he alleges that there was never a market analysis performed.  So that's the paragraph I'm referring to.

THE COURT:  But looking at it in isolation -- first of all, I don't know when this conversation even took place, right?  It's not dated.  It could have been 2023.

When was he hired, this FE12?

MR. HARROD:  I think 12 was hired in August of 2021.

THE COURT:  August of 2021.  So I don't know -- he performed a market analysis in 2023.  They had a conversation, he said your numbers are unrealistic and he said we need to find another Amazon, or it's a way of saying we need to find another big client, but that's all that you have.

So he didn't make any -- to impute knowledge and misrepresentation because he made some statements about the future, that to me just isn't enough.

Let me hear from --

MR. HARROD:  Can I just respond to one thing?

THE COURT:  Yes.  Again, I'm talking about pre-2022.

So you throw things out about marketing survey in 2023.  There were statements that were pre-2022 that are found in your Complaint at 243, right?  And so at the time what was

false about that statement?

You can't refer to undated things that might have happened a year and a half later, and that's what we're doing here.

243 is at the end -- in February of '21, Rozner touted the Company revenue guidance of 500,000 million, that we are more confident than ever in our ability to achieve our 500-million-dollar run rate ahead of plan while expanding gross margin and profitability.

That's the pre-2021 revenue growth misstatement that you allege.

MR. HARROD:  So what the allegation is in paragraph 158 is that they never assessed the size of the market until 2023.  So 2023 they then know what the size of the market is.  In 2021 they didn't even know what the potential size of the market is.

This was a massive amount of growth from where they were at that point.  So saying that you're going to achieve that when you have no realistic projection basis estimate of how you were going to get there is, you know, I think at best misleading.  You're basically telling the market you've primed the pump to achieve massive revenue growth when you literally don't have any information to support that conclusion.

THE COURT:  All right.  Can I hear from defense counsel on the pre-2022 statements?

MR. POLUBINSKI:  Yes.  Thank you, your Honor.

These are exactly the kind of statements that the PSLRA was intended to address and to make inactionable.  These are classic forward-looking statements that refer to a range of different risk factors that could cause results to be different.  Those two facts mean that they're protected by the safe harbor.

In addition to that, they're also opinions that the Plaintiffs haven't alleged were not honestly held by the folks who offered them.

They offer FE12.  FE12 was a marketing person, as your Honor said.  FE12 had no involvement in generating projections or forecasts.  And FE12's entitled to his or her opinion about what is or isn't reasonable here, but it doesn't mean that the projections that were actually being offered by the people who are actually doing the work were not honestly held and protected both as opinions and under the bold statements of safe harbor.

The study, as your Honor said, that he did or she did, that FE12 did was a study that wasn't delivered to the Defendants until 2023.  Long after 2021 or 2022.  And so insofar as that showed anything that could undermine their confidence in these numbers, it was information that Plaintiff themselves concede that the Defendants didn't have until 2023.

These statements are not actionable for the reasons

that your Honor has laid out.

THE COURT:  Thank you.  And I agree for those reasons, and I'll add the following that even treating these statements as not forward-looking, the Complaint does not contain enough specificity to demonstrate that this positive outlook was false or misleading, or if construed as opinions, omitted facts to make them not misleading around or before Q4 2021.

Knowledge concerning the decline in demand and loss of competition to M&R did not begin to manifest until late 2021 to early 2022, and the other allegations concerning issues with the service department printer reliability, KornitX, do not give enough context concerning the material impacts those concerns had on the company.  In other words, while there may have well have been those other issues, the SAC does not give adequate detail concerning how those issues should have factored into Defendants' longer-term outlook.  This is especially true when fiscal year 2020 and 2021 were, on the whole, banner years for Kornit with explosive growth.

Let's talk about the post-2022 statements, which I think are a closer call but ultimately not actionable.  I reach that conclusion preliminarily because they appear to be, again, largely forward-looking statements accompanied by incorporated SEC disclosures.  Exhibit 20 is an SEC disclosure, Exhibit 21, and they were accompanied by contemporaneous disclosures

concerning the negative decline in demand the Company was facing in the e-commerce sector.  For example, Exhibit 9 which I think was a statement disclosing macroeconomic headwinds and near-term volatility and discussing working extremely hard to mitigate the external macro factors.

Again, in June 2022, Exhibit 17 where one of the -- either Rozner or Samuel explained slowdown in Q1 2022, describing a realtime increase in supply orders in Q2 2022 but declining to commit to revenue projections for H2.

And statements touting the very, very strong new moat and describing the great adoption and growth of the Atlas Max automatic upgrade are not -- I don't see how they could be demonstrably false and misleading.  There just isn't enough information in the Complaint concerning the Max products in particular to render those statements misleading.  They're more like opinions as, again, we lack information to demonstrate the opinion omitted material facts.  For example, the SAC discusses Delta's move to M&R but it's not apparent that Delta had the Atlas products or that Defendants even knew the extent of Delta's collaboration with M&R.

So again, I'll turn it over to Plaintiff before I make my final decision.  That's what I'm inclined to find.

MR. HARROD:  Your Honor, I'm going to give you a couple of numbers.  In the second quarter of '22, which is from March to June of 2022, the Company preannounced on July 5th of

72

2022 that the revenue for that quarter would be 56.4 to 59.4 million. Okay. It was down from the prior quarter from all the quarters previous in the Class Period.

To achieve a 500-million-dollar per year annual run rate, you would need quarterly revenue 125 million dollars.

So in the quarter that he's making these statements, in May in the paragraph in 250, 251 statements and 252, that's during that quarter when they reported, I think, ultimately about 57 million dollars in revenue. He's projecting that no more than five quarters after that they would have more than doubled the revenue they reported in that quarter. They didn't -- they don't do that. They didn't even come close to doing that. They never came close to doing it. They still haven't done it. They never will, probably.

So at the time this statement was made, he had a lot of data and information about what the revenue looks like. They had a down quarter in the first quarter. They had to augment by pulling revenue into it. And he knows, again, that they had never assessed the size of the market at that point in time he's making these statements, and he's already experiencing the significant decline, which reflects both a trend line and an absolute amount of revenue that was so far below these numbers that for the risk disclosures and other disclosures you've talked about to have been affected, they would have had to said we're having a very bad quarter, the

trend lines look down.

To say it like the trend lines, we're experiencing competition or there's other risks to the business and those risks have already abjectly materialized in the business and you're sliding downwards, is just misleading.  Not every statement, certainly at the pleading stage, I can prove with objective numbers to a day to a person what the actual experience was, but we know from the reported numbers and we know from the other allegations in the Complaint that these statements are clearly misleading, particularly in May and June of 2022.  I mean, they're just terrible disclosures that completely fly in the face of what was actually happening in the business.

THE COURT:  Weren't there disclosures in numerous SEC files by that point?

MR. HARROD:  There were disclosures about the risk, the things that could -- things that were bad could happen, not that they were already happening, not that things were already very, very bad.  You know, I don't know how in light of those things you can come out and say we're -- he says we're going to achieve it even earlier.  I mean, that's a misleading statement to investors when you're running the business that's doing poorly.

THE COURT:  I'll hear from defense counsel.

MR. POLUBINSKI:  Sure.  Thank you, your Honor.

So Mr. Harrod is asking the Court I think here to speculate about a process forecasting on which he's offered no confidential witness.

The fact is when the Defendants made these statements, classic forward-looking statements, they did refer to meaningful cautionary statements that accompanied them. They're covered by the PSLRA. This is precisely what the PSLRA requires, and it's *Chubb* that requires the Plaintiffs to -- they come forward with their confidential witness and make these allegations on information and belief, but they need to have someone who has knowledge of the process to be able to make the allegation. They haven't done that.

This is, again, class PSLRA forward-looking statements. Also doubly protected is opinion statements that Plaintiffs haven't met their burden on *Omnicare* with.

THE COURT: I'm satisfied that -- it's a closer call certainly the closer we get to the February, March, April, May time frame, but I'm constrained to agree with the Defendants that these are forward-looking statements. They are also opinions and there is no -- you know, what we have through the new witnesses is just not enough to move the needle for me to find that they ineffectively pleaded for that time frame that they were misleading statements and I'm not going to let that claim move forward.

Let's talk about KornitX. So Defendants publicly

touted the strong interest in KornitX, the platform's robust capabilities and how they expected the platform to become a 100 million-dollar software service by 2026.

Defendants argue that the statements about KornitX are puffery, opinion, or forward-looking statements accompanied by robust disclosures.

I'm going to ask -- I'm struggling with finding how these statements about KornitX are false in context.

I'll have Plaintiff's counsel to really address this. Statements like:  Huge interest in the technology -- that's at 264 -- big adoption, great momentum, great feedback, massive growth coming in, don't appear to convey to a reasonable investor that people have purchased the technology but are merely interested in the technology.  And while FE alleges that the technology was not ready and completed, sales were slow, that doesn't make those prior statements necessarily misleading or false.

You really haven't demonstrated with specificity a clearly pessimistic backdrop to render these optimistic statements misleading.  That's the *Macomb* case out of the 9th Circuit.

Service revenue resulted from software subscriptions was increasing broadly throughout the majority of the Class Period, even though, as Plaintiff argued, there was a drop in the number of KornitX customers from when Kornit first acquired

the technology from Custom Gateway; and March 2023 SEC filing that did not state that the software subscriptions drove the increase in service revenues.

But a drop in customers broadly speaking can be attributed to a concentration of the customer base, not a loss of growth altogether, and that's the problem with demonstrating falsity. The Complaint does not plead with particularity when those customer losses occurred in relation to public statements.

The March 2022 SEC disclosures indicated that KornitX had 250 customers, and the last allegedly misleading statement was just a few months later in June of 2022.

Even if the software sales did not drive growth in service revenue disclosed in the March 2023 filing, I'm struggling with the inference that software sales did not contribute to the service revenue at all. The SEC filing just did not include it as one of the main drivers of increase.

Let me hear again from the Plaintiff on the KornitX issue, the misstatements.

MR. HARROD: I think it's easiest and time most productive for me to just focus on a few of the statements that I think are not either opinions or forward-looking and I don't think are puffery.

The first one I would focus on is paragraph 265 where this is described as a robust platform, and then in 266 the

United States District Court
Newark, New Jersey

Company says -- I'm sorry, Defendant Rozner says, We already see the huge value KornitX brings to our customers.

So, We already see, that's not a forward-looking statement.

And then in paragraph 268 --

THE COURT:  Let me stop you for a minute.  It doesn't say we already see the huge revenue.  It says the huge value and the potential.  I mean, that's a little different than saying, you know, it's made a ton of money for us.

MR. HARROD:  Right.  A statement can be qualitative and also misleading.  I think that's what I would argue here, although I do think we can argue that the revenue was effectively nonexistent.

One more statement I want to read --

THE COURT:  Sure.

MR. HARROD:  -- which is we said great adoption on the KornitX by customers.  That's a statement Samuel made on June 10, 2023.

THE COURT:  July 13th of 2021.

MR. HARROD:  Actually, he made it twice.  He made it on June 10th and July 13th.  You see great adoption, he said it first in June and then in paragraphs 268 and 269.

THE COURT:  Okay.

MR. HARROD:  So the starting point for this is on November 9th of 2022, Samuel himself says, KornitX still needed

to be stabilized in that it generates a few million dollars of revenue, which was not meaningful enough.

So that's a few months after the end of the Class Period. That's a platform which he described the year before as being robust. So something that needs to be stabilized I don't think can be robust; so I think that statement was false.

I think the statements that your Honor talked about with regard to the immaterial amount of revenue and the decline in customers are directly inconsistent with the idea that they're seeing a great adoption in customers in the present tense. They were losing customers during this period of time. This is corroborated by I think four different former employees who say things like KornitX did not generate any sales in the Americas from July of 2021 through the end of the Class Period.

FE10 who was hired to sell KornitX to existing customers said they didn't sell any of the KornitX platform to any customer during his tenure from March through July of 2022. He talks in detail about the projections that were sent, which says the maximum projections for the product were under, I think a million dollars or slightly over a million dollars. I think 1.2 million dollars, for the entire I think Americas.

FE11 said the product was not ready. FE12 said the product was never properly integrated and there was no way to practically use it.

So if you take this --

THE COURT:  What did the contemporaneous SEC disclosure show?  Didn't they disclose a loss of KornitX business?

MR. HARROD:  The loss of customers is not disclosed until 2020 -- the post-Class Period.

THE COURT:  Two.  No.  It was 300 and then it went to 250, and then in late 2022 after the Class Period, it went to 166.

Is that right?

MR. HARROD:  If the argument is is that disclosure inferior of the other statements, I don't think it is.  They made statements that they're achieving great adoption.  They're hinging 100 million dollars in future revenue on this which bolsters their other statements about projections in growth.

So if you take all of these -- all of these facts together, including what the CEO of the company said, I don't know how you can square those facts with it being robust, they're seeing a great adoption.  Those statements are qualitatively false and misleading.  They're not forward-looking.  I don't believe you could say that they're opinions currently, and I don't believe that they're puffery because they're introducing this new product line which they say will achieve a significant amount of revenue.  And investors want to know is it being adopted, the CEO says it's being adopted.  He later says it didn't work.  It generated

almost no revenue.

So I think that those statements are on any basis --

THE COURT:  Where do they say they're generating a lot of revenue?  Where are those statements?  We are optimistic, we have great hope, we see a very big adoption, you know, very -- we see a value in it and the potential in it.

Where are they saying KornitX has generated substantial revenue for us?  It doesn't exist.  In fact, the SEC disclosure saw a drop in customers.

So I hear you, but I just don't see -- those statements really are not factual statements.  They are optimistic statements, forward-looking statements.  I don't see it.

MR. HARROD:  Again, I really disagree with the idea that the statement that we're seeing a great adoption or that a platform is robust, which is later characterized by the same person as unstable, can be squared.  I understand what you're saying about revenue.

THE COURT:  Where is the robust statement?  When was that made?

MR. HARROD:  I think paragraph 265, which is March 25th, 2021.

THE COURT:  That's different than May and June. Let's be real about it.  That's part of the struggle, that you have to look at different statements made at different points

in time.  The May statement is different than the March statement, which is different than the December statement.

The later statements that you've been focusing on, the May and June one, the June 1, the Blair Growth Stock Conference and the May investor meeting, that was later.  And there was also disclosure at the same time in March of '21 that showed a decline of business.

Let me turn it over to Defendants for a moment.

MR. POLUBINSKI:  Thanks, your Honor.  Just a couple of quick things on this.

First, your Honor already alluded to extensive disclosures here about KornitX.  Among other things, the Company clearly did disclose that it faces challenges -- this is what it says in its public filings -- and it did not expect KornitX to significantly impact results of operations in the near term.

The statements that we're talking about are classic puffery.  Robust is a classic puffery word.  The *Navient* case which we cite addresses robust and concludes that it's puffery.

As you said, huge value talks about potential.  It doesn't talk about revenue.  And, likewise, you can have great adoption of a platform but it doesn't mean that it necessarily translates to revenue.  Even if those things were not puffery, which they are, and then the confidential witnesses that we're talking about here, none of them actually worked on KornitX.

They were all -- they were all folks who worked in different places. FE3, as we explained in briefs, never worked at KornitX. FE10 was not even there when both of the statements were made. FE11 and FE12 only said that Kornit was figuring out KornitX, but that's the same thing that they disclosed in their 20-F.

There's nothing here that's actionable or false or misleading, and certainly nothing here that would suggest that the Defendant had any intent to mislead on these points.

THE COURT: I'm not allowing these claims to move forward, many of them for the reasons I expressed earlier but I will add that many of them are part opinion. Describing KornitX as a huge opportunity; Defendants' expectations concerning KornitX's very strong stickiness; statements detailing subjective evaluations of pleasure concerning its adoption, or describing it as a secret sauce, as well as belief statements about its future impact of the company are based on opinion, not existing, present fact.

Again, the Plaintiffs argue that these opinions are misleading without disclosure of KornitX's relatively slow sales or buggy technology. Defendant did disclose to some degree those concerns in contemporaneous SEC filings.

I just want to speak briefly about the 2026 financial projections, namely that KornitX would generate 100 million dollars in 2026. They assert this was unrealistic. FE10, who

was only at Kornit for five months in total, March to July of 2022, thought the sales target for '26 were unrealistic based on how much he was responsible for selling. FE3 did not end up working on KornitX explained that it had not turned a profit or generated sales in the Americas by the time he left in December of 2022. And finally, FE11, a software engineer who was there from July of '21 to November '21, five months, said they were constantly trying to figure out integration, and that FE12 just vaguely said it was never properly integrated and did not work well.

These allegations are too general and unreliable given the scope of the knowledge of the FEs.

Let's talk about Materialized Risk As Hypothetical, the last category. I think this would cover it today -- well, for these claims.

In its March 25, 2021 SEC filing concerning fiscal year 2020, Kornit stated that systems, ink, and other consumables may contain undetected errors or defects which could cause the company to incur costs and harm its representation. In its March 25, 2022 SEC filing concerning fiscal year 2021, Kornit similarly stated that the loss of a large client or variability in order flows could materially impact its business, and that undetected errors or defects in products could cause the Company to incur costs and harm its reputation.

The first statement in the 2022 SEC filing was false and misleading because it made the concerns regarding products errors or defects appear hypothetical when it had, in fact, materialized. The second statements from the 2022 SEC filing were false or misleading because at one point, Kornit had already lost a major client and, again, it already suffered impact from product errors.

And I want to turn it over to Defendants to start with to go over whether these alleged omissions had been disclosed at that time.

MR. POLUBINSKI: Thank you, your Honor.

On the first one, I'm looking now at page 15 of the 20-F, Exhibit 1, the issue here is that the risk factor, if you read the whole risk factor and include the sentence that the Plaintiffs decided to leave out, it actually says -- and I'm quoting this -- we have experienced these errors and defects in the past during the introduction of new systems and system upgrades.

This isn't just a hypothetical risk. On the face of risk factor, it says that it's happened before and it says that it may happen again.

So there's nothing -- there's nothing in this statement that's at all misleading by omission. There's no omission.

On the second statement which relates to the loss of

United States District Court
Newark, New Jersey

either Amazon or another one of our large customers, the Plaintiffs don't allege that any large customers were actually lost. They allege some business is lost from Delta and Fanatics at some point in time, but they don't allege, certainly as of this time, that any customer, significant customer is lost. So, again, there's nothing that's false or misleading or omissive about this at all.

On top of that, this is a disclosure that comes out, if I'm following the timing on this correctly, on March 25th of 2022, which is the same time that Delta and Fanatics made their announcement about taking some of their business, not all of their business, but some of their business to M&R.

So there's nothing here, again, that's at all misleading by omission, especially in context.

THE COURT: Let me ask Plaintiff's counsel. Let's pick up where you left off, and that is FE4. At paragraph 280, the SEC disclosure was submitted prior to Delta's public announcement -- right? -- disclosing collaboration with M&R on March 28th, 2022. It's not apparent that the Delta/DTG2go was lost and Plaintiff have failed to provide enough context concerning the extent of Delta's move to M&R, whether they disposed of or stopped using Kornit machines or merely stopped purchasing new ones, or whether the move to M&R was a move away from Kornit, or just a collaboration with a different company for a different sector of its work.

So it seems that FE4 could not speak fully to the extent of the loss to M&R, and that's what has me troubled here about that statement.

Anything you'd like to say in response?  Maybe you will be able to replead that with more specificity, but the way it is now, it doesn't seem to be sufficient.

MR. HARROD:  I'm trying -- I'm going to ask somebody to help me find a paragraph number for this, but --

THE COURT:  I think it's 280.  Is that right?

MR. HARROD:  No, no.  I have the disclosure.  There's an allegation, which I think is more or less uncontested, is that they did lose Fanatics as a customer in that they lost a significant amount of business from Delta.  So that was not disclosed until after this 20-F.  We allege that those risks and those two customers were known to the company, and certainly the implication of this risk disclosure I think is inconsistent with certainly losing Fanatics, and also with losing a material amount of business from one of your other top ten customers contemporaneous with the disclosure.

So there's a way to write disclosures that are not opaque and you don't -- you can just say we have lost or we believe we are in the process of losing the material customer, and that's not what this says.

I have the same quibble, if I could go back to the earlier risk disclosure, Mr. Polubinski correctly said that

they said they had had those problems and they may have them in the future.  Our allegation is yes, you had them and yes, we understand that you said you may have them again in the future, but that is not an adequate disclosure of a risk that is happening right now, and that's what we allege is happening and that's why that risk disclosure is inadequate.  It's not true.

So that would be my response on the question of both of those risk disclosures why they are materially false and misleading.

THE COURT:  Well, I'm not allowing these claims to move forward.  I'm satisfied that they were adequately disclosed, and in the 2020 SEC filing the Defendants explicitly stated that they had experienced product defects in the past.  And the bolded quote Plaintiffs allege was false and misleading from the 2021 filing submitted in March 25th at paragraph 281 does not appear to be in the filing, if you compare with Exhibit 2 at 13, using similar language to discuss product liability concerns, not the exact language that you cite.  And that Defendants also disclosed prior product defects and errors in Kornit's fiscal year 2019 SEC disclosure.

I already talked about the impact of losing a large customer and the Delta public announcement.

So I'm satisfied that there was sufficient disclosure here.  I'm not going to allow these claims to move forward.

Let me move on.  I didn't think we would be here this

long, but let me just set up the Section 11 and 12(a)(2) Claims.

There are a number of statements from 2020 Form 20-F filed March 20th -- let me say that again.

The fiscal year 2020 Form 20-F statements filed March 25, 2021.

I'll hear from Plaintiff on these.  I'm not inclined to let them go forward, but you can make your arguments about each of them and then I will respond -- I'll let Defendant respond and then make my ruling.

MR. HARROD:  Thank you, your Honor.

So to start with, the Section 11 claims are subject to Rule 8 plausibility standard.

THE COURT:  Let's assume that for right now.

MR. HARROD:  All right.  And we make allegations regarding, I think it's four disclosures that are incorporated or in the prospectus.

THE COURT:  Yes.

MR. HARROD:  Each of those is untrue, particularly under the Rule 8 standard that's applicable here.

The first one concerns -- this is I think a similar disclosure to the one we were just talking about.  The risk factor that defects may cause Kornit to incur significant warranty costs, we have incorporated significant allegations indicating that those defects and issues were, in fact,

existing at the time of the secondary public offering in November of 2021. And again, saying that the risk disclosure -- saying the risk had occurred in the past and may occur in the future is incorrect in light of the fact that the situation was currently inconsistent with that risk disclosure.

Similarly, the next statement is -- concerns what I say are the attractive and best cost of total ownership of the Company's products. You know, these are statements that are actionable. They sought to distinguish Kornit from its competition, which were classically statements that are non-puffery. That's attributable to the *Merck* case, which we cite in our brief. In touting their competitive position, particularly in light of the ROI problems that we allege in the Securities Act section of the Complaint made those statements materially misleading or untrue for purposes of Sections 11 and 12.

Again, the next one concerns Kornit was making the appropriate investment in services support and delivering best-in-class customer experience. We allege a host of allegations in the Securities Act section of the Complaint showing that to put Defendants on notice of the fact that they were not plausibly investing in services and support and, in fact, that part of the Company's business was not well run and not operating at an appropriate level to be consistent with the disclosure.

And then, finally, the last one concerns KornitX which is described as, again, a robust platform with a wide range of services to digitally transform our customer's operations. These statements were inconsistent with the allegations that we have in the Securities Act section of the Complaint. Defendants are clearly on notice of the basis for which those statements are false because as we just talked about, Mr. Samuel, you know, the Company later described that product as needing to be stabilized.

So I know Defendants make some other arguments about whether these statements ought to be considered under Rule 9(b), we disagree with that, but I certainly think under the plausibility standard of Rule 8, there's no question that those statements ought to be succinct.

THE COURT: I'll hear from defense counsel.

MR. POLUBINSKI: Thank you, your Honor.

So assuming just for the moment that we're talking about Rule 8(a), these statements don't remotely satisfy the burden of plea to claim under Rule 8(a).

I won't spend more time on the first statement which we did talk about at some length in terms of whether the -- whether the statement was somehow misleading. Again, if you look at the sentence that was omitted, it answers the question.

There is, by the way -- this is what the risk factor says. It says both that Kornit had experienced these errors

and defects in the past, and expects that these errors and defects will be found from time to time, which again suggests that it's something that it's a risk, it's something that is happening and will happen going forward.

Plaintiffs or the former employees aren't alleging anything different than what was disclosed.

On the second point, statements about high productivity and attractive total cost of ownership is classic puffery. I think both of those terms, attractive and high quality, were at issue in the *TimberTech* case, which concluded that they were puffery, and Kornit also amply disclosed the risk of product defects, as I just mentioned.

The third statement, allegations that Kornit strived to delivered best-in-class customer service are not alleged to be false. Can't allege that Kornit didn't try to go only to achieve best-in-class service, whatever best-is-class even is. Best-in-class is also a phrase that has been deemed to be inactionable puffery. The *Gentiva* case, which we cited is an example of that.

The last statement about KornitX and whether it is or isn't a robust platform, again, is classic puffery. The *Navient* case includes the phrase robust as classic puffery. And again, the disclosures here in the very same document made very clear that KornitX -- or Kornit, rather, expected that KornitX would make only a limited contribution to revenue.

Again, all of these allegations fail under Rule 8.

We do respectfully suggest that rule 9(b) should apply here.  The reason for that is the Plaintiffs have basically cut and pasted the allegations from the Exchange Act Section directly into the Securities Act Section.

The Suprema case, which they cite, doesn't mean the Court is supposed to ignore reality, and the reality, just because Plaintiffs have invoked certain magic turns and phrases, the reality here is that these are fraud claims.  And Plaintiff's own brief, for what its worth, actually confirms this point.

THE COURT:  Let me stop you for one minute.

The third statement, the investment and support services, I read it in your briefs but I couldn't find it in the record.  Do you know where that's located?  We continue to make the appropriate investments in ensuring we serve their needs as it comes to sales and services support.  Do you know where that is just so we have a record?

MR. POLUBINSKI:  Where are you, your Honor?

THE COURT:  The third bullet.  I know I'm throwing a lot at you, but it's paragraph 409 of the Second Amended Complaint.  I'm just looking for a cite in the disclosures.

MR. POLUBINSKI:  The one, Strategic accounts are an important and valued part, and we continue to make the appropriate investments, is that it?

THE COURT: Yes.

MR. POLUBINSKI: I'm hopeful that one of my colleagues can help me find the cite on that, your Honor.

THE COURT: Okay. I'll take you at your word because no one seems to dispute what it said, but I'd like to have a citing for it so the record is complete.

MR. POLUBINSKI: Yes. Understood. I mean, it is, for what it's worth, the statement that you read is actually in the Complaint in the paragraph that you cited --

THE COURT: Yes, it is.

MR. POLUBINSKI: -- is the citation to the actual public filing, but we'll try to find that quickly in our remaining minutes.

MR. SUSHON: Your Honor?

THE COURT: Yes.

MR. SUSHON: Bill Sushon, counsel for the Underwriter Defendants. I'd also like to be heard briefly on these issues since the 12(a)(2) claim does involve my clients, but I don't want to interrupt. I'm sorry.

THE COURT: You can say what you have to say. Go ahead. You can be heard.

MR. SUSHON: I join in and adopt the arguments that Mr. Polubinski has made.

I would also point out, your Honor, that with respect to the claim about the statement in paragraph 409, you've

already decided that the identical statement should be dismissed in the 10(b) claims, it's in paragraph 208, on puffery grounds which apply under Rule 8 or Rule 9(b).  It doesn't matter.

The same goes for the statements about KornitX.  The statements about KornitX which appear in paragraph 411, are also in paragraph 265, which your Honor already dismissed on puffery grounds.  And as to the first statement, it's an issue, you dismissed that because the exact same statement in the 10(b) case on the grounds that it was already disclosed.

So whether Rule 9(b) or Rule 8(a) applies, that dismissal should stick for the Securities Act Claims as well.

Of course, just as to the third statement, I agree with Mr. Polubinski.  The words, you know, attractive total cost of ownership are puffery.  Retail of great quality, if it's not puffery, it certainly seems like it should be puffery, but there's no allegation that, in fact, Kornit did not offer retail of great quality of its Atlas product.

Not to guild the lily, but I did think I should make those points, your Honor.  Thank you.

THE COURT:  Well, you earned your money today so that's all good.

MR. SUSHON:  Thank you.

THE COURT:  I am not inclined and I will not let these claims go forward for the reasons articulated by me from

counsel on both sides, but I'll just run through them quickly.

The first statement in the Kornit Form 20-F statements.  The ink systems may contain undetected errors or defects and such problems could cause us to incur significant warranty and repair costs, divert our attention, et cetera, I am satisfied that the risks were clearly disclosed and they had already materialized in the very offering materials that are alleged to be false and misleading.  So I'm not going to let that go forward, under either 8 or 9, but I'm going to evaluate it under 8.

Two, statements concerning the total cost of ownership of its products.  Plaintiff alleges that the total cost of ownership of these products was significantly higher than Kornit led it to believe.  I'm satisfied that it's not actionable.  These are high-level, vague, puffery.  Statements concerning productivity and cost of ownership are related to particular models.  The most specific statements in the 20-F relate to the Vulcan model, but no allegations in the Complaint discuss the particular models' productivity.

Third, Kornit's aspiration to make the appropriate investments in services support and to strive to deliver best-in-class customer experience, Plaintiff alleged that these statements are false, in effect, because the service department was a mess.  I'm also, for the reasons I stated earlier, they're not actionable.  Statements like driving to deliver

best customer service are puffery that no reasonable investor would rely on, and the 20-F filing discloses the drain on customer service.

Statements discussing Kornit making appropriate investments in services support are too vague and high-level and is not apparent from the SAC whether at the time this registration statement was filed, the ill effects of the poor service had materialized.

Finally, the statement about KornitX as robust, but allegedly Kornit was still stabilizing its platform. Because I'm satisfied that calling a new technology robust is puffery and fatally vague, I'm not going to let it go forward.

I know that I let a number of isolated claims go forward and there's a possibility that there could be future amendments. If there are, I want it done in a slightly different way.

Since this is the second round of extensive argument, especially today, that to the extent that Plaintiff wants to file additional amendments, rather than having a restructuring of this Complaint that makes it very hard for me to compare red line to the prior document, you can do it by letter in lieu of -- a letter request to me in lieu of a formal motion that sets forth the additional allegations that you would like to plead so that we will just address those allegations in the future, and you can reference other parts of the Complaint

where they would fit appropriately.  You can guide your arguments accordingly.

But I've gone through everything today that I could and I don't want to be in a position six months from now, if there is a renewed request, to make more specific allegations with different employees, that I'm forced to go through a lot of -- this Complaint is very dense and I made the best rulings that I could and tried to group them in a logical way.

But if there's a third pleading, I'd rather have it first as paragraphs you would like to add and then I'll allow you to add them rather than actually give me a red line, unless the red line is only going to be an addition to certain paragraphs.  If you want to add like paragraph 22 -- 201 and a half, you can put it in, but you're going to be halfs.  So point A or point B, so I could see just what's added and look at it that way.

You can do it by letter brief or you can do it just by an amended complaint that only adds an underlined, the new proposed pleadings.  I'm not going to accept -- I'm going to dismiss it if it comes back to me rewritten and reorganized at this point.  It is what it is.  I've made my rulings and they will be the rulings that will govern the case.

I'll give Plaintiff's counsel time to digest that. Advise counsel if you would like to go forward in that way, and then you can send me a letter in the next 45 days and tell me

how you plan on proceeding, and then we can either have another briefing schedule or just move forward with the case.  Okay?

Thank you.

Have a nice weekend, everyone.

We're adjourned.

MR. HARROD:  Thank you, your Honor.

THE COURT:  We're adjourned.

(Time noted: 4:54 p.m.)

-------------------------------------------------

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/S/Diane DiTizii, CCR, CRR, RMR, RDR          09/08/2025

Federal Official Court Reporter                    Date

United States District Court
Newark, New Jersey