# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re Kornit Digital Ltd. Securities Litigation | No. 2:23-cv-00888-MCA-AME<br>*Document Filed Electronically*<br><br><u>CLASS ACTION</u><br><br>**ORAL ARGUMENT REQUESTED**<br><br>**RETURN DATE:**<br>January 5, 2026 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

OF COUNSEL:

Edmund Polubinski III (*pro hac vice*)
Dana Seshens (*pro hac vice*)
Daniel J. Schwartz (*pro hac vice*)
Marie Killmond (*pro hac vice*)
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
edmund.polubinski@davispolk.com
dana.seshens@davispolk.com
daniel.schwartz@davispolk.com
marie.killmond@davispolk.com

Samuel I. Portnoy
Michael V. Caracappa
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
sportnoy@gibbonslaw.com
mcaracappa@gibbonslaw.com

*Counsel for Kornit Digital Ltd., Ronen Samuel, and Alon Rozner*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................1

BACKGROUND ..................................................................................................4

    A.    Kornit's Business, Service Capabilities, and Disclosures ...................4

    B.    The February 2021 Service Contract Statement ..................................5

    C.    The May and July 2022 Alleged "Corrective Disclosures" .................7

    D.    This Litigation and the Court's Decision on Defendants'
        Motion to Dismiss the ACC .................................................................8

LEGAL STANDARD ...........................................................................................10

ARGUMENT .....................................................................................................12

I.     Plaintiffs Fail To Plead Loss Causation Because Their Purported
      Corrective Disclosures Did Not Correct the Service Contract
      Statement .....................................................................................................14

II.    Plaintiffs Fail To Plead Loss Causation Based on the Materialization
      of an Unknown Risk Purportedly Concealed by the Service Contract
      Statement .....................................................................................................18

CONCLUSION ...................................................................................................21

## TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Abady v. Lipocine Inc.*,
2023 WL 2938210 (D. Utah Apr. 13, 2023) ..................................................... 19

*In re AOL Time Warner, Inc. Sec. Litig.*,
503 F. Supp. 2d 666 (S.D.N.Y. 2007) .............................................................. 19

*Bartesch v. Cook*,
941 F. Supp. 2d 501 (D. Del. 2013) ........................................................... 13, 18

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
455 F.3d 195 (3d Cir. 2006) ............................................................................ 13

*City of Cambridge Ret. Sys. v. Alitsource Asset Mgmt. Corp.*,
908 F.3d 872 (3d Cir. 2018) ............................................................................ 13

*City of Omaha Police v. Cognyte Software Ltd.*,
2024 WL 4349289 (S.D.N.Y. Sept. 30, 2024) ................................................. 20

*In re Curaleaf Holdings, Inc. Sec. Litig.*,
519 F. Supp. 3d 99 (E.D.N.Y. 2021) ............................................................... 20

*In re Dell Inc., Securities Litig.*,
591 F. Supp. 2d 877 (W.D. Tex. 2008) ............................................................ 19

*Garza v. Citigroup Inc.*,
724 F. App'x 95 (3d Cir. 2018) ....................................................................... 10

*In re Hertz Global Holdings, Inc.*,
905 F.3d 106 (3d Cir. 2018) ............................................................................ 12

*Holland v. Standley*,
2025 WL 2434230 (E.D. Pa. Aug. 21, 2025) .............................................. 16, 17

*In re Intelligroup Sec. Litig.*,
468 F. Supp. 2d 670 (D.N.J. 2006) .................................................................. 19

*In re Intelligroup Sec. Litig.*,
    527 F. Supp. 2d 262 (D.N.J. 2007) ....................................................... 12, 13, 17

*Katyle v. Penn Nat'l Gaming, Inc.*,
    637 F.3d 462 (4th Cir. 2011) ................................................................... 13

*LD Gelato LLC v. Hartford Underwriters Ins. Co.*,
    676 F. Supp. 3d 317 (D.N.J. 2023) .......................................................... 11

*Leyse v. Bank of Am. Nat'l Ass'n*,
    804 F.3d 316 (3d Cir. 2015) ..................................................................... 11

*Liburd v. Gov't of the Virgin Islands*,
    2013 WL 960780 (D.V.I. Mar. 13, 2013) ................................................. 10

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ................................................................... 13

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008) ...................................................... 20

*Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.*,
    720 F. Supp. 2d 517 (D.N.J. 2010) ..................................................... 13, 17, 18

*Or. Pub. Emps. Ret. Fund v. Apollo Grp.*,
    774 F.3d 598 (9th Cir. 2014) ................................................................... 13

*Payne v. DeLuca*,
    433 F. Supp. 2d 547 (W.D. Pa. 2006) ...................................................... 17

*PDX N., Inc. v. Comm'r New Jersey Dep't of Lab. & Workforce Dev.*,
    978 F.3d 871 (3d Cir. 2020) ..................................................................... 11

*Prime Mover Capital Partners L.P. v. Elixer Gamings Techs., Inc.*,
    898 F. Supp. 2d 673 (S.D.N.Y. 2012) ...................................................... 20

*In re Sanofi Sec. Litig.*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016) ...................................................... 19

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*,
    499 F. Supp. 3d 49 (D. Del. 2020) ........................................................... 18

*In re Tellium, Inc. Sec. Litig.*,
    2005 WL 2090254 (D.N.J. Aug. 26, 2005) .................................................. 17, 18

*Thomas v. Duvall*,
    2021 WL 1225938 (M.D. Pa. Apr. 1, 2021) ...................................................... 10

*Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*,
    475 F.3d 824 (7th Cir. 2007) ............................................................................. 13

*Wolfington v. Reconstructive Orthopaedic Associates II PC*,
    935 F.3d 187 (3d Cir. 2019) ............................................................................... 11

*Wu v. GSX Techedu Inc.*,
    2023 WL 2207422 (D.N.J. Feb. 24, 2023) .................................................. 16, 17

### STATUTES & RULES

15 U.S.C. § 78u-4 ..................................................................................................... 12

Fed. R. Civ. P. 8 ....................................................................................................... 13

Fed. R. Civ. P. 9 ....................................................................................................... 13

Fed. R. Civ. P. 12 ............................................................................................... 10, 11

\*\*\*

**Note on Citation Format**:  Unless otherwise noted, emphasis has been added to quotations, and internal quotations, brackets, ellipses, citations, and footnotes have been omitted.  References to Ex.__ correspond to the exhibits attached to the Declaration of Edmund Polubinski, filed contemporaneously herewith.

## **PRELIMINARY STATEMENT**

Defendants Kornit Digital Ltd., Ronen Samuel, and Alon Rozner make this targeted motion for judgment on the pleadings as to a narrow, but significant, remaining portion of this federal securities action.  Specifically, Defendants seek dismissal of Plaintiffs' claim as to the first of the five remaining alleged misstatements.  It is clear from the pleadings that Plaintiffs have failed to plead the required element of loss causation—a discrete and straightforward legal ground not previously before the Court—as to that statement.  Granting this motion would substantially advance the resolution of this case.  It would shorten the putative class period by a full year and thus substantially reduce claimed damages.  It would also narrow the scope of discovery and streamline the case for further proceedings.

On September 4, 2025, the Court granted Defendants' motion to dismiss the Amended Consolidated Complaint ("ACC") in substantial part.  The Court dismissed much of the ACC but permitted Plaintiffs' claims under Section 10(b) of the Securities Exchange Act of 1934 to proceed as to five discrete allegedly misleading statements.  The earliest of these statements—Mr. Samuel's February 2021 statement regarding the length of Kornit's service contracts (the "Service Contract Statement")—predates the others by twelve months and concerns a wholly different topic.

Although the Court held that Plaintiffs had sufficiently pled two elements

(falsity and scienter) as to the Service Contract Statement, judgment on the pleadings is appropriate because it is apparent that Plaintiffs have failed to plead a *different* element (loss causation) with respect to that statement.

To plead a securities fraud claim under Section 10(b), it is not sufficient for a plaintiff to plead that a statement was misleading and made with scienter. In addition, a complaint must also plead that the actionable statement *caused* a cognizable economic loss: *i.e.*, that the declines in stock price for which the plaintiff seeks to recover were caused by the disclosure of defendants' alleged fraud. The ACC fails to do so here. Plaintiffs aver that the ACC's two alleged corrective disclosures in May and July 2022 revealed some "truth" about Defendants' prior alleged misstatements and caused the stock price drops for which Plaintiffs seek to recover. But the supposed corrective disclosures were simple earnings releases and forecasts. They said nothing at all about service contracts, much less service contract length, and they certainly did not reveal any inaccuracy in the Service Contract Statement. Because there is no connection between the alleged corrective disclosures and the Service Contract Statement, the ACC does not and cannot plead loss causation as to this statement.

Nor can Plaintiffs plead loss causation by claiming that the corrective disclosures revealed some hidden risk. Setting aside that the Third Circuit has not even recognized the so-called materialization-of-unknown-risk theory as a viable

means to plead loss causation, the ACC does not and cannot plead the basic requirements of the theory. Even in courts that accept the theory, a plaintiff must plead that the alleged misstatement concealed some undisclosed risk that caused an economic loss when it later came to pass. The ACC, however, does not identify *any* risk—undisclosed or otherwise—that the Service Contract Statement concealed, much less allege how such a risk materialized to cause Plaintiffs' losses in May and July of 2022. Nor could it. As the Court found, Kornit *did* provide meaningful disclosures about the service-related risks it faced.

Dismissal of these claims on this Rule 12(c) motion is appropriate. A motion for judgment on the pleadings is available only after the pleadings are closed, and the Third Circuit permits Rule 12(c) motions on grounds that were available, but not raised, in a prior Rule 12(b)(6) motion. Dismissal of the Service Contract Statement now would substantially narrow and focus the remaining case both temporally and topically. It would dramatically reduce the scope—and the corresponding cost and burden—of discovery. And it would also drastically reduce the length of the Class Period, impacting and narrowing the class certification motion.

# BACKGROUND[1]

## A.    Kornit's Business, Service Capabilities, and Disclosures

Defendant Kornit Digital Ltd. ("Kornit") is an Israel-based company that develops, designs, and markets digital printing solutions for the global printed textile industry.  ACC ¶ 25; Ex. 1 (2020 20-F) at 36.  Ordinary shares of its stock trade on the Nasdaq Global Select Market.  ACC ¶ 25.  Defendant Ronen Samuel is Kornit's CEO, and Defendant Alon Rozner was Kornit's CFO during the alleged Class Period (February 17, 2021 to July 5, 2022).  *Id*. ¶¶ 4, 26–27.

Kornit's products include digital printing systems that enable companies to print designs on garments or rolls of fabric; the inks and other consumables used with its systems; and software that, among other things, monitors system productivity.  *Id*. ¶¶ 32–33.

Kornit also sells maintenance and support service contracts, *id*. ¶¶ 6, 33; Ex. 2 (2021 20-F) at 54; Ex. 1 (2020 20-F) at 46, and during the alleged Class Period, was in the process of "seeking to increase the number of customers that rel[ied] on [the Company] to provide services for their systems by expanding [its] service capabilities."  Ex. 3 (2019 20-F) at 43; *see also* Ex. 1 (2020 20-F) at 46; Ex. 2

---

[1] Plaintiffs' allegations and this case's procedural history are extensively addressed in Defendants' motions to dismiss the Consolidated Complaint (Dkt. 34) and the ACC (Dkt. 64), as well as in the Court's hearings on those motions.  Accordingly, this section briefly summarizes only the allegations and procedural history most relevant to the instant motion.

(2021 20-F) at 54; Ex. 4 (2022 20-F) at 52.  Consistent with these goals, Kornit's

service revenue increased throughout the Class Period.  *See* Ex. 3 (2019 20-F) at

49–50; Ex. 1 (2020 20-F) at 52–53; Ex. 2 (2021 20-F) at 62–63; Ex. 4 (2022 20-F)

at 65–66.

As the Court observed at oral argument on Defendants' motion to dismiss

the ACC, Kornit also provided "meaningful disclosures" throughout the Class

Period regarding the challenges its service business faced.  *See* Dkt. 76 ("Hr'g

Tr.") at 16:14–15; *see also id.* at 87:10–13, 18–20 (similar).  Specifically, Kornit

disclosed that its products had in the past and would in the future contain errors

and defects, and that financial and reputational costs incurred in remedying those

defects could harm Kornit's business.  Ex. 1 (2020 20-F) at 15; Ex. 3 (2019 20-F)

at 15; *see also* Ex. 2 (2021 20-F) at 13 (similar).  Kornit further disclosed that its

customers could purchase a year of support coverage, which they "c[ould] renew"

(or not) for additional periods, or could choose to "rely on [Kornit's] support on a

time-and-materials basis."  Ex. 1 (2020 20-F) at 46; Ex. 2 (2021 20-F) at 54; Ex. 3

(2019 20-F) at 43.

### B.    The February 2021 Service Contract Statement

During Kornit's Q4 2020 earnings call on February 16, 2021, Mr. Samuel

had the following exchange with an analyst from Stifel, Nicolaus & Company:

> **Analyst:** Congrats on the nice quarter and into the year.
> Ronen, first off, you posted some very strong services

numbers, and in your prepared remarks, you talked about the increasing attach rates. Can you give a little bit [of] color if some of those attach rates are now for multiyear type of service agreements? Or are they still kind of singular year contracts, which you have to get "renewals" with these customers?

**Ronen Samuel:** So we're already – about 1.5 years ago, we moved to a full contract. Every machine that we are selling, we are selling it with a contract. There's no other way to buy from us a machine, and it's not for 1 year, it's for multiple year contracts. And we see a very nice recurring revenue coming from the service business.

Ex. 5 (2/16/2021 Q4 2020 Call Tr.) at 7. There is no dispute that Kornit had indeed seen increasing revenue from the service business in the preceding year. *See* Ex. 3 (2019 20-F) at 49–50 ($23.3 million in service revenue); Ex. 1 (2020 20-F) at 52–53 ($28.4 million in service revenue). Plaintiffs themselves allege that "Kornit systems automatically came with a [] service agreement." ACC ¶ 95.

Plaintiffs claim, however, that Mr. Samuel's response—*i.e.*, the Service Contract Statement—is actionable because it misleadingly implied that "Kornit customers were [] obligated to purchase a *two-year* service contract with each printer," when in fact "Kornit systems automatically came with a *one-year* service agreement," *id*., and Kornit customers signed two-year contracts "only occasionally." *Id*. ¶ 94.

### C.    The May and July 2022 Alleged "Corrective Disclosures"

Plaintiffs claim that the supposed "truth" about all of the allegedly actionable statements in the ACC was first partially revealed on May 11, 2022, when Kornit reported $83.3 million in revenue, below previously provided guidance, and disclosed other financial results and guidance that Plaintiffs characterize as "disappointing."  ACC ¶¶ 183–85.  On the earnings call the same day, Kornit provided more information about the challenges its business was facing, including "overall macro pressures," the "post-pandemic dynamic," a "slowdown" in the "e-com segment," and "some of [its customers'] purchases and expansion plans . . . shifting out into later quarters."  Ex. 6 (5/11/2022 Q1 2022 Call Tr.) at 5, 6, 9.  Kornit's stock price declined by roughly 33% following these disclosures (the "May 2022 Disclosures").  ACC ¶ 187.

Plaintiffs claim that the truth was then fully revealed a few weeks later, on July 5, 2022, when Kornit "disclosed that it expected revenue for the second quarter to be in the range of $56.4 million to $59.4 million," as compared to the "$85-95 million guidance" the Company previously had provided.  ACC ¶ 194.  "Kornit attributed these poor results to 'a significantly slower pace of direct-to-garment (DTG) systems orders in the second quarter as compared to our prior expectations.'"  *Id*.  Kornit's stock price declined by roughly 26% following these disclosures (the "July 2022 Disclosures").  ACC ¶ 198.

7

The ACC does not allege that the May and July 2022 Disclosures corrected the February 2021 Service Contract Statement.  Indeed, the May and July 2022 Disclosures did not discuss the length of Kornit's service contracts at all.  Nor do Plaintiffs claim that Kornit itself or any external analyst attributed Kornit's results in Q1 and Q2 2022 to issues relating to the length of its service contracts.  ACC ¶¶ 184, 191, 195–96.[2]  Notably, the July 5, 2022 disclosure attributed the reduced revenue guidance to "a significantly slower pace of direct-to-garment (DTG) systems orders in the second quarter as compared to our prior expectations."  Ex. 10 (7/5/22 6-K) at 5.  And the May 2022 results for Q1 2022—far from attributing the missed revenue guidance to the length of Kornit's service contracts—reported an *increase* in service revenue compared to Q1 2021; Defendants remarked on that increase in the May 11, 2022 earnings call.  *See* Ex. 11 (5/11/22 6-K) at 10; Ex. 6 (5/11/22 Earnings Tr.) at 6.

### D.    This Litigation and the Court's Decision on Defendants' Motion to Dismiss the ACC

Plaintiffs filed the operative ACC on November 8, 2024 (Dkt. 61), alleging dozens of misstatements on a variety of topics, including positive statements about

---

[2] Instead, the reports cited in the ACC attributed the results to, *inter alia*, temporary pressure in ecommerce, *see* Ex. 7 (5/11/22 Barclays report); lower volume, material and logistical costs, and the macroeconomic environment, *see* Ex. 8 (5/11/22 Blair report); and lower e-commerce demand, *see* Ex. 9 (7/6/22 Craig-Hallum report).

Kornit's service business and the Service Contract Statement.  Defendants moved to dismiss the ACC in its entirety on the grounds that Plaintiffs had failed to plead falsity or scienter (Dkt. 64 (the "Motion to Dismiss")); the Court granted the Motion to Dismiss in part, dismissing all claims asserted under the Securities Act and the majority of the alleged Exchange Act claims.  *See generally* Hr'g Tr.  As noted, following the Court's ruling, only five alleged misstatements remain.

As relevant here, the Court dismissed most service-related statements on falsity and/or scienter grounds, including positive statements about "strong growth" in Kornit's service business and about "Kornit's ability to serve its customers or provide service."  Hr'g Tr. at 15:20–16:1.  Although Plaintiffs claimed these statements were misleading because Kornit allegedly "was not providing good customer service," *id*. at 16:2–5, the Court found these allegations failed to render the statements false or misleading because the service department in fact "was increasing in profitability" during the Class Period and because Kornit provided "meaningful disclosures in the SEC filings" about the risks affecting its service business.  *Id*. at 16:11–16; *see also id.* at 87:10–13.

The Court, however, declined to dismiss Plaintiffs' claim as to the Service Contract Statement, holding that Plaintiffs had adequately pled that it could be understood as a representation that Kornit was "getting multiple year contracts and [] see[ing] a very nice income stream from it," when, Plaintiffs alleged, most

9

contracts were for only one year and many were not renewed.  *Id*. at 12:20–23.

Because loss causation did not provide a complete basis to dismiss the case as a

whole and because a partial dismissal of the ACC as initially pled would not have

led to meaningful efficiencies, Defendants did not raise Plaintiffs' failure to allege

loss causation as to the Service Contract Statement in their Motion to Dismiss.  In

light of the Court's decision on the Motion to Dismiss, however, dismissal of the

Service Contract Statement now for failure to plead loss causation would have a

material impact on the size and scope of this case moving forward.

## **LEGAL STANDARD**

"A party may move for judgment on the pleadings after the pleadings are

closed so long as the timing of the motion does not delay trial."  *Garza v.

Citigroup Inc.*, 724 F. App'x 95, 98 (3d Cir. 2018) (citing Fed R. Civ. P. 12(c)).

Here, because Defendants have answered Plaintiffs' Complaint (Dkt. 83) and trial

has not yet been scheduled, Defendants' Motion is timely.  *See, e.g.*, *Thomas v.

Duvall*, 2021 WL 1225938, at *2 (M.D. Pa. Apr. 1, 2021) (noting that courts have

"uniformly held" that 12(c) motions filed even "after the close of discovery" in

matters "not yet [] scheduled for trial" are timely).[3]

---

[3] *See also, e.g.*, *Liburd v. Gov't of the Virgin Islands,* 2013 WL 960780, at *4
(D.V.I. Mar. 13, 2013) (holding that motion for judgment on the pleadings "filed
approximately three months before the then-scheduled trial" was timely).

Where, as here, "a Rule 12(c) motion is based on failure to state a claim, it is analyzed under the same standards that apply to a Rule 12(b)(6) motion." *LD Gelato LLC v. Hartford Underwriters Ins. Co.*, 676 F. Supp. 3d 317, 321 (D.N.J. 2023). Under this standard, a plaintiff's "allegations must be enough to raise a right to relief above the speculative level and support a plausible claim for relief." *Id.* "[I]n deciding a motion for judgment on the pleadings, a court may only consider the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019).

While Defendants' prior motions to dismiss did not raise Plaintiffs' failure to plead loss causation with respect to the Service Contract Statement as a basis for dismissal—instead focusing on other deficiencies that provided grounds for dismissal of the entire ACC—"Rule 12 permits filing a Rule 12(c) motion on grounds that were available, but not previously raised, in a Rule 12(b)(6) motion." *See PDX N., Inc. v. Comm'r New Jersey Dep't of Lab. & Workforce Dev.*, 978 F.3d 871, 881 n.8 (3d Cir. 2020) (citing *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 322, 322 n.5 (3d Cir. 2015)); *see also* Fed R. Civ. P. 12(h)(1)–(2) (providing that the

defense of "[f]ailure to state a claim upon which relief can be granted . . . by a motion under Rule 12(c)" is not waived if not included in an earlier Rule 12 motion).[4]

## **ARGUMENT**

"To adequately allege a § 10(b) securities fraud claim, a plaintiff must plead (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *In re Hertz Glob. Holdings, Inc.*, 905 F.3d 106, 114 (3d Cir. 2018).  As discussed, this Motion challenges the adequacy of Plaintiff's pleading only as to loss causation and only as to the February 2021 Service Contract Statement.

Loss causation "refers to [the] plaintiff's burden to plead a causal link between the disclosure of alleged fraud and the economic harm ultimately suffered by the plaintiff." *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 295 (D.N.J. 2007); *see also* 15 U.S.C. § 78u-4(b)(4) (providing that in any action under the PSLRA, the "plaintiff shall have the burden of proving that the act or omission of

---

[4] While Defendants reserve all rights with respect to the Court's holding that Plaintiffs sufficiently alleged that the Service Contract Statement was false or misleading and was made with scienter, the instant Motion does not ask the Court to revisit that decision.  Plaintiffs' failure to plead loss causation as to the Service Contract Statement provides a wholly independent basis to dismiss, even assuming that Plaintiffs have sufficiently alleged that the statement was false or misleading and made with scienter.

the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages"). "In other words, the plaintiff is required to plead that the decline in the stock price was caused by the market's discovery of defendant's fraud." [5] *Intelligroup*, 527 F. Supp. 2d at 295; *see also City of Cambridge Ret. Sys. v. Alitsource Asset Mgmt. Corp.*, 908 F.3d 872, 883 (3d Cir. 2018) ("Plaintiffs must . . . adequately allege that, when the truth was revealed about th[e alleged] fraudulent statements, Plaintiffs suffered an economic harm as a result."); *cf. Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006) (similar).

In the Third Circuit, the loss causation element "requires that there have been corrective disclosures that exposed the alleged fraud." *Bartesch v. Cook*, 941 F. Supp. 2d 501, 512 (D. Del. 2013). Accordingly, "the absence of any allegation of a corrective disclosure warrants dismissal." *Id.*; *see also Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.*, 720 F. Supp. 2d 517, 563 (D.N.J. 2010) (finding failure to plead loss causation where there were "no allegations anywhere

---

[5] Although neither the Supreme Court nor the Third Circuit has addressed whether Rule 9(b)'s heightened pleading standard applies to loss causation, a majority of circuits that have addressed this issue have held that it does. *See, e.g., Or. Pub. Emps. Ret. Fund v. Apollo Grp.*, 774 F.3d 598, 605 (9th Cir. 2014); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011); *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007); *but see Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009). But the Court need not reach this question to grant the instant Motion; Plaintiff's allegations here fail even under Rule 8.

in the Amended Complaint that the market learned" of the alleged fraudulent practices).

Here, Plaintiffs do not (and cannot) plead that the May and July 2022 Disclosures "exposed" the so-called truth that Mr. Samuel's February 2021 statement allegedly misrepresented—namely, the true length and attach rates of Kornit's service contracts. As a result, Plaintiffs fail to plead loss causation with respect to that Statement. Although Plaintiffs also attempt to allege that unspecified "concealed risks materialized" in May and July 2022 and caused their losses, ACC ¶ 285, this too fails, including because the ACC does not and cannot identify any risk that was concealed by the Service Contract Statement.

## I.    Plaintiffs Fail To Plead Loss Causation Because Their Purported Corrective Disclosures Did Not Correct the Service Contract Statement

The ACC does not adequately plead that the Service Contract Statement caused the losses for which they seek to recover. Plaintiffs' Complaint identifies two alleged corrective disclosures, the May and July 2022 Disclosures. ACC ¶ 285. Plaintiffs claim generically that these statements "partially and fully disclosed" *all* Defendants' "prior misrepresentations and fraudulent conduct" and that the May and July 2022 stock drops therefore should be attributed to the market's reaction to the revelation of the supposed "truth" about Kornit's business. ACC ¶ 285.

But neither of the May and July 2022 Disclosures corrected anything about

the Service Contract Statement.  Indeed, they said nothing at all about service

contracts, and there is no plausible inference that they revealed anything about Mr.

Samuel's supposed "prior misrepresentation" on that topic.  Instead, they simply

addressed missed revenue guidance and other financial results that Plaintiffs

characterize as "disappointing."  ACC ¶¶ 183–85, 194.  Indeed, Kornit's May 2022

Press Release regarding its Q1 2022 results did not address the length of service

contracts, instead attributing Kornit's allegedly disappointing results to "overall . . .

macro[-economic] headwinds" and "near-term volatility."  Ex. 10 (7/5/22 Press

Release) at 5.  Notably, rather than suggesting that Kornit's allegedly

"disappointing" results that quarter were attributable to any component of Kornit's

services business, Kornit's Q1 2022 results reported an *increase* in service revenue

compared to Q1 2021.  *See* Ex. 11 (5/11/22 6-K) at 10.  Defendants remarked on

that increase on the earnings call that same day.  Ex. 6 (5/11/22 Earnings Tr.) at 6.

And the July 2022 Disclosures did not touch on Kornit's service business at all and

instead attributed Kornit's reduced revenue guidance to "a significantly slower

pace of direct-to-garment (DTG) systems orders in the second quarter as compared

to our prior expectations."  Ex. 10 (7/5/22 6-K) at 5.

Because these disclosures do not relate to the length of service contracts,

much less correct the Service Contract Statement, they cannot constitute corrective

disclosures.  For a disclosure to be considered corrective of an alleged

misstatement, it must reveal the fraud that the alleged misstatement concealed or misrepresented.  If a plaintiff's proffered corrective disclosure does not do this, it is not a corrective disclosure.  For example, in *Wu v. GSX Techedu Inc.*, 2023 WL 2207422 (D.N.J. Feb. 24, 2023), the plaintiffs brought securities claims based, in pertinent part, on allegations that the defendant education company had "fabricated most of its enrollment figures and, thus, committed fraud by inflating its revenue and misstating other financial information." *Id.* at *1.  In support of the loss causation element, the plaintiffs pointed to several disclosures that they claimed were partially corrective because they contained "negative financial information" about the defendant. *Id.* at *15.  The Court held that these allegations were insufficient to allege loss causation, observing that "disclosures that reveal only negative financial information about a company, without connecting those negative financials to the alleged fraud, cannot serve as corrective disclosures." *Id.*

Similarly, in *Holland v. Standley,* 2025 WL 2434230 (E.D. Pa. Aug. 21, 2025), the plaintiffs alleged that the defendant pharmacy company had engaged in "inappropriate dispensing of opioids," *id.* at *1, a practice which it allegedly concealed by failing to adequately disclose its risk of legal liability and touting its compliance with regulations and internal procedures relating to controlled substances. *Id.* at *7.  In support of the loss causation element, the *Holland* plaintiffs argued that a newspaper article stating that the defendant was considering

16

bankruptcy constituted a corrective disclosure. The court in *Holland* also rejected these allegations as insufficient to plead loss causation, holding that the "fact that [the defendant] was considering bankruptcy . . . reveal[ed] nothing about the falsity" of the alleged prior misstatements regarding opioids. *Id.* at *19.[6]

In sum, "loss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud." *In re Tellium, Inc. Sec. Litig.*, 2005 WL 2090254, at *4 (D.N.J. Aug. 26, 2005). That is the case here with respect to the alleged May and July 2022 Disclosures. They do not even relate to, much less correct, the Service Contract Statement. For that reason, the ACC fails to plead loss causation, *see, e.g.*, *Wu*, 2023 WL 2207422, at *15; *Holland,* 2025 WL 2434230, at *19, and all claims arising from the Service Contract Statement should be dismissed, *see, e.g. PharmaNet,* 720 F. Supp. 2d at

---

[6] *See also PharmaNet*, 720 F. Supp. 2d at 563 (loss causation not pled where "noticeably absent is any assertion that any wrongdoing was disclosed to the market," and "none of the announcements made by Defendants mention any alleged fraudulent practices"); *Intelligroup*, 527 F. Supp. 2d at 333 (rejecting alleged corrective disclosure that "did not disclose to the market any true information about the particular errors in [the defendant's] statements"); *Payne v. DeLuca*, 433 F. Supp. 2d 547, 609 (W.D. Pa. 2006) ("[T]he proximate cause of that plunge [in stock price] cannot be the fact that investors learned the truth about the scheme that led to this situation because there is nothing in this report which disclosed any part of Defendants' allegedly fraudulent activities.").

563; *Tellium*, 2005 WL 2090254, at *5.[7]

## II. Plaintiffs Fail To Plead Loss Causation Based on the Materialization of an Unknown Risk Purportedly Concealed by the Service Contract Statement

To the extent Plaintiffs seek to pled loss causation under a so-called

materialization-of-the-risk theory, *see* ACC ¶ 285, that argument also fails.

As a threshold matter, the Third Circuit has not accepted the materialization-

of-the-risk theory as a viable way of pleading loss causation when plaintiffs—as

here—cannot plead that a corrective disclosure actually corrected a prior

misleading statement.  *Bartesch*, 941 F. Supp. 2d at 512; *PharmaNet*, 720 F. Supp.

2d at 563 n.35 (similar).  But, even setting that aside, the ACC fails to satisfy the

most basic elements of that theory as set forth by the courts that have accepted it.

---

[7] Even if the May and July 2022 Disclosures had expressly informed investors that Kornit's service contracts were generally for one year—i.e., even if they had expressly corrected the Service Contract Statement—Plaintiffs still could not plead loss causation, because Kornit had disclosed that information more than a year earlier.  *SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 70 (D. Del. 2020) (concluding that, because the "[d]efendants' disclosures did not reveal any new facts regarding the alleged omissions [at issue], [they] could not have caused [p]laintiff's losses associated with the decline in stock price."). Specifically, Kornit's 2021 Form 20-F, issued in March 2021, stated that Kornit provided "a six-month warranty" on its printing systems, while also allowing customers to "purchase an additional year of support coverage at the time of purchase," after which they "c[ould] renew their support contract by purchasing a" multi-year "support package" that, among other things, included "on-site yearly maintenance." Ex. 2 (2021 20-F) at 54.  In light of this clarification regarding the length of Kornit's service contracts, the May and July 2022 Disclosures not only did not but *could not* have corrected anything.

Under the "materialization of the risk theory, a misstatement or omission is the proximate cause of an investment loss" only "if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations." *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 410 (S.D.N.Y. 2016). "[I]f the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements and the harm actually suffered, a fraud claim will not lie." *In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670, 705 (D.N.J. 2006).

Here, Plaintiffs' pleading is wholly conclusory. The ACC does not identify what risk (if any) the Service Contract Statement concealed. *See* ACC ¶ 285 (alleging that "concealed risks materialized" without identifying such risks). This alone is fatal to any materialization-of-the-risk pleading. *See In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 678 (S.D.N.Y. 2007) (collecting cases and observing that, "[w]ithout providing some indication of the nature of the risk alleged, bare allegations that an undisclosed risk materialized to cause a plaintiff's loss are insufficient"); *In re Dell Inc., Securities Litig.*, 591 F. Supp. 2d 877, 911 (W.D. Tex. 2008) ("[A]llegations of materialization of the risk must identify some event or condition . . . which was concealed by the defendant's actions."); *Abady v. Lipocine Inc.*, 2023 WL 2938210, at *27 (D. Utah Apr. 13, 2023) (holding that, to plead materialization of risk, "plaintiff must, necessarily, identify the risk that was allegedly concealed and then later materialized").

19

Moreover, Plaintiffs *could not* identify any *undisclosed* risk concerning Kornit's service business that supposedly was concealed by the Service Contract Statement.  As the Court already noted, Kornit provided "meaningful disclosures in its SEC filings" regarding risks associated with its service business.  Hr'g Tr. at 16:14–15.  Kornit also made clear (in disclosures that Plaintiffs have never disputed) that its customers could choose to renew their service contracts *or* could choose not to do so if they preferred to "rely on [Kornit's] support on a time-and-materials basis."  Ex. 1 (2020 20-F) at 46; Ex. 2 (2021 20-F) at 54; Ex. 3 (2019 20-F) at 43.  Kornit thus disclosed the risks applicable to its services business, including the specific risk that customers could choose not to renew service contracts.  A plaintiff cannot plead loss causation by alleging the materialization of an "amply disclosed" risk.  *In re Curaleaf Holdings, Inc. Sec. Litig.*, 519 F. Supp. 3d 99, 110 (E.D.N.Y. 2021); *see also, e.g. City of Omaha Police v. Cognyte Software Ltd.*, 2024 WL 4349289, at *9 (S.D.N.Y. Sept. 30, 2024); *Prime Mover Capital Partners L.P. v. Elixer Gamings Techs., Inc.*, 898 F. Supp. 2d 673, 685 (S.D.N.Y. 2012); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 365 (S.D.N.Y. 2008).

Finally, even if the Third Circuit accepted the materialization-of-the-risk theory (which it has not), and even if the allegations in the ACC had specified some risk related to the Service Contract Statement (which they have not), and

even if Plaintiffs could allege that such a risk was insufficiently disclosed (which they could not, in light of Kornit's disclosures), the theory would still fail to plead loss causation. That is because there is no plausible basis on which to allege that the allegedly disappointing results announced in the May and July 2022 Disclosures had anything to do with service contracts or, indeed, any aspect of the service portion of Kornit's business. In fact, as the Court found, Plaintiffs fail to allege that *any* service-related issues materialized *ever* to cause any "actual impact" on Kornit's business during the Class Period, during which service revenue *increased*. *See* Hr'g Tr. at 20:13–21; *id.* at 16:11–16.

## CONCLUSION

For the reasons set forth herein, Defendants respectfully request that the Court dismiss all claims relating to the Service Contract Statement.

Dated:  December 4, 2025

Respectfully submitted,

**GIBBONS P.C.**

_s/ Samuel I. Portnoy_
Samuel I. Portnoy
Michael V. Caracappa
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
sportnoy@gibbonslaw.com
mcaracappa@gibbonslaw.com

**DAVIS POLK & WARDWELL LLP**

Edmund Polubinski III (_pro hac vice_)
Dana Seshens (_pro hac vice_)
Daniel J. Schwartz (_pro hac vice_)
Marie Killmond (_pro hac vice_)
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
edmund.polubinski@davispolk.com
dana.seshens@davispolk.com
daniel.schwartz@davispolk.com
marie.killmond@davispolk.com

_Counsel for Kornit Digital Ltd., Ronen_
_Samuel, and Alon Rozner_