**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re Kornit Digital Ltd. Securities Litigation | Civil Action No. 2:23-cv-00888-MCA-AME<br>*Document Filed Electronically*<br><br>CLASS ACTION<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**RETURN DATE:**<br>January 5, 2026 |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' PARTIAL MOTION FOR
JUDGMENT ON THE PLEADINGS**

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................1

II.   STATEMENT OF FACTS AND PROCEDURAL HISTORY ......................4

     A.    Defendant Samuel Misrepresents The Length, Mandatory Nature, And Quality Of Recurring Revenues From Service Contracts........................................................................................4

     B.    Defendants' Service Contract Misstatements Caused Investor Losses ........................................................................................6

     C.    The Litigation And The Court's Partial Denial Of Defendants' Motion To Dismiss.............................................................9

III.  ARGUMENT......................................................................................10

     A.    The Complaint Adequately Alleges Loss Causation For The Service Contract Misstatements........................................11

     B.    Defendants' Loss Causation Arguments Should Be Rejected............16

         1.    The Disclosure Need Not Perfectly Mirror Defendants' Service Contract Misrepresentations ......................................16

         2.    Defendants' Boilerplate Risk Warnings Do Not Defeat Causation................................................................19

IV.   CONCLUSION..................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................10, 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................................10

*In re Bradley Pharms., Inc. Sec. Litig.*,
421 F. Supp. 2d 822 (D.N.J. 2006).....................................................................13

*Chabot v. Walgreens Boots All., Inc.*,
2023 WL 2908827 (M.D. Pa. Mar. 31, 2023) .....................................................15

*Curran v. Freshpet, Inc.*,
2018 WL 394878 (D.N.J. Jan. 12, 2018)..............................................................12

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) .............................................................................15

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)...........................................................................2, 11, 12, 13

*In re DVI, Inc. Sec. Litig.*,
2010 WL 3522090 (E.D. Pa. Sept. 3, 2010).......................................................13

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
343 F.3d 189 (2d Cir. 2003) ................................................................................15

*EP Medsys., Inc. v. EchoCath, Inc.*,
235 F.3d 865 (3d Cir. 2000) ...........................................................11, 12, 13, 18

*In re EQT Corp. Sec. Litig.*,
504 F. Supp. 3d 474 (W.D. Pa. 2020)..................................................................15

*In re Gilead Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) .............................................................................15

*Hall v. Johnson & Johnson*,
2019 WL 7207491 (D.N.J. Dec. 27, 2019)....................................................11, 12

ii

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
2015 WL 4469143 (D.N.J. July 22, 2015) ................................................2, 15, 16

*Howard v. Arconic Inc.*,
2021 WL 2561895 (W.D. Pa. June 23, 2021) ....................................................12

*Huddleston v. Herman & MacLean*,
640 F.2d 534 (5th Cir. 1981), *aff'd in part and rev'd in part on other
grounds,* 459 U.S. 325 (1983) ..............................................................13

*In re Insulin Pricing Litig.*,
2025 WL 2573410 (D.N.J. Sept. 5, 2025)..........................................................18

*In re Lehman Bros. Sec. & Erisa Litig.*,
131 F. Supp. 3d 241 (S.D.N.Y. 2015) ..............................................................21

*Leventhal v. Chegg, Inc.*,
2024 WL 3447516 (N.D. Cal. July 17, 2024) ..............................................16, 17

*McCabe v. Ernst & Young, LLP*,
494 F.3d 418 (3d Cir. 2007) ..............................................................11, 13

*In re Merck & Co. Sec., Derivs. & "ERISA" Litig.*,
2011 WL 3444199 (D.N.J. Aug. 8, 2011) ..........................................................13

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ..............................................................19

*Phillips v. Cnty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008) ..............................................................11

*In re RenovaCare, Inc. Sec. Litig.*,
2024 WL 2815034 (D.N.J. June 3, 2024)..........................................................2, 21

*Revell v. Port Auth. of N.Y. & N.J.*,
598 F.3d 128 (3d Cir. 2010) ..............................................................10

*River Cross Land Co., LLC v. Seminole Cnty.*,
2019 WL 12518728 (M.D. Fla. Aug. 21, 2019)..................................................18

*Rocks v. City of Phila.*,
868 F.2d 644 (3d Cir. 1989) ..............................................................10

iii

*Ruggiero v. Mount Nittany Med. Ctr.*,
  736 F. App'x 35 (3d Cir. 2018) ...............................................................12

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
  732 F. Supp. 3d 300 (S.D.N.Y. 2024) .......................................................3, 20

*In re Splunk Inc. Sec. Litig.*,
  592 F. Supp. 3d 919 (N.D. Cal. 2022)........................................................15

*In re Toyota Motor Corp. Sec. Litig.*,
  2012 WL 3764903 (C.D. Cal. Feb. 21, 2012) ..................................................19

*Utesch v. Lannett Co. Inc.*,
  385 F. Supp. 3d 408 (E.D. Pa. 2019)..........................................................12

*Vanderhoef v. China Auto Logistics Inc.*,
  2021 WL 3260849 (D.N.J. July 30, 2021) ....................................................17, 18

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011) ..........................................................20

*In re Wilmington Tr. Sec. Litig.*,
  29 F. Supp. 3d 432 (D. Del. 2014)..............................................................18

*Wu v. GSX Techedu Inc.*,
  738 F. Supp. 3d 527 (D.N.J. 2024)..............................................................3

## STATUTES AND RULES

15 U.S.C. §78u-4..............................................................................11

Fed. R. Civ. P. 8(a).........................................................................2, 12, 15

Fed. R. Civ. P. 9(b) .........................................................................11, 12

Fed. R. Civ. P. 12(b)(6).....................................................................10, 19

Fed. R. Civ. P. 12(c).......................................................................1, 10, 12, 19

Fed. R. Civ. P. 15 ............................................................................22

\*\*\*

iv

**Note on Citation Format**: Unless otherwise noted: (i) all capitalized terms have the same meanings ascribed to them in the Amended Consolidated Complaint, ECF No. 61 ("Complaint"); (ii) all references to "¶__" are to paragraphs in the Complaint; (iii) all references to "DX" are to the exhibits to the Declaration of Edmund Polubinski filed with Defendants' Motion for Partial Judgment on the Pleadings, ECF No. 84-2; (iv) all references to "PX" are to the exhibits to the Declaration of James A. Harrod filed with Plaintiffs' Opposition to Defendants' Motion for Partial Judgement on the Pleadings; and (v) all emphasis is added and internal quotations and citations are omitted unless otherwise indicated.

Lead Plaintiffs Genesee County Employees' Retirement System, Kranot Hishtalmut Le Morim Tichoniim Havera Menahelet LTD, Kranot Hishtalmut Le Morim Ve Gananot Havera Menahelet LTD, and Hachshara Insurance Company Ltd. (together, "Lead Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' Motion for Partial Judgment on the Pleadings (ECF No. 84-1, the "Motion" or "Mot.").

## I.    INTRODUCTION

After two motions to dismiss totaling over 380 pages of briefing and more than four hours of oral argument, the Court sustained five false and misleading statements made by Defendants and allowed this case to proceed into discovery. Now, more than three-and-a-half years after the filing of the initial complaint, Defendants for the first time challenge loss causation as to a ***single*** misstatement concerning the mandatory nature and length of service contracts under Federal Rule of Civil Procedure 12(c). Defendants' arguments are wrong as the Complaint adequately pleads loss causation as to that statement. Moreover, given that discovery will proceed regardless of the outcome of Defendants' Motion, rather than requiring the Court to render a ***third ruling*** on the pleadings, these issues should be decided at a later stage based on a more developed factual record. This approach is consistent with the "fact-intensive" nature of loss causation, which disfavors resolution at the pleading stage.

That is especially true when the substance of the Motion is considered in light of the low burden imposed by the applicable pleading standard for loss causation. The Motion must be denied because the Complaint more than adequately pleads loss causation by providing "some indication of the loss and the causal connection that the plaintiff has in mind." *See, e.g.*, *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2015 WL 4469143, at *10 n. 6 (D.N.J. July 22, 2015) (Arleo, J.) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). Plaintiffs allege that Kornit's revenue declined at the end of the Class Period in July 2022, which can be linked to the fact that expected revenue from the purported "multiple year" service contracts did not materialize. In 2022, Kornit's "attach rate" for service contracts—reflecting the percentage of Kornit printers that had an active service contract—declined markedly. Defendants concealed that customers whose single year service contracts expired were frequently not renewed, and that therefore, the overall percentage of customers who operated Kornit printers and had active service contracts fell. That declining attach rate would ultimately be reflected by an associated revenue decline—as customers who did not renew service contracts did not generate service revenue for Kornit. The decline in revenue reported in July 2022 thus was a manifestation of (part of) the truth—that the service contracts were not for "multiple years."

2

These allegations easily meet the lenient Rule 8(a) standard consistently applied in this District, under which "generalized allegations" suffice to plead causation. *See In re RenovaCare, Inc. Sec. Litig.*, 2024 WL 2815034, at *26 (D.N.J. June 3, 2024) (collecting cases); ¶¶182-198.

And this would still be true even if the Court were to adopt Defendants' contrived and overly rigid articulation of the loss causation pleading requirements, which is at odds with the Third Circuit's pragmatic approach. As described above, Defendant Samuel's misstatement concerning the length and mandatory nature of service contracts proximately caused Plaintiffs' losses when Defendants experienced a significant decline in service contract attach rates and a subsequent decline in service revenues. *See, e.g.*, *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 324 (S.D.N.Y. 2024) (collecting authorities and holding that "it will often be difficult for a plaintiff to prove that disappointing earnings were caused by the materialization of the risk concealed by the fraudulent statement. But so long as the plaintiff's theory of causation is plausible, that difficulty doesn't justify dismissal").

While Defendants purport that their "targeted motion" is intended to promote efficiency, Mot. 1, having conceded the causal connection between the four other misstatements and Kornit's stock price declines in May and July of 2022 at this stage of the litigation, the most efficient course is to allow Plaintiffs to prove their

3

causation theories through discovery. Indeed, because Plaintiffs are required to disaggregate between damages caused by the alleged fraud as opposed to non-fraud causes, the bulk of the discovery about which Defendants complain will be required *regardless* of the outcome of the Motion. *See, e.g., Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527, 569 n. 47 (D.N.J. 2024) (declining to consider "irrelevant" causation arguments attacking specific misstatements where causation established for other categories of misstatements).

Defendants' Motion should be denied.

## II.   STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.   Defendant Samuel Misrepresents The Length, Mandatory Nature, And Quality Of Recurring Revenues From Service Contracts

Kornit develops and sells printers, ink, and associated services designed to let the Company's customers print directly onto fabrics and finished garments. ¶29. Kornit also sells maintenance and support contracts purportedly designed to ensure that its customers' machines are fixed quickly to avoid down-time (¶33), which the Company claims "will ultimately . . . increase system utilization and the number of impressions printed" (DX 2 at 46), thereby generating more revenue for the Company.

At the start of the Class Period, Defendant Samuel misled investors about the sustainability and quality of revenues from the Company's service contract business. Specifically, on February 16, 2021, Kornit released its quarterly results for the fourth

4

quarter of 2020, filed with the SEC on Form 6-K, disclosing that the Company had achieved a year-over-year increase in service revenue of 70%, totaling $10.9 million in the fourth quarter of 2020. ¶92. As part of this initiative, Defendant Samuel asserted during Kornit's earnings call that day that Kornit customers were obligated to purchase a ***multi-year*** service contract with each printer, and that there was ***no other way*** to purchase a Kornit printer. *Id.* Elaborating on the connection between the purportedly mandatory two-year service contracts and Kornit's service revenues, Defendant Samuel stated: "we see a very nice recurring revenue coming from the service business." ¶205.

Echoing Defendant Samuel's misstatement, analysts from Needham noted the impressive growth in service revenue, which they understood "benefit[ed] from strong service-contract attach rates." ¶92. Lending further credence to Needham's assessment, on March 25, 2021, Kornit stated in its annual report that approximately 75% of the Company's installed base had service contracts. DX 1 at 46. This represented a massive increase from the previously reported attach rate of just 32% as of December 31, 2019. Thus, at the start of the Class Period, investors perceived the significant increase in service contract attach rates and the resulting revenues as sustainable.

In truth, Defendant Samuel's representations about the mandatory nature and length of Kornit's service contracts, and the "very nice recurring revenue" stream

5

generated through the sale of those contracts, were false. Former Kornit employees confirm that there was never a requirement that customers purchase a two-year service contract when buying a printer (¶¶92-96) and that "a lot of customers would cancel the service contract *as soon as the six-month warranty was up*." ¶76. According to FE1, that happened quite a bit, and getting customers to renew service contracts was a "very tough sell," with only about "*twenty percent renewed contracts*." *Id.*

**B.   Defendants' Service Contract Misstatements Caused Investor Losses**

Defendant Samuel's misrepresentations concerning the length of service contracts contributed to the losses suffered by Kornit investors when they learned that the purportedly "very nice recurring revenue" generated through mandatory two-year service contracts was an illusion. ¶205. Kornit experienced a decline in the number of printers that had active service contracts in 2022. This is what the Company referred to as the "attach rate." At the beginning of the Class Period, Kornit stated that the "attach rate" for service contracts was 75%. DX 1 at 46. But that figure later declined significantly, and on March 30, 2022, Kornit disclosed that the attach rate for service contracts had fallen to 43%. DX 2 at 54. While the disclosure suggested that the proportion of active systems in use to service contracts had dropped off, it was not explicit that this was because the *single year* service contracts sold with printer systems in 2020 and 2021 had expired. However, the

6

Complaint's allegations that the length of Kornit's service contracts was misstated cannot be revisited on this Motion. The disclosure of lower attach rates is consistent with the falsity of the sustained false statement concerning service contract length—those contracts were shorter in duration than represented and not being renewed. Kornit's opaque reporting of service revenues, as well as the unknown timing of contract expiration, made any meaningful assessment of contract length and their mandatory nature impossible to ascertain until it became manifest in the later-disclosed revenue decline.

On July 5, 2022, after the market closed, Kornit stunned investors by announcing disappointing *preliminary* financial results for the second quarter of 2022. ¶194. This disclosure began to clarify the impact of declining service revenue caused by the illusion of "multi-year" service contracts. In its earnings release, the Company disclosed that it expected revenue for the second quarter to be in the range of $56.4 million to $59.4 million, a dramatic reduction of more than 35% at the midpoint from earlier guidance. *Id.* Furthermore, Kornit cryptically told investors that it expected results for the third quarter of 2022 to be "at or above" second quarter levels, which also implied a substantial decrease to consensus expectations. *Id.* Kornit did not break out or detail service revenues specifically in the July 5, 2022 press release, nor did it specifically quantify the underlying sources of the revenue decline. *See* ¶¶194-98; DX 10.

7

Analysts were astonished, given Defendants' previous statements. ¶195. For example, analysts at Craig-Hallum downgraded Kornit to "hold," remarked on the "surprisingly weak results," and expressed that "visibility has become increasingly challenged" given the "sizeable revenue and profitability miss." *Id.* Analysts at Berenberg Capital Markets stated that the "other shoe drops" as the July 5 disclosure "shows sobering results." *Id.* Analysts also immediately called management's candor into question. Berenberg Capital Markets stated: "we believe management regaining the trust of the investment community will prove to be a long and winding road." ¶196. Other analysts were particularly puzzled by "the delta between [second quarter] results and expectations given management's generally bullish tone" "both pre-1Q (with 2Q guide missing consensus on revenues) and post-1Q (with management pointing to recovery in 2H)." *Id.*

As a result of these disclosures, the price of Kornit ordinary shares declined by $8.10 per share, or 25.7%. ¶198. This decline wiped out approximately $402 million in Kornit's market capitalization. *Id.*

Subsequent disclosures by Kornit confirm that the disastrous results pre-announced on July 5, 2022, were materially impacted by underperformance in the service department. Specifically, on August 10, 2022, Kornit reported that for the second quarter of 2022, the service department revenues declined to $10.5 million from $10.8 million in the prior quarter and that the service department was now

8

operating at a loss. *Compare* DX 11 at 6 and PX 1 at 6. This decline was mitigated by the robust printer sales in 2021, which would still have active service contracts for one full year.

### C. The Litigation And The Court's Partial Denial Of Defendants' Motion To Dismiss

On September 4, 2025, more than three-and-a-half years after the filing of the initial complaint in this matter and after over 380 pages of briefing and oral argument on successive motions to dismiss, the Court denied in part Defendants' motion to dismiss (ECF No. 74), allowing the action to proceed into discovery.

As relevant here, in briefing and during oral argument on the two motions to dismiss, Defendants strenuously argued that the service contract misstatements were immaterial given contemporaneous and purportedly curative disclosures in the Company's annual filings with the SEC. *See, e.g.*, PX 2 at 9:1-5; 11:1-16. The Court heard, considered, and explicitly rejected these arguments, holding, "I'm satisfied that this statement meets the standard. It's false. ***It's not saved by the SEC filing***. It is plain English, it's a misstatement, and it is actionable." PX 2 at 15:10-13.

Defendants claim that the Court dismissed other alleged service misstatements concerning "strong growth" in the service department and Kornit's ability to provide good customer service on the grounds that the service department was increasing in profitability throughout the Class Period. Mot. 9. This factual predicate is inaccurate. In truth, service department margins declined to breakeven in the first quarter of

9

2022 (DX 11 at 6), and turned negative in the second quarter of 2022 (PX 1 at 6), coinciding with the alleged loss-causing events.

On December 4, 2025, Defendants filed this Motion. ECF No. 84. Therein, Defendants improperly rehash the same materiality challenge explicitly rejected by the Court. *See, e.g.,* Motion at 18 n.7; PX 2 at 15:10-13. Defendants' motion, despite two prior opportunities to do so, now mounts a loss causation challenge to Plaintiffs' already-sustained claim concerning service contracts and related revenues.

## III.    ARGUMENT

Defendants seek partial judgment on the pleadings under Rule 12(c) as to their service contract misstatement, arguing that the Complaint fails to allege loss causation as to those misstatements. A Rule 12(c) motion "based on the defense that the plaintiff has failed to state a claim is analyzed under the same standards that apply to a Rule 12(b)(6) motion." *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010). As such, a court must accept as true all reasonable inferences that may be drawn from the allegations and view those facts and inferences in the light most favorable to the non-moving party. *Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989). A court must deny a Rule 12(c) motion if "a complaint [] contain[s] sufficient factual matter, accepted as true, [that] 'state[s] a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when

10

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Dismissal is inappropriate even if "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

Defendants do not challenge any element of Plaintiffs' claims that is subject to the heightened pleading standards set forth in Rule 9(b) or the PSLRA. Thus, the Court need not consider the particularity of the Complaint's allegations, any competing inferences that Defendants seek to draw from the Complaint, or materials attached to Defendants' request for judicial notice. *See, e.g., EP Medsys., Inc. v. EchoCath, Inc.*, 235 F.3d 865, 885 (3d Cir. 2000). Defendants' request for judicial notice (ECF No. 84-2), is "inappropriate . . . at this juncture" because they "attempt to rely on [their exhibits] to create a defense to the Complaint's otherwise well-pled allegations, and suggest that th[e] Court should assume the factual assertions in those documents to be true." *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *10 (D.N.J. Dec. 27, 2019).

### A.   The Complaint Adequately Alleges Loss Causation For The Service Contract Misstatements

Loss causation refers to the "causal connection between the material misrepresentation and the loss [suffered]." *Dura Pharms.*, 544 U.S. at 342. Loss causation is a "highly factual" inquiry that requires expert testimony to resolve and

11

"frequently preclud[es] judgment on the pleadings." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 427 n.4 (3d Cir. 2007); *see also EP Medsys.,* 235 F.3d at 884 (reversing dismissal because loss causation was improperly assessed at pleading stage); *Howard v. Arconic Inc.,* 2021 WL 2561895, at *17 (W.D. Pa. June 23, 2021) (stating that "loss causation is a fact intensive inquiry which is best resolved by the trier of fact."). Pleading loss causation is "not meant to impose a great burden upon a plaintiff." *Dura Pharms.*, 544 U.S. at 346-47. Rather, a complaint need only provide a "short and plain" statement to give "some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* If the inference of a causal connection is at least plausible, then the Court should deny a Rule 12(c) motion. *See, e.g., Ruggiero v. Mount Nittany Med. Ctr.*, 736 F. App'x 35, 41 (3d Cir. 2018) (complaint that raised "plausible inferences" is "sufficient").

Courts in this Circuit, including this Court, have "consistently analyzed loss causation under Rule 8(a), rather than the more stringent requirements of Rule 9(b)," *Hall*, 2019 WL 7207491, at *27 (collecting cases); *Curran v. Freshpet, Inc.*, 2018 WL 394878, at *6 (D.N.J. Jan. 12, 2018) (Arleo, J.). Defendants cite no Third Circuit authority to the contrary. *See* Motion at 13 n.5. Consistent with this liberal pleading standard, the Third Circuit has adopted "a practical approach [to loss causation], in effect applying general causation principles." *Arconic Inc.*, 2021 WL 2561895, at *17. A plaintiff pleads loss causation by alleging a "sufficient causal nexus between

12

the loss and the alleged misrepresentation." *Utesch v. Lannett Co. Inc.*, 385 F. Supp. 3d 408, 424 (E.D. Pa. 2019) (quoting *EP Medsys.*, 235 F.3d at 883); *see also McCabe*, 494 F.3d at 430 (quoting *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981), *aff'd in part and rev'd in part on other grounds,* 459 U.S. 325 (1983)) ("the misrepresentation" need only "**touch[] upon** the reasons for the investment's decline in value").

Courts in this Circuit have recognized that "*Dura* did not impose any rigid form on the nature of a corrective disclosure but rather allowed a pragmatic approach to loss causation." *In re Merck & Co. Sec., Derivs. & "ERISA" Litig.*, 2011 WL 3444199, at \*30-31 (D.N.J. Aug. 8, 2011). "*Dura* [also] did not address what type of events or disclosures may reveal the truth. . . . Nor did *Dura* explain how specific such disclosure must be." *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828 (D.N.J. 2006). A plaintiff thus may plead loss causation "through a series of disclosing events," *id.*, or "**indirect[ly] through disclosure of another event**," *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at \*6 (E.D. Pa. Sept. 3, 2010), **even if they are not "the 'mirror image' of the alleged fraud,"** *Merck*, 2011 WL 3444199, at \*32. Plaintiff easily meets this standard here.

Plaintiffs adequately allege a corrective event that touched upon the relevant truth concealed by Defendant Samuel's misrepresentation concerning the "very nice recurring revenue" generated through purportedly mandatory two-year service

13

contracts. Specifically, as customers rejected renewal of service contracts that were expiring after one year (not two or more), Kornit's service contract attach rates declined to 43 percent, from the 75 percent attach rate disclosed at the beginning of the Class Period. Then on July 5, 2022, Kornit stunned investors by announcing disappointing ***preliminary*** financial results for the second quarter of 2022. In its earnings release, the Company disclosed that it expected revenue for the second quarter to be in the range of $56.4 million to $59.4 million, a dramatic reduction from prior guidance. ¶194; *see also supra* §II.B.

Analysts were astonished, noted the "surprisingly weak results," and expressed that "visibility has become increasingly challenged" given the "sizeable revenue and profitability miss." ¶195. Analysts also immediately called management's candor into question. ¶196.

Subsequent disclosures by Kornit confirm that the disastrous results pre-announced on July 5, 2022, were materially impacted by underperformance in the service department. Specifically, on August 10, 2022, Kornit reported that for the second quarter of 2022, the service department revenues shrunk, and the service department was now operating at a loss, a testament to the revenue impact of declining attach rates as customers' single year service contracts were not renewed. This was a function, at least in part, of the lower attach rates, the financial impact of which was revealed to investors when Kornit's revenue declined. PX 1 at 6.

14

As plaintiffs here need only give "some indication of the loss and the causal connection that the plaintiff has in mind" to establish loss causation, *Hertz*, 2015 WL 4469143, at *10 n. 6, these allegations easily plead loss causation under Rule 8(a). *See In re Gilead Sec. Litig.*, 536 F.3d 1049, 1054 (9th Cir. 2008) (loss causation alleged where investors did not know "impact of the off-label marketing and the [FDA] Warning Letter [until] Gilead issued a press release detailing third quarter financial results"); *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 502 (W.D. Pa. 2020) (loss causation alleged where stock fell 13% following disclosure of negative financial results that "tend[ed] to contradict EQT's statements"); *Chabot v. Walgreens Boots All., Inc.*, 2023 WL 2908827, at *20 (M.D. Pa. Mar. 31, 2023) (crediting expert testimony supporting loss causation which explained that "concealment can lead to damages, either by, of course, the company admitting the truth, but more commonly it is revealed when ***the consequences of the alleged truth are revealed***"); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005) (allegation of stock price decline "after defendants began to reveal figures showing the company's true financial condition" sufficient to allege loss causation).[1]

---

[1] *See also In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 951 (N.D. Cal. 2022) (holding that the complaint "raise[d] [a] reasonable inference that" material omitted information was "a significant cause of the earnings miss" that led to a stock price decline); *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 199 (2d Cir. 2003) (noting that, to establish loss causation, securities fraud plaintiffs must "demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered").

15

**B.      Defendants' Loss Causation Arguments Should Be Rejected**

In support of their Motion, Defendants make two unavailing arguments. First, Defendants argue that the July 2022 disclosures did not "expose" the true length and attach rate of Kornit's service contracts, and is therefore not corrective of Defendants' prior misrepresentations. Mot. 13-17. Second, Defendants contend that Plaintiffs have not adequately alleged loss causation under a materialization of the risk theory because Plaintiffs did not identify the particular risks concealed and because Kornit otherwise provided "meaningful" risk disclosures about its service department. Mot. 18-21. Neither of these arguments passes muster.

**1.      The Disclosure Need Not Perfectly Mirror Defendants' Service Contract Misrepresentations**

Defendants contend that because the disclosures said "nothing at all" about service contracts, there is no plausible inference that they revealed anything about Mr. Samuel's "prior misrepresentation" on that topic. Mot. 14-15. Not so. The disclosures clearly "touch upon" the service department and the revenues generated by that department, *see supra* §II.B, and thus "give [Defendants] some indication of the loss and the causal connection that the plaintiff has in mind." *Hertz*, 2015 WL 4469143, at *10 n. 6. That is sufficient to allege loss causation. *See, e.g.*, *Leventhal v. Chegg, Inc.*, 2024 WL 3447516, at *3 (N.D. Cal. July 17, 2024) (causation adequately alleged where defendant corporation "issued revenue guidance providing

16

a more accurate impression of its business" despite lack of explicit correction of alleged misstatements).

Without any factual basis from the ***pleadings***, Defendants contend that the July 2022 disclosure "did not touch on Kornit's service business at all" and that Kornit otherwise attributed reduced guidance to slower system orders. Mot. 15. This argument ignores Defendants' subsequent disclosure confirming that the revenue miss announced in July 2022 was caused, in part, by a ***decrease*** in service department revenues, and otherwise strengthens Plaintiffs' causation allegations. *See Chegg*, 2024 WL 3447516, at *3 (statements echoed by analysts "attributing lowered guidance [to] a return to in-person learning where cheating on Chegg was less feasible simply strengthened plaintiffs' allegations of a connection between defendants' prior misstatements and the inflated growth of Chegg's stock price"). Defendants' authorities (Mot. at 16), which unlike here failed to connect the disclosure of negative financial information to the alleged fraud, are inapposite.

To the extent Defendants otherwise argue that loss causation requires a mirror image corrective disclosure or a "revelation" of the fraud, that is not the law. Instead, a corrective disclosure need only "relate back to the misrepresentation"; it need not "precisely mirror" it. *Vanderhoef v. China Auto Logistics Inc.*, 2021 WL 3260849, at *5 (D.N.J. July 30, 2021). "Neither a single complete disclosure nor a fact-for-fact disclosure of the relevant truth to the market is a necessary prerequisite to

17

establishing loss causation. Instead, a plaintiff need only allege that the market was able to 'infer' from the corrective disclosure that the misrepresentation at issue had occurred. Further, evidence of such a market inference can be found where a company's stock price drops 'precipitously' following a corrective disclosure." *Id.*

Moreover, questions of loss causation are notoriously fact intensive and should be developed in discovery. *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 450 (D. Del. 2014) ("Third Circuit precedent instructs that loss causation is a fact intensive inquiry which is best resolved by the trier of fact.") (citing *EP Medsys.*, 235 F.3d at 884). Plaintiffs are seeking discovery concerning the underlying reasons for the decline in revenue. At the pleading stage these allegations easily suffice, but Plaintiffs should be allowed the opportunity to establish that the corrective disclosure—a material decline in revenue—was connected to the lack of service revenue from contracts that were expected to be for multiple years, but were only for one year and were not being renewed. Finally, in a footnote, Mot. at 18 n.7, Defendants inappropriately rehash the same arguments they advanced on the motion to dismiss concerning the materiality of the service contract misstatement, which the Court expressly rejected. *See In re Insulin Pricing Litig.*, 2025 WL 2573410, at *5 (D.N.J. Sept. 5, 2025) (rejecting attempt to relitigate issue decided on motion to dismiss in a 12(c) motion); *River Cross Land Co., LLC v. Seminole Cnty.*, 2019 WL 12518728, at *4 (M.D. Fla. Aug. 21, 2019) ("Judicial economy would indeed be

18

undermined by allowing parties to revisit the issues they explicitly raised or necessarily should have addressed in a previous Rule 12(b)(6) motion."); *In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3764903, at *1 (C.D. Cal. Feb. 21, 2012) ("Judicial economy would be undermined by allowing parties an unlimited right to revisit issues raised in Rule 12(b) (6) motions via Rule 12(c) motions."). Even if the Court were to consider the issue on the merits, which it should not, Defendants have advanced no new facts that warrant the Court overturning its holding that the conditional language in Kornit's annual report concerning the length and mandatory nature of service contracts did not suffice to correct the service contract misstatement. *See* PX 2 at 12:16-20 ("That does not - *that disclosure doesn't say that*. The disclosure says they *may* buy it. This says we see an income stream and it's for multiple year contracts. And that's the difference. ***This was not a fulsome disclosure***.").

### 2. Defendants' Boilerplate Risk Warnings Do Not Defeat Causation

Plaintiffs adequately allege that the July 2022 disclosures proximately caused Plaintiffs' losses. Defendants' attempt to categorize the disclosures as either "corrective disclosures" or a "materialization of the risk" (Mot. 19-21), is irrelevant to the ultimate question of whether Defendants' misstatements proximately caused Plaintiffs' losses. *See, e.g., Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) ("[L]oss causation is a context-dependent inquiry as

19

there are an infinite variety of ways for a tort to cause a loss. Because loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss.").

Here, Defendants misrepresented the length, mandatory nature, and quality of revenues generated from service contracts. Investors were harmed when Defendants reported a decline in revenue, which was plausibly *caused* by declining service contract revenue, as reflected in markedly decreased attach rates. Thus, the very risk concealed by Defendant Samuel's misstatement proximately caused Plaintiffs' losses. *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011) (To plead loss causation under the materialization of the risk method, a plaintiff must allege that new information has "come[] to light . . . that negatively affect stock price over time," even though the new information does not specifically "identify prior statements as misleading."); *Dentsply*, 732 F. Supp. 3d at 324 (collecting authorities and holding that "it will often be difficult for a plaintiff to prove that disappointing earnings were caused by the materialization of the risk concealed by the fraudulent statement. But so long as the plaintiff's theory of causation is plausible, that difficulty doesn't justify dismissal"). Because this is self-evident from the nature of the misstatement itself, Defendants' argument that the Complaint's causation arguments are "wholly conclusory" is meritless. Regardless,

20

even generalized causation allegations may suffice in this District to plead causation. *See RenovaCare*, 2024 WL 2815034, at \*26 (collecting cases); *see also* ¶¶182-198.

Defendants next attempt to argue that their purported warnings concerning the risks associated with the service business generally render the service contract misstatements immaterial. Mot. 20. As noted above, this argument impermissibly rehashes the same failed arguments advanced in Defendants' motion to dismiss, which the Court explicitly rejected. *See supra* at §III.B.1; PX 2 at 12:16-20 ("***[T]hat disclosure doesn't say that*** . . . . ***This was not a fulsome disclosure***."). Therefore, Defendants' contention and cited authorities establishing that a failure to plead loss causation where the relevant risk was "amply disclosed" are inapposite.

Last, Defendants argue that there is no plausible basis on which to allege that the financial results announced in July 2022 had anything to do with service contracts or, indeed, any aspect of the service portion of Kornit's business." Mot. 20-21. This argument fails for the reasons discussed above, and because the decline in Kornit's revenues announced during the July disclosure was caused by plummeting attach rates, which unequivocally "touch upon" the service contract misrepresentations.[2] *See, e.g.*, *In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp.

---

[2] In furtherance of this argument, Defendants mischaracterize the Court's holding concerning the "impact" of **service failures** on Kornit's business as applying with equal force to the **service contract** misstatements. *See* Mot. at 21 (citing PX 2 16:11–16; 20:13–21). But that is not what the Court held, nor does it logically follow from the Court's dismissal of the service failure misstatements.

21

3d 241, 264 (S.D.N.Y. 2015) ("the relationship between the 'concealed risk' and the consequences of its 'materialization' need not be one-to-one.").

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for judgment on the pleadings should be denied in its entirety. If the Court grants Defendants' motion, Plaintiffs request leave to amend the Complaint pursuant to Fed. R. Civ. P. 15 as this is the first time Defendants have challenged the element of loss causation.

Dated: December 22, 2025

Respectfully submitted,

By: */s/ James E. Cecchi*
James E. Cecchi
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & ANGELLO, P.C.**
Kevin G. Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs*
*Genesee County Employees' Retirement*
*System, Kranot Hishtalmut Le Morin*
*Tichoniim Havera Menahelet LTD, Kranot*
*Hishtalmut Le Morim Ve Gananot Havera*
*Menahelet LTD, and Hachshara Insurance*
*Company Ltd.*

23

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
Hannah Ross *(*admitted *pro hac vice)*
Avi Josefson *(*admitted *pro hac vice)*
James A. Harrod *(*admitted *pro hac vice)*
Alec T. Coquin *(*admitted *pro hac vice)*
Mathews R. de Carvalho *(*admitted *pro hac vice)*
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
avi@blbglaw.com
jim.harrod@blbglaw.com
alec.coquin@blbglaw.com
mathews.decarvalho@blbglaw.com

*Lead Counsel for Lead Plaintiffs*

Thomas C. Michaud
Francis E. Judd
**VMT Law, P.C.**
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
tmichaud@vmtlaw.com
fjudd@vmtlaw.com

*Additional Counsel for Lead Plaintiff
Genesee County Employees' Retirement
System*

24

## <u>CERTIFICATE OF SERVICE</u>

I, James E. Cecchi, hereby certify that on December 22, 2025, I caused a true and correct copy of Plaintiffs' Memorandum of Law in Opposition to Defendants' Partial Motion for Judgment on the Pleadings to be filed electronically with the Clerk of the Court using the ECF system. Notice of this filing will be sent to counsel of record through the Court's electronic filing system. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: December 22, 2025          **CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & ANGELLO, P.C.**

*/s/ James E. Cecchi*
James E. Cecchi