# Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____

In Re KORNIT DIGITAL LTD.
SECURITIES LITIGATION,                    CIVIL ACTION NUMBER:

                                              2:23-cv-00888

                                              ORAL ARGUMENT
_____

MARTIN LUTHER KING BUILDING & U.S. COURTHOUSE
50 Walnut Street
Newark, New Jersey  07101
September 4, 2025
Commencing at 1:07 p.m.


**B E F O R E:       THE HONORABLE MADELINE COX ARLEO,**
**                   UNITED STATES DISTRICT JUDGE**


A P P E A R A N C E S:

CARELLA BYRNE CECCHI BRODY & AGNELLO, PC
BY:  KEVIN COOPER, ESQUIRE
5 Becker Farm Road
Roseland, New Jersey 07068
For the Movant Institutional Investors Group and Plaintiffs

BERNSTEIN LITOWITZ BERGER & GROSSMANN, LLP
BY:  JAMES A. HARROD, ESQUIRE
     MATTHEWS R. de CARVALHO, ESQUIRE
     ALEC COQUIN, ESQUIRE
1251 6th Avenue
New York, New York 10020
For the Plaintiff


                Diane DiTizii, Official Court Reporter
                         973-776-7738
                 diane_ditizii@njd.uscourts.gov

Proceedings recorded by mechanical stenography; transcript
          produced by computer-aided transcription.

A P P E A R A N C E S: (CONTINUED)

COHEN MILSTEIN SELLERS & TOLL, PLLC
BY: JULIE G. REISER, ESQUIRE
Wall Street Plaza
88 Pine Street, 14th Floor
New York, New York 10005
For the Plaintiff Indiana Police Retirement System


GIBBONS, P.C.
BY: SAMUEL I. PORTNOY, ESQUIRE
One Gateway Center,
Newark, New Jersey 07102
For the Kornit Defendants


DAVIS POLK & WARDWELL, LLP
BY: EDMUND POLUBINSKI, ESQUIRE
      DANA M. SESHENS, ESQUIRE
450 Lexington Avenue
New York, New York 10017
For the Kornit Defendants


O'MELVENY & MYERS, LLP
BY: WILLIAM J. SUSHON ESQUIRE
      RYAN J. FENNELL, ESQUIRE
1301 Avenue of the Americas, Suite 1700
New York, New York 10019-6022
For the Underwriter Defendants


A L S O   P R E S E N T:

CARELLA BYRNE CECCHI BRODY & AGNELLO, PC
ARYANA DEHGHAN, Law Clerk
MATTHEW WHIPPLE, Law Clerk

INDEX

| TOPIC | PAGE |
|---|---|
| Service Contract Attach Rates | |
| The Court | 7 |
| Mr. Polubinski | 8 |
| Mr. Harrod | 13 |
| Ruling | 15 |
| | |
| Service Profitability | |
| The Court | 15 |
| Mr. Harrod | 17 |
| Mr. Polubinski | 19 |
| Ruling | 20 |
| | |
| Sticker Mule Integration | |
| The Court | 21 |
| Mr. Harrod | 22 |
| Mr. Polubinski | 28 |
| Ruling | 28 |
| | |
| Q1 Revenue Pull-forward | |
| The Court | 29 |
| Mr. Polubinski | 31 |
| Mr. Harrod | 32 |
| Ruling | 33 |
| | |
| Competitive Moat Around Products | |
| The Court | 34 |
| Mr. Harrod | 37 |
| Mr. Polubinski | 42 |
| Ruling | 43 |
| | |
| Declining Demand | |
| | |
| Re: November 2021 and January 10, 2022 statements | |
| The Court | 43 |
| Mr. Harrod | 45 |
| Mr. Polubinski | 46 |
| Ruling | 47 |
| | |
| Re: February 15, 2022 statements | |
| The Court | 47 |
| Mr. Polubinski | 49 |
| Mr. Harrod | 51 |
| Ruling | 53 |

United States District Court
Newark, New Jersey

Re: May 2022 statements
     The Court                                    53
     Mr. Polubinski                               55
     Mr. Harrod                                   56
     Ruling                                       57

Re: June 2022 statements
     The Court                                    57
     Mr. Harrod                                58, 61
     Mr. Polubinski                               60
     Ruling                                       61

Revenue Growth
 Pre-2022 statements
     The Court                                    62
     Mr. Harrod                                   63
     Mr. Polubinski                               69
     Ruling                                       70

Post 2022 statements
     The Court                                    71
     Mr. Harrod                                   71
     Mr. Polubinski                               74
     Ruling                                       74

KornitX
     The Court                                    75
     Mr. Harrod                                   76
     Mr. Polubinski                               81
     Ruling                                       82

2026 financial projections
     The Court                                    82

Materialized Risk as Hypothetical
     The Court                                    83
     Mr. Polubinski                               84
     Mr. Harrod                                   86
     Ruling                                       87

Section 11 and 12(a)(2) Claims
     The Court                                    88
     Mr. Harrod                                   88
     Mr. Polubinski                               90
     Mr. Sushon                                   93
     Ruling                                       94

United States District Court
Newark, New Jersey

(Proceedings held via TEAMS before the Honorable Madeline Cox Arleo, United States District Court Judge at 1:07 p.m.)

THE COURT:  All right.  Good afternoon, everyone. This is Judge Arleo.

We're here for oral argument in In Re *Kornit Digital Securities Litigation*.

This is a Motion to Dismiss, second time filed, Second Amended Complaint.

Can I begin with appearances of counsel, please.

MR. COOPER:  Good afternoon, your Honor.  This is Kevin Cooper from Carella Byrne on behalf of the Plaintiffs. I'm joined by two of our law clerks here, Aryana Dehghan and Matthew Whipple.

My colleagues from Bernstein Litowitz will introduce themselves.

THE COURT:  Okay.

MR. HARROD:  Thank you.

Good afternoon, Jim Harrod from Bernstein Litowitz Berger & Grossman for the Plaintiffs.  I'm joined by my colleagues Alec Coquin and Matthew de Carvalho.

THE COURT:  Thank you.

MR. PORTNOY:  Good afternoon, your Honor.  Sam Portnoy for Gibbons for the Kornit Defendants, and with me also for the Kornit is Ted Polubinski from Davis Polk, and I believe he's joined by Dana Seshens from Davis Polk as well.

THE COURT:  All right.  Thank you.

MR. SUSHON:  Bill Sushon from O'Melveny & Myers for the Underwriter Defendants, and with me here in the conference room is my colleague Ryan Fennell.

THE COURT:  Thank you.

MR. SUSHON:  Thank you, your Honor.

THE COURT:  Okay.  I think we have everyone here.

So, again, this is a motion to Dismiss a Second Amended Class Action Complaint.  We had this last argument quite some time ago.  It was not -- I made rulings from the bench and granted Plaintiff's motion to file the Second Amended Complaint, which is now the subject of this Motion to Dismiss.

I'd like to go through today at the outset and I have grouped the statements for the 10(b)-5 claims in nine -- eight or nine broad category, nine broad categories of statements.  It was a little difficult for me to discern what new allegations were added because the whole complaint was restructured, and I can tell you at the outset we'll go through each of these subject matter claims and I'm inclined to let a few of them go forward but I'm not satisfied that the bulk of them meet the appropriate standard under 10b-5, 10(b) and we'll go through them and we can discuss them.

There may be one or two opportunities or possibilities that, depending on more fulsome descriptions from a former employee that there may be -- there may be room for

one additional amended complaint, but we'll talk about how I want that -- I don't want to just have another shot of restructuring and re-alleging a lot of claims that I'm fairly convinced are not actionable, they're puffery, they're opinions.  We'll go through them, but if we have a third iteration, I want it to be very focused.  But let's go through them subject matter by subject matter.

Let's talk about, the first one -- I'm going to say one other thing as some of my prefatory comments.  We have a Class Period of February 7th, 2021 until July 5th of 2022.  The comments that I find -- I'm inclined to find are most likely to allow to move forward are really contained in the first half of 2022.  It seems you have a very broad period beginning in early 2021 with the exception of one claim that we'll start with. The few comments that I'm going to allow to go forward, the few misstatements really are in the beginning of the 2022 frame.

But let me begin with the first statement and that is the statements surrounding the Service Contract Attach Rates. So let me put it in some context.

Early on in February of 2021 there was a conference call discussing 2020 Q40 and full year results.  In response to an analyst question concerning whether some of the attached rates are now for multiyear type of service agreements instead of single year contracts for which they need to get renewals, Samuel responds that every machine comes with a contract and

it's not for one year.  Quote, it's for multiple year contracts and we see a nice recurring revenue.

Plaintiff argued that the initial service contracts are for one year in length, not multiple years, after which customers could renew.  Defendants indicate that the initial contract was for one year; afterwards they could -- disclosures indicate that the initial contract was for one year, after which they could renew.  And FE1 indicates that 80 percent of customers declined to renew their contracts and though Kornit would occasionally sell a two-year contract, it was at a discount.

Let me hear from defendants on this one because I'm inclined to let this one go forward.

MR. POLUBINSKI:  Sure, your Honor.  Thanks so much.

I guess I'd say a couple of things about this.  In context, this equivocal and, frankly, I think confusing couple of sentences is not misleading.  As I read this one, I think that the most natural way to read it is that there's no way to buy a machine without a one-year contract and the multiyear renewals are generating -- are generating good recurring revenue.

In light of the confusing nature of this -- and again, putting it in context, this is a statement that's in answer to a single question by someone for whom English is not a first language.  In light of the confusing nature of the

statement, I think it's very important to consider the remainder of the context around this, including clear disclosures from the companies 20-Fs which were incorporated by refers and the 20-F that appeared only weeks later. And so I think in context, it's not misleading.

But the other point I would make, your Honor, is that in our last argument, we didn't focus on scienter at all. I think for this particular statement, any allegation of scienter here is unusually weak and the Plaintiffs had not alleged facts that give rise to a strong inference of scienter. And particularly, you're looking at this in the context of the *Tellabs* case and weighing competing inferences. I don't think there's any plausible way to deem that there's any inference here on Mr. Samuel's part to mislead.

Again, what we're talking about is a single equivocal answer to a sentence by someone, you know, again for whom English is not a first language. The opposite of the kind of conclusive answer that the Court was focused in the *Avaya* case -- the Third Circuit was focused on in the *Avaya* case. And even if you could assume the answer was clearly false, the fact that the accurate answer was concededly out there in the Company's annual filings, and then the Company would be repeating that accurate answer only weeks after Mr. Samuel delivered this statement, all that is totally inconsistent with any inference that he intended to mislead anybody.

United States District Court
Newark, New Jersey

I think the most plausible inference here, considerably more plausible than any inference of fraud is that he misspoke or that his answer just wasn't clear, or perhaps even that his understanding was wrong.  But it's very hard to discern any inference to mislead based on the equivocal answer here in light of the fact that the truth was readily available to anybody who printed out the annual report.

THE COURT:  Was that annual report from the prior year from 2020 where they disclosed that there was?

MR. POLUBINSKI:  Yes.

THE COURT:  Tell me what that disclosure said and the date of that disclosure.

MR. POLUBINSKI:  Sure.  Let's see.  I'm going to have to --

THE COURT:  Hold on.

MR. POLUBINSKI:  I'm sorry your Honor.  I need to take a minute.

THE COURT:  That's all right.  Take your time.  I'm looking, too.

MR. POLUBINSKI:  2019 20-F, your Honor, which is the one that would have been out there, is Exhibit 3, I believe.  And, again, we're trying to get you the page number on this.

THE COURT:  Page 43, I think.

MR. POLUBINSKI:  Thank you.  Sorry not to have it at my fingertips.

So the answer, which I think there's no dispute this is an accurate answer, is in the section here on Maintenance and Support.  And then the Company issued the exact same answer, again, not alleged to have been misleading in Exhibit 1, which is the 2020 annual report.  The date on that -- again, I don't have the exact date, but I think it was just, again, it was in March, the end of March of 2021.  So, again, we're talking about just a matter of weeks after Mr. Samuel's -- that Mr. Samuel made the statement.  Again, not conceded at all to be inaccurate and, in fact, this is where the accurate answer is pulled from.

So, again, what we've got here is a situation where the accurate answer is out there in the Company's public filings, and reissued, too.  If indeed Mr. Samuel's intent here was to mislead, it would make zero sense for him to sign off on a 20-F that disclosed a supposed --

THE COURT:  But here's the problem, the SEC disclosure is inconsistent with what his statement is, because all this says, you read this, they can renew.  They -- our customers can purchase an additional year's support at the time of purchase.  After the period, the customers can renew support by purchasing a support package that includes remote support, et cetera.

What he says here is we are selling them.  It's not per year, it's multiple year contracts and we see a very nice

recurring revenue.

So it's potentially misleading because someone hears that, they say yeah, the SEC says they may renew and this suggests that they do renew. It's for multiple year contracts and we see a very nice recurring revenue coming from the service business.

So you read that line, and I appreciate that English may not be Mr. Samuels's first language, but I'm going to read it in plain English because that's how an investor is going to understand it. There's no safe harbor for well, you know, he spoke imprecisely and it was just a mistake.

This is what he said: There's no other way to buy a machine and it's not for one year, it's for multiple year contracts and we see a nice recurring revenue coming from that income stream.

That does not -- that disclosure doesn't say that. The disclosure says they may buy it. This says we see an income stream and it's for multiple year contracts.

And that's the difference. This was not a fulsome disclosure. You could read this -- you could read that disclosure and say, yeah, but Samuel is telling us we're getting multiple year contracts and we see a very nice income stream from it. And that's what I'm struggling with.

Let me hear from Plaintiff's counsel.

MR. HARROD: Thank you, your Honor.

I agree with you.  I mean, I think there's only -- they're two different readings of what defense counsel just articulated.  One is that it's an admission that the statement was false.  So if the SEC filing is the correct disclosure, then it's an admission the statement was false.

I think the better reading is what your Honor just identified, which is that the statements sort of exist somewhat in parallel.  And I think the reason why the analyst asked this question is because the disclosure in the SEC filings is somewhat ambiguous, and they're touting -- the purpose of this statement is to tout to the market the increasing attach rate and revenue from service contracts.

The CEO of the company, who I don't think gets a pass because English is his second language, said something very emphatic and specific in service of showing that the service revenue increased.  He's saying we're going to have two-year contracts on every single machine.  His language is, I think, unequivocal and very specific and as, again, in service of showing the market that service revenue is going to increase.  That's the purpose of this statement.

So I think it's pretty clearly false.  I think it pretty clearly doesn't leave room.  I think it's also a hundred percent correct that if Kornit decided that they wanted to issue a correction to the statement, they could have.

They're -- you know, when you are on one of these

conference calls for an earnings release for a company, a public company, there are many other executives and management employees who participate who are listening who are on the phone at the same time, and certainly one of them could have slipped him a note, suggested that this was an incorrect statement themselves, or otherwise corrected it through a press release later.

None of that was done. So the idea that this was not an intended false statement is wrong.

I also think and we cite cases to the effect that this is effectively a truth on the market defense and it's really not appropriate to decide that question now because it's asking the Court in the vacuum of the pleadings to decide which of the statements that the Defendants have proffered are out in the market was more material, and that we have cases in our brief that say that that's inappropriate.

On the scienter point, we sent cases to this effect too. The CEO of the Company is making a highly explicit and specific statement about the nature of service contracts which is a key aspect of the Company's business by his own admission by making this statement. The statement is so specific that it has to assume either that he knew the contracts were not two years or multiple years or he was grossly reckless in making such a specific statement in light of the reality being other than what it was.

So there's other allegations in the Complaint that I think supports an answer on this statement but those are the ones I think are most critical.

MR. POLUBINSKI:  Your Honor --

THE COURT:  I'm letting it go forward.  I'm satisfied -- we have a lot of get through and I let you speak for ten minutes and we have probably a hundred statements to go through today.  So we're going to move this quickly and the record will speak for itself.

I'm satisfied that this statement meets the standard. It's false.  It's not saved by the SEC filing.  It is plain English, it's a misstatement, and it is actionable.  I'm going to move forward.

Let's move forward to Service Profitability.  I am not convinced that any of these statements are -- I'm going to put it right out there -- are actionable.

So let me put it in context:  In addition to selling printers, Kornit had service contracts with their customers to assist in the repair, maintenance, and upgrade of printers. Rozner and Samuel repeatedly touted during the Class Period that their profitability from the service sector was increasing, very strong growth, for example.  They expected it to continue to increase.  Leadership also noted that they were investing in the service department and generally spoke about Kornit's ability to serve its customers or provide

best-in-class customer service.

Many of Plaintiff's arguments are premised on the idea that Kornit was not providing good customer service; that these were -- there were constant complaints; there was refusal to buy additional equipment and even cancellations. That is the context about which these statements are alleged to be false or misleading.

So let me begin by one of the first points, and I'm going to lead you -- I'm going to refer you to sections, of the Second Amendment Complaint, 207, 210, 211, 212, 213 and 214.

The service department was increasing in profitability, so I don't see these statements as actually false or misleading. And that to the extent that they are forward-looking in part, they're accompanied by meaningful disclosures in the SEC filings. And that's a 2020 fiscal year report filed for 2021 and 2022.

I just want to set up the argument.

Second, it is not apparent that Kornit needed to disclose the issues with the service department to render the present statements not misleading.

The Company experienced significant growth throughout '21 and '20 and the service department had not caught up.

Plaintiff includes multiple former employee allegations concerning the state of the service department, but that allegation of, I think it's FE7 just isn't specific enough

to rise to the level of an actionable misrepresentation.

The allegations lack specifics like when the customers left, how significant the business was.  Printful and DTG2go said they wouldn't purchase more machines unless service improved.  While we could infer that those conversations took place in 2022, Quarter 1, it's not clear if FE7 received that information firsthand or from someone else, or if those threats were communicated to Defendants.

Other materials suggest there may have been different reasons that Printful and the DTG2go slowed down their purchases.  For example, Delta/Fanatics release mentioned nothing about services but indicated the move to M&R was related to different tech initiative and that they still use the Kornit printers.  And Printful allegedly told Kornit it was experiencing a slowdown with its own customers and that's why it did not purchase any more printers.

Those FE allegations I'm not satisfied provide enough context concerning the scale of the actual impact on sales and profits.

So those are some of my concerns.

I'll hear from Plaintiff's counsel.

MR. HARROD:  Thank you, your Honor.

I think of it as a totality of this.  They are portraying or attempting to portray the service department as a profit center for the Company.  They're talking about it as

United States District Court
Newark, New Jersey

18

being necessarily supportive of the sales of their printers to make sure that the customers have a good experience. I think in paragraph 208 we refer to best-in-class customer experience.

I think one of the key statements here is that they're investing in the service department. That's from August 10th of 2021. Very strong growth, growth not only in our systems and consumables business but also in our service organization.

I think, you know, they said on November 10th, 2021 -- this is paragraph 213 -- we're investing a lot in customer support.

So I understand your Honor's concern about the specificity of the allegations. That's something we talked about last year. I do think in light of the pleading standard, we've satisfied that with these statements which reflect overall a -- for example, in paragraph 62, FE5 said they needed thirty technicians; for the United States they had twenty.

FE12, who's added in this Complaint, indicates that at the time that he joined the company in the summer of 2021, the Company didn't even have a tracking system, a ticketing system for tracking customer service calls and complaints, which he flipped out about and discussed with the vice president of sales for America, Mr. Whaley, the chief operating officer, Mr. Dror. And he knew that Chuck Meyo, who is president of the Americas, knew about that too. That's in

United States District Court
Newark, New Jersey

paragraphs 81 through 84.

And the customer's complaint, he dealt with customers who complained all the time about service. And they, in fact, hired this fellow James Loomis to go on an apology tour of customers who are upset about the reliability and service issues.

So we think those allegations reflect a lack of investment, a lack of best-in-class service, which are actionable statements in light of the context in which the Company's trying to tell investors they're going to make money doing this and that they're going to provide good service which will enable customers to keep returning to them.

So I do appreciate -- I could say more but I think those are the main points that address your Honor's concerns as best I can.

THE COURT: Okay.

I'll hear from Defendants.

MR. POLUBINSKI: Your Honor, needless to say, we agree with your take on this.

THE COURT: I thought you would. I thought you would.

MR. POLUBINSKI: Yes. I think among other things, your Honor -- and I'll be very brief about this unless there's questions you have -- the Company did disclose very specifically that service revenue from services increasing

every year considerable amounts, and on this one I do have page numbers for you.  Pages 43 of Exhibit 3, page 46 of Exhibit 1 -- I think, actually, I misspoke.  I don't have a page number for Exhibit 2.

But the revenue increases every year, and the kind of statements we're talking about, things like best-in-class and appropriate are puffery in any event.

THE COURT:  This one isn't going forward for the reasons I've said earlier.  A lot of these high-level statements are just best-in-class, investments in service, ability to support customers.  That's puffery.  That's not actionable.

I want to add to what I said earlier, one other point.  Even if I were to accept FE's allegations as true, they really don't have enough context concerning the scale of the actual impact on Kornit sales and profits.  Saying what you just said, we should have more service people or more helpers, it doesn't really speak to scale.  To say it another way, the allegations do not support that the negative impacts on the service department were so imminent or inevitable to require disclosures to make them not misleading.

And further, Plaintiffs themselves allege that Kornit eventually started to make efforts to address the needs of its customers around January 2022, if not earlier.  This included hiring Jeff Loomis to fly around and meet with customers in

implementing a new charter to take care of customers better in early '22.

So evaluated in context, I am satisfied that the issues -- the alleged misstatements involving service profitability cannot go forward.

Let's talk about Sticker Mule Integration.  There's been a lot about Sticker Mule.

I'll put it in context that Samuel discussed a company Sticker Mule and how it had recently integrated a fleet of Kornit Atlas systems into their business.  Kornit was, quote, utilizing the growing customer base to support a strong DTG channel.

Plaintiffs are complaining that Sticker Mule was never able to get the printers to work correctly, leading to Sticker Mule selling them off.  The big beef here is with the word integrated.

I'm not inclined to find that this statement, the statements about Sticker Mule, were false and misleading.  There's not even a context here of how important the Sticker Mule business was even to Kornit in the sense of current and future sales, which raises questions about whether there was materiality adequately pled here.

But I'll hear first from Plaintiff's counsel on Sticker Mule integration.

MR. HARROD:  Okay.  Thank you, your Honor.